# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ARMINDA VALLES-HALL,** | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 1:06 CV 806 CKK |
| **CENTER FOR NONPROFIT ADVANCEMENT,** | ) | |
| Defendant | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Center for Nonprofit Advancement (the "Center"), by its attorneys,

moves for summary judgment and, as grounds therefor, states as follows:

1.  There is no genuine issue as to any material fact.

2.  The Center is entitled to judgment as a matter of law.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.

By ____/s/ Charles H. Fleischer_____
        Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel.: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

## REQUEST FOR HEARING

Defendant requests an opportunity to be heard on this motion.


/s/ Charles H. Fleischer
Charles H. Fleischer

# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARMINDA VALLES-HALL,** ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 1:06 CV 806 CKK |
| ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT,** ) | |
| ) | |
| Defendant ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

Table of Authorities                                                                iii

I.  Statement of the Case                                                             1

    A.  Nature of the Case                                             1

    B.  Procedural History                                             2

    C.  Summary of Facts                                               3

II.  Argument                                                                        10

    A.  Section 1981 Claims                                            11

        1.  Hall Suffered No Adverse Employment Action        12

            a.  The "Negative" Evaluation               12

            b.  Changes in Duties                       14

            c.  Threats Regarding Sick Leave            15

            d.  "Intolerable" Working Conditions        16

        2.  Hall Suffered No Discrimination                   17

            a.  No Direct Evidence of Discrimination     18

            b.  No Indirect Evidence of Discrimination   20

        3.  Hall Suffered No Retaliation                      23

    B.  State Law Discrimination and Retaliation Claims                27

    C.  State Law "Constructive Discharge" Claim                       29

D.  Common Law Negligence Claims                                        30

    1.  Hall Fails to State a Negligent Infliction Claim           30

    2.  Hall Fails to State a Negligent Supervision Claim          31

    3.  The Claims Are Barred by the Workers' Compensation Act     32

III.  Conclusion                                                        33

**TABLE OF AUTHORITIES**

Statutes

28 U.S.C. § 1331                                                                 3

28 U.S.C. § 1367                                                                 3

42 U.S.C. § 1981                                      2, 3, 10, 11, 12, 24, 28, 29

42 U.S.C. § 2000e, *et seq*. (Title VII)           11, 14, 16, 24, 25, 26, 27, 28

D.C. Code § 2-1401.01, *et seq*. (Human Rights Act)            11, 27, 28, 32

D.C. Code § 32-1501, *et seq*. (Workers' Compensation Act)              33

Cases

*Anderson v. Group Hosp., Inc*., 820 F.2d 465 (D.C.Cir. 1987)            11

\* *Boulton v. Institute of Int'l Edu*., 808 A.2d 499 (D.C. 2002)        28, 29, 33

\* *Broderick v. Donaldson*, 437 F.3d 1226 (D.C.Cir. 2006)             24, 25, 26

*Brown v. Argenbright Security, Inc*., 782 A.2d 752 (D.C. 2001)         31

\* *Brown v. Brody*, 199 F.3d 446 (D.C.Cir. 1999)                   13, 23, 25, 29

*Brown v. Snow*, 440 F.3d 1259 (11th Cir. 2006)                        14

*Bryant v. Aiken Regional Med. Centers, Inc*., 333 F.3d 536 (4th Cir. 2003)       24

*White v. Burlington Northern & Santa Fe Ry. Co.*, 364 F.3d 789
    (6th Cir. 2004), *cert. granted*, 126 S.Ct. 797 (2005)              25

*Canady v. Wal-Mart Stores, Inc*., 440 F.3d 1031 (8th Cir. 2006)        20

*Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997)                    32

\* *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001)        25, 26, 27

*Coghlan v. American Seafoods Co.*, 413 F.3d 1090 (9th Cir. 2005)                    18

*Contreras v. Suncast Corp.*, 237 F.3d 756 (7th Cir. 2001)                    27

*Doe v. Exxon Mobil Corp.*, 2006 WL 516744 (D.D.C. No. 01-1357,
    decided March 2, 2006)                    31

*Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793
    (D.C. 2003)                    29

*Grabovac v. Allstate Ins. Co.*, 426 F.3d 951 (8th Cir. 2005)                    23

*Hollins v. Federal Nat. Mtg. Ass'n*, 760 A.2d 563 (D.C. 2000)                    29

* *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180 (4th Cir. 2004)          16, 17, 30

*Hopkins v. Women's Div., General Bd. of Global Ministries*,
    284 F.Supp.2d 15 (D.D.C. 2003)                    11

*Howard Univ. v. Green,* 652 A.2d 41 (D.C. 1994)                    27

* *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004)          13

*Johal v. Little Lady Foods, Inc.*, 434 F.3d 943 (7th Cir. 2006)                    23

* *Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362 (D.C. 2003)          28, 29, 31, 33

*Larijani v. Georgetown Univ.*, 791 A.2d 41 (D.C. 2002)                    31

*Mastro v. Potomac Elec. Pwr. Co.*, __ F.3d __, 2006 WL 1359604
    (D.C.Cir. No. 05-7044, decided May 19, 2006)                    19, 29

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)          11, 17, 25, 28

*Murray v. Gilmore*, 406 F.3d 708 (D.C.Cir. 2005)                    18

*Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004)                    16

*Quick v. Wal-Mart Stores, Inc.,* 441 F.3d 606 (8th Cir. 2006)                    20, 27

*Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463 (5th Cir. 2002)                    11

-iv-

*Rand v. CF Indus.*, 42 F.3d 1139 (7th Cir. 1994)      18

*Rochon v. Gonzales*, 438 F.2d 1211 (D.C.Cir. 2006)      24, 25, 26

*Runyon v. McCrary*, 427 U.S. 160 (1976)      11

*Vitikacs v. American Legion*, 2003 WL 22004935 (D.C.Super.
     No. 02-CA-10202, decided June 8, 2003)      32

*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006)      24

* *Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C.Cir. 2002)      17, 23

*Williams v. Baker*, 572 A.2d 1062 (D.C. 1990)      31

*Wilson v. Legal Assistance of North Dakota*, 669 F.2d 562 (8th Cir. 1982)      11

# I.  Statement of the Case

## A.  Nature of the Case

Plaintiff Arminda Valles-Hall ("Hall"), who is of Mexican ancestry and whose sexual orientation is stated to be heterosexual, worked as a senior manager for the Center for Nonprofit Advancement ("Center") from April 21, 2003 to February 14, 2005. [1]  The Center is a tax-exempt, District of Columbia nonprofit corporation, founded in 1979 to serve the nonprofit community in the Washington metropolitan area through education, advocacy, nonprofit community building, and group purchasing.

Hall claims in Counts I through IV of her Amended Complaint that the Center discriminated against her on the basis of race and sexual orientation and it retaliated against her for complaining about those and other matters.  Specifically she claims that in July 2004 the Center gave her only an "above average" evaluation instead of an "outstanding" evaluation and it gave her only a 3% raise instead of a 5% raise; that the Center retaliated against her for complaining about the evaluation and about perceived racial discrimination against others by changing her duties and responsibilities and by threatening her over excessive use of leave; and, ultimately, that the Center constructively discharged her.

In Counts V and VI, Hall complains of negligent infliction of emotional distress and negligent supervision.

---

[1] The Center was formerly known as the Washington Council of Agencies.  It is referred to in the record by that name and "WCA" as well as the "Center" and "CNA".

Finally, in Counts VII and VIII Hall claims race discrimination in violation of 42 U.S.C. § 1981.

When Hall quit her job at the Center, she had already been offered and accepted employment with another employer at higher pay and better benefits, and with a shorter, cheaper commute, than her job at the Center. Hall started with her new employer two weeks after leaving the Center.

The Center denies any discrimination, retaliation, or other liability to Hall, and it denies that Hall suffered any damages.

## B. Procedural History

On August 9, 2004, Hall filed a complaint of discrimination with the District of Columbia Office of Human Rights ("OHR"). So far as the record discloses, OHR took no action on that complaint and it did not notify the Center of the filing.

Some months later, in December 2004, Hall filed a formal charge of discrimination with OHR. The Center first learned of Hall's discrimination charge later that month when it was served by OHR.

Hall's OHR charge was set for mandatory mediation on Friday, February 11, 2005. Although the session lasted several hours, it ultimately proved unsuccessful. Three days later, Hall quit.

On July 28, 2005, Hall voluntarily withdrew her OHR charge and that Office subsequently closed the administrative proceeding with no findings. Then on September 8, 2005 Hall filed her Complaint in this case with the Superior Court of the District of

Columbia, alleging statutory and common law claims under District of Columbia law. The Complaint did not include a demand for trial by jury. The Superior Court thereafter entered a Scheduling Order establishing, among other deadlines, April 10 for concluding discovery and April 24 for filing dispositive motions.

On March 31, 2006, Hall moved to amend her Complaint to add two counts under 42 U.S.C. § 1981, and for a jury trial. By Order docketed April 27, 2006, the Superior Court granted Hall leave to file her Amended Complaint but denied as untimely Hall's request for a jury trial. Also on April 27 the Court granted the Center's request to file an Amended Answer adding an additional defense to Hall's common law claims, based on the District of Columbia's Workers' Compensation Act.

On May 2, 2006, the Center removed the case from the Superior Court to this Court, grounding jurisdiction over Hall's § 1981 claims on 28 U.S.C. § 1331, and grounding jurisdiction over her state law claims on 28 U.S.C. § 1367.

With discovery completed, the Center now moves for summary judgment. [2]

## C.  Summary of Facts

The pertinent facts are set forth in detail in the Center's accompanying Statement of Material Facts Not in Dispute and are summarized briefly below. Supporting record

---

[2] Under the Superior Court's Scheduling Order, dispositive motions were due by April 24. Prior to that time, and while motions to amend were pending, the parties jointly requested an extension of the dispositive motions deadline. That request had not been acted upon at the time the case was removed.

references are included in the Statement of Material Facts, but have generally been omitted here for readability.

The Center is a diverse, multicultural organization. Just prior to termination of Hall's employment, its staff consisted of six African Americans, six whites, and one Latina. The Center's volunteer Board of Directors was equally diverse; like the staff, it then had six African Americans, six whites, and one Latino. Although sexual preference is not similarly observable, there appears to be a mix of both gay and straight employees at the Center.

The Center's paid staff is headed by its long-time Executive Director, Betsy Johnson, who reports to the Board. As the senior staff member, Johnson makes all hiring and firing decisions (except for herself); she makes all decisions regarding staff compensation within general guidelines established by the Board (again, except for herself); and she evaluates those staff members who report directly to her.

In March 2003 Johnson personally interviewed Hall for the position of Director of Education. The position had previously been held by a heterosexual Latina hired by Johnson. After interviewing Hall, Johnson made Hall a written offer of employment, which Hall accepted. For most of her subsequent tenure at the Center, Hall reported directly to Johnson.

The Center evaluates each of its employees annually in late June or early July and considers possible raises at that time. Johnson's normal practice is not to evaluate any employee who has been with the Center less than six months. Hall, who as of June 2003

-4-

had then been Director of Education for only about two months, nevertheless requested an evaluation and Johnson agreed. Using the Center's written evaluation form, which rates employees from "1" (unsatisfactory) to "5" (outstanding) on 13 criteria, Johnson gave Hall a "5" on eight criteria. The remaining five criteria were then inapplicable to Hall. Johnson also gave Hall a raise of more than 15%, from $52,000 to $60,000 per year, making Hall the third-highest-paid employee at the Center, behind only Johnson herself and Jeff Kost, the Center's second-ranking staff member.

Over the ensuing year, a number of incidents involving Hall came to Johnson's attention, leading Johnson to conclude that Hall had problems with inter-personal staff relations. For example, the Center's long-time office manager complained of a run-in with Hall in which Hall called her unprofessional. Hall took the same confrontational approach with a number of other employees (including Johnson herself) who, in Hall's view, were not showing her sufficient respect. Hall was also quick to assert racial motivations behind workplace events involving others that from an objective viewpoint were racially neutral.

Hall's work habits were also problematic. For example, in the fall of 2003 she unilaterally assigned herself compensatory time in violation of the Center's Personnel Handbook. And in early 2004, Hall failed to remit proceeds for a workshop she had run. During a routine audit of the Center's finances, those proceeds were found still in her possession, some of which were as old as two months. She had even borrowed from the

proceeds for personal purposes.  This resulted in the Center's receiving a "management letter" from the Center's auditor, criticizing the Center for poor handling of funds.

A recurring theme during discovery was Hall's relationship with the Washington Post Award for Excellence in Nonprofit Management (the "Post Award") – a program sponsored by the Washington Post and managed by the Center.  When Hall was first employed at the Center, management of the Post Award was tasked to Center employee Susan Sanow, who had established the Post Award some ten years earlier and had managed it ever since.  When Sanow left the Center in November 2003 for another job, management was assigned to Hall, with instruction to hire an assistant to help her with the added responsibilities.  Perhaps because Hall did not hire an assistant until the following March, she fell behind in her work.  This in turn generated criticism by a Board member and by Sanow, who remained a consultant on the Post Award.

In April 2004, Sanow's new employer offered to allow Sanow to resume management of the Post Award at no cost to the Center.  This amounted to a substantial gift in kind, plus it placed a highly experienced person back in charge.  Johnson viewed this as an offer she could not refuse and she explained that to Hall.  Hall nevertheless accused Johnson of disregarding standard professional protocols and courtesies and intentionally damaging Hall's professional reputation and credibility.

These various incidents were reflected in Johnson's July 2004 evaluation of Hall.  Specifically, Johnson gave Hall a "5" (outstanding) on five of 13 criteria, a "4" (above average) on three criteria, and a "3" (satisfactory) on the remaining five criteria, for an

overall rating of "4" (above average).  At the same time, Johnson gave Hall a 3% raise to

$61,800, which kept Hall as the third-highest-paid employee. [3]

Hall protested the evaluation, suggesting that it was motivated by race and gender

discrimination.  Johnson met with Hall in early August to discuss Hall's protest, but

Johnson refused to make any changes.  During the August meeting, Johnson specifically

responded to Hall's assertion of discrimination by asking her whether Hall's interactions

with co-workers was a "cultural thing," in which case the staff would just have to "buck

up and take it."  But Johnson promptly answered her own question, saying that in her

view Hall's behavior was not cultural but instead was "*verbal abuse.*"  Hall Dep. Ex. 38

(Apx. 124); emphasis in original.

Following Johnson's refusal to change the evaluation, Hall appealed to Mary Ann

de Barbieri, the Center's volunteer President.  She also filed her initial charge with the

OHR.  And she began looking for another job.

In response to Hall's appeal, de Barbieri conducted an investigation which

included a two-hour, off-site interview of Hall, and interviews with Johnson and five

other staff members.  De Barbieri then prepared a written report of her investigation, in

which she concluded there was no evidence of discrimination or retaliation in Johnson's

---

[3] Paragraphs 23a. through 23k. of the Statement of Material Facts Not in Dispute contains a detailed description of the incidents involving Hall's workplace behavior, her performance, and her work habits that came to Johnson's attention and that influenced Johnson's 2004 evaluation of Hall.

2004 evaluation of Hall and that Hall's workplace difficulties were of her own making.

The investigative report states in part:

> I did not find ... evidence that Ms. Valles-Hall's 2004 evaluation was racially or ethnically biased.  It appears to me that her difficulties are a result of her approach to her staff colleagues.  It appears that some individuals have been insulted and demeaned by her manner of dealing with them, a manner that was characterized ... by some interviewed as aggressive and confrontational.

> I see no evidence that Ms. Valles-Hall's 2004 evaluation scores were a retaliation, as they appear to be based upon a valid assessment of her performance during the past year by her supervisor.

Hall Dep. Ex. 21A (Apx. 113).

The months following the 2004 evaluation saw further deterioration in Hall's performance and work habits.  During a six-week period in September and October 2004, Hall worked only 12 out of 29 scheduled workdays, claiming an unspecified illness. Johnson pressed Hall about her attendance in an effort to determine just what the Center could expect from her, threatening disciplinary action for refusal to provide a doctor's statement and warning of possible replacement should her high absentee rate continue. Hall's belated response was a note from her doctor saying only: "Pt. is undergoing treatment for a medical condition & needs periodic followup & assessment."  Hall Dep. Ex. 56 (Apx. 134).

Perhaps because of her attendance problem, Hall was months late in completing her primary duty of preparing and distributing the Center's fall course catalog, resulting in cancellation of some courses and poor attendance at others.  In contrast, Hall's flat

refusal in January 2005 to post the spring course catalog on the Center's website, despite

explicit instructions from Sanow (her immediate supervisor) and from Johnson herself,

cannot be excused by illness.  Hall had performed the task previously, but this time she

claimed it was not her job.  Although she ultimately did the posting, her initial

insubordination was unacceptable to Johnson.

On February 1, 2005, Hall accepted an employment offer from the Society of

Research Administrators International in Arlington, Virginia, with a start date of March 1,

2005.  Not knowing about Hall's new job, Johnson independently made the decision to

fire Hall.  Johnson decided to postpone doing so, however, in the hope that a mediation

session at OHR, scheduled for Friday, February 11, would make firing unnecessary.

When mediation proved unsuccessful, Johnson decided to terminate Hall on Monday,

February 14 and to bar Hall's access to the Center's office suite and her remote access to

the Center's computer network over the February 12-13 weekend.  On Monday, February

14, before being fired, Hall quit.

Two weeks later, Hall began working for the Society for Research Administrators

International at a salary higher than her former salary at the Center, with benefits better

than those offered by the Center, and with a commute shorter and cheaper than her

commute to the Center.

Despite her claims of discriminatory treatment, Hall candidly admitted at

deposition that she does not know how other employees were evaluated in 2004 or what

raises they may have received; that she has no documentation to support her claim that

her 2004 evaluation was different from similarly situated white or gay managers; that Johnson has never made a derogatory reference to race, color, national origin or sexual orientation to Hall, in Hall's presence, or in the presence of any other Center employee; and that Johnson has never tolerated derogatory racial or sexual comments from other Center employees.

The record does show that in 2003 a similarly situated, gay, white female employee received an overall rating of "2" (marginal) and no raise, primarily for her verbal abuse of other staff.   Hall's replacement, hired by Johnson in March 2005, is a straight African American female.  Hall's predecessor in the job, also hired by Johnson, is a straight Latina.

## II.  Argument

Each of Hall's eight counts is grounded on the same operative allegations.  Counts VII and VIII of the Amended Complaint charge violations of 42 U.S.C. § 1981; they are discussed in Section A below.  Counts I through IV, claiming race and sexual orientation discrimination, retaliation, and constructive discharge, invoke the employment discrimination provisions of the District of Columbia's Human Rights Act, D.C. Code § 2-1401.01, *et seq*.; they are discussed in Sections B and C below.  Finally, Counts V and VI of the Amended Complaint allege common law claims of negligent infliction of emotional distress and negligent supervision, discussed in Section D below.

**A.  Section 1981 Claims**

42 U.S.C. § 1981 assures that all benefits, privileges, terms and conditions of employment will be enjoyed free of racial discrimination.  It does not protect against sexual orientation discrimination.  *See Runyon v. McCrary*, 427 U.S. 160, 165 (1976).  The standards applied in evaluating a claim of race discrimination in employment under § 1981 are the same as those applied in actions under Title VII.  *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002); *Wilson v. Legal Assistance of North Dakota*, 669 F.2d 562, 562-63 (8th Cir. 1982).  Specifically, both require an adverse employment action, *Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F.Supp.2d 15, 25-27 (D.D.C. 2003), and both require proof of intentional discrimination, *Anderson v. Group Hosp., Inc.*, 820 F.2d 465, 468 (D.C.Cir. 1987).

To establish a *prima facie* case of employment discrimination under § 1981 (and Title VII), and hence to defeat a summary judgment motion, Hall must show that (1) she belongs to a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action despite her qualification; and (4) the adverse employment action was based on the characteristic that placed her in the protected class.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The Center does not dispute that Hall, as a Mexican-American, belongs to a protected class for § 1981 purposes.  And at least on paper, she was qualified for her job.  However, the Center will show that Hall cannot prevail in her claims because, as a matter of law, Hall did not suffer any adverse

employment action, discrimination, or retaliation, and her actual performance did not
meet the Center's requirements and expectations.

### 1. Hall Suffered No Adverse Employment Action

Hall's Amended Complaint asserts that (a) she suffered a "negative employment
evaluation" after she "brought several incidents involving minority co-workers ... to
management's attention" (Amend. Cmplt. ¶¶ 16, 17); (b) the Center "changed her job
description and responsibilities, increased her workload without increasing her staff
support and eliminated her authority over projects on which she was working" (Amend.
Cmplt. ¶ 23); (c) the Center "threatened ... that she would be terminated as a result of
health-related absences ... [and] demanded proof of illness" (Amend. Cmplt. ¶ 61); and
(d) "having no choice ... [she] tendered her letter of resignation ... [because the Center]
deliberately made ... [her] working conditions intolerable" (Amend. Cmplt. ¶ 28, 47).
These allegations are considered in turn, below.

### a. The "Negative" Evaluation

Hall bases her claims in part on the allegedly "negative" evaluation she received in
July 2004. In fact, the evaluation was not negative at all, in that she averaged "4" (above
average), the next-to-highest rating possible. Based on that evaluation, Hall received a
3% raise, which kept her the third-highest-paid employee at the Center.

Another senior-level employee, who is a white, gay female, was denied a raise in
2003 (in contrast to Hall's $8,000 raise in 2003 and her $1,800 raise in 2004) for abusive

behavior similar to Hall's.  If anything, Hall was singled out for *favorable*, not *adverse*,

treatment.

Even if the 2004 evaluation could be construed as negative, an evaluation standing

alone is not an "adverse employment action" under the civil rights laws.  *Brown v. Brody*,

199 F.3d 446, 455-458 (D.C.Cir. 1999) ("[T]he weight of contemporary authority is

solidly with the ... [employer].  Just as lateral transfers do not ordinarily constitute

'adverse actions,' a similarly thick body of precedent ... refutes the notion that formal

criticism or poor performance evaluations are necessarily adverse actions"); *James v.

Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) ("A downgrade of a

performance evaluation *could* affect a term, condition, or benefit of employment if it has

a tangible effect on the terms or conditions of employment.  However, a poor

performance evaluation is actionable only where the employer subsequently uses the

evaluation as a basis to detrimentally alter the terms or conditions of employment.  An

evaluation merely causing a loss of prestige or status is not actionable") (citations and

quotation marks omitted; emphasis in original); *Brown v. Snow*, 440 F.3d 1259, 1265

(11th Cir. 2006) ("Brown [the employee] must show that he suffered a tangible em-

ployment action, which is a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing significant change in benefits. ... A lower score on Brown's performance

evaluation, by itself, is not actionable under Title VII unless Brown can establish that the

-13-

lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities") (citation and quotation marks omitted).

### b. Changes in Duties

Hall was hired as "Director of Education." See offer letter (Apx. 90) and job description (Apx. 91). That remained her formal title throughout her tenure at the Center.

The only significant change in duties that can be gleaned from the extensive discovery in this case relates to the Post Award. In November 2003, Sanow, who had originated the Post Award and managed it for some ten years, resigned to take another position. With Sanow's resignation, Johnson assigned Post Award responsibilities to Hall and instructed her to hire an assistant. When asked her reaction to the new assignment, Hall testified, "I was excited about the award." Hall Dep. 67-68 (Apx. 32-33). If Hall then found herself over-worked – a complaint she never voiced at the time – it was a result of Hall's own failure in not hiring an assistant until the following March.

Hall's performance on the Post Award between November and March generated criticism from a Center Board member and long-time Treasurer, and from Sanow, who remained a consultant for the program. So when in late March Sanow's new employer offered Sanow to resume full charge of the Post Award at no cost to the Center, Johnson readily agreed. By that time Hall had hired an assistant, so that she then had *less* work and *more* help.

Neither of these changes in duties – assignment of Post Award responsibilities to Hall when Sanow resigned, and re-assignment of responsibilities back to Sanow – was

-14-

accompanied by any change in Hall's pay, benefits, work location, shift, title, or any other tangible employment term, condition or privilege. Neither, therefore, is actionable.

### c. Threats Regarding Sick Leave

In the fall of 2004, after Hall had missed 12 out of 29 workdays over a six-week period, Johnson counseled her about her absences and requested a doctor's note. When no note was forthcoming, Johnson wrote to Hall saying that her "poor attendance record over the past two months has caused serious disruption to the work of WCA [the Center], particularly since many of your absences have been unscheduled." Johnson went on to give Hall a deadline for furnishing the doctor's note and she threatened disciplinary action if the deadline were not met. Johnson also told Hall that if her absences continued at the "current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed," possibly including the hiring of a permanent replacement. Hall Dep. Ex. 29 (Apx. 120).

Hall did then furnish a doctor's note, cryptic as it was (see Apx. 134), and her attendance improved. Neither threat was ever carried out.

Like poor evaluations, unfulfilled threats of discipline are not actionable under Title VII. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997) (verbal threat of firing, reprimand, and being placed on "final warning" do not constitute adverse employment actions because of their lack of consequences).

### d. "Intolerable" Working Conditions

Under the constructive discharge doctrine, a resignation will be deemed a discharge when "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign ...." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

As shown above, Johnson's July 2004 "above average" evaluation of Hall (accompanied by a 3% raise), Johnson's first assigning the Post Award to Hall, then re-assigning it to Sanow, and Johnson's threats over excessive sick leave do not even amount to adverse employment actions; necessarily they could not have created intolerable working conditions. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 187 (4th Cir. 2004) ("[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign") (citation omitted).

The only employer conduct that might conceivably justify Hall's quitting was the action taken on Friday, February 11, to exclude Hall from the Center's offices and from remote access to the Center's computer network over the February 12-13 weekend. But it makes no difference here whether the Center's conduct reasonably led Hall to believe she would be fired: Hall had been searching for a new job since the fall of 2004 and, as of February 11, *she had already made the decision to quit*.

In *Honor v. Booz-Allen & Hamilton, Inc.*, as here, the employee had begun a job search and had received and accepted an employment offer. For that reason, the

employee's resignation in *Honor* was deemed voluntary as a matter of law and not a constructive discharge, even though the employee had been explicitly told on multiple occasions that he would loose his job. The same conclusion applies here.

### 2. Hall Suffered No Discrimination

Assuming for argument purposes that Johnson's conduct rose to the level of adverse employment actions, Hall still cannot show that those actions were motivated by intentional discrimination.

Discrimination may be proved by direct evidence of discriminatory animus, or indirectly using the three-part, burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C.Cir. 2002). It is undisputed that Johnson, who allegedly took adverse employment actions against Hall for discriminatory reasons, is the same person who personally interviewed Hall, hired her, and gave her substantial raises. When as here the "same actor inference" applies, the fact-finder is not permitted to find discrimination and the employer is entitled to summary judgment. *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1096-97 (9th Cir. 2005); *Rand v. CF Indus.*, 42 F.3d 1139, 1147 (7th Cir. 1994). *See Murray v. Gilmore*, 406 F.3d, 708, 715 (D.C.Cir. 2005) (referencing *Rand's* same actor inference with approval).

In addition, Hall (who describes herself as a "woman of color") was replaced by an African American woman. While Hall is not required to show that she was replaced by someone *outside* her protected class, *Mastro v. Potomac Elec. Pwr. Co.*, __ F.3d __, 2006

WL 1359604 *4 (D.C.Cir. No. 05-7044, decided May 19, 2006), the fact that she was replaced by someone *within* her protected class "cuts strongly against any inference of discrimination" and justifies summary judgment for the employer. *Murray*, 406 F.3d at 715.

Apart from these threshold factors, Hall cannot make out a *prima facie* case of discrimination, either directly or indirectly, and she cannot overcome the Center's legitimate, non-discriminatory reasons for its actions.

### a. No Direct Evidence of Discrimination

Hall admitted unequivocally at deposition that Johnson never made a derogatory reference to Hall or in Hall's presence concerning race, color or national origin. Nor, to Hall's knowledge, did any other employee ever made such a reference in Johnson's presence. In fact, but for the "cultural thing" comment (discussed below) and Johnson's sending Hall an e-mail on May 5, 2004 to wish her a happy *cinco de Mayo*, Johnson never so much as *mentioned* race, color or national origin in the workplace.

Hall cites two incidents, each involving African American visitors to the Center, as evidence of racism. In one incident, a Center employee (not Johnson) may have interrupted a meeting among Hall, the visitor, and another Center employee when he asked if he could use the conference room sooner than scheduled. In the second incident, a Center employee (again, not Johnson), acting out of security concerns, stopped and questioned a visitor he did not recognize. The Center employee testified at deposition that building management had warned of thefts in other suites and that he had taken

similar action numerous time before, with whites as well as blacks.  Baird Dep. 16-17, 29,

45-49 (Apx. 323-332).

Even if the employees' actions in these two incidents are seen as rude, there is

absolutely nothing in the record aside from Hall's unsupported speculation that the

employees were motivated by racial animus.  Such speculation is insufficient to create a

genuine dispute of fact.  *Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C.Cir. 2006) ("[I]n

deciding whether there is a genuine issue of material fact, the court must assume the truth

of all statements proffered by the non-movant *except for* conclusory allegations lacking

any factual basis in the record") (emphasis in original).

In any event, to the extent those incidents reflected racial animus – a proposition

without record support – that animus is not attributable to Johnson, the decision-maker in

the case.  *See Canady v. Wal-Mart Stores, Inc*., 440 F.3d 1031, 1034 (8th Cir. 2006)

(racial slurs by employee's immediate supervisor were not attributable to other managers

who suspended and then fired the employee).

Hall points to Johnson's "cultural thing" question during their meeting on August

6, 2004, which Hall had requested to discuss her evaluation.  Viewed in context, the

question does not constitute evidence of discrimination.  Hall had already asserted that the

evaluation was discriminatory; according to Hall's own notes of the meeting, what

Johnson then said was:

> If making judgments about people and telling them is a cultural thing, then
> maybe we should tell the staff it's a cultural thing and they should buck up

> and take it.  But frankly that would come as a surprise to me.  But I don't
> think it's a cultural thing.  It's *verbal abuse* ....

Hall Dep. Ex. 28 (Apx. 124) (emphasis in original).  At worst, the comment is a stray

remark not sufficient to meet a summary judgment motion.  *Quick v. Wal-Mart Stores,*

*Inc.*, 441 F.3d 606, 609 (8th Cir. 2006) is instructive:

> [D]irect evidence is evidence showing a specific link between the alleged
> discriminatory animus and the challenged decision, sufficient to support a
> finding by a reasonable fact finder that an illegitimate criterion actually
> motivated the adverse employment action.  Direct evidence of employment
> discrimination must be distinguished from stray remarks in the workplace,
> statements by non-decisionmakers, or statements by decisionmakers
> unrelated to the decisional process.

Citation and quotation marks omitted; alteration in original.

### b.  No Indirect Evidence of Discrimination

Hall has no knowledge as to how other employees were evaluated in 2004, she

does not know whether or the extent to which other employees received raises, and she

has no documentation to support her claim that her 2004 evaluation was different from

similarly situated white managers.

Similar evidentiary gaps undercut Hall's claim that threats surrounding excessive

use of sick leave were discriminatory:  Hall has not identified any other employee who

fared better despite a comparable history of absences.  Nor can re-assignment of the Post

Award back to Sanow support Hall's discrimination claim because that was a unique

workplace event.

Finally, assuming for argument purposes that Johnson's preparations on Friday, February 11 to fire Hall the following Monday amounted to a constructive discharge, Hall has not shown that the Center overlooked white employees' insubordination, late work product and repeated friction with colleagues.

To the extent any explanatory burden shifts to the Center, the Center can readily show legitimate, non-pretextual reasons for its treatment of Hall. The Center's Personnel Handbook sets forth standards of conduct for employees, including the following:

> In addition to expecting employees to perform their jobs competently and reliably, WCA expects employees to conduct themselves in a professional, ethical and responsible manner that reflects well upon WCA, that promotes a spirit of cooperation and teamwork among employees, and that is respectful of the members, volunteers, and other members of the public with whom we interact. Failure to do so may lead to disciplinary action, including dismissal.

Hall Dep. Ex. 5 (Apx. 92). The Handbook goes on to list specific types of misconduct that could lead to corrective action or dismissal, such as "conduct, including speech, that ... is abusive to or disrespectful of WCA' s directors [or] employees" and "neglect of duty."

Each employee is required, on being hired, to acknowledge in writing that he or she has received and read the Handbook. Although Hall received and receipted for her copy, she failed in significant ways to live up to its requirements.

Hall's interactions with her co-workers and with her supervisor were frequently unpleasant. To cite examples, Hall had less-than-civil exchanges with Mendoza (the long-time office manager), Sanow (the Post Awards consultant), Kost (the second ranking

-21-

Case 1:06-cv-00806-CKK    Document 9    Filed 05/25/2006    Page 30 of 58

staff member), and Johnson herself.  Hall also misused compensatory time, she withheld

and misused funds belonging to the Center, she was unacceptably late in getting the fall

2004 course catalog out, and she was insubordinate in refusing to post the spring course

catalog on the Center's website.

Regarding sick leave, during the six-week period September 10 - October 20,

2004, Hall missed 12 out of 29 scheduled workdays.  Hall's absences had a substantial

impact on the Center's mission, as shown by the two-month delay in issuance of the

Center's fall course catalog.  Johnson had every right to insist on a statement from Hall's

doctor and to warn Hall that continuing absences – even for legitimate medical reasons –

could force the Center to make other arrangements, including hiring a permanent

replacement.

Johnson's Post Award business decisions were well within her authority as

Executive Director.  Even if the soundness of those decisions is arguable, they would still

not be actionable:

> Perhaps in recognition of the judicial micromanagement of business
> practices that would result if [courts] ruled otherwise, other circuits have
> held that changes in assignment or work-related duties do not ordinarily
> constitute adverse employment decisions if unaccompanied by a decrease in
> salary or work hour changes.

*Brown v. Brody*, 199 F.3d at 452 (citation and quotation marks omitted; alteration in

original).  *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C.Cir. 2002)

("[C]ourts are without authority to second-guess an employer's personnel decision absent

demonstrably discriminatory motive. ... It is not enough for the plaintiff to show that a

reason given for a job action is not just, or fair, or sensible") (citations and quotation marks omitted); *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946-47 (7th Cir. 2006) ("[I]t is not our role to question the wisdom of a company's decision on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination"); *Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 955 (8th Cir. 2005) ("the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination") (citation and quotation marks omitted).

Although Hall is quick to blame others for her failings, or to minimize their seriousness, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff...." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (citation and quotation marks omitted; alteration in original). Here, Johnson's perceptions fully justified her re-assigning the Post Award back to Sanow, they justified her evaluation that pointed out shortcomings in Hall's inter-personal relations and work habits, they justified her counseling Hall on attendance matters, and they justified the unexecuted decision to fire Hall for insubordination.

### 3. Hall Suffered No Retaliation

Section 1981, unlike Title VII, does not include a separate retaliation provision. Nevertheless, case law indicates that § 1981 will support a retaliation claim. *E.g. Bryant v. Aiken Regional Med. Centers, Inc.*, 333 F.3d 536 (4th Cir. 2003). For purposes of its

-23-

summary judgment motion, the Center assumes that such a claim may be brought under §

1981 to the same extent as under Title VII.

To establish a *prima facie* case of retaliation, a Title VII plaintiff must provide

evidence that he was engaged in protected activity, that his employer took a materially

adverse action against him, and that a causal connection exists between the two.

*Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C.Cir. 2006) (identifying the three

elements of a Title VII retaliation case); *Rochon v. Gonzales*, 438 F.2d 1211, 1219

(D.C.Cir. 2006) (the adverse action must be "material or significant" ... [and result in]

"'objectively tangible harm'" (quoting *Brown v. Brody*). [4]   Activity is protected only if

the plaintiff reasonably believes that the underlying employment practice which he is

complaining about or opposing is unlawful.  *Clark Cnty. School Dist. v. Breeden*, 532

U.S. 268, 271 (2001) (retaliation claim rejected because "no reasonable person could

---

[4]  *Broderick* held that a Title VII retaliation plaintiff must suffer an "adverse employment action" within the meaning of *McDonnell Douglas*.  Some three weeks later in *Rochon* a different panel of the D.C. Circuit observed: "[W]e have yet to determine whether the adverse action alleged [in a Title VII retaliation case] must be an adverse personnel action, or otherwise related to the plaintiff's employment," 438 F.3d at 1217, and it went on to hold that although the adverse action must be material and significant, it need not be employment-related.

In *White v. Burlington Northern & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004) (*en banc*), *cert. granted*, 126 S.Ct. 797 (No. 05-259, Dec. 5, 2005), a Title VII retaliation case, the Supreme Court granted certiorari on the question whether an employer can be held liable for "a *materially adverse change* in the terms of employment ...; for any adverse treatment that was reasonably likely to deter the plaintiff from engaging in protected activity ...; or only for an *ultimate* employment decision." Petition for Writ of Certiorari, 2005 WL 2055901 (internal quotation marks omitted; emphasis in original).

have believed that the single incident ... [involving alleged sexual harassment] violated Title VII's standard").

Hall's retaliation claim can be summarized as follows:  In the spring of 2004 she "brought several incidents involving minority co-workers ... to management's attention" (Amend. Cmplt. ¶ 16) – presumably the incidents involving Kost (who may have interrupted a meeting attended by an African American visitor when he asked about getting early access to the conference room) and Baird (who stopped and questioned an African American visitor whom he did not recognize); Johnson then retaliated by moving Post Award responsibilities from her to Sanow and giving her a poor evaluation; when she protested and then appealed the evaluation she suffered additional retaliation in the form of threats of discipline for excessive absences; and finally, after Johnson learned about her complaint to OHR in December 2004 and participated in an unsuccessful mediation of that complaint in February 2005, Johnson constructively discharged her.

The chain reaction Hall seeks to initiate fails for a number of reasons.  First, the triggering incidents are far too trivial for Hall to have reasonably believed them (as she must under *Breeden*) to be unlawful employment practices.  "[N]ot everything that makes an employee unhappy is an actionable adverse action.  Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit."  *Broderick*, 437 F.3d at 1233 (alteration in original).

-25-

In addition, Hall's merely bringing the Kost and Baird incidents to management's attention, without more, was insufficient to constitute a protected complaint of discrimination. As *Broderick* points out, "Not every complaint garners its author protection under Title VII." Although no magic words are required, the complaint must in some way allege unlawful discrimination. *Broderick*, 437 F.3d at 1232.

Finally, except for the alleged constructive discharge (discussed below), none of the Center's actions qualifies as sufficiently "material or significant" or resulted in "objectively tangible harm" to Hall. *Rochon v. Gonzales*, 438 F.2d at 1211.

The only employer action that might qualify as material and significant was Johnson's preparations in February 2005 to fire Hall. But those preparations came to naught, since Hall had already decided to quit for a better job and she in fact did so before any termination could take place.

Supposing Johnson had seen her decision through and actually fired Hall, she certainly had legitimate, non-pretextual reasons for doing so. See Argument Section A.2.c above. While Hall may argue that the timing of the intended termination, following as it did the unsuccessful OHR mediation, is suspicious, courts are "hesitant to find pretext or discrimination on temporal proximity alone." *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006) (citation and quotation marks omitted). *Accord*, *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) ("[A]bsent other evidence of retaliation, a temporal relation is insufficient to survive summary judgment"). Moreover, an employer has no obligation to suspend a previously planned employment

-26-

action upon discovering that the employee has engaged in protected activity; an employer's proceeding with such action "is no evidence whatever of causality." *Breeden*, 532 U.S. at 272.

## B.  State Law Discrimination and Retaliation Claims

The employment provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.01, *et seq*. ("HRA") were modeled after Title VII.  Title VII case law therefore provides guidance in applying the HRA.  *E.g.*, *Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C. 1994) ("[W]e look for guidance to ... case law under federal employment discrimination legislation analogous to the [HRA]").  In turn, Title VII and § 1981 apply the same standards in evaluating claims of race discrimination.

A well-developed body of local decisions makes clear that Title VII and the HRA are generally comparable statutes.  For example, in *Boulton v. Institute of Int'l Edu.*, 808 A.2d 499, 502 & n.3 (D.C. 2002), a termination case involving claims of sexual orientation discrimination, the Court made the same distinction between direct and indirect evidence of discrimination as do federal cases applying Title VII.  Since the plaintiff in that case failed to show that similarly situated employees outside his protected class were not terminated or that he was replaced by a person outside his protected class, summary judgment for the employer was affirmed.

*Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362, 372 (D.C. 2003), involved claims of race and age discrimination under the HRA, as well as common law causes of action. The Court invoked a burden-shifting analysis identical to *McDonnell Douglas*, it assumed

that the plaintiff had made out a *prima facie* case, it concluded that the employer had

successfully articulated legitimate, non-discriminatory reasons for its employment

actions, and it then upheld summary judgment for the employer.

*Joyner* is of particular interest because there, as here, the parties pointed to a

number of incidents which they variously claimed as evidencing discrimination or as

justifying the employer's actions.  The characterization of those incidents, including

whether at least one of them even took place, was disputed.  But those disputes were not

enough to deny summary judgment.  As the Court repeatedly emphasized, the incidents

themselves were not material; what was material was whether  the decision-maker had

legitimate, non-discriminatory reasons to discipline the plaintiff.  *Joyner*, 826 A.2d at

369-72.

In *Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793, 803 (D.C.

2003), the Court upheld summary judgment in favor of the employer, ruling that

"conclusory allegations by the nonmoving party are insufficient to establish a genuine

issue of material fact or to defeat the entry of summary judgment" (quoting *Hollins v.

Federal Nat. Mtg. Ass'n*, 760 A.2d 563 (D.C. 2000)).   Echoing the D.C. Circuit in *Brown

v. Brody*, the *Futrell* panel recognized that "courts are not in a position to pass on the

appropriateness or inappropriateness of an employer's business decisions when there is

no evidence of discrimination."  *Futrell*, 816 A.2d at 804.

Hall's Amended Complaint includes a claim of sexual orientation discrimination

under the HRA, based on her *hetero*sexual status.  (Although claims of sexual orientation

-28-

discrimination are not cognizable under federal law, the analysis is the same. *E.g.*, *Boulton*, 808 A.2d at 502-3.)  Where, as here, a majority-group plaintiff alleges reverse discrimination, she "must show additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *Mastro v. Potomac Elec. Pwr. Co.*, 2006 WL 1359604 *4 (citation and internal quotation marks omitted).  Nothing in the extensive discovery in this case raises any suspicion of sexual orientation discrimination.

For all the same reasons Hall cannot overcome summary judgment on her § 1981 claims (see Argument Section A above), she similarly fails in her District of Columbia Human Rights Act claims.

## C.  State Law "Constructive Discharge" Claim

Constructive discharge is not a cause of action, but only a legal fiction by which courts treat a voluntary quit as an involuntary termination.  Count IV therefore fails on its face to state a good claim for relief.

Further, as shown above, long before Johnson made preparations to fire Hall, Hall had begun a job search, she had secured a new and better position, she had accepted the position, and she had made a definite decision to quit.  And she did in fact quit before being fired.  Those facts rule out a constructive discharge. *Honor v. Booz-Allen & Hamilton, Inc.* (employee who had undertaken a job search and had received and accepted an employment offer treated as having quit, even though the employee had been explicitly told on multiple occasions that he would loose his job).

-29-

Finally, as also shown above, Johnson had ample, non-pretextual reasons to fire Hall.

## D.  Common Law Negligence Claims

### 1.  Hall Fails to State a Negligent Infliction Claim

Count V of the Amended Complaint purports to state a claim for negligent infliction of emotional distress, while Count VI would claim negligent supervision.  Both Counts are based on the same factual allegations that Hall relies on to support her discrimination claims.

In the District of Columbia, damages for negligent infliction of emotional distress are recoverable only if the plaintiff was in a zone of physical danger and if, as a result of the defendant's negligence, the plaintiff was caused to fear for his or her own safety. *Brown v. Argenbright Security, Inc*., 782 A.2d 752, n.9 (D.C. 2001) (quoting *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990)); *Doe v. Exxon Mobil Corp*., 2006 WL 516744 *4-5 (D.D.C. No. 01-1357, decided March 2, 2006).

Here, Hall does not allege that she was in a zone of physical danger nor that she feared for her safety.  In addition, her Amended Complaint necessarily alleges intentional, not negligent, acts.  Those failings compelled dismissal of negligent infliction claims in both *Brown* and *Doe* and they warrant the same result here.

Dismissal of Count V would be equally warranted were that count to be read as alleging *intentional* infliction.  To recover on an intentional infliction claim, a plaintiff must establish conduct so outrageous in character and so extreme in degree as to go

-30-

beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community. *Joyner*, 826 A.2d at 373 (despite evidence that a supervisor slammed the employee's hand in a door, the Court affirmed summary judgment, saying, "In the employment context, we traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim") (citation and quotation marks omitted). *Cf. Larijani v. Georgetown Univ.*, 791 A.2d. 41 (D.C. 2002) (allegation that employer knowingly and continuously subjected employee to noise-making machines, causing her physical and emotional distress for which she required medical attention, stated intentional infliction claim).

### 2.  Hall Fails to State a Negligent Supervision Claim

Count VI of the Amended Complaint alleges that the Center "failed to enforce their [sic] policies of non-discrimination and non-retaliation against Johnson and other WCA senior staff actions, thereby breaching its duty of care in the supervision and maintenance of its personnel."  Here, however, the policies are based on *statutory* non-discrimination requirements, violations of which give rise to *statutory* remedies which supersede any common law remedies that might otherwise be available.  *See Carl v. Children's Hosp.,* 702 A.2d 159, 171 (D.C. 1997) (Ferren, J., concurring) ("[W]e would be entirely off base if we were not to conclude that the [District of Columbia] Council had preempted, for example, the legal fields represented by the exhaustive list of Human Rights Act prohibitions against discrimination in employment ..."); *Vitikacs v. American Legion*, 2003 WL 22004935 * 4 (D.C.Super. No. 02-CA-10202, decided June 8, 2003)

(Kravitz, J.) (common law count of wrongful discharge, based on public policy stated in HRA, dismissed for failure to state a claim).

To the extent Hall's Count VI claim is based on Center policies that are independent of any statutory requirements, those policies are not contractual and they cannot be enforced against the Center. The Center's Personnel Handbook says:

> This Employee Handbook is intended to serve as a guideline, describing the basic personnel policies and practices ordinarily applied by WCA. *It is not intended to create and is not a contract of employment.* No contractual rights are conferred on the employee by this Employee Handbook; its provisions shall not constitute contractual obligations enforceable against WCA. The employees of the Washington Council of Agencies are terminable-at-will, meaning that either the employee or WCA may terminate the employment relationship at any time, with or without cause.

Personnel Handbook (Apx. 92) at 3; emphasis in original. These provisions are sufficient as a matter of law to preclude the creation of implied contractual obligations. *Boulton*, 808 A.2d 505.

### 3. The Claims Are Barred by the Workers' Compensation Act

Finally, Hall's common law negligence claims are barred by the exclusivity provisions of the District of Columbia's Workers' Compensation Act, D.C. Code § 32-1501, *et seq.* Specifically, § 32-1504 provides that an employer's statutory, no-fault liability for compensable injuries "shall be exclusive and in place of all liability of such employer to the employee ...." *See Joyner*, 826 A.2d at 373-74 (unless workplace injuries

are "clearly" not compensable, the Department of Employment Services has primary jurisdiction). [5]

### III.  Conclusion

For all the foregoing reasons, the Court should grant the Center's motion for summary judgment.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By____/s/ Charles H. Fleischer_____
       Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel.: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

---

[5] *Joyner* held that common law claims should be stayed, not dismissed, pending action by the Department of Employment Services.  Here, however, any Workers' Compensation Act claim Hall may have had would be barred by the one-year limitation in D.C. Code § 32-1514.

-33-

# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARMINDA VALLES-HALL,** ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 1:06 CV 806 CKK |
| ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT,** ) | |
| ) | |
| Defendant ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to LCv.R 7(h), defendant Center for Nonprofit Advancement (the "Center"), [1] by its attorneys, submits this Statement of Material Facts Not in Dispute in support of its accompanying Motion for Summary Judgment:

1.  The Center is a tax-exempt, District of Columbia nonprofit corporation headquartered in the District of Columbia.  [Johnson Dep. I 11, Apx. 141] [2]

2.  The Center was founded in 1979 to serve the nonprofit community in the Washington metropolitan area through education, advocacy, nonprofit community building, and group purchasing. [Johnson Dep. I 11-12, Apx. 141-142]

---

[1] The Center was formerly known as Washington Council of Agencies.  It is referred to in the record by that name and "WCA" as well as the "Center" and "CNA".

[2] "Apx. ___" refers to the Appendix accompanying the Center's Motion for Summary Judgment.

3.  The Center has approximately 1000 members, each of which is, in turn, a non-profit organization. [Johnson Dep. I 62, Apx. 150]

4.  The Center is governed by a volunteer Board of Directors, which is chaired by its President.  At relevant times, Mary Ann de Barbieri ("de Barbieri") served as President of the Center.  [Johnson Dep. I 20-22, Apx. 144a - 144c; de Barbieri Dep. 7, Apx. 250]

5.  The Center has a paid staff, headed by its Executive Director who reports to the Board of Directors.  Betsy Johnson ("Johnson") has been the Center's Executive Director since 1988.  [Johnson Dep. I 12-14, Apx. 142-144; de Barbieri Dep. 10, Apx. 251]

6.  The Center has a Personnel Handbook, which contains, among other provisions, provisions relating to equal employment and non-discrimination, use of compensatory time, sick leave, workplace behavior, and discipline.  [Hall Dep. 55 & Ex. 5, Apx. 21, 92; Johnson Dep. I 77, Apx. 151]

7.  The Center's Personnel Handbook lists specific types of misconduct that could lead to corrective action or dismissal, such as "conduct, including speech, that ... is abusive to or disrespectful of WCA' s directors [or] employees" and "neglect of duty." [Hall Dep. 55 & Ex. 5, Apx. 21, 92; Johnson Dep. I 77, Apx. 151]

8.  Each employee is required, on being hired, to acknowledge in writing that he or she has received and read the Center's Personnel Handbook.  [Johnson Aff.¶ 5, Apx. 245]

9.  The Center evaluates its employees, and it considers employee salary increases, annually in late June or early July.  In evaluating employees the Center rates employees on 13 criteria, using a 5-point scale from 1 to 5, where "1" is unsatisfactory, "2" is

marginal, "3" is satisfactory, "4" is above average, and "5" is outstanding. [Hall Dep. Ex. 8, Apx. 103; Johnson Dep. I 31-32, Apx. 144d-144e]

10. The Board of Directors establishes guidelines for awarding salary increases to Center employees coincident with annual evaluations. [Johnson Dep. II 9-10, Apx. 202-203]

11. Center's office suite at 1666 K Street, N.W., Washington, DC includes a conference room that provides a connection between the common hallway and the Center's interior office space. On a number of occasions, unauthorized persons have gained access to the Center's interior office space and have been seen in private offices and using telephones. Building management has also warned of thefts in other suites in the building. As a result, the Center's employees have assumed responsibility to stop and question persons within the Center's interior offices whom they do not recognize. [Johnson Dep. I 132, Apx. 170; Mendoza Dep. II 52, Apx. 285; Baird Dep. 16-17, 29, 45-49, Apx. 323-332]

12. In March 2003 plaintiff Arminda Valles-Hall ("Hall") applied to the Center for the position of Director of Education. The position had previously been occupied by a Latina female, hired by Johnson, whose sexual orientation appears to be heterosexual. [Hall Dep. I 50-51, 54-55 Apx. 17-18, 148-149]

13. Johnson, as Executive Director, interviewed Hall in person and thereafter offered her the position of Director of Education at a starting salary of $52,000 per year.

Johnson was solely responsible for the decision to offer Hall the position.  [Hall Dep. 51-52, 56 & Ex. 3, Apx. 17-18, 22, 90; Johnson Aff.¶ 4, Apx.]

14.  Hall accepted Johnson's offer and began working at the Center on April 21, 2003.  Hall was an at-will employee of the Center from April 21, 2003 to February 14, 2005, when her employment terminated.  [Hall Dep. 19, 41, 55 & Ex. 5, Apx. 7, 16, 21, 94]

15.  Upon being hired, Hall received and signed for a copy of the Center's Personnel Handbook.  [Hall Dep. 55 & Ex. 6, Apx. 21, 102]

16.  As Director of Education for the Center, Hall had the following duties, among others:

　　　a.  to assess the educational and technical assistance needs of the Center's members;

　　　b.  to develop educational offerings to meet those needs, including workshops, conferences and seminars;

　　　c.  to work with senior staff to assure the relevancy of courses offerings;

　　　d.  to identify, solicit and assist speakers;

　　　e.  to develop and implement registration procedures;

　　　f.  to market educational offerings;

　　　g.  to handle on-site logistics;

　　　h.  to develop and implement an evaluation system for the educational offerings;

-4-

      i.  to consider methods to implement on-line education; and

      j.  to calendar and manage use of the conference room and to develop

policies and processes for securing the conference room.

[Hall Dep. 53-54, 64-65 & Ex. 4, Apx. 19-20, 29-30, 91; Johnson Dep. I 39, 107-108,

Apx. 145, 160-161]

    17.  From April 21, 2003 to January 3, 2005, Johnson was Hall's immediate

supervisor and was responsible for evaluating Hall.  From January 3, 2005 until Hall's

employment terminated on February 14, 2005, Susan Sanow ("Sanow") was Hall's

immediate supervisor.  [Johnson Aff. ¶ 6, Apx. 245; Sanow Dep. 56, Apx. 316]

    18.  Johnson's normal practice is not to do a formal evaluation of an employee

who has been with the Center for fewer than six months.  However, Hall, who had then

been with the Center for only two months as of June 2003, requested that Johnson

evaluate her during the Center's June/July 2003 evaluation cycle and Johnson agreed to

do so.  [Johnson Aff. ¶ 7, Apx. 245]

    19.  In her June 2003 evaluation of Hall, Johnson gave Hall a "5" (outstanding) on

eight of 13 criteria based on two months' work, but did not evaluate Hall on the five other

criteria because the other criteria concern supervision and were then inapplicable to Hall.

[Hall Dep. 58-61 & Ex. 8, Apx. 23-27, 103; Johnson Dep. I 154-155, Apx. 178-179]

    20.  Coincident with her June 2003 evaluation of Hall, Johnson raised Hall's

salary by $8,000 from $52,000 to $60,000 per year.  At $60,000, Hall was the third-

highest-paid employee at the Center, behind only Johnson (the Executive Director, who

had then been with the Center for 18 years) and Jeff Kost (the Deputy Director for

External Affairs, who was the second-ranking official at the Center and who had then

been with the Center for five years).  [Hall Dep. 60, Apx. 25; Johnson Aff.¶ 8, Apx. 245]

21.  Hall does not know how other employees were evaluated in 2003 and she does

not know whether or the extent to which they received raises.  [Hall Dep. 62-63, Apx. 27-

28]

22.  Also in June 2003 Johnson gave another employee in a management position

comparable to Hall's (referred to here as Employee "A") an overall rating of "2"

(marginal) and no raise.  The primary reason why Johnson gave Employee "A" a

marginal evaluation and no raise was her history of verbal abuse toward other staff.

Employee "A" is a white female whose sexual orientation appears to be homosexual.

[Johnson Aff.¶ 9, Apx. 245-246; Mendoza II Dep. 22-25, 27, 29-30, 33, 37, 39-40, 42,

Apx. 272-283]

23.  During the evaluation period July 2003 – June 2004 the following matters

involving Hall came to Johnson's attention:

a.  *Compensatory Time*.  In the fall of 2003 Hall assigned herself

compensatory time without approval from the Executive Director and in violation of the

Center's Personnel Handbook.  Johnson counseled her about the matter.  [Hall Dep. Ex.

5; Apx. 92; Ans. to Interrog. #18(a), Apx. 227]

b.  *Mendoza Complaint*.  In October 2003 Barbara Mendoza, the Center's

office manager who had been with the Center since 1988, left a message for Hall

concerning conference room security.  Hall then criticized Mendoza for leaving the message, calling Mendoza unprofessional.  Mendoza complained to Johnson about the incident and Johnson counseled Hall on the matter, but Hall persisted in her criticism of Mendoza.  [Johnson Dep. I 133-134, 136, Apx. 171-173; Johnson Dep. II 35, Apx. 207; Ans. to Interrog. #11(a) & 18(c), Apx. 223, 227; Mendoza Dep. II 50, 52-56, 74-75, 79 Apx. 284-292]

       c. *Freedman Complaint*.  A Center program known as the Washington Post Award for Excellence in Nonprofit Management (the "Post Award"), had been created by Sanow and managed by her for some ten years prior to Sanow's resignation in November 2003.  Upon Sanow's resignation, Johnson assigned management of the Post Award to Hall and authorized her to hire an assistant to help with her increased responsibilities.  In late 2003 or early 2004, Michael Freedman complained to Johnson about Hall's management of the Post Award.  At the time Freedman was a member of the Center's Board of Directors, he was the Center's long-time Treasurer, and he was a member of the Post Award selection committee.  [Hall Dep. 63-64, 66-68, Apx. 28-29, 31-33; Johnson Dep. I 89-91, Apx. 153-155; Johnson Dep. II 18, Apx. 205]

       d. *Budget Submission*.  In March of 2004, Hall submitted a budget for her educational programs directly to a board member without Johnson's knowledge or consent.  [Johnson Aff. ¶ 10, Apx. 246; de Barbieri Dep. 76, Apx. 261]

       e. *Workshop Funds*.  In January 2004 the Center conducted a workshop for which it charged attendees a fee.  Part of Hall's responsibility was to collect those fees

and turn them over to the Center's bookkeeper for deposit.  In February, during a routine audit of the Center's finances, Hall was found to have receipts still in her possession, some of which were as old as two months.  Hall had also borrowed cash from the receipts for personal purposes.  As a result, the Center received a "management letter" from its auditor criticizing the Center for poor handling of funds.  [Hall Dep. 107-109, Apx. 42-44]

        f. *Kost Conference Room Incident*.  In February 2004 Hall and Jeff Kost, the Deputy Director for External Affairs, had a disagreement over use of the conference room.  Hall claimed that the Deputy Director showed disrespect toward her and she demanded that he apologize.  Johnson inquired into the matter but could find no evidence that the Deputy Director had been disrespectful.  Johnson concluded that Hall had been inflexible in her position and unnecessarily confrontational.  [Johnson Dep. I 109-110, 112, 119, Apx. 162-166; Johnson Dep. II 35, Apx. 207; Kost Dep. I 12-15, Apx. 230-233; Kost Dep. II 20, Apx. 239]

        g. *Baird Incident*.  In February 2004 a visitor was present in the Center's offices.  At a time when the visitor was not accompanied by anyone from the Center, a Center employee, Jeremy Baird, approached the visitor and questioned her about her presence at the Center.  Hall did not witness the incident, but when she heard about it she complained that the Center's employee was motivated by racism and she encouraged the visitor to make a written complaint to the Center.  Johnson investigated the matter and concluded that the employee's actions were not racially motived but were consistent with

the Center's security concerns.  [Hall Dep. 224, Apx. 70; Johnson Dep. I 126-127, 131-

132, Apx. 167-170;  Baird Dep. 16-17, 29, 45-49, Apx. 323-332]

  h. *Sanow Incident*.  Sanow, who had created the Post Award and managed

it for some ten years, resigned in November 2003.  Management of the Post Award was

then assigned to Hall in November 2003 and Sanow was asked to continue serving as a

consultant.  Hall was instructed to hire an assistant to help her with the added duties.

Prior to March 2004 Hall had still not hired an assistant and she was behind in her work

on the Post Award.  In March 2004 Sanow sent Hall an e-mail pointing out her late

delivery of applicant materials and pointing out some inconsistencies within the materials

themselves.  The e-mail also reminded Hall of approaching critical deadlines and it

offered Sanow's help.  Johnson concluded that Sanow's comments were justified and that

Hall's response to Sanow's e-mail was angry and defensive.  [Hall Dep. 66-69, 70-73 &

Ex. 8A & 9, Apx. 31-33, 35-38, 104, 105; Johnson Dep. I 92-93, 95-96, Apx. 156-159;

Sanow Dep. 26-30, 33-36, 88, Apx. 299-303, 305-308, 321]

  i. *Post Award Complaint*.  In April 2004 Sanow's then current employer

offered to allow Sanow to manage the Post Award without cost to the Center.  Johnson

accepted the offer because it amounted to a substantial gift in kind and because Sanow

was highly experienced in managing the Post Award.  Also, in Johnson's view, Hall's

management of the Post Award to that time had not been satisfactory.  When Hall

complained to Johnson about the decision, Johnson attempted to explain to Hall why she

(Johnson) had accepted the offer, but Hall persisted in accusing Johnson of disregarding

standard professional protocols and courtesies and intentionally damaging Hall's

professional reputation and credibility.  [Hall Dep. 73-76 & Ex. 10, Apx. 38-41, 106;

Johnson Dep. I 137, 139, 165, Apx. 174-175, 184; Johnson Dep. II 35, Apx. 207; Ans. to

Interrog. #15, Apx. 225; Sanow Dep. 14, 16, 20-22, 31, 40-42, 48-49, Apx. 294-298, 304,

309-313]

      j.  *Kost Security Incident*.  In June 2004 Kost noticed that the conference

room was not secure and he circulated an e-mail regarding the problem.  Hall responded

by e-mail: "In past person-to-person communications and, most recently, in your June 30

email to Lee and me, you have chosen to communicate in an offensive tone, displaying a

lack of professional control, courtesy and regard."  [Johnson Dep. II 35, Apx. 207; Hall

Dep. 109 & Ex. 12, Apx. 44, 109; Kost Dep. I 16-17, 20, Apx. 234-236]

      k.  *Miscellaneous Matters*.  During the evaluation period July 2004 – June

2005, Johnson became aware that Hall routinely worked with her office door shut

(contrary to most other employees); that she had little interaction with other staff

members; that she refused to keep Johnson informed of her activities, requiring Johnson

to schedule weekly meetings with her; that she frequently missed staff meetings; and that

she failed to schedule her time efficiently, resulting in Hall and another staff member

working all night on at least one occasion to meet a deadline.  [Johnson Dep. I, 112-113,

181-182, 210, Apx. 164-165, 185-186, 196; Johnson Dep. II 11, 58, Apx. 204, 212; Ans.

to Interrog. #11(b) & (d), Apx. 223-224; Kost Dep. II 13, 24-25, Apx. 238, 240-241;

Mendoza Dep. I 18-20, Apx. 268-270]

24.  On May 5, 2004, Johnson sent Hall an e-mail wishing her a happy *cinco de Mayo* – the anniversary of Mexico's victory over French troops in 1862.  [Johnson Dep. II 29, Apx. 206]

25.  The Board of Directors authorized Johnson to award salary increases up to a maximum of 5% coincident with evaluations of employees in July 2004.  [Hall Dep. 259-260, Apx. 76-77; Johnson Dep. I 157, Apx. 181]

26.  In her July 2004 evaluation of Hall, Johnson gave Hall a "5" (outstanding) on five of 13 criteria; a "4" (above average) on three criteria; and a "3" (satisfactory) on five criteria, for an overall rating of "4" (above average).  The criteria for which Hall received a "3" on her July 2004 evaluation were Attitude; Open Mindedness; Inter-personal Communication; Assertiveness; and Work Habits.  [Hall Dep. 110 & Ex. 13, Apx. 45, 110; Johnson Dep. I 142-143, 155-159, Apx. 176-177, 179-183; Johnson Dep. II 44, Apx. 208]

27.  Coincident with her July 2004 evaluation of Hall, Johnson raised Hall's salary from $60,000 to $61,800 per year, a 3% increase.  At that salary, Hall continued to be the third-highest-paid employee of the Center.  [Hall Dep. 129, Apx. 48; Johnson Dep. 157, Apx. 181; Johnson Aff. ¶ 11, Apx. 246]

28.  Hall complained to Johnson about her July 2004 evaluation, stating: "I believe that my style of communication is viewed as aggressive and 'inflammatory.'  These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive."  [Hall Dep. I 131 & Ex. 14, Apx. 50, 111]

29. Johnson met with Hall on August 6, 2004 to discuss Hall's complaint about her evaluation. During that meeting Johnson stated among other things that Johnson saw a pattern in Hall's interactions with co-workers in which Hall formed negative judgments about them and made inflammatory remarks to them. [Hall Dep. 255-256 & Ex. 38, Apx. 74-75, 121; Johnson Dep. II 44, Apx. 208]

30. Also during the August 6, 2004 meeting between Johnson and Hall, Johnson stated that if Hall's making judgments about co-workers was "a cultural thing," then the staff "should buck up and take it," but that Johnson thought Hall's behavior was not a cultural thing and instead amounted to verbal abuse. [Hall Dep. 253-254, 262 & Ex 38, Apx. 72-73, 79-80, 121; Johnson Dep. I 199-201, Apx. 193-195]

31. Except for the *cinco de Mayo* e-mail and Johnson's use of the phrase "a cultural thing" during her August 6, 2004 meeting with Hall, Johnson has never made any reference in the workplace, directly or indirectly, to Hall's ancestry, race or color. [Hall Dep. 127-128, 276, 297-300, Apx. 46-47, 81, 86-89]

32. Johnson has never made any reference in the workplace, directly or indirectly, to Hall's sexual orientation. [Hall Dep. 297-300, Apx. 86-89]

33. Johnson has never made a derogatory reference to race, color, national origin or sexual orientation to Hall, in Hall's presence, or in the presence of any other Center employee. [Hall Dep. 297-300, Apx. 86-89]

-12-

34. No other employee of the Center has ever made a derogatory reference to race, color, national origin or sexual orientation in Johnson's presence. [Hall Dep. 297-300, Apx. 86-89]

35. Hall does not know how other employees were evaluated in 2004, she does not know whether or the extent to which they received raises, and she has no documentation to support her claim that her July 2004 evaluation was different from similarly situated white and/or gay managers. [Hall Dep. 31, 129-130, Apx. 9, 48-49]

36. On August 9, 2004, Hall filed a charge of discrimination with the District of Columbia Office of Human Rights ("OHR"). [Hall Dep. 141, Apx. 52]

37. Johnson did not learn of the OHR charge until December 2004 when OHR served notice of the charge on the Center. [Hall Dep. 151, 233, Apx. 55, 71; Johnson Dep. II 127, Apx. 219]

38. On August 16, 2004 Hall complained to de Barbieri (then the Center's President), that her July 2004 evaluation was "biased on the basis of race, national origin and, possibly, retaliation." [Hall Dep. 40 & Ex. 15, Apx. 15, 112; de Barbieri Dep. 51-52, Apx. 257-258]

39. Following Hall's complaint to de Barbieri, de Barbieri conducted an investigation, which included a two-hour interview with Hall and interviews with Johnson and five other Center employees. [Hall Dep.147-148, Apx. 53-54; Johnson Dep. II 1290130, Apx. 220-221; de Barbieri Dep. 65-66, 126, Apx. 259-260]

-13-

40.  As a result of her investigation, de Barbieri prepared a written report in which she concluded that there was no evidence of discrimination or retaliation in Hall's 2004 evaluation.  [Hall Dep. 157-158 & Ex. 21A, Apx. 56-57, 113; de Barbieri Dep. 113, Apx. 262]

41.  Hall was explicitly invited in writing on two occasions, once by the Center's President and again by the Center's Executive Director, to specify any additional complaints she may have had concerning discrimination, but she did not do so.  [Hall Dep. 175-178, 254-255 & Ex. 23 & 24; Apx. 60-63, 73-74, 117, 118-119]

42.  Hall was actively job-hunting in the fall of 2004.  [Hall Dep. 13, Apx. 1a]

43.  The catalogue for the Center's fall 2004 courses offerings, which was Hall's responsibility, was not completed until the end of October, more than two months late. By that time, the dates for some course offerings had already passed.  Other courses had to be canceled as a result of low registration.  [Johnson Dep. I 212-213, 216-217, Apx. 197-200; de Barbieri Dep. 38-39, Apx. 254-255; Sanow Dep. 57-58, Apx. 317-318]

44.  In the six-week period from September 20 to October 30, 2004 Hall worked a total of 12 out of 29 scheduled workdays, claiming an unspecified illness.  [Johnson Aff. ¶ 12, Apx. 246]

45.  In October 2004 Johnson counseled Hall on her poor attendance and requested that Hall provide a note from her doctor about what could be expected.  Again on November 4, 2004, Johnson counseled Hall about her poor attendance and told her that should her absences continue at the current, unacceptable rate, other arrangements would

-14-

have to be made, including possibly the hiring of a permanent replacement.  [Hall Dep. 192-193, & Ex. 29, Apx. 64-65a, 120; Johnson Dep. II 71-72, Apx. 213-214; Ans. to Interrog. #11(d) & 18(g), Apx. 224, 228]

46.  Hall did not provide a note from her doctor until November 4, 2004.  The note, in its entirety, said: "Pt. is undergoing treatment for medical condition & needs periodic followup & assessment."  The note did not say what the Center could expect in terms of Hall's future medical absences.  [Hall Dep. 176-177, 273 & Ex. 24 & 56, Apx. 61-62, 80, 118, 134]

47.  The Center re-hired Sanow effective January 3, 2005, and appointed her Director of Programs.  In that capacity Sanow became Hall's immediate supervisor. [Sanow Dep. 54-56, Apx. 314-316]

48.  At various times during January 2005 Johnson and Sanow instructed Hall to post the Center's spring course offerings on the Center's website – a duty that she had performed several previous times.  Hall initially refused to do so, saying that was not part of her job.  [Hall Dep. 196-197, 214, Apx. 66-68; Johnson Dep. I 188, 193-194, Apx. 188-190; Johnson Dep. II 55, Apx. 209; Ans. to Interrog. #11(c), Apx. 223-224; Sanow Dep. 60-61, Apx. 319-320]

49.  On February 1, 2005, Hall received and accepted an offer of employment with Society of Research Administrators International ("SRAI").  [Hall Dep. 14-16; Apx. 2-4]

50.  In early February 2005 Johnson decided to fire Hall for insubordination, poor performance, and unacceptable workplace behavior.  The decision was Johnson's alone.

Johnson postponed doing so, however, pending mediation of Hall's OHR complaint.
[Johnson Dep. I 188-189, 197-198, Apx. 187-188, 191-192; Johnson Dep. II 55-56, Apx.
209-210; Johnson Aff. ¶¶ 13-14, Apx. 246; de Barbieri Dep. 153, Apx. 264]

51.  On Friday, February 11, 2005, the parties attended an unsuccessful mediation
session in connection with Hall's OHR complaint.  At the mediation session, the parties
and their attorneys signed an agreement that "all matters discussed during mediation are
confidential."  [Hall Dep. 296 & Ex. 72, Apx. 85, 139]

52.  Late on the afternoon of Friday, February 11, 2005, Johnson arranged to bar
Hall's access to the Center's offices during the February 12-13 weekend and to bar Hall's
remote access to the Center's computer network, all preliminary to firing her.  [Ans. to
Interrog. #19, Apx. 228; Johnson Aff. ¶15, Apx. 246-247]

53.  On February 14, 2005, prior to being fired, Hall submitted a written letter of
resignation to the Center, with copies of the letter to various individuals.  The letter
purported to describe certain statements made by Johnson during the mediation.  [Hall
Dep. 292-294 & Ex. 70A and 71, Apx. 82-84, 135, 136]

54.  On March 1, 2005, Hall began working for SRAI at a higher salary and with
better benefits than the salary and benefits she had been receiving at the Center.  Hall also
has an easier and cheaper commute to SRAI than she did to the Center.  [Hall Dep. 15-19,
Apx. 3-7]

55.  On April 4, 2005, Johnson hired Kai Dwyer as Manager of Education and
assigned her a number of functions previously performed by Hall.  (The remaining

functions were assigned to Sanow.)  Dwyer is an African-American female whose sexual

orientation appears to be heterosexual.  Johnson was solely responsible for the decision to

hire Dwyer.  [Johnson Aff. ¶ 17, Apx. 247]

56.  Just prior to Hall's resignation, the Board had 13 directors, consisting of six

African-Americans,  six whites, and one Latino.  [Johnson Aff. ¶18, Apx. 247]

57.  Just prior to Hall's resignation, the Center had a staff of 13 – six African-

Americans, six whites, and one Latina.  [Johnson Aff. ¶ 19, Apx. 247]

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By ____/s/ Charles H. Fleischer_____
        Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*

-17-