# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ARMINDA VALLES-HALL,** | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 1:06 CV 806 CKK |
| **CENTER FOR NONPROFIT ADVANCEMENT,** | ) | |
| Defendant | ) | |

## APPENDIX TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| Tab# | Description | Apx. Page |
|---|---|---|
| 1 | Arminda Valles-Hall depositions dtd. 1-4-06 & 2-16-06 (excerpts) | 1 |
| 2 | Exhibit 3 – offer letter dtd. 4-2-03 | 90 |
| 3 | Exhibit 4 – job description | 91 |
| 4 | Exhibit 5 – personnel handbook (excerpts) | 92 |
| 5 | Exhibit 6 – receipt for personnel handbook dtd. 4-28-03 | 102 |
| 6 | Exhibit 8 – evaluation dtd. 6-26-03 | 103 |
| 7 | Exhibit 8A – email dtd. 3-23-04, Sanow to Hall | 104 |
| 8 | Exhibit 9 – email dtd. 3-24-04, Hall to Sanow | 105 |
| 9 | Exhibit 10 – memo dtd. 5-11-04, Hall to Johnson | 106 |
| 10 | Exhibit 12 – emails dtd. 6-30-04 & 7-2-04, btwn. Kost & Hall | 109 |
| 11 | Exhibit 13 – evaluation dtd. 7-7-04 | 110 |
| 12 | Exhibit 14 – memo dtd. 8-4-04, Hall to Johnson | 111 |
| 13 | Exhibit 15 – email dtd. 8-16-04, Hall to de Barbieri | 112 |

| | | |
|---|---|---|
| 14 | Exhibit 21A – de Barbieri draft report | 113 |
| 15 | Exhibit 23 – letter dtd. 12-6-04, de Barbieri to Hall | 117 |
| 16 | Exhibit 24 – emails dtd. 11-4-04, btwn. Hall & Johnson | 118 |
| 17 | Exhibit 29 – memo dtd. 11-3-04, Johnson to Hall | 120 |
| 18 | Exhibit 38 – notes of meeting btwn. Hall & Johnson on 8-6-04 | 121 |
| 19 | Exhibit 56 – doctor's note dtd. 10-24-04 | 134 |
| 20 | Exhibit 70A – email dtd. 2-14-05, Hall to Johnson | 135 |
| 21 | Exhibit 71 – letter dtd. 2-14-05, Hall to Johnson | 136 |
| 22 | Exhibit 72 – mediation & confidentiality agreement dtd. 2-11-05 | 139 |
| 23 | Betsy Johnson depositions dtd. 1-12-06 & 2-23-06 (excerpts) | 140 |
| 24 | Center interrogatory answers served 1-5-06 (excerpts) | 222 |
| 25 | Jeff Kost depositions dtd. 1-12-06 & 2-23-06 (excerpts) | 229 |
| 26 | Betsy Johnson supplemental affidavit dtd. 4-11-06 | 244 |
| 27 | Mary Ann de Barbieri deposition dtd. 2-28-06 (excerpts) | 249 |
| 28 | Barbara Mendoza depositions dtd. 2-28-06 & 3-20-06 (excerpts) | 265 |
| 29 | Susan Sanow deposition dtd. 2-28-06 (excerpts) | 293 |
| 30 | Jeremy Baird deposition dtd. 4/5/06 (excerpts) | 322 |

Page 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

- - - - - - - - - - - - - - - x
                              :
ARMINDA VALLES-HALL,          :
                              :
            Plaintiff,        :
                              :
v.                            :  Civil Action No.
                              :  05-7238
CENTER FOR NONPROFIT          :
ADVANCEMENT,                  :  VOLUME I
                              :
            Defendant.        :
                              :
- - - - - - - - - - - - - - - x

                    Wednesday, January 4, 2006

                    Bethesda, Maryland

DEPOSITION OF:

            ARMINDA VALLES-HALL

        a Plaintiff in the above-entitled cause,

called for examination by counsel for the Defendant,

pursuant to notice and to agreement of counsel as to

time and place, at the law offices of Oppenheimer,

Fleischer & Quiggle, P.C., 7700 Old Georgetown Road,

Suite 800, Bethesda, Maryland 20814-6100, commencing

at 10:30 a.m., before Marney Alena Mederos, RPR, a

Notary Public in and for the State of Maryland, when

1   of?

2        A    No.  There was an additional on-line

3   resume that I submitted which I don't have a copy

4   of.

5        Q    Okay.  To whom did you submit that?

6        A    I don't remember the name of the

7   organization.  It was through idealist.org.

8        Q    When did you submit it?

9        A    In probably October or November of

10   2004.

11        Q    Okay.  Were you actively job hunting in

12   the fall of 2004?

13        A    Yes, I was.

14        Q    Applications for employment -- that's

15   request number 3 -- I did see some materials in the

16   documents you produced.

17          Do I have all of them?

18        A    Those are the ones that I had.

19        Q    Okay.  For offer letters, you say see

20   attached.

21          I didn't see any offer letters.  From

22   whom did you receive offer letters?

*App. 1a*

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 14

1          A      From my current employer, but I haven't

2    been able to find the current offer letter.

3          Q      Okay.  And who is your current

4    employer?

5          A      SRA International.

6          Q      What does that stand for?

7          A      Society of Research Administrators

8    International.

9          Q      All right.  When did you apply to SRA?

10         A      In June of 2005 -- January, excuse me,

11   of 2005.

12         Q      All right.  And when did you get an

13   offer from them?

14         A      February 1st, 2005.

15         Q      When did you accept that offer?

16         A      February 1st, 2005.

17         Q      What was your planned start date?

18         A      March 1st, 2005.

19         Q      Did you, in fact, start with them on

20   that date?

21         A      Yes, I did.

22         Q      What does SRA do?

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 15

1          A      They provide educational programs to

2    research administrators, the folks who handle the

3    administrative side of research grants.  It's an

4    international society with members around the

5    world.

6          Q      What do you do for them?

7          A      I'm their education officer.

8          Q      What's your salary there?

9          A      77,000.

10         Q      And was that your salary when you

11   started in March?

12         A      No, it was not.

13         Q      What was your salary then?

14         A      62,000.

15         Q      When were you increased to 77,000?

16         A      October of 2005.

17         Q      Okay.  I'm going to ask you about

18   benefits at SRA, but maybe I can simplify this.  How

19   do the benefits at SRA compare with the benefits at

20   the Center for Nonprofit Advancement?

21               MR. FLEISCHER:  Let me interrupt

22   myself.  Just for convenience, the Respondent in

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 16

1    this case is now named the Center for Nonprofit

2    Advancement.  It was previously named the Washington

3    Council of Agencies.  If it's agreeable with

4    everybody, I'm just going to say CNA --

5              MR. TEMPLE:  That's fine.

6              MR. FLEISCHER:  -- and I mean to refer

7    to that organization before and after its name

8    change.

9              Is that comfortable with everybody?

10             MR. TEMPLE:  Sure.

11             BY MR. FLEISCHER:

12        Q    Let me go back to my question.  How

13   would you compare the benefits at SRA with the

14   benefits that were provided to you at CNA?

15        A    I have never done an analysis of it.  I

16   know the health benefits are better.

17        Q    At SRA?

18        A    No.  At SRA -- yes, at SRA, I mean.

19        Q    Okay.  They're better at SRA?

20        A    That's correct.

21        Q    What other benefits do you have at SRA

22   that you can think of?

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                JANUARY 4, 2006

Page 17

1      A      Just the standard vision, dental,

2   personal time off instead of -- annual leave and

3   sick leave is split.  Just seventeen days of

4   personal time off.

5      Q      Seventeen days of PTO?

6      A      That's correct.

7      Q      Life insurance?

8      A      They're a member of the WCA or the CNA,

9   so they participate in their plans.

10     Q      Okay.  And disability insurance?

11     A      That's correct.

12     Q      Same answer?

13     A      Yes.

14     Q      Can you think of any benefits that you

15   had at CNA that are not available to you at SRA?

16     A      No.

17     Q      Okay.  Request number 5, written

18   communications between you and a prospective

19   employer at any time after April 2003, and I did see

20   some documents in the file.

21            You were hired effective April 21, 2003

22   at CNA?

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 18

1          A     That's correct.

2          Q     When after that date did you actively

3    start looking for another job?

4          A     In the fall of 2004.

5          Q     Okay.  Nothing between the fall of 2004

6    and April of '03?

7          A     No.

8          Q     To whom did you apply beginning in the

9    fall of 2004?

10          A     The Training Source at their

11    invitation; to KidsSafe; to the Idealist job, but I

12    don't remember what it was; to SRA; to the D.C.

13    Public Charter School Association.  Those are the

14    only ones I remember.

15          Q     Okay.  And the only offer you got was

16    from SRA?

17          A     That's correct.

18          Q     What's your commute now between your

19    home and SRA?

20          A     Four-and-a-half miles.

21          Q     How does that compare with your commute

22    from home to CNA?

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          JANUARY 4, 2006

Page 19

1          A     I don't have to take the Metro in from

2     Rosslyn.  Ordinarily, I would take the Metro --

3     drive in to Rosslyn and take the Metro in to D.C.  I

4     don't have to take the Metro now.

5          Q     Is your commuting time shorter now?

6          A     Yes, it is.

7          Q     Is it cheaper now?

8          A     Yes, it is.

9          Q     Okay.  The next request was notes of

10    oral communications between you and a prospective

11    employer, and you say none are available.

12               Is that accurate?

13         A     Whatever I supplied is whatever there

14    was.  I don't remember if we supplied anything on

15    that.

16         Q     Okay.  You have not applied for

17    unemployment insurance at any time after leaving

18    CNA; is that right?

19         A     That's right.

20         Q     Have you ever had an employment

21    contract either with CNA or with SRA?

22         A     I received acceptance letters.

ARMINDA VALLES-HALL                                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                   JANUARY 4, 2006

Page 22

1    searching for employment after January of 2003 don't

2    exceed $300?

3         A    I think that's accurate.

4         Q    I asked for communications between you

5    and the Office of Human Rights and I did see some

6    documents on that.

7              Anything else?

8         A    That's all I had in my file.

9         Q    When did you first file a complaint

10   with the Office of Human Rights?

11        A    I believe the date was August 9th.

12        Q    That was of 2004?

13        A    2004.

14        Q    All right.  I asked for pleadings,

15   affidavits, notices, et cetera filed with OHR, and

16   your answer is no such documents are available.

17             I take it, other than what you've

18   produced, nothing else is available?

19        A    That's right.  That's what I have in my

20   files.

21        Q    Okay.  Number 14 asks for pleadings and

22   so forth with respect to any other -- let me be sure

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT    JANUARY 4, 2006

Page 31

1        A      Yes.

2        Q      Have you given me everything you have

3   on that?

4        A      I believe so.

5        Q      All right.  I take it from your

6   response to number 31 that you have no documents

7   supporting your allegation that CNA terminated an

8   African-American director because she was not a good

9   fit?

10       A      That's right.

11       Q      Okay.  Who are you referring to there?

12       A      Lisa Ransom.

13       Q      Okay.  I asked for documents supporting

14  your allegation that your July 2004 evaluation by

15  CNA was different from similarly-situated Caucasian

16  and/or gay managers, and your answer is no such

17  documents are available?

18       A      That's correct.

19       Q      Do you know how other employees of CNA

20  were evaluated in the 2004 evaluation cycle?

21       A      Only through Betsy Johnson's words.

22       Q      Okay.  You haven't talked to any other

ARMINDA VALLES-HALL                                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                   JANUARY 4, 2006

Page 32

1     employees --

2           A     No.

3           Q     -- about their evaluations?

4           A     No.

5           Q     And you haven't seen their evaluations?

6           A     No, I have not.

7           Q     It's just whatever Betsy Johnson told

8     you?

9           A     That's correct.

10          Q     Okay.  Do you know how raises were

11    handed out or not handed out to other employees at

12    CNA as of July 2004?

13          A     No, I don't.

14          Q     Okay.  You got an $1,800 raise or a

15    $1,600 raise?

16          A     1,800.

17          Q     $1,800 raise?

18          A     (Witness nods head.)

19          Q     All right.  You alleged in the

20    Complaint -- I'm looking at request number 34.  You

21    alleged in the Complaint that there were some

22    financial irregularities with CNA's 403(b) plan?

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

---

Page 33

1          A      (Witness nods head.)

2          Q      I asked for documents in that category,

3     and you said none are available.

4                 Have you looked for any documents in

5     that category?

6          A      I don't have them.

7          Q      Are you aware of the existence of any

8     documents?

9          A      Yes.

10         Q      What would that be?  What was the

11    irregularity that you were referring to?

12         A      I was informed by a colleague that her

13    403(b) contributions were not being made on a timely

14    basis and that she complained about it twice and was

15    told that the organization was having cash flow

16    problems.

17         Q      Who was the colleague?

18         A      Karen Bailey, the health trust

19    accountant.

20         Q      And she complained -- to whom did she

21    complain?

22         A      To Betsy and to Barbara, I believe.

Page 34

1    Barbara Mendoza and Betsy Johnson.

2         Q      According to Karen, who was it who told

3    her that the organization was having cash flow

4    problems?

5         A      I believe it was Barbara Mendoza.

6         Q      Are you aware of any late deposits of

7    your 403(b) contributions?

8         A      No.

9         Q      Is it your contention that there were

10   some late deposits of your contributions?

11        A      I wasn't making contributions.

12        Q      So this didn't -- if there was

13   something going on, it didn't affect you?

14        A      No.

15        Q      All written complaints -- number 35,

16   all written complaints that you made concerning

17   financial impropriety, financial irregularities, and

18   so forth with respect to the 403(b) plan, and you

19   said see attached.

20              Did you produce anything in that

21   category?

22        A      I believe -- yes.  In communications

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 38

1    Q    How often do you see her?

2    A    Weekly.

3    Q    And it's been weekly since September?

4    A    That's correct.

5    Q    September of '04?

6    A    That's correct.

7    Q    Are there any other issues other than

8    work-related issues that you and she have dealt

9    with?

10    A    Yes.

11    Q    So you see her for other reasons as

12    well?

13    A    Yes.

14    Q    When did you start with physical

15    therapy?

16    A    I believe it was September of 2004.

17    Q    All right.  About the same time you

18    started the psychotherapy?

19    A    That's right.

20    Q    Number 37, all written complaints of

21    alleged discrimination made to CNA or any of its

22    officers, directors, or employees, and you see

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT        JANUARY 4, 2006

Page 39

1    attached.

2                    I take it I have all of those?

3         A    That's correct.

4         Q    All right.

5         A    That would be contained in the other

6    documents provided to Betsy Johnson and Mary Ann

7    de Barbieri.

8         Q    Are those the two people to whom you

9    made complaints?

10        A    That's correct.

11        Q    All right.  I did see an e-mail to

12   Ms. Mendoza.

13        A    Oh, that is right.

14        Q    Okay.

15        A    I thought that was the process.

16        Q    And she, in turn, referred you to Betsy

17   Johnson?

18        A    That's correct.

19        Q    And because the complaint was related

20   to Betsy Johnson, she, in turn, referred you to Mary

21   Ann de Barbieri; is that right?

22        A    That's correct.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 40

1          Q     Were there any subsequent complaints?

2     You made a complaint to Ms. de Barbieri in August of

3     2004, I'm recalling; is that right?

4          A     That's correct.

5          Q     All right.  That started the process

6     and you objected to the process and so forth, but

7     were there any other complaints of discrimination

8     that you made to CNA or anyone involved in CNA?

9          A     I don't believe so.

10          Q     All right.  I've asked you for

11     documents regarding your claim for attorney's fees

12     in this case, and you say see attached.

13               I didn't see anything there.

14          A     Uh-huh.

15          Q     Are you --

16          A     My bank is researching getting a copy

17     of the checks for me.

18          Q     So you've made payments to Mr. Temple's

19     firm in connection with that?

20          A     That's correct.

21          Q     Are you on an hourly basis with

22     Mr. Temple?

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT             JANUARY 4, 2006

Page 41

1          A     I've retained him and I've paid him

2     money to get started on the case.

3          Q     Okay.  It's well-earned, I'll tell you,

4     but what's the basis for the fee arrangement?  Is it

5     contingency, is it hourly, or some combination?

6          A     We haven't worked out all the details.

7          Q     Okay.  According to the file that I've

8     seen, you were employed by CNA beginning on

9     April 21, 2003; is that right?

10         A     That's right.

11         Q     And your letter of resignation is dated

12    February 14, 2005?

13         A     That's correct.

14         Q     And your last actual day of work was

15    February 11, 2005?

16         A     That's correct.

17         Q     Let me show you what I believe to be a

18    copy of the resume that you submitted in connection

19    with your application for employment.

20              MR. FLEISCHER:  Donald, I have one for

21    you.

22              If we could go off the record for just

ARMINDA VALLES-HALL                      ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT           JANUARY 4, 2006

Page 51

1        Q     Had you previously known Susan Sanow?

2        A     Yes.

3        Q     In what capacity had you known Susan?

4        A     From working in the nonprofit

5    community.

6        Q     Just networking and --

7        A     That's correct.

8        Q     Okay.  Did you submit a resume?

9        A     I believe this is the resume

10   (indicating).

11       Q     The resume we're looking at is the one

12   you submitted?

13       A     I believe so.

14       Q     Did you submit it electronically?

15       A     I believe so.

16       Q     What happened next?

17       A     I received a call for an interview, and

18   I was interviewed on March the 11th, I believe.

19       Q     By?

20       A     Betsy Johnson.

21       Q     How long did the interview last?

22       A     About two hours.

Page 52

1      Q      Was there any discussion of your

2  ancestry or race in that interview?

3      A      No.

4      Q      Was there any discussion of your sexual

5  orientation in that interview?

6      A      No.

7      Q      And I take it Betsy then hired you?

8      A      Not on the spot.

9      Q      Okay.  When did she hire you?

10     A      I believe it was March 18th by phone.

11     Q      Let me show you what I believe to be

12  the offer letter that you received as Exhibit 3.

13            Can you identify Exhibit 3 as the offer

14  letter you got?

15     A      I believe this is the offer letter.

16     Q      Ms. Valles-Hall, in some of the papers

17  that I have seen and that we'll look at in the

18  course of today, you refer to yourself -- if I'm

19  reading correctly, you refer to yourself as a woman

20  of color.

21            Do you consider yourself a woman of

22  color?

ARMINDA VALLES-HALL                      ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 53

1          A      Yes.

2          Q      In your opinion, do people -- all we

3    have here is a dry transcript.  We don't have --

4    we're not videotaping or anything else, so I need to

5    make a record.

6                 In your opinion, do people who you meet

7    see you as a woman of color?

8          A      Yes.

9          Q      Do you know, did Betsy Johnson see you

10   as a woman of color when she interviewed you and she

11   hired you?

12         A      Yes.

13         Q      What leads you to say that?

14         A      My appearance.

15         Q      Let me show you what I've marked as

16   Exhibit 4.

17                Can you tell me what that is, please?

18         A      It appears to be the job description

19   for the director of education position at the

20   Washington Council of Agencies.

21         Q      Okay.  If you would look back at

22   Exhibit 3, please, what is the position being

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT             JANUARY 4, 2006

                                                          Page 54

1      offered to you at CNA?

2             A      It reads director of education.

3             Q      And looking at Exhibit 4, what's the

4      job being described there?

5             A      Director of education.

6             Q      Is this the job description that you

7      were given upon hiring?

8             A      It is upon applying.

9             Q      Upon applying?

10            A      (Witness nods head.)

11            Q      And was it your understanding that that

12     was your job description that you were being hired

13     to fulfill?

14            A      Job description, yes.  Title, no.

15            Q      Tell me what title it is you understood

16     you were getting.

17            A      Director of the Center for Nonprofit

18     Learning & Leadership.

19            Q      When was that title first discussed?

20            A      In the interview.

21            Q      The initial interview with Betsy?

22            A      That's correct.

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                 JANUARY 4, 2006

Page 55

1          Q     Were you therefore surprised when the

2     offer letter came and it said director of

3     education?

4          A     Not a bit.

5          Q     Why not?

6          A     I just thought it was an oversight.  I

7     didn't think it was an issue.

8          Q     All right.  Upon hiring, were you

9     provided with a personnel handbook?

10         A     I believe so.

11         Q     I'll show you Exhibit 5, which I'm

12    going to tell you is the personnel handbook of CNA.

13              Can you identify it as such?

14         A     It appears to be, yes.

15         Q     And I'm going to show you Exhibit 6,

16    which I believe to be your receipt for the handbook.

17              Can you identify your signature on

18    Exhibit 6?

19         A     Yes, that is my signature.

20         Q     All right.  And it's dated April 28.

21              Is that about when you signed the

22    document?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 56

1      A      I would say yes.

2      Q      What was your starting salary?

3      A      My starting salary was 52,000.

4      Q      Who decided on your starting salary?

5      A      Betsy and I discussed it.

6      Q      What had you been making at

7  Grantmakers?

8      A      Fifty-eight-five.  58,500.

9      Q      Did you tell Betsy Johnson that?

10     A      I told her I was earning close to 60.

11     Q      Tell me how the salary negotiations

12  went.

13     A      She said she could only offer me 52,

14  and I told her that I thought that was low.  And she

15  said she -- that was all she could do at this time

16  until the next fiscal year, but that then she would

17  be able to adjust it to a more appropriate level.

18  And under those circumstances, I accepted it, and

19  she in my employment letter indicates it's my

20  starting salary.

21     Q      And you took that reference to be a

22  reference to the discussion you had that in the next

Page 58

1    the three boxes on the far left.

2              One box, if I'm reading it correctly,

3    says Programs, Vacant.  And then below and to the

4    left of that, it says Center for Nonprofit

5    Learning & Leadership, Arminda Valles-Hall.  And

6    then below that and to the left, it says Educational

7    Programs, Lee Mason.

8              Do you see those boxes?

9         A    Yes, I do.

10        Q    When did you learn that that was the

11   organizational chart or the intended chart for CNA?

12        A    I saw an organizational chart -- I

13   don't know if it's the same one -- that had a

14   program position vacant on March 9th at an executive

15   committee meeting in 2004.

16        Q    Do you have any recollection in your

17   interview with Betsy Johnson of her describing the

18   reporting structure and that your reporting to her

19   was only while a programs position was vacant?

20        A    I am certain she never said that.

21        Q    Okay.  Let's turn to your June 2003

22   evaluation.  You had been on the job at that point

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          JANUARY 4, 2006

Page 59

1    six or seven weeks; is that right?

2         A    From April 21st to June.

3         Q    Okay.  And when in June -- do you

4    recall the date of the evaluation?

5         A    I believe it was the 26th.

6         Q    Okay.  So perhaps eight weeks?

7         A    That's correct.

8         Q    Please take a look at Exhibit 8.

9              Can you tell me, is that your June

10   evaluation -- June 2003 evaluation?

11        A    Yes, it is.

12        Q    I see that item G is blank, and items

13   J, K, L, and M are blank.

14             Did Ms. Johnson tell you why those

15   items were blank?  Let me back up.  Let me withdraw

16   that question.

17             Tell me about the evaluation process.

18   Who did it, where did it take place, and who was

19   present?

20        A    Betsy Johnson completed the form.  I do

21   not believe it was completed in my presence.  I

22   don't remember specifically the details.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT               JANUARY 4, 2006

Page 60

1          Q      Did you have a meeting with Ms. Johnson

2     in which she gave you this evaluation?

3          A      I don't remember.

4          Q      Do you remember having any discussions

5     with Ms. Johnson about the evaluation?

6          A      I remember seeing it, but I don't

7     remember having discussions about it.

8          Q      You got a raise at about that time from

9     52,000 to 60,000; is that right?

10         A      Yes.

11         Q      How did you learn about your raise?

12         A      She came to my office and said, "I'm

13    giving you 60," and I didn't know what she was even

14    referring to because we weren't in the middle of a

15    conversation.  And I asked her what she meant, and

16    she said, "60,000," and then I understood I was

17    getting a salary adjustment.

18         Q      That was a separate discussion from any

19    discussion you might have had about the evaluation

20    itself?

21         A      Yes.

22         Q      At some point either in a meeting or in

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 61

1    some other way, Exhibit 8 came into your hands; is

2    that right?

3         A    That's correct.

4         Q    And items G, J, K, L, and M are blank;

5    is that right?

6         A    Yes.

7         Q    What was your reaction to seeing an

8    incomplete evaluation?

9         A    I had no reaction to it.

10        Q    Did you have occasion to ask

11   Ms. Johnson, well, what about these other categories

12   that you didn't fill in?

13        A    No, I didn't ask her about that.

14        Q    Why not?

15        A    I was new.  I wasn't managing anyone.

16        Q    It made sense to you that those items

17   would be left blank?

18        A    Sure, that they could be left blank.

19        Q    Explain to me the rating system.  I see

20   1 to 5 here.  What's your understanding of how the

21   rating system works?

22        A    Well, the key reads that the rating for

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 62

1     1 is unsatisfactory, number 2 is marginal, number 3

2     is satisfactory, number 4 is above average, and

3     number 5 is outstanding.

4          Q     Do you know how any other employees

5     were evaluated in June of 2003?

6          A     No.

7          Q     You haven't talked to them about their

8     evaluations?

9          A     No.

10         Q     And you haven't seen their evaluations?

11         A     No.

12         Q     And Ms. Johnson didn't tell you about

13    their evaluations?

14         A     No.

15         Q     Do you know whether any other employees

16    got raises in June of 2003?

17         A     No.

18         Q     Again, you haven't talked to any

19    employees about that?

20         A     No.

21         Q     You haven't seen any pay stubs?

22         A     No.

ARMINDA VALLES-HALL                        ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 63

1          Q     Ms. Johnson hasn't talked to you about

2     whether other employees got raises?

3          A     No.

4          Q     In the course of your work at CNA, did

5     you have access to payroll records?

6          A     No.

7          Q     I'm going to focus now on the

8     approximately one-year period from June 2003 to July

9     2004, a 13-month period, and I'm going to ask you

10    about a number of incidents or events that I

11    understand occurred during that period.

12              First, I want to talk a little bit

13    about Susan Sanow and your relationship with her.

14    When you started, it's my understanding -- you tell

15    me if I'm wrong or not.  When you started, CNA ran a

16    program called The Washington Post Award for

17    Excellence in Nonprofit Management; is that right?

18         A     That's correct.

19         Q     I'm going to refer to it as the Post

20    award.

21         A     That's fine.

22         Q     Okay.  When you started, who was in

Page 64

1    charge of the Post award?

2         A    Susan Sanow.

3         Q    And did you understand at the time she

4    had actually initiated that award and run it for

5    some nine years?

6         A    Yes, I did.

7         Q    What was your involvement with the Post

8    award when you started?

9         A    I had no involvement with it other than

10   working with Susan to promote programming related to

11   the Post award best practices.

12        Q    Let me back up for a minute and ask you

13   to describe your duties when you started.  I know we

14   have a job description.  First of all, let me ask,

15   is that job description fairly accurate?

16        A    One major responsibility that is not

17   included that was added to my plate shortly after I

18   came on board was management of the use -- internal

19   use and outside use of the center's meeting space.

20        Q    Okay.  Those are the A and B conference

21   rooms?

22        A    That's correct.

ARMINDA VALLES-HALL                        ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 65

1          Q     All right.  And you were in charge of

2     calendaring that use?

3          A     Calendaring the use, developing the

4     policies and processes for securing that space,

5     collecting rentals, and managing the use of that

6     space.

7          Q     Okay.  Other than that, is Exhibit 4,

8     the job description we're looking at, a fairly

9     accurate description of what you did from day to

10    day?

11         A     Yes.

12         Q     All right.  Let me go back to Susan

13    Sanow and --

14         A     Excuse me.  I would add one thing to

15    that.

16         Q     Sure.

17         A     I was also called upon to discuss

18    issues, for example, the database, and to weigh in

19    from an education perspective on changes --

20    organization-wide changes and issues such as the new

21    database.

22         Q     Okay.  What was in the database?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 66

1       A      They were talking about revamping the

2    database, and they brought in a variety of staff

3    members to lend opinions and to study the issues

4    that they were looking at.

5       Q      What data did the database contain?

6       A      Member information primarily.

7       Q      Okay.  I think we established that when

8    you started, Susan Sanow was in charge of the Post

9    award and you had no direct responsibility for that;

10   is that right?

11      A      That is correct.

12      Q      At some point, did you become involved

13   in the Post award?

14      A      Yes, I did.

15      Q      When was that?

16      A      In, I believe, November of 2003.

17      Q      And why did that happen?

18      A      Because Susan Sanow left the agency.

19      Q      Where did she go?

20      A      To the Virginia Tech Nonprofit

21   Initiative, I think it's called.

22      Q      Having left the agency, was she still

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 67

1   to have any responsibility with regard to the Post

2   award?

3           A       She was to remain a consultant on it

4   for a one-year cycle.

5           Q       But essentially, you were given her job

6   to run the Post award; is that right?

7           A       That's correct.

8           Q       What else did Susan Sanow do in

9   addition to the Post award when she was at CNA?

10          A       I don't know the full range of her

11  responsibilities, but she handled communications and

12  membership generally.

13          Q       So the Post award was only a part of

14  her responsibilities?

15          A       That's correct.

16          Q       Do you know the percentage of time she

17  devoted to the Post award before she left in

18  November of 2003?

19          A       I do not.

20          Q       Who assigned you the Post award?

21          A       Betsy Johnson.

22          Q       What was your reaction to that

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT         JANUARY 4, 2006

Page 68

1    assignment?  Did you say, hey, that's neat, or I

2    can't do it, or what was your reaction?

3            A     I was excited about the award.

4            Q     Did Ms. Johnson at the time ask you to

5    hire an assistant to help you with it?

6            A     She asked me to hire an assistant to

7    help with the full range of responsibilities of my

8    position.

9            Q     Okay.  And that was because the extra

10   work was being placed on your shoulders?

11           A     And because I -- when I was hired, I

12   told her it was not a one-person job.

13           Q     She agreed with that?

14           A     She did.

15           Q     But this is the first time, in November

16   of 2003, that she authorized you or directed you or

17   whatever she did to hire an assistant?

18           A     Yes, and I would go back to my

19   response.  It wasn't when she hired me that I said

20   that.  It was when she interviewed me that I told

21   her it was not a one-person job.

22           Q     Did you hire an assistant?

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT             JANUARY 4, 2006

Page 69

1          A     Yes, I did.

2          Q     When was that?

3          A     In March of 2004.

4          Q     And who was that?

5          A     Lee Mason, L-e-e, Mason.

6          Q     Why the gap from November to March?

7          A     Because I was not given a position

8    description for him; I had to develop it.  In

9    addition, I was managing The Washington Post award

10   on my own.  There was the holiday season, and there

11   were -- I was also in the process of developing the

12   spring calendar of programming approximately 50

13   courses for the spring.

14         Q     So you didn't -- you just didn't have

15   the time to turn to that; is that what you're

16   saying?

17         A     It's not that I didn't have the time.

18   It's that it was a process.  I was balancing all of

19   my responsibilities.

20         Q     Okay.  So you worked it in as best you

21   could?

22         A     I wouldn't characterize it as best as I

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 70

1    could.  It was an additional responsibility that I

2    handled like every other --

3         Q    Okay.  Did you view your being assigned

4    these additional responsibilities with regard to the

5    Post award as motivated by discrimination on Betsy

6    Johnson's part?

7         A    No, I did not.

8         Q    Let me ask you to look, please, at

9    Exhibit 8A.

10             Can you tell me what this is?

11        A    This is a letter from -- this is an

12   e-mail from Susan Sanow to me CC'd to Betsy

13   regarding the Post award dated March 23rd, 2004.

14        Q    Is this an e-mail you recall getting?

15        A    Yes, I do.

16        Q    What were Susan Sanow's

17   responsibilities with regard to the Post award as of

18   March 23, '04, the date of the e-mail?

19        A    To provide consulting services to the

20   award.

21        Q    She was still in that consulting

22   capacity?

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 71

1        A      Yes, she was.

2        Q      Did there come a point where Susan was

3   placed back in charge of the Post award although not

4   an employee of CNA?

5        A      Yes.

6        Q      When was that?

7        A      April the 8th or the 7th of 2004.

8        Q      Okay.  So at this point as of March 23,

9   she's still in her consulting capacity?

10       A      That's correct.

11       Q      We'll look at the substance of the

12  e-mail in a minute.  My question is:  Without regard

13  to the substance, was it appropriate for her to be

14  communicating with you about the Post award?

15       A      Absolutely.

16       Q      The e-mail that we're looking at,

17  Exhibit 8A, has something of a critical flavor to

18  it.

19              Would you agree with that?

20       A      Yes.

21       Q      What was it that Susan was criticizing?

22       A      The delay in getting -- one -- let me

Page 72

1    step back.

2              Number one was that the committee

3    members had been sent, in her opinion, more

4    information than they needed to have.

5         Q    Did you agree with that?

6         A    No.

7         Q    Okay.

8         A    And, two, the timeline for the

9    distribution of the materials.

10        Q    It says, "I am concerned that part 2

11   aps got out so, so late," and the words S-O, S-O are

12   capitalized.

13             So she's criticizing the timeliness of

14   the distribution?

15        A    That's correct.

16        Q    And did you agree with that criticism?

17        A    No.

18        Q    Putting aside for a minute whether

19   she's right or wrong about the criticisms she

20   raises, is it appropriate for her to be addressing

21   those topics?

22        A    Yes.

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 73

1          Q    All right.  Would you look at

2     Exhibit 9, please, and tell me if you can what that

3     is?

4          A    This is my March 24th e-mail to Susan

5     CC'd to Betsy in response to Susan's March 23rd

6     e-mail to me regarding The Washington Post award.

7          Q    Okay.  I have no other questions on

8     that.

9               Okay.  Tell me what happened in early

10    April of 2004 with regard to Susan Sanow's Post

11    award responsibilities.

12         A    Betsy informed me on April the 7th that

13    there was a possibility for -- that Virginia Tech

14    might or would be funding Susan's management of

15    The Washington Post award.  And the next day, it was

16    announced that Susan was -- Susan announced to the

17    committee that indeed she was going to be managing

18    it and that I was off the project.

19         Q    All right.  Did Betsy tell you that you

20    were completely off the project or that you would

21    have some continuing responsibilities?

22         A    She told me I was off the project.

ARMINDA VALLES-HALL                        ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 74

1          Q      Betsy told you that?

2          A      Well, I didn't have any continuing

3    responsibilities surrounding it.

4          Q      All right.

5          A      She didn't say you're off the project.

6    I just knew I wouldn't have any more responsibility

7    for it.

8          Q      You knew you wouldn't?

9          A      She told me that I wouldn't have

10   responsibility for it, that Susan was going to

11   manage the project because they had secured

12   funding.

13         Q      Okay.  What was your reaction to that?

14         A      I was very disappointed.  I asked -- I

15   was disappointed.

16         Q      Did you view your change in

17   responsibilities with regard to the Post award on

18   April 7, 2004 as motivated by discrimination?

19         A      I viewed it as motivated by

20   retaliation.

21         Q      Retaliation for what?

22         A      For my close association and working

Page 75

1    relationship with Lisa Ransom.

2         Q     What was Ms. Ransom's employment status

3    as of April 7, 2004?

4         A     She was a full-time employee of the

5    Washington Council of Agencies as its director of

6    advocacy -- public policy and advocacy.

7         Q     When did her employment terminate?

8         A     I believe June 15th, 2004.

9         Q     What is it about your association with

10   Ms. Ransom, in your view, that prompted Betsy

11   Johnson to retaliate against you?

12        A     I don't believe she liked either Lisa's

13   or my competency, frankly, and our strive to do

14   excellent work.

15        Q     Betsy Johnson, in your view, would have

16   preferred mediocre work?

17        A     Absolutely.

18        Q     Well --

19        A     She would have preferred status quo.

20        Q     What I'm trying to get at is -- it

21   seems to me we're saying two different things.  On

22   the one hand, Betsy Johnson is retaliating against

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 76

1    you because of your extra competency.

2                    Are we saying that?

3         A    She was retaliating on me because of my

4    association and close working relationship,

5    professional relationship with Lisa.

6         Q    Okay.  Let me show you Exhibit 10,

7    please.

8                    Can you tell me what that is?

9         A    This is a May 11, 2004 memo that I

10   submitted and discussed with Betsy Johnson regarding

11   my continued successful management of the Center for

12   Nonprofit Learning & Leadership.

13        Q    All right.  Did you personally deliver

14   this memo to Ms. Johnson?

15        A    Yes.

16        Q    And that was on May 11, 2004?

17        A    I believe so.

18        Q    All right.  I see most of the thrust of

19   it deals with The Washington Post award; is that

20   fair to say?

21        A    There are three items listed.  It's one

22   of three items.

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 107

1    issue, whatever that was.  So I suggested that if

2    she wanted to get a facilitator, I would be happy to

3    try to find one for her, but she never approached me

4    about getting one.

5         Q    When did that take place?

6         A    Sometime in the winter of 2004.  I

7    don't know the date.

8         Q    Okay.

9         A    I don't know the month.

10        Q    Winter 2004 being December 2004 or

11   January 2004?

12        A    I don't know.  I don't know.

13        Q    Okay.

14        A    Sometime in that time frame, that two-

15   or three-month time frame of winter.

16        Q    Winter 2003-2004?  Do you see what I

17   mean?

18        A    Oh, I'm sorry, yes, '03 to '04.

19        Q    Is Barbara Mendoza a Latino?

20        A    No.  She married a Latino.

21        Q    Do you recall an incident in January or

22   February of 2004 in which you were criticized for

ARMINDA VALLES-HALL                         ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

                                                        Page 108

1    failing to make timely deposits of workshop

2    receipts?

3          A     Yes.

4          Q     Who criticized you?

5          A     It was for Betsy, I believe, and it

6    was -- yes, Betsy.

7          Q     Was that justified?

8          A     Yes.

9          Q     All right.  In that same incident, were

10   you criticized for borrowing from cash receipts for

11   your personal needs?

12         A     Yes.

13         Q     Did you do that?

14         A     I did.

15         Q     Are you aware that CNA got a so-called

16   management letter on account of those incidents?

17         A     Yes.  Betsy told me that.

18         Q     Okay.

19         A     I discussed it with her, and she said,

20   "It's not a big deal."  She understood the

21   circumstances.

22               It was absolutely a lapse of judgment,

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                JANUARY 4, 2006

Page 109

1    but it was not -- there was no -- and I

2    self-reported it.  I said, "You know, I borrowed $10

3    to go get lunch.  I'll get it back tomorrow," and I

4    did, and I reported it.  The auditor noted that as

5    well in the report.  I also talked to Mary Ann

6    de Barbieri and explained the circumstances.

7              It was highly embarrassing to me that I

8    had had that lapse of judgment.  It was not in any

9    way intended to take from WCA.

10        Q    Let me show you two documents which

11   I've marked as 12 and 13, please.  12, I guess I'll

12   use.  Exhibit 12, if you would look at that,

13   please.

14        A    (Witness complies.)

15        Q    You testified earlier about an exchange

16   of e-mails involving Jeff Kost and the security of

17   the conference room.

18              Is that what we're looking at?

19        A    That's correct.

20        Q    Okay.  That's all I wanted to ask you

21   about on that.

22              Let us turn to your July 2004

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                JANUARY 4, 2006

Page 110

1    evaluation.  I'm showing you Exhibit 13.

2              Can you identify Exhibit 13 as your

3    July '04 evaluation?

4         A    Yes.

5         Q    Who performed the evaluation?

6         A    Betsy Johnson.

7         Q    Describe the circumstances of who was

8    present and where it took place.

9         A    The evaluation was over a two-day

10   period, July 7th and 8th, and it was me and Betsy

11   Johnson in her office.

12        Q    Let's start with July 7th, which is the

13   date on Exhibit 13.

14             About what time of day did that start?

15        A    I don't remember.

16        Q    How long --

17        A    It was in the afternoon.

18        Q    How long did you meet with her on the

19   7th?

20        A    I believe about an hour and a half to

21   two hours.

22        Q    Did you see the evaluation at that

Page 127

1    that yet.

2              You made reference to Betsy using the

3    term cultural thing or something like that.

4              Did she say anything else during the

5    July 7 and July 8 meetings which you took as a

6    reference to race or color?

7         A    Her actions said it.

8         Q    Okay.

9         A    Her disrespectful tone, the way she

10   believed every other person's opinion -- or not

11   even -- I don't even think they were legitimate

12   complaints.  I mean, she just made this stuff up.

13        Q    I understand that.

14        A    But even if they -- that's what did it.

15        Q    I understand that.

16             What I'm looking for is any words she

17   used which were racial in nature or related to

18   sexual orientation.

19        A    It was very clear to me what she meant

20   when she said cultural.

21        Q    Okay.

22        A    That's clear to anybody, so no.

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 128

1    Q    Did she use anything else?

2    A    No.

3    Q    Did Ms. Johnson -- I'm looking at

4    line H, pledges to get work done in allotted time.

5         Did she say anything about the

6    timeliness of your work?

7    A    She -- this was related to my having

8    pulled a 24-hour day to ensure that the HSC

9    conference, the conference in Prince George's

10   County, happened as scheduled.  We had some computer

11   glitches at the last minute, and I had to work

12   through the night to make sure that that was done.

13        She criticized me for that rather than

14   saying, you know, under the circumstances, you did a

15   great job.  You know, you did what you needed to do

16   to make sure that that event went off without a

17   hitch the next morning.  No.  I got criticized for

18   that.  That's what that related to, and I didn't

19   pledge anything.  She wrote that.  I believe I

20   worked -- my work habits were exemplary.  I worked

21   hard, I worked efficiently, and I produced good

22   quality.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT               JANUARY 4, 2006

                                                           Page 129

 1          Q       You got a raise at that meeting, did

 2     you not?

 3          A       Yes.

 4          Q       What, if anything, did Ms. Johnson tell

 5     you about the raise?

 6          A       That she was giving me a 3 percent

 7     raise.  She also told me if I corrected these

 8     deficiencies, I would get a good evaluation next

 9     year.

10          Q       Do you know how any other employees got

11     evaluated in July of 2004?

12          A       I don't know what's on their paper, no.

13          Q       Have you talked to any other employees

14     about their evaluations?

15          A       I conducted one, so I know what his

16     says.

17          Q       Who is that?

18          A       Lee Mason.

19          Q       Did you evaluate Lee?

20          A       I did.

21          Q       Okay.  How about anybody else at CNA?

22     Do you know what their evaluations were?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 130

1           A    No.

2           Q    Do you know whether they got raises?

3           A    I don't.

4                MR. FLEISCHER:  Would this be a good

5    time to break for lunch?

6                MR. TEMPLE:  I think so.

7                (Whereupon, at 12:58 p.m., the

8                deposition in the above-entitled matter

9                was temporarily recessed to reconvene

10               at 2:00 p.m. this same day.)

11

12

13

14

15

16

17

18

19

20

21

22

Page 131

1             A F T E R N O O N   S E S S I O N

2                         (2:10 p.m.)

3             BY MR. FLEISCHER:

4       Q    Let's look at Exhibit 14.  If you can,

5   tell me what that is, please.

6             (Discussion off the record.)

7             THE WITNESS:  This is my August 4th,

8   2004 e-mail or memo, rather, to Betsy Johnson

9   regarding my July 2004 evaluation.

10            BY MR. FLEISCHER:

11      Q    I take it the handwritten notes are

12  Ms. Johnson's and not yours?

13      A    That's correct, except for my

14  initialing.

15      Q    Okay.  Well, I won't ask you about her

16  notes then.  I'll just ask you about what you wrote.

17            Let me start with the second paragraph,

18  the second sentence:  Quote, I am concerned that the

19  basis of all scores rated less than 5 on my most

20  recent evaluation were based on biased subjective

21  impressions and on false and completely unfounded

22  and undocumented charges discussed for the first

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                JANUARY 4, 2006

Page 139

1    directed at Karen by Dawn and did nothing about it.

2              Q     How do you know that Betsy did nothing

3    about it?

4              A     Because Karen told me.

5              Q     Would you know if Dawn were given a

6    critical evaluation?

7              A     No.

8              Q     Would you know if Dawn was denied a

9    raise?

10             A     No.

11             Q     Would Karen know?

12             A     I don't know.

13                   Are you getting the picture?  We have a

14   different system here at work.  The complaints by

15   black people and brown people irrespective of their

16   position --

17             Q     I've got to tell you, there's no

18   question pending.

19             A     Well, it's a continuation of my answer

20   then.

21                   -- whether they're employees or

22   faculty, get dismissed.  The only thing that matters

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          JANUARY 4, 2006

Page 141

1          A     I don't recall.

2          Q     You didn't leave it at that?  You did

3     more, did you not?

4          A     Yes.

5          Q     Tell me what you did.

6          A     I filed a complaint with the Office of

7     Human Rights in the District of Columbia.

8          Q     And that was filed on August 9?

9          A     I believe that's the correct date.

10         Q     Did you do anything more internally?

11         A     I e-mailed Barbara Mendoza requesting a

12    formal investigation.  I believed Barbara to be the

13    person handling personnel issues and was told that

14    that had to go directly to Mary Ann de Barbieri, so

15    I e-mailed her with a formal request for

16    investigation.

17         Q     Is this a copy of your e-mail to Mary

18    Ann (indicating)?

19         A     Yes.

20         Q     And what response did you get from Mary

21    Ann?

22         A     She acknowledged receipt and said she

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 147

1          Q     Okay.  Look at Exhibit 20, please.

2          A     (Witness complies.)

3          Q     Is this an e-mail you received from her

4     on or about September 30th of '04?

5          A     That's correct.

6          Q     She says in this e-mail -- and I'll

7     paraphrase it, but if I misstate it, just let me

8     know -- she says that it's going to be a one-on-one

9     interview, and she offers three dates, October 13,

10    14, and 19.  And she says that I'm not willing to

11    delay this matter beyond October 19.

12                Is that a fair summary of the e-mail?

13         A     Yes.

14         Q     And then you agree to the 19th; is that

15    right?

16         A     I believe so, yes.

17         Q     And the interview did, in fact, take

18    place?

19         A     Yes, it did.

20         Q     Tell me where it took place.

21         A     At the lounge of the Capital Hilton at

22    16th and K Streets, Northwest.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT             JANUARY 4, 2006

Page 148

1          Q     Okay.  Who chose that location?

2          A     I did.

3          Q     Why did you choose that location?

4          A     So that I would be comfortable during

5     the interview.

6          Q     And she agreed to that?

7          A     Yes, she did.

8          Q     How long did the interview take place?

9          A     Two hours, I believe.

10         Q     Were you given an opportunity to tell

11    her everything on your mind?

12         A     Yes.

13         Q     Did she take notes?

14         A     Yes.

15         Q     Did she ask you any questions?

16         A     Yes.

17         Q     Do you remember the questions she asked

18    you?

19         A     Not specifically, no.

20         Q     Did you tell her as best you recall

21    everything that you've told me during the course of

22    the deposition about why you think CNA treated you

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 151

1        A     It is an e-mail I sent on

2   November 10th, 2004 to Charles Teixeira at the D.C.

3   Office of Human Rights.

4        Q     All right.  It looks to me as if you

5   were working with him on preparing a draft charge.

6   Is that what you were doing?

7        A     I don't know if that's what this is

8   called.

9        Q     May I see it, please?

10        A     (Witness complies.)

11             (Discussion off the record.)

12             BY MR. FLEISCHER:

13        Q     Do you know when CNA was notified of

14   your complaint?

15        A     No.

16        Q     Do you know whether it was after this

17   November 10 e-mail to Mr. Teixeira?

18        A     Not offhand, no.

19        Q     All right.  I'll just read you the

20   first sentence of the e-mail.  Quote, in this

21   e-mail, I am sending you text that constitutes my

22   complaint as it should be presented to the

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                JANUARY 4, 2006

Page 157

1    comfortable.

2         A    Okay.

3         Q    Can you identify Exhibit 21A as the

4    draft report you received from Mary Ann de Barbieri?

5         A    Yes, it appears to be.

6         Q    Can you tell me when you received it?

7         A    Not the specific date.

8         Q    Can you give me an estimate of how much

9    time following her interview with you you received

10   this?  Was it a week or two weeks?

11        A    Approximately a month --

12        Q    A month?

13        A    -- to five weeks.

14        Q    Okay.  If you would look at the bottom

15   of page 1, she lists the goals of her investigation.

16             Is that consistent with what you asked

17   her to do?

18        A    I requested a formal investigation.

19        Q    Of?

20        A    Of my complaint.

21        Q    Okay.  And are those goals consistent

22   with what you asked for?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 158

1       A      Those are the ones she identified, I

2   guess, for herself.  I didn't identify those.

3       Q      Okay.  Do the ones she identified

4   comprehend the issues that you sought to raise in

5   your complaint?

6       A      I would say generally, yes.

7       Q      Okay.  In her report, she says that in

8   addition to interviewing you, she interviewed Betsy

9   Johnson, Jeremy Baird, Jeff Kost, Barbara Mendoza,

10  Karen Bailey, and Lee Mason.

11          Do you have any reason to doubt that

12  she did, in fact, interview those folks?

13      A      No.

14      Q      Is there anyone you asked her to

15  interview that she didn't interview?

16      A      I mentioned Lisa Ransom, and I

17  mentioned Keonda Chester.

18      Q      At this point, was Lisa still an

19  employee?

20      A      No.

21      Q      How about Keonda Chester?  Was she an

22  employee?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 172

1        A     Because it was designed to make me

2    fail.  We had commitments to these people that we --

3    we had put proposals out there to deliver training.

4    We had already accepted a job to conduct an

5    evaluation of the training needs of the D.C. Office

6    of Asian and Pacific Islander Affairs.  We had

7    already accepted that job, and my staffing was cut.

8            That involved doing a focus group,

9    interviewing, I think, fifteen nonprofits from the

10   community about their training needs, conducting

11   personal interviews, conducting an evaluation --

12   on-line evaluation, and preparing a report of

13   finding.  That was a tremendous effort.  That was a

14   tremendous effort, and it wasn't a one-person job,

15   but my staffing was cut.

16        Q    Okay.  So it's your testimony that

17   Betsy hired you, she gave you two raises, and then

18   she wanted you to fail?  That's your testimony?

19        A     Repeat the question.

20        Q    Yes.

21           It's your testimony that Betsy hired

22   you, she gave you two raises, and she wanted you to

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 173

1    fail?

2           A    She absolutely, absolutely set the

3    course -- set up the course for me to be humiliated,

4    to undermine my work --

5           Q    I didn't ask you that.

6                Is it your testimony that she wanted

7    you to --

8           A    So yes.

9           Q    -- fail?

10          A    Absolutely.  I'm explaining it to you.

11          Q    I didn't ask for an explanation.

12          A    But I'm explaining it.

13               MR. BLUE:  She's answered the question.

14               BY MR. FLEISCHER:

15          Q    I didn't ask you for an explanation.

16               All right.  Look at --

17          A    Further --

18          Q    There's no question.

19          A    Okay.

20          Q    He can ask you any questions he wants.

21          A    Okay.

22          Q    If you would look at paragraph

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT               JANUARY 4, 2006

Page 175

1          Q     Okay.  I don't have those yet, okay.

2                Do you know what the total payments to

3     the psychotherapist is?

4          A     No.

5          Q     Have you ever claimed workers'

6     compensation for the medical conditions resulting

7     from what you claim to be a hostile work

8     environment?

9          A     No.

10         Q     Would you look, please, at Exhibit 23?

11         A     (Witness complies.)

12         Q     Can you identify Exhibit 23 as a letter

13    you received from Mary Ann de Barbieri?

14         A     Yes.

15         Q     All right.  Did you receive it on or

16    about December 6, 2004?

17         A     That's the date of the letter, yes.

18         Q     And is that about when you got it?

19         A     I suspect so.

20         Q     Looking at the second paragraph, I'm

21    going to quote it.  Paragraph 7 of your response

22    claims that Ms. Johnson used the term, quote,

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                 JANUARY 4, 2006

Page 176

1    cultural thing, closed quote, as a possible

2    explanation of your relations with colleagues.  If

3    you believe that that incident constituted

4    discrimination against you, I invite you, if you

5    wish, to provide detailed information about the

6    incident.  Your information should include details

7    as to where and when the incident occurred, who was

8    present, what was said and by whom, and why you

9    believe it constituted an adverse employment action

10   against you.  It would be helpful if you could

11   provide such information in writing, closed quote.

12           Did you provide any further information

13   to Ms. de Barbieri in response to her invitation?

14       A    No.

15       Q    I'm going to ask you to look at

16   Exhibit 24, please.

17       A    Thank you.

18       Q    My only question -- well, no.  I take

19   it back.  You look at it and then I'll ask you some

20   questions.

21       A    Okay.

22       Q    Can you identify Exhibit 24 as -- well,

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 177

1    there's several e-mails.  The two I want to ask you

2    about are one dated November 4, 2004 from you to

3    Betsy Johnson and then a response dated November 4

4    from Ms. Johnson to you.

5            A    Yes.

6            Q    Okay.  Look, please, at the e-mail from

7    you to Ms. Johnson.  There are four numbered

8    paragraphs, and below that is an unnumbered

9    paragraph.  And in that unnumbered paragraph, you

10   use the term hostile working conditions.

11           Do you see that?

12           A    Yes.

13           Q    Okay.  And then Ms. Johnson's response

14   to you says, quote, your e-mail describes your

15   working conditions as hostile and abusive.  WCA

16   takes all such accusations seriously.  As you are

17   aware, the chair of our board is currently

18   investigating your earlier personnel complaint.  If

19   you believe that you have been subjected to

20   discriminatory conduct different from or in addition

21   to the complaint that is currently under

22   investigation, please let me know preferably in

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          JANUARY 4, 2006

Page 178

1    writing.  You should identify as specifically as

2    possible the new matters you are complaining about,

3    including the times and dates and the persons

4    involved, closed quote.

5              Did you do that?

6         A    She was aware of what she was doing.

7         Q    I didn't ask you what she was aware

8    of.  I asked you:  Did you do that?

9         A    So no.

10        Q    Would you look, please, at Exhibit 25?

11        A    Wait a minute.  No.  I have to say

12   that -- well, yes, Betsy was very aware --

13        Q    I didn't ask you that.

14        A    I'm answering your question, whether

15   she was --

16        Q    No, you're not.

17        A    Yes, I am.

18        Q    You're answering somebody else's

19   question.

20        A    How would you know if I haven't

21   finished my answer?

22        Q    Could you tell me what Betsy was aware

Page 192

1          Q    Okay.  Let's look at the item 10/20.

2    You indicate five hours worked, two hours' sick

3    leave, and handwritten after that is four hours'

4    sick leave plus two.

5               Do you know which of those is

6    accurate?

7          A    The one I submitted is the one that

8    would have been accurate.

9          Q    And is the same thing true of the other

10   handwritten entries?

11         A    That's correct.

12              I'm sorry, but I need to go to the

13   ladies' room.

14         Q    Of course.  Of course.

15              (Recess from 3:55-4:00.)

16              BY MR. FLEISCHER:

17         Q    Ms. Johnson complained about your

18   attendance to you, did she not?

19         A    Yes.

20         Q    Did you view those complaints as

21   justified?

22         A    No.

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                  JANUARY 4, 2006

Page 193

1      Q      Why not?

2      A      Because the reason I missed work was

3  because I was sick.

4      Q      All right.  How much sick leave does

5  CNA provide you?

6      A      I don't remember.

7      Q      Had you exhausted your sick leave?

8      A      No.

9      Q      So at the time she was complaining to

10  you about attendance problems, you had not exhausted

11  your sick leave?

12      A      I don't believe I had.

13      Q      She asked you for a doctor's note?

14      A      Yes.

15      Q      Did you provide her one?

16      A      Yes.

17      Q      How long after she asked you for the

18  note did you provide it to her?

19      A      About two weeks.

20      Q      I'm sorry for the almost complete

21  illegibility of Exhibit 30, but if you could take a

22  look at it and tell me if that's the document you're

1     talking about.

2          A     Yes.

3          Q     Okay.  Can you read the doctor's name?

4          A     It's Ambrish Gupta, Jyotsna Gupta, and

5     Manish Upadhyay, M-a-n-i-s-h, second name

6     U-p-a-d-h-y-a-y.

7          Q     And that's dated 10/29/04?

8          A     It's a little unclear.  I can't tell.

9          Q     Okay.  And then the substance of the

10    note says:  Patient is undergoing treatment for?

11         A     Medical condition and needs periodic

12    follow-up and assessment.

13         Q     Okay.  When did you deliver this note

14    to Ms. Johnson?

15         A     I believe the date was 11/02 or 11/04.

16               (Discussion off the record.)

17               BY MR. FLEISCHER:

18         Q     Can you tell me whether that's a memo

19    you got from Ms. Johnson?

20         A     Yes, it is a memo I received from Betsy

21    Johnson.

22         Q     Susan Sanow returned full time when?

Apx. 65a

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 196

1    change on Susan's arrival?

2        A    In terms of my authority, yes.

3        Q    Okay.  You had less authority?

4        A    Yes, absolutely.  And I was no longer

5    permitted to do the kind of relationship building

6    and outreach that had been part of my work

7    previously.

8        Q    Your job responsibilities were

9    decreased?

10       A    They were changed in a way that

11   minimized or eliminated my authority for decision

12   making over the program I managed.  They weren't

13   decreased.  More work was given to me.

14       Q    And what was that more work?

15       A    I was told I had to put all of the

16   courses for the spring calendar onto our website in

17   addition to RegOnline, which was the on-line event

18   management software that we used to manage our

19   programs.

20            I complained that -- I informed them

21   that that was the communication director's job.

22   That had been the agreement, and that was his job.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 197

1   Nonetheless, I was forced to do that work.  I was

2   threatened.

3          Q      Did you ultimately do it?

4          A      I had to.

5          Q      Had you ever done it before?

6          A      I had.

7          Q      When had you done it before?

8          A      When we didn't have a communications

9   director.

10         Q      So you had done it before?

11         A      Yes.

12         Q      Okay.  Did you at first refuse to do

13  it?

14         A      I did.

15         Q      When were you first assigned the duty

16  of posting the courses on the website?

17         A      In a January meeting -- early January

18  meeting with Betsy and Susan, we discussed that.

19         Q      All right.  And did you come away from

20  that meeting with the understanding that, like it or

21  not, that was being assigned to you?

22         A      No.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT               JANUARY 4, 2006

Page 214

1          MR. FLEISCHER:  I want to give your

2    counsel a chance to read that.

3          MR. TEMPLE:  Okay.  Thank you.

4          BY MR. FLEISCHER:

5     Q     In the third bullet about two-thirds of

6    the way into that paragraph, quote, I stated in our

7    January 5 meeting that I was not hired to be a

8    website manager, and this responsibility is not

9    listed in my job description, closed quote.

10          Is it your position that CNA had no

11   right to change your duties?

12     A     CNA had no right to give -- to make me

13   do other people's work.  I was doing what I was

14   hired to do.

15     Q     And CNA had no right to ask you to do

16   something else?

17     A     Obviously, they do.  They put a lot

18   more on my plate, but I -- I don't believe I should

19   have done his work.

20          MR. FLEISCHER:  It's 4:30, Ladies and

21   Gentlemen.  Do you want to stop?

22          MR. TEMPLE:  Yes.

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            February 16, 2006

Page 219

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - - - - -x

ARMINDA VALLES-HALL,

     Plaintiff,

 vs                                 Civil Action No.
                                     05-7238
CENTER FOR NONPROFIT
ADVANCEMENT,                         VOLUME II

     Defendant.

- - - - - - - - - - - - - -  x
                        Thursday, February 16, 2006
                        Bethesda, Maryland

CONTINUED DEPOSITION OF:

         ARMINDA VALLES-HALL,

called for further oral examination by counsel for

the defendant, pursuant to notice and agreement of

Counsel, commencing at 10:15 a.m. at the law offices

of Oppenheimer, Fleischer & Quiggle, PC, 7700 Old

Georgetown Road, Bethesda, Maryland, 20814, before

Maureen Donelson, Court Reporter, Notary Public in

and for The State of Maryland, when were present on

behalf of the respective parties:

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 224

1    Q.    Did you note any corrections?

2    A.    Yes.

3    Q.    Why don't we save that until the end.

4    A.    Okay.

5    Q.    And you can tell me what they are and

6  we can talk about that if we need to.

7    A.    Okay.

8    Q.    One of the events that came up in some

9  of the pleadings you filed and some of the documents

10  you've authored involves Carlottia Scott.  Can you

11  tell me about that incident?

12    A.    I didn't witness the incident.  I

13  brought Ms. Scott into the office as a potential

14  trainer for an advocacy program.  Carlottia Scott is

15  a very highly regarded public policy trainer.  She

16  worked with I believe the Democratic National

17  Committee conducting training for the DNC.  And very

18  well respected, very highly regarded.

19           She came to WCA through Lisa Ransom

20  Brown.  And as Lisa and I were talking about

21  developing advocacy trainings through the Center for

22  Nonprofit Learning and Leadership, which I managed,

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 233

1          A.   No, I don't, but I know that they

2    received Lisa Ransom Brown's complaint in June of

3    2004 --

4          Q.   I'm just asking about yours.

5          A.   -- and the behavior against me,

6    because I was listed as a witness on that.

7          Q.   I'm asking about notice of your

8    charge, ma'am.

9          A.   Right, but it connects to Lisa's

10   because --

11         Q.   I know you connect it, but I am not

12   asking about that.

13         A.   Right.  But as soon as she filed,

14   that's when it really came down on me.

15         Q.   But that's not what I'm asking about.

16   What I'm asking about is, do you know when CNA

17   received notice of the charge you filed?

18         A.   No, I don't.

19         Q.   Did you tell anyone at CNA that you

20   had filed a charge?

21         A.   Yes.

22         Q.   Who did you tell?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 253

1  Ms. Johnson said to you?

2        A.   Yes.

3        Q.   Who is the guy that's being referred

4  to?

5        A.   I don't remember his name, but he was

6  a participant, an attendee, of one of my sessions.

7  And he did not pay for the session in advance.  And

8  when I followed up with him, he said in a rather --

9  well, he wasn't interested in following up and

10  paying for the program.  He said call our office

11  accountant or whatever the title was for that

12  person.  And I asked him to follow-up with his own

13  office to get payment for that program.

14        Q.   At some point, and I want to pin down

15  when, and maybe more than once, Ms. Johnson used the

16  phrase "cultural thing".

17            Did that phrase or a similar phrase

18  get used during the course of the July 7, 8

19  evaluation?

20        A.   I don't remember.  I would have to

21  look through all the notes.

22        Q.   I can tell you I didn't see it.  I do

ARMINDA VALLES-HALL                        ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT        February 16, 2006

                                                      Page 254

1    see it in some notes of a subsequent meeting.   I

2    didn't see it in the notes that we're looking at

3    right now.

4              Do you have any independent

5    recollection of whether the phrase "a cultural

6    thing" came up during July 7 or 8?

7         A.    I don't.

8         Q.    My recollection of your testimony last

9    time was that sometime after this evaluation session

10   that we've just been talking about, you sent a memo

11   to Ms. Johnson complaining about the evaluation. And

12   I believe we saw that memo.  We marked it Exhibit 14

13   last time is my recollection.

14              Does that sound right to you?

15        A.    It sounds right.

16        Q.    And in that memo, you make reference

17   to, quote, women and people of color, closed quote.  .

18              Do you recall that?

19        A.    Yes.

20        Q.    Is that memo the first time that you

21   made specific reference to race or color or national

22   origin in complaining to Betsy about how you had

Page 255

1    been treated?

2              A.    I don't recall.

3              Q.    As you sit here, and please take a

4    moment if that would be helpful to you, do you

5    recall making any such reference earlier than that

6    memo?

7              A.    I don't.

8              Q.    In that memo you suggested that you

9    and Betsy have a meeting or you said you would be

10   willing to meet about it or words to that effect.

11   Did a meeting take place with Ms. Johnson?

12             A.    I'm sorry, Mr. Fleischer, would you

13   please repeat that?

14             Q.    Sure.  In the memo you said you would

15   like to have a meeting with Ms. Johnson or you would

16   be willing to sit and meet with her about the memo.

17   Did a meeting take place?

18             A.    Yes, we did meet.

19             Q.    Take a look, please, at what I have

20   marked as Exhibit 38.

21             A.    Okay.

22             Q.    Am I accurate in describing Exhibit 38

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 256

1    as notes you made of the meeting you had with

2    Ms. Johnson on August 6, 2004?

3            A.    Yes.

4            Q.    And the topic of that meeting was your

5    evaluation and your objections to it; is that right?

6            A.    That's correct.

7            Q.    The first entry says, quote, some of

8    the issues that have come up in the last year were

9    not evident then, closed quote.

10            I'm guessing that the then refers back

11    to your 2003 evaluation; is that right?

12            A.    That's correct.

13            Q.    And you're complaining that, hey, I

14    did fine in 2003, how come I didn't do so hot in

15    2004; is that right?

16            A.    That's correct.  Not how come I didn't

17    -- yes.

18            Q.    How come my evaluation isn't so good?

19            A.    Well --

20            Q.    I don't want to put words in your

21    mouth.

22            A.    This is Betsy's explanation of my

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 259

1           A.   I think they were twice a month.

2           Q.   And so there would have been some 24

3    of them or close to it in calendar year 2004?

4           A.   Some were canceled.

5           Q.   Do you remember how many?

6           A.   No.

7           Q.   Can you give me an estimate of how

8    many meetings actually took place?

9           A.   I can't.

10          Q.   Can you give me an estimate of what

11   percentage of the meetings you attended?

12          A.   I'd say close to 90.

13          Q.   Ninety percent?

14          A.   I would think so, yes.

15          Q.   If you look at the second page of

16   Exhibit 38, please, about three-quarters of the way

17   down the page.

18          A.   The first page?

19          Q.   The second page.

20          A.   Okay, the second page.

21          Q.   There is one thing is here that is

22   completely wrong.  Five percent is the ceiling,

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 260

1    underscored, approved by the board, underscored, not

2    the base minimum standard.

3                      She's talking here about raises in

4    July of 2004, is she not?

5            A.    Yes.

6            Q.    Is that statement accurate so far as

7    you know?

8            A.    I believe that's what she told me.

9            Q.    Do you have any reason to doubt it?

10           A.    And I think I did see that in the

11   personnel handbook post this, yes.

12           Q.    Do you have any reason to doubt the

13   accuracy of this statement?

14           A.    No.

15           Q.    Look at the next page, please, about

16   the middle of the page, starting in the middle of

17   the paragraph, by the way, you are not the first

18   person who I've had to speak to about their attitude

19   toward people, and, amazingly, the other person was

20   not a person of color.

21                      Did Ms. Johnson make that statement,

22   first of all?

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            February 16, 2006

Page 261

1          A.    Um-hum.

2          Q.    Yes?

3          A.    Yes.

4          Q.    How did the issue of person of color

5     come up in this meeting?  Did you raise it?  Did she

6     raise it?

7          A.    That's what she said.

8          Q.    Yes, but had you prior to her saying

9     this complained that as a person of color you were

10    being treated differently?

11         A.    This was -- the date of this meeting

12    was August the 6th.  I think my letter to her was

13    dated -- my memo to her was dated August the 4th.

14    And she had received it.  That's when I requested a

15    meeting that resulted in this meeting.  So yes, I

16    had talked about women and people of color.

17         Q.    So you raised that issue previously,

18    and part of her response is this statement?

19         A.    That's right.

20         Q.    Do you have any reason to doubt the

21    truth of the statement?

22         A.    Yes, because she was lying to me

ARMINDA VALLES-HALL                     ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT      February 16, 2006

Page 262

1    throughout this process.  So, yes.

2          Q.    Do you know who the person is she's

3    referring to here?

4          A.    I have no idea.

5          Q.    Then if you turn to the next page, it

6    has a Bate stamp of 366 on the bottom:  If it's a

7    cultural thing, I don't know.  It's not an

8    experience I've ever had.  If making judgments about

9    people, telling them is a cultural thing, then maybe

10   we need to tell staff it's a cultural thing and they

11   should buck up and take it.  But frankly that would

12   come as a surprise to me.  But I don't think it's a

13   cultural --

14         A.    Right.

15         Q.    -- a cultural right.  It's verbal

16   abuse, underscored.  And in the other instance, it

17   was a white person talking about a black person.

18   The white person was wrong, in my view, and we can

19   only go by my view.

20               Is this an accurate recording of what

21   Ms. Johnson said?

22         A.    Yes.

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 273

1          A.    That's correct.

2          Q.    Exhibit 51 is your response

3     transmitting your comments to Ms. de Barbieri.

4          A.    Yes.

5          Q.    Exhibit 52 is Ms. de Barbieri's

6     response back to you.  Is that accurate?

7          A.    Yes.

8          Q.    I have another set of documents that

9     I'm not going to ask questions about.  I would

10    simply like to have them identified on the record.

11    I'm going to suggest we go off the record again and

12    perhaps we can stipulate to that.

13                   (Thereupon, a discussion occurred

14                    off the record)

15               MR. FLEISCHER:  Back on the record.

16               Mr. Temple, can we have a stipulation

17    that Exhibits 53 through 66 are authentic?

18               MR. TEMPLE:  Yes, indeed.

19          BY MR. FLEISCHER:   (RESUMED)

20          Q.    In the earlier session, I asked you

21    about Betsy sending you an e-mail on May 5, on Cinco

22    de Mayo, and I think you said she did.

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 276

1    file that was in Ms. Johnson's office?

2           A.    That's correct.

3           Q.    Had you or she ever made reference to

4    your Mexican ancestry prior to May 5, 2004?

5           A.    Not that I recall.

6           Q.    Did this come as a surprise to you?

7           A.    No, not a bit.

8           Q.    Was it common knowledge around the

9    office that your ancestry is Mexican?

10          A.    Maybe not that I was Mexican, but

11   certainly that I was Latina.

12          Q.    Did you have occasion to speak Spanish

13   to members, trainers, others around the office?

14          A.    Yes.  Not in a conversational way,

15   because no one spoke Spanish, but in terms of using

16   phrases that are generally known, hasta luego, como

17   esta, that kind of thing, yes.

18          Q.    So you would say that as part of your

19   normal speech?

20          A.    Oh, yes.

21          Q.    Let me ask you to look at Exhibit 68,

22   please.

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          February 16, 2006

Page 292

1          Q.    What did you do when you were in the

2    office?

3          A.    I packed what was left of my stuff in

4    the office and I walked out of the door.  And on the

5    way out, we saw the security guard, and that's when

6    I saw the letter and my picture.

7          Q.    How long were you in the office?

8          A.    Twenty minutes, approximately.

9          Q.    Did you and Karen Bailey have any

10   discussions?

11         A.    I told Karen that I was resigning, and

12   she helped me carry a box out.

13         Q.    Any other discussions with her?

14         A.    No.  I called her on Sunday to ask her

15   if I could follow her in because my key fob didn't

16   seem to be working.

17         Q.    Did she say anything to you on that

18   Sunday telephone conversation which would indicate

19   she knew anything about your employment status?

20         A.    No.

21         Q.    Let me show you Exhibits 70-A and 71.

22               Is Exhibit 70-A an e-mail that you

Page 293

1    sent on February 14th?

2            A.   Yes, it is.

3            Q.   I'm looking at the header up there

4    len.min@comcast.net.  That's your home e-mail?

5            A.   That's correct.

6            Q.   Did you send it to the e-mail

7    addresses that are indicated in the "to" area?

8            A.   Yes.

9            Q.   Did you also send it to Mr. Temple and

10   Michelle Thomas?

11           A.   Yes.

12           Q.   Look at Exhibit 71, please.  Is 71 a

13   letter of resignation that you wrote on February 14,

14   2005?

15           A.   It's dated February 14, yes.

16           Q.   When did you actually write it?

17           A.   On the 13th.

18           Q.   How did you mail it or deliver it?

19           A.   I left it in Ms. Johnson's box when I

20   went to work that day on February the 14th.  And I

21   e-mailed it to Ms. Johnson and the rest of the board

22   of directors, members of the board of directors,

Page 294

1    from my home computer on February the 14th.

2            Q.    It also shows a CC to Michelle Thomas,

3    investigator, D.C. Office of Human Rights.  Did you

4    send it to her?

5            A.    I believe I did.

6            Q.    Let me call your attention to the

7    first page of Exhibit 71, please, the bottom of the

8    page, last sentence, I think it is, on the bottom of

9    the page, quote, when our lawyers you and I, met

10   with the D.C. Office --

11           A.    I'm sorry, you're on Exhibit 71, what

12   page?

13           Q.    The first page, the bottom of the

14   page.

15           A.    Yes.

16           Q.    When our lawyers, you and I, met with

17   the D.C. Office of Human Rights on Friday, February

18   11, 2005 -- let me interrupt myself.

19                 The meeting you're referring to is the

20   mediation; is that right?

21           A.    That's correct.

22           Q.    Quote, you told the mediator that

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 296

1          THE WITNESS:  I didn't think of that.

2      BY MR. FLEISCHER:  (RESUMED)

3      Q.    Look at Exhibit 72, please.  Can you

4  identify that?

5      A.    Yes.

6      Q.    Is that the confidentiality agreement

7  that you signed at mediation on February 11, 2005?

8      A.    Yes.

9      Q.    That is your signature over the line

10  complainant's signature?

11      A.    Yes.

12          MR. FLEISCHER:  Let's go off the

13  record.

14          (Thereupon, a recess was taken)

15          MR. FLEISCHER:  Back on the record.

16      BY MR. FLEISCHER:  (RESUMED)

17      Q.    Ms. Valles-Hall, I asked you about

18  attorneys fees at our first session, and I think you

19  said you paid Mr. Temple something but you hadn't

20  worked out arrangements for going forward.

21      A.    That's right.

22      Q.    Have those arrangements been worked

ARMINDA VALLES-HALL                                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                      February 16, 2006

Page 297

1    out?

2              A.    No.

3              Q.    So you still don't know what, if

4    anything, he will be charging you; is that right?

5              A.    That's right.

6              Q.    A while ago we looked at the notes of

7    your meeting with Ms. Johnson on August 6, 2004.

8              A.    Um-hum.

9              Q.    And those notes contained a reference

10   to, quote, cultural thing, closed quote.

11             A.    Um-hum.

12             Q.    Do you recall Ms. Johnson using that

13   phrase subsequent to August 6, 2004?

14             A.    No.

15             Q.    So we have her on August 6th using the

16   phrase cultural thing, presumably in reference to

17   either that you are a woman of color or that you are

18   of Mexican ancestry.  We have her sending you an

19   e-mail wishing you happy Cinco de Mayo.

20                   Can you think of any other instances

21   in which Ms. Johnson made reference to your color or

22   national origin?

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
February 16, 2006

Page 298

1          A.    No.

2          Q.    Have you ever heard anyone in

3    Ms. Johnson's presence make reference to your color

4    or your national origin?

5          A.    No.

6          Q.    Have you ever heard Ms. Johnson use a

7    derogatory racial term?

8          A.    What she said was derogatory.  What

9    she said was highly derogatory.

10         Q.    Which one, the cultural thing?

11         A.    That if this alleged negative behavior

12   on my part, my going around and berating people was

13   cultural in nature, that she should just tell the

14   staff and they should buck up and take it.

15               That was highly derogatory.  And her

16   subsequent behavior confirmed that.

17         Q.    Let me put that incident aside.  I

18   understand it.  We've got testimony about it.  We've

19   got documents that support it.  Let me put that

20   aside.

21               Other than that August 6th incident,

22   have you ever heard her use a derogatory racial

ARMINDA VALLES-HALL                     ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT          February 16, 2006

Page 299

1    term?

2            A.    No.

3            Q.    And by racial, I'm referring to

4    national origin and ancestry.  Did you mean it that

5    way?

6            A.    No, but I heard her -- she has made

7    reference to race in a way that was not appropriate.

8    When I interviewed Lee Mason and I told her that one

9    candidate of the approximately ten that I had

10   interviewed had risen to the top -- I mean, there

11   was just no question he was far above the other

12   candidates, her two questions to me were very

13   interesting:  Is he black, which I couldn't avoid

14   answering; and does he have children.

15           Q.    Was the candidate you're referring to

16   Mr. Mason?

17           A.    Who is a black man.

18           Q.    What was your answer to whether he had

19   children?

20           A.    I said I didn't know.

21           Q.    Did she ask you to find out?

22           A.    No.

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT        February 16, 2006

Page 300

1          MR. TEMPLE:  Can I see the exhibits

2    one more time?

3          MR. FLEISCHER:  Sure.

4       BY MR. FLEISCHER:  (RESUMED)

5       Q.   Have you ever heard Ms. Johnson make

6    reference to sexual orientation or sexual preference

7    in your presence?

8       A.   Her own or others?

9       Q.   Anybody.

10      A.   Well, her partner was hired to do --

11   her partner Gretchen, who I met -- I don't know

12   Gretchen's last name -- was hired by the WCA to work

13   on special projects related to the health trust.  So

14   it was common knowledge that she and her partner

15   were gay.

16      Q.   I'm not asking you what Ms. Johnson's

17   sexual preference is.  I'm asking you if you've ever

18   heard her make reference to anybody's sexual

19   preference or sexual orientation?

20      A.   No.  Aside from that, no.

21      Q.   Have you ever heard anyone in

22   Ms. Johnson's presence make reference to sexual

# Washington Council of Agencies
### WASHINGTON AREA NONPROFITS WORKING TOGETHER

April 2, 2003

Arminda Valles Hall
107 N. Manchester Street
Arlington, VA 22203

Dear Arminda:

I am pleased to offer you the position of Director of Education here at the Washington Council of Agencies.

My understanding is that you will begin work on April 21, 2003. We agreed that your starting salary will be $52,000.

We look forward to your joining our team at WCA.

Sincerely,

Betsy Johnson
Executive Director

Apx. 90



CNA #0238

1666 K Street, NW • Suite 440 • Washington, DC 20006
tel: 202.457.0540 • fax: 202.457.0549 • wca@wcanonprofits.org • www.wcanonprofits.org

## Job Description

### Director of Education
### The Washington Council of Agencies

The Washington Council of Agencies recently created the position of Director of Education in order to provide educational opportunities and other educational assistance to its nonprofit organizational members and to the wider nonprofit community in the Washington region.

The following is an outline of **Responsibilities**:

1. Develop, implement and evaluate a technical assistance/educational needs assessment.
2. Develop goals for educational offerings.
3. Develop educational offerings for the nonprofit sector in the Washington region. These may include, but not be limited to, full and half-day workshops, all-day or several-day conferences, lunch-time workshops, other timely seminars and gatherings.
4. Develop a file of speakers, solicit their participation, ~~help~~ coordinate and , if necessary, help plan their presentations.
5. Research and implement effective registration procedures.
6. Market the educational offerings.
7. Plan and implement pricing and registration procedures.
8. Handle on-site logistics.
9. Develop and implement strong evaluation system of workshop and seminar offerings and speakers performance based on articulated goals.
10. Member of Senior staff and work with other senior staff to insure relevancy of educational offerings.
11. Begin consideration of online "chat room" or other method of online education to be implemented when workshops and seminars are functional.
12. Continue planning for continued seminars and workshops.

Apx. 91


EXHIBIT
4

# WCA

# PERSONNEL HANDBOOK

October, 2001

EXHIBIT

0229593.01

4

## I.    Introduction

The Washington Council of Agencies (WCA) welcomes you as a new employee. As you may know, The Washington Council of Agencies is a nonprofit, 501(c)(3), charitable, tax-exempt organization founded in 1979 whose mission is to strengthen, promote and represent nonprofit organizations based in metropolitan Washington in order to help them better meet the diverse needs of their communities. It is our goal to help nonprofit organizations be better managed, to help them advocate on their own behalf, and to help them locate resources in this community.

WCA's funding sources include membership dues income, fee-for-service income from such sources as educational seminars and publications, and donations from foundations, corporations and individuals.

WCA has a Board of Directors comprised of members of the community who are elected for 3 year terms. Half of the Members of the Board of Directors must be Executive Directors of member agencies. The Board of Directors establishes WCA's mission and policies and hires the Executive Director to implement them. It is the Executive Director's responsibility to hire, supervise and make personnel decisions regarding all additional employees, although the Executive Director may choose to delegate some of these responsibilities to other managerial staff within WCA.

Because of our charitable mission and our public support, we believe that WCA's employees have a special responsibility to adhere to the highest standards of ethics and professionalism in representing WCA and carrying out our mission.

## II.    Purpose of This Employee Handbook

This Employee Handbook is intended to serve as a guideline, describing the basic personnel policies and practices ordinarily applied by WCA. It is not intended to create and is not a contract of employment. No contractual rights are conferred on the employee by this Employee Handbook; its provisions shall not constitute contractual obligations enforceable against WCA. The employees of The Washington Council of Agencies are terminable-at-will, meaning that either the employee or WCA may terminate the employment relationship at any time, with or without cause.

The Washington Council of Agencies reserves the right to make changes, from time to time, with or without notice, in the policies and practices described in this Handbook. Moreover, because it is impossible to anticipate every situation that may arise, WCA reserves its right to address a situation in a manner different from that described herein if, in WCA's discretion, the circumstances so warrant.

If you have questions about the policies and procedures described in this Handbook, or suggestions for improvement, please see your supervisor or the Executive Director.

## III.    Equal Employment Opportunity

WCA is committed to a policy of equal employment opportunity, and does not discriminate in the terms, conditions, or privileges of employment on account of race, color, creed, religion, national origin, sex, age, physical or mental disability, physical or economic condition, marital or parental status, personal appearance, family responsibilities, matriculation, political affiliation, source of income, place of business or residence, pregnancy, child birth or related conditions, or sexual orientation, or otherwise as may be prohibited by federal and state law.

5

WCA also has a policy prohibiting discriminatory harassment, including sexual harassment. This policy is described in Sections X and XI below.

## IV.  Terms and Conditions of Employment

### A.  At-Will Status

**Employees of WCA are employed at will, which means that they are not hired for any definite period of time and either they or WCA may terminate the employment relationship at any time, with or without cause.** *The only exception to this rule* would be an employee who, due to unusual circumstances, has been provided a promise of employment for a particular length of time, which is in writing and signed by the Executive Director.

*Only the Executive Director has the authority to make any promises to employees regarding the duration of employment; to be binding, such promises must be in writing and signed by the Executive Director.* If you believe that you have been made any promises to the effect that your employment will continue for some definite period of time, and that you are not an at-will employee, please consult with the Executive Director immediately.

### B.  Classification of Employees

Full-time employees are those employed to work on a regular basis for at least 35 hours per week. They are eligible for all benefits described in this Handbook, so long as they meet the applicable requirements, such as length of service.

Part-time employees are those employed to work on a regular basis for fewer than 20 hours per week. They are eligible for only those benefits that they have been promised in writing (signed by the Executive Director) or that are stated in this Handbook to be available to part-time employees.

Employees working more than 20 hours a week but less than 35 will have benefits prorated.

Temporary employees are those hired with the understanding that their employment will not continue beyond a stated date or beyond completion of a specified project or projects. They are eligible for only those benefits that they have been promised in writing and signed by the Executive Director.

All employees of WCA, whether full-time, part-time or temporary, are employed at will. See previous section regarding at-will employment.

Independent contractors are those non-employees who are paid on a fee-for-service basis to perform certain specified services. Volunteers are those who provide services to WCA without financial compensation, other than reimbursement of authorized expenses.

### C.  Exempt/Non-exempt Employees; Overtime Pay

When you were hired, you should have been told whether your position is "exempt" (meaning, among other things, you are exempt from the overtime pay requirements of the Fair Labor Standards Act) or "non-exempt" (meaning you are covered by the overtime requirements.) Generally speaking, exempt employees are those whose jobs are primarily executive, administrative or professional in nature, as defined by federal regulations, and who are paid on a salary basis, again as defined by federal regulations.

Apx. 94

6

### 1.    Non-exempt employees and overtime

If you are non-exempt, you will be paid overtime, at the rate of one and one half times your regular hourly rate of pay, for any hours worked beyond 40 hours in a given work week. However, non-exempt employees must obtain advance permission from the Executive Director before working more than 40 hours in a work week.

For overtime purposes, the work week begins Sunday at 12:01 a.m. and ends Saturday at midnight. Only those hours that are actually worked by the employee will be considered "hours worked" in computing whether overtime is due and, if so, how much. Scheduled and unscheduled absences and time off for holidays, vacation, sickness, jury duty, bereavement leave or military leave, or for other reasons, will not count as hours worked for this purpose.

Non-exempt employees may not take compensatory time in lieu of overtime pay, unless the compensatory time is taken within the same work week in which the extra hours were worked. For instance, if this week you work 12 hours on Monday, it is permissible (**with the assignment and advance consent of your supervisor**) to work only 4 hours on Tuesday, so that by the end of the week you will not have worked over 40 hours. In fact, your supervisor may require that you take such compensatory time. However, you may not wait until next week to take the four hours off and use that in lieu of overtime pay.

### 2.    Exempt employees and overtime

Exempt employees are responsible for working as many hours as necessary to get the job done, but may check with the Executive Director during extraordinarily busy times to arrange for compensatory time, which may be granted when, in the Executive Director's discretion, it is appropriate and circumstances permit. **All compensatory leave must be granted by the Executive Director.**

### D.    Time Sheets

All employees including exempt, non-exempt, full-time, part-time and temporary are responsible for completing and submitting time sheets; if you are unaware of the procedures for doing so, please ask your supervisor or the Office Manager. .

### E.    Reporting to Work

The regular, full-time work day is from 9:00 a.m. to 5:00 p.m., with a one hour lunch period not to be taken as the first or last hour of the day. If you are out of work or late for any reason and have not received advance permission for the absence, please call your supervisor and the main office number before 9:00 a.m. to report your absence or lateness. Absence without notice for three days may be considered a voluntary quit.

### F.    Intellectual Property

Work products created by any person employed by WCA are a "works made for hire" under the copyright and trademark laws and are owned by the WCA. Work products include written memorandum, letters, contributions to publications and the website of the WCA, speeches, electronic files, designs, trademarks and service marks. If all or a portion of work product is not deemed owned by WCA, then the employee agrees to sign any documents necessary to assign all right, title and interest in the work product to WCA.

8

In addition to the holidays designated by WCA, full-time employees are entitled to **two religious days** each calendar year and, except with regard to the first calendar year in which they are employed, will receive **two personal days** each calendar year. With regard to the first calendar year of employment with WCA, employees who start working for WCA between January and June will receive two personal days and those who start working between July and November 1 will receive one personal day. Employees who begin work after November 1 will not receive personal days for that year. Religious and personal days do not accrue from year to year.

2.                    **Vacation.**   Full-time employees earn vacation or annual leave time according to the following schedule:

| | |
|---|---|
| 1st Year of Employment | 10 Days |
| 2nd and 3rd Years of Employment | 15 Days |
| 4 or more Years of Employment | 20 Days |

Time is accrued per pay period, so employees do not start out with 10 days but achieve it pro rata by year's end. Annual leave should be requested from the employee's supervisor and granted by the supervisor in advance of taking the leave. Leave slips must be filled out, approved by the supervisor and submitted to the WCA Office Manager for filing. Supervisors have the right to deny leave time if they deem the workload to be too heavy.

Ten days of annual or vacation leave may be carried over into the next year.

Employees will be paid for accrued, unused annual leave upon termination. Employees may not, and will not be required by WCA to, use vacation leave as their last weeks of employment. Holidays that fall within an employee's vacation will count as holidays and not as vacation leave.

3.   **Sick leave.**   Sick leave will be granted to full-time employees at the rate of 10 days per year. Sick leave is accrued per pay period pro rata, and so the first 10 days are not fully achieved until the end of the first year of employment.

Employees should notify their supervisor when they take sick leave. Where sick leave is taken for known doctor's visits, leave slips should be filled out in advance and signed by the supervisor and filed with Barbara. In other cases, leave slips should be filled out upon the employee's return to work.

If an employee takes more than a week of sick leave at a time, the Executive Director **may** require a Doctor's note.

Sick leave will not be advanced to any employee.

Sick leave accrual is limited to 60 days and any amount accrued in one year may be may be carried into the next year if the employees still has less than 60 days accrued.

At termination, sick leave will be converted to annual leave at the rate of five days of sick leave equals one day of annual leave. The days of annual leave thus achieved will be paid at the employee's regular rate.

10

You and/or any members of your family who are covered under your group health insurance plan will have the right to continue coverage under the group plan for 18 months, at your or your family member's expense, even after eligibility would otherwise terminate due to your death, termination of employment, divorce or various other qualifying events. For further information about the right to continued coverage, and any requirements you must fulfill to be eligible, please see the Manager of Health Program Administration.

**11. Pension plan.** WCA currently participates in a 403(b) tax sheltered annuity plan. Any full-time employee may contribute to his/her own account from date of hire. WCA will contribute 5% of employee's salary after completion of two years of service. After 10 years of service, WCA will contribute 9% of the employee's salary to his/her retirement plan. See office manager for enrollment information.

## VI.  Job Performance and Conduct As Employee

Generally, performance reviews of employees will be conducted on an annual basis, although usually a new employee will be reviewed at the end of the first three months, as well. Performance reviews are intended to identify both those aspects of the job which are being performed well and those aspects that need attention. They are also a formal opportunity for you to express any concerns you might have about the job or about your employment with WCA. However, if you do have concerns, there is no need to wait until your next review to express them; your supervisor and/or the Executive Director is available throughout the year to meet with you about issues, problems or questions related to your employment.

In addition to expecting employees to perform their jobs competently and reliably, WCA expects employees to conduct themselves in a professional, ethical and responsible manner that reflects well upon WCA, that promotes a spirit of cooperation and teamwork among employees, and that is respectful of the members, volunteers, and other members of the public with whom we interact. Failure to do so may lead to corrective action, including dismissal.

Although it is impossible to anticipate in advance every possible kind of misconduct that would be of concern to WCA and that could lead to corrective action, including dismissal, the following conduct is prohibited and will not be tolerated by WCA. This list of prohibited conduct is illustrative only and is not intended to be exhaustive:

1.    Violation of any of the policies described in this Handbook or otherwise communicated to employees.

2.    Conduct, including speech, that physically harms or threatens others or that is abusive to or disrespectful of WCA's directors, employees, contractors, members, volunteers or other persons involved with WCA.

3.    Failure to adhere to the work schedule that has been established for you. This includes absence without notice to WCA, except where an emergency prohibited the giving of notice and notice was given as soon as reasonably possible.

4.    Failure to be honest in your communications with WCA and/or falsifying records or other documents.

5.    Theft or misappropriation of property owned by WCA, a co-worker, a member, or anyone else who has property that you may come into contact with through your employment.

Apx. 97

6.    Unlawful conduct during non-work hours that might lead our members or the public to lose confidence in you or in WCA.

7.    Insubordination.

8.    Failure to conduct yourself in a professional and cooperative manner while carrying out your duties.

9.    Neglect of duty; failure to perform your responsibilities in a manner acceptable to WCA.

## VII.    Corrective Action; Dismissal

When performance issues are identified with respect to an employee, when instances of unacceptable conduct occur, or when for any reason the employment relationship has become problematic from the point of view of WCA, any of a variety of steps might be taken, up to and including termination. In some cases, the employee might be given an oral or written warning. In other cases, immediate probation, suspension (with or without pay), demotion, termination or other corrective action might take place. WCA reserves its right to determine what it believes is an appropriate response, and to implement it.

## VIII.    Separation from Employment

As stated above, all employees of the Washington Council of Agencies are employed at will, meaning that they or the employer may terminate the employment relationship at any time, with or without cause. The following policies apply to those who are separating from WCA's employment.

### A.    Notice

Employees are asked to give at least two weeks notice of resignation. Some employees, upon hiring, will be asked to give more notice than this, because of the nature of their employment. WCA reserves the right to pay a resigning employee for the notice period, but to prohibit the employee from working for WCA during that time.

### B.    Lay-offs

There may be times when WCA determines that it is necessary to make cutbacks or reductions in staff, leading to the lay-off of one or more employees. In determining which employee(s) shall be laid off, WCA may consider any and all factors that it deems relevant, including, without limitation: the needs of WCA as a whole; the skills, qualifications and performance histories of individual employees; anticipated changes in funding received or services to be provided by WCA; seniority; budgetary constraints; and any restrictions or guidelines imposed by law or by funding sources.

### C.    Severance Pay

Severance pay is not available to employees who are dismissed or who resign for reasons related to misconduct as an employee, including violations of WCA's policies.

Apx. 98

Full-time employees who have completed at least one year of full-time employment with WCA and who are laid off because of cutbacks or reductions in staff, or terminated involuntarily for reasons not connected with misconduct, are entitled to severance pay calculated at the rate of one week's pay for each full year of WCA employment up to a maximum of two weeks of severance pay, so long as they:

(1)     continue to work until the last day scheduled for their employment, unless this requirement is expressly waived by the Executive Director or, in the case of the Executive Director, by the President of the Board of Directors;

(2)     turn in all reports and paperwork required to be completed by them when due and no later than the last day of work;

(3)     return any files, documents, equipment, keys, software or other property belonging to WCA, and pay any money they owe to WCA;

(4)     participate in an exit interview, upon the request of their supervisor; and

(5)     agree to sign a release of employment-related claims against WCA, upon the Executive Director's request or, in the case of the Executive Director, upon the request of the President of the Board of Directors.

Notwithstanding the above, employees who violate WCA's policies or who demonstrate unacceptable conduct (including insufficient effort on the job) during the remainder of their employment following notice of the termination or lay-off may be denied severance pay and/or may be dismissed prior to the agreed-upon termination date, in the discretion of the Executive Director or, in the case of termination of the Executive Director, in the discretion of the President of the Board of Directors.

D.     **Use of Grievance Procedures in Cases of Termination**

Employees (other than temporary employees) who have been employed for at least six consecutive months and who are dismissed from employment may use the Grievance Procedures described in Section IX below to challenge the dismissal. However, WCA is not required to keep such employees on the payroll or enrolled in any benefits pending completion of the grievance process.

E.     **Pay Upon Termination**

Upon voluntary or involuntary termination of the employment relationship, regardless of the reason, the employee will be paid any wages earned but not yet paid, and any accrued but unused vacation pay and converted sick leave. The employee will not be paid for accrued but unused personal days or religious leave. Severance pay will be paid only as authorized in Section VIII.C, above.

X.     **Grievance Procedure**

Apx. 99

If an employee feels that inappropriate corrective action or any improper action has been taken against him/her, and the employee has been unable to resolve the matter informally by speaking with the supervisor, the employee has ten business days from the taking of the action to pursue the matter by filing a written grievance with the Executive Director . The Executive Director will conduct an investigation of the incident, where

13

appropriate, and will generally provide a written response to the employee within 20 business days. If more time is needed to respond to the complaint, the person filing the complaint will be so notified. The decision of the Executive Director is final.

If an employee has a complaint about the Executive Director, the employee shall take up that complaint directly with the Executive Director. If that does not resolve the matter, the employee has ten days to choose to pursue the matter by making a written complaint about the matter to the Board President. The Board President is required to consult with the Executive Director about the matter in pursuit of resolution of the complaint.

The filing of a grievance does not operate to suspend the action being complained of. For instance, if the employee is complaining that s/he was unfairly suspended without pay, s/he will remain suspended without pay for the period initially determined, unless and until the Executive Director reverses the decision leading to the suspension. Similarly, WCA has no obligation to keep a terminated employee on the payroll or enrolled in any benefits not ordinarily available to terminated employees, pending completion of the grievance process. However, if the action is reversed, the Executive Director may determine, in his/her discretion, that the employee should be reimbursed for some or all of the pay and/or benefits lost during the interim.

Temporary employees and employees who have not completed at least nine months of continuous employment with WCA are not entitled to use the formal Grievance Procedure outlined above, but are encouraged to discuss any concerns they may have with their supervisor.

## X.    Discriminatory Harassment

It is a violation of federal and/or state law to harass anyone at work because of their race, color, age, religion, sex, disability, national origin, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, source of income, place of business or residence, pregnancy, child birth, or related conditions.

If you believe that you have been subject to discriminatory harassment by a co-worker, supervisor, volunteer, client or vendor, or by anyone else during the course of your employment, please report your concerns immediately to the Executive Director (first) or the Board President (in the case of a complaint against the Executive Director). Retaliation against an employee by any person under WCA's control for opposing such harassment, for filing a bona fide complaint of discriminatory harassment or for providing information in good faith regarding another employee's complaint will not be tolerated.

Once a complaint of discriminatory harassment has been filed, an investigation will be conducted. The nature and extent of the investigation will depend upon the complaint. The intent is to obtain further information about the events/conduct complained of, to enable the person(s) named in the complaint to tell his/her side of the story, to determine whether discriminatory harassment has in fact occurred, and to develop an appropriate resolution. You may be asked to put your complaint in writing, or the person with whom you discuss your complaint might take notes and ask you to sign them. All employees are expected to cooperate with any WCA-sponsored investigation of a complaint of discriminatory harassment, upon the request of the Executive Director or the Board President.

Any employee who is determined to have committed discriminatory harassment or retaliation or who fails to cooperate with a WCA-sponsored investigation of discriminatory harassment or retaliation will be subject to disciplinary action, up to and including termination.

Apx. 100

14

## XI.    Sexual Harassment

Sexual harassment is a form of discriminatory harassment and will be treated in accordance with the discriminatory harassment policy outlined above. However, because it is the subject of a great deal of controversy and misunderstanding, we have chosen to define it in more detail in this Handbook.

Sexual harassment is unwelcome conduct of a sexual nature when:

(a)    submission to such conduct is made (explicitly or implicitly) a term or condition of the individual's employment;

(b)    submission to or rejection of such conduct is used as the basis for employment decisions affecting the individual; or

(c)    the conduct has the purpose or effect of unreasonably interfering with the individual's job performance or creating an intimidating, hostile, or offensive working environment.

Examples of some of the kinds of conduct that violate our Sexual Harassment policy include:

1.    Sexual assaults, including rape and molestation, and attempts or threats to commit these assaults;

2.    Unwanted intentional contact of a sexual or suggestive nature, such as touching, pinching, patting, grabbing, kissing, brushing against or poking a person's body;

3.    Unwanted sexual advances, propositions or comments, including sexually oriented gestures, jokes or comments about a person's sexuality or sexual experience;

4.    Preferential treatment or the promise of preferential treatment to an employee for engaging in sexual conduct;

5.    Displaying or publicizing pictures, posters, reading materials, calendars, objects, etc. that are sexually suggestive, sexually demeaning or pornographic; and

6.    Disciplining or retaliating against an employee in any way because s/he has resisted, reported or complained about sexual harassment.

If you feel that you have been sexually harassed during the course of your employment, or if you believe you have witnessed another employee being sexually harassed, report your concerns immediately, as described in Section XII, above, "Discriminatory Harassment". The procedures outlined in that section will apply.

## XII.    Smoking Policy

Because we wish to provide a healthy environment for all of our staff, volunteers and clients, smoking is prohibited throughout our offices.

Apx. 101

## ACKNOWLEDGMENT

I have received a copy of the WCA Employee Handbook, have reviewed it and had the opportunity to ask my supervisor questions about it. I understand the policies described in the Handbook and agree to abide by them.

**I understand that this Handbook does not represent a contract of employment, but rather serves as a guideline.**

I acknowledge that no representative of WCA has promised me employment for any definite period of time, and that no one is authorized to make such promises to me unless they are in writing signed by the Executive Director. I understand that as an employee of WCA, I am employed at will, meaning that either I or WCA may terminate my employment at any time, with or without cause.

I understand that this Employee Handbook, and the policies and benefits described in it, may be changed from time to time, with or without advance notice, in WCA's discretion.

Signed _____

Please Print Name _Arminda Valles-Hall_____

Date _April 28, 2003_____

Apx. 102



## WCA PERSONNEL REVIEW FORM

Employee _Arminda Valles-Hall_          Date _6/26/03_

| Rating | Degree | Description |
|--------|--------|-------------|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above-average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance; conspicuous by her achievements. |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| **Personal Attributes** | | | | | | |
| A) Attitude Comments: | Positive outlook, constructive ideas, works well with others. | ✓ | | | | ✓ |
| B) Initiative Comments: | Seeks out and accepts responsibility. | ✓ | | | | ✓ |
| C) Open Mindedness Comments: | Open to new ideas, methods and situations. | ✓ | | | | ✓ |
| D) Inter-personal Communication Comments: | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. | ✓ | | | | ✓ |
| E) Self Confidence Comments: | Confident of own ability; acts decisively. | ✓ | | | | ✓ |
| F) Assertiveness Comments: | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. | ✓ | | | | ✓ |
| **Job Skills** | | | | | | |
| G) Job-Knowledge Comments: | Knows own job well and how it relates to the organization. _new_ | | | | | |
| H) Work Habits Comments: | Dependable, orderly, uses time effectively. | ✓ | | | | ✓ |
| I) Quality/Quantity Comments: | Does complete job, maintaining quality and proper balance between various facets of the job. | ✓ | | | | ✓ |
| **Managerial Skills** | | | | | | |
| J) Planning Comments: | Plans realistically, short and longer range. Able to set priorities and meet goals. | | | | | |
| K) DecisionMaking Comments: | Identifies true problems, alternatives and understands their impact on the problem. | | | | | |
| L) Leadership Comments: | Makes things happen through people, in good times and bad. Respected by others. | | | | | |
| M) Motivating Comments: | Gives of self; strives to set a climate which is conducive to the growth of others. | | | | | |

Is the employee marginal in his/her present position?  ( ) YES  (✓) NO

Additional Comments/ Recommendations:

_Although only two months on job, taking over very well._
_- Raise to $60,000_

Apx. 103

Supervisors Signature _from Johnson_



EXHIBIT
8

# Betsy Johnson

**From:** Susan Sanow [sanow@vt.edu]
**Sent:** Tuesday, March 23, 2004 11:36 AM
**To:** armindav@wcanonprofits.org
**Cc:** Betsy Johnson
**Subject:** A few things

Hi Arminda – I have a few things to go over with you regarding the Post Award:

1. Got the Part two applications. I wish you had checked with me since I think you made Part 2 more complex than you needed. I recommend that only the eleven Part 2 answers be distributed to the selection committee. I know the committee had asked for financial information on the 10 semi-finalists. That was good that it was shared at this time. But, I recommend that the back up materials (strategic plans, communication plans, etc. ) only be available for review at WCA. The problem comes because now 8 groups have the back-up materials shared with the Selection Committee and Threshold and Imagination Stage does not have that advantage...or disadvantage. I also don't like having the strategic plans in SO many hands. You may want to discuss this aspect of the competition with James.

2. I am concerned that the part 2 apps got out SO, SO Late! I know you have a zillion things to do, but we are asking the committee to do this work quite quickly. We promised (actually I promised, so I am sensitive to this) to have Part 2 applications to them by March 8. To shorten the review time from 4 weeks to two weeks, is just not fair...to the promises made to the selection committee or to the quality of competition. I am sure the committee will adjust, but I wish you had told me you needed help.

. I made a point about #2...because the work moving from selection of Part 2 to setting up the site visits is INCREDIBLY IGHT!!! This needs attention and handholding from April 2 until the site visits begin April 19. THIS WORK CANNOT BE ELAYED!

ach selection committee member must provide their April 19- May 20 schedules when they attend the April 2 meeting. hose committee members not in attendance must submit their schedules ahead of time). A master schedule is built, and en work with the final five to schedule the most effective times for both the organization and selection committee teams. his is a challenge since some committee members have preferences where they want to go or cannot go (this is specially sensitive to organizations that have been a finalist in the past). Also, you need to be sensitive to the make-up of e committee (mix of veteran/rookies, men/women, racially diverse), where committee members live for a commutable sit, as well as where the site visit will occur so not to get committee members tied up into rush hour. (i.e., I would not ask ichael Freedman who lives/works in Bethesda to do a site visit in Springfield or Waldorf on a Friday from 3 p.m – 5 p.m.)

now you have your new staff member on board, and perhaps this phase will run smoother, but **IF YOU NEED MY SSISTANCE AT THIS STAGE, please, please, please let me know!!!!!!**

Has the Post confirmed the Award will be presented on June 24th???

now this e-mail is a bit negative, but I ask these questions out of concern and commitment to this program.

anks.

usan

Apx. 104

**Betsy Johnson**

---

**From:** Arminda Valles-Hall [armindav@wcanonprofits.org]
**Sent:** Wednesday, March 24, 2004 1:47 PM
**To:** Susan Sanow
**Cc:** Betsy Johnson
**Subject:** RE: A few things

...s, the tone is negative and unnecessarily so. I care about the project also, and have, as you noted in the last meeting, ...ade some important improvements to it, most notably compiling the information in binders that are easier to manage and ...ference, and establishing an online evaluation system that greatly simplifies reporting.

... to your points that 1) I sent the committee more than you would have sent; and, 2) that I sent the packet later than you ...omised, note the following.

1.  The application invites committee members to submit documentation related to communications, fundraising, strategic plans, etc. for consideration by the Selection Committee. It is wholly unreasonable to think that committee members will actually review these documents for 10 groups ON THE DAY they are trying to whittle the selection down to five, all within a two-hour meeting. Without an opportunity to review these documents in advance, the Committee would not TRULY have an opportunity to consider these documents, rendering their submission by the applicants useless. Additionally, while the materials submitted by two groups were too voluminous at 65 pages & 100 pages to include in the packet, Selection Committee members were told they could call me for a copy of the materials if they wanted to review them. To date, no on has.

2.  Regarding your second point, the responses to the Part II questions were due POSTMARKED by Wednesday, March 3. The last packet wasn't received until the morning of Tuesday, March 9, one day past the March 8 deadline you set for getting the Part II materials to Committee members. Your March 8 deadline did not factor in that some responses might not arrive until March 8 or later, as was the case with one packet. Nor did it consider the time needed to copy the information, package the mailing, and deliver the package to Committee members through the mail service. For your information, from the point that I received all of the responses, it took me 5 business days to get the materials in the mail (March 16). I think we would both agree that, ideally, the information would be mailed within two or three days of receipt. I appreciate your offer to shorten this time in the future and, should the need arise, will call on you readily.

3.  Still addressing your second point, you will recall that on January 30 Committee members indicated they liked the online evaluation reporting done for Part I and asked that they receive the online evaluation reports for Part II in advance of the next meeting (April 2). At the time, I informed Committee members that I would need completed evaluations sooner than originally scheduled to accommodate this request, hence the March 29 due date rather than April 1 for evaluations.

...look forward to working with you to learn more about how the site visits have been run in the past, and to considering ...rays to smooth out the process.

...rminda

...rminda Valles-Hall
...irector, Center for Nonprofit Learning & Leadership
...Vashington Council of Agencies
...rmindav@wcanonprofits.org
...02.457.0540



...dvance your organizational goals and professional development through the WCA's **Center for Nonprofit Learning &**



**THE CENTER *for* NONPROFIT LEARNING & LEADERSHIP**

To:        Betsy Johnson

From:      Arminda Valles-Hall

Re:        Issues of Concern & Discussion

Date:      May 11, 2004

---

Following is a list of concerns I am raising as the Director of the WCA's Center for Nonprofit Learning & Leadership that interfere with my continued successful management of the Center.

1.  **Lack of Communication & a Disregard of Standard Professional Protocols & Courtesies**
    a.  **Management of the Washington Post Award Competition**
        i.  Handling of the Change of Management from WCA to Virginia Tech
            1.  Lack of communication
            2.  Consultant's emails (April 8, May 5, May 7 – see attachments)
            3.  Public impact of abrupt change of management combined with April 8 email
                a.  The abrupt change with inadequate notice & discussion created the impression with Selection Committee, WCA staff, and board members that my department had not adequately or properly managed this important competition. (In the consultant's April 8 email to the Selection Committee, my management was characterized as "able.")
                b.  Damage to WCA & its connection to the Award competition. The transfer of management to an outside institution makes the WCA's connection to the competition more tenuous and less relevant, especially since the new administrator calls herself the "mother" of this award competition. If the event is supported by the Washington Post, Raffa & Associates, and now Virginia Tech, and managed by Virginia Tech, what is the significance of the WCA's role?

Apx. 106

EXHIBIT
10

     c. Damage to my professional reputation & credibility.

4. When did the negotiations with Virginia Tech around its sponsorship of the management of the competition begin? (I was informed of this on April 7 and the public announcement of the new management was made April 8 by the consultant.)

5. Why was I excluded from those negotiations?

6. Why was the change in management handled in this way, that is:

    a. Despite the expansion of Center staff (expansion of internal capacity to handle the responsibilities of the Award competition. (Education & Program Manager hired March 22)

    b. With no direct communication from the WCA Executive Director to the Award Selection Committee to properly frame the change in management & minimize any negative impressions associated to my department and my professional reputation.

    c. With no public acknowledgement of my contributions & improvements (i.e., establishing online evaluation system & presenting information to Selection Committee members in a more organized, easy-to-reference way)

ii. **Assignment of Administrative Functions to Center Staff Following Change of Management**

1. On May 4, you requested that Lee provide administrative support to the Award competition by putting the June 14 Awards Presentation & Best Practices Workshop on the online registration system. I responded that this was an administrative function and that anyone could do this. I suggested Jeremy Baird, Membership Manager, since he is familiar with the set-up of events on regonline.com and this event has equal implications as a membership recruitment & development opportunity at this point. You replied that this was an educational program and, as such, Lee would be responsible for setting up the event registration online.

2. The consultant/administrator of the Award competition, as the former deputy director of this organization, knows the regonline system since it was adopted during her tenure with this organization. Furthermore, she is the former website administrator. Why are Center staff resources being used when Virginia Tech is supporting the administration of this project?

Apx. 107

3. On May 5, the outside consultant/administrator emailed Lee directly without copying me on the email. This practice was repeated by Jeremy Baird in a subsequent email on May 7. (See attachments.) What will be done to address this lapse in standard protocol & professional courtesy? **To effectively manage & delegate to Lee, it is essential that any requests for his time be cleared & routed through me.**

2. **Communications/Development Audit & Organizational Assessment**

   i. I was pleased to receive today the Executive Summary of the WCA Communications, Development & Organization Audit, for which I was interviewed in December 2003. This is my first look at this important document, despite learning from Jeff on April 13 that the report raised questions about the Center's marketing, specifically the need to position the Center so that it is more closely associated with the WCA.

   ii. This issue, however, is not raised in the Executive Summary, nor has it been discussed in any of our bi-monthly Senior Staff Team Meetings, which are intended to focus on policy & other big picture issues.

   iii. Would you please provide me with a copy of the report? At minimum, I would like to see those parts of the report that affect the direction of the Center & discuss them with you so that I may consider any issues raised, and develop a strategic action plan for responding accordingly.

3. **Lee Mason's Computer**

   a. As discussed in our April 20 Senior Staff Team Meeting, at times I call on Lee to update details related to courses listed through our website. Unfortunately, his computer does not have the capacity to make even minor changes because it freezes or moves so slowly it's a waste of his time. As a result, those changes have to occur through my computer which, while also very slow, is considerably faster than Lee's. This is not just a question of inconvenience; this is a question of Lee not being able to do a vital part of his job and me being significantly hampered in my ability to do the same.

   b. Please advise as to how to proceed.

Betsy, I look forward to a productive discussion and resolution of these issues.

AV

Attachments

Apx. 108

CNA #0253

# Betsy Johnson

| | |
|---|---|
| **From:** | Arminda Valles-Hall [armindav@wcanonprofits.org] |
| **Sent:** | Friday, July 02, 2004 10:19 AM |
| **To:** | Jeff Kost |
| **Cc:** | Betsy Johnson; Lee Mason |
| **Subject:** | RE: Conference Room |
| **Attachments:** | image001.gif |

eff:

past person-to-person communications and, most recently, in your June 30 email to Lee and me, you have chosen to ommunicate in an offensive tone, displaying a lack of professional control, courtesy and regard. Please do not ommunicate with me in this way again. I am certain you can find a way to engage me as your colleague in a way that onors professional bounds and courtesies.

s a courtesy to you as my colleague, I will share with you that Lee and I effectively manage the Center space and are just s concerned as everyone else about security issues. If you actually believed that the office suite was left in such a ulnerable" position, you simply needed to close the door. Given your stated concern, I'm surprised that did not happen. 'hen Lee arrived, following a late lunch after facilitating most of the same workshop held in that space from 1:00 – 3:30 m., he found the door propped open. He arrived just minutes after you said you arrived at 3:35 p.m.

s we try to build an esprit de corps for the WCA, it's incumbent on all of us to act in ways that foster teamwork and ollegiality.

rminda

rminda Valles-Hall
irector, Center for Nonprofit Learning & Leadership
/ashington Council of Agencies
mindav@wcanonprofits.org
)2.457.0540

dvance your organizational goals and professional development through the WCA's **Center for Nonprofit Learning & eadership**.

-----Original Message-----
**From:** Jeff Kost [mailto:JeffK@wcanonprofits.org]
**Sent:** Wednesday, June 30, 2004 4:47 PM
**To:** Arminda Valles-Hall
**Cc:** Lee Mason
**Subject:** Conference Room

I returned to the office at 3:35 pm this afternoon and the door to Conference Room B was propped open and empty. It made me nervous that the office suite was left in such a vulnerable position. Am I wrong to think that one of the two of you would take responsibility for ensuring that the room is locked and all participants and the presenter have left? If it's absolutely impossible for either of you to be there for the end of a workshop, I would suggest that you ask one of us here in the office to monitor the room. Thanks!

Apx. 109

**EXHIBIT**

Celebrating

## WCA PERSONNEL REVIEW FORM

Employee _Aminda Vulles Hall_                    Date _7/7/04_

| Rating | Degree | Description |
|---|---|---|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above-average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance; conspicuous by her achievements. |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| **Personal Attributes** A) Attitude | Positive outlook, constructive ideas, works well with others. *responds with inflamatory remarks* | | | ✓ | | |
| Comments: | *sometimes positive outlook, sometimes constructive* | | | | | |
| B) Initiative | Seeks out and accepts responsibility. *ideas* | | | | ✓ | |
| Comments: | | | | | | |
| C) Open Mindedness | Open to new ideas, methods and situations. | | | ✓ | | |
| Comments: | *from certain people but not others* | | | | | |
| D) Inter-personal Communication | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. | | | ✓ | | |
| Comments: | *good with outsiders, needs work in staff* | | | | | |
| E) Self Confidence | Confident of own ability; acts decisively. | | | | | ✓ |
| Comments: | | | | | | |
| F) Assertiveness | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. | | | ✓ | | |
| Comments: | *in conflicts in the office reactions need work* | | | | | |
| **Job Skills** G) Job-Knowledge | Knows own job well and how it relates to the organization. | | | | | ✓ |
| Comments: | | | | | | |
| H) Work Habits | Dependable, orderly, uses time effectively. | | | ✓ | | |
| Comments: | *pledges to get work done in allotted time* | | | | | |
| I) Quality/Quantity | Does complete job, maintaining quality and proper balance between various facets of the job. | | | | | ✓ |
| Comments: | *extremely good with participants* | | | | | |
| **Managerial Skills** J) Planning | Plans realistically, short and longer range. Able to set priorities and meet goals. | | | | ✓ | |
| Comments: | | | | | | |
| K) DecisionMaking | Identifies true problems, alternatives and understands their impact on the problem. | | | | ✓ | |
| Comments: | | | | | | |
| L) Leadership | Makes things happen through people, in good times and bad. Respected by others. | | | | ✓ | |
| Comments: | | | | | | |
| M) Motivating | Gives of self; strives to set a climate which is conducive to the growth of others. | | | | | ✓ |
| Comments: | *supervising lee* | | | | | |

Is the employee marginal in his/her present position?  ( ) YES.   (✓) NO

Additional Comments/ Recommendations: _Aminda is very good with customers/consumers/ people outside WCA. You need to work harder at solving problems with colleagues and refrain from telling them your judgement of them._  _raise to 61,800_

Supervisors Signature _Patry Blinson_

Apx. 110



EXHIBIT
13

*[handwritten at top:] got a 16% raise on 6 weeks work*

TO    :    Betsy Johnson
           Executive Director

FROM :    Arminda Valles-Hall
           Director, Center for Nonprofit Learning & Leadership

RE    :    July 2004 Evaluation

DATE :    August 4, 2004

This memo is in response to my most recent evaluation conducted on July 7-8, 2004. I am requesting a correction of my evaluation and a corresponding retroactive adjustment of salary commensurate with the quality and quantity of my work and contributions to the Washington Council of Agencies.

The evaluation is markedly different from my first evaluation in June 2003 in which I received excellent marks (all 5's) in all categories in which I was evaluated. I am concerned that the basis of all scores rated less than 5 on my most recent evaluation were based on biased subjective impressions and on false and completely unfounded and undocumented charges discussed for the first time in my evaluation.  *[handwritten: 6 weeks / no firm / irregular / no home / calling no / going straight]*

I believe I am not being treated equitably and that I am being evaluated differently and more critically than my colleagues and peers. As a result, I have suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard.  *[handwritten: why / to board / members / not / 5% is ceiling]*

I believe my style of communication is viewed unfortunately as aggressive and "inflammatory." These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive.

I would like to resolve my concern about my evaluation and put this issue behind us so that I may continue to focus undistractedly on my primary responsibility of bringing high-quality and affordable professional and organizational development training to the nonprofit community and best serve this center.

I am available to discuss my concerns and reach an equitable solution at your convenience.

*[handwritten at bottom:]*
*regular, weekly meetings scheduled*
*where is Ideas to Dialogue?*
*why 2 months to get fall catalog in place*
*outside work/participation should be discussed*
*with me first - what benefit is it to*
*WCA?*

Apx. 111

EXHIBIT

**From:**  len.min@comcast.net
**Sent:**  Monday, August 16, 2004 9:01 AM
**To:**  debarasso@aol.com
**Subject:** Formal Complaint & Request for Investigation

Dear Mary Ann:

I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

Thank you,

Arminda

--
Arminda Valles-Hall
armindav@wcanonprofits.org / len.min@comcast.net
202-327-5216 (w-direct) / 703-351-7966 (h)

Apx. 112



# DRAFT

**Washington Council of Agencies**
**Report on Investigation of Personnel Complaint by Arminda Valles-Hall**
**By Mary Ann de Barbieri, President, Board of Directors, WCA**

<u>Details of Complaint:</u>

On August 16, 2004, Arminda Valles-Hall emailed WCA board chair, Mary Ann de Barbieri, to formally complain about her most recent personnel evaluation conducted on July 7-8, 2004. In her complaint, Ms. Valles-Hall noted that "the scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation". She further stated: "I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy."

As is noted in the following timeline, the investigation of this complaint was delayed due to Ms. Valles-Hall's unwillingness or unavailability to set a date for an interview.

On August 24, I emailed Ms. Valles-Hall to ask for an appointment to investigate her complaint on September 1, 2 or 3. She responded in an email on August 26 that she did not feel comfortable meeting with me alone and asked for the rules governing the complaint investigation process. I responded on August 27 to explain that as WCA board chair it was my responsibility to investigate a complaint against the WCA executive director, provided details of the investigation process and reiterated my request for an interview on September 1, 2 or 3.

On September 1, Ms. Valles-Hall emailed that she would contact me to set up a date for an interview. Hearing nothing further from her, on September 27 I emailed Ms. Valles-Hall to say that if she wished to pursue her complaint, that she should get in touch with me by September 30, 2004, otherwise WCA would assume that she did not wish to pursue her complaint.

On September 29, Ms. Valles-Hall emailed a request for an interview during the second or third weeks of October. I responded to her email on September 30 offering my availability for an interview with her on October 13, 14 or 19. I further stated in this email that I was not willing to delay the matter beyond October 19, 2004.

Having no response to my September 30 email, I emailed Ms. Valles-Hall on October 7 requesting that she respond to my request for an interview by October 8, 2004. She responded on October 7 requesting an interview on October 19.

<u>Investigation Report:</u>

The goal of my investigation was to ascertain:
1. if the scores in Ms. Valles-Halls 2004 personnel evaluation were the result of unfounded complaints that had been raised with her for the first time during this evaluation as she has maintained;
2. if she was being evaluated in a manner differently than other staff members;
3. if her evaluation biased on the basis of race or national origin;
4. if her evaluation scores were a retaliation.

Apx. 113



1

Interview with Arminda Valles-Hall:

I interviewed Ms. Valles-Hall on October 19, 2004. During this interview, Ms. Valles-Hall
noted the comparison between her first personnel evaluation, which took place in June 2003
shortly after she began work at WCA in April 2003, and her 2004 evaluation which took place in
July of 2004. In her 2004 evaluation, Ms. Valles-Hall pointed out that she had received all
ratings of "5", the highest rating. A review of her 2004 evaluation shows that out of 13
evaluation criteria, Ms. Valles-Hall received five ratings of "5" (outstanding), three ratings of
"4" (above average) and five ratings of "3" (satisfactory). Both Ms. Valles-Hall's 2003 and
2004 evaluations were conducted by WCA executive director Betsy Johnson.

In response to my inquiry for a description of the evaluation process, Ms. Valles-Hall indicated
that Ms. Johnson began the evaluation with a blank evaluation review form and that she
completed the form as she discussed each point on the evaluation form with Ms. Valles-Hall.

Ms. Johnson indicated in Ms. Valles-Hall's 2004 evaluation that she needed to improve her
working relationship with WCA staff colleagues. Ms. Valles-Hall believes that Ms. Johnson's
assessment of her interpersonal relations with WCA staff members is unfounded. She said that
Ms. Johnson told her during the interview that she has an offensive tone, has offended people by
calling them names and that staff members had complained about her. She noted that Ms.
Johnson told her that she should be the one trying to solve problems and that she was not doing
enough to solve problems. She said that Ms. Johnson told her that the only time she came into
her office was to complain.

Ms. Valles-Hall said that Ms. Johnson's complaints about her are vague and untrue. When Ms.
Valles-Hall asked Ms. Johnson to provide examples of staff complaints about her, Ms. Johnson
mentioned incidents/situations that involved three staff members, Jeff Kost, Jeremy Baird and
Barbara Mendoza. During our interview, Ms. Valles-Hall provided me with her perspective of
what had happened with each of these staff members.

Ms. Valles-Hall indicated that she feels that things she says and does are misinterpreted. She
noted that she is criticized for keeping the door to her office closed, but she feels that she needs
to close the door for personal reasons (diabetes, when she was nursing) and notes that she works
and focuses better when her door is closed. She also indicated that there had been complaints
that her time sheets being late, but that others are late with them as well.

Ms. Valles-Hall said that when she began working for WCA that she got much praise from Ms.
Johnson for things that she was doing. She indicates that now that she receives constant
criticism. She believes that the tension with Ms. Johnson began in the spring of 2004 when Ms.
Valles-Hall began to work with another staff member on an outreach program (a conference) in
Prince George's County. She indicated that Ms. Johnson complained about the conference
taking too much staff time.

Apx. 114

Ms. Valles-Hall also noted specific criticism from Ms. Johnson that she was not bringing enough
people into the Center and that she did not appear to be involved and interested in things that
relate the organization as a whole. Ms. Valles-Hall said that this was not true by pointing out her

2

involvement in the integrated database project for WCA, in speaking with consultants conducting an organization audit and sharing her experience to help improve the WCA website. She noted that when she added several thousand email addresses to increase electronic outreach for the Center, Ms. Johnson criticized her by saying that the list should not be just a Center list, that she must share it as part of WCA list.

Ms. Valles-Hall believes that there has been a lack of communication with Ms. Johnson. She suggests that Ms. Johnson has a very unforgiving attitude and has created a hostile work environment that is undermining her ability to perform. She mentioned this as the reason the Center's fall catalog did not get out on time.

When asked what could be done to remedy the situation, Ms. Valles-Hall said:
   o  She would like all the interpersonal references out of her personnel evaluation.
   o  She wants the hostility to end.

However, Ms. Valles-Hall commented that she doesn't think things can change, that there is a "pattern of allowing folks to speak to people of color like they are nothing." She feels that there is an undermining of her ability to perform. She said that she feels like there is a club and she is an outsider.


Interview with Betsy Johnson:

I interviewed Betsy Johnson, executive director of WCA, on November 10, 2004. I asked Ms. Johnson to provide me with an explanation of her 2004 personnel evaluation of Ms. Valles-Hall. Ms. Johnson cited complaints from Jeff Kost, Jeremy Baird and Barbara Mendoza as examples of why she had rated Ms. Valles-Hall satisfactory rather than outstanding or above average in the areas of her interaction with staff. Ms. Johnson said that her evaluation of Ms. Valles Hall was true and not biased. She also noted that things with Ms. Valles-Hall had deteriorated since the evaluation, that she has been difficult to deal with and unpleasant often canceling or rescheduling weekly meetings that Ms. Johnson had asked for in order to work with Ms. Valles-Hall to address and resolve performance issues.

Ms. Johnson said that, prior to her 2004 personnel evaluation, Ms. Valles-Hall did not communicate to her that she perceived she was under constant criticism and working in an environment that was hostile to her. Ms. Johnson commented that Ms. Valles Hall did not ask for help in resolving issues with staff. In fact, Ms. Johnson indicates that she believes that Ms. Valles-Hall has been responsible for creating a hostile work environment for herself at WCA. She noted that some staff members avoid Ms. Valles-Hall as a result of past unpleasant interactions with her and resent the fact that she segregates herself behind her closed office door. Ms. Johnson feels that there is a lack of communication from Ms. Valles-Hall except for complaints about others, that she is not a team player, does not discuss what she is doing and planning or offer ideas for input and discussion, but instead produces things in final form or when it too late for input.

Ms. Johnson would like for Ms. Valles-Hall to take responsibility for her actions and to apologize to staff members, clear the air, and repair the working relationship.

<u>Findings of the Investigation:</u>

I interviewed five staff members on November 10 in addition to Betsy Johnson. These interviewees included three staff members cited by Betsy Johnson as making complaints about Mr. Valles-Hall: Jeremy Baird, Jeff Kost and Barbara Mendoza. I interviewed two staff members suggested by Ms Valles Hall: Karen Bailey and Lee Mason.

Three staff members confirmed that they had made complaints to Ms. Johnson about Ms. Valles-Hall. It was clear from speaking with these staff members that Ms. Johnson's complaints from staff were factual. The two staff members that Ms. Valles-Hall suggested I interview said that they had good working relationships with her. One of these individuals suggested that this was due to a personal preference for speaking directly to individuals about misunderstandings and clearing the air.

Staff members interviewed who had been evaluated by Ms. Johnson provided an overview of their evaluation process and it was the same process described by Ms. Valles-Hall. One interviewee states that the evaluation form is not prepared in advance, but that Ms. Johnson has thought about it. This individual indicated that if there are differences of opinion about the evaluation that these differences can be discussed easily with Ms. Johnson.

I did not find that evidence that Ms. Valles-Hall's evaluation was racially or ethnically biased. It appears to me that her difficulties are a result of her approach to her staff colleagues. It appears that some individuals have been insulted and demeaned by her manner of dealing with them, a manner that was characterized as by some interviewed as aggressive and confrontational.

I see no evidence that Ms. Valles-Hall's 2004 evaluation scores were a retaliation, as they appear to be based upon an valid assessment of her performance during the past year by her supervisor. Nor is Ms. Valles-Hall's 2004 evaluation excessively negative as the evaluation contains praise for her work with WCA's external stakeholders.

December 6, 2004

Ms. Arminda Valles-Hall
Director,
Center for Nonprofit Learning and Leadership
Washington Council of Agencies
1666 K Street, N.W., Suite 440
Washington, DC  20006

Dear Ms. Valles-Hall:

I acknowledge receipt of your November 24 response to my draft investigation report.  I have carefully considered your response and find that it deals almost exclusively with personnel issues unrelated to your initial claim that your evaluation was "biased on the basis of race, national origin and, possibly, retaliation."  I have therefore decided to conclude my investigation and submit my report as final.

Paragraph 7 of your response claims that Ms. Johnson used the term "cultural thing" as a possible explanation of your relations with colleagues.  If you believe that that incident constituted discrimination against you, I invite you, if you wish, to provide detailed information about the incident.  Your information should include details as to where and when the incident occurred, who was present, what was said and by whom, and why you believe it constituted an adverse employment action against you.  It would be helpful if you could provide such information in writing.

Sincerely,


Mary Ann de Barbieri
President, Board of Directors
Washington Council of Agencies

Apx. 117

EXHIBIT
23

**From:** Betsy Johnson [betsyj@wcanonprofits.org]
**Sent:** Thursday, November 04, 2004 3:24 PM
**To:** Arminda Valles-Hall
**Subject:** Re: Note from Doctor & Request for Clarification

Arminda,

Your e-mail describes your working conditions as hostile and abusive. WCA takes all such accusations seriously. As you are aware, the chair of our board is currently investigating your earlier personnel complaint. If you believe you have been subjected to discriminatory conduct different from or in addition to the complaint that is currently under investigation, please let me know, preferably in writing. You should identify as specifically as possible the new matters you are complaining about, including the times and dates and the persons involved.

Your e-mail also asks for clarification on WCA's absenteeism policy. If an employee has exhausted all available leave and he or she continues to be absent on so frequent a basis that the employee's work is not being completed in a satisfactory and timely manner, WCA may be forced to hire a permanent replacement for the employee. This may occur even if the absences are for illness.

—— Original Message ——
**From:** Arminda Valles-Hall
**To:** 'Betsy Johnson'
**Cc:** Mary Ann de Barbieri
**Sent:** Thursday, November 04, 2004 10:17 AM
**Subject:** RE: Note from Doctor & Request for Clarification

Apx. 118

EXHIBIT
29

Good morning, Betsy.

As per my email message of November 2nd found below, please find a copy of my doctor's note in your inbox. To review the chronology related to this request, please note the following:

1. You requested a doctor's note on October 19.
2. I met with my doctor on Friday, October 29 and obtained the note.
3. I met with you on Monday, November 1st and informed you I had left my wallet containing the note in my car and would bring it in the next day.
4. On November 2nd, I realized the note was not in my wallet after all, informed you of that via the email found below, and stated I would continue looking for it or obtain another one on November 3rd. In fact, I did find the note and placed a copy of it in your box this morning.

Regarding your memo of November 3, 2004, which you have also sent to WCA Board President Mary Ann de Barbieri, please note that I did not say nor do I acknowledge as true your statement that "By your own admission, you are unable to complete your duties in a timely way when you are absent so much." What I stated very clearly to you in our Monday, November 1 meeting was that I have performed and continue to perform to the best of my ability given the hostile working conditions, abuse and outright lies to which I have been subjected.

Furthermore, in your November 3 memo you state, "Your poor attendance record over the past two months has caused serious disruption to the work of WCA, particularly since many of your absences have been unscheduled." By definition, absences due to illness are unscheduled, since illness cannot be predicted. With regard to scheduled doctor visits, I have kept you informed of my appointments, including those related to my

son's scheduled surgery on September 23 and his two episodes with asthma in October. Regarding my appointments, I would call to your attention my email of September 27, in which I informed you I was beginning medical treatment that would require multiple doctor visits per week, and the additional updates I provided to you on September 28, September 29, October 5, October 8, and October 26 (for all appointments through November 5th.)

With regard to other statements contained in your November 3 memo, I ask for clarification. You write, "While I have agreed that future absences may be charged against annual leave, I cannot allow you to continue missing work on such a frequent basis. Should your absences continue at the current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed. These arrangements may include hiring a permanent replacement for your position." Just to be clear about what these statements mean, are you telling me I cannot be sick and threatening me with the loss of employment should I continue to be sick? Please respond in writing.

Thank you.

Arminda

Arminda Valles-Hall
Director
Center for Nonprofit Learning & Leadership
Washington Council of Agencies
1666 K Street, NW, Suite 440
Washington, DC 20006
202.327.5216 (direct) / 202.457.0540 (main)
202.457.0549 (fax)
armindav@wcanonprofits.org

Advance your organizational goals & professional development through The Center for Nonprofit Learning & Leadership. Visit www.nonprofitlearning.org!

-----Original Message-----
**From:** Arminda Valles-Hall [mailto:armindav@wcanonprofits.org]
**Sent:** Tuesday, November 02, 2004 11:12 AM
**To:** 'Betsy Johnson'
**Subject:** Note from Doctor

Betsy,

I've misplaced the note from my doctor. I thought it was in one place, but it wasn't there. It could only be in one OTHER place, so I'll check on that tonight. If it's not there, I'll get another one tomorrow. Sorry for the delay.

Arminda

Arminda Valles-Hall
Director
Center for Nonprofit Learning & Leadership
Washington Council of Agencies
1666 K Street, NW, Suite 440
Washington, DC 20006
202.327.5216 (direct) / 202.457.0540 (main)
202.457.0549 (fax)
armindav@wcanonprofits.org

Advance your organizational goals & professional development through The Center for Nonprofit Learning & Leadership. Visit www.nonprofitlearning.org!

**The Washington
Council of Agencies**

# Memo

**To:**     Arminda Valles-Hall

**From:**   Betsy Johnson

**CC:**     Mary Ann de Barbieri

**Date:**   11/03/2004

**Re:**     Absences

Your poor attendance record over the past two months has caused serious disruption to the work of WCA, particularly since many of your absences have been unscheduled. By your own admission, you are unable to complete your duties in a timely way when you are absent so much.

You have stated that your absences were for medical reasons. I have asked you to furnish me with a statement from your health care practitioner justifying the leave. To date you have failed to provide such a statement. In order for me to consider your prior absences as excused, I must have such a statement by close of business on Thursday, November 4. Failure to provide a statement will result in disciplinary action.

According to our payroll records, you have exhausted your sick leave and you have 7.34 days of annual leave remaining. While I have agreed that future absences may be charged against annual leave, I cannot allow you to continue missing work on such a frequent basis. Should your absences continue at the current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed. These arrangements may include hiring a permanent replacement for your position.

Apx. 120



CNA #0266

Mtg w/ BJohnson

August 6, 2004                    Discussion re: Evaluation Rebuttal

- Some of the issues that have come up in the last year were
  not evident then
      Issues are: The financial biz — not depositing the check, borrowing
                      — Inability to get time sheets in
                        on time
                  — ~~cavalier~~ cavalier attitude toward
                      or Staff mtgs

Time sheets:   My expectation is you read the personnel manual & if you
               don't understand something you have to ask, like time sheets
               Instead of just deciding They're not important things.
Part of a Pattern — I have to ask you to bring in a time sheet,
               — I have to ask you to deposit checks —
               —

      — We had the issue of comp time — you were assigning
      yourself comp time when the personnel manual says
          only the ED assigns comp time. That is cleared up, too.
      I didn't receive any instruction on how to complete
      the time sheet

                                                      Apx. 121

  + at your request, after being here first 2 mos, I gave
  you a 16% increase. Yes, you were singled out, you
  were treated differently.
      + over the course of the year, a # of things
      have come along, & you've made decisions
      ~~about~~ about how things s/be done —
      — time sheets, missing staff mtgs,

      Only time, we've had a problem w/ people not depositing

DEFENDANTS' DEPOSITION
EXHIBIT
38
2-16-06 MD

000363

Was also surprised that you borrowed cash.
We don't have a petty cash fund so that no one is
tempted.

Don't know when it was lost @ one point you started
calling people "unprofessional" + making a judgment
about them.
+ Frankly, people started complaining about it.
Don't know if it's a cultural thing, but when it was
when indiscriminately applied to everyone you
came in contact w/, it became a communications
issue.

When someone behaves badly, I often don't believe
what I see + I figure people will figure
that out + correct their behavior.

As your supervisor, it's my job to point that out
+ there's no more appropriate time than in a
performance review.

There is one thing in here that is completely
wrong. 5% is the ceiling approved by the
board, not the base minimum standard.

Why weren't these things

Apx. 122

— Didn't believe it was a pattern
— Thought you might have been provoked,
   ~~but if they're~~
— When 1st reported to me, I didn't think

000364

about that, it would ruin the flow of your
~~behavior~~. performance.

But when people come in complaining about
what you'd told them,

1st time - kinda the ups +
when it continued to happen it become + patterns

And these were people that other people weren't
complaining about. You can see patterns. By the way,
you are not the 1st person who I've had to
speak to about their attitude toward people
And, amazingly, the other person was not a
person of color

Apx. 123

"What caused you to judge anything about me as
inflammatory?"
When you make a negative judgment about
someone in a workplace, ~~that's~~ + tell them
about it it's inflammatory. When you tell
them they're ill-behaved, or unprof. or
childish - whatever you tell them, it's
inflammatory + not ~~conductive~~ conducive to
a workplace.
And you aren't the only one who's ever behaved
like that
"When did I call anyone unprofessional?"
A: I don't know.

000365

I don't want to tell anyone anything they don't want to hear.

When someone is going around calling people names, it's not as productive.

If it's a cultural thing, I don't know. It's not an experience I've ever had

If telling making judgements about people telling them is a cultural thing then maybe we need to tell staff it's a cultural thing + they should buck up + take it. But frankly that would come as a surprise to me. But I don't think it's a cultural right. It's verbal abuse + in the other instance, it was a white person talking about a black person. The white person was wrong in my view + we can only go by my view.

I want to know what was said, by whom + when —
        I'm sorry I don't remember
The people you have offended are:
        Myself
        Jeff
        Jeremy
        Barbara
        Susan
Subsequently, I learned of your disciplining

Apx. 124

behavior was bad —
    In what way?
        I wasn't there.
    Someone came + told me I wasn't there.
    I don't know when it was, it was told to
    me yesterday by someone who does not work
    here.

        Won't tell you what was said yesterday. I
        take it to be hearsay.

Myself — How have I offended you?
        — let's start @ the beginning.
    When you're not happy w/ Sonita, you come in
    here + tell me I've offended you, That
    I haven't considered your reputation +
    that you felt it had been purposely done to
    hurt you + That you want it to stop.
    Specifics —
    It was the Post award

    or was it The Carlottia thing.

Apx. 125

    How poorly I had handled it. W/ Carlottia,
    how there were so many red flags.

    You came stomping in here about how I had
    offended you + came in w/ The accusation
    that I had intended to treat you badly.
    That I intended to ruin your reputation
    when I accepted the offer of VA Tech to

000367

other people have come to tell me that.
I apologized right away. I had no intention
of offending you.

Others, Rather than making a scene w/ you, just avoid
you to avoid being called "unprofessional."

Never schedule meeting to discuss what ~~you~~
you're doing — to talk about why 11 courses
were cancelled, or what you + he are doing,
other than w/ finances, you just schedule
meetings to tell me how I offend you.

Jeff — don't have any remembrances specifically
of what you've said to him. He's just not
interested in that, but I do believe
you called him unprofessional during the
incident re: the conf. room. —

        Speaking of the initial encounter w/ Jeff
when he had people waiting to use the
conf. room + you were interviewing a trainer.
I have to say I would have moved. You
had to make some point w/ him + presumably
you did

                                        Apx. 126

Any other remembrances, even vague, ones?

I based this on just reports of your inability
to work w/ others, you calling them names.

000368

Issue - have no idea
Don't remember when mtg was held or
~~who~~ who was in the room.

Who was going to tell AV about this & no one would
answer. Their reluctance was palpable. They
didn't want you to ~~snap~~ snap @ them.
~~Dik~~ No one said that. I interpreted
~~Dik~~ the silence to mean that.

Are you going to refute each of these issues, if
so, that's a waste of time.   Not to me.
To sit there & expect ~~you~~ you're going to sit there &
Call me racist ~~____~~   My advice would be for you to s

for a group of ~~people~~ I've worked up for a
long time, that's a waste of time. What peace
of mind will you get having someone else say
"Betsy's a racist."

Apx. 127

My rec is for you to sit down w/ everyone you've
offended or email them & tell them you're sorry
you've offended them & sorry for calling
people "unprof" for those you've called unprofessional

Jeremy - What did Jeremy say? - "I have no
recollection."
What are you basing the assumption that he's offended
him on?
I'm basing it on the Carlottia Scott motivations &
I do feel you helped motivate that he treated
her in a very bad manner & you made no
attempt to calm her down. And, frankly,
when your email said "and I want you to
let me know what you're going to do about

That's none of your business

I want to know what you're going to do about this
That I took to mean, how are you going to
reprimand Jeremy.

If you hadn't Thought he was completely
wrong, you would have tried to smooth
things out by Carlottia.

I will take resp for what I've done. Not for
what you've done

Agenda — Goal — T'sday, all 5's —
~~Believe they're in~~ I want what is fair.
I frankly think you got on your evaluation
what is very appropriate.

To think you haven't been half of the problem w/
Jeff, is not right. I need you to take
resp. for situations you create + for others to
take resp for The situations They create.

*You have no idea what this eval reflects.*

When people don't work as a team, I'm going
to have to say something to you

Apx. 128

From my pt of view — I feel like I've taken
a chance on you — we have no Ideas to
Dialogue, no Summer progs. I guess you want
a 16% raise, + a million % raise for Lee.
I guess you think you will cut out printing

000370

Barbara — I believe you called her unprofessional
I believe you said that. I believe
she said you said that.
If that is the case, why didn't you bring me
or to talk about this —
I don't get involved in little squizes.
I firmly believe you are big people you
should come here, leave your "shit" at
home, + do your work.
People do get angry at one another.
Sometimes I do have to get involved.
I think its immature behavior + that
parties that do hold grudges need to try
to work of other people.

I do not believe anyone is any better than anyone
else here.
I don't believe anyone has the right to tell
anyone that they're better than anyone else
around here.
You have the right to discipline only the person
who works for you.
People don't come to me until they're really upset about it.
~~B. D.~~ They know I don't want to hear it
because I believe people are adults + they
need ~~had~~ to leave their shit @ home + that people
struggle to live up to that standard.

Apx. 129

If you write to them + ~~say~~ Betsy said these
things + they're not true, that will just make it
worse.

000371

I believe alley people negative names + getting Their back up

BJ   I know a # of people ~~who~~ who have come to me + complained about you.

AV   Andy, I'm asking you to tell me what was said. What is The basis of my evaluation?

When I have addressed my colleagues it has been in a professional way each + every time.

What makes you Think that telling people how to behave is your job?

Susan — You said her remarks to you were inappropriate — relates to the memo she sent re: WP Award.

All I'm saying to you, Armanda, is to keep them to yourself. Only one you can tell that to is her. I guess that's the ~~way~~ you get satisfied.

Apx. 130

I'm just trying to chg how you get along w/ people around here. You need to work w/ them positively + you need to figure out a way of working w/ them positively. If you can work This out, you will get a positive eval next ~~year~~ year. Do not ~~making~~ this up. This is not based

000372

Why wasn't This "pattern" of negative behavior brought to
my attention before the evaluation?
 Maybe you weren't here. Maybe I wasn't here.
Maybe you were busy — like w/ The HSC — + tell you
"You know what? No body likes you."

 I wasn't about to ruin a conf by having This discussion
w/ you.
 And I'll tell you someth'g else about myself, which
you can put into whatever little report you writing
to whoever. whoever.

 Gutter - ignored, until It was a big problem

 Some of us suffered The loss of 2 people. One
person's reaction to The loss was to be abusive,
+ I had to say to that person that this was
inappropriate behavior + frankly, that person's
behavior did. (Changed)

 I would like to not have to deal w/ this.
What was happening was you are segregating
yourself from others, + they're afraid to go to
you.
 But I'm sorry to say That so many people
have come to me, That it's all your behavior
That people complain about.
 I try to counsel Them.
                Counsel

                                    Apx. 131

What's happening w/ you is that a lot of people
are coming to me about you, telling them they're

because I want you to be successful + people are
afraid of you!

Why didnt you bring a tape recorder? Wished I
had - forget cramps.

If I don't catch you going down this road of
alienating everyone, then we'll have a
situation of A going down one road,
apart from everyone else.
The Center is a project of this org.
I frankly think you have segregated yourself,
that's a serious problem + I want you to do
your part in ending it.

How?   I think you need to stop telling people when you
make a negative judgment about them.
If you want to come in here + yell your head
off, then do it.

I hate this rift. And, I'm very sorry if you
haven't seen or noticed that there are bad
feelings. I don't know, maybe you prefer
to sit in your office + not have any interaction
w/ people. But that's not what the WCA needs.
WCA needs teamwork. If those 2 are not compatible
then we've had a misunderstanding

Apx. 132

Your discussions w/ me are very guarded, you
hold grudges, instead of working it out!
I can't make you be/ let less guarded, make

000374

Aug 4   /concerns
Asked That my letter re: eval be added.
Agreed to add to file.

Obtained copies of all Henis personnel file



Apx. 134



Comcast Message Center                                http://mailcenter2.comcast.net/wmc/v/wm/43B5AF45000CE46200..

Comcast

**From:** len.min@comcast.net

**To:** betsyj@wcanonprofits.org; debarasso@aol.com; tkime@iwdc.org;
Tim@abercrombiellc.com; earene@consejo.org; simplydfc@aol.com; gallj@cof.org;
dharps@mandtbank.com; ajones@dckids.org; mwatson-cab@dcgov.org;
cbaker@wwc.org; rkrasnow@uwnca.com; swmorris@equals3.com
**Cc:** templepc@aol.com; michelle.thomas@dc.gov

**Subject:** Arminda Valles-Hall's Resignation / Violation of Protected Rights

**Date:** Mon, 14 Feb 2005 21:55:57 +0000

I am writing to announce my resignation, effective immediately, and to inform
you that my protected rights under the D.C. Human Rights Act have been
violated by the Washington Council of Agencies. Attached are a copy of my
resignation letter and a copy of a complaint letter from Carlottia Scott, both of
which were delivered to the offices of the WCA early this morning. I am writing
to ensure that you received both.

On Friday, February 11, 2005, while our lawyers, you and I were in a mediation
hearing with the D.C. Office of Human Rights related to the discrimination
complaint I filed against the WCA last summer, plans were underway in the
office to, in effect, fire me. My key fob, which provides me access to the
building and WCA suite was deactivated; a security code was placed on my
phone to prohibit the retrieval of messages; and, in an effort to publicly
humiliate me, the building management was given a letter written by the WCA
that informed building security that I was not to be allowed to enter the building
under any circumstances. Along with the letter, which was signed by WCA
Office Manager Barbara Mendoza and dated February 11, 2005, was a 4" x 6"
color photo of me. Both were posted at the security desk in the lobby. Further,
please note I was not informed that these measures were put into effect and no
one has provided an explanation of these overtly hostile actions.

It is unfathomable to me that you would retaliate in such a blatant fashion. You
must know that the DC Human Rights Acts prohibits this exact type of
retaliation. Perhaps I should not be surprised, given the insensitivity that you
have demonstrated to date, that you would continue your discriminatory actions
in this manner.

The outrageous and overtly hostile actions taken by the WCA further
demonstrate the abusive and discriminatory working conditions I reported to
this board and the DC Office of Human Rights months ago, and exemplify the
aggressive retaliation directed at me since I complained about the
discriminatory practices of the WCA.

I am thoroughly sickened by the deplorable, shameless and illegal actions of
this organization.

Arminda Valles-Hall

Apx. 135

**Attachment 1:** Resignation Letter.doc (application/msword)

DEFENDANT'S DEPOSITION EXHIBIT
70A
2-16-06

02/14/05   11:36   ☎202 457 0549          WCA                              ☒002/005

February 14, 2005

Betsy Johnson
Executive Director
Center for Nonprofit Advancement
Formerly the Washington Council of Agencies
1666 K Street, NW, Suite 440
Washington, DC 20006

Betsy:

Effective immediately, I am resigning my position as Director, Center for Nonprofit Learning and
Leadership, Washington Council of Agencies. This experience has been the worst of my professional life.

I have been judged differently and more harshly than my white counterparts, subjected to aggressive
retaliatory action when I complained about this treatment and forced to do the work of others under the
threat of job loss. Your behavior and practices are appalling, disgraceful and, worse, discriminatory and
illegal. Further, your actions are directly related to a decline in my health; as you are aware, for the past
five months, I have been under medical care to deal with the extreme stress caused by this hostile work
environment.

If any WCA board members are learning of these concerns for the first time, they shouldn't be. I alerted
the senior-most leadership of the board of my concerns months ago and requested a formal investigation
in August 2004. I also filed a complaint with the D.C. Office of Human Rights in August 2004.
Unfortunately, this Board sanctioned your abuse and discrimination when its president, Mary Ann de
Barbieri, conveniently diminished or ignored key information I reported to her that supported my claims of
biased treatment. Also, she ignored the complaints of at least one other staff member, who is a person of
color, who reported having experienced similar treatment. Ms. de Barbieri did not interview all of the other
people of color of whom she was aware, who could verify from first-hand experience the disrespectful and
discriminatory treatment they received from white WCA staff members. Further, Ms. de Barbieri chose not
to forward my response to her Draft Report of Investigation of Personnel Complaint to the Executive
Committee.

Two of the individuals who directly experienced disrespectful and discriminatory treatment had been
recruited to teach *pro bono* at the education center by former WCA staff member Lisa Ransom Brown
(fired June 2004) and me. One trainer, Carlottia Scott, a Black woman, was so incensed by the treatment
she received that she sent you a formal complaint. By way of background, Ms. Scott is the former chief of
staff to two members of the U.S. House of Representatives and, more recently, the former director of
policy for the Democratic National Committee. (A copy of Ms. Scott's complaint is attached.) Ironically,
Ms. Scott was exploring WCA membership for two of the nonprofits she chairs just minutes before
experiencing the mistreatment from WCA Membership Manager Jeremy Baird.

You have treated me differently and evaluated me more harshly because of the manner in which I
accepted condescending or disrespectful action and comments from my white colleagues and you.
Further, you have repeatedly and falsely accused me of calling my white colleagues names. During my
annual evaluation in July 7-8, 2004, you accused me of calling Mr. Baird a racist. I vehemently denied
that; it is simply not true. I have never exchanged a cross word with him. In response to my denial, you
responded "but you think he is," and tried to goad me into saying I thought Mr. Baird was a racist. When
our lawyers, you and I met with the DC Office of Human Rights on Friday, February 11, 2005, you told the
mediator that, while you do not remember accusing me of calling Mr. Baird a racist, you will continue to
believe I think he is racist unless and until I affirmatively state that I do not think he is. How ludicrous and
oppressive of you to evaluate me on that basis!

DEFENDANT'S DEPOSITION EXHIBIT

In my July 2004 annual evaluation, you made many other outrageous, unsupported and undocumented allegations and statements including, but not limited to, the following:

1.  You stated that 13 of 14 of my colleagues, everyone but Lee Mason, who I hired and supervised, was "scared" of me. You told me that 13 of 14 staff members had complained to you about me. When you made this incredible claim, I repeated it and asked you if that was what you were stating. You said it was. I repeatedly asked for information regarding the 13 complaints; specifically, I asked you to tell me who said what and when, to the best of your recollection. This was the first time I was learning of ANY complaint about me. Incredibly, you had no documentation to support your claims, yet repeatedly cited these phantom complaints as the basis of the lower scores on my evaluation in at least four areas: Attitude, Open Mindedness, Inter-Personal Communications and Assertiveness. (In each of these areas, I had received "Excellent" in my June 2003 evaluation.)

    On August 6, 2004, I requested a copy of my personnel file and accompanied you to the Supply Room to copy everything in it. It contained absolutely no documentation supporting your allegations.

2.  During my evaluation, I continued to ask for specifics regarding the alleged complaints. At one point, you responded in very disagreeable and disrespectful terms that you expected your staff, as adults, "to leave their shit at home." You said this twice. This was the tenor of my four-hour evaluation over the course of two days (July 7-8).

3.  Pressed for specifics about the 13 alleged complaints, you finally said five (5) individuals had complaints about me: Jeremy Baird, Jeff Kost, Barbara Mendoza, Susan Sanow and yourself. These complaints were as baseless, unsubstantiated and exaggerated as the falsehoods you were perpetuating about my interaction with Mr. Baird. Regarding Ms. Mendoza, for example, you again falsely accused me of berating a colleague. In this case, you claimed I called her "unprofessional." I never said this and told you that. When I asked you for specifics about this complaint, you could provide none. When I asked if Ms. Mendoza actually said I called her unprofessional, you replied that you thought that was what she said. With regard to Ms. Sanow, who was working as a consultant to the WCA on the Washington Post Award competition, you cited the "harsh" tone of a March 2004 email to her as the basis of lower marks on my evaluation. A comparison of Ms. Sanow's email, which by her own admission was "a bit negative," and mine reveals that my response was not harsh at all; in fact, it was quite measured.

4.  On the evaluation you wrote, "You need to work harder at solving problems with colleagues and refrain from telling them your judgment of them." Further, you commented that this alleged negative behavior on my part – judging people and berating them – might be "cultural" in nature. Specifically, you said, "If making judgments about people and telling them is a cultural thing, then maybe we need to tell staff it's a cultural thing and they should buck up and take it." Your statement maligned me as a Mexican woman and person of color. To suggest that this type of unprofessional and completely inappropriate behavior, in which I NEVER engaged, is cultural in nature is plainly racist. On February 11, 2005, you told the mediator from the D.C. Office of Human Rights, in the presence of our attorneys and me, that you were "born white" and "raised white" and sincerely wanted to know if my (alleged) disrespectful behavior was due to my cultural background. It is absolutely appalling that in this day and age anyone would make this type of racist comment. I find it sad that an organization of the WCA's stature would have as its leader a person who thinks this way. Further, it is extremely painful to be the victim of this type of unevolved thinking.

5.  During my evaluation, you told me that you wanted me to "swallow inflammatory remarks" and suggested that is what a good leader would do.

Since complaining about these working conditions and your abuse, and also reporting information regarding possible financial irregularities related to the late depositing of 403(b) contributions, you have retaliated against me in numerous ways, including completely eliminating my staff support while adding a significant project to my workload; severely reducing my authority and almost fully eliminating my decision-making power over the project I was hired to run, the Center for Nonprofit Learning &

02/14/05   11:37   ☎202 457 0549          WCA                                    ☑004/005

Leadership, even though my work performance was never cited as a reason for negative evaluation; allowing my white colleagues and counterparts to mischaracterize and misrepresent the facts related to my discussions with them and you; and forcing me to do the work of a colleague when he, you and I had previously agreed it was his responsibility.

I can no longer accept such horrible and deplorable working conditions, in particular a workplace environment where I am judged differently from my counterparts because of my race, national origin and, possibly, sexual orientation. I have been a victim of a double standard, outright lies and arbitrary evaluation. In short, the collective impact of the professional indignities I have suffered leave me no choice but to resign.

Enclosed is my key fob. I expect to receive my two remaining checks by electronic deposit as has been the practice, and the corresponding pay stubs by mail at my home address. I will forward my hours for the pay period of February 1 – 15, 2005 later today to Ms. Mendoza, Ms. Sanow and you.


Arminda Valles-Hall

CC:
WCA Board Members
Michelle Thomas, Investigator, DC Office of Human Rights
Donald M. Temple, Esq.

Apx. 138

### GOVERNMENT OF THE DISTRICT OF COLUMBIA
#### Office of Human Rights

Judiciary Square Office
441 4th Street, NW Suite 570N
Washington, DC 20001
Phone: (202) 727-4559 • Fax:(202) 727-9589



Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl,
Washington, DC 20020
Phone: (202) 727-4559 • Fax:(202) 645-6390

**Kenneth L. Saunders**
**Director**

## MEDIATION AND CONFIDENTIALITY AGREEMENT

Reference:    *Arminda Valles-Hall vs. Washington Council of Agencies*
Docket No.: 05-074-P (N)
EEOC No.: n/a

Complainant and Respondent agree that all matters discussed during mediation are
confidential and cannot be used as evidence in any subsequent administrative or judicial
proceeding.  As such, parties further agree not to attempt to subpoena the mediator(s) in
any future proceeding.

_____          _____
COMPLAINANT'S SIGNATURE                      RESPONDENT'S SIGNATURE

                                         Christ H. Fleischer
DATE: February 11, 2005 / 2/11/05           _____
                                         BETSY JOHNSON
                                         RESPONDENT (PRINT NAME)

                                              2/11/05
                                         _____
                                         DATE

Apx. 139



1

```
 1 WASHINGTON, D. C.
 2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
 3 _____X
 4 ARMINDA VELLES-HALL,        :
 5                             : Civil Action No.
 6        Plaintiff       : 05-7238
 7 vs.                         :
 8 CENTER FOR NONPROFIT ADVANCEMENT,:
 9        Defendant.          :
10 _____:
11                             X
12            Thursday, January 12, 2006
13            Washington, D. C. 20005
14      The deposition of, BETTY JOHNSON, witness, was called
15 for examination by counsel for the Plaintiff,
16 pursuant to notice, at the offices of Donald Temple,
17 Esq., 1229 15th Street, Northwest, Washington, D. C.
18 20005, before Sharon L. Banks, C.R.,  a notary public in
19 and for the District of Columbia, commencing at 10:00
20 o'clock a.m.,  when were present on behalf of the
21 respective parties:
22
23
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

11

```
 1      A               Well, I was born in Pittsburgh and
 2 lived there until I was 16; moved to Atlanta when I was
 3 16.
 4      Q               Are you presently employed?
 5      A               Yes.
 6      Q               Where?
 7      A               Center for Non Profit
 8 Advancement.
 9      Q               Just state for the record, what
10 kind of business that is?
11      A               It is a non profit organization
12 that serves other non profits in the Metropolitan/
13 Washington region.
14      Q               How does it do that?
15      A               We do it through educational
16 programs, net working advocacy, group buying programs.
17      Q               When you say " networking, " what
18 do you mean?
19      A               Programs that allow nonprofits to
20 get together and talk to each other about issues that are
21 interesting to them.
22      Q               How long has this business been
23 in place?
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

12

1     A            I believe 27 years.

2     Q            When you say " advocacy, "

3 what do you mean?

4     A            Advocacy is working with

5 organizations to make their case or their wishes known to

6 policy makers.   It generally, takes the form of

7 organizations that try to tell policy makers what the

8 situation is; what it is like for the mentally ill, for

9 jobless people, for all different kinds of people.

10    Q           What is your start date, at CNA?

11    A           October 1, '86.

12    Q           What is your present title,

13 please?

14    A           I am the executive director.

15    Q           How long have you had that

16 position?

17    A           Since February 1, of 1988.

18    Q           What are your duties and

19 responsibilities as executive director?

20    A           My duties are to carry out the

21 will of the board, to see to it that the programs are

22 accomplished as desired, to manage finances, to manage

23 staff, at least.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

13

1       Q              How do you determine what the
2 will of the board is?

3       A              We do a strategic plan
4 periodically and revisit it.

5       Q              When was the last strategic plan
6 done?

7       A              We have -- we are sort of
8 finalizing a current one.   So that would be 2005.

9       Q              Before 2005 when was the last
10 strategic plan?

11      A              Probably 2003.   Might be wrong
12 about that.

13      Q              Is there a plan that is developed
14 by the board?

15      A              It is developed by board and
16 staff.

17      Q              When you say " staff, " are you
18 taking about management staff?

19      A              All staff are invited.

20      Q              Do you have a supervisor?

21      A              The board.

22      Q              I see.   When  you say
23 " the board, " you report directly to the board?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

14

```
 1      A              That is right.

 2      Q              So you -- prior to working here

 3 where did you work?

 4      A              Prior to working here I worked

 5 for the Woman's -- National Women's Law Center.

 6      Q              For what period of time?

 7      A              I believe it was a year.

 8      Q              Why did you leave there?

 9      A              This was a better job.

10      Q              Ever been terminated from a job.

11      Q              Yes.

12      Q              What position is that?

13      A              I was terminated from -- I worked

14 for a college called Beacon College.  I was terminated.

15      Q              How many years did you work

16 there?

17      A              What years or how?

18      Q              How many years?

19      A              Two years; I believe.

20      Q              Why were you terminated?

21      A              I cannot recall.

22      Q              Where is Beacon College?

23      A              It is no longer in business, but
```

20

1        A                    That is correct.

2        Q                    And the rates are cheaper as a

3 result?

4        A                    Hopefully.

5        Q                    How long has the health trust been

6 in existence?

7        A                    Um, I can not be exactly sure, but

8 the health trust has been in existence probably 23 or 24

9 years.

10       Q                    You mentioned that your board has

11 14 members; okay.   And they have a traditional

12 leadership structure; chairman, president?

13       A                    Yes.

14       Q                    So is it president, chair person?

15       A                    They call it president, vice

16 president.

17       Q                    Treasurer?

18       A                    Treasurer.

19       Q                    Secretary?

20       A                    Secretary.

21       Q                    Any other executive offices?

22       A                    On some years, in some years they

23 have a president elect.   And when they desire it, they

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

21

1 have an assistant treasurer; they have had.

2      Q            How are persons appointed to the

3 board?

4      A            The board governments committee

5 develops, um, first of all a matrix of who is now on the

6 board, and who they may represent and develops a list of

7 who we desire to be on the board.   In other words, if we

8 have not enough business people on the board, the board

9 will look for those people.  If we don't have enough

10 members on the board, the board will look for those

11 people.

12        The governments committee then recommends

13 potential members to the board and once that has

14 happened, then the members elect the board, the new board

15 members.

16      Q            The board member terms are how

17 long?

18      A            Three years.

19      Q            Officers' terms?

20      A            I believe they are 2 years.

21      Q            Who is the present president of

22 the board?

23      A            We are sort of between presidents.

22

1 Mary Ann de Barbieri has been the president for the last

2 2 years.

3        Q            Never heard between presidents.

4 Is there a president?

5        A            The last board meeting was

6 December.   The next board meeting is March.

7        Q            Uh, huh.

8        A            The December board meeting was

9 chaired by Mary Ann de Barbieri.   That was her last

10 meeting to chair.   The March meeting will be chaired by

11 the newly elected president.

12        Q            Who has not been elected yet?

13        A            Has been elected; yes.

14        Q            Who is that?

15        A            Tim Kind.

16        Q            Have you had any conversations

17 with Tim Kind about Ms. Hall's performance?

18        A            Only in the executive committee.

19        Q            Other than executive committee has

20 he ever told you that he has met with Arminda Hall?

21        A            No.

22        Q            So Mary de Barbieri is the out

23 going president?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 144c

31

1 tell me.

2       Q             Is there a system that you have

3 for them to tell you?

4       A             No.

5       Q             If they are not doing well, or

6 there are specific problems that you have with their

7 performance, what do you do?

8       A             Generally, I meet with them.

9       Q             And?

10      A             We talk about what ever their

11 issue is.

12      Q             You have evaluations.  Your

13 evaluation process is annual?

14      A             Yes.

15      Q             Is it consistent with the date of

16 hire?

17      A             No.

18      Q             Is it at a particular period each

19 year?

20      A             Yes.

21      Q             When is it?

22      A             Prior to July 1.  Or prior to the

23 July, the first July paycheck.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

32

1        Q                So we are saying then that all

2 annual evaluations take place before the July pay check?

3        A                That is correct.

4        Q                If you have a problem with

5 employee X, and if you ask X to come in your office to

6 meet with you, do you make notes regarding discussions

7 that you have with that particular person?

8        A                Not usually.

9        Q                How do you keep track then of the

10 varying levels of performance that you have with your

11 different employees?

12        A                It is not a large office.   It is

13 not difficult for me to know what it is they are working

14 on and I don't supervise everyone.

15        Q                You do supervise your directors

16 and assistant directors?

17        A                I supervise the directors.

18        Q                And they supervise the deputy

19 directors?

20        A                Yes.

21        Q                You only have 2 deputy directors?

22        A                That is right.

23        Q                How about your managers,

39

```
 1      Q                  They want it to be self
 2 sufficient?
 3      A                  They want it to move much closer
 4 to self sufficiency; yes.
 5      Q                  Did they have a plan to achieve
 6 that.
 7      A                  They did not have a direct plan;
 8 no.  They expected the staff to come up with one.
 9      Q                  Who on the staff was responsible
10 for the coordination of these education programs?
11                  MR. FLEISCHER:  Again, when?
12                  BY MR. TEMPLE:
13      Q                  2002 through -- everything that I
14 am asking you right now --
15      A                  2002 through 2004.
16      Q                  -- is between 2002 through 2005,
17 February.
18      A                  Arminda.
19      Q                  This was one of her duties and
20 responsibilities?
21      A                  Yes.
22      Q                  And that was as director of
23 Education?
```

41

1 2003, in terms of the debt that was created to the

2 corporation by virtue of these programs?

3          A                    It is always a problem with debt.

4          Q                    Specifically, education programs?

5          A                    Yes.

6          Q                    How much debt did you encounter

7 in 2002, 2003?

8          A                    I don't remember that.

9          Q                    Was that a problem relative to

10 Arminda's performance, i.e. the cost benefit of the

11 educational programs?

12         A                    It was a problem with her

13 performance in that her job was to plan and manage it so

14 that it would become self sustaining.

15         Q                    Was that a problem that the board

16 discussed?

17         A                    It discussed the issue of  it not

18 being self sustaining.

19             They did not discuss Arminda is not doing a good

20 job.

21         Q                    Was the fact of it not being self

22 sustaining, or getting -- was there a time period in

23 which they projected that it should become self

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 146

47

1 fundraising.  Not ultimately, but he shares in the final

2 responsibility -- failed responsibility to have a

3 sustained, self sustained Education program?

4        A              No.

5        Q              You take that -- the buck stops

6 with you?

7        A              That is correct.

8        Q              To the extent that the board is

9 interested in the Education program, it's interest is in

10 the extent to which the program is being self sustained

11 financially?

12       A              Yes.

13       Q              That has nothing to do then with

14 Arminda?

15       A              Well, it has a lot to do with

16 Arminda.  She is the director.  She is expected to

17 develop programs that will bring in or have more

18 participants and bring in more money.

19       Q              Did you -- she is not responsible

20 for fundraising for the plan, would you agree?

21       A              She could help.

22       Q              Did you ever sit down with Arminda

23 and Jeff and yourself and say we need a self sustaining

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 147

55

```
 1      A              She was director of Education &
 2 Training.
 3      Q              Is that position director of
 4 Education or director of Education and Training?
 5      A              We call it director of Education
 6 and Training.
 7      Q              It's formal title is director of
 8 Education?
 9      A              Director of Education and Training
10 is it's formal title.
11      Q              I note just to reference here,
12 Arminda's job description was director of Education?
13      A              Okay.
14      Q              Is that correct?
15      A              If that is what the paper says;
16 yes.
17      Q              Would the job description have to
18 have the technically correct title?
19      A              I am sorry.
20      Q              Would a job description contain
21 the technically correct title?
22      A              Generally, yes.
23      Q              How long did Elsa work for you?
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

62

1 off hand, I don't know it.

2          Q                    I understand that WCA presently

3 has over 12 hundred members?

4          A                    No.

5          Q                    How many members do you have?

6          A                    We have almost 1 thousand.

7          Q                    You have some idea about the

8 background of the membership of the 1 thousand members;

9 is that right?  What types of groups they are, their

10 interests?

11         A                    I suppose so.

12         Q                    Do you do a analysis of your

13 membership in terms of market interest or market

14 objectives?

15         A                    No.

16         Q                    Do you know for example, what

17 percentage of your membership is -- what percentage of

18 your membership organizations have predominantly Black or

19 Latino members?

20         A                    No, I don't.

21         Q                    Do you have any idea of what

22 percentage of your memberships' members are minority

23 versus non-minority?

77

1      Q                Have you had a chance to read

2 over these questions and answers prior to signing this;

3 is that correct?

4      A                Yes.

5      Q                Is there anything in here that

6 you want to change at this point in time?

7      A                Not that I can think of.

8      Q                Very well.

9                MR. FLEISCHER:  Counsel, we are

10 supplementing per your request.

11               MR. TEMPLE:  Yes.

12               BY MR. TEMPLE:

13     Q                Let me show you what has been

14 marked as Exhibit 2, please.

15     A                Uh, huh.

16     Q                Do you recognize this document?

17     A                Yes.

18     Q                Tell me what it is for the

19 record, please?

20     A                It's the personnel hand book that

21 we go by.

22     Q                It says WCA?

23     A                Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

78

```
 1      Q              Is that the same organization as
 2 CNA?
 3      A              Yes, it is.
 4      Q              Has there been a name change?
 5      A              Yes.
 6      Q              When was the name change?
 7      A              I am sorry.
 8      Q              When was the name change?
 9      A              When?  February, a year ago.
10 February, 2005.
11      Q              So this is the personnel hand
12 book for CNA?
13      A              Yes.
14      Q              It is CNA is that right?
15      A              I call it the Center for Non
16 Profit Advancement.
17      Q              This is Washington.  We all have
18 acronyms for everything.
19      A              But there is an insurance company
20 called CNA, I believe and I prefer not to threaten them.
21      Q              I am sorry.
22      A              Okay.
23      Q              This personnel hand book, who
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 152

89

```
 1      A              Not as a general rule.

 2      Q              If you were to give someone a

 3 written warning it would be in the form of a memo or an

 4 e-mail?

 5      A              Yes.

 6      Q              I understand that from time to

 7 time you received complaints about Arminda?

 8      A              Yes.

 9      Q              Would that be exclusively from

10 within your organization?

11      A              I could not verify that.

12      Q              Do you know of any complaints that

13 you received about Arminda from persons who were not

14 employed by WCA?

15      A              Yes.

16      Q              Who were those people?

17      A              Michael Freedman.

18      Q              Uh, huh.   Who else?

19      A              I can't name anyone else.

20      Q              Who is Michael Freedman?

21      A              Michael Freedman is a partner in

22 Gelman, Rosenberg & Freedman, a CPA firm and had been for

23 many years treasurer of the board.
```

90

1      Q           Does that complaint concern the

2 ten dollars that she spent?

3      A           No.

4      Q           What was the nature of the

5 complaint?

6      A           I believe that his complaint was

7 about the management of the Post Award, the Washington

8 Post Award for Excellence in Non Profit Management.

9      Q           What was his specific complaint?

10     A           The best that I can recollect is

11 he said she just was not doing a good job.

12     Q           Did you ask him any questions when

13 he said that to you?

14     A           No.

15     Q           Did you discuss it with him?

16     A           No.

17     Q           Why?

18     A           He registered his complaint.  That

19 was as much as I needed to know or wanted to know.

20     Q           Would you want to know if somebody

21 told you that somebody was not doing a good job, why

22 someone thought they were not doing a good job?

23     A           Yes, I would.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 154

91

1      Q              Why would you not have asked him
2 then, what the -- why would he say something?
3      A              I may have.   I really don't  have
4 any recollection of that.
5      Q              When did he make this complaint?
6      A              I don't know.   It would have had
7 to have been between November of 2003, and March of 2004.
8 March or April or 2004.
9      Q              What is his relationship to the
10 Washington Post Award?
11     A              He is a committee member.
12     Q              Did he make his complaint in
13 writing?
14     A              No.
15     Q              Did you ever tell Arminda that you
16 received a complaint from someone about her performance
17 with the Washington Post Award?
18     A              I did not make, I did not --
19 possibly.   Not prior to Susan Sano taking over the
20 award.
21     Q              I am not understanding your
22 answer.
23     A              I did not mention it to her prior

92

1 to March of 2004.   I may have mentioned it in the Summer

2 of 2004 and I may not have.

3        Q               As of March 2004, Susan Sano took

4 over the Washington Post Award?

5        A               Right.

6        Q               Prior to Susan Sano taking over

7 the Washington Post Award, did anyone other than Mr.

8 Freedman complain about Ms. Hall's performance relative

9 to that award?

10       A               Susan complained.

11       Q               What did Susan say?

12       A               I believe that she said something

13 a long the lines of I believe there were 2 complaints.

14 There is an e-mail that says this.   I believe there were

15 2 complaints.   One is that material was not given to

16 committee members timely and equal material was not given

17 to material members.  In other words, some material was

18 given for an organization competing -- more information

19 was given about one organization than another

20 organization.   That is my understand.

21       Q               Any other complaints from Susan?

22       A               No.

23       Q               That's the only complaint that she

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

93

1 had?

2        A                My understanding of it.

3        Q                What was Arminda's role and

4 responsibility relative to the Washington Post Award?

5        A                November of 2003, I asked her to

6 take over the Post Award, management of the Post Award.

7        Q                What would that management require

8 of her?

9        A                It would require holding meetings

10 of the committee.  It would require getting the

11 applications out to committee members.   It would have

12 required -- well, in holding meetings, making sure they

13 have read the reports, making sure that they came to the

14 meeting with a way to judge the competition.

15       Q                And who was she to report to

16 relative to that particular duty?

17       A                Myself.

18       Q                Did she report to you?

19       A                Did she.

20       Q                Did she actually report to you in

21 November, December, January and February?

22       A                What do you mean by " report? "

23       Q                You said she was required to report

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 157

95

```
 1      Q              Was there any documentation that
 2 she provided to you either in December, 2003, January,
 3 February 2004, regarding the work she was performing for
 4 you on the Washington Post Award?
 5      A              I don't believe so.
 6      Q              Susan was a consultant at that
 7 time; correct?
 8      A              That is correct.
 9      Q              Susan had been the person who
10 started this Washington Post Award; is that correct?
11      A              That is correct.
12      Q              What was Susan's relationship with
13 the Center financially?
14                     MR. FLEISCHER:  When?
15                     BY MR. TEMPLE:
16      Q              Thank you.  Through February 2004?
17      A              From November of 2003?
18      Q              Yes.
19      A              To 2004?
20      Q              Yes.
21      A              She was to be paid for time that
22 she spent.  I don't recall the -- I don't recall the, um,
23 how much we were to pay her.  And there was no
```

96

1 particular agreement about a set number of hours.

2          Q              Was it an agreement -- was there a

3 written agreement between the Center and Susan?

4          A              I don't believe so.

5          Q              So it would be a hand shake

6 consultancy?

7          A              Right.

8          Q              How much was she paid an hour?

9          A              I don't know.

10         Q              What was her particular duties and

11 responsibilities as a consultant?

12         A              Well, they were not specified, but

13 my understanding of them, her job would have been to

14 guide Arminda through the process of the Post Award.

15         Q              You said it was a committee?

16         A              Yes.

17         Q              Who was on the committee for the

18 Post Award?

19         A              I can get a list, but off hand, I

20 don't know.

21         Q              If your employees were doing a

22 good job in fund raising, membership, how would they

23 know?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

107

1    Q              Did you tell Arminda that -- did

2 Susan report to you about the Washington Post Award,

3 during the months of -- between November when Arminda

4 took over, through March when you took her off the

5 project?

6    A              She sent me an e-mail, yes.

7    Q              One e-mail?

8    A              Yes.  Her report to me was in the

9 form of e-mail.   Which was the same -- it was an

10 e-mail to Arminda, I believe, copied to me in which she

11 pointed out the things that should have been done or

12 needed to be done.

13    Q              Did Arminda correct the

14 deficiencies at that time?

15    A              I don't know.  My understanding is

16 that one of the deficiencies was that the applications

17 were not sent out -- were sent out several weeks later

18 than the initial date that had been set for their

19 mailing, which meant that the committee members had a lot

20 less time to read them; half as much time to read them.

21    Q              At that particular point in time

22 what were Arminda's specific duties and responsibilities

23 as of February 2004?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

108

1          A                ' She was to put on the educational

2  work shops, and she was to administer the Washington Post

3  Award for excellence and nonprofit management.

4          Q                The applications that you said

5  were sent out, several weeks late; did you say?

6          A                That is my understanding.

7          Q                Do you know why they were sent out

8  several weeks late?

9          A                I have no idea.

10         Q                To this day?

11         A                To this day I have no idea.

12         Q                Did you ever ask Arminda, Arminda,

13  why were they sent out several weeks late?

14         A                It was too late.

15         Q                You never asked her that?

16         A                No.  I did not ask her that, no.

17         Q                Do you know if they attributed it

18  at all in part to Susan that they were sent out 2 weeks

19  late?

20         A                I don't know -- have any knowledge

21  of whether that was the case.

22         Q                Did you factor --

23              Did you receive any complaints about Arminda

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

109

1  electronically by e-mail?

2          A                I don't believe so.

3          Q                Did Jeremy Byrd ever complain to

4  you electronically about Arminda?

5          A                No.

6          Q                Did he ever explain to you about

7  Arminda?

8          A                I don't believe so.

9          Q                Did Jeff Kost ever communicate to

10  you electronically about her?

11          A                No.

12          Q                I am not saying did he complain.

13  I am saying did he communicate with you electronically

14  about Arminda?

15          A                No.

16          Q                You are certain of that?

17          A                I am fairly certain of that.

18          Q                Did he every complain to you about

19  Arminda?

20          A                Yes.

21          Q                In what form; was it written or

22  face-to-face?

23          A                Face-to-face.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

110

```
 1      Q              On how many occasions?

 2      A              I could not say.

 3      Q              More than one?

 4      A              I believe so.

 5      Q              Do you remember approximately when
 6 he made these complaints?

 7      A              They had to have been -- I don't
 8 have any remembrance of exactly when they were but they
 9 had to have been between Thanksgiving of 2003 and the
10 Spring of 2004.

11      Q              ' Spring meaning June?

12      A              No.   I would have thought April
13 or May.

14      Q              What was his work, working
15 relationship with Arminda during that period of time,
16 Jeff?

17      A              The period of time from
18 Thanksgiving, 2003 until --

19      Q              Yes.

20      A              -- until Spring of 2004?

21      Q              Yes.   April in particular?

22      A              He was a colleague of hers.

23      Q              He was not in her chain of
```

112

1          It was his job generally, to be concerned for
2 fund raising for the whole organization.   But he was not
3 -- it was not his job to fund raise entirely for
4 Education.

5          Q          Did you ever tell anyone other
6 than Jeff that they had to assume responsibility for fund
7 raising for Education programs?

8          A          I never told anyone they had to
9 assume responsibility for fund raising in Education, no.

10          Q          What were Jeff's complaints about
11 Arminda?

12          A          My understanding is that they had
13 had a misunderstanding with each other about use of the
14 conference room.   He felt that she demanded and apology
15 when that demand was not warranted.

16          Q          Relative to the conference room?

17          A          Right.   Relative to the
18 misunderstanding of the conference room.

19          Q          That is complaint number one.
20 What is complaint number two?

21          A          Complaint number 2 would be that
22 she did not work with other people.

23          Q          Jeff told you that?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

113

```
 1      A              Yes.

 2      Q              What is complaint number 3?

 3      A              That would be the extent of it.

 4      Q              How would Jeff know if she is not

 5  in his chain of command that she is not working with

 6  other people?   Did you ask him that?

 7      A              The culture at the organization

 8  because it is a small organization, is that we all have

 9  to work cooperatively with each other.

10      Q              What does that mean?

11      A              Well, it means that we don't work

12  in silos.   In other words, we don't work individually

13  and don't even care what the person next to us does.   It

14  means it is all inter-related and everyone is expected to

15  interact with everyone.

16      Q              When you say " interact, " do

17  you mean socially or do you mean in terms of work

18  productivity?

19      A              I am talking about work.

20      Q              In the context of interacting with

21  someone on a work project, does that mean that -- explain

22  what you mean by that?

23      A              I mean talking to them about it.
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

119

1 you talked to Arminda about Jeff's complaints about her

2 interaction with other people?  Isn't that correct?

3        A              That is correct.

4        Q              When she was evaluated by you,

5 that was one of the issues, wasn't it?

6        A              Yes.

7        Q              In terms of the conference room,

8 this conference room incident, can you tell me what you

9 recall about the incident?

10       A              I was not there.   My

11 understanding of it is that she was meeting in the

12 conference room with someone and he was scheduled to have

13 the conference room shortly and then there was some

14 interaction between them about whether or not he could

15 get in sooner.   And the next day she demanded an apology.

16       Q              At the time, did you know that

17 relative to the conference room incident, that there was

18 someone that was meeting in the conference room at the

19 time with Arminda?

20       A              That is why she was in the

21 conference room; I knew that.

22       Q              Do you know with whom she was

23 meeting?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 166

126

1 -- that is as much as I can remember.

2          Q          When she told you that, did you

3 consider the possibility that Jeff's approach to that

4 particular incident may have been offensive?

5          A          Yes.

6          Q          Did you tell Jeff that?

7          A          Yes.

8          Q          Did you discipline Jeff for that?

9          A          I don't know what discipline

10 would be.

11          Q          Did you give him a warning, a

12 written warning about it?

13          A          No.

14          Q          Did you put anything in his

15 personnel file about it?

16          A          No.

17          Q          Did you factor that incident into

18 his performance evaluation?

19          A          I am sure I did.

20          Q          It was another incident involving

21 a woman named Carlotta Scott?

22          A          Yes.

23          Q          Did that also involve Jeff?

Apx. 167

127

```
 1      A                I don't believe so.

 2      Q                Who did that involve?

 3      A                Jeremy.

 4      Q                And Jeff was not involved?

 5      A                Jeff was -- my only understanding

 6 is that Jeff was in Jeremy's office when it happened.

 7      Q                What is your recollection about

 8 that particular incident?

 9      A                Jeff told me Lisa had complained

10 about Jeremy stopping somebody in the hall and

11 questioning that person about where she was supposed to

12 be.

13      Q                How was Arminda connected to the

14 Carlotta Scott incident?

15      A                My understanding is that Lisa and

16 Arminda and Carlotta were meeting.

17      Q                Were they meeting in the

18 conference room?

19      A                Yes.

20      Q                What is your understanding about

21 the communication between Jeremy and Carlotta.

22      A                My understanding is that Jeremy

23 asked her where she was supposed to be.
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 168

131

1 because it had not been forwarded to me.   So I had no

2 way of contacting Carlotta.   There was no information on

3 there for me to contact Carlotta.   So I asked for that

4 information.

5          Q              Who did you ask that information

6 of?

7          A              Arminda.

8          Q              Did she give it to you?

9          A              Yes.

10         Q              What did you do?

11         A              I called Carlotta that day and

12 every day until she returned my call.

13         Q              You did speak to her about it?

14         A              I believe I spoke to her about

15 it.

16         Q              When you talked to her, what did

17 you say?

18         A              I apologized and I said this was

19 not the kind of behavior that we thought was all right in

20 this organization.   I was very sorry that it happened.

21 That he had been -- I tried to explain why he would have

22 seemed confrontational.   But mostly I apologized.

23         Q              Why would he have seemed

132

1 confrontational?

2       A              We have -- the conference room

3 opens on to the hallway, the building hallway.   And  we

4 have a number of organizations that may use the

5 conference room that are not related to us.

6            And we have had instances of their employees

7 wandering through our suite.   Sometimes, coming into

8 individual offices, using the phone, and the men who work

9 for us, have taken it upon themselves to challenge

10 people.

11      Q              Uh, huh.

12      A              Other people have been

13 challenged.

14      Q              You told Carlotta that?

15      A              Yes, I did.

16      Q              Did it bother you that -- this is

17 not a man.   This is a woman, first of all.   Did it

18 bother you that this communication for her must have

19 really been violating?

20      A              Yes.

21      Q              Did you talk to Jeremy about it?

22      A              Yes, I did.

23              MR. TEMPLE:   It is 1:00 o' clock.   Take

133

1 a break; lunch.

2                    (Whereupon, at 1:00 o'clock p.m., the

3 proceedings were adjourned for the luncheon recess, to

4 reconvene at 2:20 o'clock p.m., the same day.)

5                    BY MR. TEMPLE:

6      Q                    Other than Jeff, did anyone else

7 internally, complain about Arminda?

8      A                    Barbara Mendosa did.

9      Q                    Barbara Mendosa?

10     A                    Yes.

11     A                    Do you know when she complained?

12     A                    I don't and I may have asked her.

13     Q                    When would you have asked her?

14     A                    It may be that I heard that there

15 had been some kind of difficulty and asked her.

16     Q                    What do you recall her saying?

17     A                    She told me that Arminda had

18 called her unprofessional.

19     Q                    Did she say why?

20     A                    I don't recall.  She probably did

21 and I just don't remember what it was about.

22     Q                    Do you -- did you say anything

23 else other than that?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

135

1       Q                    Why would you have asked Ms.

2  Mendoza in 2003 about this incident between her and

3  Arminda?

4       A                    If she had been upset by it and

5  was withdrawn or was expressing some hurt, I would have

6  asked her what was wrong, which was likely what happened.

7       Q                    So she was upset and hurt and

8  withdrawn?

9       A                    Well, that was my -- that's the

10 way Barbara behaves and when she behaves that way, I ask

11 her what the matter is.

12      Q                    This could have been just

13 incidental?

14      A                    Exactly.

15      Q                    Did you consider that Arminda may

16 have said that Barbara was unprofessional to be a

17 problem?

18      A                    I am sorry?

19      Q                    Did you consider that Arminda said

20 that Barbara was unprofessional to be a problem?

21      A                    That she said it?

22      Q                    If Arminda had said Barbara you

23 are unprofessional, is that a problem?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 172

136

```
 1      A               At that time I did not think it
 2 was a problem.
 3      Q               Did you think it was a problem
 4 after you had that conversation with Barbara?
 5      A               No, not after I had that
 6 conversation.
 7      Q               Did you ever come to think it was
 8 a problem?
 9      A               Yes.
10      Q               When?
11      Q               After there were a series of
12 complaints and probably not until after Arminda had
13 suggested that I was thoughtless, disrespectful, for the
14 way the Washington Post Award was handled.
15      Q               I am not following you.
16           You did not think that the problem that Mendoza
17 told you about was of any moment until Arminda complained
18 to you about the Washington Post issue?
19      A               My understanding is that the
20 incident with Barbara was the first -- this is the first
21 one I knew about.
22           Next, was the, um, probably, possibly Michael
23 Freedman's complaint.   The next one would have been the
```

137

1 incident with Jeff Kost and then, when Arminda confronted
2 me with why the Washington Post Award was -- why the
3 management of it was changed.   She accused me of you
4 know, intentionally being disrespectful or thoughtless,
5 that I had the distinct impression that she thought I had
6 intentionally ruined her reputation.

7        Q              Was reputation at issue?

8        A              I did not think so.

9        Q              She never spoke to you in a
10 disrespectful manner?

11       A              Not until then.

12       Q              She wrote to you in that regard;
13 isn't that correct?

14       A              My recollection is that she -- she
15 may have written to me, but I thought we had a discussion
16 about it.   It is possible that she wrote to me prior to
17 that.   We had a verbal discussion about it.

18       Q              Do you think if you violate
19 someone's rights that they should be nice and pleasant
20 with you when they discuss that, they should not have
21 some level of emotion?

22              MR. FLEISCHER:   Objection.   There is an
23 assumption  built into that question that is not

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

139

1     A                    That is right.

2     Q                    So she only did -- that happens
3 every day from a manager's point of view?

4     A                    That is correct.

5     Q                    So she did not do anything that
6 was disrespectful to you other than telling you that she
7 thought that what you did was disrespectful?

8     A                    I felt that her -- I felt that
9 she was insinuating that I had intended harm to her.

10    Q                    If she believed that you had
11 intended harm to her, that was her expression of her
12 opinion?

13    A                    That is right.

14    Q                    It was not necessarily
15 disrespectful was it?

16    A                    I don't think it is okay to jump
17 to conclusions about the way people feel about finding
18 out how they feel.

19    Q                    Is that so?

20    A                    Yes.

21    Q                    When Barbara Mendoza told you
22 that Arminda said she was unprofessional, did you think
23 that way enough to ask Ms. Hall, what happened?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

142

1        Q                I am trying to get to the point

2   in terms of Arminda.    It may be 2 people, but ultimately

3   in the over all scheme of things, Arminda -- it was a

4   situation that came to a head when there was a decision

5   made, a recommendation made that Arminda should be

6   terminated; is that correct?

7        A                No.

8        Q                Okay.

9        A                Not by me.

10       Q                At some point, it was -- Arminda

11  was evaluated?

12       A                That is right.

13       Q                What Barbara thought and what Jeff

14  thought and what Jeremy thought those views were taken

15  into consideration by you relative to Ms. Hall's

16  evaluation; is that correct?

17       A                And Susan and my experience with

18  her.

19       Q                So yet, when Michael told you, he

20  had a complaint about Arminda, you took Michael's word

21  for it.    You never, ever talked to Arminda about

22  Michael's complaint, did you?

23       A                I did not assume he was right

Apx. 176

143

1 either.

2       Q                But you never spoke to Arminda

3 about Michael's complaint; isn't that correct?

4       A                That is correct.

5       Q                You never spoke to Arminda about

6 Susan's complaint; did you?

7       A                I don't recall.

8       Q                You never spoke to Arminda and

9 told her that Barbara said that she thought she was

10 unprofessional during the time period that Barbara said

11 she was unprofessional; okay.

12      A                No.

13      Q                And when you had a situation with

14 Carlotta between Jeff and -- the misunderstanding between

15 Jeff and Arminda, ultimately, you factored that into

16 Arminda's evaluation in terms of how she dealt with Jeff;

17 isn't that correct?

18      A                It was her demand that he

19 apologize that troubled me.

20      Q                Well, if Carlotta was offended and

21 racially offended in the way that you described in this

22 deposition and you apologized for what happened, do you

23 think somebody else who was directly involved should have

154

1 significantly offended?

2      A                    I was more upset about the fact

3 that Ms. Scott had been significantly offended.

4      Q                    Relative to the complaints about

5 -- and I am getting to the evaluation of Arminda.  In her

6 2004 evaluation, you stated she received 5, 3s on a scale

7 of --

8      A                    One to five.

9      Q                    One to five.   Five being

10 highest.

11            (Exhibit nos. 3&4 were marked for

12            ID.)

13            BY MR. TEMPLE:

14      Q                    I am showing you, for the record,

15 what is marked as the Exhibit 3, which is the 2003

16 evaluation of Arminda Hall.  I note that she received all

17 fives?

18      A            Yes.

19      Q            Why is that?

20      A            I believe that she was doing a

21 fine job.

22      Q            You had no problem with her

23 attitude?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

155

```
 1        A              No.

 2        Q              Initiative?

 3        A              No.

 4        Q              So she was giving you 100 percent?

 5        A              As far as I could tell.

 6        Q              Let me show you what has been

 7 marked as Exhibit no. 4.

 8               For the record, this is her 2004 evaluation

 9 dated July 7th, 2004.   It looks like to me she got five

10 fives; is that right.

11        A              Looks the same to me.

12        Q              And it looks like she got 3, 4s?

13        A              Looks the same to me.

14        Q              And she got 5 3s?

15        A              That looks the same to me.

16        Q              Tell me please, what does a 3 mean

17 in the scoring process?

18        A              It means satisfactory and on the

19 back of the, back of the forms is a sort of measure.   It

20 means satisfactory.   It means it needs some work.

21        Q              Can you tell me -- and a 4 means?

22        A              Doing well, not fabulously.

23        Q              Above average though?
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 179

156

```
 1      A              Yes.

 2      Q              Five means?

 3      A              Outstanding.

 4      Q              Here, there are at least five
 5 categories where she is just satisfactory and five
 6 categories where she is outstanding.  Would you agree
 7 that the five categories where she is just satisfactory
 8 have to do with her interaction and communication skills?

 9      A              With this staff.

10      Q              With the staff?

11      A              With the staff.

12      Q              The first category, let me direct
13 your attention to that, please.  For the record, there
14 is writing on this document, would the writing be your
15 handwriting?

16      A              Yes, it is.

17      Q              At the bottom can you read into
18 the record as to what it says under " additional
19 comments? "

20      A              " Arminda is very good with
21 customer/consumers/people outside WCA.  You need to work
22 harder at solving problems with colleagues and refrain
23 from telling them your judgement of them.  "
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

157

1          And then I gave her a raise to  $61,800.

2     Q               What would that raise be, from
3 what to what?

4     A               Sixty thousand.

5     Q               Let me talk about the raises for a
6 minute.   The raises are based on what?

7     A               Based on if I think they are doing
8 a good job.

9     Q               To some extent they are based on
10 merit.   Is there a percentage cap to which a person can
11 get a raise?

12     A               The board, I asked the board for
13 an authorization each year of a ceiling.

14     Q               Uh, huh.

15     A               In this particular year the
16 ceiling was five percent.

17     Q               So her maximum raise would have
18 been potential 3 thousand dollars?

19     A               I don't know.

20     Q               Five percent.   Is that five
21 percent of the previous salary or five percent of sixty
22 thousand?

23     A               Right.   Right.

158

```
 1        Q               So, do you give raises above the
 2 five percent?
 3        A               Occasionally.
 4        Q               Based upon?
 5        A               Based upon my belief that the
 6 person has done way more than asked for.
 7        Q               Let me direct your attention to
 8 the first -- to A, personal attributes.  Can you read
 9 the handwriting there please?
10        A               Yes.   " Responds with
11 inflammatory remarks.  Sometimes positive out look.
12 Sometime constructive. "  I don't know what that is.
13 Ideas.
14        Q               For attitude, which is A, personal
15 attributes.  Positive outlook, constructive ideas, works
16 well with others.  She received a 3.
17        A               Yes.
18        Q               You said she responds with
19 inflammatory remarks?
20        A               Yes.
21        Q               To what are you referring?
22        A               To her calling Barbara Mendoza
23 unprofessional.  For her automatic judgement that Jeff
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 182

159

1 was disrespectful.   For her automatic judgement that I

2 had intended to harm her reputation.   For her snapping

3 at Susan when Susan tried to give her direction.

4          Q                Let me start with Barbara's

5 unprofessional -- did Arminda call Barbara

6 unprofessional?

7          A                As far as I know, she did.

8          Q                How do you know?

9          A                Barbara told me she did.

10         Q                Did you ever ask Ms. Hall?

11         A                We talked about it and Arminda

12 swore she did not.

13         Q                Arminda said she did not and

14 Barbara said she did.  So you believe Barbara.

15         A                I have worked with Barbara for

16 fifteen years.

17         Q                My question is:   So you believe

18 Barbara?

19         A                I don't know which is true.

20         Q                So you believe Barbara?

21         A                My answer would be that I believe

22 Barbara with regard to her -- with regard to Arminda's

23 evaluation.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 183

165

1 to take you off of this project because I don't think you

2 are doing a good job.

3          That is why you took her off the project; isn't

4 that right?

5     A          No.  That is not right.

6     Q          Why did you take her off of the

7 project?

8     A          I took her off the project

9 because we had an offer to have it paid for.

10    Q          How so?

11    A          Have the staff paid for.

12    Q          So you did not take her off of

13 the project because of the complaint of Susan and

14 Freedman?  Is that right?

15    A          They may have been part of it,

16 but they were not the only reason.

17    Q          Is it true that even though

18 Virginia Tech. is it, had offered to subsidize Susan's

19 salary, isn't it true that did not mean that you had to

20 take Arminda off of the project?

21    A          Right.  That is right.

22    Q          In fact, that would have

23 augmented Arminda's ability to do the project if Susan

181

1      A              People have what ever reaction
2 they want.  That is all I am saying.
3      Q              Have you not in your professional
4 work experience, encountered where someone says that is
5 not professional?  That is not good.  That is --
6 commented on something that another person does to
7 someone?
8      A              Yes.  I have.
9      Q              She did not evaluate her.
10      Whose job would it be to tell her that her work
11 was unprofessional; that the situation was
12 unprofessional?
13      A              Mine.
14      Q              If it would have been your job to
15 tell her that her work was unprofessional or the
16 situation was unprofessional, how do you investigate it
17 to find out whether it was unprofessional or not?
18      A              I am a poor manager.
19      Q              Let me go to work habits here; H
20 H, work habits.  Pledges to get work done in allotted
21 time.  Uses time effectively.
22      What are you referring to here?
23      A              We had an annual meeting I believe

182

1 on the first of December.

2      Q                    2004, 2003?

3      A                    2003.  And she was working with

4 other people on this, but she stayed up all night the

5 night before getting things done.  And I don't -- I like

6 people to work in the allotted time.  And I had spoken

7 to her about that.

8      Q                    Why did she stay up all night the

9 night before?

10     A                    I don't know.

11     Q                    Did you ask her?

12     A                    Possibly.

13     Q                    Could it have been a situation

14 that would have justified her staying up all night?

15     A                    Yes.  There might have been.

16     Q                    In a  situation like that, if an

17 employee is supposed to do something, filing something,

18 copying, preparing a report, could there be some

19 emergency possibly, that might cause a delay that would

20 justify the delay?

21     A                    Certainly.

22     Q                    How would you know?

23     A                    If they tell me.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

188

1  complaint and that she feels she is a victim of

2  discrimination.  She feels that if she were, uh, that her

3  discrimination is based on the fact that she is not

4  sharing the same sexual preference and she has a

5  different race and national origin?

6        A              I understand that is her

7  complaint.

8        Q              Well, she complained to you.

9        A              She did not complain to me that

10 she was being treated differently because of her national

11 origin or her sexual preference.

12       Q              What did she complain to you about

13 when she complained to you in August 2004?

14       A              That this was not correct.  She

15 never mentioned race or sexual preference.

16       Q              At the time that you did this

17 evaluation, in July, 2004 you were not considering

18 termination of Arminda; were you?

19       A              That is right.  I was not

20 considering it.

21       Q              At some point you started

22 considering that; isn't that right?

23       A              Much later.

189

1      Q              When did you first begin to think
2 that you may have to terminate Ms. Hall?

3      A              Probably around the 1st of 2005.

4      Q              What was the trigger factor that
5 lead you to begin to think that you might have to
6 terminate her in January, 2005?

7      A              That she was unwilling to do work
8 that we considered to be part of her job.

9      Q              What was the specific work?

10     A              My understanding was that she had
11 refused although she eventually did it, she refused to
12 post work shops on the web sites.

13     Q              Let's talk about that.  That
14 involved a situation with an employee by the name of --
15 what was the employee's name?

16     A              I am afraid I don't know what you
17 are talking about.

18     Q              Indulgence?

19     A              Richard Rose, Rick Rose.

20     A              Yes, Rick Rose.

21     Q              The work shops that you are
22 talking about, what was the purpose of these workshops?

23     A              To educate our members.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 188

193

1 was Rick's job?   You don't know?

2        A                 Right.  She could have been.

3        Q                 If it was Rick's job and she was
4 asked to do somebody else's job --

5        A                 No, no.   She was not asked to do
6 somebody else's job.

7              If it was his job, it was new to his job.   This
8 was a new position when he came to work there.   We had
9 not had that position before.   And in every previous
10 time, that work shops had been put on the web site, they
11 had been put on by the Education Department and they had
12 been put on, at one point, by Arminda.

13        Q                 But if it was his job, if it were
14 his job and he is new, what is it problem in her saying
15 we have somebody now in this -- it is their job or part
16 of their job helping me to put these classes on line?

17        A                 There would not be any problem,
18 but there was no offer to help.   It was no asking for
19 help on her part.

20        Q                 What do you recall what she said
21 about this?

22        A                 I believe there is an e-mail and
23 she said she was not going to do somebody else's job.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

194

1     Q                    What was your reaction to that?

2     A                    My reaction to that was that the

3  work had to be done and it was not up to her to determine

4  what anyone else's job was.   It had been part of her

5  job.  And it had not been specifically taken away from

6  her.

7        It was her job to get this stuff out.  She

8  wanted to narrow her job without any discussion with

9  anybody.

10     Q                    At the present time, at that

11  particular point in time you don't know if it is Rick's

12  job.   You only know that you told Arminda to do it and

13  no matter what, she is to do what she was told because it

14  was part of her job in the past?  That is essentially it.

15  Is that it?

16     A                    Yes.

17     Q                    Did you have a meeting with her

18  and say Arminda you have to do this or did you bring in

19  Rick and say, Rick, you need to help her?

20     A                    I believe we did have a meeting

21  with her about this was her job.

22     Q                    We who?

23     A                    Susan Sano, who was her supervisor

197

```
 1      A              No.

 2      Q              Did there come a time that

 3 something happened after that point in time that lead you

 4 to view that she should be terminated?

 5      A              Um, yes.

 6      Q              What was that?

 7      A              She was just, she was just --

 8 resisted everything.

 9      Q              What does that mean?

10      A              It means that she would not --

11 she did not want to participate.   She did not -- she said

12 no to things and then she would do them.   It just was

13 not a collegial attitude with her.   It was not a team,

14 it was no team spirit.   It was her or everybody else.

15      Q              Me against the world?

16      A              Pardon me?

17      Q              Me against the world?

18      A              Against people she did not like

19 in the office.  Not against the world, I would say.

20      Q              You think she did not like you?

21      A              Yes.

22      Q              Why?

23      A              Because she thinks I am racist.
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

198

```
 1        Q                So if someone did something to
 2 you that you thought violated your rights, would you like
 3 that person?
 4        A                Maybe.  Maybe not.
 5        Q                At what point did you decide that
 6 Arminda should be terminated?
 7        A                Probably that 2nd week in
 8 February.
 9        Q                What was the triggering event?
10        A                I don't know.
11        Q                Was it before or after the
12 mediation?
13        A                Before.
14        Q                Did the board executive committee
15 play a role in your decision?
16        A                No.
17        Q                Who did you discuss -- did you
18 discuss your decision with anyone other than counsel?
19        A                Not other than counsel; no.
20        Q                Did you have any discussion with
21 any member of the board about your thoughts that Ms. Hall
22 should be terminated?
23        A                No.
```

199

```
 1          (Break taken, afterwhich the following
 2 occurred.)
 3                      (Exhibit Nos. 5-7 were marked
 4                      for ID.)
 5               BY MR. TEMPLE:
 6      Q               Back on Arminda's evaluation.
 7 When you gave her the evaluation that is dated July 7th,
 8 2004, you actually did that in a meeting with her?
 9      A               Yes.
10      Q               And you had a discussion --
11      A               Yes.
12      Q               -- with her?
13      A               Yes.
14      Q               During that discussion, you told
15 her that the manner in which she might be participating,
16 you considered that it might be cultural in nature?
17      A               Yes.
18      Q               Can you tell me what you told
19 her?
20      A               | I asked her -- we were talking
21 about the fact that I felt that these remarks were
22 inflammatory and confrontational.  And she said she did
23 not think they were.   She did not think this was
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

200

1 troublesome.   So I asked her, I said if this is a

2 cultural thing, if you will let me know, I can tell the

3 rest of the staff and we can learn to deal with it.

4      Q              What did you mean by that?

5      A              I meant that if -- I don't have

6 any experience with people who were constantly

7 confrontational, constantly telling other people that

8 they are doing a bad job, constantly telling them they

9 are disrespecting them.  I think I have never had any

10 experience with anyone like that.   It is possible that

11 my experience is limited.   And that there are some

12 things other than my experience as a manager and so I

13 asked her if that was the case.

14      Q              When you say " cultural, " did you

15 mean the fact that -- did you think that because she was

16 Mexican American it was something peculiar to her culture

17 that you may not know about?

18      A              Something that I might not know

19 about; yes.

20      Q              Did you think that it was

21 something peculiar to her culture that would make her

22 confrontational?

23      A              I thought it could be a

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 194

201

1 possibility, yes.

2     Q                For example what could possibly
3 exist in that culture?

4     A                I don't know.   I don't know.   I
5 was not raised in that culture.   I can't know.

6     Q                Did you think the possibility
7 existed that it was something peculiar to her culture in
8 its entirety that might lend to Mexican Americans being
9 confrontational?

10     A                I was looking for what every could
11 be causing this.   And the only place that I felt I did
12 not have any experience was in her culture.

13     Q                Did you consider that she might
14 not have been -- that what she was doing was not
15 confrontational?

16     A                No.

17     Q                In your assessment of
18 confrontation, the nature of something being
19 confrontational here, the nature of Arminda being
20 confrontational, I want to be clear here.   You never
21 considered that Jeff Kost might have been wrong and
22 offensive in his dealings with her?

23     A                Yes, I did.

210

1 scheduled, where is ideas to dialogue, why two months to

2 get fall catalogue in place.   Outside work/participation

3 should be discussed with me first.   What benefit is it to

4 WCA. "

5        Q                What are you referring to with

6 regard to  " regular weekly meetings scheduled? "

7        A                I had asked her -- let's see

8 here.   I had asked her to stick her head in my office

9 and give me an update on things she was doing.   She said

10 I can't do that.

11        Q                ' Why?

12        A                She did not say.   I was shocked

13 by the answer.   So I did not ask.

14        Q                Okay.

15        A                So I felt that if she did not feel

16 that she could do that, that -- then I would take the

17 initiative and schedule regular weekly meetings.

18        Q                You said " where is ideas to

19 dialogue? "

20        A                Part of her job was to schedule 3

21 meetings that we called " ideas to dialogue. "   They

22 were educational in nature, but they were a little bit

23 above the regular workshops and they were more conceptual

Apx. 196

212

1 about her substantive performance instead of writing it

2 on August 4th?

3       A              I can't know what my intent was or

4 my ideas were at that time.   It is very possible that I

5 thought in July we could still have 3 ideas or 2 ideas to

6 dialogue that had not yet been held.

7       Q              You say why 2 months to get Fall

8 catalogue in place.   What are you referring to please?

9       A              The conference that she and Lisa

10 put on was in the 2nd week of June, I believe and I had

11 had a conversation with Arminda about the fall catalogue

12 and we had sort of agreed that until the conference was

13 over, you know, she had to concentrate on the conference.

14        But she did not have anything else to do after

15 that, except get the Fall catalogue together.

16      Q              When was the Fall catalogue dead

17 line?

18      A              Well, if you are going to have

19 classes and you want people to come to them, you have to

20 have the catalogue in their hands prior to the first

21 class.   So there was no deadline written except for

22 when we wanted people to attend these courses.

23      Q              When was the first class

213

1 scheduled?

2      A                Mid September.   I don't know the
3 date.

4      Q                Lisa and Arminda were working on
5 the conference.   Did you -- the Fall catalogue is
6 something that she is assigned to; is that correct to do?

7      A                Yes.

8      Q                Was there anyone else assigned to
9 work on the Fall catalogue other than Arminda?

10     A                It was Arminda's job to see to it
11 that it got done.

12     Q                That is not my question.   My
13 question is --

14     A                If Arminda assigned someone else,
15 she might have.   I don't know.

16     Q                Did you assign someone else?

17     A                No, I did not assign anyone.

18     Q                You understood that the conference
19 that took place in Prince George's County consumed a
20 great deal of time and work and energy; is that correct?

21     A                Yes.

22     Q                And resources; is that right?

23     A                In terms of what we paid Arminda

216

1      A              Yes.

2      Q              To the extent that Arminda is
3 involved in that conference, and it is consistent with
4 your mission, did you consider she might need additional
5 support to ensure that she might be able to do the
6 cataloging in a timely fashion?

7      A              At that time, she had herself and
8 Lee.   The conference was over.

9      Q              I am talking about before the
10 conference was over?

11     A              Before the conference was over, I
12 was not expecting her to have the catalogue completed.

13     Q              After the conference, how soon did
14 you expect catalogue to be completed?

15     A              I would have expected it to be
16 completed by the first of August.

17     Q              When was it completed?

18     A              It was on the street on October
19 28th.

20     Q              You were not able to do the
21 classes for September?

22     A              The classes, many of the classes
23 were cancelled.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

217

1        Q                Why was it -- why did it take from

2   June to October to get the catalogue?

3        A                I don't know.

4        Q                Did you ask Arminda?

5        A                I asked Arminda where -- how it

6   was going, where it was through the end of July and into

7   August and she said it is at the printer, it is at the

8   printer, it is at the printer and it was not until

9   September that I understood it was not at the printer.

10  So I did ask her, yes.

11       Q                Do you know why -- you don't know

12  why that situation happened?

13       A                She told me it was at the printer.

14       Q                Did you ask her why?

15       A                Why it was at the printer?

16       Q                Yes.   Did you ask her --

17          No, of course not.   But why would she tell you

18  that it was at the printer in August and it was not until

19  September that you found out it was not at the printer.

20  It was an inconsistency.   Did you ask her why?   You are

21  saying she told you a lie?

22       A                If it was at the printer, it was

23  at the printer until October 28th.   I am not accusing her

                    SHARON L. BANKS REPORTING
                         P.O. Box 44773
                  Fort Washington, Maryland  20744
                         (301) 372-6922

1

```
 1 WASHINGTON, D. C.

 2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 3 _____X

 4 ARMINDA VELLES-HALL,        :

 5                             : Civil Action No.

 6        Plaintiff       : 05-7238

 7 vs.                         :

 8 CENTER FOR NONPROFIT ADVANCEMENT, :

 9        Defendant.          :

10 _____:

11                  :                X

12              Thursday, February 23, 2006

13              Washington, D. C. 20005

14              Session II

15    The deposition of, BETTY JOHNSON, witness, was

16 called for examination by counsel for the Plaintiff,

17 pursuant to notice, at the offices of Donald Temple,

18 Esq., 1229 15th Street, Northwest, Washington, D. C.

19 20005, before Sharon L. Banks, C.R.,  a notary public in

20 and for the District of Columbia, commencing at 10:30

21 o'clock a.m.,  when were present on behalf of the

22 respective parties:

23
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

9

1 public policy work was phenomenal and it did so much for

2 the organization that on several occasions I believe I

3 gave her greater than five percent raise.

4        Q               So the factors that you consider

5 are quality of work?

6        A               In that case it was, yes.

7        Q               How about -- is there an absolute

8 factor, or series of factors that you consider when you

9 are giving more than a five percent raise?

10       A               No.

11       Q               So is it subjective?

12       A               To some extent, yes.

13       Q               Are your decisions to give raises

14 and the amount of raises that you give subjective?

15       A               There is no written criteria that

16 I follow.  Therefore, it would be subjective, yes, sir.

17       Q               Does the board have to approve any

18 raises that you give?

19       A               The board approves a ceiling.  I

20 go to the Board with a budget in December.  And part of

21 that budget, I say I would like to have a ceiling of a

22 percentage of raises.   And the understanding is that if

23 they approve that, that I can give raises up to that

10

1 amount.  It is not automatic.  It is not a guarantee.

2 That is just the amount of money allocated for

3 increases.

4       Q              Some years -- in previous years --

5 one year, it was 3 percent.   In previous years, I asked

6 for 3 percent raises.  One year I asked for 3 percent and

7 they asked me to give five percent as a ceiling.   So --

8       Q              As a management style, do you

9 require your employees to meet and give you weekly

10 reports?

11      A              I don't require.   It is the term

12 " require " that is difficult for me.   I expect

13 employees to keep me posted on what is going on with the

14 work that they are doing.

15      Q              How do you expect them to do that?

16 By what means?

17      A              How do they do it or how do I

18 expect it?

19      Q              How do you expect -- by what means

20 do you expect it?

21      A              I expect that they should do it in

22 what ever way they are comfortable with.   Most people

23 come into my office and tell me what is going on.   They

              SHARON L. BANKS REPORTING
                    P.O. Box 44773
            Fort Washington, Maryland  20744
                   (301) 372-6922

11

1 will update me if they have come from a member meeting,

2 they will tell me what happened.  If they have come from

3 a meeting with the Prince George's Council, they will

4 tell me what happened.  If they come from a meeting with

5 funders, they tell me what happens.

6        Q            Did you have any problems with

7 Arminda Velles-Hall not telling you what she was doing?

8        A            Eventually I did, yes.

9        Q            When did that occur?

10       A            When I did her personnel

11 evaluation, in the Summer of what ever year.  I don't

12 know.  2004, is that --

13       Q            Yes.

14       A            -- is that right?  I asked her

15 to stick her head in and let me know what was going on.

16 She said I can not do that.  So I set up weekly meetings

17 so that I could be informed of what was going on with

18 her.

19       Q            Did she say why she could not do

20 that?

21       A            She did not.

22       Q            Did you ask her why she said that?

23       A            No, I did not.

18

1 working on a contract, because we talked about the cost

2 of doing it, and we had a discussion about that.

3        Q                Did you have an objection to the

4 contracts?

5        A                Yes.   The objection to the

6 contracts was the going out and seeking work in -- with

7 different organizations was not part of our plan.

8            Secondly, my problem, maybe this was larger, was

9 that I did not feel that we had our educational work

10 shops that we were offering under control.   I did not

11 think we knew anything about them, too many were being

12 cancelled, not enough people coming to them and I felt we

13 should be concentrating our efforts there.

14           I guess I was afraid that we would loose our

15 internal workshops to bad reputation and then we would

16 only be seeking contracts with other people which is not

17 what the Board wanted; did not want to do it that way.

18       Q                Did you communicate that to

19 Arminda?

20       A                I did tell her that the Board did

21 not want us to do consulting, yes.   Whether I told her

22 anything else, I don't recall.

23       Q                Did you tell her that those

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

29

```
1     A              Yes.

2     Q              And to the Board?

3     A              I don't know.

4     Q              Do you know what Cinco DeMayo is?

5     A              Yes.

6     Q              What is it?

7     A              It is the Mexican Independence

8  day.

9     Q              Do you recall sending a note to

10 Arminda regarding that?

11    A              Yes, I did.

12    Q              When was that, approximately?

13    A              Well, it would have been the 5th

14 of May, 2004 I believe.

15    Q              And do you recall why you sent

16 her a note?

17    A              I sent her a note because I have

18 another friend who is of Mexican destraction, (sic) who

19 is -- likes to be remembered, likes for somebody to

20 remember that that is important to her.

21    Q              You mean Mexican extraction.   You

22 said destraction.

23    A              Extraction.   I am sorry if I said
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

35

1      A              I did not say that.  She can be
2  upset.  But to solve the problem, you don't solve the
3  problem by calling someone a worse name back or another
4  name back.  That does not solve the problem.

5      Q              In what instance in this case did
6  she call anybody a name?

7      A              She called Barbara unprofessional.
8  She called me disrespectful.  She called Jeff
9  disrespectful.  And it was -- it starts the conversation
10 you disrespected me.  And I really think that, that
11 exacerbates the situation.  I believe that is
12 inflammatory.

13     Q              Do you think it was inflammatory
14 when Jeremy confronted Carlotta Scott in the hallway?

15     A              Yes.  I might have.  I did not see
16 it.  I don't know what was said.  It very well may have
17 been inflammatory; yes.

18     Q              Do you think it was inflammatory
19 when Jeff confronted Arminda and Lisa in the conference
20 room and told her on that date he wanted to use the
21 conference room?

22     A              It might have been.  I did not
23 see it.  It is possible it was.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

44

1 incident, too.

2          By  the time we got to her performance review,

3 several events had happened.   And I felt there was a

4 pattern of reacting quickly and negatively to anyone who

5 had anything to say that she did not like.

6          Q          What was -- what had happened

7 between the time that you counseled both Jeff and Arminda

8 and the time of Arminda's evaluation that constituted

9 this pattern that you are talking about?

10          A          She called me disrespectful and

11 said I intended to ruin her reputation.   She ordered

12 Susan not to be so negative.   And that to me became a

13 pattern because there were already 2 incidents and then

14 there were 2 more.

15          Q          So calling you disrespectful,

16 calling Susan disrespectful and calling Barbara

17 unprofessional and this incident with Jeff, those are the

18 incidents that you are talking about?

19          A          Yes.

20          Q          You are talking about Arminda's

21 letter to Susan; is that correct?

22          A          Right.   E-mail.

23          Q          E-mail.   With the one sentence

55

1 before we move forward.    The reasons that you were going

2 to terminate Arminda were attendance, is that correct?

3        A              No.

4        Q              What were the reasons?

5        A              I felt that she was not willing to

6 do her work.    She certainly was not willing to work with

7 anybody else in the office, but she had declined to do

8 work that was hers.    And she was just -- she fought

9 everything.    It was -- she was not willing to be part of

10 anything.    She was not willing to be part of a group.

11       Q              When you said " she fought

12 everything," what are you talking about?

13       A              She would say I am not going to do

14 that.    That is somebody else's job.

15       Q              How many times did she say that?

16       A              I don't know.

17       Q              It was only one time that she

18 raised concerns about work that she thought was on

19 somebody else's job; is that right?

20       A              I don't know.

21       Q              You can not tell me how many times

22 she told you she was not going to do a job?

23       A              No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 209

56

1        Q              When she told that you she was not
2 going to do a job, it had to do with the 60 courses that
3 you wanted her to put on the web site in January of 2005;
4 you --

5        A              That is correct.

6        Q              -- do remember that?

7        A              Yes.

8        Q              You realize that was a lot of
9 work.  She did not refuse to do that; right?

10        A              Initially, she did.

11        Q              But she did it, did she not?

12        A              Yes, she did.

13        Q              And she asked for help didn't she?

14        A              I don't know.

15        Q              Isn't it true that Lee offered to
16 help Arminda do that and you told her -- let me finish
17 the question.   You told him that he could not help her?

18        A              I don't recall that.

19        Q              That would be inconsistent with
20 your theory about the culture of the organization;
21 wouldn't it?

22        A              It would be, but I don't recall
23 that.  I don't know that I said that at all.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

58

1 could do it faster than she could do it, because of his

2 technological competencies; is that correct?

3        A            I don't know that, no.

4        Q            Did you know that he had put

5 certain courses on the site and did so very quickly?

6        A            No.

7        Q            Did you have any conversations

8 with him about this issue?

9        A            I don't recall.

10        Q            Did you ever ask him to help

11 Arminda?

12        A            I asked him to help Arminda, yes.

13 I don't recall whether I asked him to help Arminda around

14 this issue.

15        Q            You said she was not willing to be

16 part of a group.  What do you mean by that, " no be part

17 of a group? "

18        A            When you say to me or your

19 supervisor " that is someone else's job, "  I don't

20 believe that that's a willingness to work with the group.

21        Q            Can you think Ms. Johnson of any

22 other basis other than -- any other instance, you think

23 other than that particular situation, where she did

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

59

1 something that would lead you to say that she was not

2 part of the group?

3        A            She often could not come to senior

4 staff meetings, often could not come to staff meetings.

5 We had professional development where we did Myers

6 Briggs,  you know the typing that Myers Briggs does.

7 And she declined to share that with the group, even

8 though everybody else did.  That's -- those are the

9 things that I can remember.

10        Q            If she did not attend the  senior

11 staff meetings, are you saying she was at work at a

12 particular point in time and it was a senior staff

13 meeting and she did not attend?

14        A            That is correct.  I don't know if

15 she was at the office.

16        Q            But are you telling me today that

17 there were times when she was present at the office?

18        A            No.  I said at work.

19        Q            Well, when she was present at --

20 senior staff meetings are at the office?

21        A            That is right.

22        Q            Are you telling me that there are

23 times when senior staff meetings take place and she is at

Apx. 212

71

1      Q              I am not talking about attendance.
2 I am talking about the fact of whether a person is or is
3 not unprofessional who works for you.
4        You were quick to say that Arminda was
5 unprofessional, but you can not say that this person is
6 unprofessional.
7              MR. FLEISCHER:   Objection.   That has
8 not been her testimony.
9              BY MR. TEMPLE:
10     Q              You can answer the question.
11     A              I don't believe that I have
12 testified to that.  And as a result, I am not willing to
13 agree that, that is -- I can not answer that question.
14     Q              You were aware that Arminda was
15 taking  sick leave in the last quarter of 2004; is that
16 right?
17     A              Yes.
18     Q              You received medical
19 documentation to that affect; is that correct?
20     A              Yes.
21     Q              Did you ever inquire of her how
22 she was doing?
23     A              I believe I did.

72

1    Q               To what extent did her absences

2 affect the quality of her work?

3    A             Her work did not get done.

4    Q             Which work specifically?

5    A             There was no -- the catalogue of

6 courses did not get out until the end of October.

7    Q            Was that attributed, exclusively,

8 to Arminda?

9    A             It was her responsibility to see

10 to it that that was produced.

11   Q            Were there specific reasons why

12 the catalogue did not get out until the end of October?

13   A            I don't know the specific

14 reasons.

15   Q            Were they -- why -- what

16 responsibilities did she fail to institute, to do, that

17 caused the catalogue to get out the end of October?

18   A            I don't know.

19   Q            It was nobody else's fault then

20 that, that catalogue came out in October?

21   A            Arminda was responsible to see to

22 it that it got out.

23   Q            To the extent that she was sick

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

CONFIDENTIAL

100

1 be offensive.  She was.

2        Q                    You said she was?

3        A                    She was.

4        Q                    How can you say that she was

5 offensive and you don't -- you were not there.  Yet, you

6 can not say that Jeremy was offensive with Carlotta?

7        A                    I said that Carlotta was offended

8 by Jeremy and I can say that Barbara was offended by

9 Arminda.

10       Q                    You can not say that you know

11 that Jeremy intended to be offensive?

12       A                    And I can not know that Arminda

13 intended to be offensive either.

14       Q                    How would you learn that?

15       A                    I think it would be a pattern of

16 behavior.

17       Q                    But you punished Arminda for

18 being offensive to Barbara.

19       A                    I punished Arminda for being

20 offensive to a number of people.

21       Q                    To Susan, Barbara, Jeff and

22 Jeremy?

23       A                    And to myself.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

CONFIDENTIAL

CONFIDENTIAL

101

```
 1        And I am not sure I would characterize it as
 2 punishment.
 3      Q            You told her that she needed to
 4 -- you suggested that she needed to apologize to these
 5 people to smooth things out.
 6      A            I suggested that would be one way
 7 to handle it; yes.
 8      Q            You never suggested to Jeff that
 9 he should apologize  to Arminda?
10      A            I may have.
11      Q            You never suggested to Jeremy
12 that he apologize?
13      A            To Arminda?
14      Q            Yes.
15      A            I don't believe I ever suggested
16 that.
17      Q            You never suggested to Susan, who
18 wrote a negative letter to Arminda, that she should
19 apologize?
20      A            I may have.  I don't know.
21      Q            You never apologized to Arminda?
22      A            I certainly did apologize to
23 Arminda.
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

CONFIDENTIAL

114

1      A                  That's the only number that gave a

2 specific complaint about her to me; yes.

3      Q                  You referenced Stephanie to her

4 and something about the humidity in the hall way?

5      A                  I believe Stephanie said something

6 to me about she could tell things were tense by the

7 humidity in the hallway.   That was the term Stephanie

8 used.

9      Q                  What was she referring to?

10      A                  Uh, people being angry with

11 people.  People being afraid of people.   I don't have

12 any notes of that.   I believe it was with regard to

13 Arminda.

14      Q                  Did you tell Arminda that you need

15 a list of things not to say to you?

16      A                  Probably.

17      Q                  Did you tell her, " I want to see

18 an effort to swallow inflammatory and solve the problem.

19 Leaders don't make it worse.   Leaders don't respond with

20 inflammatory remarks.  I can not judge whether any remark

21 is inflammatory or not.   You take it that way.  I think

22 it is your job to help solve the problem.  We only make

23 it worse by reacting with another inflammatory remark. "

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

115

1      A              I am not sure I can say I said
2 exactly all of those things.    I -- the intend was, yes,
3 I thought that she should curb her use of inflammatory
4 remarks and yes, I said that leaders don't respond that
5 way.

6      Q              Which inflammatory remark were you
7 referring to or remarks were you referring to when you
8 said that?

9      A              The remarks when she called
10 Barbara unprofessional.  The remarks when she tells Jeff
11 that he automatically disrespected her.   The remark
12 where she tells me that I am disrespectful to her, that I
13 intended to ruin her reputation.  The remark that she
14 made to Susan about it was unnecessary to be so negative.
15 Those are inflammatory.

16      Q              So to the extent that Susan was
17 negative, it was inflammatory for her to tell Susan that
18 she did not have to be so negative?

19      A              I believe it was, yes.

20      Q              Why?

21      A              I think it is just the back in
22 your face.

23      Q              By saying that somebody is

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 218

127

1 that.  I don't recall.

2        Q                When did you first learn about

3 her complaint to D. C. Human Rights?

4        A                Would have been in December.  We

5 had an annual meeting and it was, I believe it was

6 delivered to us the day of that annual meeting and I

7 could find that date, but off hand, I don't know.  Early

8 in December is my recollection.

9        Q                What was your reaction to that?

10        A                I was sorry.  I was surprised and

11 I was sorry.

12        Q                The only person than you talked to

13 about the termination of Arminda was Mary Ann deBarbieri?

14        A                Yes.

15        Q                You told her -- she concurred with

16 the decision?

17        A                I did not -- I did not ask her.  I

18 may have said I think I am going to have to let her go.

19 I did not ask for her permission.  I did not --

20        Q                When did you say that to Mary Ann

21 deBarbieri?

22        A                I would have said it to her, first

23 week in February or the 2nd week in February.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

129

1 Regarding, um --

2          Q                 Regarding her performance or lack

3 there of?

4          A                 You have all of the e-mails that

5 are --

6          Q                 Okay.

7          A                 -- regard Arminda.

8          Q                 Did she talk to you about her

9 investigation?

10         A                 Did Mary Ann talk to me about her

11 investigation?

12         Q                 Yes, ma'am.

13         A                 She interviewed me after she

14 interviewed all the staff people and she asked me

15 questions and she gave me a copy of the, I believe, it

16 was the final report.

17         Q                 Did you see the draft?

18         A                 I can't -- I don't remember which

19 is the draft and which is not.

20         Q                 How long did she interview you

21 for?

22         A                 Me?

23         Q                 Yes.

130

1      A                 For 45 minutes; I don't know.

2      Q                 Where did that take place?

3      A                 In my office.

4      Q                 And you know that she interviewed
5 all the other persons as well?

6      A                 My understanding is that she did.
7 I don't recall that she said I could not talk to so and
8 so or anything like that.

9      Q                 Did you tell her that you thought
10 that Arminda -- did she ask you about Arminda's
11 performance?

12     A                 I have to tell you I really don't
13 know.

14     Q                 Did she make notes during the
15 meeting?

16     A                 I don't know.

17     Q                 She did not tape the meeting did
18 she?

19     A                 No.  She did not tape the
20 conversation, no.

21     Q                 Did you tell her you thought
22 Arminda was angry and hostile?

23     A                 I don't know.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## Civil Division

| | |
|---|---|
| **ARMINDA VALLES-HALL,** ) | |
| ) | |
| Plaintiff ) | Civil Action No. 05-7238 |
| ) | |
| v. ) | Judge Melvin R. Wright |
| ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT,** ) | Next Court Date: 7-18-06 |
| ) | Mediation |
| Defendant ) | |
| ) | |

## DISCOVERY RESPONSES

TO:      Arminda Valles-Hall, plaintiff

FROM:    Center for Nonprofit Advancement, defendant

### Answers and Objections to Interrogatories

Pursuant to SCR-Civil 33, defendant Center for Nonprofit Advancement

answers and its attorneys object as follows to plaintiff's Interrogatories served by mail on

November 21, 2005:

1. Describe in detail the title, job description and duties of the position Valles-Hall

was hired for in April 2003.

Response: Director of Education and Training. Job description to be produced.

2. Describe in detail the organizational structure of the Center For Nonprofit

Advancement as of April 2003.

Response: Johnson forwarded the complaint to de Barbieri, who in turn investigated the matter as set out in her report, to be produced, all as specified in the Personnel Handbook. At plaintiff's request, Johnson made a copy of plaintiff's personnel file and gave it to plaintiff.

11. Identify any and all persons who have complained about Valles-Hall's performance between January 1, 2002 and December 31, 2004; your answer should identify the person who complained about Plaintiff, the date of said complaint, its content and whether the complaint was oral or written.

Response:

(a) Mendoza. She complained to Johnson that plaintiff repeatedly called her unprofessional; that plaintiff was difficult to work with; and that plaintiff didn't turn in receipts on time and personally borrowed from cash receipts belonging to defendant. The complains were oral and were made at various times.

(b) Kost. He complained to Johnson that plaintiff was difficult to work with; that she refused to share information and work cooperatively with other employees; and that she isolated herself from other employees. The complaints were oral and were made at various times.

(c) Sanow. She complained to plaintiff and to Johnson that plaintiff was not working effectively on the Washington Post Award for Excellence in Nonprofit Management; that plaintiff failed to follow the proper chain of command in objecting to

-7-

work assignments; and that plaintiff was insubordinate in refusing to meet with Sanow and in refusing to post information on defendant's website. The complaints were oral and written and were made at various times.

       (d) Johnson. She complained to plaintiff about failing to complete her work on time; failing to her manage her work time properly, resulting in her staying up all night to complete work that should have been completed sooner; failing to work cooperatively with other staff members; engaging in conflicts with staff and failing to resolve conflicts; failing to remit receipts belonging to defendant in a timely manner; unauthorized borrowing of cash belonging to defendant; excessive absenteeism; failing to timely furnish a physician's note to support her absences; failing to follow defendant's chain of command in complaining about workplace assignments; and refusing to attend required meetings. Johnson also reported these matters to defendant's Executive Committee. The complaints were oral and written and were made at various times. See also answer to Interrogatory Nos. 15 and 18.

       12. Describe in detail the extent to which you investigated a letter of complaint from Carlottia Scott to you; your response should state in the nature and extent of your investigation, including the dates, any and all communication had by you with Carlottia Scott, all persons with whom you discussed Ms. Scott's concerns, identification of all documents generated, sent and/or received by you related to your investigation of her concerns.

Response:  Objection on the ground of relevance.

13.  Explain the basis for your lowering Plaintiff's performance in her 2004 evaluation; your answer should state the specific reasons for areas in which her scores were lowered from the scores that she received in her 2003 performance evaluation.

Response:  The evaluation was lowered in 6 out of 13 categories based on plaintiff's job performance and workplace behavior during the prior year.  See notes on 2004 evaluation, to be produced.  See answers to Interrogatory Nos. 11, 15 and 18.

14.  Identify any and all documents upon which you relied in assessing Plaintiff's performance relative to her 2004 performance evaluation.

Response:  Personnel file and intra-office communications to be produced.

15.  Explain in detail your reasons for reducing Plaintiff's authority related to her duties and responsibilities at CNPA?

Response:  Defendant is not certain what this interrogatory refers to.  Assuming that this interrogatory refers to the Washington Post Award for Excellence in Nonprofit Management, defendant responds as follows:

Sanow created the Award in 1994 and managed the Award program until her resignation in November 2003 to work for Virginia Polytechnic Institute (VPI).  When Sanow resigned, Johnson assigned responsibility to manage the Award program to plaintiff.  At the time, Johnson instructed plaintiff to hire an assistant to help her manage the Award program, but plaintiff failed to do so until March 2004.  In March 2004, VPI

-9-

offered to make a contribution to defendant by paying Sanow's salary to run the Award program. Since plaintiff had not performed satisfactorily or timely in managing the Award program, and since defendant was being offered free services, defendant shifted primary responsibility for managing the Award program from plaintiff back to Sanow. Plaintiff was expected to assist Sanow on the Award program, but plaintiff failed to attend meetings dealing with the Award program and she failed to work cooperatively with Sanow.

16. State the extent to which the Board of Directors, any of its committees and/or subcommittees considered any reports, issues or any subject whatsoever related to Plaintiff's performance, complaints or investigation of her complaints.

Response: On or about August 11, 2004, Johnson reported to the Executive Committee that plaintiff had complained about her 2004 evaluation. On or about September 15, 2004, Johnson reported plaintiff's complaint to the Board of Directors. Thereafter, Johnson had a number of informal discussions with the Executive Committee during which she expressed dissatisfaction with plaintiff's performance and workplace behavior. On or about November 28, 2004, de Barbieri distributed her investigative report to the Board of Directors.

17. State in detail any and all titles held by Plaintiff between April 1, 2003 and December 31, 2004?

Response: Director of Education and Training.

-10-

18. Identify each and every instance in which Defendant counseled Plaintiff, either orally and/or in writing regarding her performance and specifically for each of the deficiencies cited by you in your Eight Defense?

Response:  Johnson counseled plaintiff numerous times on a variety of job performance and workplace behavioral issues.  See personnel file, evaluations and intra-office communications, to be produced.  The counseling included the following:

(a)  In the fall of 2003 plaintiff began taking compensatory leave on her own accord, without Johnson's approval.  This was contrary to defendant's policy and Johnson counseled her on that matter.

(b)  Johnson had several counseling sessions with plaintiff relating to her poor working relationship with Kost growing out of an argument plaintiff had with Kost over use of the conference room.  Johnson informed plaintiff that she was thinking of hiring mediator to work out that relationship, but plaintiff pleaded with her not to do so and she did not do so.

(c)  Johnson had one or more counseling sessions with plaintiff relating to plaintiff calling Mendoza unprofessional.

(d)  Johnson spent approximately six hours with plaintiff on July 7 and July 8, 2004, regarding the 2004 evaluation.

(e)  In March 2004, Johnson explained to plaintiff her (Johnson's) decision to have Sanow manage the Washington Post Award for Excellence in Nonprofit Management program.

(f)  After the 2004 evaluation, Johnson arranged weekly meetings with plaintiff to review plaintiff's work, although these meetings were frequently postponed at plaintiff's request.

(g)  In the fall of 2004 Johnson counseled plaintiff with regard to plaintiff's excessive absences.

(h)  In January 2005 Johnson counseled plaintiff about plaintiff's failure to follow defendant's chain of command.

(i)  In early February 2005, Sanow counseled plaintiff about taking unauthorized bereavement leave.

19.  State in detail the basis upon which you restricted Plaintiff's access to your offices on or around February 12, 2005.

Response:  Plaintiff's access was limited over the weekend of February 12–13, 2005.  Her access was restored on February 14, on which date plaintiff resigned.  The limitation was imposed in anticipation of terminating her and out of concern that she might remove or destroy information or documents belonging to defendant.

-12-

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VELLES-HALL,        :

5                            : Civil Action No.

6       Plaintiff      : 05-7238

7 vs.                        :

8 CENTER FOR NONPROFIT ADVANCEMENT, :

9       Defendant.           :

10 _____:

11                            X

12              Thursday, January 12, 2006

13              Washington, D. C. 20005

14    The deposition of, JEFFREY KOST, witness, was called

15 for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 3:40

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

12

```
 1 Barbara or Jeremy about Arminda by e-mail?
 2        A              I don't recall that I have, no.
 3        Q              Have you ever discussed your views
 4 of Arminda with Barbara?
 5        A              I don't recall that; no.
 6        Q              How about with Jeremy?
 7        A              Not that I remember, no.
 8        Q              Do you recall the incident
 9 involving Mr. Terry in the conference room?
10        A              Yes.
11        Q              Did you ever have communications
12 with Mr. Terry?
13        A              No.
14        Q              You went into the conference room
15 on that particular day when Arminda and Mr. Terry and
16 Lisa were in the room?
17        A              Yes.
18        Q              Did you have the room scheduled
19 for a certain time?
20        A              I did.
21        Q              What time did you have it
22 scheduled for?
23        A              I believe it was 4:00 o'clock.
```

13

1       Q                   What time did you go into the
2  room?

3       A                   Shortly before 4.

4       Q                   About what time?

5       A                   Maybe -- I thought it was five or
6  ten minutes before 4.

7       Q                   Did you know whether they had the
8  room reserved?

9       A                   I did not.   I don't know.

10      Q                    If they have the room reserved,
11  how would you know without going into the room that day
12  before 4:00 o'clock?  Was there some centralized
13  document that you could have referred to?

14      A                   There was not.

15      Q                    When you went into the room, did
16  you tell them you wanted to use the room?

17      A                   Actually, the first thing I did
18  was there is a window pane along the door.   The first
19  thing I did was I looked through the window to make sure
20  that I was not interrupting something.   What I saw was
21  Lisa and Arminda sitting across from each other and the
22  gentleman who you refer to as Mr. Terry on his cell
23  phone.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

14

1       Q                  Uh, huh.

2       A                  So I opened the door to ask

3 Arminda if I might be able to get into the conference

4 room early because I think some of the people for my

5 meeting were showing up.   And I was afraid that they

6 were going to be -- it was going to be a disturbance in

7 the hall way or in the reception  area of the office.

8       Q                  What did she say?

9       A                  I don't recall her response, but

10 it was not -- it was neither positive nor negative.   I

11 don't remember.  I think they were shocked that I was

12 interrupting their meeting.

13      Q                  Then what happened?

14      A                  I turned and walked away.

15      Q                  Was there a problem after that

16 with the fact that you could not get into the room early

17 in advance of the 4:00 o' clock time?

18      A                  No.  I just waited until they were

19 finished.   Obviously, the answer was no.

20      Q                  When did the problem arise?

21      A                  The next day, the next morning.

22      Q                  What happened?

23      A                  Arminda came into my office, sat

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

1 down and said that I owed her an apology.

2        Q               Other than what you just

3 described, you never said anything else to Lisa or

4 Arminda?

5        A               No, sir.

6        Q               When she sat down and said you

7 owed her an apology, what was your reaction?

8        A               I was actually a little shocked.

9        Q               Did you guys talk?

10       A               I listened.

11       Q               What did she say?

12       A               She had a lot to say.

13       Q               Do you want to summarize it?

14       A               It was a long time ago.   But it

15 was -- she was I think very angry of the fact that I

16 interrupted the meeting.  My perception of you know I

17 thought I was just poking my head in at a time when they

18 were obviously on some kind of a break because he was on

19 a cell phone to see if I might be able to get into the

20 room.   She was very offended at that and  expected an

21 apology from me.   I said I did not think I could do

22 that.

23       Q               What was your relationship with

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

16

```
 1 Arminda before that?

 2         A              I think it was fine on a

 3 professional level.

 4         Q              Is that your first problem with

 5 Arminda?

 6         A              First one I can recall, yes.

 7         Q              Did you have any subsequent

 8 problems with her?

 9         A              I think there were -- it was maybe

10 another like an e-mail exchange that was not very

11 pleasant.

12         Q              What did it regard?

13         A              Conference room doors being left

14 open.

15         Q              Did -- in that particular

16 situation, you raised some concerns with her about the

17 conference door being left open?

18         A              Uh, huh.

19         Q              And someone assuming

20 responsibility for closing it, essentially; is that

21 right?

22         A              Right.

23         Q              What was her response?
```

17

```
 1      A                It got a little inflammatory.

 2      Q                Okay.

 3      A                You know, I would have sent that

 4 very same e-mail to any staff person who was responsible

 5 for that room, had it been Barbara or Jeremy or anybody

 6 else.

 7      Q                Did you talk to her about that

 8 e-mail?

 9      A                No.

10      Q                Why?

11      A                She is not a very easy person to

12 talk to.

13      Q                Let me just rewind for a few

14 minutes here.

15           You have 2 communications with her and you are

16 not very happy about either of these two communications?

17      A                No.

18      Q                You are not supervising her, are

19 you?

20      A                No.

21      Q                You are supervising Lisa?

22      A                Supervising Lisa.

23      Q                And this point in time Arminda and
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

20

1    A              Whether I like or dislike someone
2 professionally, I can still work with them professionally
3 when I need to.

4    Q              That was the case with you and
5 Arminda?

6    A              Uh, huh.  And I could still work
7 with her.

8    Q              She could still work with you?

9    A              Uh, huh.

10    Q              Did you ever complain to Betsy
11 about Arminda?

12    A              I don't think it was a complaint
13 as much as inform Betsy as to situations from time to
14 time and I don't mean like tell tales, but I mean just
15 keep informed.

16    Q              Did you ever suggest that Betsy --
17 let me ask you this:   Did you, Betsy, Arminda ever sit
18 down around a table and say this is got to stop.   You
19 guys are going to -- we are going to figure out a way to
20 work together?

21    A              I don't think so, no.

22    Q              Did you say anything to Arminda
23 that she could have considered confrontational or

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VELLES-HALL,        :

5                             : Civil Action No.

6         Plaintiff          : 05-7238

7 vs.                         :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9         Defendant.          :

10 _____:

11                             X

12              Thursday, February 23, 2006

13              Washington, D. C. 20005

14              Session II

15    The deposition of, JEFFREY KOST, witness, was called

16 for examination by counsel for the Plaintiff,

17 pursuant to notice, at the offices of Donald Temple,

18 Esq., 1229 15th Street, Northwest, Washington, D. C.

19 20005, before Sharon L. Banks, C.R.,  a notary public in

20 and for the District of Columbia, commencing at 3:21

21 o'clock p.m.,  when were present on behalf of the

22 respective parties:

23

              SHARON L. BANKS REPORTING
                  P.O. Box 44773
          Fort Washington, Maryland  20744
                  (301) 372-6922

13

1      Q            Has anyone ever told you they were
2 afraid of Arminda?

3      A            No.

4      Q            Did you think that Arminda was at
5 any point in 2004, that Arminda was an angry manager and a
6 hostile manager?

7      A            Angry.

8      Q            What made you think she was angry?

9      A            Her tone, sometimes her tone.
10 Sometimes her -- just her manner of walking around the
11 office, being sort of -- was short and not very
12 congenial.

13     Q            Was this something was that
14 constant or was it something that was isolated?

15     A            It was from -- time to time, it
16 became more regular.

17     Q            Did you have that assessment of
18 her in 2003?

19     A            No.

20     Q            At what point did you begin to
21 develop this particular assessment?

22     A            I really can not recall.

23     Q            Was it after the incident with

20

1       Q              Did you ever consider that Arminda
2  and Lisa may have been right relative to their use of the
3  conference room?   And when I say the " use of the
4  conference room, " they had it reserved and they thought
5  that they should be able to use it until they finished,
6  until the next appointment?

7       A              All I was doing was trying to find
8  out about their flexibility.   So what I did was at a
9  time when I thought they were on a break, because Mr.
10  Terry was on his cell phone, I poked my head in to ask
11  whether or not I could get in five minutes early.

12      Q              So you would consider this a
13  misunderstanding?

14      A              Yes.

15      Q              Did you ever tell Arminda that was
16  all you were trying to do?

17      A              I think I explained that the next
18  morning.

19      Q              And what happened?

20      A              She thought, she felt that it was
21  offensive to her and that she demanded an apology.

22      Q              What did you say when you went
23  into the room?

24

1      Q                You were angry before the incident
2 and not after?

3      A                No.  I was angry when I saw the
4 conference room doors wide open.

5      Q                I am saying you were angry when
6 you saw the conference room doors wide open, but that was
7 before you sent the e-mail?

8      A                Correct.

9      Q                So why were you angry?

10     A                Because I found the conference
11 room doors wide open.

12     Q                Did your e-mail correspondence
13 reflect your anger?

14     A                I think it was fairly -- I think,
15 I don't think it expressed my anger.   I think it was
16 fairly direct.

17     Q                When is it that Arminda -- when
18 can you think of a time that you tried to talk to Arminda
19 that she could not talk to you or that she did not talk
20 to you?

21     A                I can not give you dates and
22 times.  I can tell you that there have been times when I
23 have wanted to talk to her or tried to schedule time with

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

25

1 her for specific things and I have -- I was told you

2 know, I can not do this now.   We can -- I can do it you

3 know, we  can talk about this in a week or I can talk

4 about this in 2 weeks or I am really busy now, lets talk

5 about this in, you know.

6        Q              When you did that, did you ever

7 write or e-mail her and say I would like to sit down and

8 talk to you about something.   Arminda, I would like to

9 schedule an appointment with you?

10       A              Sometimes.  Depends on what it

11 was.

12       Q              You have sent her an e-mail to try

13 to schedule an appointment with her?

14       A              You are talking about something

15 that was a while ago, so I can not recall.

16       Q              I am not asking a date.   I am

17 asking whether you sent an e-mail asking her to schedule

18 a time when you all could talk?

19       A              I tend to work a little more

20 informally.  So my style would be more like I would drop

21 by and say I would like the talk to you about something.

22 Can we schedule a time to meet.

23       Q              Why didn't you do that on the

37

```
 1      A              Yes.

 2      Q              Do you work with Barbara Mendoza?

 3      A              Yes.

 4      Q              Have you observed her attendance

 5 at work in the work place?

 6      A              Yes.

 7      Q              What is your understanding of her

 8 attendance habits?

 9      A              She comes in late.   She works

10 late.

11      Q              Now, you -- do you know whether

12 the following people are actually gay or not gay?  Dawn

13 Abramson?

14      A              Never discussion it.

15      Q              Not withstanding that.  I

16 understand that, but you know.   Do you have any

17 knowledge?   Whether you discussed it or not is not the

18 question.   Actually, do you not know?

19      A              I would have to say gay.

20      Q              Jeremy Baird?

21      A              Gay.

22      Q              Rick Rose?

23      A              Gay.
```

38

```
 1      Q                Stephanie Dodge Smith?

 2      A                Gay.

 3      Q                Ms. Betsy Johnson?

 4      A                Gay.

 5      Q                No further questions.

 6              MR. FLEISCHER:  No questions.   We do not

 7 waive.

 8          Thank you.

 9              MR. TEMPLE:  One last question.  I am

10 sorry.

11              BY MR. TEMPLE:

12      Q                Have you ever observed Arminda

13 berate anybody in the work place, or talk down to anybody

14 in the work place?

15      A                (Pause)

16          Not that I recall.

17      Q                Okay.

18              THE WITNESS:  Are we finished?

19              MR. TEMPLE:  Yes.

20              MR. FLEISCHER:  I don't have any

21 questions.  And we will not waive.

22              MR. TEMPLE:  Thank you, Mr. Kost.  I had

23 all of these questions for you, about six pages and you
```

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

|  |  |
|---|---|
| **ARMINDA VALLES-HALL,** ) | |
| ) | |
| Plaintiff ) | Civil Action No. 05-7238 |
| ) | |
| v. ) | Judge Melvin R. Wright |
| ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT,** ) | Next Court Date: 7-18-06 |
| ) | Mediation |
| Defendant ) | |
| ) | |

## SUPPLEMENTAL AFFIDAVIT OF BETSY JOHNSON

I, Betsy Johnson, supplement my deposition testimony of January 12 and February 23, 2006 in this matter as follows:

1. I am an adult, not under any disability, and I am competent to testify as a witness to the matters set forth herein.

2. I am the Executive Director of the Center for Nonprofit Advancement (the "Center"), a tax-exempt, District of Columbia nonprofit corporation. The Center was formerly known as the Washington Council of Agencies. I have been the Executive Director since 1988.

3. I am familiar with the Center's hiring and personnel policies and I am responsible for all hiring and firing decisions.

4. I hired the plaintiff in this case, Arminda Valles-Hall ("Hall") effective April 21, 2003. I was solely responsible for the decision to hire her.

5. On being hired, each new Center employee is required to acknowledge in writing that he or she has received and read the Center's Personnel Handbook. As a new employee, Hall received and signed for the Center's Personnel Handbook.

6. From April 21, 2003 to January 3, 2005, I was Hall's immediate supervisor and was responsible for evaluating her. From January 3, 2005 until Hall's employment terminated on February 14, 2005, Susan Sanow was Hall's immediate supervisor.

7. My normal practice is not to do a formal evaluation of an employee who has been with the Center for fewer than six months. However, Hall, who had then been with the Center for only two months as of June 2003, requested that I evaluate her during the Center's June/July 2003 evaluation cycle and I agreed to do so.

8. Coincident with my June 2003 evaluation of Hall, I raised Hall's salary by $8,000 from $52,000 to $60,000 per year. At $60,000, Hall was the third-highest paid employee at the Center, behind only me and Jeff Kost, the Deputy Director for External Affairs, who was second-ranking official at the Center and who had then been with the Center for five years. I was solely responsible for the decision to raise Hall's salary.

9. Also in June 2003 I gave another employee in a management position comparable to Hall's (referred to here as Employee "A") an overall rating of "2" (marginal) and no raise. The primary reason why I gave Employee "A" a marginal

-2-

evaluation and no raise was her history of verbal abuse toward other staff. Employee "A" is a white female whose sexual orientation appears to be homosexual.

10. In March 2004, Hall submitted a budget for her educational programs directly to a board member, without my knowledge or consent.

11. Coincident with my July 3004 evaluation of Hall, I raised Hall's salary from $60,000 to $61,800 per year, a 3% increase. At that salary, Hall continued to be the third-highest-paid employee of the Center. I was solely responsible for the decision to raise Hall's salary.

12. In the six-week period from September 20 to October 30, 2004, Hall worked a total of 12 out of 29 scheduled workdays, claiming an unspecified illness.

13. In early February 2005 I decided to fire Hall for insubordination, poor performance, and unacceptable workplace behavior. I was solely responsible for that decision.

14. I postponed firing Hall because of a mediation session scheduled for Friday, February 11, 2005 before the D.C. Office of Human Rights. My hope was that Hall and the Center could reach a resolution of their differences that would include Hall's voluntary resignation.

15. The February 11 mediation session did not result in an agreement between Hall and the Center. I therefore made arrangements to follow through on my earlier decision to fire Hall. In preparation for doing so, I arranged for Hall's access to the

-3-

Center's offices and her remote access to the Center's computer network to be suspended during the weekend of February 12-13, 2005.

16. Hall resigned on February 14, 2005 before being fired.

17. I hired Kai Dwyer on April 4, 2005 as Manager of Education and assigned her a number of functions previously performed by Hall. The remaining functions were assigned to Susan Sanow, Dwyer's immediate supervisor. Dwyer is an African-American female whose sexual orientation appears to be heterosexual. I was solely responsible for the decision to hire Kai Dwyer.

18. Just prior to Hall's resignation, the Board had 13 directors, consisting of six African-Americans, six whites, and one Latino.

19. Just prior to Hall's resignation, the Center had a staff of 13 – six African-Americans, six whites, and one Latino.

20. None of my employment-related decisions involving Hall, including my decision to hire her, to re-assign responsibility for an awards program managed by the Center from Hall to Susan Sanow, to increase Hall's salary in June 2003, to increase Hall's salary in July 2004, and to fire Hall in February 2005, were motivated by Hall's race, color, national origin, or sexual orientation, nor were they in retaliation for for any discrimination complaints Hall made.

_Betsy Johnson_

Betsy Johnson

DISTRICT OF COLUMBIA, ss:

Subscribed and sworn to before me on information and belief this _11th_ day of

April, 2006.

_Delores Huston_

Notary Public, D.C.

My Commission expires: _____

**DELORES HUSTON**
**Notary Public District of Columbia**
**My Commission Expires October 31, 2008**

-5-

1

1                   P R O C E E D I N G S

2          Whereupon,

3                        MARY ANN DEBARBIERI,

4 was called for examination by counsel for the plaintiff

5 and after having been first duly sworn, was examined and

6 testified as follows:

7                        DIRECT EXAMINATION

8                        BY MR. TEMPLE:

9                        MR. FLEISCHER:   If I may, two very quick

10 things.   These are notes of Ms. deBarbieri's interviews

11 with the other witnesses and the reason they were

12 produced now is because I neglected to ask for them,

13 number one.

14          Number two, Ms. de Barbieri absolutely has to be

15 gone by 2:30.

16                        MR. TEMPLE:   I hope she is gone before

17 then.

18                        THE WITNESS:  Oh, thank you.   So do I.

19                        MR. FLEISCHER:   Thank you.

20     Q                 State your name, please, for the

21 record.

22     A                 Mary Ann de Barbieri.

23     Q                 Spell the last name, please.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

7

1 Foundation Centers Washington office.

2       Q                 How long were you there?

3       A                 Two years.

4       Q                 Is that like an executive

5 director when you say the director?

6       A                 Yes.

7       Q                 What is your present relationship

8 with the WCA?

9       A                 I am a board member and former

10 president of the board.

11      Q                 When were you first appointed to

12 the Board?

13      A                 In 1999.

14      Q                 How were you selected, at that

15 time?

16      A                 I don't know.

17      Q                 When were you selected as

18 president of the Board?

19      A                 I was appointed to serve as

20 president for 2004 and 2005.

21      Q                 Who was president before then?

22      A                 Kelly McSweeney.

23      Q                 As the president of the Board,

10

1      A                The vice president of the Board.

2      Q                Who would have been in 2004/2005?

3      A                Tim Kime, K-i-m-e.

4      Q                Do I understand that you would be

5 the direct supervisor of Ms. Johnson?

6      A                The Board is the direct

7 supervisor of Ms. Johnson.

8      Q                How do they actually carry out

9 that responsibility.

10     A                We annually evaluate the

11 executive director, a formal evaluation process.

12     Q                Is that evaluation -- do you use

13 an evaluation form?

14     A                We do.

15     Q                Is it the same as the form she

16 uses for the employees?

17     A                It is not.

18     Q                What are the criteria by which

19 you evaluate Ms. Johnson?

20     A                We utilize a format developed by

21 the Center for Non-Profit Boards to evaluate -- to

22 assess the chief executive of a non-profit organization.

23     Q                What would the criteria include?

29

1      A                    Prior to then.  I don't recall,

2 but prior to the -- prior to my notification by Ms. Hall

3 that she was  filing a complaint.

4      Q                    So you were notified in August of

5 2004 that she was filing a complaint?

6      A                    Yes.

7      Q                    Are you saying today, that there

8 were concerns before then, about her relative to class

9 scheduling?

10     A                    Again, it was -- as a Board

11 member, I was looking at the performance of the

12 department, of the division.

13     Q                    Then again, let me clarify that.

14 Prior to August, 2004, are you saying today that the

15 Board had concerns about the scheduling of classes for

16 WCA?

17     A                    We had concerns about the

18 performance of that division that we had invested the net

19 assets of our corporation in establishing.

20     Q                    Were those concerns articulated in

21 any kind of --

22     A                    At Board meetings.

23     Q                    To the extent that they were

35

1 conference?

2      A                I am sure the Board was made

3 aware of it in reports, but I don't recall the specifics;

4 As I have just stated.

5      Q                Do you know the extent to which

6 Arminda was required to invest her time and resources in

7 the preparation for that conference?

8      A                I do not.

9      Q                What was your understanding at

10 the time that you conducted your performance

11 investigation as to Arminda's duties and

12 responsibilities?

13      A                She was responsible for the

14 education program, specifically for the work shops that

15 happened and that was the majority of my understanding of

16 her job description.

17      Q                What is the basis for your

18 understanding as to her job description?

19      A                Just what I recall.

20      Q                Did Betsy tell you that?

21      A                I am certain at some point there

22 was some sort of discussion at a Board meeting prior to

23 hiring this individual.

38

1      Q                Was that good that you were asked

2 to conduct that workshop?

3      A                I have often, during my tenure,

4 conducted workshops for WCA for other organizations in

5 town.

6      Q                Was that good that you were asked

7 to conduct that workshop?

8      A                What do you mean by good?

9      Q                Was it a good thing?

10     A                For who?

11     Q                For WCA?

12     A                For WCA, yes.

13     Q                Did you find your dealings with

14 Arminda relative to communication about that workshop to

15 be professional?

16     A                No.

17     Q                Why?

18     A                Because the workshop was not

19 advertised in a timely fashion and there were very few

20 participants.

21     Q                Who sponsored the workshop?

22     A                The Washington Counsel of

23 Agencies.

39

1    Q              Did you tell Arminda that?

2    A              Excuse me.

3    Q              Did you tell Arminda that, that

4 you had concerns about the fact that --

5    A              We talked about the fact that --

6    Q              Let me finish the question,

7 please.   The fact that it was not advertised properly

8 and the fact there were few participants?

9    A              We talked about the fact that

10 there were few participants.

11   Q              Did you talk -- did you talk to

12 her and give her -- and tell her you were concerned about

13 that?

14   A              I don't recall if I -- no.

15   Q              Do you know why it was advertised

16 poorly?

17   A              I do not, except that -- my --

18 the explanation that I had was that catalogue went out

19 late.

20   Q              My question to you though was

21 about your communication, specifically with Arminda

22 relative to your doing this particular workshop?  Did you

23 find the communication to be professional?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

43

1        A                    It is the responsibility of the

2 executive director to hire, support and fire the staff

3 and that is not something that was on my radar screen.

4        Q                    So the answer then, would be that

5 you did not know anything about her performance as of

6 July -- excuse me.   As of August, 2004?

7        A                    Other than the performance to

8 goals with our education programs, number goals, dollar

9 goals.

10        Q                    Again --

11        A                    Again, which would reflect upon

12 the person who is running that department.   That was all

13 I would --

14        Q                    As of August, 2004, you had no

15 specific knowledge about Arminda's goals -- excuse me.

16 Arminda's performance other than what you had in terms of

17 reports about education.   Is that correct?

18        A                    As I recall, that is correct.

19        Q                    Have you ever had any

20 communication with Tim Kime about Arminda's performance?

21        A                    As a part of the -- as a member

22 of the executive committee, yes.

23        Q                    How about Michael Freedman?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

51

1  Q    At some point you were asked to

2 conduct an investigation involving Arminda Valles-Hall?

3  A    Yes.

4  Q    Can you tell me how that occurred?

5  A    Pursuant to our personnel manual,

6 after Ms. Valles-Hall sent an e-mail to an office manager

7 asking for an investigation,  she was told to forward it

8 to me as president of the Board to investigate any

9 complaints against the executive director.

10  Q    Have you ever conducted an

11 investigation, a personnel investigation prior to this

12 one?

13  A    No, I have not.

14  Q    Did you consult with anyone

15 regarding how this investigation should take place?

16  A    Yes.

17    MR. FLEISCHER:  Objection.   Go ahead.

18 Answer it yes or no.

19    THE WITNESS: Yes.

20    BY MR. TEMPLE:

21  Q    Other than with counsel, did you

22 consult with anyone?

23  A   No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

52

1       Q               Can you tell me what was the

2 objective of your investigation?

3       A               I was investigating

4 Ms. Valles-Hall's complaint that her personnel evaluation

5 was biased for race, national origin, or possibly

6 retaliation.

7       Q               What was your understanding

8 specifically as to what she was complaining of?

9       A               Her scores.

10      Q               Relative to her scores, she was

11 not complaining so much about the fives on her

12 performance evaluation?

13      A               Right.

14      Q               You actually looked at her

15 performance evaluation; is that correct?

16      A               Yes.

17      Q               You talked to her about what she

18 was complaining about; is that right?

19      A               Yes.

20      Q               Is it your understanding that she

21 was complaining about the 3's, the 5, 3s on her

22 evaluation?

23      A               It is my understanding; yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

65

```
 1              BY MR. TEMPLE:

 2      Q                 Do you recall how long your

 3 interview with Betsy was?

 4      A                 I don't.

 5      Q                 Do you recall how long your

 6 interview with Jeff was?

 7      A                 I don't.

 8      Q                 Jeremy?

 9      A                 I don't.

10      Q                 Barbara?

11      A                 I don't.

12      Q                 Do you recall where you met with

13 Betsy?

14      A                 In the office.

15      Q                 And  Jeff?

16      A                 In the office.

17      Q                 And Jeremy?

18      A                 In the office.

19      Q                 Barbara?

20      A                 In the office.

21      Q                 Arminda?

22      A                 In the Capital Hilton.

23      Q                 Do you recall how long your
```

Apx. 259

66

1 meeting was with Arminda?

2      A              It was extensive; couple hours.

3      Q              Let me show you what is marked as

4 Complainant's Exhibit Number One.   Do you recognize that

5 document?

6      A              Yes.

7      Q              Can you tell me what it is for

8 the record?

9      A              It's a memo to Ms. Valles-Hall

10 from Betsy Johnson.

11      Q              You received a copy of this on or

12 around 11-03-2004?

13      A              Yes.  I believe so.

14      Q              Let me show you what has been

15 marked as Exhibit 2.   It is a draft report --

16      A              Uh, huh.

17      Q              -- of investigation?

18        Can you describe that document for the record?

19      A              It is a draft of the details of my

20 investigation of the personnel evaluation complaint.

21      Q              Did you do a final report of

22 investigation?

23      A              Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

76

1 director.     In this instance it was -- I -- I don't know

2 when she met about the budget alone.

3          I guess the point was the budget is the

4 responsibility of the executive director and I guess

5 board members do not go directly to staff.     Should not

6 go directly to staff.

7     Q          Well, if a board member went to a

8 staff person in front of the executive director and the

9 executive director had nothing to say about it, should

10 the staff member disobey the request to meet with the

11 board member?

12          MR. FLEISCHER:     Objection.     There is no

13 basis in fact here.

14          THE WITNESS:     Ask the question again;

15 please.

16          BY MR. TEMPLE:

17     Q          If a board member in the presence

18 of the executive director requested a meeting with a

19 staff person, should -- and the executive director had no

20 view either way, said nothing to the staff person, should

21 a staff person not meet with the board member?

22     A          The staff person should go to the

23 executive director and confirm -- affirm that it was

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 261

113

1 okay, but when it comes to work habit, employ X would get

2 above average.    Wouldn't that be inconsistent if Arminda

3 was being graded poorly for work habit, but employ X, who

4 is coming to work late is not being graded similarly?

5          A                I did not investigate that.

6          Q                Based upon your investigation of

7 Arminda, you determined that the complaints that were

8 being made against Arminda were valid?

9          A                Yes.

10          Q                That is based upon Jeremy's

11 complaint, Jeff's complaint and Barbara's complaint; is

12 that correct?

13          A                Yes.

14          Q                And you agreed with Ms. Johnson's

15 assessment that Arminda should apologize to them; is that

16 correct?

17          A                I found in my investigation that

18 she was not discriminated against on the basis of -- in

19 her performance evaluation on the basis of race or

20 national origin or retaliation.    That is what I was

21 looking for and that is what I found.

22          Q                Did you agree with Ms. Johnson's

23 recommendation to Ms. Hall that she should apologize to

126

1 it to?

2     A               The executive committee of the

3 Board.

4     Q               When you read it, did you do

5 anything other than reading it to investigate whether

6 what Ms. Valles-Hall was saying in this document had any

7 factual validity?

8     A               I did not.  In my opinion, I

9 discharged my duty to investigate her personnel complaint

10 in my report.

11     Q               But the objective of the

12 investigation was it not, to ascertain the truth of what

13 actually happened?

14     A               About her personnel evaluation.

15     Q               Okay.  You essentially in your

16 report relied upon Jeff, Jeremy and Ms. Mendoza to

17 conclude that the personnel evaluation was valid; is that

18 correct?

19     A               I relied upon Mr. Kost, Mr. Baird,

20 Ms. Mendoza, Ms Bailey, Mr. Mason, and Ms. Johnson.

21     Q               But you did not rely on what Ms.

22 Valles-Hall stated; right.   You did not give it any

23 credence, at all?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 263

153

1 don't recall the dates.

2        Q               Would it have been close to that

3 particular point in time?

4        A               I don't recall.

5        Q               You -- did Betsy ever report to

6 the executive committee of the Board that she was going

7 to terminate Arminda?

8        A               I don't recall.  It would not --

9 there was not a meeting of the executive committee around

10 that time.  I don't recall.

11       Q               Were you involved in approving

12 Betsy's decision to terminate Arminda?

13       A               No.   It is Betsy's responsibility

14 as executive director.

15       Q               If Betsy told you that she was

16 going to terminate Arminda, did you have any questions

17 for her?

18       A               Not that I recall.

19       Q               Did you have a particular reaction

20 to that?

21       A               Not that I recall.

22       Q               Did you know that Betsy had

23 prohibited Arminda from coming into the building on

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,       :

5                            : Civil Action No.

6        Plaintiff      : 05-7238

7 vs.                        :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9        Defendant.          :

10 _____:

11                          X

12              Tuesday, February 28, 2006

13              Washington, D. C. 20005

14              Session I

15     The deposition of, BARBARA MENDOZA, witness, was

16 called for examination by counsel for the Plaintiff,

17 pursuant to notice, at the offices of Donald Temple,

18 Esq., 1229 15th Street, Northwest, Washington, D. C.

19 20005, before Sharon L. Banks, C.R., a notary public in

20 and for the District of Columbia, commencing at 4:21

21 o'clock p.m., when were present on behalf of the

22 respective parties:

23

              SHARON L. BANKS REPORTING
                   P.O. Box 44773
              Fort Washington, Maryland 20744
                   (301) 372-6922

11

```
 1      A          1984.

 2      Q          Any subsequent academic post

 3 secondary work?

 4      A          No.

 5      Q          Post graduate work?

 6      A          No.

 7      Q          Of course you have never been

 8 convicted of a crime?

 9      A          No.

10      Q          When were you hired by WCA?

11      A          September 7th 1988.

12      Q          Who hired you?

13      A          What was known as Washington

14 Council of Agencies.

15      Q          Which individual made the decision

16 to hire you?

17      A          I was given a letter by Betsy

18 Johnson.

19      Q          What position did you hold when

20 you started?

21      A          Office manager.

22      Q          What position do you hold now?

23      A          Office manager/administrative
```

12

1 assistant.

2       Q              What are your duties and

3 responsibilities as an office manager?

4       A              A lot.   Primarily, it is

5 management of the office in terms of equipment, daily

6 routines, ordering supplies,  keeping, um, like I call in

7 payroll, I am also -- bookkeeping.   I am not the official

8 accountant, but I am the book keeper.   I enter financials

9 into the computer system.

10      Q              From a personnel point of view, do

11 you manage the administrative annual or sick leave of the

12 various employees there?

13      A              I report that to payroll.

14      Q              Who is in charge of payroll?

15      A              We go through Prime Pay.

16      Q              An outside contractor?

17      A              Yes.

18      Q              Are you familiar -- who actually

19 keeps time sheets for people?

20      A              I do.

21      Q              Okay.

22      A              I collect them.

23      Q              How often are they collected?

18

1 closed?

2      A            I keep my door open.

3      Q            Do you close it sometimes?

4      A            Occasionally.

5      Q            Why do you close it?

6      A            For -- um, if I am working on a

7 deadline um, for uh, um, on certain times we have the

8 doors closed for security.  I have financial records in

9 my office.

10      Q            But you leave it open sometimes

11 too?

12      A            For the most part.

13      Q            Has anybody ever complained to you

14 about you keeping your door closed at all?

15      A            No.

16      Q            Have you ever gone to Arminda's

17 office to talk to her?

18      A            Yes.

19      Q            About how many times in 2004?

20      A            I would say if not daily at least

21 once every other day, saying hello, acknowledging people.

22      Q            Have you had occasion to walk by

23 her door, as well to go from one part of the office to

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

19

1 another part of the office?

2      A              Occasionally, if I am down that

3 hallway.   There are several offices.

4      Q              Did you find her office was open

5 when you walked by on most occasions?

6      A              No.

7      Q              It was closed?

8      A              Yes.

9      Q              How would you say hello to her if

10 her door was closed?

11      A              I would knock and I would --

12 excuse me.

13              MR. FLEISCHER:  Do you need some water?

14              THE WITNESS: That is okay.

15              MR. FLEISCHER:  No.   Lets get some.

16              THE WITNESS: I guess my mouth is dry.

17      I would knock on the door, um, and say are you

18 available; is it okay.

19              BY MR. TEMPLE:

20      Q              Did she tell you to come in?

21      A              Sure.

22      Q              Would you all talk?

23      A              Sure.

20

```
1        Q              Would you sometimes see her door

2 open?

3        A              Occasionally.

4        Q              It was not always closed; right?

5        A              No.

6        Q              How often would you see it open?

7        A              I am sorry.

8        Q              How often would you see it open?

9 What percentage of time?

10       A              Percentage, um, five to ten

11 percent.

12       Q              Did everyone else keep their door

13 open?

14       A              Yes.

15       Q              Did Jeff always have his door

16 open?

17       A              Yes.

18       Q              Did you ever see his door closed?

19       A              Not to my recollection.

20       Q              Did you ever see Jeremy's door

21 closed?

22       A              Yes.

23       Q              Have you seen it open sometimes?
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

```
1              SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
2                          CIVIL DIVISION

3      - - - - - - - - - - - - - - - - - x
4                                        :
5      ARMINDA VALLES-HALL,              :
6                                        :
7                        Plaintiff,      :
8                                        :
9      vs.                               : Civil Action No.
10                                       : 05-7238
11     CENTER FOR NONPROFIT ADVANCEMENT, :
12                                       :
13                        Defendant.     :
14                                       :
15     - - - - - - - - - - - - - - - - - x

16                            Washington, D.C.

17                            Monday, March 20, 2006
18                            Session II
19
20            Deposition of

21                        BARBARA MENDOZA

22     called for examination by counsel for the plaintiff,

23     pursuant to notice, in the Temple Law Offices, 1229 15th

24     Street, N.W., Washington, D.C., 20005, commencing at 10:05

25     o'clock, a.m., before Mark Dembinski, court reporter and

26     Notary Public for the District of Columbia, when were

27     present on behalf of the respective parties:




28     Reported by:  Mark Dembinski
```

22

```
1            Q.   Ms. Abramson, was it?

2            A.   Abrahamson.

3            Q.   Abrahamson.  What was her position at

4       the  center?

5            A.   She was the director of the health

6       benefits program and group buying programs.  And

7       it's a long title but director of the benefits

8       trust.

9            Q.   And how long did she work there?

10           A.   It would be short of two years.  I

11      think she was -- came on board in 2002, and she

12      left in October of -- I think 2004.  Again, I go

13      by payroll records.

14           Q.   What was your working relationship with

15      her?

16           A.   Co-worker -- I mean, she was a

17      director, I'm support staff.

18           Q.   Did you have a good working

19      relationship?

20           A.   I worked with her more closely because

21      part of my job involves the accounting work for

22      the health trust.

23           Q.   Did she have problems with any of the
```

23

```
 1     employees, to your knowledge?
 2           A.  Yes.
 3           Q.  And can you tell us what those problems
 4     consisted  of?
 5           A.  I think there were some differences of
 6     opinion on some -- it varied, it varied.
 7           Q.  Let's take it employee by employee.
 8           A.  Okay.  I had some problems with her.
 9           Q.  Okay.  Let's start with your problems
10     with her and then move forward.
11           A.  Okay.  At times, we had a -- the health
12     trust was in a state of flux at that time due to
13     Wanda Sadelson being out of the office with
14     illness.
15           Q.  And -- I'm sorry, I'm going to try not
16     to interrupt you but you said, at that time,
17     Wanda Sadelson -- I mean, what time are we
18     talking about and who is Wanda Sadelson?
19           A.  Okay.  Wanda Banks-Sadelson was -- she
20     was -- she was manager of the health program; she
21     was the de facto person in between.  The previous
22     director of health was Tom Beggs. And Wanda had
23     been there for several years and had -- she was
```

24

1    the staff most experienced in health program at
2    that  time.
3                    After Tom left, Wanda basically was
4    default leader of the department.  And when
5    she -- she was diagnosed in October of 2002 and
6    Dawn had become director earlier that year.
7                    We had some established things in the
8    health trust.  Even though we were in flux, there
9    were some things that I felt strongly needed to
10   be done, from an accounting point of view, in
11   order to keep things on an even keel for record
12   keeping.
13                   And she and I -- Dawn Abrahamson --
14   would have some disagreements on priorities of
15   when certain things would be done.
16                   Again, they mostly affected the
17   accounting part of the health system.  They had
18   their own billing system, it interacts with the
19   center's accounting.  That's where they come
20   together, so that big disagreements came from
21   that  point.
22        Q.  Was it frequent?
23        A.  No.  I want to say seasonal.  But

```
 1        depending on the circumstances, there's a couple
 2        of stressful times in the health calendar year.
 3                    And one was open enrollment time, where
 4        there's a lot of activity, a lot of things going
 5        on, a lot of deadlines; that was the primary
 6        times.
 7            Q.   Were -- was Betsy aware of these
 8        disagreements that you and she were having -- you
 9        and Dawn were having?
10            A.   Occasionally.
11            Q.   How did she become aware?
12            A.   Well, they would get to the point of, I
13        would go to Betsy for advice.  There were a
14        couple of occasions where we had a breakdown in
15        communications and we both went to Betsy
16        together;  she  became  involved.
17            Q.   Did she become sort of like a mediator?
18            A.   Yes, similar, in terms of calming the
19        tempers down and getting what needed to be done,
20        done.
21            Q.   To the extent that you said, "calming
22        the tempers down," did people get angry?
23            A.   It got heated at times.
```

27

1       could not come to an agreement and a couple of

2       times there were rude comments.

3            Q.  She made rude comments to you?

4            A.  Yes.

5            Q.  What did she say?

6            A.  Basically, drop this; stay out of this,

7       this is -- I'm going to do it the way I want to.

8            Q.  Are you telling me everything that she

9       said?

10           A.  No, because my memory is -- it would --

11      and that's paraphrased, that's not direct quote.

12      It  happened  2002/2003.

13          Q.  I understand.  I mean --

14           MR. FLEISCHER:  If she used vulgar

15      language -- I mean, you may be hesitant to use

16      that but you are free to, if you think that's --

17           THE WITNESS:  Oh, you mean in terms of

18      swearing,  or  vicious?

19           BY MR. TEMPLE:

20          Q.  No, no, a truthful and accurate

21      statement as to what she said to you, to the best

22      of your knowledge.

23          A.  Okay.  Yes.  There was no -- when I say

29

```
1        But in terms of vulgarity or rudeness, I don't
2        recall any in response to her saying, "Stay out
3        of this."
4                 I would say to her, in a loud voice,
5        "No, I can stay; this is what we need to do."
6        And at that point, we would discuss it with
7        Betsy.
8             Q.  And you would complain to Betsy
9        individually?  And just to be clear, there were
10       times when you complained to her individually and
11       there were times when you and Dawn went to her
12       together, is that correct?
13            A.  Right.
14            Q.  And how many times, approximately, had
15       you gone to Betsy individually about Dawn?
16            A.  I don't know.  Probably on different
17       matters, and not always on a heated-type of
18       thing, probably five or six.
19            Q.  And what would you -- I mean,
20       generally, in those five or six times, would you
21       deem those communications to constitute
22       complaints  about  Dawn?
23            A.  Say the first part of your question?
```

30

1          Q.  Do you deem those communications to

2    Betsy, on those five or six occasions, to be

3    complaints made by you about Dawn?

4          A.  In some instances, yes.

5          Q.  Okay.  And those complaints would be

6    about the way that she was doing her work on the

7    project, her attitude, her temper, her

8    communication with you?  Describe those

9    complaints.

10          A.  Okay.  Attitude and temper -- again, I

11    am support staff, I'm office manager.  I deal

12    very closely with other support staff.  And in

13    some ways, during the flux of Wanda no longer

14    being there to hold the health department

15    together, I'd be -- people would come to me with

16    issues.  I would advise them to talk directly to

17    Betsy but they felt more comfortable, at times,

18    telling  me.

19              Some of those times, I would go to

20    Betsy and say, "This is what people have been

21    saying.  I'm just giving it to you, and that's

22    the case on that."

23              In terms of my own personal times with

33

```
1      to --
2            Q.  Did other people have problems with
3      Betsy -- I mean, Dawn, other than you, on the
4      administrative   side?
5            A.  Yes.
6            Q.  And who were they?
7            A.  In the health -- in the health part.
8            Q.  Who else had problems with her?
9            A.  Let me think.
10              THE COURT REPORTER:  Excuse me.  Could
11     we go off for a moment to --
12              MR. TEMPLE:  Sure.
13              THE COURT REPORTER:  Off the record.
14                   (Thereupon, a short break was
15                    taken, after which the following
16                    proceedings  were  had:)
17              THE COURT REPORTER:  Back on the
18     record.
19              BY MR. TEMPLE:
20            Q.  Go ahead.
21            A.  I only know the ones that had been
22     communicated to me, in any kind of thing.
23     Sometimes it would be other -- Dawn was
```

37

1 makes too many mistakes; look at this, this,
2 this.
3     And I just didn't think -- and, again,
4 my opinion only.  I was not Keonda's supervisor
5 but I had observed her, and I genuinely disagreed
6 with  Dawn's  assessment.
7   Q.  Did Keonda complain to you about the
8 way that Dawn spoke to her?
9   A.  Yes.  I think they had a -- there was a
10 definite difference in style, in supervisor,
11 where I think Dawn was unaware, sometimes, of how
12 she would say something.
13     And, again, from my personal
14 experience, sometimes she would say things to me
15 that could be interpreted differently.  And if
16 you took it the wrong way, you know, it felt like
17 she -- it -- her supervisory skills, at times,
18 were -- as she said to me, "I'm not the warm
19 fuzzy type.  I want things done and I want them
20 done  correctly."
21   Q.  Can you give me an example of what she
22 said to you that could be misinterpreted in the
23 wrong  way?

39

1    on that matter, either.  I just said that her

2    initial statement to her did not do well toward

3    improving  the  overall  situation.

4         Q.  Did you ever hear Dawn call people

5    stupid, or dumb, or idiots?

6         A.  Not directly to their face.

7         Q.  Did she ever call them that indirectly?

8         A.  Actually, to Keonda, it was

9    definitely -- definitely in close-by situations.

10              I correct my earlier statement of that,

11   that, to Keonda, I think she did say something

12   like -- either, how idiotic, or something like

13   that, on these mistakes.

14        Q.  Did Keonda ever say that she thought

15   this was a racial issue to you?

16        A.  No.  I -- no.  It was -- she just --

17   it's not fair, it's abusive; it's --  you don't

18   talk to me like that.

19        Q.  So she complained to you just about the

20   fact of --

21        A.  The tone of voice.

22        Q.  -- being abusive

23        A.  The tone of voice and the -- yes.

40

```
 1          Q.  But she did say the words, that she
 2     thought it was abusive?
 3          A.  Yes.
 4          Q.  And did you let Betsy know that?
 5          A.  Yes.
 6          Q.  And did Betsy meet with her to discuss
 7     that?
 8          A.  Yes -- meet with who?  She met --
 9          Q.  Did she meet with Dawn to discuss --
10          A.  Yes, she met both with Dawn --
11          Q.  -- the concerns that you had raised
12     with Betsy, about the way that she was talking to
13     Keonda?
14          A.  Yes, this was one of the times that I
15     went to Betsy directly, privately.  And then I
16     saw that she met directly with Keonda, and she
17     also met directly with Dawn.  And I believe on
18     one occasion, they met together; Betsy, Keonda,
19     and Dawn together.
20          Q.  Let me direct your attention to Karen
21     Bailey.
22          A.  Karen  Bailey.
23          Q.  What was she complaining about relative
```

42

```
 1          A.  That Dawn would not listen to her.  She
 2     refused to hear her out, in terms of why we
 3     needed to -- you know, on -- collections was a
 4     thing that -- we need to terminate this group.
 5              You know, she was responsible for
 6     collections, or she became increasingly
 7     responsible, and I think they would just screen
 8     it sometimes.  And Dawn would say, "No, let's try
 9     to do another letter to them."  And they would
10     disagree to the point where it would get heated.
11          Q.  Did Dawn -- Karen tell you that she
12     didn't like the way that Dawn spoke to her?
13          A.  A couple of occasions, yes.
14          Q.  And what did she say on those couple of
15     occasions?
16          A.  Well, it was quite -- it was -- if I
17     could explain.  My office is a --
18              MR. FLEISCHER:  Just answer the
19     question,  please.
20              THE WITNESS:  Okay.
21              MR. TEMPLE:  Oh, no, wait a minute.
22     Counsel, you cannot do that.
23              MR. FLEISCHER:  I --
```

50

1    had disagreements; you know, differences of

2    opinion on things with every person, or they with

3    me.  But in terms of getting heated, no.

4        Q.  And relative to Arminda, the

5    differences of opinion were on work items?  Or

6    not?

7        A.  No, it became a -- there were -- the

8    two -- there were feelings involved, I guess.

9        Q.  How many disagreements are we talking

10    about, that you can recall?

11        A.  With  Arminda?

12        Q.  Yes,  ma'am.

13        A.  There were two times.

14        Q.  And can you tell me what those two

15    times  were?

16        A.  One was early on in regard to use of

17    the  conference  room.

18        Q.  And the second?

19        A.  The other was a much more -- a casual

20    remark made to me in the doorway of my office.

21        Q.  And relative to both of those

22    situations, again, did you ever talk to Arminda

23    directly about those -- let's say situation A,

52

1          Q.  Okay.

2          A.  As am I.  I was on my way out the door

3    to a doctor's appointment.  I went out our main

4    street door.  Immediately to my right was an open

5    door of our conference room.  We had -- had

6    building security issues with thefts in the

7    building.  On previous occasions, I had asked

8    both Arminda and Lee, who was -- Lee Mason, who

9    also helped with the workshop program --

10   regarding that those doors.

11          The room was empty, the conference

12   room; no one was in there.  If someone was in

13   there, it wouldn't have been an issue.

14          On occasions before, I had reminded

15   people about security, and the fact that, when no

16   one is in that door -- in that conference room --

17   a person can walk in there, and go right though

18   our whole office without being detected.

19          And the building has warned tenants

20   regarding -- do not -- most of our neighbors on

21   the fourth floor have key access, and we -- we

22   don't lock the door.  We have a bell that rings

23   but those conference room doors usually are to be

```
1          kept closed unless someone is in there.

2                    I was in a hurry because I did have a

3          doctor's appointment.  I was a little aggravated

4          because this was not the first time.  I opened

5          correctly the suite door -- the glass door -- and

6          I said to Shauntage Hardy-Wilkins, who was  -- at

7          that time was our reception.

8                    I said to her, "Tell Arminda that --

9          that door is open and that she needs to close

10         it," and I was aggravated.  I left.  I had a

11         doctor's appointment but I was back within the

12         hour; it was close by.

13                   When I -- upon my return, Shauntage

14         said to me -- Shauntage Hardy said that, "I don't

15         know, Arminda is not happy right now."  I said,

16         "Well, did you tell her about the door being

17         open?"  And she said -- and Arminda was -- you

18         know, she said, "I don't know, you better talk to

19         her."

20                   I went to my office, because I had all

21         my bags and things.  My recollection isn't clear

22         whether it was -- this was in the late afternoon.

23         I know it was, like, a 3:00 o'clock appointment.
```

54

1                        In any event, when I had come back, the
2         door was closed.  And it was toward the end of
3         the day; it was after 4:00 o'clock.  I went back
4         to my office.
5                        I believe it was the next morning that
6         Arminda had requested that I come see her.  And
7         she told me -- I went down to her office.  We sat
8         down, and she said, "Well, I'm concerned.
9         Shauntage Hardy" -- who, again, she's support
10        staff, like me; we have a good relationship --
11        "she was very upset at being told to tell me to
12        close the door."
13                       And I was sort of puzzled at that.  And
14        I said, "Well, I was in a hurry."  I told her,
15        you know -- again, because of repeated times, I
16        was frustrated at that.  And she said, "Well, she
17        came up twice to see me."  And I was like, I
18        don't -- I don't know.
19                       The conversation ensued, where she then
20        said to me, "Well, your behavior is quite
21        unprofessional."  And we discussed -- during this
22        conversation, I said, "Well, how was I
23        unprofessional?"  "Well, you should have come

55

1          directly to me."
2                    I said, "You were in the front area.  I
3          didn't have time to go back to your desk, to talk
4          to you about this.  I have talked to you before
5          about it."  So, the conversation ensued.  I
6          believe, at some point, Lee actually may have
7          been part of the meeting.  I'm not sure, the
8          first or the -- I believe the first part.
9                    There was also a -- in the conference
10         room before, when -- there had been a change,
11         when we were at the old conference room at 1001
12         Connecticut, and the new space.  The person -- I
13         had been told by Betsy, that the conference room
14         duties are the responsibility of the person
15         handling the workshop program, so I brought this
16         up.
17                   I said, "This is not my responsibility,
18         this is the workshop program," and was told that,
19         "Well, this is not something" -- I can't -- I
20         can't -- verbatim, I can't -- not remember that
21         part of -- just that it -- we did not come to any
22         conclusion.  I was rather stung, I guess, by this
23         thing that I wasn't doing my job and being

56

```
1      unprofessional.

2                     So I did go, as I always do, to keep --

3      try to keep communication lines clear, I went to

4      my supervisor, which is Betsy, and said, "Tell me

5      what our conference room policy is because there

6      seems to be some misunderstanding."

7                     And she explained -- she wanted me to

8      explain what had happened.  I went through that,

9      the discussion of the meeting, and she said to

10     me, "Well, Barb, it's their responsibility for

11     the workshop.  But just let this go, it's not a

12     big deal.  I'll talk to her about it.  You two

13     are" -- she said that we were both Tauruses,

14     which we are, and that -- and not in any -- you

15     know, she doesn't -- that's her way of explaining

16     that I can be stubborn at times.  And so that, to

17     let this go by; this was not a problem.

18                     I did bring up the professionalism.

19     She said, "Just let it go; just do what you need

20     to do.  I will talk to her about the conference

21     room rules and regulations," because I wanted

22     clarification on conference room usage.

23            Q.  Now, let me go back to this door on
```

74

```
1              A.   I think it's not necessary to become
2         stinging in your sense of -- there's a difference
3         between discussing and judging; discussing is
4         productive, judging becomes personal and has no
5         positive  outcome.
6              Q.   And you make the distinction between --
7         Arminda's communication was -- in terms of it
8         being wrong or improper  versus what Dawn's
9         communication was to you, when she was
10        temperamentally, in a loud tone of voice
11        communicating, yelling at you to stay out of it.
12                   Do you think that Arminda's
13        communication to you was more harmful and
14        injurious to you than Dawn's?
15             A.   Yes.
16             Q.   And do I understand that, relative to
17        incident number one, you did complain to Betsy
18        about this, Arminda saying that what you did was
19        unprofessional?
20             A.   No, that came out of the incident
21        number one, that meeting regarding the conference
22        room.
23             Q.   No, no.  Did you go to Betsy about
```

1        that?

2             A.  As I said in earlier testimony, from

3        that meeting, I went to Betsy, and said, "I need

4        to know what the conference room policy is; you

5        told me this, she says this.  And she has said

6        that I am unprofessional in the way that I'm

7        dealing with this."  And I told Betsy at that

8        point, "You have to make some kind of a decision

9        regarding this conference room policy."

10            Q.  What policy did you talk to her about?

11       What policy was at issue?

12            A.  The -- who was responsible for the

13       security, and upkeep, and scheduling; all things

14       related to the conference room.

15            Q.  But Arminda didn't question whether or

16       not she was or you were responsible?

17            A.  Yes, she did.

18            Q.  She told you that you were not

19       responsible, that she was responsible or that you

20       were  responsible?

21            A.  She said it was not her responsibility

22       to close the conference room door.

23            Q.  Do you know who had left the conference

79

```
1          Arminda -- said that you were unprofessional?
2               A.  I started the conversation regarding
3          the conference room policy, and Betsy
4          questioned -- she said, "What's going on?  Tell
5          me what happened."
6               Q.  So, were you more concerned about the
7          conference room policy --
8               A.  I was frustrated about the -- -
9               Q.  -- than the --
10              A.  -- conference room policy.
11              Q.  Let me finish the question.  Were you
12         more concerned about the conference room policy
13         than the fact that you say that Arminda said you
14         were   unprofessional?
15              A.  Both.
16              Q.  And so, when you told Betsy that
17         Arminda said you were unprofessional, okay, that
18         was your very first complaint about Arminda?
19              A.  Yes.
20              Q.  And during the time that Arminda worked
21         there, you only had two complaints about Arminda,
22         is that right?
23              A.  Two regarding personal.  I had a very
```

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,        :

5                             : Civil Action No.

6        Plaintiff    : 05-7238

7 vs.                        :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9         Defendant.         :

10 _____:

11                        X

12           Tuesday, February 28, 2006

13           Washington, D. C. 20005

14        The deposition of, SUSAN SANOW, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 2:35

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

                SHARON L. BANKS REPORTING
                    P.O. Box 44773
             Fort Washington, Maryland  20744
                   (301) 372-6922

14

1 salary in 2003 did you receive from CNA.

2              MR. FLEISCHER:  Well, same problem.

3 Could we excuse the witness for a moment.

4        (Conversation had off the record, afterwhich the

5 following occurred.)

6              BY MR. BLUE:

7    Q          Did there come a time in 2003 when

8 you left CNA?

9    A          Yes.

10   Q          When was that?

11   A          November 14, 2003.

12   Q          Why did you leave?

13   A          I left the job for 3 reasons?

14   Q          Okay.

15   A          One is I was burned out.   The

16 second one was that we experienced some very terrible

17 deaths within the office; 2 people had died.  I found

18 that very difficult to be around and then the most

19 important reason was I personally saw my 39 year old

20 sister-in-law die of a brain tumor leaving 2 children, 7

21 years old and 9 years old.

22   Q          Who were the 2 employees from CNA

23 that died?

             SHARON L. BANKS REPORTING
                 P.O. Box 44773
           Fort Washington, Maryland  20744
                 (301) 372-6922

16

```
1      Q            So your leaving was voluntary?

2      A            Yes.

3      Q            What did you do immediately after

4 you left?

5      A            I went to a new job.

6      Q            Would that be the job at Virginia

7 Tech?

8      A            Yes.

9      Q            When did that start?

10     A            November 17th, 20003.

11     Q            What was your job there?

12     A            I was a project associate for a

13 academic research program.

14     Q            What kind of job responsibilities

15 did that entail?

16     A            I -- the project dealt with

17 non-profit management at a masters and doctorate level.

18 So I was assisting them in determining activities for the

19 program.

20     Q            Prior to your departure did any of

21 your job duties, responsibilities entail supervision of

22 the employees?

23     A            Yes.
```

20

1     Q              I am guessing no one knew that you

2 were looking for other employment at that time?

3     A              Correct.

4     Q              How long did you work at Virginia

5 Tech?

6     A              I work at Virginia Tech from

7 November, 2003 until December of 2004.

8     Q              Prior to your departure, would you

9 say that one of your major job responsibilities was the

10 planning and implementation of the Washington Post

11 Awards?

12    A              Yes.

13    Q              At what point in 2003 did you work

14 on those awards?

15    A              Say that again.

16    Q              Did you work on the awards every

17 day probably during 2003?

18    A              I did not work on it every day,

19 but it was my responsibility every day.

20    Q              Could you give me a sense of the

21 kind of time investment that was required during 2003?

22    A              The awards program starts in

23 September and that is when we were -- well, actually, the

21

1 awards pretty much start planning the previous Summer.

2 So I start working on the 2005 competition in July.   It

3 is kicked off in September or October, that time period.

4 And it runs through June of 2005.   So it starts the

5 previous year and we actually touch on 2 calendar years.

6       Q             So immediately, once the awards

7 are over, you begin to prepare for the next cycle?

8       A             Yes.

9       Q             At what point did you know that

10 you were leaving CNA in 2003?

11       A             End of October, 2003.

12       Q             So how many weeks notice did you

13 give?

14       A             Three.

15       Q             Did you begin to prepare to

16 transition your job responsibilities to any other

17 employee?

18       A             Yes.

19       Q             What did that process consist of?

20       A             Preparing documents that try to

21 piece together all the details of any of my

22 responsibilities.

23       Q             Had the successor to your position

22

1 been identified by your departure?

2          A              Yes.

3          Q              Who was that?

4          A              Arminda Valles-Hall.

5          Q              Do you now mean that only in terms

6 of the Washington Post Awards?

7          A              Yes.

8          Q              What about as director of

9 Membership and Advocacy?  Had a successor been identified

10 before your departure for the role of director of

11 Membership?

12         A              No.

13         Q              How was Ms. Valles-Hall chosen as

14 a successor in terms of planning for the Washington Post

15 Awards?

16         A              I don't know.

17         Q              Do you know whether she was hand

18 picked?

19         A              I believe so.

20         Q              Did you prepare a transition memo?

21         A              Yes.

22         Q              Did you give that to her?

23         A              Yes.

26

1    Q           Did Ms. Johnson ever ask you about

2 her performance?

3    A           No.

4    Q           Did you ever provide any comments

5 about her performance?

6    A           No.

7    Q           Would you please describe your

8 working relationship with Ms. Valles-Hall in 2003 prior

9 to your departure from CNA?

10    A          Very positive, happy to have her

11 part of our team; was very happy that she joined our

12 staff.  I thought it was a terrific hire.

13    Q          At one point did that ever change?

14          MR. FLEISCHER:  In 2003, you are

15 talking?

16          BY MR. BLUE:

17    Q          In 2003?

18    A          No, never changed.

19    Q          In 2003 when you left CNA, did you

20 continue to play any role in the preparation for the

21 Washington Post Awards?

22    A          Yes.

23    Q          What kind of role was that?

Apx. 299

27

1      A              I was asked to be retained as a

2 consultant to the program.

3      Q              Who asked you?

4      A              Betsy.

5      Q              Were you paid as a consultant?

6      A              Yes.

7      Q              What was your compensation?

8      A              $35 an hour.

9      Q              What kind of support did you

10 provide in 2003, relative to the Washington Post Awards?

11      A              I would answer questions.   As

12 Arminda went through the program, if she was not

13 understanding what was part of the program, she would

14 call me or e-mail me and I would respond to that and I

15 also attended all the selection committee meetings.

16      Q              How many meetings were there in

17 2003?

18      A              In 2003, actually there were no

19 meetings.    No meetings.

20      Q              Who would have determined whether

21 there would be any meetings?

22      A              They were preset.

23      Q              By whom?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

28

1     A            By the schedule of the

2 competition.

3     Q            Was there any point in 2003 where

4 you questioned Ms. Hall's ability to administer the

5 awards?

6     A            No.

7     Q            In 2004, did you continue to

8 provide support for the Washington Post Awards?

9     A            Yes.

10     Q            What kind of support did you

11 provide in 2004?

12     A            Same; same support.  I was

13 retained as a consultant to the program.

14     Q            How much time, on a weekly basis,

15 did you commit to the awards?  In 2004.

16     A            In 2004...

17     Q            Let me rephrase the question.

18       How much time did you commit to the

19 administration of the awards in January, of 2004?

20     A            That I was paid for?

21     Q            Total amount of time.

22     A            Oh, maybe under five hours.

23 Probably under 3.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

29

1       Q               What kind of things did you do

2 during that five hour time period?

3       A               Just answer questions and attended

4 a 2 hour meeting.

5       Q               What about February of 2004, same

6 question?

7       A               Probably zero  hours.

8       Q               Is that because no one asked you

9 to do anything?

10      A               Correct.

11      Q               What about March of 2004?

12      A               March, I attended a selection

13 committee meeting and then probably another five to 6

14 hours.

15      Q               Was there any point in 2004 that

16 you questioned the ability of Ms. Hall to administer or

17 plan effectively, the awards?

18      A               Yes.

19      Q               When was that?

20      A               In latter March in 2004.

21      Q               What happened about March of 2004

22 that made you question that?

23      A               I noticed that some of the

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

30

1 deadline were being missed earlier that month, which was

2 fine and Arminda was able to get the materials in time,

3 but I was very concerned with the lack of wiggle time in

4 the up coming weeks of the competition.

5      Q               Let's deal with the first issue.

6 In terms of deadlines being missed, what was the origin

7 of these deadlines or who set these deadlines.

8      A               I set the deadlines.

9      Q               When did you set those?

10     A               July, 2003.

11     Q               Did you consult with anyone prior

12 to setting those deadlines?

13     A               No.

14     Q               Do you recall what kind of

15 information or deliverables had to be delivered by those

16 deadlines?

17     A               Yes.

18     Q               What were they?

19     A               Dead lines of notifying committee

20 members, notifying participants in the program, things

21 like that.

22     Q               Did you discuss these issues on

23 the telephone with Ms. Valles-Hall?

31

1      A                No.

2      Q                Did you discuss any of these

3 issues at any of the selection committee meetings with

4 Ms. Valles-Hall?

5      A                No.

6      Q                At what point did you begin to

7 discuss these issues with her?

8      A                In the middle or end of March

9 after the 2nd selection committee as we were moving into

10 phase 3 of the program and there was -- there is very

11 little wiggle room in that the dates and deadlines have

12 to really be respected at a point.

13      Q                What do you mean by wiggle room?

14      A                That the dates and the deadlines

15 really have to be respected.

16      Q                As a consultant, would you say

17 your primary job was to offer advice?

18      A                My primary role in this program

19 was to uphold the integrity of the selection process.

20      Q                How long had you been involved

21 with the Washington Post Award?

22      A                At that point, ten years.

23      Q                Was anyone involved in the awards

33

1      A              I had made that decision when I

2 realized that was part of leaving the job.  I had long

3 ago wrestled  with it and realized that the best thing

4 that could happen to that program is to see it run

5 without me to know that it truly is the strong program

6 that I thought it was, the legacy to the community.

7      Q              When you relinquished control of

8 the awards you had confidence in Ms. Valles-Hall could

9 administer  it effectively?

10     A              Yes.

11            (Exhibit no. 1 was marked

12          for ID.)

13            BY MR. BLUE:

14     Q              I am showing you Exhibit One.

15 Would you please review what appears to be an exchange of

16 e-mails between you an Ms. Valles-Hall?

17     A              (Witness doing as instructed.)

18     Q              Do you recall this e-mail

19 exchange?

20     A              Yes.

21     Q              Did you send the e-mail that is on

22 page 2 of Exhibit 1, beginning at the bottom?

23     A              Yes.

34

1        Q                Is it a fair characterization of

2 this e-mail that it contains suggestions and criticisms

3 of her administration of the Washington Post Awards?

4        A                Yes.

5        Q                Would you turn your attention to

6 number 4 on the last page of this exhibit where the

7 e-mail states. " I know this e-mail is a bit negative,

8 but I ask these questions out of concern and commitment

9 to this program. "

10        When you sent that, did you have the

11 understanding that your e-mail could be construed as

12 negative?

13        A                No.

14        Q                Why did you write I know this

15 e-mail is a bit negative?

16        A                I consider this to be a bit

17 negative, not negative.

18        Q                So there would be elements of

19 negativity contained within the e-mail; is that fair?

20        A                Yes.

21        Q                When you received Ms.

22 Valles-Hall's response, which I believe is the next day,

23 she writes, yes, the tone is negative, but and

35

1 unnecessary so.    Did that statement offend you?

2      A         Um, no.

3      Q         You did not find it offensive?

4      A         I did not care.

5      Q         Did you find her statement to be

6 confrontational?

7      A         I felt that she just needed to get

8 these thoughts on paper.   Sometime people just have to

9 emote.

10      Q         Did you tell Betsy Johnson that

11 you thought that this statement was confrontational?

12      A         I told Betsy, and I can't remember

13 the order, but I felt that in addition to this e-mail, I

14 also received a phone call from Arminda berating me and I

15 felt the double whammy of phone call and e-mail was

16 uncalled for.

17      Q         When did you receive the phone

18 call?

19      A         I can't remember.  I thought -- I

20 guess I must have received -- I can't remember if I got

21 the phone call first or the e-mail first, but I know that

22 I was berated twice.

23      Q         Do you know that you got the phone

36

1 call after the March 23rd e-mail that you sent to her?

2        A                Yes.

3        Q                You just said that you were

4 berated twice.   Do you consider her March 24th, e-mail

5 to be abrasive or to have been berating to you; that's

6 the term?

7        A                To tell me once, if that is how

8 she feels, that is okay.   It was telling me twice, the

9 exact same thing, one verbally and one on paper I thought

10 was a little bit over kill for something that was a bit

11 negative.

12       Q                What was the exact nature of your

13 phone conversation?

14       A                The phone call, Arminda was very

15 unhappy with me, told me I had no business going to Betsy

16 about this, that how dare I set false deadlines that were

17 impossible and that I had no business basically writing

18 any of this.

19       Q                Why did you cc Betsy on the

20 e-mail?

21       A                I was very greatful to Betsy

22 Johnson to allow me to work on the Washington Post

23 Awards and my responsibility to the integrity of the

40

1     Q                When did you talk to Betsy?

2     A                Um, my -- within a few days.   I

3 don't recall precisely.

4     Q                What did you say to her?

5     A                I probably sent her an e-mail

6 asking her to clarify my role in the awards program to

7 say something about you know -- I am here, what is my

8 role in the Wash Post Award?   I thought I am here to

9 uphold the integrity of the competition.

10    Q                Did you receive a response to that

11 e-mail?

12    A                Yes.

13    Q                What was the response?

14    A                Yes.   You are responsible for --

15 you have a role -- you are here to uphold the integrity

16 of the Washington Post Award.

17    Q                What does that mean to you,

18 upholding the integrity of the award?

19    A                To make sure that the competition

20 is being run as the rules are written.

21    Q                There came a time in 2004 where

22 you replaced Ms. Hall in terms of the administration of

23 the award; is that right?

41

1      A            Yes.

2      Q            When did that happen?

3      A            Early April, 2004.

4      Q            How did that come about?

5      A            I told my -- well, let me -- can

6 you ask it again.

7      Q            How did you -- how did it come

8 about that you replaced Ms. Hall in terms of running the

9 awards?

10      A            My current employer at that time,

11 Virginia Tech, I told them -- they asked me how the

12 Washington Post Award was going; they were very intrigued

13 by it; liked the program and liked that I had done this

14 for the community.  And in talking with them I said I

15 was a little concerned and as the competition was going

16 into it's most crucial time how things were being

17 handled.

18      They showed an interest saying could you play a

19 bigger role.  And I had no idea that that was possible

20 and we got to talking and it was like okay.  So -- and

21 about several days later, maybe a week later, I had lunch

22 with Betsy and I told them that Virginia Tech was

23 interested in becoming a sponsor and allowing me to run

42

1 the program.

2     Q           I want to be sure to clarify what

3 you said.  Did you ever convey to Virginia Tech that you

4 had concerns or problems with the way the award was being

5 planned?

6     A           With being implemented, yes.

7     Q           A few minutes ago when I asked you

8 about the nature of your criticisms or suggestions, you

9 stated something to the effect that you did not see them

10 as that big a deal; is that correct?

11    A           Well, I -- it was not a big deal

12 in that I knew if the person running the program said you

13 know what, I am committed, I better put this on the front

14 burner.  That is exactly -- I think that is the wording

15 somewhere in here.  That it needs to be on the front

16 burner.  Meaning it has to be the priority for the month

17 of April and May.  And if the person was able to do

18 that, they could run the program fine.  I still had

19 confidence in Arminda.

20    Q           You had confidence in Arminda

21 after your e-mail exchange?

22    A           Sure.

23    Q           Did you have confidence in her

48

1    Q                Within that 2 week period, did you

2 have any conversations with Ms. Valles-Hall other than

3 the phone conversation you mentioned or this e-mail about

4 her preparation for the awards?

5    A                No.

6    Q                When Virginia Tech had indicated

7 that they would be -- strike that.

8                When Virginia Tech indicated that they pay for

9 your work on the award, what was the nature of your

10 discussions with Ms. Johnson about that?

11    A                Would you clarify that.

12    Q                Did you approach Ms. Johnson about

13 your future involvement in the award after Virginia Tech

14 informed you that they would pay for your involvement?

15    A                Correct, yes.

16    Q                What was the nature of those

17 discussions?

18    A                Betsy and I -- I told Betsy that

19 Virginia Tech has offered to become a sponsor and their

20 contribution would be my time to run the competition for

21 the rest of 2004.

22    Q                Did you ever say to Ms. Johnson

23 that you thought Ms. Valles-Hall should be included in

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 312

49

1 those discussions?

2      A            No.

3      Q            Did Ms. Johnson ever express the

4 same sentiment to you?

5      A            No.

6      Q            Did you ever suggest there should

7 be a meeting with the 3 of you to talk about your future

8 involvement in the awards?

9      A            No.

10      Q            Did you suggest there should be a

11 meeting to discuss Ms. Hall's involvement in the awards?

12      A            No.

13      Q            In 2004, did there come a time

14 when you stopped working with Virginia Tech?

15      A            Yes.

16      Q            When was that?

17      A            December 19th, 2004 was my last

18 day.

19      Q            Why did you stop working there?

20      A            Job related issues.

21      Q            Such as?

22      A            The person I was working directly

23 for was about to go on a 6 month work assignment and then

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 313

54

1 Hall had filed a complaint against CNA with the D. C.

2 Human Rights Commission?

3    A          Probably after my return.

4    Q          How did you become aware of that?

5    A          I -- I don't recall.

6    Q          When you returned to CNA --

7          MR. FLEISCHER:  Could we put a date on

8 her return, please?

9          BY MR. BLUE:

10    Q          What day -- what day was your

11 first day back with CNA?

12    A          January 3rd, 2005.

13    Q          On your first day back at CNA, did

14 you inform Ms. Hall that you would be her supervisor?

15    A          No.

16    Q          Did you ask to meet with her?

17    A          I on my 2nd day.

18    Q          You did what on your 2nd day?  You

19 asked to meet with her?

20    A          Asked to meet with her on my

21 second day.

22    Q          Did you meet with her?

23    A          Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

55

1    Q            What was that meeting about?

2    A            Just we were going over where

3 things stood for the Spring 2005 semester and how the --

4 what details still needed to occur for the semester to go

5 forth.

6    Q            Were you aware of Ms. Hall's

7 unhappiness at CNA at that time?

8    A            Yes.

9    Q            How did you become aware of that?

10    A            Betsy Johnson told me.

11    Q            When did she tell you?

12    A            Sometime before my return.

13    Q            What did she say?

14    A            She said that Arminda is not happy

15 and the Educational program is loosing money and there

16 are a lot of concerns and thing needed to be tightened up

17 and figured out how to make the educational program work.

18    Q            Did she say why she was not happy?

19    A            Because the educational program

20 was loosing money.

21    Q            No.  Did she say why Ms. Hall was

22 unhappy?

23    A            No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 315

56

1       Q               Did you ask?

2       A               No.

3       Q               You made a face.  Did you care why

4 she was not happy?

5       A               I was most concerned with getting

6 the educational program in order.

7       Q               So you come again in early

8 January to supervise Ms. Valles-Hall and you have an

9 understanding that she is not happy, but you were not

10 particularly interested in why?

11      A               Not really.

12      Q               Did you think it was important to

13 find out?

14      A               No.

15      Q               Why not?

16      A               Because I knew what needed to be

17 done to get the educational program on track and that was

18 -- if she had personal issues to go with personal issues.

19 You can deal with those.

20      Q               What was your understanding of

21 how the education program was not on track?

22      A               I knew that it was loosing lots

23 of money.  There was large gaps of time where programs

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 316

57

1 were not being offered, an incredible amount of classes

2 being cancelled and it was a problem getting information

3 out to the community in order to sign up for classes.

4        Q              In remedying those problems, did

5 you ever consult with the fund raising -- the individual

6 responsible for fund raising at CNA?

7        A              No.

8        Q              Why not?

9        A              Did not think it had anything to

10 do with that in the first step of putting things in

11 order.

12       Q              If CNA is not making enough money

13 to sustain its education program, you did not think it

14 was appropriate to contact the person responsible for

15 funds raising?

16       A              The first part -- the most

17 important thing that I was response for, was making sure

18 the quality of the program was good.  And that was in

19 question.  So I needed to make sure I was happy with the

20 program and then we start looking at the fund raising.

21       Q              What is your basis for saying that

22 the quality of the program was in question?

23       A              Incredible number of classes had

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

58

1 to be cancelled, registration was very, very low.

2 Promotional materials were incredibly late.   That people

3 did not know to go to the classes because they got the

4 materials after the classes had been -- had either

5 occurred or most likely cancelled.

6       Q              Where did you learn that

7 information?

8       A              I knew something was wrong in the

9 Fall, in that I knew classes were beginning in September

10 and I did not receive my educational catalogue at home

11 until about October 27th, October 30th.  It was the end

12 of October.

13      Q              In the first week in January, when

14 you rejoined CNA, did you ask why the catalogue had

15 gotten out late?

16      A              I was more concerned with how are

17 we going to get the next catalogue out on time.

18      Q              Did you ask why the prior

19 catalogue had gotten out late?

20      A              No.

21      Q              Did you have any conversation with

22 Ms. Valles-Hall about why the prior catalogue had gotten

23 out late?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

60

1        A                Yes.

2        Q                Did you discuss getting the next

3 catalogue out with her?

4        A                Yes.

5        Q                What was the nature of those

6 discussions?

7        A                It was like the January 4th

8 meeting where we spelled out what needed to be done when,

9 what the current status is of the copy, when it is, you

10 know, going to the next phase.  What is the schedule for

11 putting things on the web site.    I really wanted to get

12 a firm grip on what was going on.

13               (Exhibit no. 3 was marked

14               for ID.)

15               BY MR. BLUE:

16        Q                In January of 2005, what problems

17 be did you have with Ms. Valles-Hall's   work performance

18 or did you have any problems with her work performance?

19        A                Do you need me to read this first?

20        Q                Not yet.

21        A                Okay.

22        Q                Did you have any problems with her

23 work performance?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

61

1       A               Yes.

2       Q               What were they?

3       A               She seemed to be unhappy with my

4 direction, did not want to follow it.

5       Q               What makes you say that she did

6 not want to follow your direction?

7       A               When we told her -- I told her

8 that it needs to be on the -- all the classes need to be

9 on the web site by a certain date, she said " no,

10 impossible.   Can not be done. "

11      Q               Did that happen during an oral

12 conversation?

13      A               Yes.

14      Q               Did she ever inform you that she

15 did not believe that that was within her job?

16      A               Yes.

17      Q               Duties?

18      A               Yes.

19      Q               How did you respond?

20      A               I needed more information.    I

21 remember that is how I responded.

22      Q               Did she ever tell you that CNA had

23 hired a communications director --

            SHARON L. BANKS REPORTING
                  P.O. Box 44773
            Fort Washington, Maryland  20744
                  (301) 372-6922

88

1 e-mail exchange you had regarding the Washington Post

2 Awards.

3        Is it a fair characterization of your testimony

4 that you stated that you believe that the phone call in

5 conjunction with the e-mail, you felt like you were being

6 berated; is that correct?

7        A          Yes.

8        Q          What was the tone of your phone

9 conversation with Ms. Hall?

10       A          She was very angry and wanted to

11 tell her -- tell me how unhappy she was.  And how dare I

12 you know, contact Betsy.  I had no right of contacting

13 Betsy.  How dare I infer that she had done anything

14 wrong.

15       Q          What was her tone of voice?

16       A          Angry.

17       Q          Was she yelling at you?

18       A          Yes.

19       Q          She was yelling at you?

20       A          Yes.  Louder voice than hi, how

21 are you.

22       Q          Well, was it a loud voice or was

23 she yelling?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

1

1 WASHINGTON, D. C.

2     IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,     :

5                          : Civil Action No.

6        Plaintiff     : 05-7238

7 vs.                       :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9        Defendant.        :

10 _____:

11                          X

12         Wednesday, April 5, 2006

13         Washington, D. C. 20005

14     The deposition of, JEREMY BAIRD, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 12:05

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

                SHARON L. BANKS REPORTING
                     P.O. Box 44773
            Fort Washington, Maryland  20744
                    (301) 372-6922

16

```
1      A            I did not attend the conference.

2      Q            Uh, huh.

3      A            And I know -- don't know much

4  about it.   I know they worked on it; it was a lot of

5  work.   But other than that, it was about bringing

6  non-profits together in Prince George's County, but I

7  don't know any specifics.

8      Q            How do you know it was a lot of

9  work?

10     A            It was talked about a lot at staff

11 meetings?

12     A            It was partnering with an outside

13 organization, maybe more than one.   It involved 2 staff

14 people.   It was -- the attendance numbers were high for

15 our events, that I recall.

16     Q            At some point, during your

17 employment at WCA, the issue arose involving a woman

18 named Carlotta Scott?

19     A            Yes.

20     Q            Do you recall that?

21     A            Yes.

22     Q            Can you tell me what you recall

23 about that particular incident?
```

17

1       A                I was sitting in my office and at

2 that time, my office, my desk, I faced the hallway and a

3 woman walked past my door.   I got up from my desk and I

4 stepped out into the hallway to see who it was.   I did

5 not recognize her as an employee or a sub tenant.

6              She was going into the conference room and I

7 said to her excuse me, may I help you?   And she said she

8 was here for a meeting.   She was in the conference room,

9 she just used the rest room and was coming back.   I said

10 okay.   Next time please use the door to the hallway from

11 the conference room.   We don't like people walking

12 through the suite.

13             And she as I recall sort of smiled or nodded or

14 something to that affect and then I went back to my

15 office and went about my business.   The next day, Jeff

16 Kost said to me, that he had received a complaint from

17 Lisa Ransom Brown, who was his employee at the time  that

18 this woman, I did not know her name at the time, was, um,

19 felt very upset about the way I treated her and that she

20 -- Lisa had gone to Betsy about it and that Betsy might

21 be talking to me about it.

22       Q                Did Betsy talk to you about it?

23       A                A long time after that happened.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 324

21

1    Q              Had you had any further

2 communications with Jeff?

3    A              Not since he told me that after it

4 happened?

5    Q              Had you had any communication with

6 Arminda?

7    A              Not that I remember.

8    Q              How was -- was there any suggested

9 resolution at the conclusion of your meeting with Betsy?

10    A              She suggested that I apologize and

11 when Carlotta was coming to teach a work shop, that I

12 introduce myself and apologize to her.

13    Q              At that particular point in time,

14 did you know when next Carlotta would be coming to do a

15 work shop?

16    A              I had a vague idea based upon the

17 workshop schedule.

18    Q              How soon after that, would that

19 time arise?   Let me be fair.  How soon after that did

20 you expect that she would come to do a work shop with

21 WCA?

22    A              As I remember, it was in the next

23 2 months or so.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Apx. 325

23

1       Q               Were you disciplined as a result

2 of that Carlotta Scott incident?

3       A               No.

4       Q               Were you given anything at all in

5 writing to memorialize that incident?

6       A               Yes.

7       Q               What was that?

8       A               I was given a letter very late

9 after that, a warning letter and that was indicated as

10 one point of concern that I refused to apologize to

11 Carlotta.

12      Q               What is the approximate date of

13 that warning letter?

14      A               It was around October 1, 2005.

15      Q               2005?

16      A               Yes.

17      Q               Okay.  Who gave you that letter?

18      A               It was given to me by Stephanie

19 Smith, my supervisor at the time and Betsy Johnson

20 together.

21      Q               How many pages?

22      A               I recall it to be a two page

23 letter.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

29

1      A               I apologize for a lot of things as

2 a membership and customer service professional that I

3 have no control over.   This was something that I felt

4 was blown out of proportion based upon the facts that I

5 had and felt I did nothing wrong.

6      Q               Why did you think it was blown out

7 of proportion?

8      A               Because I had stopped people

9 plenty of times before; similar considerations.

10     Q               At that particular point in time,

11 did you have a good working relationship with Lisa

12 Ransom?

13     A               As I recall, yes.

14     Q               Did you attribute the Carlotta

15 Scott incident at all to -- and problem that you were

16 encountering, did you attribute that to Lisa in any way?

17     A               No.

18     Q               Did there come a time that you saw

19 Carlotta at all?

20     A               Not that I am aware of.

21     Q               When she came back to do her work

22 shop were you present?

23     A               As I recall the work shop was

45

```
1       A               No.

2       Q               Or Arminda?

3       A               No.

4       Q               Lisa Ransom?

5       A               No.

6       Q               Other than the incident with the

7  late information from Arminda, would you say you had a

8  good working relationship with her?

9       A               For the most part.  There were

10 challenges like with any relationship, by it was a good

11 working relationship.

12              MR. TEMPLE:  No further questions.

13              MR. FLEISCHER:  Mr. Baird, I have a

14 couple questions.

15              CROSS EXAMINATION

16              BY MR. FLEISCHER:

17      Q               Let me take you back to the time

18 when you stopped a woman in the hall, whom you later

19 learned was named Carlotta Scott.  Where was Ms. Scott

20 when you stopped her?

21      A               As I recall, she was at the

22 entrance to the conference room from the main hall way of

23 our suite.
```

46

| 1 | Q | This was within CNA's offices? |

1      Q          This was within CNA's offices?

2      A          Correct.

3      Q          Why did you stop her?

4      A          She was not -- I did not recognize
5 her as a staff person or as a subtenant.  She was an
6 unknown person in our space.

7      Q          Did you stop her because she was
8 African American?

9      A          No.

10     Q          As of that time, had you stopped
11 other people who were in your suite?

12     A          Yes.

13     Q          About how many?

14     A          I don't remember.

15     Q          Can you give me a rough estimate?
16 Fewer than ten, more than ten?

17     A          I would say over a span of time,
18 that we have been in that space, probably about ten.

19     Q          Is it your practice to stop people
20 whom you do not recognize when you see them in your
21 suite?

22     A          Yes.

23     Q          Why is that your practice?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

47

1      A              Security.   Um, we at that time,

2 there had been incidents, we received reports from the

3 building manager about other suites that were

4 burglarized, suspicious people in suites in the building,

5 things like that.   And it was my understanding that it

6 was encouraged that we did ask people who we did not

7 recognize, it would help them to determine if they were

8 -- if they needed help in getting to where they were

9 going or whether they were not in the space they should

10 be in, et cetera.

11     Q              Of the ten or so people that you

12 had stopped, prior to this incident with Ms. Scott, were

13 any of them White?

14     A              Yes.

15     Q              Do you have a rough idea how many

16 were White and how many were people of color?

17     A              No.

18     Q              At the time you stopped Ms. Scott,

19 and spoke with her, did you know her sexual orientation?

20     A              No.

21            MR. FLEISCHER:  I have no further

22 questions.  Thank you.

23            REDIRECT EXAMINATION

             SHARON L. BANKS REPORTING
                  P.O. Box 44773
          Fort Washington, Maryland  20744
                  (301) 372-6922

48

1               BY MR. TEMPLE:

2        Q              Do you know Arminda's sexual

3 orientation?

4        A              Yes.

5        Q              What is it?

6        A              She is heterosexual.

7        Q              What is your sexual orientation?

8        A              I am gay.

9        Q              You said there were ten people

10 that you stopped.  Over what period of time?

11       A              We moved into that space um, in

12 July of 2002?

13       A              So between July, 2002 and the date

14 that you left, you stopped ten people?

15       A              I had answered the question in

16 terms of up to the point when Carlotta Scott, when I

17 stopped her.

18       Q              Okay.  You said you were

19 encouraged to stop people.  Who encouraged you to stop

20 people?

21       A              Betsy.

22       Q              What did she say?

23       A              I don't recall her exact words,

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

49

1  but because of the reports from the building management

2  of crime and suspicious people, that she liked when I did

3  that to make sure that people were -- customer service

4  wise, if we can actually help them find some place or to

5  be aware of suspicious people, people who were where they

6  were not supposed to be.

7          Q                Anything to your knowledge ever

8  been stolen by someone in your suite?

9          A                Not to my knowledge.

10         Q                Had there ever been -- had you

11 ever had anyone in your suite, to your knowledge, who was

12 not authorized to be in your suite?

13         A                Yes.

14         Q                And who was that?

15         A                Someone who was selling art work.

16         Q                Okay.

17         A                And there have been also some

18 solicitors, sales people that have....

19         Q                Now, was there anything about

20 Carlotta that you considered to be suspicious?

21         A                She was someone that I did not

22 recognize myself.

23         Q                Other than the fact that you did

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922