IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARMINDA VALLES-HALL )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>CENTER FOR NONPROFIT )<br>ADVANCEMENT )<br>)<br>Defendant )<br>) | Case No: 1:06-CV-806 CKK<br>**ORAL ARGUMENT REQUESTED** |

## OPPOSING STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to LCv.R 7(h), Plaintiff Arminda Valles-Hall ("Plaintiff" or "Ms. Valles-Hall"), by and through undersigned counsel, submits this Opposing Statement of Material Facts Not in Dispute in support of its Memorandum of Law in Opposition to Defendant Center for Nonprofit Advancement's Motion for Summary Judgment.

1.   Ms. Valles-Hall is a heterosexual, Mexican-American whose racial identity is Latino.  *See* Valles-Hall Dep. at 30, attached hereto at Exhibit A; Valles-Hall Dep. II at 286, attached hereto at Exhibit B.

2.   In June 2003, Ms. Valles-Hall received a perfect employment evaluation. *See* 2003 Evaluation., attached hereto at Exhibit C.  She received the highest score for each performance category for which she was evaluated, including "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits"  *Id.*  At that time, she had not had any adverse interaction with any of Defendant's employees so as to merit any such indication on her performance evaluation.  *See id.*

3.    During the duration of 2003 and into 2004, Ms. Valles-Hall began to experience events that began to give rise to concerns of illegal discrimination.  Thus, she

made her first formal complaint of discrimination was made on April 8, 2004, via telephone, and again on April 9, 2004, during a lunch meeting, to Tim Kime, Vice-Chairman of the CNA Board of Directors. During the fifteen minute telephone conversation and the one and one-half hour lunch meeting Ms. Valles-Hall told Kime that one of her African-American colleagues with whom she had a close working relationship was "being treated in a discriminatory way and that I was in the cross hairs (sic) of that." The principal event to which Ms. Valles-Hall referred during her conversations with Kime was Johnson's decision to strip her of her full responsibilities relative to the Washington Post Awards. Specifically, Ms. Valles-Hall has testified under oath that she believed that her close association with her African-American colleague made her the subject of Johnson's racial animus. Valles-Hall Dep. at 82.

4. Ms. Valles-Hall made a second formal complaint of racial discrimination with Johnson on August 4, 2004. *See* Letter, dated August 4, 2004, attached hereto at Exhibit D. In that letter, Ms. Valles-Hall wrote:

> I believe I am not being treated equitably and that I am being evaluated differently and more critically than my colleagues and peers. I have suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard.
>
> I believe my style of communication is viewed unfortunately as aggressive and "inflammatory." These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive.

*Id.*

5. In June 2004, Ms. Valles-Hall received a performance evaluation that was markedly lower than her 2003 evaluation. *See* 2004 Evaluation, attached hereto at Exhibit E. In the categories for "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits", she received a score of 3— satisfactory. *Id*. Handwritten comments on the evaluation include: "responds with

2

inflammatory remarks"; "needs work on staff"; "in conflicts in the office, reactions need work"; "you need to work harder at solving problems with colleagues and refrain from telling them your judgment of them." *Id.* The 2004 evaluation was used by Johnson to give Ms. Valles-Hall a 3 percent raise rather than a 5 percent raise, which was the ceiling for that year. *See* Johnson Dep. at 158, attached hereto at Exhibit F. Additionally, the substantive issues raised during the 2004 evaluation process were used to terminate Ms. Valles-Hall in February 2005. The issues that transpired between June 2003 and 2004, and upon which Ms. Valles-Hall's 2004 evaluation is allegedly based concern a series of alleged incidents with Ms. Valles-Hall's coworkers.

6. Ms. Valles-Hall met with Johnson to discuss her performance evaluation in July 2004. Johnson informed Ms. Valles-Hall that thirteen out of fourteen employees complained about her. Valles-Hall Dep. I. at 113-115. After Ms. Valles-Hall pressed Johnson about the quantity and substance of these alleged complaints, Johnson finally stated that only five employees complained—Jeff Kost, Jeremy Baird, Susan Sanow, Barbara Mendoza, and herself. *Id* at 115.

   a. *Jeff Kost.* Jeff Kost is Defendant's Deputy Director for External Affairs. In February 2004 Kost rudely, and without announcement, interrupted a meeting between Ms. Valles-Hall, Lisa Ransom (African-American), and a volunteer (Billy Terry) in Defendant's conference room. *See* Valles-Hall Dep. at 86-87. He spoke to Ms. Valles-Hall in an offensive tone, impliedly demanding immediate use of the conference room. *Id.* at 88. Ms. Valles-Hall unquestionably was racially offended by the incident because she had never observed Kost interact with white colleagues in a similar manner. *Id.* 89.

Johnson stated that Kost complained about Ms. Valles-Hall relative to the conference room incident. *Id.* She reiterated this at deposition, saying that Kost complained about Ms. Valles-Hall on more than one occasion. *Id.* Kost testified, however, that he never met with Johnson, nor did he communicate via e-mail or

3

telephone with her to specifically complain about Ms. Valles-Hall. Kost Dep. II at 26-27, attached hereto at Exhibit G. He further described Ms. Valles-Hall's initial response to the incident as "neither positive nor negative." *See* Kost Dep. I at 14, attached hereto at Exhibit H. He also testified that she had never called him any names. *See* Kost dep. II at 5. He stated that she never did anything that he could consider to be offensive to him. *Id.* at 14. Furthermore, he did not recall ever observing Ms. Valles-Hall berate or talk down to anyone in the workplace. *Id*. at 38.

  Moreover, as part of Johnson's alleged inquiry into the matter, she never discerned whether Ms. Valles-Hall or Kost had properly reserved use of the conference room. *See* Johnson Dep. I at 122-23. She never even considered discussing the matter with the volunteer who allegedly had been offended by Kost's behavior. *Id*. at 124. In fact, Johnson acknowledges that she had "no clue" that the volunteer found the incident offensive. *Id.* at 147. Johnson did, however, factor Ms. Valles-Hall's interaction with Kost in this regard negatively into her performance evaluation of Ms. Vales-Hall, but declined to make any reference to Kost's negative and disrespectful conduct in his evaluation. Johnson Dep. I at 149, 161;

    b.  *Jeremy Baird*.  Next, Johnson stated that Baird complained about Ms. Valles-Hall relative to an incident involving an African-American female volunteer, Carlottia Scott. Valles-Hall Dep. I at 119. Ms. Scott had been meeting in a conference room with Ms. Valles-Hall and Lisa Ransom, an African American employee. Ms. Scott left the conference room to use the restroom, and when she returned to Defendant's hallway, she was confronted in a hostile manner by Baird. Ms. Scott indicated, via letter addressed to Johnson (but forward to Ms. Valles-Hall for purposes of transmittal) that she was deeply racially offended by the incident. Johnson, despite having been approached by Kost about the incident (who conveyed that Ms. Ransom, who he supervises, was offended by the incident) as well as having received Ms. Scott's letter, did not even address the matter with Baird for some two months. Johnson never

disciplined Baird for the incident, nor did she instruct him to apologize. *See* Johnson Dep. I at 126-132; Baird Dep. at 21-34, attached hereto at Exhibit I; Kost Dep. I at 22-23.

At deposition, Johnson recanted and changed her story, now saying that Baird did not complain about Ms. Valles-Hall. Johnson Dep. I at 109. Baird also testified that he never had any complaints to any regarding any disrespect from Ms. Valles-Hall. Baird Dep. at 15. He further testified that she was respectful to him, never screamed or yelled at him, and never called him any names. *Id.* at 14-15.

    c.    *Susan Sanow.* From November 2003 through January 2005, Susan Sanow was a contractor who Defendant retained to work on the Washington Post Award. In March 2004, Ms. Valles-Hall had full responsibility for administering the award. Sanow, who created the award and managed it for ten years, sent Ms. Valles-Hall an e-mail in March 2004 criticizing her administration of the award. In so doing, Sanow stated "I know this e-mail is a bit negative, but I ask these questions out of concern and a commitment to this program." Ms. Valles-Hall responded to the e-mail by addressing each of the several points, and also stating that Sanow's e-mail was unnecessarily negative. Johnson informed Ms. Valles-Hall that Sanow complained that the e-mail Ms. Valles-Hall sent in response to Sanow's e-mail criticizing her work was unnecessarily harsh. Valles-Hall Dep. I at 122. Sanow testified, however, that she was *not* offended by Ms. Valles-Hall's response. Sanow Dep. at 34-35, attached hereto at Exhibit J. She also acknowledged that portions of her e-mail criticizing Ms. Valles-Hall were, in fact, "negative." *See* Sanow Dep. at 34. Nonetheless, Johnson refused at deposition, despite Ms. Valles-Hall and Sanow's perception that portions of Sanow's e-mail were negative, to acknowledge as much. *See* Johnson Dep. I at 204. However, when asked about Ms. Valles-Hall's written response to Sanow's e-mail and specifically what language therein was "angry and defensive," Johnson stated that three words in the entire document, "and unnecessarily so," were confrontational. *Id.* at 206.

    d.    *Barbara Mendoza.*    Barbara Mendoza is Defendant's office

manager. Defendant alleges that Ms. Valles-Hall called Mendoza "unprofessional," and that this "run-in" was instigated by Plaintiff's "confrontational approach." *See* Def. Br. at 5. At deposition, however, Ms. Valles-Hall unequivocally stated "I never called Barbara unprofessional." Valles-Hall Dep. I p. 31. Furthermore, Johnson, after discussing the alleged incident with Mendoza, said that she did not think it—meaning the alleged incident—was a problem. *See* Johnson Dep. I at 136. In fact, Johnson did not even discuss the matter with Ms. Valles-Hall. *See* Johnson Dep. I at 134. Johnson did not think that Mendoza's allegations, which are refuted on the record, were a problem until after her meeting with Ms. Valles-Hall in which Ms. Valles-Hall lodged a formal complaint of discrimination with Johnson. *See id.* Ultimately, despite Defendant's claims to the contrary Ms. Valles-Hall did not call Mendoza unprofessional. Furthermore, Mendoza was not penalized in her performance evaluation for any negative interaction with Ms. Valles-Hall. *See* Mendoza Personnel Review Form, attached hereto at Exhibit ___, filed under seal.[1]

      e.    *Betsy Johnson*. After discussing several false complaints with Ms. Valles-Hall, Johnson revealed the basis of her stereotyping and hostility toward her when she stated, "[i]f making judgments about people and telling them is a cultural thing, then maybe we should tell the staff it's a cultural thing and they should buck up and take it." Valles-Hall Dep. Ex. 28. In light of this "cultural thing," which apparently was a problem from Johnson's perspective, Johnson suggested that Ms. Valles-Hall apologize to everyone she may have offended in person or by e-mail. Valles-Hall Dep. I at 125-126. She also told her that "she expected people to leave their shit at home." *Id.* at 113.

      7.    Ms. Valles-Hall logged her third formal complaint of discrimination on

---

[1] During the discovery, both parties reached an oral agreement to keep employee records confidential. Pursuant to that agreement, Mendoza and Kosts' evaluation forms will be filed under seal.

August 9, 2004 when she filed a discrimination charge with the District of Columbia Office of Human Rights alleging discrimination on the basis of race and national origin. *See* Valles-Hall Dep. p. 141.

8. Ms. Valles-Hall logged her fourth formal complaint of racial discrimination with Mary Ann de Barbieri, the Chairman of the CNA Board of Directors, on August 16, 2004. *See* Letter, dated August 16, 2004, attached hereto at Exhibit K. In an e-mail, Ms. Valles-Hall wrote:

> I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

*Id.*

9. In September 2004, Ms. Valles-Hall began to suffer from physical ailments caused by work-induced stress. *See* Valles-Hall Dep. I at p. 35-36. Later that month, she also began to see a licensed clinical social worker. *Id.* at 37. Naturally, Ms. Valles-Hall was required to miss some work to address her physical and mental ailments, which were caused by her work environment. *See id.*

10. On November 3, 2004, Johnson informed Ms. Valles-Hall, via letter, that (1) she was required to produce a doctor's note to prove that her sick leave was justified, and (2) that future absences would result in her termination. *See* Letter, dated November 3, 2004, attached hereto at Exhibit L. Johnson's letter was uncharacteristic, particularly as the office manager had never known of an instance in which an employee's job would be threatened for their use of sick leave. *See* Mendoza Dep. I at 25, attached hereto at Exhibit M.

11. By November 2004, de Barbieri had begun to investigate Ms. Valles-Hall's discrimination claim. In so doing, she determined that the following matters or allegations were irrelevant to Ms. Valles-Hall's complaint that race played an improper

role in her evaluation process, including Johnson's conclusion that she was to blame for the inter-office conflicts:

- de Barbieri determined that the conference room incident involving Kost, Billy Terry, Lisa Ransom, and Ms. Valles-Hall was irrelevant to her investigation.  de Barbieri Dep. at 48-49.

- de Barbieri did not investigate an African American female employee's observation that "[t]here is an issue with race," particularly in the concerns of minorities, i.e. "people of color" are ignored.  *Id.* at 100-101.

- Despite Ms. Valles-Hall's complaint that her performance evaluation was based on racial bias, de Barbieri never reviewed the performance evaluations of similarly situated white employees.  *Id.* at 110-111.

- de Barbieri never investigated the truthfulness of the complaints that allegedly were made against Ms. Valles-Hall.  *Id.* at 136-137.

12.     Ms. Valles-Hall's made one last complaint and expressed protected speech on February 11, 2005 when she attempted to resolve her disputes with Defendant at mediation session at the D.C. Office of Human Rights.  While the content of those discussions are confidential pursuant to an agreement that was executed by both parties, it is axiomatic, given the nature of Ms. Valles-Hall's discrimination charge, that the discrimination allegations were the subject of the mediation.

13.     Immediately after the mediation on February 11, 2006, Johnson instructed office personnel to: (1) deny her access to Defendant's office suit by deactivating her office key; (2) deny her access to the building in which Defendant's offices are located by instructing security to prohibit her entry and giving the same security personnel a picture of Plaintiff; (3) deny her access to the Defendant's voicemail system; and (4) deny her access to the Defendant's computer system.  *See* Baird Dep. at 38-41.  Barbara Mendoza testified that the foregoing acts were taken against Ms. Valles-Hall because, according to Johnson, "the mediation had gone badly and that she needed me to do

this." Mendoza Dep. II at 10.  Similarly, Susan Sanow stated that the action was taken, again, according to Johnson, because "Arminda became fairly angry and yelled at mediation." Sanow Dep. at 84.

    14.    *Miscellaneous Facts Relevant to Defendant's Pretext*

        a.  Defendant cannot produce any evidence that indicates that Ms. Valles-Hall's alleged misuse of compensatory time or withholding of corporate funds was either intentional or a problem prior to the initiation of this lawsuit.  Further, with regard to the "withholding of corporate funds," Ms. Valles-Hall has testified that:

> I discussed it with [Betsy], and she said 'It's not a big deal.'  She understood the circumstances.  It was absolutely a lapse in judgment but it was not – there was no – and I self-reported it.  I said, 'You know, I borrowed $10 to go get lunch.  I'll get it back tomorrow,' and I did, and I reported it.  The auditor noted that as well in the report.  I also talked to Mary Ann de Barbieri and explained the circumstances.  It was highly embarrassing to me that I had had that lapse of judgment.  It was not in any way intended to take from [the Defendant].

Valles-Hall Dep. I at 108.  There is no evidence any disciplinary action was taken or any counseling session regarding the matter ensued.  In fact, neither this incident nor the alleged and uncorroborated instance of Ms. Valles-Hall taking unauthorized compensatory time were referred to in any manner in Ms. Valles-Halls June 2004 performance evaluation.  *See* 2004 Evaluation.

        b.    With respect to publication of the Fall 2004 course catalog, neither Defendant nor any of its employees ever set a deadline for publication.  Johnson Dep. I at 212.  Furthermore, any perceived tardiness is reasonably excused by Defendant's unilateral decision to cut Ms. Valles-Hall's support staff in September 2004.  *See* Valles-Hall dep. at 166.

        c.    With respect to posting of the Spring 2005 course catalog, Ms. Valles-Hall repeatedly informed Johnson and Sanow that she was overloaded with work and could not continue to do other peoples' work.  Valles-Hall dep. I at 208-209.

She further informed them that the website responsibility fell within the job description of the newly-hired communications director. Sanow dep. at 61-62. Sanow, in fact, agreed that website responsibility was not in Ms. Valles-Hall's job description. *Id.* at 62. Ms. Valles-Hall also informed them that she did not have the technical expertise to comply with their demands. *Id.* at 63. Nonetheless, and despite Defendant's claims that Ms. Valles-Hall was insubordinate, she did, in fact, put the catalog information online. *Id.* at 64.

                                          Respectfully Submitted,

                                          _____/s/_____
                                          Donald M. Temple [407849]
                                          Dhamian A. Blue [488664]
                                          1229 15th Street, NW.
                                          Washington, DC 20005
                                          Phone No. (202) 628-1101
                                          Fax No.: (202) 628-1149
                                          *Counsel for Plaintiff*