## EXHIBIT LIST

Valles-Hall Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Valles-Hall Deposition II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

2003 Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Letter dated August 4, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

2004 Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

Johnson Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

Kost Deposition II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Kost Deposition I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H

Baird Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Sanow Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . J

Letter dated August 16, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K

Letter dated November 3, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . L

Mendoza Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M

de Barbari Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . N

# EXHIBIT A

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# ARMINDA VALLES-HALL

## CASE: ARMINDA VALLES-HALL v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** January 4, 2006
**Volume:** 1

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 29

1    Do I have all of those that you are
2  able to find?
3    A    That I am able to find, yes.
4    Q    I asked about communications between
5  you and other directors, officers, or employees of
6  CNA not otherwise requested above relating to your
7  claim of discrimination, and you say no such
8  documents are available?
9    A    That's correct.
10   Q    You're not aware of any?
11   A    That's correct.
12        What number are you on?
13   Q    I'm at the top of page 6. I just
14  finished number 25 and 26.
15        27, I asked for your Social Security
16  card, and you say it's not available?
17   A    Right.
18   Q    Is that because you didn't want to
19  produce it?
20   A    No. I don't have a copy of it.
21   Q    I've asked for your driver's license,
22  and I see that.

Page 30

1        I asked for documents supporting your
2  allegation in paragraph 3 of the Complaint that you
3  are, quote, a Mexican-American, closed quote.
4        You've given me, I believe, a birth
5  certificate?
6    A    That's correct.
7    Q    And I saw an e-mail from Betsy Johnson
8  to you on Cinco de Mayo?
9    A    Uh-huh. Yes.
10   Q    Anything else?
11   A    No.
12   Q    I understand that both of your parents
13  were born in Mexico?
14   A    That's correct.
15   Q    And you were born in the U.S.?
16   A    That's correct.
17   Q    Okay. I asked in number 30 for
18  documents supporting your allegation that CNA
19  allocated $1,000 to a particular conference even
20  though $20,000 had been approved.
21        I just haven't gotten this far. Did
22  you give me something on that?

Page 31

1    A    Yes.
2    Q    Have you given me everything you have
3  on that?
4    A    I believe so.
5    Q    All right. I take it from your
6  response to number 31 that you have no documents
7  supporting your allegation that CNA terminated an
8  African-American director because she was not a good
9  fit?
10   A    That's right.
11   Q    Okay. Who are you referring to there?
12   A    Lisa Ransom.
13   Q    Okay. I asked for documents supporting
14  your allegation that your July 2004 evaluation by
15  CNA was different from similarly-situated Caucasian
16  and/or gay managers, and your answer is no such
17  documents are available?
18   A    That's correct.
19   Q    Do you know how other employees of CNA
20  were evaluated in the 2004 evaluation cycle?
21   A    Only through Betsy Johnson's words.
22   Q    Okay. You haven't talked to any other

Page 32

1  employees --
2    A    No.
3    Q    -- about their evaluations?
4.   A    No.
5    Q    And you haven't seen their evaluations?
6    A    No, I have not.
7    Q    It's just whatever Betsy Johnson told
8  you?
9    A    That's correct.
10   Q    Okay. Do you know how raises were
11  handed out or not handed out to other employees at
12  CNA as of July 2004?
13   A    No, I don't.
14   Q    Okay. You got an $1,800 raise or a
15  $1,600 raise?
16   A    1,800.
17   Q    $1,800 raise?
18   A    (Witness nods head.)
19   Q    All right. You alleged in the
20  Complaint -- I'm looking at request number 34. You
21  alleged in the Complaint that there were some
22  financial irregularities with CNA's 403(b) plan?

SLR  REPORTING
(301) 340-0042

ARMINDA VALLES-HALL                     ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT               JANUARY 4, 2006

Page 33

1    A    (Witness nods head.)
2    Q    I asked for documents in that category,
3  and you said none are available.
4         Have you looked for any documents in
5  that category?
6    A    I don't have them.
7    Q    Are you aware of the existence of any
8  documents?
9    A    Yes.
10   Q    What would that be?  What was the
11  irregularity that you were referring to?
12   A    I was informed by a colleague that her
13  403(b) contributions were not being made on a timely
14  basis and that she complained about it twice and was
15  told that the organization was having cash flow
16  problems.
17   Q    Who was the colleague?
18   A    Karen Bailey, the health trust
19  accountant.
20   Q    And she complained -- to whom did she
21  complain?
22   A    To Betsy and to Barbara, I believe.

Page 34

1  Barbara Mendoza and Betsy Johnson.
2    Q    According to Karen, who was it who told
3  her that the organization was having cash flow
4  problems?
5    A    I believe it was Barbara Mendoza.
6    Q    Are you aware of any late deposits of
7  your 403(b) contributions?
8    A    No.
9    Q    Is it your contention that there were
10  some late deposits of your contributions?
11   A    I wasn't making contributions.
12   Q    So this didn't -- if there was
13  something going on, it didn't affect you?
14   A    No.
15   Q    All written complaints -- number 35,
16  all written complaints that you made concerning
17  financial impropriety, financial irregularities, and
18  so forth with respect to the 403(b) plan, and you
19  said see attached.
20        Did you produce anything in that
21  category?
22   A    I believe -- yes.  In communications

Page 35

1  with Mary Ann de Barbieri, my response to her draft
2  report of investigation includes a summary, in a
3  sense, of some of the things that we talked about,
4  and it includes that allegation.
5    Q    Okay.  Number 36, documents supporting
6  the allegation that you suffered mental anguish,
7  depression, loss of self-esteem, and so forth, and
8  you say see attached.
9         I did see -- it looked like a
10  transcript of invoices from a mental health
11  organization.
12   A    That's correct.
13   Q    Is there anything else?
14   A    I also was in physical therapy for four
15  months approximately, from September to December
16  and those records are being provided.
17   Q    Who was the health care provider for
18  the therapy?
19   A    Patriot Sports Medicine.
20   Q    Okay.  What is the connection between
21  your work at CNA and physical therapy, please?
22   A    The stress had caused a lot of neck and

Page 36

1  shoulder -- shoulder pain, and I was getting
2  headaches from the stress.
3    Q    Do you have any physician or other
4  health care worker who has told you that your
5  working conditions caused the pain in your
6  shoulders?
7    A    My primary care physician also saw me,
8  and he referred me to the physical therapy.
9    Q    Did he tell you that it was work
10  related?
11   A    I told him it was work related.
12   Q    Okay.  Did he agree with you?
13   A    Yes.
14   Q    What's his name or her name?
15   A    His -- the physician who saw me was
16  Dr. Upadhyay.
17   Q    Could you spell that for the reporter,
18  please?
19   A    I wish I could, but it is with the
20  medical office of Ambrish Gupta, A-m-b-r-i-s-h,
21  G-u-p-t-a.
22   Q    All right.  And say the gentleman's

9 (Pages 33 to 36)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 37

1 name again.
2      A     Dr. Upadhyay.
3      Q     Upadhyay beginning with a U?
4      A     Yes. He's since left the practice, but
5 I may have been seen by some of the other attending
6 physicians there as well.
7      Q     And he's the one who referred you to
8 the physical therapist?
9      A     I believe so.
10     Q     All right. When did you start seeing
11 the mental health practitioner?
12     A     I believe my first appointment was on
13 September the 27th of 2004.
14     Q     And how long did you continue seeing --
15 what was the -- what was the practitioner's name?
16     A     Her name is Alex Roth.
17     Q     Is she a psychiatrist?
18     A     She's a licensed clinical social
19 worker.
20     Q     Okay. How long did you continue seeing
21 Ms. Roth?
22     A     I still see Ms. Roth.

Page 38

1      Q     How often do you see her?
2      A     Weekly.
3      Q     And it's been weekly since September?
4      A     That's correct.
5      Q     September of '04?
6      A     That's correct.
7      Q     Are there any other issues other than
8 work-related issues that you and she have dealt
9 with?
10     A     Yes.
11     Q     So you see her for other reasons as
12 well?
13     A     Yes.
14     Q     When did you start with physical
15 therapy?
16     A     I believe it was September of 2004.
17     Q     All right. About the same time you
18 started the psychotherapy?
19     A     That's right.
20     Q     Number 37, all written complaints of
21 alleged discrimination made to CNA or any of its
22 officers, directors, or employees, and you see

Page 39

1 attached.
2            I take it I have all of those?
3      A     That's correct.
4      Q     All right.
5      A     That would be contained in the other
6 documents provided to Betsy Johnson and Mary Ann
7 de Barbieri.
8      Q     Are those the two people to whom you
9 made complaints?
10     A     That's correct.
11     Q     All right. I did see an e-mail to
12 Ms. Mendoza.
13     A     Oh, that is right.
14     Q     Okay.
15     A     I thought that was the process.
16     Q     And she, in turn, referred you to Betsy
17 Johnson?
18     A     That's correct.
19     Q     And because the complaint was related
20 to Betsy Johnson, she, in turn, referred you to Mary
21 Ann de Barbieri; is that right?
22     A     That's correct.

Page 40

1      Q     Were there any subsequent complaints?
2 You made a complaint to Ms. de Barbieri in August of
3 2004, I'm recalling; is that right?
4      A     That's correct.
5      Q     All right. That started the process
6 and you objected to the process and so forth, but
7 were there any other complaints of discrimination
8 that you made to CNA or anyone involved in CNA?
9      A     I don't believe so.
10     Q     All right. I've asked you for
11 documents regarding your claim for attorney's fees
12 in this case, and you say see attached.
13           I didn't see anything there.
14     A     Uh-huh.
15     Q     Are you --
16     A     My bank is researching getting a copy
17 of the checks for me.
18     Q     So you've made payments to Mr. Temple's
19 firm in connection with that?
20     A     That's correct.
21     Q     Are you on an hourly basis with
22 Mr. Temple?

10 (Pages 37 to 40)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 81

1  the outcome of this one.
2      Q    All right. Going back to issue
3  number 1, which concludes at the top of page 3,
4  you've typed it in bold: To effectively manage and
5  delegate to Lee, it is essential that any requests
6  for his time be cleared and routed through me,
7  closed quote.
8          Did Betsy agree to do that?
9      A    She did.
10     Q    Okay. So other than the fact that
11 Susan Sanow would now be in charge of the award, the
12 concerns expressed in your memo were addressed?
13     A    This wasn't about changing the
14 management of The Washington Post award. This was
15 about a discussion of extending professional --
16 standard professional courtesies to me, and that's
17 what we discussed. I wasn't vying for her to change
18 management. I was trying to understand why she
19 hadn't discussed it with me and why it was handled
20 in a way that hurt me reputationally.
21     Q    She responded to that by explaining why
22 the decision which she characterized as a business

Page 82

1  decision was made, did she not?
2      A    Yes.
3      Q    The concerns that you either expressed
4  here or that are implicit in Exhibit 10, in your
5  view, do they arise out of any discriminatory intent
6  on the part of Ms. Johnson?
7      A    Yes, I believe they do.
8      Q    Okay. Now, a few moments ago, we
9  talked about Susan Sanow taking over the Post award
10 and your being removed from responsibility for that,
11 and you told me that it was retaliation for your
12 close association with Ms. Ransom, and now you're
13 telling me that some of those same issues arise out
14 of discrimination.
15         What happened between April 7 and
16 May 11 to make you believe that Ms. Johnson was
17 motivated by discriminatory intent?
18     A    The actions directed at Lisa were
19 discriminatory. My close association with Lisa
20 resulted in her retaliating against me. My working
21 relationship with Lisa resulted in her retaliation.
22     Q    Had you complained to anyone about

Page 83

1  discrimination against Lisa as of, let's say,
2  May 11, 2004?
3      A    Yes.
4      Q    To whom?
5      A    To Tim Kime.
6      Q    Who was he?
7      A    He was the vice chair of the board of
8  directors.
9      Q    When did you complain to Tim Kime?
10     A    On April the 8th, 2004 and again on
11 April 9th.
12     Q    Did you complain in writing?
13     A    No.
14     Q    How did you complain?
15     A    I called him and I spoke to him in
16 person.
17     Q    On two separate occasions?
18     A    That's correct.
19     Q    How long did those conversations last?
20     A    The phone call was about 15 minutes.
21 The meeting was about an hour and a half.
22     Q    All right. So on April 8th, you

Page 84

1  called, and on April 9th, you met with him in
2  person?
3      A    Yes.
4      Q    What did you say to him about the
5  treatment of Lisa that you perceived as
6  discriminatory?
7      A    I told him that there was -- that Lisa
8  was being treated in a discriminatory way and that I
9  was in the cross hairs of that.
10     Q    Because of your association with her?
11     A    That's correct.
12     Q    And what did he say?
13     A    He invited me to lunch. We had lunch
14 together on the 9th, and I told him how things had
15 been transpiring.
16     Q    All right. And what was his reaction?
17     A    He listened closely. He asked me what
18 I wanted him to do about it, and I said I didn't
19 know.
20     Q    Did he do anything about it to your
21 knowledge?
22     A    No.

21 (Pages 81 to 84)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 85

1    Q    Did he take notes?
2    A    No.
3    Q    Was he then the executive director of
4  Leadership Washington?
5    A    Yes.
6    Q    That's where you previously worked?
7    A    That's correct.
8    Q    Okay. The phone call was on April 8,
9  and the meeting was on April 9, the luncheon
10  meeting?
11    A    That's correct.
12    Q    And the decision to replace you as
13  being in charge of the Post award was made on
14  April 7 or earlier?
15    A    I learned of it on April 7th.
16    Q    So obviously the decision was made then
17  or earlier?
18    A    (Witness nods head.)
19    Q    Yes?
20    A    Yes.
21    Q    So that decision could not have been in
22  retaliation for your complaint to Tim Kime; is that

Page 86

1  right?
2    A    Right.
3    Q    Had you made any earlier complaints
4  about what you perceived as discriminatory treatment
5  directed at Lisa?
6    A    No. Well, no. I'm sorry, yes.
7    Q    Tell me about that.
8    A    I spoke to Betsy about an incident with
9  a faculty member, Billy Terry, who Lisa and I were
10  trying to recruit to teach a course on advocacy.
11  And the behavior directed at the faculty member --
12  the prospective faculty member, Lisa, and me by Jeff
13  Kost was highly disrespectful, and it was done in
14  the presence of the faculty member, and I did report
15  that to Betsy Johnson.
16    Q    When was that?
17    A    The date was early February -- I think
18  the 9th -- of 2004.
19    Q    Describe for me the behavior of
20  Mr. Kost which you viewed as disrespectful. Was
21  that your word?
22    A    Yes.

Page 87

1    Q    Okay. Describe that behavior for me,
2  please.
3    A    He interrupted our meeting because we
4  were -- well, we were using one of the two halves of
5  the conference room. I had arranged -- I had
6  reserved that conference room for my meeting with
7  Mr. Terry and Lisa Ransom. Mr. Terry was using the
8  white boards to outline what he would teach during
9  the advocacy course.
10          About 30 minutes before -- 25 minutes
11  before we were to vacate the space, because one of
12  Jeff's -- one of the groups with which he's
13  affiliated, the Association of Fund-Raising
14  Professionals, had also reserved that same space
15  following our meeting. I'm not sure if it was 2:30
16  to 3:00 or 3:00 to 3:30, but we were -- let's say we
17  had the room until 3:30.
18          At about 3:05, if that's the right time
19  frame -- I don't remember that specifically --
20  Barbara Mendoza came to the conference room and
21  interrupted our meeting and said that some of the
22  AFP members had started to arrive, and she was

Page 88

1  wondering if, you know, I had gotten the times
2  wrong.
3          I went to check my computer calendar
4  where I kept meeting room reservations and informed
5  her that they didn't have the space until 3:30, for
6  another 25 minutes, and she left. I told her to let
7  them wait in the lobby, and she left.
8          Approximately five minutes later, Jeff
9  Kost stormed into the room, didn't knock --
10    Q    When you say stormed, tell me what you
11  mean.
12    A    Didn't knock, didn't -- the door was
13  closed, and he didn't knock, didn't say excuse me,
14  and just launched into the situation. "I have
15  people waiting, and they are waiting in the lobby."
16          And I said, "Well, Jeff, they don't
17  have the room until 3:30."
18          And he said, "Well, what do you want me
19  to do, make them wait?" And he raised his voice at
20  me in the presence of Ms. Ransom, in the presence of
21  Billy Terry, and then he stormed out of the room.
22  He turned on his heel and walked out. He was

22 (Pages 85 to 88)

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 89

1   clearly very upset.
2           It was shocking to me that he treated
3   us that way. It was embarrassing. The trainer was
4   very annoyed by it. He was surprised and shocked to
5   be witnessing it. I was embarrassed that he
6   witnessed it. This was his first contact with the
7   Center for Nonprofit Learning & Leadership, the
8   education program. So that's what happened.
9       Q   Do you attribute Mr. Kost's behavior to
10  discrimination?
11      A   I think so.
12      Q   And why do you make that attribution?
13      A   I think so. I never saw him deal with
14  white colleagues in that kind of fashion. Mr. Terry
15  was a black man, Lisa is a black woman, and I'm a
16  woman of color. I'm a Mexican woman.
17      Q   Have you ever seen him behave
18  differently under the same factual circumstances
19  where Caucasians are involved?
20      A   No.
21      Q   So you don't have anything to compare
22  it to?

Page 90

1       A   No.
2       Q   Okay. You worked with Beth Schaffer
3   and Ellen Toups --
4       A   I believe it's Toups.
5       Q   -- on some workshops?
6       A   That's correct.
7       Q   Your workshops are evaluated, I take
8   it? You do an evaluation of them afterwards?
9       A   Generally, yes.
10      Q   What's the format of the evaluation?
11  How does that work?
12      A   An on-line evaluation is sent post the
13  meeting.
14      Q   So you encourage attendees to submit an
15  evaluation?
16      A   That's correct.
17      Q   How is the evaluation scaled?
18      A   I don't remember now. I believe it was
19  a 1 through 5 scale.
20      Q   Which is the best, 1 or 5?
21      A   5.
22      Q   Is that similar to the personnel

Page 91

1   evaluation, 1 through 5 with 5 being the best?
2       A   Yes.
3       Q   Let me ask you to take a look, please,
4   at Exhibit 11.
5           MR. TEMPLE: After this -- we've been
6   going about an hour and a half -- can we take a
7   little break?
8           MR. FLEISCHER: Sure. Let's do this,
9   and then we'll be done.
10          BY MR. FLEISCHER:
11      Q   Can you tell me what that is, please?
12      A   This is an e-mail to Beth Schaffer and
13  Ellen Toups titled Positive Feedback dated
14  August 27th, 2003 from me to Beth and Ellen Toups
15  regarding, it looks like, courses -- two courses
16  they had presented.
17      Q   All right. I'm reading, I guess, the
18  second sentence: The overall rating for both
19  workshops averaged 4 on a scale of 1 to 5 with 5
20  being the highest rating. Good marks!
21  Congratulations!
22          Is that what you wrote them?

Page 92

1       A   Yes. The -- yes.
2           MR. FLEISCHER: Okay. Do you want to
3   take a break?
4           MR. TEMPLE: Yes.
5           (Recess from 12:05-12:14.)
6           BY MR. FLEISCHER:
7       Q   The conference room that you described
8   with Mr. Kost, that was in February of 2004; is that
9   right?
10      A   Yes.
11      Q   What grew out of that, if anything?
12  Did you speak to Jeff about that? Did you speak to
13  anybody else about that?
14      A   Yes and yes.
15      Q   All right.
16      A   The next day, I went to Jeff's office
17  and I ruminated about how to ask the question,
18  because I didn't want anything to be exacerbated.
19  My question was very open ended, very general. I
20  just asked him what happened yesterday, and he was
21  very hostile still, very hostile. He wouldn't look
22  me in the eyes. He wouldn't look at me, and he said

23 (Pages 89 to 92)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 105

1      Her complaint was that sometimes the
2  coffeepots get left in the conference room. So when
3  the caterers come to pick up their coffeepots,
4  someone has to let them into the room. And I said,
5  "Well, that's an easy one to solve. What we can do
6  after a meeting is simply take it into our kitchen,
7  which is an open area, allowing the catering folks
8  to just go straight into our kitchen area and take
9  the pots." That was it. That was it. There was no
10  animosity about it.
11      I just said, "In the future, just come
12  to me. I mean, this one is an easy one to solve.
13  There's no need to get upset about it." Barbara
14  did, though, get upset. She started quivering a
15  little bit and walked away.
16      I saw her in the hallway coming from
17  the bathroom later that day, and I said, "Is
18  everything okay with us," and she started crying.
19  She started crying. And I said, "What's going on,"
20  because I knew it had nothing to do with our
21  conversation, and it didn't.
22      She started complaining about the

Page 106

1  executive director, and she started complaining
2  about Lisa to me. She started complaining about
3  Lisa. And I said, "What is it about Lisa?"
4      And she said, "She thinks her job is
5  more important than mine."
6      And I said, "You know, what do you base
7  that on?"
8      And she said, "She's always talking
9  about the people that she meets with."
10  Lisa by virtue of being a public policy
11  person does meet with elected officials and others
12  that hold, you know, offices and stuff. And I said
13  to Barbara, "You know, Barbara, when Lisa mentions
14  that to me, I don't think that she's necessarily --
15  that she's in any way putting -- lording her
16  position over mine, because that's just her job, and
17  you shouldn't either."
18      And then she continued crying about
19  Betsy and how Betsy mistreated her, and I said, "You
20  know, it sounds like we or you might need --"
21  because at this point, I was not into this issue. I
22  wasn't into Betsy and Barbara's -- I mean, Barbara's

Page 107

1  issue, whatever that was. So I suggested that if
2  she wanted to get a facilitator, I would be happy to
3  try to find one for her, but she never approached me
4  about getting one.
5      Q    When did that take place?
6      A    Sometime in the winter of 2004. I
7  don't know the date.
8      Q    Okay.
9      A    I don't know the month.
10      Q    Winter 2004 being December 2004 or
11  January 2004?
12      A    I don't know. I don't know.
13      Q    Okay.
14      A    Sometime in that time frame, that two-
15  or three-month time frame of winter.
16      Q    Winter 2003-2004? Do you see what I
17  mean?
18      A    Oh, I'm sorry, yes, '03 to '04.
19      Q    Is Barbara Mendoza a Latino?
20      A    No. She married a Latino.
21      Q    Do you recall an incident in January or
22  February of 2004 in which you were criticized for

Page 108

1  failing to make timely deposits of workshop
2  receipts?
3      A    Yes.
4      Q    Who criticized you?
5      A    It was for Betsy, I believe, and it
6  was -- yes, Betsy.
7      Q    Was that justified?
8      A    Yes.
9      Q    All right. In that same incident, were
10  you criticized for borrowing from cash receipts for
11  your personal needs?
12      A    Yes.
13      Q    Did you do that?
14      A    I did.
15      Q    Are you aware that CNA got a so-called
16  management letter on account of those incidents?
17      A    Yes. Betsy told me that.
18      Q    Okay.
19      A    I discussed it with her, and she said,
20  "It's not a big deal." She understood the
21  circumstances.
22      It was absolutely a lapse of judgment,

27 (Pages 105 to 108)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 113

1  She said that she expected people to leave their
2  shit at home. She was offensive. She was hostile.
3      Q    What other abusive language did she
4  use?
5      A    I would have to look at my notes. I
6  believe there's another -- another term she may have
7  used.
8      Q    Was it --
9      A    I took extensive notes.
10     Q    Was it racially demeaning or --
11     A    Oh, yes. On July 7th and 8th in that
12  evaluation, she told me that I needed to swallow
13  inflammatory remarks, that that is what a good
14  leader would do.
15     Q    Tell me why that's racially
16  discriminatory.
17     A    She told me that my -- that 13 of 14
18  people had complained about me when I -- and I'm
19  getting to your answer. She told me that 13 of 14
20  people had complained about me. I was incredulous.
21  I actually said to her -- I repeated it. I said,
22  "You're telling me that 13 of 14 people have

Page 114

1  complained about me? Is that what you're telling me
2  today?"
3          She said, "Yes."
4          And I said, "Tell me who, when, and
5  what was said, because this is the first time I am
6  hearing of anything -- anything related to
7  complaints about me."
8      Q    Okay. And tell me --
9      A    And --
10     Q    Sorry.
11     A    If I may finish?
12     Q    Sure.
13     A    And she went on -- I went on, and I
14  said, "I need details. I need to know exactly."
15  And I also asked her, "Who is the 14th person who
16  didn't complain about me?"
17          And she said, "Lee Mason," the one
18  person I supervised.
19          And I said, "Then tell me exactly what
20  everyone has said."
21          "I'm not going to get into that. I
22  don't remember specifics."

Page 115

1          I said, "But you're basing my
2  evaluation on these impressions that you have and
3  these so-called complaints that you've received? I
4  want to know what they are. I want to know who
5  complained about me." And she would not get into
6  specifics.
7          After I repeatedly hammered for
8  specifics, she finally said that the five people
9  were Jeff Kost, Jeremy Baird, Susan Sanow, Barbara
10  Mendoza, and Betsy.
11         And I said, "Tell me what each of those
12  people said."
13         With Jeff Kost, she said -- she
14  referred to the incident with the -- with the
15  conference room door -- with the conference room
16  door and with the trainer, Billy Terry, and me not
17  giving up the space. Betsy said, "I guess you
18  needed to make a point, didn't you, by staying in
19  that room? And I guess you made whatever point you
20  needed to make."
21         I reminded her that she apologized for
22  his behavior when I raised it. Somehow, she had

Page 116

1  forgotten that.
2          And then --
3      Q    Let me interrupt you for a second.
4      A    I still have more to say about that,
5  sir.
6      Q    I know you do, but let me interrupt.
7      A    I have a lot more to say about that.
8      Q    I understand you do, but let me
9  interrupt you for a second. We're here today
10  because you've accused CNA of discrimination, and
11  that's what I'm interested in.
12     A    And I'm getting there.
13     Q    If you disagree with Betsy, if you
14  think she's a miserable old goat, that's fine, but
15  that has nothing to do with what we're here about.
16         What I'm interested in is
17  discrimination. So if you could focus on that, I
18  would welcome it.
19         MR. TEMPLE: Wait a minute. If you're
20  not satisfied with her answer because she doesn't
21  show you that it's discrimination, then that's a
22  different issue, but she can respond. It may not be

29 (Pages 113 to 116)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 117

1  to either of our satisfaction, but it is what it is.
2        MR. FLEISCHER: Fine.
3        MR. TEMPLE: If it doesn't meet the
4  threshold, then I'm sure we can anticipate a motion
5  at some point.
6        MR. FLEISCHER: Okay.
7        MR. TEMPLE: But I think that the
8  questions have to be pointed in the direction of
9  what you want.
10       MR. FLEISCHER: Okay. Well, I'm going
11  to let her finish.
12       MR. TEMPLE: What was the question?
13       (Whereupon, the reporter read back.)
14       BY MR. FLEISCHER:
15   Q    Let me just say, I'm going to let you
16  go as long as you want --
17   A    Good.
18   Q    -- but I'm inviting you to focus on
19  discrimination, because, in my view, that's why
20  we're here today.
21   A    That's why we're here.
22   Q    Go ahead.

Page 118

1   A    So --
2        MR. TEMPLE: Actually, let me just say
3  for the record that I thought she was answering the
4  question.
5        MR. FLEISCHER: Perhaps she was.
6        BY MR. FLEISCHER:
7   Q    Go right ahead.
8   A    And as I indicated to you, I will get
9  to all of that.
10   Q    Okay.
11   A    So Jeff Kost, who is white and gay,
12  right, behaves against -- behaves in a
13  disrespectful, unprofessional way with me, and I try
14  to deal with it constructively. I go to my boss, I
15  follow the appropriate channels, and I get blasted
16  for it in my evaluation. I get blasted for it. She
17  tells me I get blasted for it. That's not right.
18  That's not right. So that's phantom complaint
19  number one.
20        The second one related to Jeremy
21  Baird. Betsy actually said that I called him a
22  racist. I said, "I did not call him a racist."

Page 119

1        And she -- her response was, "But you
2  think he is, don't you," and tried to goad me into
3  saying that I think Jeremy Baird is a racist.
4  Jeremy is white. Jeremy is gay. I told her I had
5  never had a cross word with Jeremy. She told me
6  that Jeremy felt I should have done more for him
7  with the Carlottia Scott incident, which we haven't
8  explored.
9        Carlottia Scott was another prospective
10  faculty member that Lisa Ransom and I were bringing
11  in to teach a course on advocacy, a black woman with
12  long twists down her back. She comes into our
13  office, we were meeting in the conference room, I
14  excuse myself to get something for her, and Lisa
15  also had to leave the conference room area to do
16  something for Carlottia, who was even contemplating
17  membership for some of the nonprofits with which
18  she's associated, WCA membership.
19        Carlottia excuses herself to go out the
20  side door to go to the ladies' room and doesn't
21  realize that she's locked herself out of the
22  conference room. So she goes to the front desk as

Page 120

1  she had previously and says, "I was meeting with
2  Arminda and Lisa. May I go back to the conference
3  room?"
4        She gets stopped halfway down the
5  hallway by Jeremy Baird, who deals with her as if
6  she's some kind of a criminal. Rather than asking
7  how may I help you, the question is lodged at her,
8  "What are you doing here?"
9        And she -- Carlottia Scott was deeply
10  and highly offended by it. She said that this was
11  supposed to be friendly territory, and she's treated
12  this way for what reason? For what reason? Why was
13  she treated like that, one of my faculty members?
14  Why was she treated that way? There's no
15  explanation. So she's treated that way, and there's
16  no explanation or no justification for treating a
17  visitor like that.
18        Betsy says, "Well, Jeremy is very
19  concerned about security issues. He cares about
20  security issues and no one else does."
21        Absolutely false. That's just
22  ridiculous. That's a justification for behavior

30 (Pages 117 to 120)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 121

1  that should not have been tolerated -- should not
2  have been tolerated.
3         I wasn't Jeremy's supervisor. I never
4  discussed it with Jeremy. I just brought it to the
5  attention of Betsy, and I provided -- I forwarded
6  the e-mail complaint letter that Carlottia Scott
7  sent to Betsy along with contact information for
8  Carlottia Scott.
9         Upon receiving that e-mail, Betsy's
10 question to me was, "Who wrote this?"
11        And I said, "Carlottia Scott."
12        "Let me see the original."
13        I said, "Well, I forwarded it to you."
14 And I explained to her that Carlottia had put a
15 funky yellow background on the e-mail she had sent
16 me, that the complaint letter was an attachment.
17 And rather than forward the e-mail with that funky
18 background, which would have attached to my e-mail,
19 which, you know, would not have looked so good, I
20 just copied the attachment and sent it to her.
21        Well, Betsy followed me down the
22 hallway like I was some criminal to retrieve that

Page 122

1  e-mail. And I stopped her in the hallway, and I
2  said, "You don't know me very well, but I am not
3  without integrity. I did not alter that letter, I
4  did not change it in any way, and I resent your
5  following me down the hallway like a criminal." So
6  that was complaint number two, Jeremy Baird.
7         Complaint number three, I supposedly
8  called Barbara Mendoza unprofessional. I never
9  called Barbara unprofessional. I asked Betsy for
10 specifics. I said, "You're telling me Barbara said
11 I called her unprofessional?"
12        "I believe she did. I believe she
13 did."
14        That's what my evaluation was based on,
15 Betsy's belief that Barbara said that?
16        The fourth one was Susan Sanow and
17 her -- that, quote, Susan thought you were harsh in
18 your response to her. Harsh? Susan's very own
19 March 23rd e-mail admits that I know this is a bit
20 negative.
21        She was harsh. She didn't have to deal
22 with me that way. My response was tempered. I

Page 123

1  wrote a very collegial letter back to her, and I
2  said, "Yes, your tone is negative and unnecessarily
3  so. I too care about The Washington Post award
4  project and I made some significant improvements to
5  it which you noted in our first meeting."
6         So for me to get criticized and that be
7  the fourth complaint of the thirteen phantom
8  complaints was really offensive. Again, Susan is
9  white, Barbara is white, everybody is white. Their
10 words are believed against me because I'm not. I'm
11 neither gay and I'm neither white, and I'm not
12 white.
13        The fifth one was Betsy herself. I
14 guess she had to come up with something. She said
15 that every time I come to her, I come in an
16 offensive tone and that I just come to complain.
17        Absolutely false. I have come to her
18 with issues, I've come to her with good news, I send
19 her project reports of how the center's attendance
20 was increasing and how ratings were for our
21 sessions. I had -- I had been communicating with
22 her in the fashion that she said she wanted.

Page 124

1         When I was hired -- when I was
2  interviewed, rather, she said, "I don't need to know
3  all the details. I expect people to come in here
4  and do their job and do a good job," and that's what
5  I was doing. That's what I was doing. I was
6  playing by her rules. She said that's the kind of
7  manager she was. All of a sudden, I was being told
8  that all I do is complain. Absolutely false.
9         She cited the May 11th meeting with her
10 in which I raised concerns. Those are legitimate
11 concerns. If I'm responsible for managing someone's
12 time and responsibilities and he is getting
13 assignments from people without them being filtered
14 through me, that makes it difficult for me to manage
15 his time and responsibilities. All I was asking for
16 were basic professional courtesies extended to me.
17        Then she said that I called people
18 names, and I asked her to tell me what those names
19 were. She said that I called people unprofessional
20 and that if my behavior -- alleged behavior, because
21 I never did any of that, was cultural in nature as a
22 Mexican woman, that she should just tell the staff

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 125

1  that it was cultural in nature and that they should
2  buck up and take -- and take it.
3          How offensive is that to imply that
4  because I'm a Mexican woman I would be operating in
5  such a fashion? That's disgraceful. It's
6  disgraceful the way she treated me, someone who was
7  performing -- performing on every level that they
8  were demanding of me and producing massive
9  quantities of work.
10     Q    Why don't you take a minute. ·
11     A    I took pride in my work. I take pride
12  in my work. I care about my reputation. Betsy
13  said, "Take this with a grain of salt," her abuse,
14  her comments, her allegations that I was
15  inflammatory, that I should swallow inflammatory
16  remarks because that's what a good leader would do.
17  No, I won't do that. I won't allow myself to be
18  abused.
19          And she told me I should go and
20  apologize to everyone either in person or by e-mail,
21  everyone I've offended, but that I shouldn't say
22  Betsy told me you said this and it isn't true,

Page 126

1  because that wouldn't be productive.
2          It wouldn't be productive because it's
3  not true. None of those people -- those were not
4  legitimate allegations that she was making. She was
5  making them up as she went along. She was making
6  them up as she went along. It was subjective, it
7  was arbitrary, it was racist, it was demeaning, it
8  was humiliating, and it set the course for all the
9  mental pain that I've been through with that
10  organization. It was the worst emotional
11  experience of my life and the one in which I worked
12  the damn hardest.
13          It is unfathomable to me that this kind
14  of behavior was allowed. I told -- I reported all
15  of this in detail to de Barbieri. I reported
16  everything to her that was happening to me, and I
17  told her why it was happening to me. She
18  sanctioned -- Betsy Johnson's legal actions, she
19  sanctioned it. This board is just as culpable as
20  Betsy for this behavior.
21     Q    I'm asking you about the interview --
22  about the evaluation. I haven't asked you about

Page 127

1  that yet.
2          You made reference to Betsy using the
3  term cultural thing or something like that.
4          Did she say anything else during the
5  July 7 and July 8 meetings which you took as a
6  reference to race or color?
7     A    Her actions said it.
8     Q    Okay.
9     A    Her disrespectful tone, the way she
10  believed every other person's opinion -- or not
11  even -- I don't even think they were legitimate
12  complaints. I mean, she just made this stuff up.
13     Q    I understand that.
14     A    But even if they -- that's what did it.
15     Q    I understand that.
16          What I'm looking for is any words she
17  used which were racial in nature or related to
18  sexual orientation.
19     A    It was very clear to me what she meant
20  when she said cultural.
21     Q    Okay.
22     A    That's clear to anybody, so no.

Page 128

1     Q    Did she use anything else?
2     A    No.
3     Q    Did Ms. Johnson -- I'm looking at
4  line H, pledges to get work done in allotted time.
5          Did she say anything about the
6  timeliness of your work?
7     A    She -- this was related to my having
8  pulled a 24-hour day to ensure that the HSC
9  conference, the conference in Prince George's
10  County, happened as scheduled. We had some computer
11  glitches at the last minute, and I had to work
12  through the night to make sure that that was done.
13          She criticized me for that rather than
14  saying, you know, under the circumstances, you did a
15  great job. You know, you did what you needed to do
16  to make sure that that event went off without a
17  hitch the next morning. No. I got criticized for
18  that. That's what that related to, and I didn't
19  pledge anything. She wrote that. I believe I
20  worked -- my work habits were exemplary. I worked
21  hard, I worked efficiently, and I produced good
22  quality.

32 (Pages 125 to 128)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 129

1    Q    You got a raise at that meeting, did
2  you not?
3    A    Yes.
4    Q    What, if anything, did Ms. Johnson tell
5  you about the raise?
6    A    That she was giving me a 3 percent
7  raise. She also told me if I corrected these
8  deficiencies, I would get a good evaluation next
9  year.
10   Q    Do you know how any other employees got
11  evaluated in July of 2004?
12   A    I don't know what's on their paper, no.
13   Q    Have you talked to any other employees
14  about their evaluations?
15   A    I conducted one, so I know what his
16  says.
17   Q    Who is that?
18   A    Lee Mason.
19   Q    Did you evaluate Lee?
20   A    I did.
21   Q    Okay. How about anybody else at CNA?
22  Do you know what their evaluations were?

Page 130

1    A    No.
2    Q    Do you know whether they got raises?
3    A    I don't.
4         MR. FLEISCHER: Would this be a good
5  time to break for lunch?
6         MR. TEMPLE: I think so.
7         (Whereupon, at 12:58 p.m., the
8         deposition in the above-entitled matter
9         was temporarily recessed to reconvene
10        at 2:00 p.m. this same day.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 131

1         A F T E R N O O N   S E S S I O N
2              (2:10 p.m.)
3         BY MR. FLEISCHER:
4    Q    Let's look at Exhibit 14. If you can,
5  tell me what that is, please.
6         (Discussion off the record.)
7         THE WITNESS: This is my August 4th,
8  2004 e-mail or memo, rather, to Betsy Johnson
9  regarding my July 2004 evaluation.
10        BY MR. FLEISCHER:
11   Q    I take it the handwritten notes are
12  Ms. Johnson's and not yours?
13   A    That's correct, except for my
14  initialing.
15   Q    Okay. Well, I won't ask you about her
16  notes then. I'll just ask you about what you wrote.
17        Let me start with the second paragraph,
18  the second sentence: Quote, I am concerned that the
19  basis of all scores rated less than 5 on my most
20  recent evaluation were based on biased subjective
21  impressions and on false and completely unfounded
22  and undocumented charges discussed for the first

Page 132

1  time in my evaluation, closed quote.
2         We had a lengthy discussion this
3  morning about that very topic, and my question is:
4  Is there anything more you can tell me about that
5  that you haven't already told me?
6    A    Yes.
7    Q    Okay. Then please do.
8    A    These phantom charges were the basis
9  for my continued -- for the continued hostility
10  directed at me by Betsy Johnson as we moved through
11  month and month and month until I departed on
12  February the 14th.
13   Q    Okay. Let me back up and make my
14  question just a little clearer. I'm speaking now of
15  August 4 when you wrote this, and really my question
16  is intended -- was intended to be, are there any
17  more facts or information you can give me to support
18  the statement that I just quoted?
19   A    Yes. The treatment that people of
20  color, whether visitors or staff, received at the
21  WCA set up a cast system, if you will, where the
22  stereotypes, the discrimination, their impressions

SLR  REPORTING
(301) 340-0042

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                  JANUARY 4, 2006

Page 141

1    A    I don't recall.
2    Q    You didn't leave it at that? You did
3  more, did you not?
4    A    Yes.
5    Q    Tell me what you did.
6    A    I filed a complaint with the Office of
7  Human Rights in the District of Columbia.
8    Q    And that was filed on August 9?
9    A    I believe that's the correct date.
10   Q    Did you do anything more internally?
11   A    I e-mailed Barbara Mendoza requesting a
12 formal investigation. I believed Barbara to be the
13 person handling personnel issues and was told that
14 that had to go directly to Mary Ann de Barbieri, so
15 I e-mailed her with a formal request for
16 investigation.
17   Q    Is this a copy of your e-mail to Mary
18 Ann (indicating)?
19   A    Yes.
20   Q    And what response did you get from Mary
21 Ann?
22   A    She acknowledged receipt and said she

Page 142

1  wanted to meet.
2    Q    She acknowledged receipt the next day,
3  did she not?
4    A    I don't know.
5    Q    Okay. Look at 16, please.
6    A    Yes, she did.
7    Q    16 is a copy of her response?
8    A    That's correct.
9    Q    And then when did she get back to you
10 and tell you that she wanted to meet with you?
11   A    I don't remember.
12   Q    Would you look at Exhibit 17, please?
13   A    It's not dated.
14   Q    All right. Do you see an e-mail from
15 her to you on the bottom half of that page and then
16 an e-mail from you to her?
17   A    That's correct.
18   Q    And the e-mail from you to her is dated
19 August 26th?
20   A    That's correct.
21   Q    All right. So her e-mail to you was on
22 that date or earlier; is that right?

Page 143

1    A    That's correct.
2    Q    Okay. Tell me, did a meeting take
3  place?
4    A    Yes.
5    Q    When was the meeting?
6    A    October 19th.
7    Q    I've reviewed the e-mail exchange
8  between you and her, and I've got it here and we can
9  look at it, but certainly I come away with the
10 impression that you resisted a meeting with her.
11       Is that a fair impression?
12   A    No.
13   Q    Were you anxious to meet with her?
14   A    Yes.
15   Q    I'm looking at your response dated the
16 17th. Quote, given the seriousness of the matter, I
17 do not feel comfortable meeting with you alone.
18       Why did you say that?
19   A    Because of her position as the board
20 chair and her friendship with Betsy Johnson.
21   Q    Who else did you want in the meeting?
22   A    Possibly my lawyer.

Page 144

1    Q    Up until that point, had Mary Ann said
2  or done anything that you're aware of which would
3  lead you to believe she harbored racist feelings?
4    A    No.
5    Q    Has she said or done anything which
6  would lead you to believe that she -- when I say
7  racist, I'm talking both national origin and color.
8        Did you mean it that way in your
9  response?
10   A    Yes.
11   Q    Okay. Up until that point, had she
12 said or done anything which would lead you to
13 believe that she harbored biased feelings against
14 heterosexuals?
15   A    No.
16   Q    Did Ms. de Barbieri respond to your
17 concern about learning what the rules and procedures
18 would be?
19   A    Yes, she did.
20   Q    Okay. Look at Exhibit 18, please.
21   A    Uh-huh.
22   Q    Is this a copy of an e-mail you

36 (Pages 141 to 144)

ARMINDA VALLES-HALL                              ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                  JANUARY 4, 2006

Page 165

```
1    A    Yes.
2    Q    Go ahead.  Go ahead.
3    A    The way things happened with Lee are as
4  follow: He -- after Lisa Ransom was fired in June,
5  he was offered her position even though he has no
6  substantive public policy background.  Lee's areas
7  of expertise are in program, not public policy, and
8  they -- his -- any experience he might have would
9  absolutely pale by leaps and bounds to what Lisa
10  Ransom brought to the table in terms of public
11  policy.
12    Q    Okay.  That was a promotion for him?
13    A    That was a promotion.
14    Q    To a directorship position?
15    A    That's correct.
16    Q    And he's a black male?
17    A    Yes, that's correct.
18    Q    Okay.  Go ahead.
19    A    He initially refused the job citing his
20  own lack of public policy experience.  He's not
21  qualified for the job, but it didn't matter.  He's a
22  black man, and they need a black face, and so they
```

Page 166

```
1  offered him the job, and he turned it down.
2         Then they threatened funding staffing
3  for the center.  I was told the board was
4  considering cutting the staffing.  I mentioned that
5  to Lee because I knew he had responsibilities as a
6  father with kids in college.  His actions -- rather,
7  he discussed this information with Betsy, and then
8  he was hired as the public policy director in
9  September, I believe, of 2004.
10         I was told and he was told subsequently
11  that effective October, he would only be supporting
12  education efforts 50 percent of the time.  Mind you,
13  we had 75 or so workshops in the works that had to
14  be managed.  They had already been planned, and I
15  was going to have to manage them alone.  And what
16  that entails is not just planning the workshops but
17  getting them executed, working with the trainers,
18  setting up the rooms, ordering whatever I needed to
19  make those courses happen, conducting post-event
20  evaluations.  It was a tremendous load.  It was a
21  tremendous load.
22         At the same time, all that summer, we
```

Page 167

```
1  had been talking about the sustainability plan that
2  Lee and I had developed in concert and at the
3  direction of a board member who had asked to meet
4  with us about just that subject.  They asked for
5  that meeting in a public setting, in a board
6  meeting, to develop a sustainability plan so the
7  center could be a self-sustaining project of the --
8  of the WCA eventually.
9    Q    Had the center ever made money?
10    A    No.
11    Q    Had it always lost money?
12    A    It lost money from its inception.
13  There was no funding provided for it, or very
14  limited funding.  There was no budget developed for
15  the center until I developed one.  I got a program
16  that had no budget.  I had to -- I had to do that,
17  and I did it six months after I got there
18  approximately.  That was the first budget this
19  center had.  It was launched in March of 2003, one
20  month before I arrived.
21         I was told and Lee was told -- I told
22  him -- that the board had -- Betsy had represented
```

Page 168

```
1  to me that the board was willing to fund the
2  center's operations even at a deficit for three
3  years.  We weren't going to wait three years to try
4  to make it sustainable.  It was clear the
5  organization was not raising money for it -- any
6  substantial amount of money for it.
7         We were -- Lee and I were securing
8  resources to the best ability that we could in terms
9  of in-kind contributions to the center.  Over the
10  course of the time that I worked there, those
11  resources totaled approximately $250,000 in faculty
12  time alone.
13         We didn't pay our faculty generally.
14  We recruited them to teach on a pro bono basis for
15  sometimes courses that were full-day workshops.
16  Hiring those people as consultants and paying them
17  what they would ordinarily charge is how we arrived
18  at that $250,000 mark over the course of the two
19  years -- approximately two years that I managed that
20  center, but we couldn't exist on in-kind
21  contributions alone.  We needed real resources
22  directed at the center.
```

42 (Pages 165 to 168)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 205

1    Q    I'm looking at Exhibit 33, and it
2  starts off: I reiterate I submitted all of the text
3  needed for a full catalog on December 17th, and the
4  last phrase is bolded.
5         What were you responding to?
6    A    To Rick's Friday, January the 7th
7  e-mail.
8    Q    All right. I suppose this is a little
9  out of context, and maybe you can help me with the
10  context. Was he complaining that something wasn't
11  done or wasn't complete or something?
12    A    Yes. They were putting the delay in
13  processing -- in producing the hard-copy catalog on
14  me as if I had not produced what was required to
15  produce a full catalog as scheduled on
16  December 17th.
17    Q    Okay. And that submission on
18  December 17th, Exhibit 31 that we looked at, that
19  was all the designer needed in order to go ahead and
20  move forward with the catalog?
21    A    To my understanding, yes, in terms of
22  what I was producing for it.

Page 206

1    Q    Okay. Who else had responsibility?
2    A    Subsequent to this, Rick was --
3  submitted some additional stuff for the catalog.
4    Q    Okay. But as far as you're concerned,
5  you did everything you were required to do --
6    A    And more.
7    Q    -- and more to get the catalog moving?
8    A    Betsy and I agreed that December 17th
9  would be the deadline, not the 14th as stated by
10  Rick, and that all I was required to do was to
11  produce 40. I produced complete information on 55,
12  I believe, and Betsy and I had discussed that
13  anything that was not finalized by the date of
14  December 17th could be eliminated.
15    Q    Okay. If you would look at 34 and 34A,
16  please.
17    A    (Witness complies.)
18    Q    All right. Let me ask you about 34.
19  Is this an e-mail with the attachment that you got
20  from Susan Sanow on or about January 13th?
21    A    Yes.
22    Q    Am I correct in understanding that

Page 207

1  Susan had just returned full time as director of
2  programs?
3    A    Yes.
4    Q    You and she and Betsy had a meeting on
5  January 5 at which a variety of things were
6  discussed.
7         Tell me what was discussed at the
8  meeting.
9    A    I don't remember everything that was
10  discussed, but these items here were among them.
11    Q    Okay. So Susan has correctly
12  identified the topics, if not the substance, of the
13  discussion; is that fair to say?
14    A    She has identified some topics. I
15  don't know if it's a comprehensive list of topics.
16    Q    All right. And then some 12 days
17  later -- 11 days or whatever that is, 12 days
18  later -- she sends you an e-mail with a summary of
19  her version of what was discussed at the meeting?
20    A    Yes.
21    Q    All right. Looking at paragraph
22  number 4 of Susan's summary, about two-thirds into

Page 208

1  that paragraph --
2         MR. TEMPLE:  That's Exhibit 34, right?
3         MR. FLEISCHER:  That's Exhibit 34, yes,
4  and it's the second page of that exhibit, Bates 335.
5         BY MR. FLEISCHER:
6    Q    -- quote, Arminda must take
7  responsibility for adding course information to that
8  website ensuring access to registration for spring
9  2005 classes, closed quote.
10         If I understood your earlier testimony,
11  that's not what happened at the meeting?
12    A    That's exactly right.
13    Q    Okay. Tell me what happened at the
14  meeting with regard to web-posting responsibility.
15    A    I informed Betsy and Susan that I was
16  not willing to do other people's work anymore, that
17  I was overloaded.
18    Q    Had somebody asked you at the meeting
19  to do it?
20    A    Yes.
21    Q    So who asked you at the meeting to do
22  it?

52 (Pages 205 to 208)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 209

1    A    Betsy and Susan.
2    Q    And you responded that that's somebody
3  else's job, not mine?
4    A    That I could not continue to do other
5  people's work and that -- I could not continue to do
6  other people's work. And Betsy ultimately took on
7  responsibility for getting those courses on-line.
8    Q    Okay. So the way it was left after
9  they told you that you had to do it and you said not
10  my job, Betsy said, okay, I'll figure it out?
11    A    I didn't say not my job. I said that I
12  couldn't continue to do other people's work.
13    Q    I didn't mean to put words in your
14  mouth. I was --
15    A    Yeah.
16    Q    Okay. And Betsy then said she would
17  take care of it?
18    A    She got very upset and yelled that she
19  would do it, raised her voice.
20    Q    Upset at you?
21    A    Presumably.
22    Q    Okay. So that was your understanding

Page 210

1  of how the matter got left --
2    A    That's correct.
3    Q    -- was that Betsy would take
4  responsibility for getting it done?
5    A    That's correct.
6    Q    And then you get this e-mail, and it
7  says -- all of a sudden, it's back on your plate?
8    A    That's exactly right.
9    Q    All right. Look at the next exhibit,
10  please, 34A.
11    A    (Witness complies.)
12    Q    Can you tell me what this is, please?
13    A    It's a January 14 e-mail to Betsy
14  CC'ing Susan regarding -- written in response to
15  Susan's January 5th meeting notes.
16    Q    One of the issues you raise in your
17  e-mail concerns whether or not they would go
18  forward -- CNA would go forward with a faith-based
19  CEDC program.
20         What's CEDC?
21    A    Community Economic Development
22  Corporation.

Page 211

1    Q    Okay. You had made tentative plans for
2  such a workshop?
3    A    Yes.
4    Q    And Susan and Betsy disagreed that CNA
5  should do that?
6    A    That's right.
7    Q    Did you see that decision as rooted in
8  discrimination against you?
9    A    I saw it as a continuing pattern of
10  undermining any authority I had for decision making
11  and raised issues for them to consider as to my
12  rationale for thinking this was a good program and
13  one that would be well-received by the community.
14         It had membership opportunities. It
15  had -- it was outreach opportunities to a new market
16  that we hadn't been tapping. It was a win all the
17  way around, and I had support from the faith-based
18  community to do it. I had avenues to the
19  faith-based community to make that happen, and so I
20  explained to them my reasons for it.
21         This memo, however, is more about my
22  concern about the growing collective badgering I was

Page 212

1  under, the lies that were being perpetrated, the
2  lies that were being -- the lies that were being --
3  that were the recharacterizations and the
4  mischaracterizations of conversations I was having
5  with them.
6         One can't operate when you're, you
7  know, stepping on shifting sands, and that's exactly
8  what this was. There was no steady ground. We had
9  conversations and came to conclusions that were
10  thrown out the window whenever they wanted them
11  thrown out the window, that were made to cast me in
12  a bad light, that were made to undermine my
13  authority further, that were made to further an
14  already hostile environment I was under that forced
15  me to spend significant hours of additional time
16  beyond what I was already doing to accomplish all of
17  the work I had on my plate, with no staff support
18  mind you, in responding to those
19  mischaracterizations to those lies.
20    Q    All I asked you about was this point
21  about the faith-based workshop. They were pretty
22  clear at the meeting that they didn't want to do it;

53 (Pages 209 to 212)

SLR  REPORTING
(301) 340-0042

# EXHIBIT B

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# ARMINDA VALLES-HALL

## CASE: ARMINDA VALLES-HALL v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** February 16, 2006
**Volume:** II

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

ARMINDA VALLES-HALL                          ARMINDA VALLES-L
vs. CENTER FOR NONPROFIT ADVANCEMENT              February 16, 20

---

Page 283

1    A. That would be a reference to Betsy
2  Johnson.
3    Q. Betsy Johnson, okay. In other words,
4  BJ is not going to be in a great mood if neither
5  Gretchen nor her have had the ability to check on
6  their newly built property; worse, if they have
7  learned from their northern neighbors that their new
8  retirement investment sustained some damaged. I
9  don't wish anything bad on anyone, but when I saw
10 the news this afternoon, Betsy did cross my mind
11 along with, quote, God don't like ugly, closed
12 quote, closed quote.
13    What is she talking about?
14    A. I think it's self-explanatory.
15 Massachusetts apparently had a big snow fall. And
16 Betsy and her partner Gretchen had built a house in
17 Massachusetts. She's also referring to Betsy's
18 behavior toward me. That's with the God don't like
19 ugly is.
20    I mean, Betsy's behavior towards me
21 was reprehensible, disgraceful and illegal, I
22 believe. And it was a reference to her horrible --

---

Page 284

1  that particular reference, God don't like ugly, was
2  a reference to that despicable behavior that she
3  lodged at me.
4    Q. And God is punishing her by perhaps
5  damaging her new home in Massachusetts? Is that the
6  idea?
7    A. Oh, God, no. No. I don't think
8  that's -- she writes there, I don't wish bad on
9  anyone.
10    Q. But God does is the implication?
11    A. I'm not going to get into a religious
12 conversation about an interpretation of this. It's
13 a very common phrase.
14    Q. Let me turn to the mediation that took
15 place on February 11 of 2005 before the Office of
16 Human Rights.
17    I think your testimony in the previous
18 session was that earlier that same day, you sent
19 yourself a number of e-mails. You sent them from
20 the office to your home e-mail address; is that
21 correct?
22    A. That's correct.

---

Page 285

1    Q. In fact, we've looked at many of them
2  here this morning.
3    You previously testified that you did
4  it because you didn't trust Ms. Johnson.
5    A. That's right.
6    Q. My question is, why did you choose
7  that day to send those e-mails?
8    A. Because the mediation was happening
9  and I had no idea how she would respond to it. And
10 I wanted to be certain that I had a complete record,
11 as complete as possible, of my contributions to the
12 WCA, so that I would be able to support what I had
13 done for that organization and the extensive quality
14 and quantity of work that I produced on behalf of
15 WCA.
16    It was clear to me that Betsy would
17 never fully credit me for my many contributions.
18 And that's based on the way that she minimized my
19 contributions to the organization and to the
20 negative evaluation that I had received.
21    Q. The answer to my question is you chose
22 that day because the mediation was occurring that

---

Page 286

1  day?
2    A. That's right.
3    Q. And you didn't know what the outcome
4  of the mediation would be?
5    A. I forwarded documents to my home on
6  various occasions, not just that day. But certainly
7  I did on that day as well.
8    Q. You then attempted to gain access to
9  the office on Saturday, February 12. Why?
10    A. I believe I left my backpack in the
11 office when I left the office on -- I had left
12 something in the office. I'm not sure what it was
13 when I went to the mediation hearing. And I was
14 expecting to come back to the office. But it went
15 until about 4:15 or so, and I didn't go back to the
16 office. So I went to retrieve whatever I had left.
17 My husband was with me.
18    Q. Had you on prior occasions gone to the
19 office on a Saturday?
20    A. Oh, absolutely.
21    Q. On prior occasions had your husband
22 accompanied you to the office on a Saturday?

---

17 (Pages 283 to 286)

# EXHIBIT C

WCA PERSONNEL REVIEW FORM

Employee  Armenda Valles-Hall          Date  6/26/03

| Rating | Degree | Description |
|---|---|---|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance in competition to others for advancement. |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Personal Attributes | | | | | | |
| A) Attitude | Positive outlook, constructive ideas, works well with others. | | | | | ✓ |
| B) Initiative | Seeks out and accepts responsibility. | | | | | ✓ |
| C) Open Mindedness | Open to new ideas, methods and situations. | | | | | ✓ |
| D) Inter-personal Communication | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. | | | | | ✓ |
| E) Self Confidence | Confident of own ability; acts decisively. | | | | | ✓ |
| F) Assertiveness | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. | | | | | ✓ |
| Job Skills | | | | | | |
| G) Job-Knowledge | Knows own job well and how it relates to the organization. new | | | | | |
| H) Work Habits | Dependable, orderly, uses time effectively. | | | | | ✓ |
| I) Quality/Quantity | Does complete job, maintaining quality and proper balance between various facets of the job. | | | | | ✓ |
| Managerial Skills | | | | | | |
| J) Planning | Plans realistically, short and longer range. Able to set priorities and meet goals. | | | | | |
| K) DecisionMaking | Identifies true problems, alternatives and understands their impact on the problem. | | | | ✗ | |
| L) Leadership | Makes things happen through people, in good times and bad. Respected by others. | | | | ✗ | |
| M) Motivating | Gives of self; strives to set a climate which is conducive to the growth of others. | ✓ | | | | |

Is the employee marginal in his/her present position?  ( )YES  (✓)NO

Additional Comments/ Recommendations: Although only two months on job, taking over very well.
Raise to $60,000

Supervisors Signature  Tom Johnson

# EXHIBIT D

*got a 16% raise for 6 weeks work*

TO      :    Betsy Johnson
              Executive Director

FROM :       Arminda Valles-Hall
              Director, Center for Nonprofit Learning & Leadership

RE      :    July 2004 Evaluation

DATE :       August 4, 2004

This memo is in response to my most recent evaluation conducted on July 7-8, 2004. I am requesting a correction of my evaluation and a corresponding retroactive adjustment of salary commensurate with the quality and quantity of my work and contributions to the Washington Council of Agencies.

*6 weeks*

The evaluation is markedly different from my first evaluation in June 2003 in which I received excellent marks (all 5's) in all categories in which I was evaluated. I am concerned that the basis of all scores rated less than 5 on my most recent evaluation were based on biased subjective impressions and on false and completely unfounded and undocumented charges discussed for the first time in my evaluation.

*no firm*
*irregular*
*no Board*
*Calling no going to training, members*

*why*

I believe I am not being treated equitably and that I am being evaluated differently and more critically than my colleagues and peers. As a result, I have suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard.

*to board members*
*5% is ceiling*

I believe my style of communication is viewed unfortunately as aggressive and "inflammatory." These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive.

I would like to resolve my concern about my evaluation and put this issue behind us so that I may continue to focus undistractedly on my primary responsibility of bringing high-quality and affordable professional and organizational development training to the nonprofit community and best serve this center.

I am available to discuss my concerns and reach an equitable solution at your convenience.

→ *regular, weekly meetings scheduled*
*where is Ideas to Dialogue?*
*why 2 months to get fall catalog in place*
*outside work/participation should be discussed*
*with me first (- what benefit is it to*
*WCA?*

DEFENDANT'S DE
EXHIBIT

# EXHIBIT E

# WCA PERSONNEL REVIEW FORM

Employee _Arminda Vulles Hall_   Date _7/7/04_

| Rating | Degree | Description |
|---|---|---|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above-average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance; conspicuous by her achievements. |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Personal Attributes A) Attitude | Positive outlook, constructive ideas, works well with others. Comments: _responds with subteams for / reminders sometimes positive outlook sometimes constructive_ | | | ✓ | | |
| B) Initiative | Seeks out and accepts responsibility. Comments: _ideas_ | | | | ✓ | |
| C) Open Mindedness | Open to new ideas, methods and situations. Comments: _from certain people but not others_ | | | ✓ | | |
| D) Inter-personal Communication | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. Comments: _good with outsiders, needs work in staff_ | | | ✓ | | |
| E) Self Confidence | Confident of own ability; acts decisively. Comments: | | | | ✓ | |
| F) Assertiveness | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. Comments: _in conflicts in the office reactions need work_ | | | ✓ | | |
| Job Skills G) Job-Knowledge | Knows own job well and how it relates to the organization. Comments: | | | | ✓ | |
| H) Work Habits | Dependable, orderly, uses time effectively. Comments: _pledges to get work done in allotted time_ | | | ✓ | | |
| I) Quality/Quantity | Does complete job, maintaining quality and proper balance between various facets of the job. Comments: _extremely good with participants_ | | | | ✓ | |
| Managerial Skills J) Planning | Plans realistically, short and longer range. Able to set priorities and meet goals. Comments: | | | | ✓ | |
| K) DecisionMaking | Identifies true problems, alternatives and understands their impact on the problem. Comments: | | | | | ✓ |
| L) Leadership | Makes things happen through people, in good times and bad. Respected by others. Comments: | | | | ✓ | |
| M) Motivating | Gives of self; strives to set a climate which is conducive to the growth of others. Comments: _supervising bee_ | | | | | ✓ |

Is the employee marginal in his/her present position?   ( )YES   (✗)NO

Additional Comments/ Recommendations: _Arminda is very good with customers/consumers/people outside WCA. You need to work harder at solving problems with colleagues and refrain from telling them your judgement of them. raise to 61,800_



Apx. 110

EXHIBIT

Supervisors Signature _____

# EXHIBIT F

1

```
 1 WASHINGTON, D. C.

 2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 3 _____X

 4 ARMINDA VELLES-HALL,        :

 5                             : Civil Action No.

 6         Plaintiff       : 05-7238

 7 vs.                            :

 8 CENTER FOR NONPROFIT ADVANCEMENT,:

 9         Defendant.            :

10 _____:

11                               X

12              Thursday, January 12, 2006

13              Washington, D. C. 20005

14    The deposition of, BETTY JOHNSON, witness, was called

15 for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 10:00

20 o'clock a.m.,  when were present on behalf of the

21 respective parties:

22

23
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

Page 34

1 the year?
2    A    No.
3    Q    How do you know at a particular
4 point in a year, whether a particular employee has
5 achieved certain benchmarks in terms of the performance
6 goals and objectives?
7    A    Well, the dash board will measure
8 those things and the work plan will say these are the
9 things that have to be done periodically and I will go
10 back to the work plan and see what is on there.
11    Q    That is what I asked, though.  It
12 would seem to me that in order to evaluate a person, you
13 would have to look at where that person is in terms of
14 what they are doing relative to your planning process.
15    So you would have to look at the work plan and
16 the dash boards to see?
17    A    Yes, I generally know where they
18 are.
19    Q    How is that?
20    A    Because they tell me.  And
21 because I don't sit in my office with my door closed.
22    Q    Relative to the board, does the
23 board want to know about employees' performances?

Page 35

1    A    Not generally, no.
2    Q    Does the board have a particular
3 interest in Arminda's performance?
4    A    No.
5    Q    Did you prepare any written
6 reports to the board regarding Arminda's performance?
7    A    No.
8    Q    Is the board generally involved
9 in termination of employees?
10    A    Not generally.
11    Q    Is the executive committee
12 involved in the termination --
13    A    Not generally.
14    Q    -- of employees?
15    A    If I could go back for a minute.
16 The board is interested in the performance of the
17 organization.
18    Q    Uh, huh.
19    A    So they are interested in whether
20 or not membership is dropping.  They are interested in
21 whether participation in the health trust is dropping or
22 increasing.
23    And they -- the other thing is that they are

Page 36

1 very concerned about the education program because it was
2 not funded by any outside source.
3    Q    Let's talk about that.  When you
4 talk about the education program, explain that to me?
5    A    One of the things that we do is
6 education and training.  That takes the form primarily,
7 but not entirely of training work shops.  That was not a
8 function that we did as a major function until the
9 support center went out of business in 2001.  And then
10 we took it on as a major program.
11    And we knew it would not make money at first.
12 So the board authorized the use of the organization's
13 reserve funds to develop that program with the idea that
14 it would eventually make money.  Or that it would move
15 towards being more self sufficient.
16    Q    Through what vehicle?
17    A    We did not know initially, but the
18 major vehicle would have been the fees that work shop
19 participants pay.
20    Q    Ultimately -- let me go back to
21 this education and training workshops and the financing
22 of that.  The money then had to come out of your own
23 budget?

Page 37

1    A    That is correct.
2    Q    What was the nature of the
3 programs that will be sponsored under this auspice, this
4 education program auspice?  Who would be these -- let me
5 strike that.
6    The beneficiary of these programs or the
7 audience of these programs would be your member
8 organizations?
9    A    And other non profits.
10    Q    Who was responsible for doing
11 these programs?
12    MR. FLEISCHER:  When?
13    BY MR. TEMPLE:
14    Q    Let's talk about the period 2002
15 through 2004.
16    A    I have to say I am not entirely
17 sure what you mean.
18    Q    You just told me that the board
19 was interested in the education programs?
20    A    We had a staff person.
21    Q    Uh, huh.
22    A    Who was the person on staff who
23 was supposed to organize and see to it that these

Page 42

```
 1  sustaining?
 2     A        Initially, they felt it should be
 3  self sustaining after 3 years.
 4     Q        That is 3 years from what point?
 5     A        Probably 2002.
 6     Q        So it should be self sustaining
 7  by 2005?
 8     A        Right.
 9     Q        Was there a particular plan that
10  the board adopted which would achieve the education
11  programs becoming self sustaining?
12     A        No.  It was our job to, the
13  staff's job to develop that plan.
14     Q        Did the staff develop a plan to
15  achieve a self sustaining education program?
16     A        Between 2002 and 2005, no.
17     Q        It seems there was a
18  disconnection, there was no plan in place by the staff?
19  Is that right.
20     A        Right.
21     Q        Why was there no plan in place?
22     A        The staff did not prepare a plan.
23     Q        Did you direct the staff to
```

Page 43

```
 1  prepare a plan?
 2     A        Yes.  I believe I did.
 3     Q        In writing?
 4     A        No.  Thought I believe -- I don't
 5  know.  It may have been part of the job description.
 6     Q        Did you have meetings with the
 7  staff to discuss the preparation of a plan?
 8     A        Probably not.
 9     Q        Who on your staff is responsible
10  for fund raising?
11     A        Jeff Kost.
12     Q        What specifically in terms of
13  what specific types of fund raising does he do?
14     A        His responsibility lies in
15  foundation fund raising, and sponsorships, which we
16  subsequently found were -- would be more useful with the
17  education plan.
18     Q        Sponsorships such as?
19     A        M&T Bank, for instance, sponsored
20  the financial track.  No, I am sorry.  It was an
21  accounting firm that sponsored the financial track.
22     Q        I don't understand.
23     A        It would be a series of work
```

Page 44

```
 1  shops about financial management and we would ask a
 2  business if they would contribute up I believe to $2500
 3  maybe more, to sponsor the track and their name would go
 4  in there; every financial management work shop would say
 5  sponsored by.
 6     Q        Wicovia Bank, et cetera, et
 7  cetera?
 8     A        Right.
 9     Q        Was anybody other than Jeff Kost
10  responsible for fund raising?
11     A        In general, no.  My self.
12     Q        Were any other programs other
13  than the Education Program required to secure outside
14  financing?
15     A        If I may answer that in this way:
16  Other programs do not have sources of income.   They
17  don't have their own revenue.  For instance, membership
18  has membership dues.   The news letter has advertising.
19  Advocacy has no stream of income.   Education has a
20  minimal stream of income.
21     Q        Help me understand the
22  distinction you make between Advocacy and Education in
23  terms of programming if any?
```

Page 45

```
 1     A        Okay.  Education is about the
 2  different sort of educational needs that non profits may
 3  have.  They may not know how to deal with their board of
 4  directors.  They may not know how to keep a budget.
 5  They may not know how to manage staff.   And so we would
 6  have workshops that would help them with different
 7  aspects of all of those issues.
 8        There are a number of other issues.  Advocacy is
 9  a separate program entirely.   Advocacy is about helping
10  the members get access to public officials to policy
11  makers, not just public officials; to policy makers  and
12  also helping them make their case to policy makers
13  locally.
14     Q        And so if I recall, the advocacy
15  objective is one of your stated objectives of the
16  organization?
17     A        Yes.
18     Q        Would Education be on the same
19  level as an objective?
20     A        Yes.
21     Q        Back to fund raising:  Did you
22  ever sit down with Jeff Kost as executive director and
23  say Jeff, I need a plan to ensure financial viability of
```

1  with him?
2    A    No.
3    Q    How do you know?
4    A    I suppose he told me.
5    Q    So she told you that she did not
6  know Jeff Kost?
7    A    She did not come to me and say
8  Betsy, I don't know Jeff.
9    Q    My question is she told you that
10  she did not know Jeff Kost or anything about him prior to
11  him coming to work for you?
12    A    She did not tell me that prior to,
13  but prior to, she never said anything about him.  No,
14  she did not know him.
15    Q    When Mr. Freedman, Michael
16  Freedman complained about Arminda, did that affect your
17  view of her management of the Washington Post Award
18  assignment?
19    A    Not substantially.
20    Q    What does that mean; less than not
21  substantially?  I mean did it affect you in any way?
22    A    I always pay attention to any
23  complaint.

1    Q    So it did not substantially affect
2  it, but did it affect the fact that you thought that
3  based upon that, that she was not doing what she should
4  have been doing?
5    A    No, not just based on that
6  complaint; no.
7    Q    Was it based upon that and Susan's
8  complaint that she thought she was not doing what she was
9  supposed to be doing?
10    A    Susan's complaint was more
11  substantial.
12    Q    Susan's complaint was about her
13  distribution of information concerning 2 committee
14  members?
15    A    On a timely basis.
16    Q    Was it only one particular
17  incident of untimeliness or more?
18    A    As far as I know.
19    Q    After you received Mr. Freedman's
20  and Ms. Sano's complaint, did you sit down with Arminda
21  and say Arminda, I am hearing some things and I would
22  like to know whether they are true?
23    A    No.

1    Q    So if somebody complains about an
2  employee, you just operate on the basis of the complaint
3  and act on that without having communication with the
4  employee to ascertain the validity of the complaint?
5    A    No.
6    Q    So why didn't you sit down with
7  Arminda?   You gave her the task in November to do this
8  job.  And Freedman said something and Susan said
9  something and you don't even have a conversation with
10  her?
11    A    I did not say anything when
12  Michael said something because he had been on the
13  committee for a long time and he was, I felt very used to
14  the way things work.  I also felt that there was a
15  possibility that there was a -- there were other ways to
16  run the committee and run the award than the way Susan
17  ran it.
18    Q    I am not badgering you.  I am
19  trying to understood something.  Michael could have been
20  on the committee for fifty years.  He could have been
21  president of the United States.  He said something to
22  you.  An employee had the right, would you not agree to
23  know if he or she is doing something wrong; wouldn't you

1  agree?
2    A    I am not sure I would agree.
3    Q    If an employee is doing something
4  how would an employee know in the performance of his or
5  her job that they are doing something wrong if you don't
6  say hey listen, you need to know that you are not doing
7  this right?
8    A    I don't really feel it is
9  important to rush to an employee the minute I have one
10  sour note about them.  I don't feel that is particularly
11  useful.
12    Q    Let's operate on that premise, you
13  have 2 sour notes and let me ask you, were they within
14  the same 30 to 60 day period?
15    A    I don't know.
16    Q    If you have 2 complaints about an
17  employee, on a project when was the culmination of the
18  Washington Post Award?  Was that in June?
19    A    Yes.
20    Q    It was 3 months, 90 days out.
21  You are saying based on your experience that you would
22  not sit down with an employee and say hey listen, this is
23  coming up, this is serious.  I have some concerns that