Page 106

1 have been raised by people, to try to get that employee
2 back on track relative to that particular objective?
3      A      You know what I would do is
4 difficult to say.   The situation was that Susan told
5 Arminda what needed to be done.
6      Q      But you told me earlier --
7      MR. FLEISCHER: Were you finished?  I am
8 sorry.
9      THE WITNESS: Yes.
10     BY MR. TEMPLE:
11     Q      She paused -- I presume that if
12 you paused, that you will be finished.  I don't want to
13 step on your answer.
14     You told me that Arminda did not report to
15 Susan, she reported to you; is that correct?
16     A      Susan was a consultant on the
17 project and she was a consultant because she knew how it
18 ran and what I did say was that I expected Susan to guide
19 Arminda so she would have consulted with Susan.  That
20 would have been my view of how it would have gone.
21     Q      But my question was am I correct
22 that you told me that Arminda was to report to you?
23     A      Yes.  I did tell you that.

Page 107

1      Q      Did you tell Arminda that -- did
2 Susan report to you about the Washington Post Award,
3 during the months of -- between November when Arminda
4 took over, through March when you took her off the
5 project?
6      A      She sent me an e-mail, yes.
7      Q      One e-mail?
8      A      Yes.  Her report to me was in the
9 form of e-mail.   Which was the same -- it was an
10 e-mail to Arminda, I believe, copied to me in which she
11 pointed out the things that should have been done or
12 needed to be done.
13     Q      Did Arminda correct the
14 deficiencies at that time?
15     A      I don't know.  My understanding is
16 that one of the deficiencies was that the applications
17 were not sent out -- were sent out several weeks later
18 than the initial date that had been set for their
19 mailing, which meant that the committee members had a lot
20 less time to read them; half as much time to read them.
21     Q      At that particular point in time
22 what were Arminda's specific duties and responsibilities
23 as of February 2004?

Page 108

1      A      She was to put on the educational
2 work shops, and she was to administer the Washington Post
3 Award for excellence and nonprofit management.
4      Q      The applications that you said
5 were sent out, several weeks late; did you say?
6      A      That is my understanding.
7      Q      Do you know why they were sent out
8 several weeks late?
9      A      I have no idea.
10     Q      To this day?
11     A      To this day I have no idea.
12     Q      Did you ever ask Arminda, Arminda,
13 why were they sent out several weeks late?
14     A      It was too late.
15     Q      You never asked her that?
16     A      No.  I did not ask her that, no.
17     Q      Do you know if they attributed it
18 at all in part to Susan that they were sent out 2 weeks
19 late?
20     A      I don't know -- have any knowledge
21 of whether that was the case.
22     Q      Did you factor --
23     Did you receive any complaints about Arminda

Page 109

1 electronically by e-mail?
2      A      I don't believe so.
3      Q      Did Jeremy Byrd ever complain to
4 you electronically about Arminda?
5      A      No.
6      Q      Did he ever explain to you about
7 Arminda?
8      A      I don't believe so.
9      Q      Did Jeff Kost ever communicate to
10 you electronically about her?
11     A      No.
12     Q      I am not saying did he complain.
13 I am saying did he communicate with you electronically
14 about Arminda?
15     A      No.
16     Q      You are certain of that?
17     A      I am fairly certain of that.
18     Q      Did he every complain to you about
19 Arminda?
20     A      Yes.
21     Q      In what form; was it written or
22 face-to-face?
23     A      Face-to-face.

Page 122

1  the conference room on a reservation basis; is that
2  correct?
3      A        Not entirely.  The conference
4  rooms purpose was to hold Educational workshops.
5      Q        Are you telling me that staff do
6  not reserve and did not reserve the conference room?
7      A        No.  I am not telling you that.
8      Q        But my question is the conference
9  room was used by your staff and they reserved that room
10 at given points in time; isn't that correct?
11     A        Yes.
12     Q        And this particular date, isn't it
13 true that Jeff Kost had reserved the room at a point in
14 time and that Arminda had reserved the room at a point in
15 time?
16     A        I don't have any knowledge that
17 Arminda had reserved the room.
18     Q        You have never known as of today,
19 that Arminda had reserved the room for the time that she
20 had met with Mr. Terry?
21     A        No.
22     Q        Would it make a difference to you
23 if you knew that Arminda had reserved that room during

Page 123

1  the time that she met with Mr. Terry and that Mr. Kost
2  wanted to use the room prior to the expiration of the
3  time which Mr. Terry and Arminda were meeting?
4      A        Ask me that question again.
5      Q        Let me try to be clearer.
6          Would it make a difference to you if Arminda was
7  using the room during the time that she reserved the use
8  of the room and Mr. Kost wanted to the use the room
9  before the expiration of that time?
10     A        Yes.
11     Q        And are you sensitive to the fact
12 that there are tensions sometimes between Black and White
13 people to how we deal with each other; White people deal
14 with Black people, Black people deal with White people?
15     A        Yes.  I am aware of that.
16     Q        And their sensitivities are often
17 times rooted in communication and how people talk to each
18 other?
19     A        Yes, I am aware of that.
20     Q        Do you know whether at any point
21 in time, if Mr. Terry was offended by the manner in which
22 this misunderstanding between Arminda and Jeff took
23 place?

Page 124

1      A        I don't have any knowledge of
2  that.
3      Q        Did you ever consider talking to
4  Mr. Terry about what happened?
5      A        No.  I did not think it was that
6  important.
7      Q        Mr. Terry is a volunteer and there
8  are hundreds of volunteers.  If Mr. Terry is giving his
9  time and he has an impression of your organization and if
10 a misunderstanding happens that could have offended him
11 and the offensive nature could have been based on race,
12 you would not consider that important?
13     A        Yes.  I would consider that
14 important.
15     Q        Did you not know that Mr. Terry
16 was offended by this incident?
17     A        No.  I did not know.
18     Q        What did Jeff tell you about the
19 conference room incident?
20     A        As far as I can remember, he told
21 me that she was meeting with someone in the conference
22 room and that he had scheduled it for a little bit later
23 like fifteen or 20 minutes later and that his -- I don't

Page 125

1  think he even told me his people had arrived.  He asked
2  her if he could get in early and she did not answer, but
3  she did not say yes.
4          And the next day she demanded an apology because
5  he had been rude to her; disrespectful.
6      Q        When he told you that, did you
7  talk to Arminda?
8      A        Yes.
9      Q        Did you call her into your
10 office?
11     A        I don't recall.
12     Q        You had a face-to-face meeting?
13     A        Yes.
14     Q        What happened during that
15 meeting?
16     A        I probably asked her what
17 happened from her point of view.  And suggested that it
18 was a misunderstanding that could get worked out.
19     Q        What did she tell you?
20     A        She told me, as much as I can
21 remember that she and Lisa were meeting with someone who
22 was a potential work shop provider.  And that Jeff had
23 stormed in and demanded to use the room and she may have

Multi-Page™

Page 126

1 then took it, arranged for it. The only time she said
2 anything to me about it after that was arranging
3 interviews with staff people, which she asked me to
4 arrange. And until she wrote her report, she and I had
5 no discussion about it.
6    Q        Did you think that Arminda thought
7 that she was being treat differently because of her race
8 and national origin?
9    A        No. At that time I would not
10 have thought that.
11   Q        Would you have had any reason to
12 mention that there was not a race issue at WCA in your
13 communications with her.
14       MR. FLEISCHER: There was or there was
15 not? I did not hear you.
16       BY MR. TEMPLE:
17   Q        There was not.
18   A        I am sorry. Say the question
19 again.
20   Q        Would you have had any reason to
21 tell her that you did not think it was a race issue, what
22 was happening to her was not racially related?
23   A        If she asked me, I would have said

Page 12

1 that. I don't recall.
2    Q        When did you first learn about
3 her complaint to D. C. Human Rights?
4    A        Would have been in December. We
5 had an annual meeting and it was, I believe it was
6 delivered to us the day of that annual meeting and I
7 could find that date, but off hand, I don't know. Early
8 in December is my recollection.
9    Q        What was your reaction to that?
10   A        I was sorry. I was surprised and
11 I was sorry.
12   Q        The only person than you talked to
13 about the termination of Arminda was Mary Ann deBarbieri?
14   A        Yes.
15   Q        You told her -- she concurred with
16 the decision?
17   A        I did not -- I did not ask her. I
18 may have said I think I am going to have to let her go.
19 I did not ask for her permission. I did not --
20   Q        When did you say that to Mary Ann
21 deBarbieri?
22   A        I would have said It to her, first
23 week in February or the 2nd week in February.

Page 128

1    Q        Why did you say that to her?
2    A        I thought that it was possible
3 that we would have to let Arminda go.
4    Q        Did you have a conversation with
5 her or did you just say that to her?
6    A        With Mary Ann?
7    Q        Yes.
8    A        I generally reported things to her
9 and so I really can not say whether it was a conversation
10 or just a report.
11   Q        Did she ask you any questions?
12   A        I don't recall.
13   Q        Do you remember whether it was in
14 the meeting or just walking down the hallway?
15   A        Probably in a phone conversation.
16   Q        Did she say okay?
17   A        I don't recall.
18   Q        Okay. And there was no other
19 correspondence exchanged between you and Ms. deBarbieri
20 at any point in January, February, 2005?
21   A        Regarding?
22   Q        I am sorry. Regarding Arminda.
23   A        Regarding her complaint?

Page 129

1 Regarding, um --
2    Q        Regarding her performance or lack
3 there of?
4    A        You have all of the e-mails that
5 are --
6    Q        Okay.
7    A        -- regard Arminda.
8    Q        Did she talk to you about her
9 investigation?
10   A        Did Mary Ann talk to me about her
11 investigation?
12   Q        Yes, ma'am.
13   A        She interviewed me after she
14 interviewed all the staff people and she asked me
15 questions and she gave me a copy of the, I believe, it
16 was the final report.
17   Q        Did you see the draft?
18   A        I can't -- I don't remember which
19 is the draft and which is not.
20   Q        How long did she interview you
21 for?
22   A        Me?
23   Q        Yes.

Page 130

1    A    For 45 minutes; I don't know.
2    Q    Where did that take place?
3    A    In my office.
4    Q    And you know that she interviewed
5 all the other persons as well?
6    A    My understanding is that she did.
7 I don't recall that she said I could not talk to so and
8 so or anything like that.
9    Q    Did you tell her that you thought
10 that Arminda -- did she ask you about Arminda's
11 performance?
12    A    I have to tell you I really don't
13 know.
14    Q    Did she make notes during the
15 meeting?
16    A    I don't know.
17    Q    She did not tape the meeting did
18 she?
19    A    No.  She did not tape the
20 conversation, no.
21    Q    Did you tell her you thought
22 Arminda was angry and hostile?
23    A    I don't know.

Page 13

1    Q    Did you tell her you thought
2 Arminda was not performing her work duties and
3 responsibilities?
4    A    We did talk about the fact that
5 the catalogue had not gotten on the street until the end
6 of October, yes or I informed her at some point.  So it
7 had to have been after the end of October.
8    Q    Anything else?
9    A    That's the only thing I can think
10 of.
11    Q    Did you tell her that the
12 evaluation was based on her -- the problems that she was
13 having with the staff in terms of their complaints?
14    A    Well, I would not -- first of all,
15 I would not characterize her evaluation as being based on
16 that.  It was part of her evaluation and yes, I shared
17 that with Mary Ann.
18    Q    Did you tell her that she was --
19 the same things that we talked about, that she was
20 calling other staff members names?
21    A    Yes.  All the same things; yes,
22 that I have said here.
23    Q    Do you think she interviewed

Page 132

1 Arminda as well?
2    A    I don't have -- well, she had an
3 initial interview with Arminda, yes.
4    Q    Okay.  In that process -- has
5 there ever been a process where the chair of the Board
6 has conducted an investigation before?
7    A    No.
8    Q    That's a first?
9    A    As far as I know, yes.
10    MR. TEMPLE:  Thank you.  No further
11 questions.
12    MR. FLEISCHER:  Could I look at the notes
13 of the August meeting, please?
14    MR. TEMPLE:  Yes, you may.
15    MR. FLEISCHER:  Thank you.
16    MR. TEMPLE:  Yes.
17    (Pause)
18    MR. FLEISCHER:  I have no questions.  She
19 will read.
20    (The proceedings were concluded at 3:17 o'clock
21 p.m.)
22
23

Page 1

1
2    CERTIFICATE OF NOTARY PUBLIC
3    I, Sharon L. Banks, C. R., the officer before
4 whom the foregoing deposition was taken, do hereby
5 certify that the witness whose testimony appears in the
6 foregoing deposition was duly sworn by me; that the
7 testimony of said witness was taken by me in stenotype,
8 at the time and place mentioned in the caption hereof and
9 thereafter reduced to typewriting under my supervision;
10 that said deposition is a true record of the testimony
11 given by said witness; that I am neither counsel for,
12 related to, nor employed by any of the parties to the
13 action in which this deposition is taken; and, further,
14 that I am not a relative or employee of any attorney or
15 counsel employed by the parties thereto, nor financially
16 or otherwise interested in the outcome of the action.
17
18    Sharon L. Banks, C. R.,
19    Notary Public in and for
      THE DISTRICT OF COLUMBIA
20 My commission expires:
21 November 30, 2006
22
23

Page 134

1    A        Not that I recall.
2    Q        Did you talk to Arminda about
3 that?
4    A        No, I did not.
5    Q        Why not?
6    A        That was the first, uh, first I am
7 not even sure you would call it a complaint, but the
8 first incident of, sort of misunderstanding between
9 Arminda and some other employee.   And I just thought it
10 was in the natural course of business.
11   Q        Can I try to get some idea if it
12 is possible to understand the sequence of these total,
13 um, list of complaints.  Would Freedman's complaint
14 precede Ms. Mendoza's?
15   A        Probably not.  I believe Barbara
16 Mendoza's complaint was first.
17   Q        Before Freedman's?
18   A        Yes.
19   Q        When would you have asked her,
20 about this problem with Arminda; approximately?
21   A        The best I can think is it might
22 have been in the Fall, in the -- between August and
23 December of 2003.  Is that the right year?  Yes.

Page 135

1    Q        Why would you have asked Ms.
2 Mendoza in 2003 about this incident between her and
3 Arminda?
4    A        If she had been upset by it and
5 was withdrawn or was expressing some hurt, I would have
6 asked her what was wrong, which was likely what happened.
7    Q        So she was upset and hurt and
8 withdrawn?
9    A        Well, that was my -- that's the
10 way Barbara behaves and when she behaves that way, I ask
11 her what the matter is.
12   Q        This could have been just
13 incidental?
14   A        Exactly.
15   Q        Did you consider that Arminda may
16 have said that Barbara was unprofessional to be a
17 problem?
18   A        I am sorry?
19   Q        Did you consider that Arminda said
20 that Barbara was unprofessional to be a problem?
21   A        That she said it?
22   Q        If Arminda had said Barbara you
23 are unprofessional, is that a problem?

Page 136

1    A        At that time I did not think it
2 was a problem.
3    Q        Did you think it was a problem
4 after you had that conversation with Barbara?
5    A        No, not after I had that
6 conversation.
7    Q        Did you ever come to think it was
8 a problem?
9    A        Yes.
10   Q        When?
11   A        After there were a series of
12 complaints and probably not until after Arminda had
13 suggested that I was thoughtless, disrespectful, for the
14 way the Washington Post Award was handled.
15   Q        I am not following you.
16         You did not think that the problem that Mendoza
17 told you about was of any moment until Arminda complained
18 to you about the Washington Post issue?
19   A        My understanding is that the
20 incident with Barbara was the first -- this is the first
21 one I knew about.
22         Next, was the, um, probably, possibly Michael
23 Freedman's complaint.   The next one would have been the

Page 137

1 incident with Jeff Kost and then, when Arminda confronted
2 me with why the Washington Post Award was -- why the
3 management of it was changed.  She accused me of you
4 know, intentionally being disrespectful or thoughtless,
5 that I had the distinct impression that she thought I had
6 intentionally ruined her reputation.
7    Q        Was reputation at issue?
8    A        I did not think so.
9    Q        She never spoke to you in a
10 disrespectful manner?
11   A        Not until then.
12   Q        She wrote to you in that regard;
13 isn't that correct?
14   A        My recollection is that she -- she
15 may have written to me, but I thought we had a discussion
16 about it.  It is possible that she wrote to me prior to
17 that.  We had a verbal discussion about it.
18   Q        Do you think if you violate
19 someone's rights that they should be nice and pleasant
20 with you when they discuss that, they should not have
21 some level of emotion?
22         MR. FLEISCHER:  Objection.  There is an
23 assumption  built into that question that is not

1 individual there and the manner in which that individual
2 was treated, that individual who was -- value added to
3 you, felt that he was being disrespected; he or she felt
4 that he was being -- the conduct of Mr. Kost was
5 offensive to him?
6     A     I don't believe that I know that
7 he felt that it was disrespectful to him.
8     Q     To the extent that Arminda and
9 let's -- okay.
10     To the extent that Arminda knew and she told Mr.
11 Kost, Mr. Kost, you offended someone who is giving his
12 time to us freely and we were in a meeting and I think
13 you owe that person an apology.  Is that a problem?
14     A     I don't think that's a problem.
15 That is not what I heard.
16     Q     Well, but did you -- you did not
17 take the time to talk to Arminda to ascertain what
18 actually happened from her point of view; isn't that
19 correct?
20     A     I don't recall.
21     Q     You certainly did not take the
22 time, you did not -- you knew that Mr. Terry was
23 involved in that incident; isn't that correct?

1     A     Actually, I did not.  I had no
2 idea that someone -- that who ever she was meeting with
3 found it offensive.  I had no clue.  She found it
4 offensive.
5     Q     So you were never told by Arminda
6 or Lisa Ransom Brown, that Mr. Terry was offended by the
7 incident?
8     A     I don't believe I ever was.
9     Q     To the extent then that the way
10 you viewed it then, was that it was a misunderstanding
11 between the two of them?
12     A     That is correct.
13     Q     To that extent though in your
14 ultimate assessment of blame, you still place more blame
15 on Arminda than you did on Jeff?
16     A     I don't know if I could come to
17 that same conclusion.
18     Q     Let's look at objective measures.
19 Okay.  In Arminda's evaluation you came to that
20 conclusion because you scored her less based upon Jeff's
21 complaint about the way that she communicated with him;
22 isn't that correct?
23     A     Not entirely on.

1     Q     But in part; isn't that true?
2     A     Possibly.
3     Q     If you put that in context, you
4 did not do the same with regard to Jeff in his 2004
5 evaluation.
6     A     Arminda's evaluation was not based
7 just on her interaction or lack of with Jeff.
8     Q     I did not say it was.
9     A     Okay.
10     Q     I said partially, but Jeff -- it
11 was no fault found what so ever and when I say it was no
12 fault, it was not one sentence, one verb -- let me
13 finish.  One noun that says any where in his records,
14 any where in his performance that Jeff you are to blame
15 in part for the manner in which you dealt with a patron
16 of the Center?
17     A     I have to just beg your
18 forgiveness.  I had no idea until you just said it that
19 a patron was offended.
20     My whole belief was that the two of them were
21 having a problem.  To answer your question, I did speak
22 to Jeff about it, yes and I did not suggest to him that
23 he was right.

1     Q     But that is not my point.  You
2 talked to Arminda as well, didn't you?
3     A     I talked to Arminda about it.
4     Q     But the way you dealt with Arminda
5 versus the way you dealt with Jeff was that you put
6 something in her evaluation.  It affected the way you
7 would score her in her evaluation.  So you gave her
8 a --
9     A     Yes.
10     Q     -- lower evaluation as a result;
11 isn't that true?
12     A     I would not say I gave her a lower
13 evaluation as a result of that, but it was in her
14 evaluation; yes.
15     Q     Let's now switch subjects if you
16 would.  Let's go to Jeremy and Jeff relative to
17 Carlotta.
18     A     Okay.
19     Q     Jeff complained to you at some
20 point as well about the Carlotta -- about the Arminda,
21 Jeremy, Carlotta issue; correct?
22     A     No.
23     Q     No?

Page 158

```
1    Q          So, do you give raises above the
2 five percent?
3    A          Occasionally.
4    Q          Based upon?
5    A          Based upon my belief that the
6 person has done way more than asked for.
7    Q          Let me direct your attention to
8 the first -- to A, personal attributes. Can you read
9 the handwriting there please?
10   A          Yes. " Responds with
11 inflammatory remarks. Sometimes positive out look.
12 Sometime constructive. " I don't know what that is.
13 Ideas.
14   Q          For attitude, which is A, personal
15 attributes. Positive outlook, constructive ideas, works
16 well with others.  She received a 3.
17   A          Yes.
18   Q          You said she responds with
19 inflammatory remarks?
20   A          Yes.
21   Q          To what are you referring?
22   A          To her calling Barbara Mendoza
23 unprofessional. For her automatic judgement that Jeff
```

Page 159

```
1 was disrespectful.  For her automatic judgement that I
2 had intended to harm her reputation.  For her snapping
3 at Susan when Susan tried to give her direction.
4    Q          Let me start with Barbara's
5 unprofessional -- did Arminda call Barbara
6 unprofessional?
7    A          As far as I know, she did.
8    Q          How do you know?
9    A          Barbara told me she did.
10   Q          Did you ever ask Ms. Hall?
11   A          We talked about it and Arminda
12 swore she did not.
13   Q          Arminda said she did not and
14 Barbara said she did.  So you believe Barbara.
15   A          I have worked with Barbara for
16 fifteen years.
17   Q          My question is:  So you believe
18 Barbara?
19   A          I don't know which is true.
20   Q          So you believe Barbara?
21   A          My answer would be that I believe
22 Barbara with regard to her -- with regard to Arminda's
23 evaluation.
```

Page 160

```
1    Q          Did you have any reason to
2 question Arminda's credibility that would lead you to
3 believe Barbara other than the fact that you knew Barbara
4 and worked with Barbara?
5    A          I am sorry. You will have to
6 repeat that.
7    Q          Did you have reason to
8 disbelieve Arminda and to believe Barbara?
9    A          Possibly.
10   Q          With respect -- when you said
11 " possibly, " what do you mean?  What are those
12 possibilities?
13   A          I don't recall how I felt at the
14 time or what I thought at the time.  So it is possible
15 that I believed that.  It is possible that I did not.
16   Q          You took into consideration here
17 as well that Arminda thought that Jeff was disrespectful?
18   A          Yes.
19   Q          And that was a problem for you?
20   A          Yes.
21   Q          But at no place on Jeff's
22 evaluation do you say there is a problem because he may
23 have been disrespectful, do you?
```

Page 161

```
1    A          I asked them to try to work it
2 out.
3    Q          That is not my question.
4    A          I understand that is not your
5 question.  But I asked them to try to work it out and
6 Arminda refused.
7    Q          What do you mean she refused?
8    A          Refused.
9    Q          What do you mean?
10   A          I said if you can not work this
11 out, I am going to get a mediator.  She said please
12 don't.  I did not.
13   Q          The question I had.  Did you put
14 any where on Jeff's evaluation any reference to the fact
15 that he may have been disrespectful?
16   A          No.
17   Q          With regard to Susan, okay, it was
18 your view that Susan was right again and that Arminda was
19 wrong; is that correct?
20   A          Arminda had said that Susan's
21 e-mail was unnecessarily negative.  I did not think it
22 was.
23   Q          You said earlier that Susan was so
```

Page 162

1 close to this particular event that she was overly
2 emotional?
3      A      I don't have to have the same
4 feeling from day-to-day.
5      Q      But at that particular point in
6 time relative to that communication between Susan and
7 Arminda you did not think she was too emotional?
8      A      Right.
9      Q      You thought Susan was right and
10 Arminda was wrong?  Is that correct?
11      A      I read the e-mail and I also did
12 not believe it was unnecessarily negative.
13      Q      But you thought that Susan was
14 right; correct?
15      A      That is right.
16      Q      Relative to you, okay, you said
17 earlier that you took Arminda off of the Washington Post
18 project in March; is that correct?
19      A      I believe so.
20      Q      And that you took her off after
21 having a complaint from Mr. Freedman?
22      A      No.  That was not the reason.
23      Q      You took her off after having a

Page 163

1 complaint.
2      A      That was not the reason.
3      Q      It was partially the reason?
4      A      That's not very much of the
5 reason.
6      Q      It did not have anything to do
7 with Mr. Freedman's complaint.  Mr. Freedman, who had
8 been a board member, who made a complaint about Arminda.
9          You are now saying that complaint had nothing to
10 do, zero, to do with you taking Arminda off of the
11 Washington Post project?
12      A      I could not say how much it had to
13 do.
14      Q      But it had something to do with
15 it?
16      A      It may have.
17      Q      But point number one, but again
18 you took Mr. Freedman's word over Arminda's word; isn't
19 that correct?
20      A      I am not sure I would say that.
21      Q      Relative to yourself — let me go
22 back to Susan.
23          Susan complained to you about Arminda?

Page 164

1      A      No.  Susan sent me the e-mails.
2      Q      Again, Susan sent you the e-mails,
3 but you did not talk to Arminda about what Susan had sent
4 you the e-mails about; isn't that correct?
5      A      I don't know.
6      Q      What you did in March, you have
7 Arminda working on a project and you give her this
8 responsibility and she reports directly to you.  Freedman
9 complains to you.  You believe Freedman, you don't have
10 a word about it with Arminda.
11          Susan complains to you, you believe Susan and
12 you don't have a word with Arminda.  And then you take
13 her off of the Washington Post project, without so much
14 as a moments discourse about what is going on.
15          Do you think that was disrespectful to her?
16      A      All of those things happened.
17      Q      Do you think it was disrespectful
18 to her?
19      A      All of those things happened, but
20 they were not the only things that happened.
21      Q      But do you think that was
22 disrespectful to her?  You have someone and you say I am
23 going to punish you without any due process.  I am going

Page 165

1 to take you off of this project because I don't think you
2 are doing a good job.
3          That is why you took her off the project; isn't
4 that right?
5      A      No.  That is not right.
6      Q      Why did you take her off of the
7 project?
8      A      I took her off the project
9 because we had an offer to have it paid for.
10      Q      How so?
11      A      Have the staff paid for.
12      Q      So you did not take her off of
13 the project because of the complaint of Susan and
14 Freedman?  Is that right?
15      A      They may have been part of it,
16 but they were not the only reason.
17      Q      Is it true that even though
18 Virginia Tech. is it, had offered to subsidize Susan's
19 salary, isn't it true that did not mean that you had to
20 take Arminda off of the project?
21      A      Right.  That is right.
22      Q      In fact, that would have
23 augmented Arminda's ability to do the project if Susan

Page 202

```
 1   Q       So to the extent that if he was
 2 wrong and offensive, in his dealings with her, did you
 3 still think that she was confrontational with him?
 4   A       Yes.
 5   Q       If she were -- in her
 6 communications that you are talking about that may be per
 7 se confrontational, that was when she was trying to
 8 correct what Jeff was doing wrong that she deemed
 9 offensive; is that correct?
10   A       She was trying to correct what
11 Jeff was --
12   Q       She was raising concerns about
13 Jeff's inappropriate conduct towards her; is that right?
14   A       I believe she was trying to
15 correct Jeff's behavior, yes.
16   Q       What was confrontational about an
17 individual who believes that someone else has offended
18 them saying you have offended me and I don't think your
19 behavior is appropriate?  What is confrontational about
20 that?
21   A       I think said in that way, I don't
22 think it is necessarily confrontational.
23   Q       Let's talk about Susan.  Susan,
```

Page 203

```
 1 what was confrontational in your view regarding Arminda
 2 and Susan is Arminda's response to Susan is that correct?
 3   A       Right.
 4   Q       And Susan's e-mail; is that
 5 correct?
 6   A       Sorry.  The question?
 7   Q       Susan's e-mail to Arminda; is that
 8 correct?
 9   A       It is Arminda's response to the
10 e-mail.  Is that the question?
11   Q       Yes.  Arminda's response to
12 Susan's e-mail?
13   A       Yes.
14   Q       You read the e-mail and you said
15 you did not see anything wrong with the e-mail?
16   A       With Susan's e-mail to Arminda.
17   Q       But Susan herself believed that
18 the e-mail had a negative tone, do you recall?
19   A       Yes.
20   Q       If Susan believed it was negative,
21 then why would Arminda not think that it was negative?
22   A       Sometimes, I don't think things
23 are negative when people say they are negative.
```

Page 204

```
 1   Q       Susan believed it was negative and
 2 Arminda believed it was negative, but you did not think
 3 it was negative?
 4   A       No, I did not.
 5   Q       I will show you what has been
 6 marked at Exhibit Five.  At the bottom of this exhibit
 7 from Susan, to Arminda dated March 23rd and cc'd to you;
 8 Susan says " I know this e-mail is a bit negative in
 9 terms of its tone and possibly other things. "
10     You read this e-mail; correct?
11   A       Yes.
12   Q       You understood the content of the
13 e-mail; correct?
14   A       Yes.
15   Q       But you did not think it was
16 negative?
17   A       No.
18   Q       Did you think Arminda could
19 perceive that it was negative?
20   A       I -- I don't know.  I don't have
21 any idea what I thought.
22   Q       Did you talk to Susan when you
23 received this e-mail from her?
```

Page 205

```
 1   A       No.
 2   Q       You are aware that Arminda
 3 responded to the e-mail on the very next day?
 4   A       Yes.
 5   Q       I want to show you what has been
 6 marked as Exhibit 6.  When you read Arminda's e-mail on
 7 the 24th of March -- did you read it on the same day?
 8   A       Probably.  I don't know what day
 9 I read any e-mail.
10   Q       Do you think --
11     Let me direct your attention to the last line in
12 this e-mail from Arminda.  She says quote, unquote to
13 Susan, " I look forward to working with you to learn more
14 about how the site visits have been run in the past and
15 to consider ways to smooth out the process. "
16     And do you see that?
17   A       Yes.
18   Q       Take a minute to look at this.
19     (Pause)
20     Is there anything that you deem confrontational
21 about the language in the last paragraph?
22   A       Not in the last paragraph, no.
23   Q       Is there anything that you deem
```

Page 206

1 confrontational in Susan's letter to Arminda?
2    A        No.
3    Q        Is there anything that you deem
4 confrontational in this -- Arminda's response to --
5    A        Yes.
6    Q        Tell me specifically what that is?
7    A        " And unnecessarily so. "
8    Q        What are you referring to?
9    A        The very first line.
10   Q        Okay. She said yes, the tone is a
11 negative one. You deem the language " and unnecessarily
12 so " to be confrontational?
13   A        Yes.
14   Q        Why?
15   A        I think it is a judgement that she
16 makes.
17   Q        Is there anything else, language
18 wise, phrases, sentences in this particular document --
19   A        No.
20   Q        Let me finish the question.
21 -- that you deem to be, quote, unquote confrontational?
22   A        No.
23   Q        Outside of the 3 words, and

Page 207

1 unnecessarily so, how would you characterize the rest of
2 the correspondence from Arminda to Susan?
3    A        I think Arminda was telling Susan
4 what she had done and proving to Susan that she had done
5 a lot of good work. She is mostly laying out the good
6 work that she has been.
7    Q        She is also responding as to why
8 and how things were working and how she was working?
9    A        Yes.
10   Q        Do you think Arminda's responses
11 were fair and reasonable?
12   A        I have never made a judgement
13 about that.
14   Q        After you received Arminda's
15 response on the 24th, you had not talked to Arminda and
16 Susan at all about this, did you?
17   A        I don't believe so.
18   Q        Susan did not tell you, did she,
19 that she thought that Arminda's correspondence was
20 confrontational?
21   A        Yes, she did.
22   Q        When did she tell you that?
23   A        She sent an e-mail to me that says

Page 208

1 " ouch. "
2    Q        Did she think that hers was an
3 ouch correspondence?
4    A        I believe she said what she felt
5 about hers. I don't know -- I can't determine what else
6 she felt.
7    Q        Arminda, earlier you said that she
8 complained to you about her evaluation in August and she
9 did not mention anything about race or anything like that
10 to you; do you remember? I show you what is now marked
11 as Exhibit 7. Take minute to look over it, please.
12      This is, for the record, a memorandum from
13 Arminda to you dated August 4th, 2004.
14      (Pause)
15      Did you deem this particular correspondence to
16 be confrontational?
17   A        Yes.
18   Q        What about it in particular, did
19 you find to be confrontational?
20   A        " I have suffered financially and
21 reputationally. " She assumes that I view her style as
22 aggressive and inflammatory. And that there -- she says
23 there are stereotype characterizations.

Page 209

1    Q        That is the extent of it, what you
2 deem to be confrontational. You said her, her style was
3 inflammatory. That is not what she deemed. That is what
4 is written in the evaluation; right?
5    A        Yes.
6    Q        She does say here that you have
7 stereotyped her as a woman of color.
8    A        That is her belief, yes.
9    Q        So there is a concern of
10 discrimination; is that correct?
11   A        I assume so.
12     I am sorry people of color is not a term in my
13 vocabulary and I don't -- until -- I did not understand
14 until this suit came a long that that was another word
15 for race.
16   Q        There is some handwriting here?
17   A        Yes.
18   Q        And is that your hand writing?
19   A        Yes, it is.
20   Q        And I would like to ask you to
21 tell me what the hand writing is at the bottom of the
22 page, please?
23   A        " This regularly weekly meeting

Multi-Page™

Page 210

1 scheduled, where is ideas to dialogue, why two months to
2 get fall catalogue in place.  Outside work/participation
3 should be discussed with me first.  What benefit is it to
4 WCA."
5    Q        What are you referring to with
6 regard to  " regular weekly meetings scheduled? "
7    A        I had asked her -- let's see
8 here.  I had asked her to stick her head in my office
9 and give me an update on things she was doing.  She said
10 I can't do that.
11    Q        Why?
12    A        She did not say.  I was shocked
13 by the answer.  So I did not ask.
14    Q        Okay.
15    A        So I felt that if she did not feel
16 that she could do that, that -- then I would take the
17 initiative and schedule regular weekly meetings.
18    Q        You said " where is ideas to
19 dialogue? "
20    A        Part of her job was to schedule 3
21 meetings that we called " ideas to dialogue. "  They
22 were educational in nature, but they were a little bit
23 above the regular workshops and they were more conceptual

Page 211

1 and not so much hands on.
2    Q        Why did you write that here?
3    A        Part of the her job was to put
4 together ideas to dialogue.
5    Q        Was she not doing that?
6    A        No.
7    Q        At this particular point, when did
8 you put this handwriting on this piece of paper?
9    A        Probably that day.
10    Q        You did not say anything about
11 this ideas to dialogue in her performance evaluation?
12    A        I did not.
13    Q        Why is that?
14    A        I thought they would be done.
15    Q        But is that a criticism, where is
16 ideas to dialogue?
17    A        I am wondering whether we were
18 going to have any.
19    Q        Is that a criticism of her
20 performance?
21    A        It could be taken that way.
22    Q        If it is a criticism, why didn't
23 you tell her that on July 11th, that it was concern about

Page 212

1 about her substantive performance instead of writing it
2 on August 4th?
3    A        I can't know what my intent was or
4 my ideas were at that time.  It is very possible that I
5 thought in July we could still have 3 ideas or 2 ideas to
6 dialogue that had not yet been held.
7    Q        You say why 2 months to get Fall
8 catalogue in place.  What are you referring to please?
9    A        The conference that she and Lisa
10 put on was in the 2nd week of June, I believe and I had
11 had a conversation with Arminda about the fall catalogue
12 and we had sort of agreed that until the conference was
13 over, you know, she had to concentrate on the conference.
14        But she did not have anything else to do after
15 that, except get the Fall catalogue together.
16    Q        When was the Fall catalogue dead
17 line?
18    A        Well, if you are going to have
19 classes and you want people to come to them, you have to
20 have the catalogue in their hands prior to the first
21 class.  So there was no deadline written except for
22 when we wanted people to attend these courses.
23    Q        When was the first class

Page 213

1 scheduled?
2    A        Mid September.  I don't know the
3 date.
4    Q        Lisa and Arminda were working on
5 the conference.  Did you -- the Fall catalogue is
6 something that she is assigned to; is that correct to do?
7    A        Yes.
8    Q        Was there anyone else assigned to
9 work on the Fall catalogue other than Arminda?
10    A        It was Arminda's job to see to it
11 that it got done.
12    Q        That is not my question.  My
13 question is --
14    A        If Arminda assigned someone else,
15 she might have.  I don't know.
16    Q        Did you assign someone else?
17    A        No, I did not assign anyone.
18    Q        You understood that the conference
19 that took place in Prince George's County consumed a
20 great deal of time and work and energy; is that correct?
21    A        Yes.
22    Q        And resources; is that right?
23    A        In terms of what we paid Arminda

# EXHIBIT G

1

WASHINGTON, D. C.

   IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____ X

ARMINDA VELLES-HALL,          :

                              : Civil Action No.

        Plaintiff       : 05-7238

vs.                                :

CENTER FOR NONPROFIT ADVANCEMENT,:

        Defendant.            :

_____ :

                          X

           Thursday, February 23, 2006

           Washington, D. C. 20005

           Session II

      The deposition of, JEFFREY KOST, witness, was called

for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R.,  a notary public in

and for the District of Columbia, commencing at 3:21

o'clock p.m.,  when were present on behalf of the

respective parties:

Page 2

```
 1        A P P E A R A N C E S
 2
 3 For the Plaintiff:
 4 DONALD TEMPLE, Esq., & DHAMIAN BLUE, Esq., 1229 15th
 5 Street, Northwest, Washington, D. C. 20005, 202 628-1101
 6
 7 For the Defendant:
 8 CHARLES H. FLEISCHER, Esq, 7700 Old Georgetown Road,
 9 Suite 800, Bethesda, Maryland 20814-6100  303-986-4056,
10 fx. 301-951-0555
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 3

```
 1                  I N D E X
 2 WITNESS        MR. TEMPLE:   MR. FLEISCHER:
 3 Jeffrey Kost        4              0
 4
 5
 6            E X H I B I T S
 7               (None)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1          P R O C E E D I N G S
 2     Whereupon,
 3          JEFFREY KOST,
 4 was called for examination by counsel for the plaintiff,
 5 and after having been first duly sworn, was examined and
 6 testified as follows:
 7          DIRECT EXAMINATION
 8     BY MR. TEMPLE:
 9   Q       Good afternoon.
10   A       Good afternoon.
11   Q       Mr. Kost, we are going to continue
12 with the series of questions from your previous
13 deposition.   We did not get too far.
14     There are a couple of things I want to know at
15 the outset.   Were you afraid of Arminda?
16   A       Afraid of her?
17   Q       Yes.
18   A       No.
19   Q       And, I understand in 2003, you had
20 a pretty good relationship with her; working relationship
21 with her?
22   A       Yes.
23   Q       You all did not have any problems
```

Page 5

```
 1 with communications; is that correct?
 2   A       Correct.
 3   Q       And has she ever called you
 4 unprofessional?
 5   A       No.
 6   Q       Has she ever called you any names,
 7 personally?
 8   A       Not that I can recall.
 9   Q       Let me um, ask you regarding your
10 evaluation.  I don't really want to talk about your
11 evaluation.  I want to talk about fund raising.
12     Do I understand, correctly that the fund raising
13 goal for WCA in 2003, was $146,000 for contributions and
14 grants?
15   A       That sounds correct.
16   Q       Other reports show that
17 contributions and grants total a range for that year was
18 $90,836.  Would that be accurate?
19   A       I don't have any information in
20 front of me.
21   Q       Were you ever told that it was
22 about a 38 percent short fall in terms of the amount that
23 was raised and the particular goal for 2003?
```

Page 14

```
 1 Carlotta?
 2    A      I think it was before that.
 3    Q      Was it after the incident with Mr.
 4 Terry?
 5    A      It was around that time.
 6    Q      Did you ever talk to her about it?
 7    A      About what?
 8    Q      About your perception that she was
 9 angry?
10    A      No.
11    Q      Why?
12    A      I don't supervise her.
13    Q      Did she ever do anything that you
14 consider to be offensive to you?
15    A      Nothing that I could not deal
16 with.
17    Q      Did she do anything that you
18 deemed offensive?  Whether you could deal with it or not
19 is another issue.
20    A      No, not really.
21    Q      Did she do anything that you
22 consider to be confrontational with you?
23    A      I think just the one time when I
```

Page 15

```
 1 was sort of -- when she came into my office and demanded
 2 an apology for something that I felt that sort of took me
 3 by surprise.
 4    Q      Is that the conference room issue?
 5    A      That was the Mr. Terry issue.
 6    Q      Did you apologize to her?
 7    A      No.  I did not.
 8    Q      Were you -- did Ms. Johnson ever
 9 talk to you about that incident?
10    A      We talked about it and she
11 counseled me; we talked about it.
12    Q      When she counseled you, where did
13 this counseling take place?
14    A      Where?
15    Q      Yes.
16    A      In her office.
17    Q      How long was this counseling?
18    A      Maybe, 20, 30 minutes.
19    Q      What did she say to you?
20    A      Um, I explained my side of the
21 story and she advised me that perhaps I should -- that I
22 did not need to act in a similar manner.
23    Q      What did she mean by a " similar
```

Page 16

```
 1 manner? "
 2    A      I assume that, that meant that I
 3 needed to take a high road.
 4    Q      What was she talking about?
 5    A      And this is -- and this is just my
 6 interpretation, but that I should just sort of either let
 7 it go or get you know, get past it.
 8    Q      Did she tell you at any point that
 9 the way you handled the situation was offensive?
10    A      No.
11    Q      At that point in time when Arminda
12 spoke to you, did you know Mr. Terry?
13    A      No.
14    Q      Did she tell you that she thought
15 that you had insulted him?
16    A      I don't think he knew I was in the
17 room.  He was on a cell phone.  So otherwise, I would
18 not have entered the room.
19    Q      Yes.
20    A      So I find it hard to believe that
21 he would have been offended.
22    Q      Let me understand something, Mr.
23 Kost.  You had that one major problem with Arminda; is
```

Page 17

```
 1 that right?  That one problem ; is that right?
 2    A      Right.  That and a minor e-mail
 3 exchange.
 4    Q      Okay.  You were -- she worked
 5 there, all of 2004, you only had that one major problem;
 6 is that right?
 7    A      Yes.
 8    Q      Did you ever say let me sit down
 9 with Arminda and we are going to talk this out?
10    A      No.  Did I ever think it or did I
11 ever?
12    Q      Did you ever think it?
13    A      Maybe I thought it.
14    Q      Why did you not do it?
15    A      I don't know.
16    Q      Did you like her?
17    A      I -- we had a professional
18 relationship.
19    Q      Did you think she was confident?
20    A      Yes.
21    Q      Did you think she was competent?
22    A      Most of the time.
23    Q      Did you have any reason to
```

Page 22

1 make sure the conference room doors are closed and
2 locked.
3    Q        What was her response?
4    A        It got fairly inflammatory.
5    Q        What do you mean? What did she
6 say?
7    A        That I, you know, I don't need to
8 send these kinds e-mails. I don't know exactly what it
9 said, but it was, you know, and I would have sent that
10 kind of e-mail to who ever's job it was to handle the
11 conference room.
12    Q        Why did you say -- what do you
13 mean when you say inflammatory?
14    A        Well, I felt like I was being
15 attacked and what I was doing was trying to protect the
16 office suite.
17    Q        Did you know who left the door
18 open to the conference room?
19    A        No.
20    Q        How far is your office from
21 Arminda's?
22    A        Two doors away.
23    Q        Why didn't you go to her office

Page 23

1 and leave her a note?
2        (Pause)
3        Strike that.
4        Why didn't you just talk to her?
5    A        Because she was not very
6 accessible to talk to.
7    Q        What do you mean? At that time,
8 she was not accessible?
9    A        No.
10    Q        Had you ever tried to talk to her
11 and she said I can not talk to you?
12    A        Yes.
13    Q        How many times?
14    A        I never counted.
15    Q        You were not able to talk to her
16 because she was busy?
17    A        Did not try.
18    Q        All right.
19    A        I actually came back and I was
20 fairly angry.
21    Q        Why were you angry?
22    A        Because I came back and the doors
23 were open.

Page 24

1    Q        You were angry before the incident
2 and not after?
3    A        No. I was angry when I saw the
4 conference room doors wide open.
5    Q        I am saying you were angry when
6 you saw the conference room doors wide open, but that was
7 before you sent the e-mail?
8    A        Correct.
9    Q        So why were you angry?
10    A        Because I found the conference
11 room doors wide open.
12    Q        Did your e-mail correspondence
13 reflect your anger?
14    A        I think it was fairly -- I think,
15 I don't think it expressed my anger. I think it was
16 fairly direct.
17    Q        When is it that Arminda -- when
18 can you think of a time that you tried to talk to Arminda
19 that she could not talk to you or that she did not talk
20 to you?
21    A        I can not give you dates and
22 times. I can tell you that there have been times when I
23 have wanted to talk to her or tried to schedule time with

Page 25

1 her for specific things and I have -- I was told you
2 know, I can not do this now. We can -- I can do it you
3 know, we can talk about this in a week or I can talk
4 about this in 2 weeks or I am really busy now, lets talk
5 about this in, you know.
6    Q        When you did that, did you ever
7 write or e-mail her and say I would like to sit down and
8 talk to you about something. Arminda, I would like to
9 schedule an appointment with you?
10    A        Sometimes. Depends on what it
11 was.
12    Q        You have sent her an e-mail to try
13 to schedule an appointment with her?
14    A        You are talking about something
15 that was a while ago, so I can not recall.
16    Q        I am not asking a date. I am
17 asking whether you sent an e-mail asking her to schedule
18 a time when you all could talk?
19    A        I tend to work a little more
20 informally. So my style would be more like I would drop
21 by and say I would like the talk to you about something.
22 Can we schedule a time to meet.
23    Q        Why didn't you do that on the

Page 26

```
 1  conference door issue?  If you do it informally, why
 2  wouldn't you have just gone by her office in that
 3  context, instead of sending an --
 4     A       I don't know.
 5     Q       Did you complain to Betsy about
 6  the e-mail?
 7     A       I don't think so.
 8     Q       Did you show Betsy the e-mail?
 9     A       I really don't remember.
10     Q       Did you sit down with Arminda to
11  work with any project after the Terry incident?
12     A       I think we did.
13     Q       What was that regarding?
14     A       I think we tried to work on some
15  corporate sponsorship.
16     Q       How did it go?
17     A       It was okay.
18     Q       Did you have any problem with her
19  at all?
20     A       No.
21     Q       Did you ever meet with Betsy to
22  specifically complain about Arminda?
23     A       Not that I can recall.
```

Page 27

```
 1     Q       Did you ever e-mail Betsy to
 2  complain about Arminda?
 3     A       No.
 4     Q       Did you ever call her on the phone
 5  to complain about Arminda?
 6     A       No.
 7     Q       When did you first learn about the
 8  Carlotta Scott incident?
 9     A       It was brought to my attention by
10  Lisa.
11     Q       Was she upset?
12     A       She was.
13     Q       What did you think when she first
14  told you what happened?
15     A       I was upset.
16     Q       Why were you upset?
17     A       Because it bothered me that that
18  happened to someone who came into our organization.  So
19  it was upsetting to me.
20     Q       What was upsetting about it?
21     A       That someone that came into our
22  organization could potentially have been treated that
23  way.
```

Page 28

```
 1     Q       Did you talk to Jeremy about it?
 2     A       No.  I asked Lisa, who actually
 3  had the contact with Carlotta, to take her concern to
 4  Jeremy.  And I asked Lisa before she left my office that
 5  if she did not get satisfaction from Jeremy to come back
 6  to me with it and I would pursue it.
 7     Q       Who was Jeremy's supervisor at the
 8  time?
 9     A       Maybe it would have been Betsy
10  because I think Susan had left and I don't think
11  Stephanie was on board.  So it would have been Betsy.
12     Q       What happened after you told Lisa
13  to meet with Jeremy, do you recall?
14     A       I actually went -- I waited a
15  little while but I -- it became clear that Lisa was not
16  going to Jeremy and so I went to Jeremy myself to find
17  out his side of the story.
18     Q       Okay.
19     A       I asked -- I asked him first if
20  Lisa had come to him and he said no.
21         MR. FLEISCHER:  He said what?  I did not
22  understand you.
23         THE WITNESS: He said no.
```

Page 29

```
 1         MR. FLEISCHER:  You asked what?
 2         THE WITNESS: I asked Jeremy if Lisa had
 3  come to talk to him and he said no.
 4         MR. FLEISCHER: I just did not hear you.
 5      BY MR. TEMPLE:
 6     Q       You got his side of the story,
 7  right?
 8     A       Right.  And as it turned out, Lisa
 9  never went to talk to Jeremy and she also never came back
10  to me.
11     Q       Did you talk to her about that?
12     A       Yes.
13     Q       What did you tell her?
14     A       I asked her why she never went to
15  talk to Jeremy.
16     Q       What did she say?
17     A       I actually don't recall.
18     Q       Do you know if Jeremy was ever
19  disciplined as a result of that incident?
20     A       I know Betsy talked to him.
21     Q       Do you know what she told him?
22     A       I know that she tried to get his
23  side of the story.   And I think Betsy tried to get --
```

1   Q        Stephanie Dodge Smith?
2   A        Gay.
3   Q        Ms. Betsy Johnson?
4   A        Gay.
5   Q        No further questions.
6        MR. FLEISCHER: No questions.   We do not
7 waive.
8      Thank you.
9        MR. TEMPLE: One last question.   I am
10 sorry.
11      BY MR. TEMPLE:
12   Q        Have you ever observed Arminda
13 berate anybody in the work place, or talk down to anybody
14 in the work place?
15   A        (Pause)
16    Not that I recall.
17   Q        Okay.
18      THE WITNESS: Are we finished?
19      MR. TEMPLE: Yes.
20      MR. FLEISCHER: I don't have any
21 questions.  And we will not waive.
22      MR. TEMPLE: Thank you, Mr. Kost.  I had
23 all of these questions for you, about six pages and you

1 cut through them.
2        THE WITNESS: Yeah?
3        MR. TEMPLE: Yeah.
4        (The proceedings were concluded at 4:25 o'clock
5 p.m.)
6        (Signature not waived.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 40

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Sharon L. Banks, C. R., the officer  before
3 whom the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears in the
5 foregoing deposition was duly sworn by me; that the
6 testimony of said witness was taken by me in stenotype,
7 at the time and place mentioned in the caption hereof and
8 thereafter reduced to typewriting under my supervision;
9 that said deposition is a true record of the testimony
10 given by said witness; that I am neither counsel for,
11 related to, nor employed by any of the parties to the
12 action in which this deposition is taken; and, further,
13 that I am not a relative or employee of any attorney or
14 counsel employed by the parties thereto, nor financially
15 or otherwise interested in the outcome of the action.
16
17        Sharon L. Banks, C. R.
            Notary Public in and for
18        THE DISTRICT OF COLUMBIA
19 My commission expires:
20 November 30, 2006
21
22
23

# EXHIBIT H

1

WASHINGTON, D. C.

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____X

ARMINDA VELLES-HALL,          :

                              : Civil Action No.

          Plaintiff           : 05-7238

vs.                           :

CENTER FOR NONPROFIT ADVANCEMENT,:

          Defendant.          :

_____:

                              X

Thursday, January 12, 2006

Washington, D. C. 20005

     The deposition of, JEFFREY KOST, witness, was called

for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R.,  a notary public in

and for the District of Columbia, commencing at 10:00

o'clock a.m.,  when were present on behalf of the

respective parties:

Page 14

```
1   Q         Uh, huh.
2   A         So I opened the door to ask
3  Arminda if I might be able to get into the conference
4  room early because I think some of the people for my
5  meeting were showing up.   And I was afraid that they
6  were going to be -- it was going to be a disturbance in
7  the hall way or in the reception  area of the office.
8   Q         What did she say?
9   A         I don't recall her response, but
10 it was not -- it was neither positive nor negative.   I
11 don't remember.  I think they were shocked that I was
12 interrupting their meeting.
13  Q         Then what happened?
14  A         I turned and walked away.
15  Q         Was there a problem after that
16 with the fact that you could not get into the room early
17 in advance of the 4:00 o' clock time?
18  A         No.  I just waited until they were
19 finished.  Obviously, the answer was no.    -
20  Q         When did the problem arise?
21  A         The next day, the next morning.
22  Q         What happened?
23  A         Arminda came into my office, sat
```

Page 15

```
1  down and said that I owed her an apology.
2   Q         Other than what you just
3  described, you never said anything else to Lisa or
4  Arminda?
5   A         No, sir.
6   Q         When she sat down and said you
7  owed her an apology, what was your reaction?
8   A         I was actually a little shocked.
9   Q         Did you guys talk?
10  A         I listened.
11  Q         What did she say?
12  A         She had a lot to say.
13  Q         Do you want to summarize it?
14  A         It was a long time ago.   But it
15 was -- she was I think very angry of the fact that I
16 interrupted the meeting.  My perception of you know I
17 thought I was just poking my head in at a time when they
18 were obviously on some kind of a break because he was on
19 a cell phone to see if I might be able to get into the
20 room.  She was very offended at that and  expected an
21 apology from me.   I said I did not think I could do
22 that.
23  Q         What was your relationship with
```

Page 16

```
1  Arminda before that?
2   A         I think it was fine on a
3  professional level.
4   Q         Is that your first problem with
5  Arminda?
6   A         First one I can recall, yes.
7   Q.        Did you have any subsequent
8  problems with her?
9   A         I think there were -- it was maybe
10 another like an e-mail exchange that was not very
11 pleasant.
12  Q         What did it regard?
13  A         Conference room doors being left
14 open.
15  Q         Did -- in that particular
16 situation, you raised some concerns with her about the
17 conference door being left open?
18  A         Uh, huh.
19  Q         And someone assuming
20 responsibility for closing it, essentially; is that
21 right?
22  A         Right.
23  Q         What was her response?
```

Page 17

```
1   A         It got a little inflammatory.
2   Q         Okay.
3   A         You know, I would have sent that
4  very same e-mail to any staff person who was responsible
5  for that room, had it been Barbara or Jeremy or anybody
6  else.
7   Q         Did you talk to her about that
8  e-mail?
9   A         No.
10  Q         Why?
11  A         She is not a very easy person to
12 talk to.
13  Q         Let me just rewind for a few
14 minutes here.
15       You have 2 communications with her and you are
16 not very happy about either of these two communications?
17  A         No.
18  Q         You are not supervising her, are
19 you?
20  A         No.
21  Q         You are supervising Lisa?
22  A         Supervising Lisa.
23  Q         And this point in time Arminda and
```

Page 22

| 1 | Q | What did you say? |
| 2 | A | I listened to what Lisa had to |

3 say.  I asked -- it made a lot of sense and I understood
4 what I thought had happened.  I suggested that Lisa talk
5 to Jeremy directly.
6  Q       Did she do that?
7  A       She did not.
8  Q       Okay.
9  A       But I further, before Lisa left my
10 office, I said if you don't get satisfaction, I want you
11 to come back and I want you to tell me.
12  Q       You were not supervising Jeremy?
13  A       No.
14  Q       Why did Lisa tell you?
15  A       Because I was supervising Lisa and
16 I think she wanted me to do something about it.
17  Q       Did you speak with Betsy about it?
18  A       I did.
19  Q       Immediately?
20  A       Yes.
21  Q       When you spoke to Jeremy, that was
22 also immediately?
23  A       Yes.

Page 23

1  Q       Tell me what happened?
2  A       I wanted to get his side of the
3 story.
4  Q       What did he tell you?
5  A       He told me that Ms. Scott was
6 walking down the hall, that he had asked her, you
7 what she was doing there or who she was seeing or
8 ever.  And that she explained that she was with Li
9 Arminda.
10  Q       Did he tell you anything about the
11 tone in which he communicated with her?
12  A       No.
13  Q       Was there anything that you recall
14 that Arminda said or did that was confrontational
15 relative to the Carlotta Scott incident?
16  A       I don't believe so.  I wish -- I
17 just -- I guess I wish that if Lisa was not going to take
18 it to Jeremy, which she obviously did not, I wish she had
19 come back and told me so that I could have taken it
20 further.
21  Q       You were aware of Carlotta's
22 response to Jeremy's interaction with her?
23  A       Carlotta's response to Jeremy?

Page 24

1  Q       Carlotta's written response?
2  A       Yes, I was.
3  Q       How did you become aware of that?
4  A       Betsy told me about it.
5  Q       Has Betsy ever given you any kind
6 of oral warning relative to your performance?
7  A       No.  We have had discussions
8 about performance and I have gone to her with concerns
9 about my performance, concerns about meeting goals.
10  Q       What kind of discussions have you
11 had with her about your performance?
12  A       I am somebody that likes to go in
13 and check in with my supervisor on a somewhat regular
14 basis to make sure I am doing okay.  So we do that from
15 time to time.
16  Q       Have there been discussions about
17 your meeting goals?
18  A       Yes.
19  Q       Have there been discussions about
20 your not meeting goals?
21  A       Yes.
22  Q       What goals were they?
23  A       Mostly financial.

Page 25

1  Q       When were those discussions?
2  A       Usually, midyear, when you are a
3 fund raiser, those kind of goals -- I mean it is pretty
4 black and white.  Either we think we are going to make it
5 or we will not make it.  Can we either adjust the budget
6 or, reduce expenses, to meet the budget.
7  Q       Those are the types of discussions
8 you had with her?
9  A       Yes.
10  Q       Would that have been in 2004?
11  A       Yes.
12  Q       2003?
13  A       Yes.
14  Q       Do you ever have discussions with
15 her at all about your general management style?
16  A       Sometimes.
17  Q       How about your communications
18 style?
19  A       More than once.
20  Q       You supervised Lisa Ransom Brown?
21  A       I did.
22  Q       Did you have any problems with her
23 performance?

# EXHIBIT I

BAIRD

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,       :

5                            : Civil Action No.

6         Plaintiff        : 05-7238

7 vs.                        :

8 CENTER FOR NONPROFIT ADVANCEMENT, :

9         Defendant.         :

10 _____:

11                            X

12              Wednesday, April 5, 2006

13              Washington, D. C. 20005

14      The deposition of, JEREMY BAIRD, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R., a notary public in

19 and for the District of Columbia, commencing at 12:05

20 o'clock p.m., when were present on behalf of the

21 respective parties:

22

23

              SHARON L. BANKS REPORTING
                  P.O. Box 44773
           Fort Washington, Maryland  20744
                  (301) 372-6922
                                                      2

1              A P P E A R A N C E S

2

3 For the Plaintiff~:

4 DONALD TEMPLE, Esq., & DHAMIAN BLUE, Esq., 1229 15th

5 Street, Northwest, Washington, D. C. 20005, 202 628-1101

6

7 For the Defendant~:

BAIRD

21      A                Was that a problem for you?

22      A                Yes.

23      Q                Did you indicate that to her?

1       A                I don't believe so.

2       Q                what was the nature of the problem

3 that occurred as a result?

4       A                Not sure I understand the

5 question.

6       Q                what problem arose as a result of

7 her slow feedback?

8       A                It delayed me in implementing the,

9 keeping the project on schedule.

10      Q                With whom did you communicate

11 about this problem?

12      A                Betsy Johnson.

13      Q                In writing?

14      A                I believe it was a verbal meeting

15 or in person meeting.

16      Q                How many times was she slow in

17 getting feed back to you?

18      A                I don't recall.

19      Q                Do you remember the approximate

20 date when this problem arose?

21      A                No.

22      Q                why didn't you communicate

23 directly with Arminda?

1       A                Because Betsy was her supervisor

2 and I went to her supervisor.

BAIRD

3    Q          You never said anything, at all I
4 take it, to Arminda; is that correct?
5    A          I don't recall.
6    Q          Do you know what Betsy did after
7 you communicated to her this problem?
8    A          No.
9    Q          . That is number one.   What are the
10 other project specific things?
11    A          That's one that comes to mind.
12    Q          Do you recall any others?
13    A          No.
14    Q          Did you have occasions to meet
15 with Arminda during the time that both of you worked
16 there?
17    A          Yes.
18    Q          One-on-one meetings?
19    A          Yes.
20    Q          Did you have any problems talking
21 to her, communicating with her directly during those
22 meetings?
23    A          No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

15

1    Q          Was she intelligent during those
2 meetings?
3    A          Yes.
4    Q          Was she respectful of you?
5    A          Yes.
6    Q          Did she ever scream and yell at
7 you during any of those meetings?
8    A          No.
9    Q          Did she ever call you any names
10 during any of those meetings?

BAIRD

11      A              No.

12      Q              Did you ever have any complaints

13 to anyone that Arminda disrespected you?

14      A              No.

15      Q              Did you ever tell anybody that she

16 called you names?

17      A              No.

18      Q              You are familiar with a conference

19 that she and Lisa Ransom worked on in Prince George's

20 County sometime in 2004?

21      A              Yes.

22      Q              What do you recall about that

23 conference?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

16

1       A              I did not attend the conference.

2       Q              Uh, huh.

3       A              And I know -- don't know much

4 about it.   I know they worked on it; it was a lot of

5 work.   But other than that, it was about bringing

6 non-profits together in Prince George's County, but I

7 don't know any specifics.

8       Q              How do you know it was a lot of

9 work?

10      A              It was talked about a lot at staff

11 meetings?

12      A              It was partnering with an outside

13 organization, maybe more than one.   It involved 2 staff

14 people.   It was -- the attendance numbers were high for

15 our events, that I recall.

16      Q              At some point, during your

17 employment at WCA, the issue arose involving a woman

18 named Carlotta Scott?

19      A              Yes.

Page 12

BAIRD

19 Betsy Johnson or Stephanie Smith.

20        Q             Prior to meeting with Betsy, had

21 you had any communications with Stephanie about this

22 incident?

23        A             No.

1         Q             Had you had any further

2 communications with Jeff?

3         A             Not since he told me that after it

4 happened?

5         Q             Had you had any communication with

6 Arminda?

7         A             Not that I remember.

8         Q             How was -- was there any suggested

9 resolution at the conclusion of your meeting with Betsy?

10        A             She suggested that I apologize and

11 when  Carlotta was coming to teach a work shop, that I

12 introduce myself and apologize to her.

13        Q             At that particular point in time,

14 did you know when next Carlotta would be coming to do a

15 work shop?

16        A             I had a vague idea based upon the

17 workshop schedule.

18        Q             How soon after that, would that

19 time arise?  Let me be fair.  How soon after that did

20 you expect that she would come to do a work shop with

21 WCA?

22        A             As I remember, it was in the next

23 2 months or so.

BAIRD

1        Q              Specifically, when you say in the
2 next 2 months, was it 2 months from the date of your
3 meeting with Betsy or was it within the 2 month period?
4        A              Within the 2 month period.
5        Q              Do you know how far within that 2
6 month period that next time was?
7        A         .    No.
8        Q              You don't know if it was a week, 3
9 weeks, 7 weeks?
10       A              No.
11       Q              How did you know it was within two
12 months?
13       A              Carlotta was scheduled in our
14 course catalogue, which had faculty members listed and
15 courses they were teaching.
16       Q              the meeting between you and Betsy,
17 on the Carlotta issue, how long did it last?
18       A              I don't remember.
19       Q              More than ten minutes?
20       A              Yes.
21       Q              More than 30 minutes?
22       A              If I had to guess it was about 30
23 minutes to 45 minutes.

1        Q              Were you disciplined as a result
2 of that Carlotta Scott incident?
3        A              No.
4        Q              Were you given anything at all in
5 writing to memorialize that incident?
6        A              Yes.
7        Q              What was that?
8        A              I was given a letter very late

BAIRD

9 after that, a warning letter and that was indicated as

10 one point of concern that I refused to apologize to

11 Carlotta.

12          Q              What is the approximate date of

13 that warning letter?

14          A              It was around October 1, 2005.

15          Q              2005?

16          A              Yes.

17          Q              Okay.  Who gave you that letter?

18          A              It was given to me by Stephanie

19 Smith, my supervisor at the time and Betsy Johnson

20 together.

21          Q              How many pages?

22          A              I recall it to be a two page

23 letter.

☐                                                              24

1          Q              Was there a meeting in addition to

2 the letter?

3          A              Yes.

4          Q              And the meeting would have taken

5 place, when?

6          A              The first week of October.   The

7 same day that I got the letter.   I don't recall which

8 day it was, but it was around the first week of October,

9 2005.

10          Q              Who participated in the meeting?

11          A              Stephanie Smith, Betsy Johnson and

12 myself.

13          Q              Where?

14          A              In Betsy's  office.

15          Q              Subject matter?

16          A              My performance.

17          Q              In the letter, the October letter,