BAIRD

18 it addressed a number of performance issues?

19        A              Yes.

20        Q              What were they?

21        A              Things that were of a concern to

22 Betsy and Stephanie about my performance over a period of

23 time.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922  .

                                                        25

1        Q              Did you know about these issues

2 prior to October of 2005?

3        A              Some, yes.  Some, no.

4        Q              When did you leave WCA?

5        A              In January of 2006.

6        Q              Were you given -- told that you

7 would either be fired or you would have to resign?

8        A              No.

9        Q              You just left?  You just resigned?

10        A              I had been looking for a job

11 during the time that I received this letter and the offer

12 that I accepted came in January.

13        Q              Do you have a copy of the letter

14 that you received in October of 2005?

15        A              Yes.

16        Q              Did you receive any subsequent

17 correspondence after that related to your performance?

18        A              No.

19        Q              Were you put on any probation of

20 sorts in October of 2005?

21        A              No.

22        Q              Did you agree with the content of

23 the letter?

BAIRD

26

```
 1      A           No.
 2      Q           Did you write -- respond to the
 3 letter in writing?
 4      A           I did not.
 5      Q           I would like to go to the issue of
 6 Carlotta Scott.  Was that a point of contention between
 7 you and Betsy at that point in time?
 8      A           It was a point of contention -- it
 9 was one of the many points of contention in the letter.
10      Q           To the extent that there was a --
11 did you refuse to apologize to Carlotta?
12      A           I did.  Betsy said it would be
13 nice if you introduced yourself when she is here for a
14 work shop and apologize and I said to Betsy, I don't
15 think I can do that.  Betsy replied, okay, if you happen
16 not to be here that day that would be okay too.  Based
17 upon that and that was her response during our meeting.
18      Q           In the couple months after the
19 incident?
20      A           Correct.
21      Q           Meeting?
22      A           Correct.
23      Q           Do you remember what month it
```

                SHARON L. BANKS REPORTING
                     P.O. Box 44773
              Fort Washington, Maryland  20744
                     (301) 372-6922

27

```
 1 was?
 2      A           I really don't remember.
 3      Q           Could it have been -- for the
 4 record, Carlotta's letter was dated February 26th, 2004.
 5 Does that refresh your recollection?
 6      A           No.
 7      Q           As to when the meeting with Betsy
```

```
                                            BAIRD
 8 happened?

 9        A                I really don't  remember.

10        Q                Betsy told you that if you happen

11 not to be there, you would not have to apologize?

12        A                No.

13        Q                what did she say?

14        A                She said if you happen not to be

15 here -- after I refused to apologize, when I said I don't

16 think I can do that, meaning apologize, she said " if you

17 happen not be here that day, that would be okay too. "

18        Q                what did she mean by that?

19        A                I took it to mean that if I was

20 not there that day, that would be okay.

21        Q                And the day we are talking about

22 is the day that Carlotta is coming to do a work shop?

23        A                She was scheduled to do a work
```

```
                    SHARON L. BANKS REPORTING
                         P.O. Box 44773
                  Fort washington, Maryland  20744
                         (301) 372-6922
```

```
 1 shop.

 2        Q                And so did she mean that if you

 3 are not there that you would not have to extend the

 4 apology?

 5                MR. FLEISCHER:  Objection.  He can not

 6 know what she meant by that.

 7                BY MR. TEMPLE:

 8        Q                Did you understand that to mean

 9 that?

10        A                I don't know what she meant.

11        Q                Did you ask her what do you mean

12 by that?

13        A                I did not.

14        Q                You said that you don't think you

15 could do that.   Did she say why?    Did she ask you why?

16        A                No.
```

BAIRD

17      Q            What was her immediate response to
18 your statement that you don't think that you could do
19 that?

20      A            I don't recall.

21      Q            Why was it at that particular
22 point in time that you did not think you could apologize
23 to Carlotta?

                SHARON L. BANKS REPORTING
                    P.O. Box 44773  .
              Fort Washington, Maryland   20744
                    (301) 372-6922
U                                                    29

1       A            I apologize for a lot of things as
2 a membership and customer service professional that I
3 have no control over.   This was something that I felt
4 was blown out of proportion based upon the facts that I
5 had and felt I did nothing wrong.

6       Q            Why did you think it was blown out
7 of proportion?

8       A            Because I had stopped people
9 plenty of times before; similar considerations.

10      Q            At that particular point in time,
11 did you have a good working relationship with Lisa
12 Ransom?

13      A            As I recall, yes.

14      Q            Did you attribute the Carlotta
15 Scott incident at all to -- and problem that you were
16 encountering, did you attribute that to Lisa in any way?

17      A            No.

18      Q            Did there come a time that you saw
19 Carlotta at all?

20      A            Not that I am aware of.

21      Q            When she came back to do her work
22 shop were you present?

23      A            As I recall the work shop was

                  SHARON L. BANKS REPORTING
                      P.O. Box 44773
                                    Page 22

BAIRD
Fort Washington, Maryland   20744
(301) 372-6922
30

1 cancelled.

2      Q            So Betsy did not require you to
3 apologize to Carlotta in 2004?

4      A            No.

5      Q            Did you have any further
6 communication about the Carlotta incident in 2004?

7      A            Not that I remember.

8      Q            After the meeting nothing happened
9 for the balance of the year?

10     A            Sorry.  I did not hear you.

11     Q            After the meeting between you and
12 Betsy to discuss the Carlotta incident, there is no
13 further communication about Carlotta for the balance of
14 2004?

15     A            To the best of my recollection,
16 no.

17     Q            Let me stay on this point.  2005,
18 is there any communication about the Carlotta incident
19 prior to this October, 2005 letter?

20     A            No.

21     Q            Nothing in a meeting, no
22 communication in a meeting?

23     A            No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922
31

1      Q            No communication by e-mail?

2      A            No.

3      Q            And no communication by any type
4 of hard copy writing?

5      A            No.

6      Q            In 2004, you received a

BAIRD

7 performance evaluation?

8       A                   Yes.

9       Q                   In the winter of 2004?

10      A                   No.

11      Q                   When was it?

12      A                   June or July.

13      Q                   In that performance evaluation you

14 met with Ms. Johnson?

15      A                   Yes.      -

16      Q                   Explain to me how that performance

17 evaluation was rendered?

18      A                   My 2000 performance evaluation

19 was --

20      Q                   2004.

21      A                   I am sorry.  My 2004 performance

22 evaluation, I met with both Stephanie Smith and Betsy

23 Johnson.  Stephanie had been my supervisor since May of

U                                                            32

1 2004 when she joined the center.   And Betsy supervised

2 my previous, previous to that from when Susan Sano left

3 the center.

4          They both met with me.   There is a standard

5 form, went over it, then they -- as I recall, they

6 evaluated me, you know, it's like a scale one to five and

7 some comments at the bottom.   Then if there is a salary

8 adjustment made, it will be noted on there as well.

9       Q                   In your 2004 performance

10 evaluation, discussions with Betsy, in 2004 discussions

11 with Betsy about your performance, did you all talk about

12 Betsy's performance concerns?

13      A                   Can you repeat the question?

14      Q                   Did Betsy inquire, did she raise

15 issues with you specifically about performance problems?

BAIRD

16    A              That's a general part of the

17 process.   Yes.

18    Q              In those discussions, did she not

19 say anything to you about your refusal to apologize to

20 Arminda?

21              MR. FLEISCHER:   Excuse me.   You said

22 did she not say.  I think that might be confusing.

23              BY MR. TEMPLE:

1    Q              Okay.   Did she say anything to

2 you?   Was there any discussion about your refusal to

3 apologize to Carlotta?

4    A              No.

5    Q              In that June/July meeting with

6 Betsy about your performance, did you ever -- did you

7 talk to her at all about any problems that you were

8 having at that time with Arminda?

9    A              I don't think so.

10    Q              So let me move forward then to

11 2004, 2005, late 2004, 2005, early.   When you were

12 interviewed by Mary Ann de Barbieri about a complaint

13 that Arminda had filed?

14    A              Yes.   I don't recall the time

15 frame, but I was interviewed.

16    Q              Do you know what the basis for

17 Arminda's complaint was at that time?

18    A              I don't recall.

19    Q              Were you told, though, by Ms.

20 deBarbieri?

21    A              I believe she told me; yes.

22    Q              Where did she interview you?

23    A              In the suite at the center in a

BAIRD
SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

U                                           34

1 private office.

2      Q            Just you and she?

3      A            Yes.

4      Q        .   Duration?

5      A            I am sorry?

6      Q            How long did the meeting last?

7      A            I don't recall.

8      A            Did she show you any other

9 documents during that meeting?

10     A            I don't recall.

11     Q            Do you recall the questions that

12 she asked you?

13     A            Some of them.

14     Q            what do you recall?

15     A            She asked about Carlotta Scott.

16 That's the one thing I remember.

17     Q            what did she ask you about

18 Carlotta Scott?

19     A            About the incident and my

20 recollection of what happened.

21     Q            You told her I essentially what

22 you told me today?

23     A            Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

                                           35

1      Q            At that time, that you interviewed

2 with Ms. deBarbieri, did you have any sense that there

3 were discrimination issues in the work place at WCA?

4        A          No.

5        Q          Did you have any sense that there

Page 26

BAIRD

23        A              No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

U                                                      38

1        Q              Did you at some point, learn that

2 Arminda was going to be terminated?

3        A          .   Yes.

4        Q              When did you learn that?

5        A              The Friday before she resigned.

6        Q              How did you learn that?

7        A              As I recall, I was told by Betsy

8 so they could deactivate some of the access that I --

9 that she had to some of our computer services systems.

10       Q              What time of day would that have

11 been?

12       A              Late after noon.

13       Q              About what time?

14       A              Sometime between 2 and 5.

15       Q              Did you know that Betsy was

16 returning from a mediation involving Arminda?

17       A              Yes.

18       Q              How did you know that?

19       A              She had mentioned --  Betsy had

20 mentioned it.

21       Q          ~   You had a conversation with Betsy

22 after she returned from mediation?

23       A              Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

D                                                      39

1        Q              Who was involved in the

2 conversation?

3        A              I don't remember.

4        Q              Was it more than you and Betsy?

Page 29

BAIRD

5       A               I don't recall.

6       Q               Do you recall what Betsy said to
7 you about the mediation, if anything?

8       A               No.  I don't.

9       Q               Was she angry?

10      A               I don't recall.

11      Q               Do you recall what her
12 instructions to you were relative to Arminda?

13      A               To deactivate her access to our
14 on line registration system.  That was the one thing
15 that I remember.

16      Q               Did she tell you to do anything
17 other than that, that you remember?

18      A               Not that I remember.

19      Q               You said that you knew she was
20 being terminated.  Did she have any discussion with you
21 about the fact that Arminda was being terminated on that
22 Friday afternoon?

23      A               She meaning?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

[]                                                          40

1       Q               Betsy?

2       A               Yes.

3       Q               What did she say?

4       A               I don't recall.

5       Q               But it was some discussion about
6 Arminda being quote, unquote, terminated?

7       A               Yes.

8       Q               Was Mary Ann deBarbieri a
9 participant in that conversation?

10      A               No.

11      Q               Do you recall whether she was
12 present there in the office?

13      A               She was not there that day.

Page 30

BAIRD

14      Q                Did you understand at that

15 particular point in time, was it your view at that time

16 that you were deactivating Arminda's access to computer

17 information because she was being terminated?

18      A                That was my understanding; yes.

19      Q                Do you also know that

20 communication in writing was being given to the security

21 at the building to exclude Arminda from entering into the

22 office?

23      A                Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922

                                                        41

1      Q                How did you know that?

2      A                I don't remember.

3      Q                Did Betsy tell you that?

4      A                I don't remember who told me.

5      Q                Did you see the communication?

6      A                I did not.

7      Q                Did you talk to Arminda that

8 afternoon at all?

9      A                No.

10      Q                Do you recall telling her that

11 she would be cut off from access to the WCA communication

12 -- computer information?

13      A                No.

14      Q                Are you familiar with the WCA's

15 sick leave policies?

16      A                Generally, yes.

17      Q                How much sick leave were you

18 entitled to on an annual basis?

19      A                I really don't remember at this

20 point.

21      Q.                Did you ever use your sick leave

# EXHIBIT J

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,         :

5                              : Civil Action No.

6          Plaintiff    : 05-7238

7 vs.                          :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9          Defendant.          :

10 _____:

11                              X

12              Tuesday, February 28, 2006

13              Washington, D. C. 20005

14          The deposition of, SUSAN SANOW, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 2:35

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

34

1       Q              Is it a fair characterization of
2  this e-mail that it contains suggestions and criticisms
3  of her administration of the Washington Post Awards?
4       A              Yes.
5       Q              Would you turn your attention to
6  number 4 on the last page of this exhibit where the
7  e-mail states. " I know this e-mail is a bit negative,
8  but I ask these questions out of concern and commitment
9  to this program. "
10         When you sent that, did you have the
11  understanding that your e-mail could be construed as
12  negative?
13      A              No.
14      Q              Why did you write I know this
15  e-mail is a bit negative?
16      A              I consider this to be a bit
17  negative, not negative.
18      Q              So there would be elements of
19  negativity contained within the e-mail; is that fair?
20      A              Yes.
21      Q              When you received Ms.
22  Valles-Hall's response, which I believe is the next day,
23  she writes, yes, the tone is negative, but and

35

1 unnecessary so.    Did that statement offend you?

2          A                Um, no.

3          Q                You did not find it offensive?

4          A                I did not care.

5          Q                Did you find her statement to be
6 confrontational?

7          A                I felt that she just needed to get
8 these thoughts on paper.    Sometime people just have to
9 emote.

10         Q                Did you tell Betsy Johnson that
11 you thought that this statement was confrontational?

12         A                I told Betsy, and I can't remember
13 the order, but I felt that in addition to this e-mail, I
14 also received a phone call from Arminda berating me and I
15 felt the double whammy of phone call and e-mail was
16 uncalled for.

17         Q                When did you receive the phone
18 call?

19         A                I can't remember.  I thought -- I
20 guess I must have received -- I can't remember if I got
21 the phone call first or the e-mail first, but I know that
22 I was berated twice.

23         Q                Do you know that you got the phone

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

61

1          A                    Yes.

2          Q                    What were they?

3          A                    She seemed to be unhappy with my

4 direction, did not want to follow it.

5          Q                    What makes you say that she did

6 not want to follow your direction?

7          A                    When we told her -- I told her

8 that it needs to be on the -- all the classes need to be

9 on the web site by a certain date, she said " no,

10 impossible.   Can not be done. "

11         Q                    Did that happen during an oral

12 conversation?

13         A                    Yes.

14         Q                    Did she ever inform you that she

15 did not believe that that was within her job?

16         A                    Yes.

17         Q                    Duties?

18         A                    Yes.

19         Q                    How did you respond?

20         A                    I needed more information.    I

21 remember that is how I responded.

22         Q                    Did she ever tell you that CNA had

23 hired a communications director --

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

62

```
 1        A              Yes.
 2        Q              -- or communications personnel?
 3        A              Yes.
 4        Q              Did she tell you that she believed
 5 it to be within his job and responsibilities?
 6        A              Yes.
 7        Q              How did you respond to that?
 8        A              In the meeting that we had at that
 9 point, I still needed more information.
10        Q              What more information did you
11 need?
12        A              I needed to know what it all
13 entailed and I can tell you how -- we then had a meeting
14 with the director of Communications and the deputy
15 director for external affairs and the executive director
16 and Arminda and myself.   And I remember specifically
17 saying I agree with Arminda.   But -- for the director of
18 Communications to put the items on the web, eventually.
19 Meaning I knew that he, our director of Communications
20 was heavily involved in a major rebranding, renaming
21 program.   So he did not have the time to do it.
22        So I agreed to, for now, in January, 2005, that
23 Arminda would continue to put the information on the web
```

63

1 and we would  reconsider this later in the year when the
2 rebranding effort was launched.

3        Q              Did she ever tell you that she did
4 not have the technical expertise to do that in a timely
5 efficient manner?

6        A              Yes.

7        Q              How did you respond to that?      ,

8        A              That with the right amount of lead
9 time we were talking about this in January.   The dead
10 line was the end of January.   I thought that a month was
11 or just under a month was sufficient to put the things
12 on.   She had put them on in the past.

13       Q              Did she ask you for help?

14       A              No.

15       Q              Did she ask you to appropriate any
16 resources to help her?

17       A              No.

18       Q              She did not ask for help from the
19 Communications Department?

20       A              Yes.

21       Q              Was Rick Rose the only person
22 working in the Communications Department that knew how to
23 get the materials on line?

64

1        A              Yes.

2        Q              Is it true that she eventually did
3 put the materials on line?

4        A              Yes.

5        Q              What other problems do you
6 perceive that you had with her in January, 2005?

7        A              Um, getting the catalogue
8 together and out.  Uh, we had a lot of discussion on the
9 types of workshops we were giving, the titles of the work
10 shops, trying to increase registration was very
11 important.

12       Q              Did you communicate that to her
13 directly?

14       A              Yes.

15       Q              Is there any writing to that
16 affect?

17       A              I can not recall.  I don't know.

18       Q              Take a look at what is marked as
19 Exhibit 2.

20       A              Okay.

21       Q              In front of you, we have what has
22 been marked as Exhibit 3.  Is this an e-mail from you to
23 Ms. Johnson?

84

1 Arminda would be -- her key faub would be, what do you
2 call it, not deleted, but disarmed and that she would be
3 locked out of the computer for the weekend.
4        Q                So this was on Friday?
5        A.               Yes.
6        Q                Did she tell you why?
7        A                She said that Arminda became
8 fairly angry and yelled at mediation and our counsel
9 advised us to --
10               MR. FLEISCHER:  Um --
11               THE WITNESS:  Okay.  Sorry.
12               MR. FLEISCHER:  Do not relate any advice
13 that you heard about from Counsel.
14               THE WITNESS: Okay.
15               MR. FLEISCHER:  Answer the question as
16 best you can without doing that, please.
17               THE WITNESS:  Can you repeat the
18 question.
19               BY MR. BLUE:
20        Q                Um, why did Ms. Johnson tell you
21 that she was restricting her building access?
22               MR. FLEISCHER:  Can you answer the
23 question without relating advice from counsel?

# EXHIBIT K

| | |
|---|---|
| **From:** | len.min@comcast.net |
| **Sent:** | Monday, August 16, 2004 9:01 AM |
| **To:** | debarasso@aol.com |
| **Subject:** | Formal Complaint & Request for Investigation |

Dear Mary Ann:

I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

Thank you,

Arminda

--
Arminda Valles-Hall
armindav@wcanonprofits.org / len.min@comcast.net
202-327-5216 (w-direct) / 703-351-7966 (h)

Apx. 112



# EXHIBIT L

**The Washington
Council of Agencies**

# Memo

**To:**   Arminda Valles-Hall

**From:**   Betsy Johnson

**CC:**   Mary Ann de Barbieri

**Date:**   11/03/2004

**Re:**   Absences

---

Your poor attendance record over the past two months has caused serious disruption to the work of WCA, particularly since many of your absences have been unscheduled. By your own admission, you are unable to complete your duties in a timely way when you are absent so much.

You have stated that your absences were for medical reasons. I have asked you to furnish me with a statement from your health care practitioner justifying the leave. To date you have failed to provide such a statement. In order for me to consider your prior absences as excused, I must have such a statement by close of business on Thursday, November 4. Failure to provide a statement will result in disciplinary action.

According to our payroll records, you have exhausted your sick leave and you have 7.34 days of annual leave remaining. While I have agreed that future absences may be charged against annual leave, I cannot allow you to continue missing work on such a frequent basis. Should your absences continue at the current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed. These arrangements may include hiring a permanent replacement for your position.



Complainant's
Exhibit

2-98-6        SAB
mD

# EXHIBIT M

1

WASHINGTON, D. C.

   IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____ X

ARMINDA VALLES-HALL,     :

                     : Civil Action No.

       Plaintiff     : 05-7238

vs.                     :

CENTER FOR NONPROFIT ADVANCEMENT,:

       Defendant.        :

_____:

                     X

           Tuesday, February 28, 2006

           Washington, D. C. 20005

           Session I

    The deposition of, BARBARA MENDOZA, witness, was

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R.,  a notary public in

and for the District of Columbia, commencing at 4:21

o'clock p.m.,  when were present on behalf of the

respective parties:

MEND2

1        A.  No.

2        Q.  Relative to her access to the computer

3    system, was that continued or disallowed?

4        A.  It was discontinued on Friday.

5        Q.  And how was that achieved?

6        A.  I believe I -- we have a software -- or

7    network maintenance providers.  I called them to

8    deactivate her access to the system.

9        Q.  And why did you do that?

10       A.  I was told to.

11       Q.  And who told you?

12       A.  Betsy.

13       Q.  And so when you spoke with Betsy, she

14   told you that she, Arminda, couldn't come into

15   the building and to deactivate the system, her

16   access to the computer system?

17       A.  Yes.

18       Q.  Did she tell you anything else other

19   than that?

20       A.  Each person has a key filed for access

21   to the building and I was told to deactivate

22   that.

23       Q.  Did you ask why?

1        A.  She told me that the mediation had gone

2    badly and that she needed me to do this.

3        Q.  Did you ask her what was bad about the

4    mediation?

5        A.  That's not my --

6        Q.  You just did what you were told?

7        A.  Yes.

8        Q.  Was anyone else present when she told

9    you to do these things?

Page 22

```
1    A        An employee earns 2.92 hours per
2  payroll period.
3    Q        During the 18 years that you have
4  been there, have you had any employees become very sick?
5    A        Yes.
6    Q        In fact one of them died; if I
7  understand correctly?
8    A        Two of them died.
9    Q        Who are they?
10   A        Phyllis Campbell Newsom and  Wanda
11 Banks.
12   Q        How did Ms. Campbell Newsom pass?
13   A        I am sorry.
14   Q        How did Ms. Campbell Newsom pass
15 away?
16   A        It was a child birth related
17 mistake.
18   Q        How about Ms. Banks?
19   A        Cancer.
20   Q        Breast cancer?
21   A        No.  Cancer of the gallbladder.
22   Q        When did she pass?
23   A        June, 7th, 19 -- 2003.
```

Page 23

```
1    Q        When Ms. Banks was sick, she was
2  required to use a lot of sick leave?
3    A        Yes.
4    Q        The same when Ms. Campbell was
5  pregnant, did she use a lot of sick leave?
6    A        She -- she used sick leave for,
7  um -- her illness was briefer.
8    Q        What was your practice relative to
9  people when they were sick and required to use most if
10 not all of their sick leave, based on your experience?
11   A        What is the practice?
12   Q        Yes.
13   A        For illness, the person is to use
14 sick leave first, then annual leave and then personal,
15 um, any accrued leave.
16   Q        What was Ms. Campbell Newsom's job
17 title?
18   A        She was director of Advocacy and
19 Community Relations.
20   Q        How long had she been there before
21 she passed?
22   A        She was there um, I am sorry
23 again, a long time.   At least 8 years.
```

Page 24

```
1    Q        In the 18 or so years that you
2  have been there, about 18 years this year?
3    A        1988, yes.
4    Q        You all ever -- do you know of any
5  instance where a person has been told they might lose
6  their job because of their illness?
7    A        No.  I was not -- the policy is
8  made clear to employees in terms of illness that you must
9  use your leave time at -- which time you need to then
10 consult with your supervisor to make special arrangements
11 of time off without leave, without pay.
12   Q        I want to make sure you understood
13 my question.
14   A        I am sorry.
15   Q        Which was have you ever -- do you
16 have any personal knowledge specifically about any
17 instance where Ms. Johnson has told an employee that
18 because they've been required to use their sick leave
19 that they may lose their job?
20   A        I am aware of instances where the
21 person is reminded that they can not go to a negative
22 leave point.
23   Q        My question is very narrow.  And
```

Page 25

```
1  I am not talking about -- I am talking about when a
2  person is told they will lose their job because they have
3  been required to exhaust their sick leave.  Have you
4  heard of that?  Do you know of an instance of that
5  nature?
6    A        No.
7    Q        Did Ms. Johnson ever consult with
8  you about Arminda's sickness or illness during the last
9  quarter of 2004?
10   A        No.
11   Q        Did you know that Arminda was
12 using sick leave during the last quarter of 2004?
13   A        Yes.
14   Q        Do you know why she was using sick
15 leave?
16   A        She had leave slips filled out and
17 it was circled as sick leave.
18   Q        Did she fill out these leave slips
19 to your knowledge, in advance of taking the leave?
20   A -      For the most part.
21   Q        Do you recall the extent to which
22 she provided the appropriate medical documentation for
23 that leave?
```

# EXHIBIT N

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,         :

5                              : Civil Action No.

6        Plaintiff    : 05-7238

7 vs.                          :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9        Defendant.            :

10 _____:

11                         X

12           Tuesday, February 28, 2006

13           Washington, D. C. 20005

14

15    The deposition of, MARY ANN deBARBIERI, witness, was

16 called for examination by counsel for the Plaintiff,

17 pursuant to notice, at the offices of Donald Temple,

18 Esq., 1229 15th Street, Northwest, Washington, D. C.

19 20005, before Sharon L. Banks, C.R.,  a notary public in

20 and for the District of Columbia, commencing at 10:30

21 o'clock a.m.,  when were present on behalf of the

22 respective parties:

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922

48

1        Q                He was one of your host lecturers

2 for one of your courses.    He was meeting with

3 apparently Arminda and Lisa in the conference room.

4        A                Oh.    It was an incident that was

5 recounted to me by Ms. Valles-Ms. Hall.

6        Q                Did Ms. Johnson have any

7 discussion with you about that particular incident?

8        A                No.

9        Q                Did Jeff Kost have any discussion

10 with you, about that particular incident?

11       A                Not that I recall.

12       Q                After you talked to Arminda about

13 that incident, did you not discuss the issue with Ms.

14 Johnson?

15       A                Not that I recall.

16       Q                Why not?

17       A                It was irrelevant to my

18 investigation.

19       Q                Why?

20       A                Of Ms. Valles-Hall's complaint.

21 In my opinion it was.

22       Q                Why?

23       A                It did not related to her

49

1 personnel complaint.

2     Q              You were aware that there was an

3 allegation that Jeff Kost had complaints about the manner

4 in which Ms. Hall had communicated with him?    Yes?

5     A.             Yes.

6     Q              Were you?

7     A              Yes.

8     Q              The answer is yes.

9     A              Yes.

10    Q              And you are aware that that

11 particular communication evolved around the Bill Terry

12 conference room incident?

13    A              I -- incidents, I am not

14 remembering that specific incident, but there were

15 complaints; yes.

16    Q              At some point you learn that

17 Arminda Valles-Hall filed a complaint with the D. C.

18 Human Rights?

19    A              I am sorry.

20    Q              At some point you learned that

21 Arminda filed a complaint with D. C. Human Right?

22    A              Yes.

23    Q              When did you learn about the D.C.

100

```
 1      A                Um, yes, office politics can be
 2 negative.  Her relationship with Jeremy and Jeff has
 3 tension and it is negative.
 4      Q                " Have you witnessed VH telling
 5 other employees what she thinks of them? "   What does
 6 she say there?
 7      A                Full staff meetings were negative.
 8 Betsy did not want to lead.   A came up with ways for all
 9 to participate.  Folks picked A's agenda away.
10      Q                Under that.
11      A                " A communication --  I don't
12 know.  Communication would lead.   She did not come to
13 all of the away with Prince George's County.  Meetings
14 were negative.
15      Q                " If yes, have you mentioned this
16 to Betsy? "  There is nothing there.  Do you know if she
17 did not respond to that question?
18      A                I don't recall.
19      Q                " Did you feel it was a hostile
20 place at WCA, particularly for people of color?   What
21 did she state there?
22      A                " She said people don't consider
23 what they say.   There is an issue with race.   People
```

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

101

1 don't like -- don't think about what they say.  Dawn

2 abused people.  She said I can't stand you to Karen.

3 Nothing was ever done. "

4        Q              Who is Dawn, do you know?

5        A              Former employee.

6        Q              There is an arrow pointing there.

7 It says, " things allowed to continue. "

8        A              Yes.

9        Q              Did you investigate that?

10       A              No.

11       Q              Was that a concern to you?

12       A              The employee was no longer there.

13       Q              Well, the fact that nothing was

14 ever done?

15       A              I don't know that.   I did not

16 investigate it.

17       Q              Dawn is White and Karen is African

18 American?

19       A              Yes.

20       Q              Question, " How are problems with

21 performance addressed generally? "   Did you read that?

22       A              I don't know what this " not " --

23 looks like " flat. "   I don't know what that means.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

110

1 document?

2        A                I sent it to Ms. Valles-Hall.   I

3 sent it to the executive committee along with Ms.

4 Valles-Hall's response to this document.

5        Q               After you conducted these various

6 interviews, what did you do with the information that you

7 received?

8        A                In my interviews.

9        Q                Yes.

10       A                I sat down and wrote a report.

11       Q                Did you look at the performance

12 evaluations of Jeff Kost?

13       A                I did not.

14       Q                Did you look at the performance

15 evaluations of Jeremy Baird?

16       A                I did not.

17       Q                Did you look at the performance

18 evaluation of Barbara Mendoza?

19       A                I did not.

20       Q                And if Arminda was complaining

21 about getting 3s for certain criteria, how could you

22 ascertain whether the process was fair without looking at

23 the performance evaluations of other similarly situated

111

1 employees?

2       A             I did not feel it had any bearing
3 in her evaluation?

4       A             Suppose other people were getting
5 higher evaluations and raises or strike that.

6             Suppose they were getting similar low
7 evaluations, but getting hirer rating, would that have
8 been a factor for you?

9       A             I was investigating Ms.
10 Valles-Hall's complaint.

11       Q             What Ms. Valles-Hall's complaint
12 was about is that she was not being treated fairly and
13 equally;  isn't that correct?

14       A             She -- she was being, um, that her
15 evaluation was biased.  That is what her complaint was.

16       Q             On your investigative report, if
17 you look at Exhibit 2 and number 2:  The goal of my
18 investigation was to ascertain, number two, if she was
19 being evaluated in a manner differently than other staff
20 members.

21             How can you tell, how would you, based upon your
22 approach to this investigation, determine the extent to
23 which Arminda was treated differently than other staff

136

1 determined that -- you determined here that Barbara made
2 a complaint; is that correct?

3        A              Yes.

4        Q              And did you determine that her
5 complaint was valid?

6        A              I did not -- I was not -- I was
7 looking at whether or not the complaints had been made.

8        Q              You had to have looked at whether
9 the complaint was made -- was valid in order to determine
10 that Arminda's difficulties were a result of her approach
11 to her staff colleagues; isn't that true?

12       A              I was not validating the
13 complaint.

14       Q               How could you, if I may, how
15 could you say that Arminda's problems were related to her
16 approach to her staff colleagues if in fact the
17 complaints that you had learned about in your
18 investigation were not valid?

19       A              I was not investigating whether
20 they were valid or not.

21       Q              So you made that determination --
22 you are telling me today, that you made that
23 determination without any determination as to whether or

137
1 not the complaints of Jeff Kost, Jeremy Baird, and
2 Barbara Mendoza were valid?   Is that your testimony?
3       A              The complaints were made is my
4 testimony.
5       Q.              Your testimony is that you made no
6 determination as to their validity; is that your
7 testimony?
8       A              I -- I don't recall making any
9 assessment of their validity.   I was attempting to find
10 out if the complaints had been made.
11      Q              So if the complaints had been
12 made, your investigation, how do you get there?   How do
13 you say that Arminda has problems related to the way she
14 is dealing with other people instead of the other people
15 having problems in terms  of what Arminda is complaining
16 about?
17      A              I got there.
18      Q              Let me ask you, um, to direct your
19 attention to page 3 of Exhibit 3.   Number 6.   It says,
20 " During my evaluation, " this is Arminda telling you
21 in her response to your final investigation. " Ms.
22 Johnson told me that she wanted me to swallow
23 inflammatory remarks."

            SHARON L. BANKS REPORTING
                 P.O. Box 44773
        Fort Washington, Maryland  20744
                 (301) 372-6922