# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ARMINDA VALLES-HALL,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:06 CV 806 CKK |
| | ) | |
| **CENTER FOR NONPROFIT ADVANCEMENT,** | ) | |
| | ) | |
| Defendant | ) | |
|  | ) | |

## REPLY IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities      ii

Argument      1

     I.  Hall's Rule 7(h) Statement is Deficient      1

     II.  Hall Has Abandoned Counts II, IV, V and VI      4

     III.  Hall Fails to Show Any Material Disputes of Fact      5

     IV.  Hall's Analysis of *Burlington* Is Incomplete      9

Conclusion      12

# TABLE OF AUTHORITIES

Page

Court Rules

Fed.R.Civ.P. 56                                                                                        8

LCvR 7(h)                                                                                           1, 2

Cases

*Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006)              9

*Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001)                              10

*Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274 (11th Cir. 2003)         4

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*,
     101 F.3d 145 (D.C.Cir. 1996)                                                      1, 2

*Jenkins v. County of Riverside*, 398 F.3d 1093 (9th Cir. 2005)                       4

*Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362 (D.C. 2003)                                 5

*Mazloum v. District of Columbia*, __ F.Supp.2d __, 2006 WL 1770500
     (D.D.C. No. 06-0002, decided June 27, 2006)                                        8

*Rocafort v. IBM Corp.*, 334 F.3d 115 (1st Cir. 2003)                                 4

**ARGUMENT**

**I.  Hall's Rule 7(h) Statement is Deficient.**

LCvR 7(h) requires that a summary judgment motion be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue.  The Rule then requires the non-movant's opposition to

> be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated. ... In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

The Rule's requirements are emphasized in the Order Establishing Procedures, which at numbered paragraph 3 states that the Court "strictly adheres to the dictates of Local Civil Rule[] 7(h)," citing *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145 (D.C.Cir. 1996).  Paragraph 3 of the Order Establishing Procedures concludes with the bolded statement:  "The Court assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."

Instead of complying with Rule 7(h), Hall filed her own "Opposing Statement of Material Facts *Not* In Dispute" (emphasis added), as if she were the movant.  This leaves undisputed the 57, record-supported facts listed in the Center's Rule 7(h) Statement.

Even giving Hall the benefit of treating her Opposing Statement as a statement of genuine issues, it is not concise, it is argumentative, and in at least one critical respect it fails to contain any record citation.  *See* Hall Statement No. 5: "[T]he substantive issues

raised during the 2004 evaluation process were used to terminate Ms. Valles-Hall in February 2005." This statement is repeated in Hall's Memorandum (Hall Mem. at 3), again without any record citation. These defects – lack of conciseness, argumentative-ness, and absence of record citations – are the very defects relied on in *Jackson,* 101 F.3d at 153 n.6, to affirm summary judgment for the employer.

The deficiencies in Hall's Rule 7(h) Statement leave the following material facts uncontested:

- Johnson (the Center's Executive Director), interviewed Hall and was the sole decision-maker in hiring Hall, evaluating Hall in 2003 and 2004, and giving Hall raises in 2003 and 2004. Center Statement, ¶¶ 13, 20, 27.

- Hall was the third-highest-paid employee of the Center, behind only John-son herself (who had been with the Center for 18 years as of June 2003) and Jeff Kost (the second-raking official at the Center, who had then been with the Center for five years). Center Statement, ¶¶ 20, 27.

- Hall does not know how other employees were evaluated in 2003 or 2004, she does not know the extent to which they received raises in 2003 or 2004, and she has no documentation to support her claim that her 2004 evaluation was different from similarly situated white and/or gay managers. Center Statement, ¶¶ 21, 35.

- In June 2003 Johnson gave a white, gay female an overall evaluation of "2" (marginal) and no raise, primarily because of that employee's verbal abuse of other staff. Center Statement, ¶ 22.

- Johnson has never made a derogatory reference to race, color, national origin or sexual orientation to Hall, in Hall's presence, or in the presence of any other Center employee and no other Center employee has ever made a derogatory reference to race, color, national origin or sexual orientation in Johnson's presence. Center Statement, ¶¶ 33, 34.

- During the 2003-2004 evaluation period, Hall misused compensatory time, she misused workshop funds belonging to the Center, and her work was

criticized by both a Center director and a consultant to the Center.  Center Statement, ¶¶ 23(a), 23(c), 23(e), 23(h).

- Hall managed the Washington Post Award from November 2003 to April 2004 as part of her job as Director of Education.  In April 2004, Johnson returned management of the Award to the former Center employee who had created the Award and had managed it for 10 years prior to November 2003.  Johnson did so because the former employee's services were offered without cost and amounted to a substantial gift in kind, because the former employee was highly experienced in managing the Award, and because Hall's management of the Award had not been satisfactory.  Center Statement, ¶¶ 16, 23(h), 23(i).

- Although Hall filed her initial charge of discrimination with the District of Columbia Office of Human Rights on August 9, 2004, Johnson did not learn of the filing until December 2004 when OHR served notice of the charge on the Center.  Center Statement, ¶¶ 36, 37.

- In the six-week period from September 20 to October 30, 2004, Hall worked a total of 12 out of 29 scheduled workdays, claiming an unspecified illness.  Johnson counseled her on several occasions about poor attendance and requested a doctor's note about what could be expected.  The note Hall provided did not say what the Center could expect in terms of Hall's future medical absences.  Center Statement,  ¶¶ 44, 45, 46.

- The catalogue for the Center's fall 2004 courses offerings, which was Hall's responsibility, was not completed until the end of October, more than two months late.  By that time, the dates for some course offerings had already passed and other courses had to be canceled as a result of low registration. Center Statement, ¶ 43.

- At various times during January 2005, both Johnson and Sanow (Hall's immediate supervisor beginning in January 2005) instructed Hall to post the Center's spring course offerings on the Center's website, a duty that she had performed several previous times.  Hall initially refused to do so, saying that was not part of her job.  Center Statement, ¶¶ 17, 48.

- On February 1, 2005, Hall received and accepted an offer, effective March 1, 2005, for another job with higher pay, better benefits and a shorter, cheaper commute.  Center Statement, ¶¶ 49, 54.

- In early February, 2005, Johnson decided to fire Hall for insubordination, poor performance, and unacceptable workplace behavior, but she postponed doing so pending mediation of Hall's OHR complaint.  On February 14, 2005, before being fired, Hall submitted a letter of resignation.  Center Statement, ¶¶ 50, 53.

- Hall's predecessor at the Center was a straight Latina woman, hired by Johnson.  Hall's successor at the Center is a straight African American woman, hired by Johnson.  Center Statement, ¶¶ 12, 55.

These facts entitle the Center to judgment as a matter of law.

## II.  Hall Has Abandoned Counts II, IV, V and VI.

The Center's motion explicitly addressed, and sought judgment on, each of the claims in Hall's eight-count amended complaint.  Hall's opposition, in contrast, is limited to race discrimination and retaliation.  Nowhere does she answer the Center's arguments against her claim of sexual orientation under the D.C. Human Rights Act (Count II), her claim of constructive discharge as a stand-alone cause of action (Count IV), or her common law claims of negligent infliction and negligent supervision (Counts V and VI).  Aside from any other basis for summary judgment, these claims should be rejected as abandoned.  *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (a 42 U.S.C. § 1983 case in which a former county employee was held to have abandoned her claims by not raising them in opposition to the county's summary judgment motion); *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003) (employee waived hostile environment claim by not adequately addressing it in opposition to employer's summary judgment motion); *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284 &

n.6 (11th Cir. 2003) (contract claim abandoned when not raised in opposition to summary

judgment motion).

### III.  Hall Fails to Show Any Material Disputes of Fact.

Hall fails in her attempts to show the existence of a material factual dispute

requiring trial.  For example, at pages 17-24 of her Memorandum she discusses in detail

the various incidents which in Johnson's mind justified only an "above average" instead

of an "outstanding" evaluation, and which Hall contends are evidence of discrimination.

While the characterization of those incidents may be open to interpretation, such differ-

ences are not material.  *See Joyner v. Sibley Mem. Hosp.*, 826 A.2d 362, 372 (D.C. 2003)

(characterization of various workplace incidents, including whether at least one of them

even took place, was disputed, but the disputes were not material for summary judgment

purposes).  Hall herself admits that, even under her characterization of the incidents,

"they likely cannot individually support a substantive claim of discrimination."  Hall

Mem. at 29.

What is material is Johnson's perceptions and her motivations in supervising and

evaluating Hall.  What Johnson perceived was a pattern of abrasive behavior by Hall

toward her colleagues, along with specific instances of workplace misconduct and failures

or refusals to complete assignments as directed.  Hall offers no competent evidence that

Johnson was motivated by racism in acting on those perceptions.

Hall similarly offers no record support for her statement (Hall Mem. at 12 n.4) that

she had not exhausted her sick leave.  In one six-week period during the fall of 2004 she

worked only 12 out of 29 scheduled workdays, missing the remaining 17. [1]  Yet as stated

at page 8 of the Center's Personnel Handbook (Apx. 96), she was entitled only to 10 days

of sick leave per year.  Although Hall claims that Johnson's insistence on a doctor's note

and Johnson's threat to replace Hall were discriminatory (Hall Mem. at 12), Hall cites no

evidence that non-minority employees with similarly poor attendance records received

more favorable treatment.  The Personnel Handbook clearly permits the Executive

Director to request a doctor's note when absences exceed one week.  Handbook at 8

(Apx. 96).

Hall is mistaken when she says that Johnson made the decision to terminate Hall

"immediately following the [OHR] mediation."  Hall Mem. at 10.  The undisputed fact is

that Johnson made the decision earlier that month, at about the same time Hall accepted

her new job.  However, Johnson postponed acting on her decision in the hope Hall and

the Center might reach a resolution of their differences at mediation that would include

Hall's resignation.  Center Statement, ¶ 50; Johnson Aff. ¶ 14 (Apx. 246).

Hall complains that de Barbieri conducted a "faux" investigation by ignoring

instances of alleged racism cited by Hall.  Hall Mem. at 5, 24.  But the only substantive

complaint de Barbieri received and undertook to investigate was that the July 2004

evaluation was biased.  Hall's August 16, 2004 e-mail to de Barbieri (Apx. 112) said: "I

---

[1] At page 15 of the Center's Memorandum in support of its summary judgment motion, and again at page 22, the Center incorrectly stated that Hall *missed* 12 out of 29 scheduled workdays.  In fact, she *worked* only 12 out of 29 scheduled workdays, missing the remaining 17. Johnson Aff. ¶ 12 (Apx. 246); Center Statement of Material Facts, ¶ 44.

am writing to formally complain about my most recent evaluation ....  The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation."  Consistent with that complaint, de Barbieri investigated the July 2004 evaluation.  The report of her investigation (Apx. 113) begins, "On August 16, 2004, Arminda Valles-Hall emailed ... [me] to formally complain about her most recent personnel evaluation ...."  Both de Barbieri and Johnson invited Hall, in writing, to specify any additional discrimination complaints she might have, but Hall did not do so. De Barbieri letter dated December 6, 2004 (Apx. 117); Johnson e-mail dated November 4, 2004 (Apx. 118).

The investigation itself included a two-hour interview with Hall on October 19, 2004, conducted off-site at Hall's request.  The two-month gap between Hall's initial e-mail and de Barbieri's interview is attributable entirely to Hall's lack of cooperation in setting up the interview.  See de Barbieri's report at 1 (Apx. 113).  De Barbieri also interviewed five other Center employees and she submitted a draft of the report to Hall for comment.  De Barbieri's procedures and the scope of her investigation were clearly reasonable under the circumstances.  Her conclusion – that Hall's difficulties were a result of her own aggressive and confrontational approach to staff colleagues, not the result of racial bias or retaliation – is well supported.

In an effort to recast her voluntary quit as a constructive discharge, Hall speculates that perhaps her new job at SRAI would only have been part-time and that she might have continued to work at the Center even after accepting the new job.  Hall Mem. at 10.

-7-

While the record does not specifically show whether the SRAI job is full-time or part-time, it does show that Hall's salary is greater than at the Center, her benefits are better, and her commute is shorter and cheaper. Hall Dep. at 15-19 (Apx. 3-7). Hall, of course, knows perfectly well what her new arrangements are; if this full-time/part-time issue is a genuine one requiring trial, she could have submitted a supporting affidavit as contemplated by Fed.R.Civ.P. 56(e). Her failure to do so is telling proof that the issue is specious.

In support of her retaliation claim, Hall cites her telephone conversation and subsequent meeting with Tim Kime, then vice-chair of the Center's Board of Directors, as protected activity. Hall Mem. at 2, 26. Hall's contacts with Kime were not discussed in the Center's initial moving papers because Johnson, the sole decision-maker, did not know about them prior to this litigation. Johnson Dep. I at 22 (Apx. 144c). Thus Johnson's actions as Hall's supervisor could not have been in retaliation for anything Hall told Kime. *See Mazloum v. District of Columbia*, __ F.Supp.2d __, 2006 WL 1770500 *8 (D.D.C. No. 06-0002, decided June 27, 2006) (a defendant's awareness that the plaintiff engaged in protected activity is essential to establish a prima facie case of retaliation under the District of Columbia Human Rights Act).

In its moving papers the Center assumed that the initial triggering events giving rise to allegedly protected activity were the Kost conference room incident, the Baird security incident, or both. See the Center's Memorandum at 25. Hall now points to her close association with an African American colleague, which allegedly provoked John-

-8-

son's animosity, which in turn led to Hall's complaint to Tim Kime, and which then led to further retaliation. Hall Mem. at 26. This chronology is equally unconvincing. First, it is based only on Hall's speculation, not on admissible evidence. Second, as pointed out above, Johnson did not know about Hall's complaint to Kime until after this litigation began. Finally, the only significant supervisory action that occurred prior to the Kime complaint was re-assignment of Washington Post Award duties – a business decision that was reasonable and justified under the circumstances and one that Johnson was entitled to make.

Hall also cites her complaint to the D.C. Office of Human Rights as protected activity. While Hall is correct that an OHR complaint is protected, she ignores the undisputed fact that Johnson did not learn about the complaint until December 2004. Thus nothing before that date, not the 2004 evaluation, not re-assignment of the Washington Post Award, and not the counseling and threats over excessive sick leave, was in retaliation for Hall's OHR filing.

## IV. Hall's Analysis of *Burlington* Is Incomplete.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), decided after the Center filed its summary judgment motion, a female railroad employee's male supervisor made insulting and inappropriate remarks in front of the employee's male colleagues, and he repeatedly told the employee that females should not be working in the company's maintenance department. The employee's initial protected activity was a complaint to company officials, resulting in an investigation, a 10-day suspension of the

supervisor, and an order that he attend sexual harassment training.  But despite respond-ing appropriately, the company also retaliated by re-assigning the employee from forklift duty to the job of track laborer – a more arduous and dirtier job involving removal and replacement of railroad track components, transporting track material, cutting brush, and clearing litter and spillage from the right-of-way.  When the employee then filed an EEOC complaint, the company suspended her without pay for 37 days.

On those facts the Supreme Court ruled that the employee had suffered actionable retaliation.  The Court held that Title VII's anti-retaliation provision prohibits discrimina-tory actions that are *materially* adverse, judged from the perspective of a *reasonable* employee, whether or not the actions affect terms and conditions of employment.  As Hall correctly points out, this standard does not require consideration of the nature of the discrimination that led to the protected activity.  What Hall fails to point out is that the Court did not overrule *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001), which held that the protected activity must arise from an underlying event that was reasonably believed to be an unlawful employment practice.  In other words, there must still be discrimination, or at least a reasonable perception of discrimination, for a subsequent complaint to be protected. [2]

---

[2] Hall states (Hall Mem. at 28) that in addressing retaliation the Center failed (presumably inadvertently) to cite certain D.C. Circuit decisions.  The Center did, however, cite the Supreme Court's *Breeden* case, which (presumably) is also the law of this Circuit.

-10-

In an attempt to bring her case within *Burlington's* fact pattern (Hall Mem. at 28), Hall distorts the record.  She says she was penalized for internal disputes, job performance and absenteeism in ways different from her white counterparts, but she makes no record showing of how others were treated.  (The record does show that a gay white female was given a "marginal" evaluation and no raise in 2003 for verbally abusing staff, whereas Hall, who was also abusive to staff, was given an "above average" evaluation and a raise in 2004.)  She says the Center refused to conduct any meaningful investigation of her discrimination complaints when, in fact, the Center's chairperson conducted an extensive investigation of Hall's 2004 evaluation complaint and invited Hall to submit any additional complaints she might have.  She says her job duties were altered by having "more arduous tasks [imposed] upon her," when elsewhere she complains she was improperly *stripped* of Washington Post Award responsibilities.  And she says she was constructively discharged when in fact she had already made the decision to quit and take another job, submitting her resignation before being fired.

The facts in this case simply do not equate with those in *Burlington*.  As shown in the Center's initial papers, the underlying events allegedly giving rise to protected activity were far too trivial to be reasonably viewed as unlawful employment practices; none of the supposed retaliation was materially adverse; and Johnson's evaluation and supervision of Hall were based on demonstrable, non-discriminatory considerations.

## CONCLUSION

For all the foregoing reasons, and for the reasons set out in the Center's initial

Memorandum, the Court should grant the Center's motion for summary judgment.

Respectfully submitted,

OPPENHEIMER, FLEISCHER & QUIGGLE, P.C.


By ____/s/ Charles H. Fleischer_____
      Charles H. Fleischer, D.C. Bar No. 4341

7700 Old Georgetown Road, Suite 800
Bethesda, MD 20814
tel.: (301) 986-4056 / fax: (301) 951-0555
e-mail: cfleischer@ofqlaw.com

*Attorneys for defendant*