**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ARMINDA VALLES-HALL | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No: 1:06-CV-806 CKK |
| | ) | **ORAL ARGUMENT REQUESTED** |
| CENTER FOR NONPROFIT | ) | |
| ADVANCEMENT | ) | |
| | ) | |
| Defendant | ) | |

_____

**PLAINTIFF ARMINDA VALLES-HALL'S MEMORANDUM OF**
**LAW IN OPPOSITION TO DEFENDANT CENTER FOR NONPROFIT**
**ADVANCEMENT'S MOTION FOR SUMMARY JUDGMENT**

Dated: July 14, 2006

       __/s/Donald M. Temple_____
Donald M. Temple [407849]
Dhamian A. Blue [488664]
1229 15th Street, NW.
Washington, DC  20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
*Counsel for Plaintiff*
dtemplelaw@aol.com

**INTRODUCTION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Arminda Valles-Hall ("Plaintiff" or "Ms. Valles-Hall") respectfully opposes Defendant Center for Nonprofit Advancement's ("Defendant" or "CNA") motion  for summary judgment, which should be denied for several reasons.  First, and relative to Ms. Valles-Hall's federal and state race discrimination claims, she has produced evidence from which a reasonable fact-finder could find in her favor.  In particular, she has established a *prima facie* case of race and national origin discrimination and retaliation, and further demonstrated that any "legitimate business reason" set forth by Defendant in defense of these claims is pretextual.

**SUMMARY OF MATERIAL FACTS**

Arminda Valles-Hall  is a Mexican-American woman whose racial identity is Latino.[1]  In June 2003, shortly after she began work at CNA, Ms. Valles-Hall received a perfect employment evaluation from them.  She received the highest score for each performance category for which she was evaluated, including "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits."

 During late 2003 and into 2004, Ms. Valles-Hall began to experience events that gave rise to concerns of illegal discrimination.  She made her first formal complaint of discrimination on April 8, 2004, via telephone, and again on April 9, 2004, during a lunch meeting, to Tim Kime, Vice-Chairman of the CNA Board of Directors.  During a fifteen (15) minute telephone conversation and a subsequent one and one-half hour lunch meeting, Plaintiff told Kime that one of her African-American colleagues (Lisa Ransom) with whom she had a close working relationship was "being treated in a discriminatory way and that I was in the cross hairs (sic) of

---

[1] Citations to the record are included in the Opposing Statement of Material Facts as well as in the argument section.   Citations have been omitted from the Summary of Facts for ease of review.

that."  The principal event to which Ms. Valles-Hall referred during her conversations with Kime was Betsy Johnson's (Ms. Valles-Hall's supervisor) decision to strip her of full responsibilities relative to the Washington Post Awards.  Specifically, Ms. Valles-Hall believed that her close association with her African-American colleague made her the subject of Johnson's racial animus.

In June 2004, Ms. Valles-Hall received a performance evaluation that was markedly lower than her 2003 evaluation.  In the categories for "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits", she received a score of 3—satisfactory.  Handwritten comments on the evaluation include: "responds with inflammatory remarks"; "needs work on staff"; "in conflicts in the office, reactions need work"; "you need to work harder at solving problems with colleagues and refrain from telling them your judgment of them."  The 2004 evaluation was used by Johnson to give Ms. Valles-Hall a 3 percent raise rather than a 5 percent raise, which was the ceiling for that year.  Additionally, the substantive issues raised during the 2004 evaluation process were used to terminate Ms. Valles-Hall in February 2005.  The issues that transpired between June 2003 and 2004, and upon which Ms. Valles-Hall's 2004 evaluation is based, concern a series of alleged incidents with Ms. Valles-Hall's coworkers, wherein she allegedly acted improperly.

Ms. Valles-Hall met with Johnson to discuss her performance evaluation in July 2004.  Johnson informed her that thirteen out of fourteen employees had complained about her.  After Ms. Valles-Hall pressed Johnson about the quantity and substance of these alleged complaints, Johnson finally stated that only five employees had complained—Jeff Kost, Jeremy Baird, Susan Sanow, Barbara Mendoza, and herself.  In fact, however, only two employees had complained.  Thus, at that meeting and subsequently through the discovery process, Ms. Valles-Hall learned

that Johnson was not forthright and used bogus employee grievances as an excuse to take

adverse employment action against her.

Thus, Ms. Valles-Hall made a second formal complaint of racial discrimination with

Johnson on August 4, 2004.  In that letter, she wrote:

> I believe I am not being treated equitably and that I am being evaluated
> differently and more critically than my colleagues and peers.  I have suffered
> financially and reputationally, having been given a 3% salary increase when 5%
> is the base minimum standard.
>
> I believe my style of communication is viewed unfortunately as aggressive and
> "inflammatory."  These are stereotyped characterizations that are often used when
> women and people of color are self-confident, intelligent and assertive.

She logged her third formal complaint of discrimination on August 9, 2004 when she

filed a discrimination charge with the District of Columbia Office of Human Rights alleging

discrimination on the basis of race and national origin.  She logged her fourth formal complaint

of racial discrimination with Mary Ann de Barbieri, the Chairman of the CNA Board of

Directors, on August 16, 2004.

In September 2004, Ms. Valles-Hall began to suffer from physical ailments caused by

work-induced stress.  Later that month, she also began to see a licensed clinical social worker.

Ms. Valles-Hall was required to miss some work to address her physical and mental ailments,

which were caused by her work environment.   On November 3, 2004, however, Johnson

informed Ms. Valles-Hall, via letter, that (1) she was required to produce a doctor's note to

prove that her sick leave was justified, and (2) that future absences would result in her

termination.  Johnson's letter was uncharacteristic, particularly as the office manager had never

known of an instance in which an employee's job would be threatened for their use of sick leave.

By November 2004, de Barbieri had begun to investigate Ms. Valles-Hall's

discrimination claim.  In so doing, she determined that several pertinent matters or allegations

were irrelevant to Ms. Valles-Hall's complaint that race played an improper role in her evaluation process, including Johnson's conclusion that she was to blame for the inter-office conflicts. Nonetheless, de Barbieri ignored those matters and issued her final report without taking certain race and employee-specific allgetions into consideration.

Ms. Valles-Hall's made one last complaint on February 11, 2005 when she attempted to resolve her disputes with Defendant at a mediation session at the D.C. Office of Human Rights. While the content of those discussions are confidential pursuant to an agreement that was executed by both parties, it is axiomatic, given the nature of Ms. Valles-Hall's discrimination charge, that the discrimination allegations were the subject of the mediation.

Immediately after the mediation on February 11, 2006, Johnson instructed office personnel to: (1) deny her access to Defendant's office suit by deactivating her office key; (2) deny her access to the building in which Defendant's offices are located by instructing security to prohibit her entry and giving the same security personnel a picture of Plaintiff; (3) deny her access to the Defendant's voicemail system; and (4) deny her access to the Defendant's computer system. These retaliatory acts were taken against Ms. Valles-Hall because "the mediation had gone badly" and "Arminda became fairly angry and yelled at mediation."

The instant case merits adjudication at trial. Not only has Defendant failed to meet its Rule 56 summary judgment burden, but also, notwithstanding that failure, Ms. Valles-Hall has conducted extensive discovery and uncovered significant facts from which a reasonable fact-finder could find that Defendant unlawfully discriminated and retaliated against her. For these reasons, Defendant's motion for summary judgment should be denied.

# ARGUMENT

## I.    LEGAL STANDARD

A party is entitled to summary judgment only if it demonstrates the "absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact where the relevant evidence in the record, taken as a whole, indicates that a reasonable fact finder could not return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) ("*Anderson*").  In making this determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor; the Court must not make credibility determinations or weigh the evidence.  *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).  "The mere existence of some alleged factual dispute between the parties" will not defeat summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505.  A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination.  *Id.* at 248, 106 S.Ct. 2505. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In the present case, Defendant's Motion fails for several reasons, all of which relate directly to its inability to meet its Rule 56 burden.  First, and relative to Ms. Valles-Hall's federal and state race discrimination claims, she has produced evidence from which a reasonable fact-finder could find discrimination and retaliation.  In particular, she has established a *prima facie*

case of race and national origin discrimination, and discovered evidence that demonstrates that any "legitimate business reason" set forth by Defendant in defense of such discrimination is pretextual. Second, and further to her race discrimination claims, Ms. Valles-Hall has demonstrated that Defendant retaliated against her.

## II.    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF EMPLOYMENT DISCRIMINATION UNDER 42 U.S.C. § 1981 AND THE D.C. HUMAN RIGHTS ACT

Ms. Valles-Hall has brought claims against Defendant for unlawful race-based employment discrimination in violation of 42 U.S.C. § 1981 and race and national origin discrimination under the D.C. Human Rights Act. Section 1981 states, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* The D.C. Human Rights Act similarly precludes employment discrimination on the basis of race and national origin, but also precludes discrimination on the basis of sexual orientation. The standards applied in evaluating a claim of race discrimination in employment under § 1981 and the Human Rights Act are the same as those applied in actions under Title VII. *See Howard Univ. v. Green*, 652 A.3d 41, 45 (D.C. 1994).

In order to prove race-based discrimination, a Plaintiff may provide direct evidence of discrimination or proceed under the burden-shifting proof scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"). Under the *McDonnell Douglas* test, once the Plaintiff establishes a *prima facie* case, she raises a presumption of discrimination. *Id.* at 12. However, once the employer offers a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination

drops from the case and the Plaintiff bears the burden of demonstrating that the defendant's

explanation is pretextual. *Tex. Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Indeed, the federal circuit courts have recognized that establishing a *prima facie* case for a

discrimination claim is a relatively easy test. *Burdine, supra*, at 253. To state a *prima facie* case

of disparate treatment discrimination, a plaintiff must establish that (1) she is a member of a

protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action

gives rise to an inference of discrimination. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843,

850 (D.C. Cir. 2006) ("*Mastro*").

### A.    Ms. Valles-Hall is a Member of a Protected Class

The fact that Ms. Valles-Hall is of Mexican-American origin is not in dispute. Indeed,

Defendant concedes her status as a member of a protected class. *See* Def. Br.

at 11. Notably, however, to construe Plaintiff's claims as being premised only on discrimination

on the basis of national origin mischaracterizes the nature of this litigation. Ms. Valles-Hall has

alleged that she has been discriminated against on the basis of her Latino racial identity which

also serves as a protected class under a § 1981 analysis. Plaintiff notes at the outset that despite

her personal references to herself as a "person of color," and contrary to Defendant's assertions,

she as a "Latino" or "Hispanic" woman, is not a member of the same protected class as an

African-American in a race discrimination analysis. *See Dancy v. American Red Cross*, 972 F.

Supp. 1, 3-4 (D.D.C. 1997) (stating that an African-American was replaced by Hispanic "non-

member" of her protected class).

### B.    Ms. Valles-Hall Suffered Adverse Employment Action

An "adverse employment action" within the meaning of *McDonnell Douglas* is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286 (D.C. Cir. 2003) (*citing Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).  Indeed, actions short of an outright firing can be adverse within the context of employment discrimination.  *Forkkio v Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).

Here, the record contains numerous facts, several of which are not in dispute, that indicate that Ms. Valles-Hall suffered adverse employment action within contemplation of federal and local anti-discrimination laws.

### 1.    Termination And/Or Constructive Termination

Ms. Valles-Hall was terminated for both discriminatory and retaliatory[2] reasons in the form of a constructive discharge.  The record clearly indicates that on or about November-December, 2005, Defendant took affirmative steps to terminate Ms. Valles-Hall's employment and/or force her to resign.  Specifically, immediately following the February 11, 2005 mediation in the D.C. Office of Human Rights, Johnson instructed her office personnel to: (1) deny Plaintiff access to Defendant's office suit by deactivating her office key; (2) deny her access to the building in which Defendant's offices are located by instructing building security to prohibit her entry and giving the same security personnel a picture of Plaintiff; (3) deny her access to the Defendant's voicemail system; and (4) deny her access to the Defendant's computer system.  In short, Defendant's termination of Ms. Valles-Hall is among the most egregious "adverse employment actions" prohibited by § 1981.

---

[2] Plaintiff's retaliation claim is discussed in further detail, *supra*.

Defendant argues, however, that because Ms. Valles-Hall accepted an offer of employment ten (10) days before she was subjected to the adverse action described above, her resignation was voluntary, and not forced. *See* Def. Br. at 16. In so doing, Defendant relies solely upon *Honor v. Booz-Allen & Hamilton*, 383 F.3d 180 (4th Cir. 2004) ("*Honor*"), a Fourth Circuit case that is distinguishable from the case at bar in several respects. First, and foremost, this Court is not bound by the Fourth Circuit's interpretation of federal employment law. Second, even if this Court were to favorably consider *Honor* as persuasive authority, the circumstances of resignation in that case differ substantially from the facts of the present case. In *Honor*, as conceded by Defendant, the plaintiff was only ***threatened*** with job termination. *See Honor*, 383 F.3d at 185. Further, Defendant clearly stated it intended to terminate her on the _____ following the February 11, 2005 mediation. There were no overt acts that effectively ended his employment at any time. According to the record in that case, mostly in the form of written correspondence, the plaintiff was searching for "alternative" employment and had articulated to the employer prior to the discharge an express interest to terminate his employment. *See id.* at 186. Thus, the court in that case concluded that no reasonable fact-finder could find that he was constructively discharged.

In the present case Defendant argues that Plaintiff was offered and accepted a job before she "resigned." *See* Def. Br. at 16. No evidence in the record indicates that at the time of Defendant's actions, that Defendant knew that Plaintiff had accepted a full-time position with a new employer. In the immediate instance, Defendant constructively terminated Plaintiff on February 11, 2005, which forced her to resign on February 14, 2005. Ms. Valles-Hall was scheduled to start a new position March 1, 2005. But for her constructive discharge, she was entitled to the benefit of an additional twenty (20) days of work.

Finally, and even more significantly, unlike the situation in *Honor*, Ms. Valles-Hall was, in fact, effectively terminated—immediately following her mediation, thereby clearly violating her protected right to challenge discrimination.  Johnson made the decision to terminate her employment, conveyed that information to other employees and building security, and initiated overt action in that respect, all of which occurred before Ms. Valles-Hall submitted her February 14, 2005 forced "letter of resignation."  For these reasons, a reasonable jury could determine that Defendant's February 11, 2005 lockout of Plaintiff constituted an "adverse employment action."

**2.    Ms. Valles-Hall Was Given a Negative Evaluation That Was Used to (1) Deny Her The Raise to Which She Was Entitled And (2) Substantiate Her Termination**

In June 2003, Ms. Valles-Hall's employment evaluation was perfect.  *See*  Exhibit C 2003 Evaluation.  She received the highest score for each performance category for which she was evaluated, including "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits"  *Id.*[3]  The fact that Ms. Valles-Hall received a perfect evaluation in 2003 is significant. In particular, she had not had any negative interaction with any of Defendant's employees at that point, which is consistent with her claim that she was subjected to a different standard than her white counterparts, particularly with regards to the evaluations process.  In 2004, however, after several encounters with fellow white employees and events transpired, which are discussed *supra* in much more detail, Plaintiff received a significantly lower performance evaluation.  Defendant gave her lower scores in subjective categories

---

[3] Each criteria for evaluation is described as follows:

> *Attitude*-positive outlook, constructive ideas, works well with others.
> *Open mindedness*—open to new ideas, methods and situations.
> *Inter-personal communication*—uses feeling and emption as an integral part of communicating and in a manner which others can handle.  Listens to others.
> *Assertiveness*—able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation.
> *Work Habits*—Dependable, orderly, uses time effectively.

including but not limited to: "attitude", "open mindedness", "inter-personal communication",

"assertiveness", and "work habits", all 3-satisfactory.  *See* Exhibit E 2004 Evaluation.  Johnson's

handwritten comments on the evaluation stated that Plaintiff "responds with inflammatory

remarks"; "needs work on staff"; "in conflicts in the office, reactions need work"; "you need to

work harder at solving problems with colleagues and refrain from telling them your judgment of

them." *Id.*  She was given a 3 percent salary increase. *See id.*  This segment of her evaluation

provided Defendant the ammunition to deny her a maximum salary increase and further provided

the partial ammunition for the Defendant to threaten her continued employment and to terminate

her.

Ms. Valles-Hall's 2004 negative performance evaluation constitutes an adverse

employment action for two reasons.  First, the evaluation itself, and the substantive matters upon

which it was based, was used by Johnson to give Ms. Valles-Hall a 3 percent raise rather than the

5 percent raise that her job performance warranted. *See* Exhibit F Johnson Dep. at 158.  Second,

the evaluation and the allegedly substantive complaints set forth therein comprised the same

"legitimate business reasons" cited by Defendant as its reasons for terminating Ms. Valles-Hall.

Clearly, then, the 2004 performance evaluation was used by Defendant to detrimentally alter and

more specifically terminate the terms and conditions of Ms. Valles-Hall's employment, and

therefore constitutes an adverse employment action.

### 3. Denial of Benefit of Sick Leave Policy

Defendant took adverse employment action against Ms. Valles-Hall when Johnson

threatened to terminate Ms. Valles-Hall for her use of sick leave, and discriminatorily required

her to produce evidence of illness while similarly situated white employees were not required to

do the same.  More specifically, in September 2004, Ms. Valles-Hall began to suffer from

physical symptoms caused by work-induced stress. *See* Exhibit A Valles-Hall Dep. I at p. 35-36.

Later that month, she also began to see a licensed clinical social worker. *Id.* at 37. Ms. Valles-

Hall was required to miss some work to address her physical and mental ailments, which were

caused by her work environment. Nonetheless, on November 3, 2004, Johnson informed Ms.

Valles-Hall, via letter, that (1) she was required to produce a doctor's note to prove that her sick

leave was justified, and (2) that future absences would result in her termination. *See* Exhibit L

Letter, dated November 3, 2004.[4]

     Despite Defendant's contentions, Johnson's threatened termination of Plaintiff

constitutes adverse employment action, particularly because Johnson's conduct rose above the

level of a simple threat. By discriminatorily demanding that Ms. Valles-Hall furnish a doctor's

note as proof of her illness, and threatening to terminate her for further absences, Johnson

deprived Ms. Valles-Hall of a significant employment benefit—the right, conferred upon Ms.

Valles-Hall by Defendant's employee handbook, to take sick leave up to the authorized amount.

Defendant's refusal to allow Ms. Valles-Hall to exhaust her sick leave before demanding a

doctor's note and threat of termination, particularly where no other employee had been similarly

subjected to that standard, resulted in a substantial change in Ms. Valles-Hall's employment

benefits, and therefore constitutes adverse employment action.

---

[4] Notably, and as discussed in further detail in a following section of this memorandum addressing pretext, Ms. Valles-Hall's sick leave had not expired, and, even more significantly, Johnson did not require any other employees to furnish a doctor's note to justify their leave.

### C.    Defendant's Conduct Gives Rise to An Inference of Discrimination

In the standard race discrimination case, where the plaintiff is a member of a minority group, an inference of discrimination arises when the employer merely carries out an adverse employment action, such as non-promotion or termination, against the plaintiff. *Mastro*, 447 F.3d at 850 (*citing Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir.1993)). A plaintiff also may satisfy the third prong of the *prima facie* test by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class. *Id.* In the present case, then, that burden has been met as a matter of law. This Plaintiff was treated differently in the evaluation process and relative to enjoyment of sick leave. If not, genuine issues of material fact preclude the entry of summary judgment in Defendant's favor.

Defendant argues that Ms. Valles-Hall is not entitled to draw an inference of discrimination because Johnson is the same person who personally interviewed her, hired her, and gave her substantial raises. *See* Def. Br. at 17. In so doing, Defendant relies upon the "same actor inference," adopted by the Ninth and Seventh Circuits. Defendant's argument fails for two reasons. First, Defendant cannot genuinely claim that this Circuit has adopted the "same actor inference." The D.C. Circuit's passing citation in *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("*Murray*"), is hardly an endorsement of that doctrine, and this Court is not bound by the Ninth and Seventh Circuit's holdings. Further, Plaintiff, and arguably Defendant, as evidenced by its failure to cite any definitive cases from this circuit, is not aware of any cases from this jurisdiction that have adopted that analysis. In fact, *Murray*'s facts do not even support an argument for the adoption of the doctrine in this circuit. In that case the matter before the court was whether the ***replacement*** of an employee by a member of her protected class gave rise

to an inference against discrimination. *See Murray*, 406 F.3d at 715. Facts in support of drawing the "same actor inference" were never before the court.

Second, even if this Court were to adopt the "same actor inference," and it should not, Defendant has grossly misstated it. The "same actor inference" does not ***preclude*** a fact-finder from finding discrimination and thereby mandate summary judgment. Such a *per se* rule would shield any employer from liability for discrimination against employees that she hires. Rather, the "same actor inference" is just that—an inference that creates a ***rebuttable*** presumption wherein a Plaintiff must corroborate the threshold inference of discrimination with more than just proof of being the member of a protected class and being subjected to adverse employment action. *See Coughlan v. American Seafoods Co.*, 413 F.3d 1090, 1096 (the "same actor inference" creates an inference that there was no discriminatory action). Indeed, evidence of discrimination still may be found, despite the applicability of the "same actor inference." *See id.* at n. 9.

Defendant further argues that Ms. Valles-Hall is not entitled to an inference of discrimination, despite her establishment of a *prima facie* case of discrimination, because she was replaced by an African American woman. *See* Def. Br. At 17 (citing *Murray*, 406 F.3d at 715). Defendant's analysis is misguided and unfounded. As previously noted, African American and Latino victims of discrimination are not within the same protected class. *See Dancy v. American Red Cross*, 972 F. Supp. 1, 3-4 (D.D.C. 1997) (stating that an African-American was replaced by a Hispanic "non-member" of her protected class). For these reasons, Defendant's motion should be denied.

III.   **THE RECORD SUPPORTS A FINDING THAT DEMONSTRATES THAT DEFENDANT'S LEGITIMATE BUSINESS REASONS FOR SUBJECTING HER TO ADVERSE EMPLOYMENT ACTION ARE PRETEXTUAL**

As a basis for Plaintiff's negative evaluation in June 2004, her 3% versus 5% raise, and further her termination, Defendant cites six (6), examples of Ms. Valles-Hall's "misconduct" that "could lead to corrective action or dismissal." *See* Def. Br. at 21.  They are: (1) her "less-than-civil exchanges" with employees Mendoza, Kost, Johnson, and consultant Sanow; (2) her misuse of compensatory time; (3) her misuse of funds belonging to the Defendant; (4) her allegedly late publication of the 2004 fall course catalog; (5) her insubordination in not immediately posting the spring course catalog on the Defendant's website; and (6) her frequent use of sick-leave during a six-week period.  *See id.* at 22.  As demonstrated below each of these asserted reasons are pretextual.

"To survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram*, 336 F.3d at 1088. By "all of the evidence," courts mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir. 1998) (en banc).

Once the sides have been presented, "the fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks,* 113 S. Ct. 2742, 2748 (1993) ("*Hicks*").  However, the proffered reasons of the employer "cannot be proved to be a pretext for discrimination unless it is shown

both that the reason was false, and that the discrimination was the real reason." *Hicks*, 113 S. Ct. at 2752. This rule does not, however, suggest that under *Hicks* a plaintiff must affirmatively prove discrimination in addition to proving the employer's proffered reasons are pretextual. *See id.* A plaintiff need only establish a *prima facie* case and introduce evidence sufficient to discredit the defendant's proffered reasons; at that point, the fact finder, if so persuaded, may infer discrimination. *Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C. Cir. 1995).

That a fact finder may infer discrimination is of course relevant to a Court's analysis under Rule 56. In discrimination cases summary judgment must be approached with special caution and the Court "must be extra-careful to view all the evidence in the light most favorable" to the plaintiff. *Hayes v. Shalala*, 902 F. Supp. 259, 263 (D.D.C. 1995) (quoting *Ross v. Runyon*, 859 F. Supp. 15, 21-22 (D.D.C. 1994)). While the fact finder at trial is not compelled to infer discriminatory pretext even when the plaintiff has discredited the employer's proffered reasons, at the summary judgment stage it is inappropriate for the Court to make that factual determination. If, on the basis of probative evidence submitted in opposition to summary judgment under Rule 56(e), a reasonable fact finder could find discrimination, summary judgment is inappropriate.

Against this legal framework, Ms. Valles-Hall focuses on Defendant's lack of credibility and pretext and yes mendacity. For reasons which are abundantly clear and discussed in further detail below, evidence in the record supports a finding that each of Defendant's proffered justifications for the above referenced adverse employment action is disingenuous, wholly pretextual, mendacious and in furtherance of Defendant's intent to discriminate and retaliate against Ms. Valles-Hall.

## A. Ms. Valles-Hall's Allegedly Hostile Interaction With Other Employees Is Pretext

Defendant alleges that Ms. Valles-Hall's interaction with Mendoza, Kost, Sanow, and Johnson supports its lowered evaluation and 3% rather than 5% raise.                    **1.**

**Barbara Mendoza**

Barbara Mendoza, a white woman, was Defendant's office manager.  Defendant alleges that Ms. Valles-Hall called Mendoza "unprofessional," and that this "run-in" was instigated by Plaintiff's "confrontational approach."  *See* Def. Br. at 5.  At her deposition, however, Plaintiff clearly stated "I never called Barbara unprofessional."  *See* Exhibit A Valles-Hall Dep. I at 31.  Furthermore, Johnson, after discussing the alleged incident with Mendoza, said that she did not think it—meaning the alleged incident—was a problem.  *See* Exhibit F Johnson Dep. at 136.  In fact, Johnson never discussed this matter with Ms. Valles-Hall.  *Id.* at 134.  Johnson even admits that she did not think that Mendoza's allegations, which are refuted on the record, were a problem until after learning that Ms. Valles-Hall had lodged a formal complaint of discrimination against Johnson.  *See id.*  Clearly, a genuine dispute of material fact exists concerning whether this alleged name-calling ever even occurred.

> **2.**     **Jeff Kost**

Jeff Kost, a white male, was Defendant's Deputy Director for External Affairs.  The only "negative" interaction between Kost and Ms. Valles-Hall that Defendant cites arose from a disagreement concerning the use of a conference room.  Kost rudely and without announcement interrupted a meeting between Ms. Valles-Hall, Lisa Ransom (African-American), and an African-American volunteer (Billy Terry) in Defendant's conference room.  *See* Exhibit A Valles-Hall Dep. I at 86-87.  Kost spoke to Ms. Valles-Hall in an offensive tone, impliedly demanding immediate use of the conference room albeit that Plaintiff's use of the conference room had been previously scheduled.  *Id.* at 88.  Ms. Valles-Hall unquestionably was racially

offended by the incident because she had never observed Kost interact with his fellow white colleagues in a similar hostile manner.  See Exhibit A Valles-Hall Dep. I at 89.  Defendant claims that "Johnson inquired into the matter but could find no evidence that the Deputy Director had been disrespectful."  Def. Stmt. at 8.  Defendant also claims that Ms. Valles-Hall was "***inflexible in her position*** and ***unnecessarily confrontational***" in her dealings with Kost.  *See* Def. Stmt. at 8 (emphasis added).

Johnson's conclusions and Defendant's argument are undermined by the record, and most significantly by Defendant's own employees.  Kost described Ms. Valles-Hall's initial response to the incident as "neither positive nor negative."  *See* Exhibit H Kost Dep. I at 14.  He also testified that Ms. Valles-Hall had never called him any names.  *See* Exhibit G Kost Dep. II at 5.  He further admits that Plaintiff never did anything that he could consider to be offensive to him.  *Id.* at 14.  He stated that he neither met with Johnson, nor communicated via e-mail or telephone with her to specifically complain about Ms. Valles-Hall.  *Id*. at 26-27.  Furthermore, he did not recall ever observing Ms. Valles-Hall berate or talk down to anyone in the workplace. *Id*. at 38.

Statements made by Johnson herself further undermine Defendant's pretextual argument. In particular, Johnson's alleged "inquiry" into the incident was itself superficial and protective of her own double-standards.  It was no more than a rubber-stamping of employee Kost's perception of the event.  For example, Johnson never discerned whether Ms. Valles-Hall or Kost had properly reserved use of the conference room.  *See* Exhibit F Johnson I at 122-23.  She never even considered discussing the matter with the African-American volunteer who had been offended by Kost's behavior.  *Id*. at 124.  All of these facts cut squarely into her conclusion that

Ms. Valles-Hall was "inflexible in her position" and "unnecessarily confrontational", and also that Kost was not disrespectful.

Of further significance is the fact that Johnson admits that she factored Ms. Valles-Hall's purported single negative interaction with Kost negatively into her performance evaluation of Ms. Valles-Hall, but declined to make any reference to Kost's adverse negative and disrespectful conduct in Kost's evaluation. *See* Exhibit F  Johnson I at 149, 161.  This shows a clear different treatment of two similar employees based upon the same specific incident.  Johnson's actions in this regard exhibit further evidence of a double-standard and intentional discrimination in the form of preferential treatment for similarly-situated white employees; Johnson blanketly accepted Kost's perception of an event over Plaintiff's.

### 3. Susan Sanow

From November 2003 through January 2005, Susan Sanow, a white female, was a contractor Defendant retained to work on the Washington Post Award.  In March 2004, Ms. Valles-Hall had full responsibility for administering the award.  Sanow, who created the award and managed it for ten (10) years, sent Ms. Valles-Hall an e-mail in March 2004 criticizing her administration of the award.  In so doing, Sanow stated "I know this e-mail is a bit negative, but I ask these questions out of concern and a commitment to this program."  Ms. Valles-Hall responded to the e-mail by addressing each of the several points, and also noting that Sanow's e-mail was unnecessarily negative.  Instead of criticizing Sanow for her admittedly "negative" email, Defendant chastised Plaintiff's interaction with Sanow relative to the Washington Post Award as "unpleasant" and relied upon the same to further justify her negative personal evaluation and 3% raise.  *See* Def. Br. at 21.  Consistent with Johnson's application of a double-standard and stereotyping of Ms. Valles-Hall, Defendant states that "Johnson concluded that Sanow's

comments [to Ms. Valles-Hall] were justified and that Hall's [written] response to Sanow's e-mail was angry and defensive." *See* Def. Stmt. at 9.

Defendant's argument lacks credibility and show Johnson's extreme bias toward Plaintiff. At deposition, Sanow acknowledged that portions of her e-mail criticizing Ms. Valles-Hall were "negative." *See* Exhibit J Sanow Dep. At 34 (commenting on her e-mail statement that "I know this e-mail is a bit negative, but I ask these questions out of concern and a commitment to this program"). Nonetheless, and illustrative of Johnson's determination to construe every misunderstanding or point of contention against Ms. Valles-Hall, Johnson insisted that her negative views about the Plaintiff were accurate and valid. *See* Exhibit F Johnson Dep. at 204. When asked about Ms. Valles-Hall's written response to Sanow's e-mail and specifically what language therein was "angry and defensive," Johnson stated that only three (3) words in the entire document, and these three words were: "and unnecessarily so," were confrontational. *Id.* at 206. Notably, Sanow testified that she was neither offended by Ms. Valles-Hall's response nor the three words. *Id.* at 34. Invariably, Johnson's perception of Ms. Valles-Hall as defensive and angry is greatly exaggerated and unsubstantiated by the record.

Defendant's assertion that Ms. Valles-Hall was incompetent in her handling of the Washington Post Award event is also unsubstantiated. Significant factual evidence demonstrates that Defendant's argument is without merit. First, Sanow, the individual who created the award and administered it for ten years, stated that she maintained confidence in Ms. Valles-Hall's performance relative to the award ***after*** their e-mail exchange and an ensuing telephone conversation. *Id.* at 42-43. Second, Defendant's reliance on an unsubstantiated hearsay allegation of CNA Board member Michael Freedman regarding Ms. Valles-Hall's administration of the award is unreliable. In fact, Johnson testified that she did not even address Friedman's

alleged concern because she "felt that there was a possibility that there was a – there were other ways to run the committee and run the award than the way Susan ran it." *See* Exhibit F Johnson Dep. at 104. Defendant's use of Freedman's alleged complaint is undeniably pretextual. The fact that Johnson testified that Friedman's alleged complaint was ***not*** the reason Ms. Valles-Hall was stripped of her responsibilities with respect to the award is proof certain of this argument. *See id.* at 162.

### 4. Betsy Johnson

Defendant cites to Ms. Valles-Hall's interaction with Johnson as another failed interpersonal relationship that justifies its decision to terminate and take other adverse employment action against Ms. Valles-Hall. *See* Def. Br. at 21. This is despite the fact that Johnson's stated reasons for a negative evaluation and beliefs about Plaintiff are unfounded and false and mendacious. Johnson is simply not credible and is thus wholly susceptible to disbelief by a reasonable fact-finder.

It is not insignificant that when Plaintiff met with Johnson to discuss Plaintiff's June 2004 performance evaluation, Johnson initially informed Ms. Valles-Hall that ***thirteen out of fourteen fellow employees*** complained about her. *See* Exhibit A Valles-Hall Dep. I. at 113-115 (emphasis added). After Ms. Valles-Hall inquired further of Johnson about the quantity and substance of these alleged complaints, Johnson finally stated that only five (5) employees actually complained—Jeff Kost, Jeremy Baird, Susan Sanow, Barbara Mendoza, and herself. *Id* at 115. Each of the representations proved to be refutable and false. Johnson then stated that Kost complained about Ms. Valles-Hall relative to the conference room incident. *Id.* She reiterated this at deposition, saying that Kost complained about Ms. Valles-Hall on more than one occasion. *Id.* As previously noted, however, Kost's testimony is flatly inconsistent with

Johnson's.  Kost never communicated via e-mail or telephone with Johnson to specifically

complain about Plaintiff.  See Exhibit G Kost Dep. II at 26-27.

Next, Johnson stated that Baird complained about Ms. Valles-Hall relative to the

Carlottia Scott incident.  *Id.* at 119.  At her deposition, she recanted and changed her story,

saying that Baird did not complain. *See* Exhibit F  Johnson Dep. at 109.  Baird also testified that

he never had any complaints about disrespect from Ms. Valles-Hall.  *See* Exhibit I Baird Dep. at

15.  He further testified that she was always respectful to him, never screamed or yelled at him,

and never called him any names.  *Id.* at 14-15.

Johnson also alleged that Sanow complained that the e-mail Ms. Valles-Hall sent in

response to Sanow's e-mail criticizing her work on the Washington Post Award was

unnecessarily harsh.  *See* Exhibit A Valles-Hall Dep. I at 122.  Sanow testified, however, that

she was ***not*** offended by Ms. Valles-Hall's response.  *See* Exhibit J Sanow Dep. at 34-35.  This

cuts squarely against Johnson's assertion in this regard.

Lastly, the only employee who appears to have complained to Johnson consistent with

Johnson's representations to Ms. Valles-Hall is Mendoza, who complained that Plaintiff called

her "unprofessional."  As stated in the sub-section above, however, Johnson never even

attempted to corroborate this allegation, which Ms. Valles-Hall denied.  Rather she gave

automatic credence to a white employee and used this single complaint to impugn Johnson's

performance and credibility.

During the same meeting in which Ms. Valles-Hall confronted Johnson about her

discriminatory treatment, Johnson made a statement that revealed her bias against Plaintiff: "[i]f

making judgments about people and telling them is a cultural thing, then maybe we should tell

the staff it's a cultural thing and they should buck up and take it."  *See* Exhibit B Valles-Hall

Dep. 2 Ex. 28. Invariably, Johnson meant that Mexicans and Latinos were "culturally different and that her culture inherently contributed to her performance problems. However, in reality Johnson had these performance problems exaggerated. Hence, one could infer that the only real reason for Johnson's actions was her bias against Plaintiff. Consistent therewith, Johnson recommended that Plaintiff apologize to all of her fellow white staffers whom she may have offended in person or by e-mail. *See* Exhibit A Valles-Hall dep. at 125-126. She also told her "she expected people to leave their shit at home." *Id.* at 113.

In light of Johnson's lack of credibility as evidenced by numerous contradictions on the record, and Johnson's statements evidencing a hostility toward Ms. Valles-Hall and her racial identity, a reasonable fact-finder could find in Plaintiff's favor.

### B.    All Other Bases Cited By Defendant As Excuses For Taking Adverse Employment Action Against Ms. Valles-Hall Are Pretextual

Defendant claims that its actions against Ms. Valles-Hall are justified because she "misused compensatory time, she withheld and misused funds belonging to the Center, she was unacceptably late in getting the fall 2004 course catalog out, and she was insubordinate in refusing to post the spring course catalog on the Center's website." Def. Br. at 22. The integrity of each of Defendant's contentions is not only compromised by Johnson's lack of credibility, but also directly contradicted by evidence in the record.

Defendant cannot produce any evidence that proves that Ms. Valles-Hall's alleged misuse of compensatory time or withholding of corporate funds was either intentional or a problem prior to the initiation of this lawsuit. In fact, with regard to the "withholding of corporate funds," Ms. Valles-Hall explained the situation as follows:

> I discussed it with [Betsy], and she said 'It's not a big deal.' She understood the
> circumstances. It was absolutely a lapse in judgment but it was not – there was
> no – and I self-reported it. I said, 'You know, I borrowed $10 to go get lunch.
> I'll get it back tomorrow,' and I did, and I reported it. The auditor noted that as
> well in the report. I also talked to Mary Ann de Barbieri and explained the
> circumstances. It was highly embarrassing to me that I had had that lapse of
> judgment. It was not in any way intended to take from [the Defendant].

*See* Exhibit A Valles-Hall Dep. I at 108. There is also no evidence that Defendant took any

disciplinary action or any rendered counseling session regarding the matter ensued. In fact,

neither this incident nor the alleged and uncorroborated instance of Ms. Valles-Hall taking

unauthorized compensatory time were referred to in any manner in Ms. Valles-Halls June 2004

performance evaluation. *See* Exhibit E, 2004 Evaluation. Now that Defendant is faced with

potential liability for illegal discrimination, it is presenting any potential justification for its

actions, notwithstanding the absence of validity.

Defendant's assertions that Ms. Valles-Hall was unacceptably late in getting out the Fall

2004 course catalog and also was insubordinate in refusing to post the Spring 2005 catalog on

Defendant's website is equally pretextual. First, with respect to publication of the Fall 2004

course catalog, neither Defendant nor any of its employees ever set a deadline for publication.

*See* Exhibit F Johnson Dep. I at 212. Furthermore, any perceived tardiness is reasonably

excused by Defendant's unilateral decision to cut Ms. Valles-Hall's support staff in September

2004. *See* Exhibit A Valles-Hall Dep. I at 166.

Second, Defendant's contention that Ms. Valles-Hall was insubordinate in refusing to

post the Spring 2005 course catalog on the website is inaccurate and disingenuous. Ms. Valles-

Hall repeatedly informed Johnson and Sanow that she was overloaded with work and could not continue to do other peoples' work. *See* Exhibit A Valles-Hall Dep. I at 208-209. She further informed them that the website responsibility fell within the job description of the newly-hired communications director. *See* Exhibit J Sanow Dep. at 61-62. Sanow, in fact, agreed that website responsibility was not in Ms. Valles-Hall's job description. *Id.* at 62. Ms. Valles-Hall also informed them that she did not have the technical expertise to comply with their demands. *Id.* at 63. Nonetheless, and despite Defendant's claims that Ms. Valles-Hall was insubordinate, she did, in fact, put the catalog information online. *Id.* at 64.

It should be noted that Defendant's faux investigation conducted by Mary Ann de Barbieri, chairperson of the Board of Directors, is further evidence of pretext and the Defendant's management sanctioning of this discrimination. De Barbieri's failure or refusal to inquire into matters that were directly relevant to Ms. Valles-Hall's claims that race played an improper role in her performance evaluation and other matters evidences Defendant's lack of interest in uncovering and remedying discrimination. For example, de Barbieri determined that the conference room incident involving Kost, Billy Terry, Lisa Ransom, and Ms. Valles-Hall was irrelevant to her investigation. *See* Exhibit N De Barbieri Dep. at 48-49. She testified that she did not investigate another African American female employee's observation that "[t]here is an issue with race," for Defendant, particularly her assertion that concerns of minorities, i.e. "people of color" are ignored. *Id.* at 100-101.

Furthermore, despite Ms. Valles-Hall's complaint that her performance evaluation was based on racial bias, de Barbieri never reviewed the performance evaluations of similarly situated white employees. *Id*. at 110-111. Finally, de Barbieri never investigated the truthfulness of the complaints that Johnson had represented were made against Ms. Valles-Hall.

*Id.* at 136-137. This last failure is of particular importance because if she had, she would have discovered that the five employee complaints were a lie, and the there had only been one which lacked merit. For these reasons, a reasonable jury could find that Defendant engaged in unlawful discrimination, and therefore its motion should be denied.

## IV.    THE RECORD SUPPORTS A FINDING THAT DEFENDANT RETALIATED AGAINST MS. VALLES-HALL

Defendant does not dispute that § 1981, and presumably, the Human Rights Act, support retaliation claims identical to such claims recognized under Title VII. *See* Def. Br. at 23. Title VII's anti-retaliation provision "forbids an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington Northern and Santa Railway Co. v. White*, No. 05-259, 548 U.S. ____ (June 22, 2006) ("*Burlington*") (*citing* 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must provide evidence that (1) she was engaged in protected activity, (2) her employer took a materially adverse action against her, and (3) a causal connection exists between the two. *Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006).

### A.    Ms. Valles-Hall Was Engaged In Protected Activity

While no "magic words" are required to satisfy the first prong regarding protected activity, the complaint must in some way allege unlawful discrimination. *Id.* at 1232. The record unequivocally illustrates that Ms. Valles-Hall repeatedly lodged formal complaints of discrimination or otherwise participated in protected speech on several occasions.

Her first formal complaint of discrimination was made on April 8, 2004, via telephone, and again on April 9, 2004, during a lunch meeting, to Tim Kime, Vice-Chairman of the CNA

Board of Directors.  During the fifteen minute telephone conversation and the one and one-half

hour lunch meeting Ms. Valles-Hall told Kime that one of her African-American colleagues with

whom she had a close working relationship was "being treated in a discriminatory way and that I

was in the cross hairs (sic) of that."  The principal event to which Ms. Valles-Hall referred

during her conversations with Kime was Johnson's decision to strip her of her full

responsibilities relative to the Washington Post Awards.  Specifically, Ms. Valles-Hall has

testified under oath that she believed that her close association with her African-American

colleague made her the subject of Johnson's racial animus.  *See* Exhibit A *Valles*-Hall Dep. I. at

82.  At deposition, Ms. Valles-Hall stated that "[Kime] invited me to lunch.  We had lunch

together on the 9th, and I told him how things had been transpiring.  . . . He listened closely.  He

asked me what I wanted him to do about it, and I said I didn't know."  Kime did not take any

action on Ms. Valles-Hall's complaint.  *See id.*

      Ms. Valles-Hall articulated a second formal complaint of racial discrimination with

Johnson on August 4, 2004.  *See* Exhibit D Letter, dated August 4, 2004.  In that letter, Ms.

Valles-Hall wrote:

> I believe I am not being treated equitably and that I am being evaluated
> differently and more critically than my colleagues and peers.  I have suffered
> financially and reputationally, having been given a 3% salary increase when 5%
> is the base minimum standard.

> I believe my style of communication is viewed unfortunately as aggressive and
> "inflammatory."  These are stereotyped characterizations that are often used when
> women and people of color are self-confident, intelligent and assertive.

*Id.*

      Ms. Valles-Hall logged her third formal complaint of discrimination on August 9, 2004

when she filed a discrimination charge with the District of Columbia Office of Human Rights

alleging discrimination on the basis of race and national origin.  *See* Exhibit A Valles-Hall Dep. I at 141.

Ms. Valles-Hall logged her fourth formal complaint of racial discrimination with Mary Ann de Barbieri, the Chairman of the CNA Board of Directors, on August 16, 2004.  *See* Exhibit K Letter, dated August 16, 2004.  In an e-mail, Ms. Valles-Hall wrote:

> I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004.  The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation.  I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

*Id.*

Ms. Valles-Hall's last instance of protected speech occurred on February 11, 2005 when she attempted to resolve her disputes with Defendant at mediation session at the D.C. Office of Human Rights.  While the content of those discussions are confidential pursuant to an agreement that was executed by both parties, it is axiomatic, given the nature of Ms. Valles-Hall's discrimination charge, that the discrimination allegations were the subject of the mediation.

**B.    Defendant Took Numerous Material Adverse Actions Against Ms.**

**Valles-Hall**

To satisfy the second element of retaliation, "a plaintiff must show that a reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington*, 548 U.S.13 (internal quotation marks omitted) (*citing Rochon v.*

*Gonzales*, 438 F.2d 1211, 1219). Under its most recent analysis, the Supreme Court reasoned

that Title VII's anti-retaliation provision forbids a much broader range of employer conduct than

its substantive provision. *Id.* at 7. Thus, "the anti-retaliation provision, unlike the substantive

provision, is not limited to discriminatory actions that affect the terms and conditions of

employment." *Id.* at 9. "This standard does *not* require a reviewing court or jury to consider the

nature of the discrimination that led to the filing of the charge. Rather, the standard is tied to the

challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII

complaint." *Id.* at 15 (internal citations and quotation marks omitted).

Ms. Valles-Hall has produced evidence that indicates that Defendant took numerous

adverse employment actions against her after her initial complaint of unlawful racial

discrimination that are cognizable under the standard set forth in *Burlington.* Specifically, the

record supports a finding that Defendant: (1) unfairly and inequitably penalized her in her

performance evaluations for conduct relative to internal disputes and job performance for which

her white counterparts were not penalized; (2) subjected her to a different standard than her

white counterparts for taking authorized medical leave, thereby resulting in an intimidating,

written threat of termination; (3) refused to conduct any meaningful investigation of allegations

of racial bias by Ms. Valles-Hall; (4) altered her job duties and responsibilities in such a way that

30

imposed more arduous tasks upon her; and (5) constructively discharged her by terminating her access to Defendant's building, office suite, access to voicemail, and the computer system after an unsuccessful mediation.  Defendant's conduct in this regard is precisely the type of retaliatory employer conduct prohibited by the federal anti-discrimination laws, as interpreted by the Supreme Court in *Burlington*.  *See Burlington*, 548 U.S. ___.

**C.**    **A Causal Connection Exists Between Ms. Valles-Hall's Complaints of Discrimination and Defendant's Adverse Employment Action**

Contrary to Defendant's argument and presumably inadvertent failure to set forth the law of this Circuit, the D.C. Circuit has held that a close temporal relationship may alone establish the required causal connection to sustain a retaliation claim.  *Singletary v. District of Columbia*, 351 F.3d 519 (D.C. Cir. 2003) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) ("[G]iven the circumstances of this case, the close temporal proximity of [the plaintiff's] discrimination complaints to the refusal to consider him for the . . . position is sufficient to establish a causal connection"); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985) ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity").  In the present case, not only does the proximity of Defendant's conduct to Ms. Valles-Hall's complaints indicate that the two are causally connected, but also, Defendant's own employees have testified in such a way that a reasonable fact finder would determine that the adverse action visited upon Ms. Valles-Hall is directly related to her protected speech.  Each instance of retaliation is addressed in turn.

By the time Ms. Valles-Hall received her June 2004 performance evaluation, wherein she received significantly lower scores that were used to deny her a full 5 percent raise, stigmatize

her, and later used to justify her termination, she had discussed with Johnson or Kime three instances of discriminatory conduct that a reasonable person could perceive as such—(1) Kost's demeaning communication with her arising out of the use of a conference room; (2) Baird's offensive conduct toward an African-American volunteer; and (3) Johnson's stripping of Ms. Valles-Hall's responsibilities relative to the Washington Post Award. While each of these incidents likely cannot individually support a substantive claim of discrimination, Ms. Valles-Hall's perception of them as illegal and predicates for a discrimination claim is reasonable. Shortly after Ms. Valles-Hall articulated her concerns in the workplace to Johnson and Kime, she was penalized and given a low performance evaluation based upon patently false statements and give a 3% rather than 5% pay increase.

Ms. Valles-Hall's next three complaints of illegal discrimination all occurred in August 2004, when she complained to Johnson, de Barbieri, and the Office of Human Rights about the discrimination to which she was subjected during the performance evaluation process. Shortly thereafter, in November 2004 Johnson began to inquire into the legitimacy of Ms. Valles-Hall's sick leave, which had not expired, and demanded a doctor's note as proof that her leave was justified. Neither Johnson's demand nor the issuance of a letter on which de Barbieri was copied were routine business practices. No other employee had been subjected to such treatment.

The final act of retaliation against Ms. Valles-Hall occurred on February 11, 2005 when Defendant locked her out of the building, terminated her access to its suite, terminated her voicemail and computer access, and instructed building security not to permit her to enter the premises. These retaliatory acts occurred immediately after the Office of Human Rights mediation between Ms. Valles-Hall and Defendant concluded. Defendant's intention to punish Ms. Valles-Hall for alleging illegal discrimination is evidenced by Defendant's employees

deposition testimony.  For example, Barbara Mendoza testified that the foregoing acts were taken against Ms. Valles-Hall because, according to Johnson, "the mediation had gone badly and that she needed me to do this."  *See* Exhibit M Mendoza Dep. at 10.  Similarly, Susan Sanow stated that the action was taken, again, according to Johnson, because "Arminda became fairly angry and yelled at mediation."  *See* Exhibit J Sanow Dep. at 84.  Hence, Defendant took retaliation against Ms. Valles-Hall clearly as a result of a protective action mediation.

## CONCLUSION

Plaintiff has demonstrated a clear pattern of hostile discriminatory action by her supervisor, in this instance, the sole decision maker.  The gravaman of her criticisms and adverse personnel actions were pretextual and false claims that Plaintiff was stereotypically confrontational.  Rather than address Plaintiff's claims Defendant forced Plaintiff to pursue repeated discrimination complaints, which subjected Plaintiff to clear retaliatory action.  In this connection, this record shows that the same supervisor interposed a double standard, in which she repeatedly blamed Plaintiff for workplace related problems and gave her negative evaluations, but did not similarly negatively evaluate Mendoza, or Jeff Kost.  This is no less the case with Plaintiff's retaliation claims.

For each of the foregoing reasons, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied.

Respectfully submitted,


  __/s/Donald M. Temple_____
Donald M. Temple [407849]
Dhamian A. Blue [488664]
1229 15th Street, NW.
Washington, DC  20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
*Counsel for Plaintiff*
dtemplelaw@aol.com