IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
ARMINDA VALLES-HALL                 )
                                    )
        Plaintiff                   )
                                    )
    v.                              )   Case No: 1:06-CV-806 CKK
                                    )   **ORAL ARGUMENT REQUESTED**
CENTER FOR NONPROFIT                )
ADVANCEMENT                         )
                                    )
        Defendant                   )
_____ )

**PLAINTIFF'S GENUINE STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to LCv.R 7(h), Plaintiff Arminda Valles-Hall ("Plaintiff" or "Ms. Valles-Hall"), by and through undersigned counsel, submits this Opposing Statement of Material Facts in Dispute in support of its Memorandum of Law in Opposition to Defendant Center for Nonprofit Advancement's Motion for Summary Judgment.

1. Ms. Valles-Hall is a heterosexual, Mexican-American whose racial identity is Latino. *See* Valles-Hall Dep. at 30, attached hereto at Exhibit A; Valles-Hall Dep. II at 286, attached hereto at Exhibit B.

2. Plaintiff was hired as the "Director of the Defendant's Center for Non-Profit Learning and Leadership" but the title was subsequently changed to Director of Education at a starting salary of $58,500. Exhibit A at 54

3. Under the Defendant's rating system, 1 is unsatisfactory, number 2 is marginal, number 3 is satisfactory, number 4 is above average, and mumber 5 is outstanding. Id at 62.

4. Defendant's management staff at the time of her hiring was predominately white and gay.                     .

1

5. In June 2003, Ms. Valles-Hall received a perfect employment evaluation. She received the highest score for each performance category for which she was evaluated, including "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits" *See* 2003 Evaluation., attached hereto at Exhibit C.

6. Up to and including that date, Plaintiff had not had any adverse interaction with any of Defendant's employees. See Id.

7. During the duration of 2003 and into 2004, Ms. Valles-Hall began to experience events that began to give rise to concerns of illegal discrimination. On or about _____, Defendant hired Lisa Ransom Brown; she has since dropped Brown (Ransom) Exhibit

8. Her duties and responsibilities included "going out into the community and conducting and conducting outreach for the organization." Exhibit A at 103.

9. On or around   , Defendant agreed to cosponsor a conference for outreach purposes in the predominately black Prince George's County; both Ransom and Plaintiff put $20,000 in their budgets. However, despite their prior commitment, Defendant only provided $1,000 for the conference and required Plaintiff and Ransom to raise all funds related to the conference. Id. At 133-134.

10. Although the Defendant supposedly supported non-profit advocacy, it refused to invest in a conference for non-profits that was serving primarily balck and Latino constituencies. Id 135

11. Immediately after this conference, management staff began to treat Plaintiff differently, and more harshly. Shortly thereafter, Johnson stripped Plaintiff of responsibilities for cooridinating the Washington Post Awards.

12. Plaintiff believed that her close association with her African-American colleague made her the subject of increased bias on the part of Johnson. Exhibit A at 82.

2

13. As a result of Johnson's different treatment of her, Plaintiff first complained on April 8, 2004, via telephone, and again on April 9, 2004, during a lunch meeting, to Tim Kime, Vice-Chairman of the CNA Board of Directors. During the 15 minute telephone conversation and the one and one-half hour lunch meeting Plaintiff told Kime that one of her African-American colleagues with whom she had a close working relationship was "being treated in a discriminatory way and that I was in the cross hairs (sic) of that." The principal event to which Plaintiff referred during her conversations with Kime was Johnson's decision to strip her of Plaintiff of her full responsibilities relative to the Washington Post Awards.

14. In June 2004, Ms. Valles-Hall received a performance evaluation that was markedly lower than her 2003 evaluation. *See* 2004 Evaluation, attached hereto at Exhibit E. In the categories for "attitude", "open mindedness", "inter-personal communication", "assertiveness", and "work habits", she received a score of 3—satisfactory. *Id*. Handwritten comments on the evaluation include: "responds with inflammatory remarks"; "needs work on staff"; "in conflicts in the office, reactions need work"; "you need to work harder at solving problems with colleagues and refrain from telling them your judgment of them." Exhibit A at 110; see also .

15. Based upon Defendant's negative evaluation, Johnson gave Plaintiff a 3% rather than the higher percentage paid to all other management staff. Hall Dep. at 129.

16. Plaintiff attributed the negative characterizations about her in Johnson's evaluation to her involvement and association with Ransom and requested a meeting with Johnson to discuss her concerns. Exhibit A at 255-256.

17. The 2004 evaluation was used by Johnson to give Ms. Valles-Hall a 3 percent raise rather than a 5 percent raise, which was the ceiling for that year. *See* Johnson Dep. at 158, attached hereto at Exhibit F

18. Plaintiff made a second formal complaint of racial discrimination with Johnson on August 4, 2004. *See* Letter, dated August 4, 2004, attached hereto at Exhibit D. In that letter, Ms. Valles-Hall wrote:

> I believe I am not being treated equitably and that I am being evaluated differently and more critically than my colleagues and peers. I have suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard.
>
> I believe my style of communication is viewed unfortunately as aggressive and "inflammatory." These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive.

*Id.*

19. The negative issues which Johnson raised during the 2004 evaluation process were used to terminate Ms. Valles-Hall in February 2005.

20. Ms. Valles-Hall met with Johnson to discuss her performance evaluation in July 2004. Johnson initially told Plaintiff that 13 out of 14 employees had complained about her. Valles-Hall Dep. I. at 113-115.

21. After Ms. Valles-Hall pressed Johnson about the quantity and substance of these alleged 14 complaints, Johnson finally revealed, still falsely, that only five employees complained—Jeff Kost, Jeremy Baird, Susan Sanow, Barbara Mendoza, and herself. *Id* at 115.

22. Johnson told Plaintiff that Kost complained about her relative to the conference room incident. *Id.* She reiterated this at deposition, saying that Kost complained about her on more than one occasion. *Id.*

23. *Jeff Kost.* Jeff Kost is Defendant's Deputy Director for External Affairs. In February 2004 Kost rudely, and without announcement, interrupted a meeting between Ms. Valles-Hall, Lisa Ransom (African-American), and a volunteer (Billy Terry) in Defendant's conference room. *See* Valles-Hall Dep. at 86-87. He spoke to Ms. Valles-

4

Hall in an offensive tone, impliedly demanding immediate use of the conference room. *Id.* at 88.

24. Contrary to Johnson's representations to Plaintiff, Kost testified that he never met with Johnson, nor did he communicate via e-mail or telephone with her to specifically complain about Ms. Valles-Hall. Kost Dep. II at 26-27, attached hereto at Exhibit G. Kost further described Ms. Valles-Hall's initial response to the incident as "neither positive nor negative." *See* Kost Dep. I at 14, attached hereto at Exhibit H. He also testified that she had never called him any names. *See* Kost dep. II at 5. He stated that she never did anything that he could consider to be offensive to him. *Id.* at 14. Furthermore, he did not recall ever observing Ms. Valles-Hall berate or talk down to anyone in the workplace. *Id*. at 38.

25. Johnson stated to Plaintiff that Jeff Baird complained about her relative to an incident involving an African-American female volunteer, Carlottia Scott. Valles-Hall Dep. I at 119. Ms. Scott had been meeting in a conference room with Ms. Valles-Hall and Lisa Ransom, an African American employee. Ms. Scott left the conference room to use the restroom, and when she returned to Defendant's hallway, she was confronted in a hostile manner by Baird. Ms. Scott indicated, via letter addressed to Johnson (but forward to Ms. Valles-Hall for purposes of transmittal) that she was deeply racially offended by the incident. Johnson, despite having been approached by Kost about the incident and received Ms. Scott's letter, failed to address the matter with Baird for some two months. Moreover, Johnson never disciplined Baird for the incident, nor did she instruct him to apologize. *See* Johnson Dep. I at 126-132; Baird Dep. at 21-34, attached hereto at Exhibit I; Kost Dep. I at 22-23.

25. At her deposition, Johnson recanted and changed her story about Baird's negative coments, saying that Baird never complained about Ms. Valles-Hall. Johnson Dep. I at 109. Contrary to Johnson's assertions in her performance evaluation of Hall, Baird testified that he never complained to anyone about Ms. Valles-Hall. Baird Dep. at

5

15. He further testified that she was never disrespectful to him, never screamed or yelled at him, and never called him any names. *Id.* at 14-15.

26. Moreover, as part of Johnson's alleged inquiry into the matter, she never investigated whether Ms. Valles-Hall or Kost had properly reserved use of the conference room. *See* Johnson Dep. I at 122-23. She never even considered discussing the matter with the volunteer who allegedly had been offended by Kost's behavior. *Id.* at 124. In fact, Johnson acknowledges that she had "no clue" that the volunteer found the incident offensive. *Id.* at 147.

27. Johnson did, however, negatively factor Ms. Valles-Hall's interaction with Kost into Plaintiff's performance evaluationl, but declined to make any reference to Kost's negative and disrespectful conduct in his evaluation. Johnson Dep. I at 149, 161.

28. *Susan Sanow.* From November 2003 through January 2005, Susan Sanow was a contractor who Defendant retained to work on the Washington Post Award. In March 2004, Ms. Valles-Hall had full responsibility for administering the award. Sanow, who created the award and managed it for ten years, sent Ms. Valles-Hall an e-mail in March 2004 criticizing her administration of the award. In so doing, Sanow stated "I know this e-mail is a bit negative, but I ask these questions out of concern and a commitment to this program."

29. Plaintiff's response to Sanow's e-mail addressed each of the several points, and also noted that her e-mail was unnecessarily negative. Johnson informed Plaintiff that Sanow had complained to her that Plaintiff's responsive e-mails to was unnecessarily harsh. Valles-Hall Dep. I at 122.

30. Sanow testified, however, that she was ***not*** offended by Ms. Valles-Hall's response. Sanow Dep. at 34-35, attached hereto at Exhibit J. She also acknowledged that portions of her e-mail criticizing Ms. Valles-Hall were, in fact, "negative." *See* Sanow Dep. at 34.

31. When asked about Ms. Valles-Hall's written response to Sanow's e-mail and specifically what language therein was "angry and defensive," Johnson stated that three words in the entire document, "and unnecessarily so," were confrontational. *Id.* at 206. Plaintiff was negatvely evaluated based thereupon.

32. Defendant alleges that Ms. Valles-Hall called Barbara Mendoza (Defendant's Office Manager) "unprofessional" and that this "run-in" was instigated by Plaintiff's "confrontational approach." *See* Def. Br. at 5.

33. Plaintiff denies this charge and unequivocally stated: "I never called Barbara unprofessional." Valles-Hall Dep. I p. 31.

34. Furthermore, Johnson, after discussing the alleged incident with Mendoza, said that she did not think it—meaning the alleged incident—was a problem. *See* Johnson Dep. I at 136.

35. Johnson never discussed this matter with Ms. Valles-Hall. *See* Johnson Dep. I at 134. Further, Johnson claims that she did not think that Mendoza's purported allegations, refuted on the record, were a problem until after her meeting with Plaintiff and learning that Ms. Valles-Hall had lodged a formal complaint of discrimination. See id.

36. Despite Defendant's claims to the contrary, Ms. Valles-Hall did not call Mendoza unprofessional. Furthermore, Mendoza was not penalized in her performance evaluation for any negative interaction with Ms. Valles-Hall. *See* Mendoza Personnel Review Form, attached hereto at Exhibit ___, filed under seal.[1]

37. *Betsy Johnson*. After discussing several false complaints with Ms. Valles-Hall, Johnson made an expressly racialized comment based upon Plaintiff's latino-Mexican to supposedly justify her false bases for Plaintiff's negative performance

---

[1] During the discovery, both parties reached an oral agreement to keep employee records confidential. Pursuant to that agreement, Mendoza and Kosts' evaluation forms will be filed under seal.

7

evaluation: *"[i]f making judgments about people and telling them is a cultural thing, then maybe we should tell the staff it's a cultural thing and they should buck up and take it."* Valles-Hall Dep. Ex. 28.  In light of this "cultural thing" (shortcoming) Johnson recommended that Plaintiff apologize to everyone that she may have offended in person or by e-mail.  Valles-Hall Dep. I at 125-126.  Even though Johnson's representations regarding complaints about Plaintiff were false, Johnson nevertheless told Plaintiff that "she expected people to leave their shit at home."  *Id.* at 113.

      38.    Ms. Valles-Hall's alleged misuse of compensatory time or withholding of corporate funds was neither intentional nor a problem prior to the initiation of this lawsuit.  Further, with regard to the "withholding of corporate funds," Ms. Valles-Hall has testified that:

> I discussed it with [Betsy], and she said 'It's not a big deal.'  She understood the circumstances.  It was absolutely a lapse in judgment but it was not – there was no – and I self-reported it.  I said, 'You know, I borrowed $10 to go get lunch.  I'll get it back tomorrow,' and I did, and I reported it.  The auditor noted that as well in the report.  I also talked to Mary Ann de Barbieri and explained the circumstances.  It was highly embarrassing to me that I had had that lapse of judgment.  It was not in any way intended to take from [the Defendant].

Valles-Hall Dep. I at 108.

      39.    Defendant did not take any disciplinary action or give any counseling regarding the alleged misuse of compensatory time.   None of these compensation issues were referenced in any respect in Plaintiff's  June 2004 performance evaluation.  *See* 2004 Evaluation.

      40.    With respect to publication of the Fall 2004 course catalog, neither Defendant nor any of its employees ever set a deadline for publication.  Johnson Dep. I at 212.  Furthermore, any perceived tardiness is reasonably excused by Defendant's unilateral decision to cut Ms. Valles-Hall's support staff in September 2004.  *See* Valles-Hall dep. at 166.

41. With respect to posting of the Spring 2005 course catalog, Ms. Valles-Hall repeatedly informed Johnson and Sanow that she was overloaded with work and could not continue to do other peoples' work. Valles-Hall dep. I at 208-209. She further informed them that the website responsibility fell within the job description of the newly-hired communications director. Sanow dep. at 61-62. Sanow, in fact, agreed that website responsibility was not in Ms. Valles-Hall's job description. *Id.* at 62. Ms. Valles-Hall also informed them that she did not have the technical expertise to comply with their demands. *Id.* at 63. Nonetheless, and despite Defendant's claims that Ms. Valles-Hall was insubordinate, she did, in fact, put the catalog information online. *Id.* at 64.

42. Shortly after meeting with Johnson, on August 9, 2004 Plaintiff logged her third formal complaint of discrimination with the District of Columbia Office of Human Rights alleging discrimination on the basis of race and national origin. *See* Valles-Hall Dep. p. 141.

43. On August 16, 2004 Plaintiff logged her fourth formal complaint of racial discrimination with Mary Ann de Barbieri, the Chairman of the CNA Board of Directors. *See* Letter, dated August 16, 2004, attached hereto at Exhibit K. In an e-mail, Ms. Valles-Hall wrote:

> I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

*Id.*

44. In September 2004, Ms. Valles-Hall began to suffer from physical ailments caused by work-induced stress. *See* Valles-Hall Dep. I at p. 35-36. Later that month, she also began to see a licensed clinical social worker. *Id.* at 37. Plaintiff was required to miss days from work to address her work related illness. *See id.*

45. On November 3, 2004, Johnson informed Ms. Valles-Hall, via letter, that (1) she was required to produce a doctor's note to prove that her sick leave was justified, and (2) that future absences would result in her termination. *See* Letter, dated November 3, 2004, attached hereto at Exhibit L.

46. Johnson's letter was uncharacteristic, particularly as the office manager had never known of another instance in which an employee's job would be threatened for their use of sick leave. *See* Mendoza Dep. I at 25, attached hereto at Exhibit M.

47. By November 2004, de Barbieri had begun to investigate Ms. Valles-Hall's discrimination claim. In so doing, she determined that the following matters or allegations were irrelevant to Ms. Valles-Hall's complaint, to wit, that race played an improper role in her evaluation process, including Johnson's conclusion that she was to blame for the inter-office conflicts:

> de Barbieri determined that the conference room incident involving Kost, Billy Terry, Lisa Ransom, and Ms. Valles-Hall was irrelevant to her investigation. de Barbieri Dep. at 48-49.
>
> de Barbieri did not investigate an African American female employee's observation that "[t]here is an issue with race," particularly in the concerns of minorities, i.e. "people of color" are ignored. *Id.* at 100-101.
>
> Despite Ms. Valles-Hall's complaint that her performance evaluation was based on racial bias, de Barbieri never reviewed the performance evaluations of similarly situated white employees. *Id.* at 110-111.
>
> de Barbieri never investigated the truthfulness of the complaints that allegedly were made against Ms. Valles-Hall. *Id.* at 136-137.

48. On February 11, 2005 Plaintiff participated in a mediation at the D.C. Office of Human Rights. Her charges of discrimination were the subject of the mediation.

49. Immediately after the February 11, 2006 mediation, Johnson instructed all of Defendant's staff to: (1) deny her access to Defendant's office suit by deactivating her

10

office key; (2) deny her access to the building in which Defendant's offices are located by instructing security to prohibit her entry and giving the same security personnel a picture of Plaintiff; (3) deny her access to the Defendant's voicemail system; and (4) deny her access to the Defendant's computer system. *See* Baird Dep. at 38-41.

50. According to Barbara Mendoza, the foregoing acts were taken against Ms. Valles-Hall because, according to Johnson, "the mediation had gone badly and that she needed me to do this." Mendoza Dep. II at 10.

51. Similarly, Susan Sanow stated that the action was taken, again, according to Johnson, because "Arminda became fairly angry and yelled at mediation." Sanow Dep. at 84.

Respectfully submitted,

_____/s/_____
Donald M. Temple [407849]
Dhamian A. Blue [488664]
1229 15th Street, NW.
Washington, DC 20005
Phone No. (202) 628-1101
Fax No.: (202) 628-1149
*Counsel for Plaintiff*