## EXHIBIT LIST

Valles-Hall Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Valles-Hall Deposition II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

2003 Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Letter dated August 4, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

2004 Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

Johnson Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

Kost Deposition II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Kost Deposition I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H

Baird Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Sanow Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . J

Letter dated August 16, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K

Letter dated November 3, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . L

Mendoza Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M

de Barbari Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . N

# EXHIBIT A

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# **ARMINDA VALLES-HALL**

## CASE: ARMINDA VALLES-HALL v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** January 4, 2006
**Volume:** 1

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 29

1    Do I have all of those that you are
2  able to find?
3    A    That I am able to find, yes.
4    Q    I asked about communications between
5  you and other directors, officers, or employees of
6  CNA not otherwise requested above relating to your
7  claim of discrimination, and you say no such
8  documents are available?
9    A    That's correct.
10   Q    You're not aware of any?
11   A    That's correct.
12        What number are you on?
13   Q    I'm at the top of page 6. I just
14 finished number 25 and 26.
15        27, I asked for your Social Security
16 card, and you say it's not available?
17   A    Right.
18   Q    Is that because you didn't want to
19 produce it?
20   A    No. I don't have a copy of it.
21   Q    I've asked for your driver's license,
22 and I see that.

Page 30

1    I asked for documents supporting your
2  allegation in paragraph 3 of the Complaint that you
3  are, quote, a Mexican-American, closed quote.
4    You've given me, I believe, a birth
5  certificate?
6    A    That's correct.
7    Q    And I saw an e-mail from Betsy Johnson
8  to you on Cinco de Mayo?
9    A    Uh-huh. Yes.
10   Q    Anything else?
11   A    No.
12   Q    I understand that both of your parents
13 were born in Mexico?
14   A    That's correct.
15   Q    And you were born in the U.S.?
16   A    That's correct.
17   Q    Okay. I asked in number 30 for
18 documents supporting your allegation that CNA
19 allocated $1,000 to a particular conference even
20 though $20,000 had been approved.
21        I just haven't gotten this far. Did
22 you give me something on that?

Page 31

1    A    Yes.
2    Q    Have you given me everything you have
3  on that?
4    A    I believe so.
5    Q    All right. I take it from your
6  response to number 31 that you have no documents
7  supporting your allegation that CNA terminated an
8  African-American director because she was not a good
9  fit?
10   A    That's right.
11   Q    Okay. Who are you referring to there?
12   A    Lisa Ransom.
13   Q    Okay. I asked for documents supporting
14 your allegation that your July 2004 evaluation by
15 CNA was different from similarly-situated Caucasian
16 and/or gay managers, and your answer is no such
17 documents are available?
18   A    That's correct.
19   Q    Do you know how other employees of CNA
20 were evaluated in the 2004 evaluation cycle?
21   A    Only through Betsy Johnson's words.
22   Q    Okay. You haven't talked to any other

Page 32

1  employees --
2    A    No.
3    Q    -- about their evaluations?
4    A    No.
5    Q    And you haven't seen their evaluations?
6    A    No, I have not.
7    Q    It's just whatever Betsy Johnson told
8  you?
9    A    That's correct.
10   Q    Okay. Do you know how raises were
11 handed out or not handed out to other employees at
12 CNA as of July 2004?
13   A    No, I don't.
14   Q    Okay. You got an $1,800 raise or a
15 $1,600 raise?
16   A    1,800.
17   Q    $1,800 raise?
18   A    (Witness nods head.)
19   Q    All right. You alleged in the
20 Complaint -- I'm looking at request number 34. You
21 alleged in the Complaint that there were some
22 financial irregularities with CNA's 403(b) plan?

8 (Pages 29 to 32)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 33

1    A    (Witness nods head.)
2    Q    I asked for documents in that category,
3  and you said none are available.
4        Have you looked for any documents in
5  that category?
6    A    I don't have them.
7    Q    Are you aware of the existence of any
8  documents?
9    A    Yes.
10   Q    What would that be?  What was the
11  irregularity that you were referring to?
12   A    I was informed by a colleague that her
13  403(b) contributions were not being made on a timely
14  basis and that she complained about it twice and was
15  told that the organization was having cash flow
16  problems.
17   Q    Who was the colleague?
18   A    Karen Bailey, the health trust
19  accountant.
20   Q    And she complained -- to whom did she
21  complain?
22   A    To Betsy and to Barbara, I believe.

Page 34

1  Barbara Mendoza and Betsy Johnson.
2    Q    According to Karen, who was it who told
3  her that the organization was having cash flow
4  problems?
5    A    I believe it was Barbara Mendoza.
6    Q    Are you aware of any late deposits of
7  your 403(b) contributions?
8    A    No.
9    Q    Is it your contention that there were
10  some late deposits of your contributions?
11   A    I wasn't making contributions.
12   Q    So this didn't -- if there was
13  something going on, it didn't affect you?
14   A    No.
15   Q    All written complaints -- number 35,
16  all written complaints that you made concerning
17  financial impropriety, financial irregularities, and
18  so forth with respect to the 403(b) plan, and you
19  said see attached.
20       Did you produce anything in that
21  category?
22   A    I believe -- yes.  In communications

Page 35

1  with Mary Ann de Barbieri, my response to her draft
2  report of investigation includes a summary, in a
3  sense, of some of the things that we talked about,
4  and it includes that allegation.
5    Q    Okay.  Number 36, documents supporting
6  the allegation that you suffered mental anguish,
7  depression, loss of self-esteem, and so forth, and
8  you say see attached.
9        I did see -- it looked like a
10  transcript of invoices from a mental health
11  organization.
12   A    That's correct.
13   Q    Is there anything else?
14   A    I also was in physical therapy for four
15  months approximately, from September to December,
16  and those records are being provided.
17   Q    Who was the health care provider for
18  the therapy?
19   A    Patriot Sports Medicine.
20   Q    Okay.  What is the connection between
21  your work at CNA and physical therapy, please?
22   A    The stress had caused a lot of neck and

Page 36

1  shoulder -- shoulder pain, and I was getting
2  headaches from the stress.
3    Q    Do you have any physician or other
4  health care worker who has told you that your
5  working conditions caused the pain in your
6  shoulders?
7    A    My primary care physician also saw me,
8  and he referred me to the physical therapy.
9    Q    Did he tell you that it was work
10  related?
11   A    I told him it was work related.
12   Q    Okay.  Did he agree with you?
13   A    Yes.
14   Q    What's his name or her name?
15   A    His -- the physician who saw me was
16  Dr. Upadhyay.
17   Q    Could you spell that for the reporter,
18  please?
19   A    I wish I could, but it is with the
20  medical office of Ambrish Gupta, A-m-b-r-i-s-h,
21  G-u-p-t-a.
22   Q    All right.  And say the gentleman's

9 (Pages 33 to 36)

ARMINDA VALLES-HALL                           ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                    JANUARY 4, 2006

| Page 37 | Page 39 |
|---|---|

**Page 37**

1  name again.
2      A    Dr. Upadhyay.
3      Q    Upadhyay beginning with a U?
4      A    Yes. He's since left the practice, but
5  I may have been seen by some of the other attending
6  physicians there as well.
7      Q    And he's the one who referred you to
8  the physical therapist?
9      A    I believe so.
10     Q    All right. When did you start seeing
11 the mental health practitioner?
12     A    I believe my first appointment was on
13 September the 27th of 2004.
14     Q    And how long did you continue seeing --
15 what was the -- what was the practitioner's name?
16     A    Her name is Alex Roth.
17     Q    Is she a psychiatrist?
18     A    She's a licensed clinical social
19 worker.
20     Q    Okay. How long did you continue seeing
21 Ms. Roth?
22     A    I still see Ms. Roth.

**Page 39**

1  attached.
2          I take it I have all of those?
3      A    That's correct.
4      Q    All right.
5      A    That would be contained in the other
6  documents provided to Betsy Johnson and Mary Ann
7  de Barbieri.
8      Q    Are those the two people to whom you
9  made complaints?
10     A    That's correct.
11     Q    All right. I did see an e-mail to
12 Ms. Mendoza.
13     A    Oh, that is right.
14     Q    Okay.
15     A    I thought that was the process.
16     Q    And she, in turn, referred you to Betsy
17 Johnson?
18     A    That's correct.
19     Q    And because the complaint was related
20 to Betsy Johnson, she, in turn, referred you to Mary
21 Ann de Barbieri; is that right?
22     A    That's correct.

| Page 38 | Page 40 |
|---|---|

**Page 38**

1      Q    How often do you see her?
2      A    Weekly.
3      Q    And it's been weekly since September?
4      A    That's correct.
5      Q    September of '04?
6      A    That's correct.
7      Q    Are there any other issues other than
8  work-related issues that you and she have dealt
9  with?
10     A    Yes.
11     Q    So you see her for other reasons as
12 well?
13     A    Yes.
14     Q    When did you start with physical
15 therapy?
16     A    I believe it was September of 2004.
17     Q    All right. About the same time you
18 started the psychotherapy?
19     A    That's right.
20     Q    Number 37, all written complaints of
21 alleged discrimination made to CNA or any of its
22 officers, directors, or employees, and you see

**Page 40**

1      Q    Were there any subsequent complaints?
2  You made a complaint to Ms. de Barbieri in August of
3  2004, I'm recalling; is that right?
4      A    That's correct.
5      Q    All right. That started the process
6  and you objected to the process and so forth, but
7  were there any other complaints of discrimination
8  that you made to CNA or anyone involved in CNA?
9      A    I don't believe so.
10     Q    All right. I've asked you for
11 documents regarding your claim for attorney's fees
12 in this case, and you say see attached.
13         I didn't see anything there.
14     A    Uh-huh.
15     Q    Are you --
16     A    My bank is researching getting a copy
17 of the checks for me.
18     Q    So you've made payments to Mr. Temple's
19 firm in connection with that?
20     A    That's correct.
21     Q    Are you on an hourly basis with
22 Mr. Temple?

                                    10 (Pages 37 to 40)

ARMINDA VALLES-HALL                    ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT            JANUARY 4, 2006

Page 81

1   the outcome of this one.
2        Q    All right. Going back to issue
3   number 1, which concludes at the top of page 3,
4   you've typed it in bold: To effectively manage and
5   delegate to Lee, it is essential that any requests
6   for his time be cleared and routed through me,
7   closed quote.
8        Did Betsy agree to do that?
9        A    She did.
10       Q    Okay. So other than the fact that
11  Susan Sanow would now be in charge of the award, the
12  concerns expressed in your memo were addressed?
13       A    This wasn't about changing the
14  management of The Washington Post award. This was
15  about a discussion of extending professional --
16  standard professional courtesies to me, and that's
17  what we discussed. I wasn't vying for her to change
18  management. I was trying to understand why she
19  hadn't discussed it with me and why it was handled
20  in a way that hurt me reputationally.
21       Q    She responded to that by explaining why
22  the decision which she characterized as a business

Page 82

1   decision was made, did she not?
2        A    Yes.
3        Q    The concerns that you either expressed
4   here or that are implicit in Exhibit 10, in your
5   view, do they arise out of any discriminatory intent
6   on the part of Ms. Johnson?
7        A    Yes, I believe they do.
8        Q    Okay. Now, a few moments ago, we
9   talked about Susan Sanow taking over the Post award
10  and your being removed from responsibility for that,
11  and you told me that it was retaliation for your
12  close association with Ms. Ransom, and now you're
13  telling me that some of those same issues arise out
14  of discrimination.
15       What happened between April 7 and
16  May 11 to make you believe that Ms. Johnson was
17  motivated by discriminatory intent?
18       A    The actions directed at Lisa were
19  discriminatory. My close association with Lisa
20  resulted in her retaliating against me. My working
21  relationship with Lisa resulted in her retaliation.
22       Q    Had you complained to anyone about

Page 83

1   discrimination against Lisa as of, let's say,
2   May 11, 2004?
3        A    Yes.
4        Q    To whom?
5        A    To Tim Kime.
6        Q    Who was he?
7        A    He was the vice chair of the board of
8   directors.
9        Q    When did you complain to Tim Kime?
10       A    On April the 8th, 2004 and again on
11  April 9th.
12       Q    Did you complain in writing?
13       A    No.
14       Q    How did you complain?
15       A    I called him and I spoke to him in
16  person.
17       Q    On two separate occasions?
18       A    That's correct.
19       Q    How long did those conversations last?
20       A    The phone call was about 15 minutes.
21  The meeting was about an hour and a half.
22       Q    All right. So on April 8th, you

Page 84

1   called, and on April 9th, you met with him in
2   person?
3        A    Yes.
4        Q    What did you say to him about the
5   treatment of Lisa that you perceived as
6   discriminatory?
7        A    I told him that there was -- that Lisa
8   was being treated in a discriminatory way and that I
9   was in the cross hairs of that.
10       Q    Because of your association with her?
11       A    That's correct.
12       Q    And what did he say?
13       A    He invited me to lunch. We had lunch
14  together on the 9th, and I told him how things had
15  been transpiring.
16       Q    All right. And what was his reaction?
17       A    He listened closely. He asked me what
18  I wanted him to do about it, and I said I didn't
19  know.
20       Q    Did he do anything about it to your
21  knowledge?
22       A    No.

21 (Pages 81 to 84)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 85

1    Q    Did he take notes?
2    A    No.
3    Q    Was he then the executive director of
4    Leadership Washington?
5    A    Yes.
6    Q    That's where you previously worked?
7    A    That's correct.
8    Q    Okay.  The phone call was on April 8,
9    and the meeting was on April 9, the luncheon
10   meeting?
11   A    That's correct.
12   Q    And the decision to replace you as
13   being in charge of the Post award was made on
14   April 7 or earlier?
15   A    I learned of it on April 7th.
16   Q    So obviously the decision was made then
17   or earlier?
18   A    (Witness nods head.)
19   Q    Yes?
20   A    Yes.
21   Q    So that decision could not have been in
22   retaliation for your complaint to Tim Kime; is that

Page 86

1    right?
2    A    Right.
3    Q    Had you made any earlier complaints
4    about what you perceived as discriminatory treatment
5    directed at Lisa?
6    A    No.  Well, no.  I'm sorry, yes.
7    Q    Tell me about that.
8    A    I spoke to Betsy about an incident with
9    a faculty member, Billy Terry, who Lisa and I were
10   trying to recruit to teach a course on advocacy.
11   And the behavior directed at the faculty member --
12   the prospective faculty member, Lisa, and me by Jeff
13   Kost was highly disrespectful, and it was done in
14   the presence of the faculty member, and I did report
15   that to Betsy Johnson.
16   Q    When was that?
17   A    The date was early February -- I think
18   the 9th -- of 2004.
19   Q    Describe for me the behavior of
20   Mr. Kost which you viewed as disrespectful.  Was
21   that your word?
22   A    Yes.

Page 87

1    Q    Okay.  Describe that behavior for me,
2    please.
3    A    He interrupted our meeting because we
4    were -- well, we were using one of the two halves of
5    the conference room.  I had arranged -- I had
6    reserved that conference room for my meeting with
7    Mr. Terry and Lisa Ransom.  Mr. Terry was using the
8    white boards to outline what he would teach during
9    the advocacy course.
10        About 30 minutes before -- 25 minutes
11   before we were to vacate the space, because one of
12   Jeff's -- one of the groups with which he's
13   affiliated, the Association of Fund-Raising
14   Professionals, had also reserved that same space
15   following our meeting.  I'm not sure if it was 2:30
16   to 3:00 or 3:00 to 3:30, but we were -- let's say we
17   had the room until 3:30.
18        At about 3:05, if that's the right time
19   frame -- I don't remember that specifically --
20   Barbara Mendoza came to the conference room and
21   interrupted our meeting and said that some of the
22   AFP members had started to arrive, and she was

Page 88

1    wondering if, you know, I had gotten the times
2    wrong.
3        I went to check my computer calendar
4    where I kept meeting room reservations and informed
5    her that they didn't have the space until 3:30, for
6    another 25 minutes, and she left.  I told her to let
7    them wait in the lobby, and she left.
8        Approximately five minutes later, Jeff
9    Kost stormed into the room, didn't knock --
10   Q    When you say stormed, tell me what you
11   mean.
12   A    Didn't knock, didn't -- the door was
13   closed, and he didn't knock, didn't say excuse me,
14   and just launched into the situation.  "I have
15   people waiting, and they are waiting in the lobby."
16        And I said, "Well, Jeff, they don't
17   have the room until 3:30."
18        And he said, "Well, what do you want me
19   to do, make them wait?"  And he raised his voice at
20   me in the presence of Ms. Ransom, in the presence of
21   Billy Terry, and then he stormed out of the room.
22   He turned on his heel and walked out.  He was

22 (Pages 85 to 88)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

---

Page 89

1    clearly very upset.
2          It was shocking to me that he treated
3    us that way. It was embarrassing. The trainer was
4    very annoyed by it. He was surprised and shocked to
5    be witnessing it. I was embarrassed that he
6    witnessed it. This was his first contact with the
7    Center for Nonprofit Learning & Leadership, the
8    education program. So that's what happened.
9          Q    Do you attribute Mr. Kost's behavior to
10   discrimination?
11         A    I think so.
12         Q    And why do you make that attribution?
13         A    I think so. I never saw him deal with
14   white colleagues in that kind of fashion. Mr. Terry
15   was a black man, Lisa is a black woman, and I'm a
16   woman of color. I'm a Mexican woman.
17         Q    Have you ever seen him behave
18   differently under the same factual circumstances
19   where Caucasians are involved?
20         A    No.
21         Q    So you don't have anything to compare
22   it to?

---

Page 90

1          A    No.
2          Q    Okay. You worked with Beth Schaffer
3    and Ellen Toups --
4          A    I believe it's Toups.
5          Q    -- on some workshops?
6          A    That's correct.
7          Q    Your workshops are evaluated, I take
8    it? You do an evaluation of them afterwards?
9          A    Generally, yes.
10         Q    What's the format of the evaluation?
11   How does that work?
12         A    An on-line evaluation is sent post the
13   meeting.
14         Q    So you encourage attendees to submit an
15   evaluation?
16         A    That's correct.
17         Q    How is the evaluation scaled?
18         A    I don't remember now. I believe it was
19   a 1 through 5 scale.
20         Q    Which is the best, 1 or 5?
21         A    5.
22         Q    Is that similar to the personnel

---

Page 91

1    evaluation, 1 through 5 with 5 being the best?
2          A    Yes.
3          Q    Let me ask you to take a look, please,
4    at Exhibit 11.
5          MR. TEMPLE: After this -- we've been
6    going about an hour and a half -- can we take a
7    little break?
8          MR. FLEISCHER: Sure. Let's do this,
9    and then we'll be done.
10         BY MR. FLEISCHER:
11         Q    Can you tell me what that is, please?
12         A    This is an e-mail to Beth Schaffer and
13   Ellen Toups titled Positive Feedback dated
14   August 27th, 2003 from me to Beth and Ellen Toups
15   regarding, it looks like, courses -- two courses
16   they had presented.
17         Q    All right. I'm reading, I guess, the
18   second sentence: The overall rating for both
19   workshops averaged 4 on a scale of 1 to 5 with 5
20   being the highest rating. Good marks!
21   Congratulations!
22         Is that what you wrote them?

---

Page 92

1          A    Yes. The -- yes.
2          MR. FLEISCHER: Okay. Do you want to
3    take a break?
4          MR. TEMPLE: Yes.
5          (Recess from 12:05-12:14.)
6          BY MR. FLEISCHER:
7          Q    The conference room that you described
8    with Mr. Kost, that was in February of 2004; is that
9    right?
10         A    Yes.
11         Q    What grew out of that, if anything?
12   Did you speak to Jeff about that? Did you speak to
13   anybody else about that?
14         A    Yes and yes.
15         Q    All right.
16         A    The next day, I went to Jeff's office
17   and I ruminated about how to ask the question,
18   because I didn't want anything to be exacerbated.
19   My question was very open ended, very general. I
20   just asked him what happened yesterday, and he was
21   very hostile still, very hostile. He wouldn't look
22   me in the eyes. He wouldn't look at me, and he said

---

23 (Pages 89 to 92)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 105

1    Her complaint was that sometimes the
2  coffeepots get left in the conference room. So when
3  the caterers come to pick up their coffeepots,
4  someone has to let them into the room. And I said,
5  "Well, that's an easy one to solve. What we can do
6  after a meeting is simply take it into our kitchen,
7  which is an open area, allowing the catering folks
8  to just go straight into our kitchen area and take
9  the pots." That was it. That was it. There was no
10 animosity about it.
11    I just said, "In the future, just come
12 to me. I mean, this one is a easy one to solve.
13 There's no need to get upset about it." Barbara
14 did, though, get upset. She started quivering a
15 little bit and walked away.
16    I saw her in the hallway coming from
17 the bathroom later that day, and I said, "Is
18 everything okay with us," and she started crying.
19 She started crying. And I said, "What's going on,"
20 because I knew it had nothing to do with our
21 conversation, and it didn't.
22    She started complaining about the

Page 106

1  executive director, and she started complaining
2  about Lisa to me. She started complaining about
3  Lisa. And I said, "What is it about Lisa?"
4    And she said, "She thinks her job is
5  more important than mine."
6    And I said, "You know, what do you base
7  that on?"
8    And she said, "She's always talking
9  about the people that she meets with."
10    Lisa by virtue of being a public policy
11 person does meet with elected officials and others
12 that hold, you know, offices and stuff. And I said
13 to Barbara, "You know, Barbara, when Lisa mentions
14 that to me, I don't think that she's necessarily --
15 that she's in any way putting -- lording her
16 position over mine, because that's just her job, and
17 you shouldn't either."
18    And then she continued crying about
19 Betsy and how Betsy mistreated her, and I said, "You
20 know, it sounds like we or you might need --"
21 because at this point, I was not into this issue. I
22 wasn't into Betsy and Barbara's -- I mean, Barbara's

Page 107

1  issue, whatever that was. So I suggested that if
2  she wanted to get a facilitator, I would be happy to
3  try to find one for her, but she never approached me
4  about getting one.
5    Q    When did that take place?
6    A    Sometime in the winter of 2004. I
7  don't know the date.
8    Q    Okay.
9    A    I don't know the month.
10    Q    Winter 2004 being December 2004 or
11 January 2004?
12    A    I don't know. I don't know.
13    Q    Okay.
14    A    Sometime in that time frame, that two-
15 or three-month time frame of winter.
16    Q    Winter 2003-2004? Do you see what I
17 mean?
18    A    Oh, I'm sorry, yes, '03 to '04.
19    Q    Is Barbara Mendoza a Latino?
20    A    No. She married a Latino.
21    Q    Do you recall an incident in January or
22 February of 2004 in which you were criticized for

Page 108

1  failing to make timely deposits of workshop
2  receipts?
3    A    Yes.
4    Q    Who criticized you?
5    A    It was for Betsy, I believe, and it
6  was -- yes, Betsy.
7    Q    Was that justified?
8    A    Yes.
9    Q    All right. In that same incident, were
10 you criticized for borrowing from cash receipts for
11 your personal needs?
12    A    Yes.
13    Q    Did you do that?
14    A    I did.
15    Q    Are you aware that CNA got a so-called
16 management letter on account of those incidents?
17    A    Yes. Betsy told me that.
18    Q    Okay.
19    A    I discussed it with her, and she said,
20 "It's not a big deal." She understood the
21 circumstances.
22    It was absolutely a lapse of judgment,

27 (Pages 105 to 108)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 113

1    She said that she expected people to leave their
2    shit at home. She was offensive. She was hostile.
3        Q    What other abusive language did she
4    use?
5        A    I would have to look at my notes. I
6    believe there's another -- another term she may have
7    used.
8        Q    Was it --
9        A    I took extensive notes.
10       Q    Was it racially demeaning or --
11       A    Oh, yes. On July 7th and 8th in that
12   evaluation, she told me that I needed to swallow
13   inflammatory remarks, that that is what a good
14   leader would do.
15       Q    Tell me why that's racially
16   discriminatory.
17       A    She told me that my -- that 13 of 14
18   people had complained about me when I -- and I'm
19   getting to your answer. She told me that 13 of 14
20   people had complained about me. I was incredulous.
21   I actually said to her -- I repeated it. I said,
22   "You're telling me that 13 of 14 people have

Page 114

1    complained about me? Is that what you're telling me
2    today?"
3            She said, "Yes."
4            And I said, "Tell me who, when, and
5    what was said, because this is the first time I am
6    hearing of anything -- anything related to
7    complaints about me."
8        Q    Okay. And tell me --
9        A    And --
10       Q    Sorry.
11       A    If I may finish?
12       Q    Sure.
13       A    And she went on -- I went on, and I
14   said, "I need details. I need to know exactly."
15   And I also asked her, "Who is the 14th person who
16   didn't complain about me?"
17           And she said, "Lee Mason," the one
18   person I supervised.
19           And I said, "Then tell me exactly what
20   everyone has said."
21           "I'm not going to get into that. I
22   don't remember specifics."

Page 115

1            I said, "But you're basing my
2    evaluation on these impressions that you have and
3    these so-called complaints that you've received? I
4    want to know what they are. I want to know who
5    complained about me." And she would not get into
6    specifics.
7            After I repeatedly hammered for
8    specifics, she finally said that the five people
9    were Jeff Kost, Jeremy Baird, Susan Sanow, Barbara
10   Mendoza, and Betsy.
11           And I said, "Tell me what each of those
12   people said."
13           With Jeff Kost, she said -- she
14   referred to the incident with the -- with the
15   conference room door -- with the conference room
16   door and with the trainer, Billy Terry, and me not
17   giving up the space. Betsy said, "I guess you
18   needed to make a point, didn't you, by staying in
19   that room? And I guess you made whatever point you
20   needed to make."
21           I reminded her that she apologized for
22   his behavior when I raised it. Somehow, she had

Page 116

1    forgotten that.
2            And then --
3        Q    Let me interrupt you for a second.
4        A    I still have more to say about that,
5    sir.
6        Q    I know you do, but let me interrupt.
7        A    I have a lot more to say about that.
8        Q    I understand you do, but let me
9    interrupt you for a second. We're here today
10   because you've accused CNA of discrimination, and
11   that's what I'm interested in.
12       A    And I'm getting there.
13       Q    If you disagree with Betsy, if you
14   think she's a miserable old goat, that's fine, but
15   that has nothing to do with what we're here about.
16           What I'm interested in is
17   discrimination. So if you could focus on that, I
18   would welcome it.
19           MR. TEMPLE: Wait a minute. If you're
20   not satisfied with her answer because she doesn't
21   show you that it's discrimination, then that's a
22   different issue, but she can respond. It may not be

29 (Pages 113 to 116)

ARMINDA VALLES-HALL                          ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT                    JANUARY 4, 2006

Page 117

1  to either of our satisfaction, but it is what it is.
2        MR. FLEISCHER: Fine.
3        MR. TEMPLE: If it doesn't meet the
4  threshold, then I'm sure we can anticipate a motion
5  at some point.
6        MR. FLEISCHER: Okay.
7        MR. TEMPLE: But I think that the
8  questions have to be pointed in the direction of
9  what you want.
10        MR. FLEISCHER: Okay. Well, I'm going
11  to let her finish.
12        MR. TEMPLE: What was the question?
13        (Whereupon, the reporter read back.)
14        BY MR. FLEISCHER:
15     Q    Let me just say, I'm going to let you
16  go as long as you want --
17     A    Good.
18     Q    -- but I'm inviting you to focus on
19  discrimination, because, in my view, that's why
20  we're here today.
21     A    That's why we're here.
22     Q    Go ahead.

Page 118

1     A    So --
2        MR. TEMPLE: Actually, let me just say
3  for the record that I thought she was answering the
4  question.
5        MR. FLEISCHER: Perhaps she was.
6        BY MR. FLEISCHER:
7     Q    Go right ahead.
8     A    And as I indicated to you, I will get
9  to all of that.
10     Q    Okay.
11     A    So Jeff Kost, who is white and gay,
12  right, behaves against -- behaves in a
13  disrespectful, unprofessional way with me, and I try
14  to deal with it constructively. I go to my boss, I
15  follow the appropriate channels, and I get blasted
16  for it in my evaluation. I get blasted for it. She
17  tells me I get blasted for it. That's not right.
18  That's not right. So that's phantom complaint
19  number one.
20        The second one related to Jeremy
21  Baird. Betsy actually said that I called him a
22  racist. I said, "I did not call him a racist."

Page 119

1        And she -- her response was, "But you
2  think he is, don't you," and tried to goad me into
3  saying that I think Jeremy Baird is a racist.
4  Jeremy is white. Jeremy is gay. I told her I had
5  never had a cross word with Jeremy. She told me
6  that Jeremy felt I should have done more for him
7  with the Carlottia Scott incident, which we haven't
8  explored.
9        Carlottia Scott was another prospective
10  faculty member that Lisa Ransom and I were bringing
11  in to teach a course on advocacy, a black woman with
12  long twists down her back. She comes into our
13  office, we were meeting in the conference room, I
14  excuse myself to get something for her, and Lisa
15  also had to leave the conference room area to do
16  something for Carlottia, who was even contemplating
17  membership for some of the nonprofits with which
18  she's associated, WCA membership.
19        Carlottia excuses herself to go out the
20  side door to go to the ladies' room and doesn't
21  realize that she's locked herself out of the
22  conference room. So she goes to the front desk as

Page 120

1  she had previously and says, "I was meeting with
2  Arminda and Lisa. May I go back to the conference
3  room?"
4        She gets stopped halfway down the
5  hallway by Jeremy Baird, who deals with her as if
6  she's some kind of a criminal. Rather than asking
7  how may I help you, the question is lodged at her,
8  "What are you doing here?"
9        And she -- Carlottia Scott was deeply
10  and highly offended by it. She said that this was
11  supposed to be friendly territory, and she's treated
12  this way for what reason? For what reason? Why was
13  she treated like that, one of my faculty members?
14  Why was she treated that way? There's no
15  explanation. So she's treated that way, and there's
16  no explanation or no justification for treating a
17  visitor like that.
18        Betsy says, "Well, Jeremy is very
19  concerned about security issues. He cares about
20  security issues and no one else does."
21        Absolutely false. That's just
22  ridiculous. That's a justification for behavior

30 (Pages 117 to 120)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

### Page 121

1 that should not have been tolerated -- should not
2 have been tolerated.
3      I wasn't Jeremy's supervisor. I never
4 discussed it with Jeremy. I just brought it to the
5 attention of Betsy, and I provided -- I forwarded
6 the e-mail complaint letter that Carlotta Scott
7 sent to Betsy along with contact information for
8 Carlottia Scott.
9      Upon receiving that e-mail, Betsy's
10 question to me was, "Who wrote this?"
11      And I said, "Carlottia Scott."
12      "Let me see the original."
13      I said, "Well, I forwarded it to you."
14 And I explained to her that Carlotta had put a
15 funky yellow background on the e-mail she had sent
16 me, that the complaint letter was an attachment.
17 And rather than forward the e-mail with that funky
18 background, which would have attached to my e-mail
19 which, you know, would not have looked so good, I
20 just copied the attachment and sent it to her.
21      Well, Betsy followed me down the
22 hallway like I was some criminal to retrieve that

### Page 122

1 e-mail. And I stopped her in the hallway, and I
2 said, "You don't know me very well, but I am not
3 without integrity. I did not alter that letter, I
4 did not change it in any way, and I resent your
5 following me down the hallway like a criminal." So
6 that was complaint number two, Jeremy Baird.
7      Complaint number three, I supposedly
8 called Barbara Mendoza unprofessional. I never
9 called Barbara unprofessional. I asked Betsy for
10 specifics. I said, "You're telling me Barbara said
11 I called her unprofessional?"
12      "I believe she did. I believe she
13 did."
14      That's what my evaluation was based on,
15 Betsy's belief that Barbara said that?
16      The fourth one was Susan Sanow and
17 her -- that, quote, Susan thought you were harsh in
18 your response to her. Harsh? Susan's very own
19 March 23rd e-mail admits that I know this is a bit
20 negative.
21      She was harsh. She didn't have to deal
22 with me that way. My response was tempered. I

### Page 123

1 wrote a very collegial letter back to her, and I
2 said, "Yes, your tone is negative and unnecessarily
3 so. I too care about The Washington Post award
4 project and I made some significant improvements to
5 it which you noted in our first meeting."
6      So for me to get criticized and that be
7 the fourth complaint of the thirteen phantom
8 complaints was really offensive. Again, Susan is
9 white, Barbara is white, everybody is white. Their
10 words are believed against me because I'm not. I'm
11 neither gay and I'm neither white, and I'm not
12 white.
13      The fifth one was Betsy herself. I
14 guess she had to come up with something. She said
15 that every time I come to her, I come in an
16 offensive tone and that I just come to complain.
17      Absolutely false. I have come to her
18 with issues, I've come to her with good news, I send
19 her project reports of how the center's attendance
20 was increasing and how ratings were for our
21 sessions. I had -- I had been communicating with
22 her in the fashion that she said she wanted.

### Page 124

1      When I was hired -- when I was
2 interviewed, rather, she said, "I don't need to know
3 all the details. I expect people to come in here
4 and do their job and do a good job," and that's what
5 I was doing. That's what I was doing. I was
6 playing by her rules. She said that's the kind of
7 manager she was. All of a sudden, I was being told
8 that all I do is complain. Absolutely false.
9      She cited the May 11th meeting with her
10 in which I raised concerns. Those are legitimate
11 concerns. If I'm responsible for managing someone's
12 time and responsibilities and he is getting
13 assignments from people without them being filtered
14 through me, that makes it difficult for me to manage
15 his time and responsibilities. All I was asking for
16 were basic professional courtesies extended to me.
17      Then she said that I called people
18 names, and I asked her to tell me what those names
19 were. She said that I called people unprofessional
20 and that if my behavior -- alleged behavior, because
21 I never did any of that, was cultural in nature as a
22 Mexican woman, that she should just tell the staff

31 (Pages 121 to 124)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 125

1  that it was cultural in nature and that they should
2  buck up and take -- and take it.
3        How offensive is that to imply that
4  because I'm a Mexican woman I would be operating in
5  such a fashion? That's disgraceful. It's
6  disgraceful the way she treated me, someone who was
7  performing -- performing on every level that they
8  were demanding of me and producing massive
9  quantities of work.
10       Q    Why don't you take a minute.
11       A    I took pride in my work. I take pride
12  in my work. I care about my reputation. Betsy
13  said, "Take this with a grain of salt," her abuse,
14  her comments, her allegations that I was
15  inflammatory, that I should swallow inflammatory
16  remarks because that's what a good leader would do.
17  No, I won't do that. I won't allow myself to be
18  abused.
19       And she told me I should go and
20  apologize to everyone either in person or by e-mail,
21  everyone I've offended, but that I shouldn't say
22  Betsy told me you said this and it isn't true,

Page 126

1  because that wouldn't be productive.
2        It wouldn't be productive because it's
3  not true. None of those people -- those were not
4  legitimate allegations that she was making. She was
5  making them up as she went along. She was making
6  them up as she went along. It was subjective, it
7  was arbitrary, it was racist, it was demeaning, it
8  was humiliating, and it set the course for all the
9  mental pain that I've been through with that
10  organization. It was the worst professional
11  experience of my life and the one in which I worked
12  the damn hardest.
13       It is unfathomable to me that this kind
14  of behavior was allowed. I told -- I reported all
15  of this in detail to de Barbieri. I reported
16  everything to her that was happening to me, and I
17  told her why it was happening to me. She
18  sanctioned -- Betsy Johnson's legal actions, she
19  sanctioned it. This board is just as culpable as
20  Betsy for this behavior.
21       Q    I'm asking you about the interview --
22  about the evaluation. I haven't asked you about

Page 127

1  that yet.
2        You made reference to Betsy using the
3  term cultural thing or something like that.
4        Did she say anything else during the
5  July 7 and July 8 meetings which you took as a
6  reference to race or color?
7        A    Her actions said it.
8        Q    Okay.
9        A    Her disrespectful tone, the way she
10  believed every other person's opinion -- or not
11  even -- I don't even think they were legitimate
12  complaints. I mean, she just made this stuff up.
13       Q    I understand that.
14       A    But even if they -- that's what did it.
15       Q    I understand that.
16       What I'm looking for is any words she
17  used which were racial in nature or related to
18  sexual orientation.
19       A    It was very clear to me what she meant
20  when she said cultural.
21       Q    Okay.
22       A    That's clear to anybody, so no.

Page 128

1        Q    Did she use anything else?
2        A    No.
3        Q    Did Ms. Johnson -- I'm looking at
4  line H, pledges to get work done in allotted time.
5        Did she say anything about the
6  timeliness of your work?
7        A    She -- this was related to my having
8  pulled a 24-hour day to ensure that the HSC
9  conference, the conference in Prince George's
10  County, happened as scheduled. We had some computer
11  glitches at the last minute, and I had to work
12  through the night to make sure that that was done.
13       She criticized me for that rather than
14  saying, you know, under the circumstances, you did a
15  great job. You know, you did what you needed to do
16  to make sure that that event went off without a
17  hitch the next morning. No. I got criticized for
18  that. That's what that related to, and I didn't
19  pledge anything. She wrote that. I believe I
20  worked -- my work habits were exemplary. I worked
21  hard, I worked efficiently, and I produced good
22  quality.

32 (Pages 125 to 128)

SLR  REPORTING
(301) 340-0042

ARMINDA VALLES-HALL                        ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT              JANUARY 4, 2006

Page 129

1    Q    You got a raise at that meeting, did
2  you not?
3    A    Yes.
4    Q    What, if anything, did Ms. Johnson tell
5  you about the raise?
6    A    That she was giving me a 3 percent
7  raise. She also told me if I corrected these
8  deficiencies, I would get a good evaluation next
9  year.
10    Q    Do you know how any other employees got
11  evaluated in July of 2004?
12    A    I don't know what's on their paper, no.
13    Q    Have you talked to any other employees
14  about their evaluations?
15    A    I conducted one, so I know what his
16  says.
17    Q    Who is that?
18    A    Lee Mason.
19    Q    Did you evaluate Lee?
20    A    I did.
21    Q    Okay. How about anybody else at CNA?
22  Do you know what their evaluations were?

Page 130

1    A    No.
2    Q    Do you know whether they got raises?
3    A    I don't.
4         MR. FLEISCHER: Would this be a good
5  time to break for lunch?
6         MR. TEMPLE: I think so.
7         (Whereupon, at 12:58 p.m., the
8         deposition in the above-entitled matter
9         was temporarily recessed to reconvene
10         at 2:00 p.m. this same day.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 131

1         A F T E R N O O N   S E S S I O N
2              (2:10 p.m.)
3    BY MR. FLEISCHER:
4    Q    Let's look at Exhibit 14. If you can,
5  tell me what that is, please.
6         (Discussion off the record.)
7         THE WITNESS: This is my August 4th,
8  2004 e-mail or memo, rather, to Betsy Johnson
9  regarding my July 2004 evaluation.
10    BY MR. FLEISCHER:
11    Q    I take it the handwritten notes are
12  Ms. Johnson's and not yours?
13    A    That's correct, except for my
14  initialing.
15    Q    Okay. Well, I won't ask you about her
16  notes then. I'll just ask you about what you wrote.
17         Let me start with the second paragraph,
18  the second sentence: Quote, I am concerned that the
19  basis of all scores rated less than 5 on my most
20  recent evaluation were based on biased subjective
21  impressions and on false and completely unfounded
22  and undocumented charges discussed for the first

Page 132

1  time in my evaluation, closed quote.
2         We had a lengthy discussion this
3  morning about that very topic, and my question is:
4  Is there anything more you can tell me about that
5  that you haven't already told me?
6    A    Yes.
7    Q    Okay. Then please do.
8    A    These phantom charges were the basis
9  for my continued -- for the continued hostility
10  directed at me by Betsy Johnson as we moved through
11  month and month and month until I departed on
12  February the 14th.
13    Q    Okay. Let me back up and make my
14  question just a little clearer. I'm speaking now of
15  August 4 when you wrote this, and really my question
16  is intended -- was intended to be, are there any
17  more facts or information you can give me to support
18  the statement that I just quoted?
19    A    Yes. The treatment that people of
20  color, whether visitors or staff, received at the
21  WCA set up a cast system, if you will, where the
22  stereotypes, the discrimination, their impressions

33 (Pages 129 to 132)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 141

1    A    I don't recall.
2    Q    You didn't leave it at that?  You did
3 more, did you not?
4    A    Yes.
5    Q    Tell me what you did.
6    A    I filed a complaint with the Office of
7 Human Rights in the District of Columbia.
8    Q    And that was filed on August 9?
9    A    I believe that's the correct date.
10   Q    Did you do anything more internally?
11   A    I e-mailed Barbara Mendoza requesting a
12 formal investigation.  I believed Barbara to be the
13 person handling personnel issues and was told that
14 that had to go directly to Mary Ann de Barbieri, so
15 I e-mailed her with a formal request for
16 investigation.
17   Q    Is this a copy of your e-mail to Mary
18 Ann (indicating)?
19   A    Yes.
20   Q    And what response did you get from Mary
21 Ann?
22   A    She acknowledged receipt and said she

Page 142

1 wanted to meet.
2    Q    She acknowledged receipt the next day,
3 did she not?
4    A    I don't know.
5    Q    Okay.  Look at 16, please.
6    A    Yes, she did.
7    Q    16 is a copy of her response?
8    A    That's correct.
9    Q    And then when did she get back to you
10 and tell you that she wanted to meet with you?
11   A    I don't remember.
12   Q    Would you look at Exhibit 17, please?
13   A    It's not dated.
14   Q    All right.  Do you see an e-mail from
15 her to you on the bottom half of that page and then
16 an e-mail from you to her?
17   A    That's correct.
18   Q    And the e-mail from you to her is dated
19 August 26th?
20   A    That's correct.
21   Q    All right.  So her e-mail to you was on
22 that date or earlier; is that right?

Page 143

1    A    That's correct.
2    Q    Okay.  Tell me, did a meeting take
3 place?
4    A    Yes.
5    Q    When was the meeting?
6    A    October 19th.
7    Q    I've reviewed the e-mail exchange
8 between you and her, and I've got it here and we can
9 look at it, but certainly I come away with the
10 impression that you resisted a meeting with her.
11       Is that a fair impression?
12   A    No.
13   Q    Were you anxious to meet with her?
14   A    Yes.
15   Q    I'm looking at your response dated the
16 17th.  Quote, given the seriousness of the matter, I
17 do not feel comfortable meeting with you alone.
18       Why did you say that?
19   A    Because of her position as the board
20 chair and her friendship with Betsy Johnson.
21   Q    Who else did you want in the meeting?
22   A    Possibly my lawyer.

Page 144

1    Q    Up until that point, had Mary Ann said
2 or done anything that you're aware of which would
3 lead you to believe she harbored racist feelings?
4    A    No.
5    Q    Has she said or done anything which
6 would lead you to believe that she -- when I say
7 racist, I'm talking both national origin and color.
8       Did you mean it that way in your
9 response?
10   A    Yes.
11   Q    Okay.  Up until that point, had she
12 said or done anything which would lead you to
13 believe that she harbored biased feelings against
14 heterosexuals?
15   A    No.
16   Q    Did Ms. de Barbieri respond to your
17 concern about learning what the rules and procedures
18 would be?
19   A    Yes, she did.
20   Q    Okay.  Look at Exhibit 18, please.
21   A    Uh-huh.
22   Q    Is this a copy of an e-mail you

36 (Pages 141 to 144)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 165

1    A    Yes.
2    Q    Go ahead. Go ahead.
3    A    The way things happened with Lee are as
4    follow: He -- after Lisa Ransom was fired in June,
5    he was offered her position even though he has no
6    substantive public policy background. Lee's areas
7    of expertise are in program, not public policy, and
8    they -- his -- any experience he might have would
9    absolutely pale by leaps and bounds to what Lisa
10   Ransom brought to the table in terms of public
11   policy.
12   Q    Okay. That was a promotion for him?
13   A    That was a promotion.
14   Q    To a directorship position?
15   A    That's correct.
16   Q    And he's a black male?
17   A    Yes, that's correct.
18   Q    Okay. Go ahead.
19   A    He initially refused the job citing his
20   own lack of public policy experience. He's not
21   qualified for the job, but it didn't matter. He's a
22   black man, and they need a black face, and so they

Page 166

1    offered him the job, and he turned it down.
2         Then they threatened funding staffing
3    for the center. I was told the board was
4    considering cutting the staffing. I mentioned that
5    to Lee because I knew he had responsibilities as a
6    father with kids in college. His actions -- rather,
7    he discussed this information with Betsy, and then
8    he was hired as the public policy director in
9    September, I believe, of 2004.
10        I was told and he was told subsequently
11   that effective October, he would only be supporting
12   education efforts 50 percent of the time. Mind you,
13   we had 75 or so workshops in the works that had to
14   be managed. They had already been planned, and I
15   was going to have to manage them alone. And what
16   that entails is not just planning the workshops but
17   getting them executed, working with the trainers,
18   setting up the rooms, ordering whatever I needed to
19   make those courses happen, conducting post-event
20   evaluations. It was a tremendous load. It was a
21   tremendous load.
22        At the same time, all that summer, we

Page 167

1    had been talking about the sustainability plan that
2    Lee and I had developed in concert and at the
3    direction of a board member who had asked to meet
4    with us about just that subject. They asked for
5    that meeting in a public setting, in a board
6    meeting, to develop a sustainability plan so the
7    center could be a self-sustaining project of the --
8    of the WCA eventually.
9    Q    Had the center ever made money?
10   A    No.
11   Q    Had it always lost money?
12   A    It lost money from its inception.
13   There was no funding provided for it, or very
14   limited funding. There was no budget developed for
15   the center until I developed one. I got a program
16   that had no budget. I had to -- I had to do that,
17   and I did it six months after I got there
18   approximately. That was the first budget this
19   center had. It was launched in March of 2003, one
20   month before I arrived.
21        I was told and Lee was told -- I told
22   him -- that the board had -- Betsy had represented

Page 168

1    to me that the board was willing to fund the
2    center's operations even at a deficit for three
3    years. We weren't going to wait three years to try
4    to make it sustainable. It was clear the
5    organization was not raising money for it -- any
6    substantial amount of money for it.
7         We were -- Lee and I were securing
8    resources to the best ability that we could in terms
9    of in-kind contributions to the center. Over the
10   course of the time that I worked there, those
11   resources totaled approximately $250,000 in faculty
12   time alone.
13        We didn't pay our faculty generally.
14   We recruited them to teach on a pro bono basis for
15   sometimes courses that were full-day workshops.
16   Hiring those people as consultants and paying them
17   what they would ordinarily charge is how we arrived
18   at that $250,000 mark over the course of the two
19   years -- approximately two years that I managed that
20   center, but we couldn't exist on in-kind
21   contributions alone. We needed real resources
22   directed at the center.

42 (Pages 165 to 168)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 205

1   Q   I'm looking at Exhibit 33, and it
2   starts off: I reiterate I submitted all of the text
3   needed for a full catalog on December 17th, and the
4   last phrase is bolded.
5       What were you responding to?
6   A   To Rick's Friday, January the 7th
7   e-mail.
8   Q   All right. I suppose this is a little
9   out of context, and maybe you can help me with the
10  context. Was he complaining that something wasn't
11  done or wasn't complete or something?
12  A   Yes. They were putting the delay in
13  processing -- in producing the hard-copy catalog on
14  me as if I had not produced what was required to
15  produce a full catalog as scheduled on
16  December 17th.
17  Q   Okay. And that submission on
18  December 17th, Exhibit 31 that we looked at, that
19  was all the designer needed in order to go ahead and
20  move forward with the catalog?
21  A   To my understanding, yes, in terms of
22  what I was producing for it.

Page 206

1   Q   Okay. Who else had responsibility?
2   A   Subsequent to this, Rick was --
3   submitted some additional stuff for the catalog.
4   Q   Okay. But as far as you're concerned,
5   you did everything you were required to do --
6   A   And more.
7   Q   -- and more to get the catalog moving?
8   A   Betsy and I agreed that December 17th
9   would be the deadline, not the 14th as stated by
10  Rick, and that all I was required to do was to
11  produce 40. I produced complete information on 55,
12  I believe, and Betsy and I had discussed that
13  anything that was not finalized by the date of
14  December 17th could be eliminated.
15  Q   Okay. If you would look at 34 and 34A,
16  please.
17  A   (Witness complies.)
18  Q   All right. Let me ask you about 34.
19  Is this an e-mail with the attachment that you got
20  from Susan Sanow on or about January 13th?
21  A   Yes.
22  Q   Am I correct in understanding that

Page 207

1   Susan had just returned full time as director of
2   programs?
3   A   Yes.
4   Q   You and she and Betsy had a meeting on
5   January 5 at which a variety of things were
6   discussed.
7       Tell me what was discussed at the
8   meeting.
9   A   I don't remember everything that was
10  discussed, but these items here were among them.
11  Q   Okay. So Susan has correctly
12  identified the topics, if not the substance, of the
13  discussion; is that fair to say?
14  A   She has identified some topics. I
15  don't know if it's a comprehensive list of topics.
16  Q   All right. And then some 12 days
17  later -- 11 days or whatever that is, 12 days
18  later -- she sends you an e-mail with a summary of
19  her version of what was discussed at the meeting?
20  A   Yes.
21  Q   All right. Looking at paragraph
22  number 4 of Susan's summary, about two-thirds into

Page 208

1   that paragraph --
2       MR. TEMPLE: That's Exhibit 34, right?
3       MR. FLEISCHER: That's Exhibit 34, yes,
4   and it's the second page of that exhibit, Bates 335.
5       BY MR. FLEISCHER:
6   Q   -- quote, Arminda must take
7   responsibility for adding course information to that
8   website ensuring access to registration for spring
9   2005 classes, closed quote.
10      If I understood your earlier testimony,
11  that's not what happened at the meeting?
12  A   That's exactly right.
13  Q   Okay. Tell me what happened at the
14  meeting with regard to web-posting responsibility.
15  A   I informed Betsy and Susan that I was
16  not willing to do other people's work anymore, that
17  I was overloaded.
18  Q   Had somebody asked you at the meeting
19  to do it?
20  A   Yes.
21  Q   So who asked you at the meeting to do
22  it?

52 (Pages 205 to 208)

ARMINDA VALLES-HALL
vs. CENTER FOR NONPROFIT ADVANCEMENT

ARMINDA VALLES-HALL
JANUARY 4, 2006

Page 209

1    A    Betsy and Susan.
2    Q    And you responded that that's somebody
3  else's job, not mine?
4    A    That I could not continue to do other
5  people's work and that -- I could not continue to do
6  other people's work. And Betsy ultimately took on
7  responsibility for getting those courses on-line.
8    Q    Okay. So the way it was left after
9  they told you that you had to do it and you said not
10  my job, Betsy said, okay, I'll figure it out?
11    A    I didn't say not my job. I said that I
12  couldn't continue to do other people's work.
13    Q    I didn't mean to put words in your
14  mouth. I was --
15    A    Yeah.
16    Q    Okay. And Betsy then said she would
17  take care of it?
18    A    She got very upset and yelled that she
19  would do it, raised her voice.
20    Q    Upset at you?
21    A    Presumably.
22    Q    Okay. So that was your understanding

Page 210

1  of how the matter got left --
2    A    That's correct.
3    Q    -- was that Betsy would take
4  responsibility for getting it done?
5    A    That's correct.
6    Q    And then you get this e-mail, and it
7  says -- all of a sudden, it's back on your plate?
8    A    That's exactly right.
9    Q    All right. Look at the next exhibit,
10  please, 34A.
11    A    (Witness complies.)
12    Q    Can you tell me what this is, please?
13    A    It's a January 14 e-mail to Betsy
14  CC'ing Susan regarding -- written in response to
15  Susan's January 5th meeting notes.
16    Q    One of the issues you raise in your
17  e-mail concerns whether or not they would go
18  forward -- CNA would go forward with a faith-based
19  CEDC meeting.
20      What's CEDC?
21    A    Community Economic Development
22  Corporation.

Page 211

1    Q    Okay. You had made tentative plans for
2  such a workshop?
3    A    Yes.
4    Q    And Susan and Betsy disagreed that CNA
5  should do that?
6    A    That's right.
7    Q    Did you see that decision as rooted in
8  discrimination against you?
9    A    I saw it as a continuing pattern of
10  undermining any authority I had for decision making
11  and raised issues for them to consider as to my
12  rationale for thinking this was a good program and
13  one that would be well-received by the community.
14      It had membership opportunities. It
15  had -- it was outreach opportunities to a new market
16  that we hadn't been tapping. It was a win all the
17  way around, and I had support from the faith-based
18  community to do it. I had avenues to the
19  faith-based community to make that happen, and so I
20  explained to them my reasons for it.
21      This memo, however, is more about my
22  concern about the growing collective badgering I was

Page 212

1  under, the lies that were being perpetrated, the
2  lies that were being -- the lies that were being --
3  that were the recharacterizations and the
4  mischaracterizations of conversations I was having
5  with them.
6      One can't operate when you're, you
7  know, stepping on shifting sands, and that's exactly
8  what this was. There was no steady ground. We had
9  conversations and came to conclusions that were
10  thrown out the window whenever they wanted them
11  thrown out the window, that were made to cast me in
12  a bad light, that were made to undermine my
13  authority further, that were made to further an
14  already hostile environment I was under that forced
15  me to spend significant hours of additional time
16  beyond what I was already doing to accomplish all of
17  the work I had on my plate, with no staff support
18  mind you, in responding to those
19  mischaracterizations to those lies.
20    Q    All I asked you about was this point
21  about the faith-based workshop. They were pretty
22  clear at the meeting that they didn't want to do it;

53 (Pages 209 to 212)

# EXHIBIT B

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# ARMINDA VALLES-HALL

## CASE: ARMINDA VALLES-HALL v. CENTER FOR NONPROFIT ADVANCEMENT

**Date:** February 16, 2006
**Volume:** II

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

ARMINDA VALLES-HALL                         ARMINDA VALLES-_.
vs. CENTER FOR NONPROFIT ADVANCEMENT                February 16, 20_

Page 283

1      A. That would be a reference to Betsy
2   Johnson.
3      Q. Betsy Johnson, okay. In other words,
4   BJ is not going to be in a great mood if neither
5   Gretchen nor her have had the ability to check on
6   their newly built property; worse, if they have
7   learned from their northern neighbors that their new
8   retirement investment sustained some damaged. I
9   don't wish anything bad on anyone, but when I saw
10  the news this afternoon, Betsy did cross my mind
11  along with, quote, God don't like ugly, closed
12  quote, closed quote.
13         What is she talking about?
14     A. I think it's self-explanatory.
15  Massachusetts apparently had a big snow fall. And
16  Betsy and her partner Gretchen had built a house in
17  Massachusetts. She's also referring to Betsy's
18  behavior toward me. That's with the God don't like
19  ugly is.
20        I mean, Betsy's behavior towards me
21  was reprehensible, disgraceful and illegal, I
22  believe. And it was a reference to her horrible --

Page 284

1   that particular reference, God don't like ugly, was
2   a reference to that despicable behavior that she
3   lodged at me.
4      Q. And God is punishing her by perhaps
5   damaging her new home in Massachusetts? Is that the
6   idea?
7      A. Oh, God, no. No. I don't think
8   that's -- she writes there, I don't wish bad on
9   anyone.
10     Q. But God does is the implication?
11     A. I'm not going to get into a religious
12  conversation about an interpretation of this. It's
13  a very common phrase.
14     Q. Let me turn to the mediation that took
15  place on February 11 of 2005 before the Office of
16  Human Rights.
17        I think your testimony in the previous
18  session was that earlier that same day, you sent
19  yourself a number of e-mails. You sent them from
20  the office to your home e-mail address; is that
21  correct?
22     A. That's correct.

Page 285

1      Q. In fact, we've looked at many of them
2   here this morning.
3         You previously testified that you did
4   it because you didn't trust Ms. Johnson.
5      A. That's right.
6      Q. My question is, why did you choose
7   that day to send those e-mails?
8      A. Because the mediation was happening
9   and I had no idea how she would respond to it. And
10  I wanted to be certain that I had a complete record,
11  as complete as possible, of my contributions to the
12  WCA, so that I would be able to support what I had
13  done for that organization and the extensive quality
14  and quantity of work that I produced on behalf of
15  WCA.
16        It was clear to me that Betsy would
17  never fully credit me for my many contributions.
18  And that's based on the way that she minimized my
19  contributions to the organization and to the
20  negative evaluation that I had received.
21     Q. The answer to my question is you chose
22  that day because the mediation was occurring that

Page 286

1   day?
2      A. That's right.
3      Q. And you didn't know what the outcome
4   of the mediation would be?
5      A. I forwarded documents to my home on
6   various occasions, not just that day. But certainly
7   I did on that day as well.
8      Q. You then attempted to gain access to
9   the office on Saturday, February 12. Why?
10     A. I believe I left my backpack in the
11  office when I left the office on -- I had left
12  something in the office. I'm not sure what it was
13  when I went to the mediation hearing. And I was
14  expecting to come back to the office. But it went
15  until about 4:15 or so, and I didn't go back to the
16  office. So I went to retrieve whatever I had left.
17  My husband was with me.
18     Q. Had you on prior occasions gone to the
19  office on a Saturday?
20     A. Oh, absolutely.
21     Q. On prior occasions had your husband
22  accompanied you to the office on a Saturday?

17 (Pages 283 to 286)

# EXHIBIT C

## WCA PERSONNEL REVIEW FORM

Employee _Aruminda Valles-Hull_    Date _6/20/03_

| Rating | Degree | Description |
|---|---|---|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance & competency, but a learning towards |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| **Personal Attributes** | | | | | | |
| A) Attitude | Positive outlook, constructive ideas, works well with others. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| B) Initiative | Seeks out and accepts responsibility. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| C) Open Mindedness | Open to new ideas, methods and situations. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| D) Inter-personal Communication | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| E) Self Confidence | Confident of own ability; acts decisively. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| F) Assertiveness | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| **Job Skills** | | | | | | |
| G) Job-Knowledge | Knows own job well and how it relates to the organization. | | | | | |
| Comments: | *New* | | | | | |
| H) Work Habits | Dependable, orderly, uses time effectively. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| I) Quality/Quantity | Does complete job, maintaining quality and proper balance between various facets of the job. | ✓ | | | | ✓ |
| Comments: | | | | | | |
| **Managerial Skills** | | | | | | |
| J) Planning | Plans realistically, short and longer range. Able to set priorities and meet goals. | | | | | |
| Comments: | | | | | | |
| K) DecisionMaking | Identifies true problems, alternatives and understands their impact on the problem. | | | | | |
| Comments: | | | | | | |
| L) Leadership | Makes things happen through people, in good times and bad. Respected by others. | | | | | |
| Comments: | | | | | | |
| M) Motivating | Gives of self; strives to set a climate which is conducive to the growth of others. | | | | | |
| Comments: | | | | | | |

Is the employee marginal in his/her present position?    ( ) YES    (✓) NO

Additional Comments/ Recommendations:
_Although only two months on job, taking over very well._

_Raise to $60,000_

Supervisors Signature _Tom Johnson_

# EXHIBIT D

*got a 16% raise on 6 weeks work*

TO    :    Betsy Johnson
            Executive Director

FROM :    Arminda Valles-Hall
            Director, Center for Nonprofit Learning & Leadership

RE    :    July 2004 Evaluation

DATE :    August 4, 2004

This memo is in response to my most recent evaluation conducted on July 7-8, 2004. I am requesting a correction of my evaluation and a corresponding retroactive adjustment of salary commensurate with the quality and quantity of my work and contributions to the Washington Council of Agencies.

The evaluation is markedly different from my first evaluation in June 2003 in which I received excellent marks (all 5's) in all categories in which I was evaluated. I am concerned that the basis of all scores rated less than 5 on my most recent evaluation were based on biased subjective impressions and on false and completely unfounded and undocumented charges discussed for the first time in my evaluation. *6 weeks / no firm / irregular / no phone / calling no / going straight / to board members*

*why*

I believe I am not being treated equitably and that I am being evaluated differently and more critically than my colleagues and peers. As a result, I have suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard. *must / 5% is ceiling*

I believe my style of communication is viewed unfortunately as aggressive and "inflammatory." These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive.

I would like to resolve my concern about my evaluation and put this issue behind us so that I may continue to focus undistractedly on my primary responsibility of bringing high-quality and affordable professional and organizational development training to the nonprofit community and best serve this center.

I am available to discuss my concerns and reach an equitable solution at your convenience.

*regular, weekly meetings scheduled
where is Ideas to Dialogue?
why 2 months to get fall catalog in place
outside work / participation should be discussed
with me first — what benefit is it to
WCA?*

DEFENDANT'S
EXHIBIT

# EXHIBIT E

## WCA PERSONNEL REVIEW FORM

Employee _Aruunda Vallis Hall_    Date _7/7/04_

| Rating | Degree | Description |
|---|---|---|
| 1 | UNSATISFACTORY | Not qualified to handle duties of present position. |
| 2 | MARGINAL | Performs frequently only at a minimum acceptable level of performance. |
| 3 | SATISFACTORY | Basically qualified; performing at an acceptable level. |
| 4 | ABOVE AVERAGE | Well qualified; consistently performs at above-average levels. |
| 5 | OUTSTANDING | Consistently demonstrates outstanding performance; conspicuous by her achievements. |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| **Personal Attributes** | | | | | | |
| A) Attitude | Positive outlook, constructive ideas, works well with others. *responds with inflammatory* | | | ✓ | | |
| Comments: | *sometimes positive outlook, sometimes constructive ideas* | | | | | |
| B) Initiative | Seeks out and accepts responsibility. | | | | ✓ | |
| Comments: | | | | | | |
| C) Open Mindedness | Open to new ideas, methods and situations. | | | ✓ | | |
| Comments: | *from certain people but not others* | | | | | |
| D) Inter-personal Communication | Uses feeling and emotions as an integral part of communicating and in a manner which others can handle. Listens to others. | | | ✓ | | |
| Comments: | *good with outsiders, needs work w/ staff* | | | | | |
| E) Self Confidence | Confident of own ability; acts decisively. | | | | | ✓ |
| Comments: | | | | | | |
| F) Assertiveness | Able to interact effectively with people in a variety of situations where conflict already exists or is created by the situation. | | | ✓ | | |
| Comments: | *in conflicts in the office reactions need work* | | | | | |
| **Job Skills** | | | | | | |
| G) Job-Knowledge | Knows own job well and how it relates to the organization. | | | | | ✓ |
| Comments: | | | | | | |
| H) Work Habits | Dependable, orderly, uses time effectively. | | | ✓ | | |
| Comments: | *pledges to get work done in allotted time* | | | | | |
| I) Quality/Quantity | Does complete job, maintaining quality and proper balance between various facets of the job. | | | | ✓ | |
| Comments: | *extremely good with participants* | | | | | |
| **Managerial Skills** | | | | | | |
| J) Planning | Plans realistically, short and longer range. Able to set priorities and meet goals. | | | | ✓ | |
| Comments: | | | | | | |
| K) Decision Making | Identifies true problems, alternatives and understands their impact on the problem. | | | | | ✓ |
| Comments: | | | | | | |
| L) Leadership | Makes things happen through people, in good times and bad. Respected by others. | | | | ✓ | |
| Comments: | | | | | | |
| M) Motivating | Gives of self; strives to set a climate which is conducive to the growth of others. | | | | | ✓ |
| Comments: | *supervising bee* | | | | | |

Is the employee marginal in his/her present position? ( ) YES.    (✓) NO

Additional Comments/ Recommendations:

*Aruunda is very good with customers/consumers/ people outside WCA. You need to work harder at solving problems with colleagues and refrain from telling them your judgement of them.    raise to 61,800*

Supervisors Signature _Kevin Bluican_

Apx. 110

EXHIBIT

# EXHIBIT F

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VELLES-HALL,        :

5                             : Civil Action No.

6         Plaintiff      : 05-7238

7 vs.                          :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9         Defendant.            :

10 _____:

11                          X

12            Thursday, January 12, 2006

13            Washington, D. C. 20005

14    The deposition of, BETTY JOHNSON, witness, was called

15 for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 10:00

20 o'clock a.m.,  when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922

Page 34

1 the year?
2    A       No.
3    Q       How do you know at a particular
4 point in a year, whether a particular employee has
5 achieved certain benchmarks in terms of the performance
6 goals and objectives?
7    A       Well, the dash board will measure
8 those things and the work plan will say these are the
9 things that have to be done periodically and I will go
10 back to the work plan and see what is on there.
11    Q       That is what I asked, though.  It
12 would seem to me that in order to evaluate a person, you
13 would have to look at where that person is in terms of
14 what they are doing relative to your planning process.
15       So you would have to look at the work plan and
16 the dash boards to see?
17    A       Yes, I generally know where they
18 are.
19    Q       How is that?
20    A       Because they tell me.  And
21 because I don't sit in my office with my door closed.
22    Q       Relative to the board, does the
23 board want to know about employees' performances?

Page 35

1    A       Not generally, no.
2    Q       Does the board have a particular
3 interest in Arminda's performance?
4    A       No.
5    Q       Did you prepare any written
6 reports to the board regarding Arminda's performance?
7    A       No.
8    Q       Is the board generally involved
9 in termination of employees?
10    A       Not generally.
11    Q       Is the executive committee
12 involved in the termination --
13    A       Not generally.
14    Q       -- of employees?
15    A       If I could go back for a minute.
16 The board is interested in the performance of the
17 organization.
18    Q       Uh, huh.
19    A       So they are interested in whether
20 or not membership is dropping.  They are interested in
21 whether participation in the health trust is dropping or
22 increasing.
23       And they -- the other thing is that they are

Page 36

1 very concerned about the education program because it was
2 not funded by any outside source.
3    Q       Let's talk about that.  When you
4 talk about the education program, explain that to me?
5    A       One of the things that we do is
6 education and training.  That takes the form primarily,
7 but not entirely of training work shops.  That was not a
8 function that we did as a major function until the
9 support center went out of business in 2001.  And then
10 we took it on as a major program.
11       And we knew it would not make money at first.
12 So the board authorized the use of the organization's
13 reserve funds to develop that program with the idea that
14 it would eventually make money.  Or that it would move
15 towards being more self sufficient.
16    Q       Through what vehicle?
17    A       We did not know initially, but the
18 major vehicle would have been the fees that work shop
19 participants pay.
20    Q       Ultimately -- let me go back to
21 this education and training workshops and the financing
22 of that.  The money then had to come out of your own
23 budget?

Page 37

1    A       That is correct.
2    Q       What was the nature of the
3 programs that will be sponsored under this auspice, this
4 education program auspice?  Who would be these -- let me
5 strike that.
6       The beneficiary of these programs or the
7 audience of these programs would be your member
8 organizations?
9    A       And other non profits.
10    Q       Who was responsible for doing
11 these programs?
12       MR. FLEISCHER:  When?
13       BY MR. TEMPLE:
14    Q       Let's talk about the period 2002
15 through 2004.
16    A       I have to say I am not entirely
17 sure what you mean.
18    Q       You just told me that the board
19 was interested in the education programs?
20    A       We had a staff person.
21    Q       Uh, huh.
22    A       Who was the person on staff who
23 was supposed to organize and see to it that these

Page 42

1 sustaining?
2     A        Initially, they felt it should be
3 self sustaining after 3 years.
4     Q        That is 3 years from what point?
5     A        Probably 2002.
6     Q        So it should be self sustaining
7 by 2005?
8     A        Right.
9     Q        Was there a particular plan that
10 the board adopted which would achieve the education
11 programs becoming self sustaining?
12     A        No. It was our job to, the
13 staff's job to develop that plan.
14     Q        Did the staff develop a plan to
15 achieve a self sustaining education program?
16     A        Between 2002 and 2005, no.
17     Q        It seems there was a
18 disconnection, there was no plan in place by the staff?
19 Is that right.
20     A        Right.
21     Q        Why was there no plan in place?
22     A        The staff did not prepare a plan.
23     Q        Did you direct the staff to

Page 43

1 prepare a plan?
2     A        Yes. I believe I did.
3     Q        In writing?
4     A        No. Thought I believe -- I don't
5 know. It may have been part of the job description.
6     Q        Did you have meetings with the
7 staff to discuss the preparation of a plan?
8     A        Probably not.
9     Q        Who on your staff is responsible
10 for fund raising?
11     A        Jeff Kost.
12     Q        What specifically in terms of
13 what specific types of fund raising does he do?
14     A        His responsibility lies in
15 foundation fund raising, and sponsorships, which we
16 subsequently found were -- would be more useful with the
17 education plan.
18     Q        Sponsorships such as?
19     A        M&T Bank, for instance, sponsored
20 the financial track. No, I am sorry. It was an
21 accounting firm that sponsored the financial track.
22     Q        I don't understand.
23     A        It would be a series of work

Page 44

1 shops about financial management and we would ask a
2 business if they would contribute up I believe to $2500
3 maybe more, to sponsor the track and their name would go
4 in there; every financial management work shop would say
5 sponsored by.
6     Q        Wicovia Bank, et cetera, et
7 cetera?
8     A        Right.
9     Q        Was anybody other than Jeff Kost
10 responsible for fund raising?
11     A        In general, no. My self.
12     Q        Were any other programs other
13 than the Education Program required to secure outside
14 financing?
15     A        If I may answer that in this way:
16 Other programs do not have sources of income. They
17 don't have their own revenue. For instance, membership
18 has membership dues. The news letter has advertising.
19 Advocacy has no stream of income. Education has a
20 minimal stream of income.
21     Q        Help me understand the
22 distinction you make between Advocacy and Education in
23 terms of programming if any?

Page 45

1     A        Okay. Education is about the
2 different sort of educational needs that non profits may
3 have. They may not know how to deal with their board of
4 directors. They may not know how to keep a budget.
5 They may not know how to manage staff. And so we would
6 have workshops that would help them with different
7 aspects of all of those issues.
8        There are a number of other issues. Advocacy is
9 a separate program entirely. Advocacy is about helping
10 the members get access to public officials to policy
11 makers, not just public officials; to policy makers and
12 also helping them make their case to policy makers
13 locally.
14     Q        And so if I recall, the advocacy
15 objective is one of your stated objectives of the
16 organization?
17     A        Yes.
18     Q        Would Education be on the same
19 level as an objective?
20     A        Yes.
21     Q        Back to fund raising: Did you
22 ever sit down with Jeff Kost as executive director and
23 say Jeff, I need a plan to ensure financial viability of

Page 102

1 with him?
2   A      No.
3   Q      How do you know?
4   A      I suppose he told me.
5   Q      So she told you that she did not
6 know Jeff Kost?
7   A      She did not come to me and say
8 Betsy, I don't know Jeff.
9   Q      My question is she told you that
10 she did not know Jeff Kost or anything about him prior to
11 him coming to work for you?
12  A      She did not tell me that prior to,
13 but prior to, she never said anything about him.  No,
14 she did not know him.
15  Q      When Mr. Freedman, Michael
16 Freedman complained about Arminda, did that affect your
17 view of her management of the Washington Post Award
18 assignment?
19  A      Not substantially.
20  Q      What does that mean; less than not
21 substantially?   I mean did it affect you in any way?
22  A      I always pay attention to any
23 complaint.

Page 103

1   Q      So it did not substantially affect
2 it, but did it affect the fact that you thought that
3 based upon that, that she was not doing what she should
4 have been doing?
5   A      No, not just based on that
6 complaint; no.
7   Q      Was it based upon that and Susan's
8 complaint that she thought she was not doing what she was
9 supposed to be doing?
10  A      Susan's complaint was more
11 substantial.
12  Q      Susan's complaint was about her
13 distribution of information concerning 2 committee
14 members?
15  A      On a timely basis.
16  Q      Was it only one particular
17 incident of untimeliness or more?
18  A      As far as I know.
19  Q      After you received Mr. Freedman's
20 and Ms. Sano's complaint, did you sit down with Arminda
21 and say Arminda, I am hearing some things and I would
22 like to know whether they are true?
23  A      No.

Page 104

1   Q      So if somebody complains about an
2 employee, you just operate on the basis of the complaint
3 and act on that without having communication with the
4 employee to ascertain the validity of the complaint?
5   A      No.
6   Q      So why didn't you sit down with
7 Arminda?   You gave her the task in November to do this
8 job.  And Freedman said something and Susan said
9 something and you don't even have a conversation with
10 her?
11  A      I did not say anything when
12 Michael said something because he had been on the
13 committee for a long time and he was, I felt very used to
14 the way things work.  I also felt that there was a
15 possibility that there was a -- there were other ways to
16 run the committee and run the award than the way Susan
17 ran it.
18         I am not badgering you.  I am
19 trying to understood something.  Michael could have been
20 on the committee for fifty years.  He could have been
21 president of the United States.  He said something to
22 you.  An employee had the right, would you not agree to
23 know if he or she is doing something wrong; wouldn't you

Page 105

1 agree?
2   A      I am not sure I would agree.
3   Q      If an employee is doing something
4 how would an employee know in the performance of his or
5 her job that they are doing something wrong if you don't
6 say hey listen, you need to know that you are not doing
7 this right?
8   A      I don't really feel it is
9 important to rush to an employee the minute I have one
10 sour note about them.  I don't feel that is particularly
11 useful.
12  Q      Let's operate on that premise, you
13 have 2 sour notes and let me ask you, were they within
14 the same 30 to 60 day period?
15  A      I don't know.
16  Q      If you have 2 complaints about an
17 employee, on a project when was the culmination of the
18 Washington Post Award?  Was that in June?
19  A      Yes.
20  Q      It was 3 months, 90 days out.
21 You are saying based on your experience that you would
22 not sit down with an employee and say hey listen, this is
23 coming up, this is serious.  I have some concerns that

Page 106

1 have been raised by people, to try to get that employee
2 back on track relative to that particular objective?
3    A    You know what I would do is
4 difficult to say.   The situation was that Susan told
5 Arminda what needed to be done.
6    Q    But you told me earlier --
7    MR. FLEISCHER: Were you finished?  I am
8 sorry.
9    THE WITNESS: Yes.
10   BY MR. TEMPLE:
11   Q    She paused -- I presume that if
12 you paused, that you will be finished.  I don't want to
13 step on your answer.
14    You told me that Arminda did not report to
15 Susan, she reported to you; is that correct?
16   A    Susan was a consultant on the
17 project and she was a consultant because she knew how it
18 ran and what I did say was that I expected Susan to guide
19 Arminda so she would have consulted with Susan.  That
20 would have been my view of how it would have gone.
21   Q    But my question was am I correct
22 that you told me that Arminda was to report to you?
23   A    Yes.  I did tell you that.

Page 107

1    Q    Did you tell Arminda that -- did
2 Susan report to you about the Washington Post Award,
3 during the months of -- between November when Arminda
4 took over, through March when you took her off the
5 project?
6    A    She sent me an e-mail, yes.
7    Q    One e-mail?
8    A    Yes.  Her report to me was in the
9 form of e-mail.   Which was the same -- it was an
10 e-mail to Arminda, I believe, copied to me in which she
11 pointed out the things that should have been done or
12 needed to be done.
13   Q    Did Arminda correct the
14 deficiencies at that time?
15   A    I don't know.  My understanding is
16 that one of the deficiencies was that the applications
17 were not sent out -- were sent out several weeks later
18 than the initial date that had been set for their
19 mailing, which meant that the committee members had a lot
20 less time to read them; half as much time to read them.
21   Q    At that particular point in time
22 what were Arminda's specific duties and responsibilities
23 as of February 2004?

Page 108

1    A    She was to put on the educational
2 work shops, and she was to administer the Washington Post
3 Award for excellence and nonprofit management.
4    Q    The applications that you said
5 were sent out, several weeks late; did you say?
6    A    That is my understanding.
7    Q    Do you know why they were sent out
8 several weeks late?
9    A    I have no idea.
10   Q    To this day?
11   A    To this day I have no idea.
12   Q    Did you ever ask Arminda, Arminda,
13 why were they sent out several weeks late?
14   A    It was too late.
15   Q    You never asked her that?
16   A    No.  I did not ask her that, no.
17   Q    Do you know if they attributed it
18 at all in part to Susan that they were sent out 2 weeks
19 late?
20   A    I don't know -- have any knowledge
21 of whether that was the case.
22   Q    Did you factor --
23    Did you receive any complaints about Arminda

Page 109

1 electronically by e-mail?
2    A    I don't believe so.
3    Q    Did Jeremy Byrd ever complain to
4 you electronically about Arminda?
5    A    No.
6    Q    Did he ever explain to you about
7 Arminda?
8    A    I don't believe so.
9    Q    Did Jeff Kost ever communicate to
10 you electronically about her?
11   A    No.
12   Q    I am not saying did he complain.
13 I am saying did he communicate with you electronically
14 about Arminda?
15   A    No.
16   Q    You are certain of that?
17   A    I am fairly certain of that.
18   Q    Did he every complain to you about
19 Arminda?
20   A    Yes.
21   Q    In what form; was it written or
22 face-to-face?
23   A    Face-to-face.

Page 122

```
 1 the conference room on a reservation basis; is that
 2 correct?
 3    A        Not entirely.  The conference
 4 rooms purpose was to hold Educational workshops.
 5    Q        Are you telling me that staff do
 6 not reserve and did not reserve the conference room?
 7    A        No.  I am not telling you that.
 8    Q        But my question is the conference
 9 room was used by your staff and they reserved that room
10 at given points in time; isn't that correct?
11    A        Yes.
12    Q        And this particular date, isn't it
13 true that Jeff Kost had reserved the room at a point in
14 time and that Arminda had reserved the room at a point in
15 time?
16    A        I don't have any knowledge that
17 Arminda had reserved the room.
18    Q        You have never known as of today,
19 that Arminda had reserved the room for the time that she
20 had met with Mr. Terry?
21    A        No.
22    Q        Would it make a difference to you
23 if you knew that Arminda had reserved that room during
```

Page 123

```
 1 the time that she met with Mr. Terry and that Mr. Kost
 2 wanted to use the room prior to the expiration of the
 3 time which Mr. Terry and Arminda were meeting?
 4    A        Ask me that question again.
 5    Q        Let me try to be clearer.
 6        Would it make a difference to you if Arminda was
 7 using the room during the time that she reserved the use
 8 of the room and Mr. Kost wanted to the use the room
 9 before the expiration of that time?
10    A        Yes.
11    Q        And are you sensitive to the fact
12 that there are tensions sometimes between Black and White
13 people to how we deal with each other; White people deal
14 with Black people, Black people deal with White people?
15    A        Yes.  I am aware of that.
16    Q        And their sensitivities are often
17 times rooted in communication and how people talk to each
18 other?
19    A        Yes, I am aware of that.
20    Q        Do you know whether at any point
21 in time, if Mr. Terry was offended by the manner in which
22 this misunderstanding between Arminda and Jeff took
23 place?
```

Page 124

```
 1    A        I don't have any knowledge of
 2 that.
 3    Q        Did you ever consider talking to
 4 Mr. Terry about what happened?
 5    A        No.  I did not think it was that
 6 important.
 7    Q        Mr. Terry is a volunteer and there
 8 are hundreds of volunteers.  If Mr. Terry is giving his
 9 time and he has an impression of your organization and if
10 a misunderstanding happens that could have offended him
11 and the offensive nature could have been based on race,
12 you would not consider that important?
13    A        Yes.  I would consider that
14 important.
15    Q        Did you not know that Mr. Terry
16 was offended by this incident?
17    A        No.  I did not know.
18    Q        What did Jeff tell you about the
19 conference room incident?
20    A        As far as I can remember, he told
21 me that she was meeting with someone in the conference
22 room and that he had scheduled it for a little bit later
23 like fifteen or 20 minutes later and that his -- I don't
```

Page 125

```
 1 think he even told me his people had arrived.  He asked
 2 her if he could get in early and she did not answer, but
 3 she did not say yes.
 4        And the next day she demanded an apology because
 5 he had been rude to her; disrespectful.
 6    Q        When he told you that, did you
 7 talk to Arminda?
 8    A        Yes.
 9    Q        Did you call her into your
10 office?
11    A        I don't recall.
12    Q        You had a face-to-face meeting?
13    A        Yes.
14    Q        What happened during that
15 meeting?
16    A        I probably asked her what
17 happened from her point of view.  And suggested that it
18 was a misunderstanding that could get worked out.
19    Q        What did she tell you?
20    A        She told me, as much as I can
21 remember that she and Lisa were meeting with someone who
22 was a potential work shop provider.  And that Jeff had
23 stormed in and demanded to use the room and she may have
```

Multi-Page™

Page 126

1 then took it, arranged for it. The only time she said
2 anything to me about it after that was arranging
3 interviews with staff people, which she asked me to
4 arrange. And until she wrote her report, she and I had
5 no discussion about it.
6    Q    Did you think that Arminda thought
7 that she was being treat differently because of her race
8 and national origin?
9    A    No. At that time I would not
10 have thought that.
11    Q    Would you have had any reason to
12 mention that there was not a race issue at WCA in your
13 communications with her.
14    MR. FLEISCHER: There was or there was
15 not? I did not hear you.
16    BY MR. TEMPLE:
17    Q    There was not.
18    A    I am sorry. Say the question
19 again.
20    Q    Would you have had any reason to
21 tell her that you did not think it was a race issue, what
22 was happening to her was not racially related?
23    A    If she asked me, I would have said

Page 127

1 that. I don't recall.
2    Q    When did you first learn about
3 her complaint to D. C. Human Rights?
4    A    Would have been in December. We
5 had an annual meeting and it was, I believe it was
6 delivered to us the day of that annual meeting and I
7 could find that date, but off hand, I don't know. Early
8 in December is my recollection.
9    Q    What was your reaction to that?
10    A    I was sorry. I was surprised and
11 I was sorry.
12    Q    The only person than you talked to
13 about the termination of Arminda was Mary Ann deBarbieri?
14    A    Yes.
15    Q    You told her -- she concurred with
16 the decision?
17    A    I did not -- I did not ask her. I
18 may have said I think I am going to have to let her go.
19 I did not ask for her permission. I did not --
20    Q    When did you say that to Mary Ann
21 deBarbieri?
22    A    I would have said it to her, first
23 week in February or the 2nd week in February.

Page 128

1    Q    Why did you say that to her?
2    A    I thought that it was possible
3 that we would have to let Arminda go.
4    Q    Did you have a conversation with
5 her or did you just say that to her?
6    A    With Mary Ann?
7    A    Yes.
8    A    I generally reported things to her
9 and so I really can not say whether it was a conversation
10 or just a report.
11    Q    Did she ask you any questions?
12    A    I don't recall.
13    Q    Do you remember whether it was in
14 the meeting or just walking down the hallway?
15    A    Probably in a phone conversation.
16    Q    Did she say okay?
17    A    I don't recall.
18    Q    Okay. And there was no other
19 correspondence exchanged between you and Ms. deBarbieri
20 at any point in January, February, 2005?
21    A    Regarding?
22    Q    I am sorry. Regarding Arminda.
23    A    Regarding her complaint?

Page 129

1 Regarding, um --
2    Q    Regarding her performance or lack
3 there of?
4    A    You have all of the e-mails that
5 are --
6    Q    Okay.
7    A    -- regard Arminda.
8    Q    Did she talk to you about her
9 investigation?
10    A    Did Mary Ann talk to me about her
11 investigation?
12    Q    Yes, ma'am.
13    A    She interviewed me after she
14 interviewed all the staff people and she asked me
15 questions and she gave me a copy of the, I believe, it
16 was the final report.
17    Q    Did you see the draft?
18    A    I can't -- I don't remember which
19 is the draft and which is not.
20    Q    How long did she interview you
21 for?
22    A    Me?
23    Q    Yes.

Multi-Page™

Page 130

```
1    A        For 45 minutes; I don't know.
2    Q        Where did that take place?
3    A        In my office.
4    Q        And you know that she interviewed
5  all the other persons as well?
6    A        My understanding is that she did.
7  I don't recall that she said I could not talk to so and
8  so or anything like that.
9    Q        Did you tell her that you thought
10 that Arminda -- did she ask you about Arminda's
11 performance?
12   A        I have to tell you I really don't
13 know.
14   Q        Did she make notes during the
15 meeting?
16   A        I don't know.
17   Q        She did not tape the meeting did
18 she?
19   A        No.  She did not tape the
20 conversation, no.
21   Q        Did you tell her you thought
22 Arminda was angry and hostile?
23   A        I don't know.
```

Page 13[1]

```
1    Q        Did you tell her you thought
2  Arminda was not performing her work duties and
3  responsibilities?
4    A        We did talk about the fact that
5  the catalogue had not gotten on the street until the end
6  of October, yes or I informed her at some point.  So it
7  had to have been after the end of October.
8    Q        Anything else?
9    A        That's the only thing I can think
10 of.
11   Q        Did you tell her that the
12 evaluation was based on her -- the problems that she was
13 having with the staff in terms of their complaints?
14   A        Well, I would not -- first of all,
15 I would not characterize her evaluation as being based on
16 that.  It was part of her evaluation and yes, I shared
17 that with Mary Ann.
18   Q        Did you tell her that she was --
19 the same things that we talked about, that she was
20 calling other staff members names?
21   A        Yes.  All the same things; yes,
22 that I have said here.
23   Q        Do you think she interviewed
```

Page 132

```
1  Arminda as well?
2    A        I don't have -- well, she had an
3  initial interview with Arminda, yes.
4    Q        Okay.  In that process -- has
5  there ever been a process where the chair of the Board
6  has conducted an investigation before?
7    A        No.
8    Q        That's a first?
9    A        As far as I know, yes.
10     MR. TEMPLE:  Thank you.  No further
11 questions.
12     MR. FLEISCHER:  Could I look at the notes
13 of the August meeting, please?
14     MR. TEMPLE:  Yes, you may.
15     MR. FLEISCHER:  Thank you.
16     MR. TEMPLE:  Yes.
17   (Pause)
18     MR. FLEISCHER:  I have no questions.  She
19 will read.
20   (The proceedings were concluded at 3:17 o'clock
21 p.m.)
22
23
```

Page 13[3]

```
1
2         CERTIFICATE OF NOTARY PUBLIC
3         I, Sharon L. Banks, C. R., the officer  before
4  whom the foregoing deposition was taken, do hereby
5  certify that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; that the
7  testimony of said witness was taken by me in stenotype,
8  at the time and place mentioned in the caption hereof and
9  thereafter reduced to typewriting under my supervision;
10 that said deposition is a true record of the testimony
11 given by said witness; that I am neither counsel for,
12 related to, nor employed by any of the parties to the
13 action in which this deposition is taken; and, further,
14 that I am not a relative or employee of any attorney or
15 counsel employed by the parties thereto, nor financially
16 or otherwise interested in the outcome of the action.
17
18         Sharon L. Banks, C. R.
19         Notary Public in and for
           THE DISTRICT OF COLUMBIA
20 My commission expires:
21 November 30, 2006
22
23
```

Page 134

```
1     A        Not that I recall.
2     Q        Did you talk to Arminda about
3 that?
4     A        No, I did not.
5     Q        Why not?
6     A        That was the first, uh, first I am
7 not even sure you would call it a complaint, but the
8 first incident of, sort of misunderstanding between
9 Arminda and some other employee.  And I just thought it
10 was in the natural course of business.
11    Q        Can I try to get some idea if it
12 is possible to understand the sequence of these total,
13 um, list of complaints.  Would Freedman's complaint
14 precede Ms. Mendoza's?
15    A        Probably not.  I believe Barbara
16 Mendoza's complaint was first.
17    Q        Before Freedman's?
18    A        Yes.
19    Q        When would you have asked her,
20 about this problem with Arminda; approximately?
21    A        The best I can think is it might
22 have been in the Fall, in the -- between August and
23 December of 2003.  Is that the right year?  Yes.
```

Page 135

```
1     Q        Why would you have asked Ms.
2 Mendoza in 2003 about this incident between her and
3 Arminda?
4     A        If she had been upset by it and
5 was withdrawn or was expressing some hurt, I would have
6 asked her what was wrong, which was likely what happened.
7     Q        So she was upset and hurt and
8 withdrawn?
9     A        Well, that was my -- that's the
10 way Barbara behaves and when she behaves that way, I ask
11 her what the matter is.
12    Q        This could have been just
13 incidental?
14    A        Exactly.
15    Q        Did you consider that Arminda may
16 have said that Barbara was unprofessional to be a
17 problem?
18    A        I am sorry?
19    Q        Did you consider that Arminda said
20 that Barbara was unprofessional to be a problem?
21    A        That she said it?
22    Q        If Arminda had said Barbara you
23 are unprofessional, is that a problem?
```

Page 136

```
1     A        At that time I did not think it
2 was a problem.
3     Q        Did you think it was a problem
4 after you had that conversation with Barbara?
5     A        No, not after I had that
6 conversation.
7     Q        Did you ever come to think it was
8 a problem?
9     A        Yes.
10    Q        When?
11    A        After there were a series of
12 complaints and probably not until after Arminda had
13 suggested that I was thoughtless, disrespectful, for the
14 way the Washington Post Award was handled.
15    Q        I am not following you.
16         You did not think that the problem that Mendoza
17 told you about was of any moment until Arminda complained
18 to you about the Washington Post issue?
19    A        My understanding is that the
20 incident with Barbara was the first -- this is the first
21 one I knew about.
22         Next, was the, um, probably, possibly Michael
23 Freedman's complaint.  The next one would have been the
```

Page 137

```
1 incident with Jeff Kost and then, when Arminda confronted
2 me with why the Washington Post Award was -- why the
3 management of it was changed.  She accused me of you
4 know, intentionally being disrespectful or thoughtless,
5 that I had the distinct impression that she thought I had
6 intentionally ruined her reputation.
7     Q        Was reputation at issue?
8     A        I did not think so.
9     Q        She never spoke to you in a
10 disrespectful manner?
11    A        Not until then.
12    Q        She wrote to you in that regard;
13 isn't that correct?
14    A        My recollection is that she -- she
15 may have written to me, but I thought we had a discussion
16 about it.  It is possible that she wrote to me prior to
17 that.  We had a verbal discussion about it.
18    Q        Do you think if you violate
19 someone's rights that they should be nice and pleasant
20 with you when they discuss that, they should not have
21 some level of emotion?
22         MR. FLEISCHER:  Objection.  There is an
23 assumption built into that question that is not
```

Page 146

1 individual there and the manner in which that individual
2 was treated, that individual who was -- value added to
3 you, felt that he was being disrespected; he or she felt
4 that he was being -- the conduct of Mr. Kost was
5 offensive to him?
6      A      I don't believe that I know that
7 he felt that it was disrespectful to him.
8      Q      To the extent that Arminda and
9 let's -- okay.
10     To the extent that Arminda knew and she told Mr.
11 Kost, Mr. Kost, you offended someone who is giving his
12 time to us freely and we were in a meeting and I think
13 you owe that person an apology.  Is that a problem?
14     A      I don't think that's a problem.
15 That is not what I heard.
16     Q      Well, but did you -- you did not
17 take the time to talk to Arminda to ascertain what
18 actually happened from her point of view; isn't that
19 correct?
20     A      I don't recall.
21     Q      You certainly did not take the
22 time, you did not -- you knew that Mr. Terry was
23 involved in that incident; isn't that correct?

Page 147

1      A      Actually, I did not.  I had no
2 idea that someone -- that who ever she was meeting with
3 found it offensive.  I had no clue.  She found it
4 offensive.
5      Q      So you were never told by Arminda
6 or Lisa Ransom Brown, that Mr. Terry was offended by the
7 incident?
8      A      I don't believe I ever was.
9      Q      To the extent then that the way
10 you viewed it then, was that it was a misunderstanding
11 between the two of them?
12     A      That is correct.
13     Q      To that extent though in your
14 ultimate assessment of blame, you still place more blame
15 on Arminda than you did on Jeff?
16     A      I don't know if I could come to
17 that same conclusion.
18     Q      Let's look at objective measures.
19 Okay.  In Arminda's evaluation you came to that
20 conclusion because you scored her less based upon Jeff's
21 complaint about the way that she communicated with him;
22 isn't that correct?
23     A      Not entirely on.

Page 148

1      Q      But in part; isn't that true?
2      A      Possibly.
3      Q      If you put that in context, you
4 did not do the same with regard to Jeff in his 2004
5 evaluation.
6      A      Arminda's evaluation was not based
7 just on her interaction or lack of with Jeff.
8      Q      I did not say it was.
9      A      Okay.
10     Q      I said partially, but Jeff -- it
11 was no fault found what so ever and when I say it was no
12 fault, it was not one sentence, one verb -- let me
13 finish.  One noun that says any where in his records,
14 any where in his performance that Jeff you are to blame
15 in part for the manner in which you dealt with a patron
16 of the Center?
17     A      I have to just beg your
18 forgiveness.  I had no idea until you just said it that
19 a patron was offended.
20     My whole belief was that the two of them were
21 having a problem.  To answer your question, I did speak
22 to Jeff about it, yes and I did not suggest to him that
23 he was right.

Page 149

1      Q      But that is not my point.  You
2 talked to Arminda as well, didn't you?
3      A      I talked to Arminda about it.
4      Q      But the way you dealt with Arminda
5 versus the way you dealt with Jeff was that you put
6 something in her evaluation.  It affected the way you
7 would score her in her evaluation.  So you gave her
8 a --
9      A      Yes.
10     Q      -- lower evaluation as a result;
11 isn't that true?
12     A      I would not say I gave her a lower
13 evaluation as a result of that, but it was in her
14 evaluation; yes.
15     Q      Let's now switch subjects if you
16 would.  Let's go to Jeremy and Jeff relative to
17 Carlotta.
18     A      Okay.
19     Q      Jeff complained to you at some
20 point as well about the Carlotta -- about the Arminda,
21 Jeremy, Carlotta issue; correct?
22     A      No.
23     Q      No?

Page 158

```
1    Q        So, do you give raises above the
2 five percent?
3    A        Occasionally.
4    Q        Based upon?
5    A        Based upon my belief that the
6 person has done way more than asked for.
7    Q        Let me direct your attention to
8 the first -- to A, personal attributes.  Can you read
9 the handwriting there please?
10   A        Yes.  " Responds with
11 inflammatory remarks.  Sometimes positive out look.
12 Sometime constructive. " I don't know what that is.
13 Ideas.
14   Q        For attitude, which is A, personal
15 attributes.  Positive outlook, constructive ideas, works
16 well with others.  She received a 3.
17   A        Yes.
18   Q        You said she responds with
19 inflammatory remarks?
20   A        Yes.
21   Q        To what are you referring?
22   A        To her calling Barbara Mendoza
23 unprofessional.  For her automatic judgement that Jeff
```

Page 159

```
1 was disrespectful.  For her automatic judgement that I
2 had intended to harm her reputation.  For her snapping
3 at Susan when Susan tried to give her direction.
4    Q        Let me start with Barbara's
5 unprofessional -- did Arminda call Barbara
6 unprofessional?
7    A        As far as I know, she did.
8    Q        How do you know?
9    A        Barbara told me she did.
10   Q        Did you ever ask Ms. Hall?
11   A        We talked about it and Arminda
12 swore she did not.
13   Q        Arminda said she did not and
14 Barbara said she did.  So you believe Barbara.
15   A        I have worked with Barbara for
16 fifteen years.
17   Q        My question is:   So you believe
18 Barbara?
19   A        I don't know which is true.
20   Q        So you believe Barbara?
21   A        My answer would be that I believe
22 Barbara with regard to her -- with regard to Arminda's
23 evaluation.
```

Page 160

```
1    Q        Did you have any reason to
2 question Arminda's credibility that would lead you to
3 believe Barbara other than the fact that you knew Barbara
4 and worked with Barbara?
5    A        I am sorry.  You will have to
6 repeat that.
7    Q        Did you have reason to
8 disbelieve Arminda with respect to believe Barbara?
9    A        Possibly.
10   Q        With respect -- when you said
11 " possibly, " what do you mean?   What are those
12 possibilities?
13   A        I don't recall how I felt at the
14 time or what I thought at the time.  So it is possible
15 that I believed that.  It is possible that I did not.
16   Q        You took into consideration here
17 as well that Arminda thought that Jeff was disrespectful?
18   A        Yes.
19   Q        And that was a problem for you?
20   A        Yes.
21   Q        But at no place on Jeff's
22 evaluation do you say there is a problem because he may
23 have been disrespectful, do you?
```

Page 161

```
1    A        I asked them to try to work it
2 out.
3    Q        That is not my question.
4    A        I understand that is not your
5 question.  But I asked them to try to work it out and
6 Arminda refused.
7    Q        What do you mean she refused?
8    A        Refused.
9    Q        What do you mean?
10   A        I said if you can not work this
11 out, I am going to get a mediator.  She said please
12 don't.  I did not.
13   Q        The question I had.  Did you put
14 any where on Jeff's evaluation any reference to the fact
15 that he may have been disrespectful?
16   A        No.
17   Q        With regard to Susan, okay, it was
18 your view that Susan was right again and that Arminda was
19 wrong; is that correct?
20   A        Arminda had said that Susan's
21 e-mail was unnecessarily negative.  I did not think it
22 was.
23   Q        You said earlier that Susan was so
```

Page 162

1 close to this particular event that she was overly
2 emotional?
3    A    I don't have to have the same
4 feeling from day-to-day.
5    Q    But at that particular point in
6 time relative to that communication between Susan and
7 Arminda you did not think she was too emotional?
8    A    Right.
9    Q    You thought Susan was right and
10 Arminda was wrong?  Is that correct?
11    A    I read the e-mail and I also did
12 not believe it was unnecessarily negative.
13    Q    But you thought that Susan was
14 right; correct?
15    A    That is right.
16    Q    Relative to you, okay, you said
17 earlier that you took Arminda off of the Washington Post
18 project in March; is that correct?
19    A    I believe so.
20    Q    And that you took her off after
21 having a complaint from Mr. Freedman?
22    A    No.  That was not the reason.
23    Q    You took her off after having a

Page 163

1 complaint.
2    A    That was not the reason.
3    Q    It was partially the reason?
4    A    That's not very much of the
5 reason.
6    Q    It did not have anything to do
7 with Mr. Freedman's complaint.  Mr. Freedman, who had
8 been a board member, who made a complaint about Arminda.
9    Q    You are now saying that complaint had nothing to
10 do, zero, to do with you taking Arminda off of the
11 Washington Post project?
12    A    I could not say how much it had to
13 do.
14    Q    But it had something to do with
15 it?
16    A    It may have.
17    Q    But point number one, but again
18 you took Mr. Freedman's word over Arminda's word; isn't
19 that correct?
20    A    I am not sure I would say that.
21    Q    Relative to yourself -- let me go
22 back to Susan.
23    Susan complained to you about Arminda?

Page 164

1    A    No.  Susan sent me the e-mails.
2    Q    Again, Susan sent you the e-mails,
3 but you did not talk to Arminda about what Susan had sent
4 you the e-mails about; isn't that correct?
5    A    I don't know.
6    Q    What you did in March, you have
7 Arminda working on a project and you give her this
8 responsibility and she reports directly to you.  Freedman
9 complains to you.  You believe Freedman, you don't have
10 a word about it with Arminda.
11    Susan complains to you, you believe Susan and
12 you don't have a word with Arminda.  And then you take
13 her off of the Washington Post project, without so much
14 as a moments discourse about what is going on.
15    Do you think that was disrespectful to her?
16    A    All of those things happened.
17    Q    Do you think it was disrespectful
18 to her?
19    A    All of those things happened, but
20 they were not the only things that happened.
21    Q    But do you think that was
22 disrespectful to her?  You have someone and you say I am
23 going to punish you without any due process.  I am going

Page 165

1 to take you off of this project because I don't think you
2 are doing a good job.
3    That is why you took her off the project; isn't
4 that right?
5    A    No.  That is not right.
6    Q    Why did you take her off of the
7 project?
8    A    I took her off the project
9 because we had an offer to have it paid for.
10    Q    How so?
11    A    Have the staff paid for.
12    Q    So you did not take her off of
13 the project because of the complaint of Susan and
14 Freedman?  Is that right?
15    A    They may have been part of it,
16 but they were not the only reason.
17    Q    Is it true that even though
18 Virginia Tech. is it, had offered to subsidize Susan's
19 salary, isn't it true that did not mean that you had to
20 take Arminda off of the project?
21    A    Right.  That is right.
22    Q    In fact, that would have
23 augmented Arminda's ability to do the project if Susan

Page 202

```
1    Q        So to the extent that if he was
2  wrong and offensive, in his dealings with her,  did you
3  still think that she was confrontational with him?
4    A        Yes.
5    Q        If she were -- in her
6  communications that you are talking about that may be per
7  se confrontational, that was when she was trying to
8  correct what Jeff was doing wrong that she deemed
9  offensive; is that correct?
10   A        She was trying to correct what
11 Jeff was --
12   Q        She was raising concerns about
13 Jeff's inappropriate conduct towards her; is that right?
14   A        I believe she was trying to
15 correct Jeff's behavior, yes.
16   Q        What was confrontational about an
17 individual who believes that someone else has offended
18 them saying you have offended me and I don't think your
19 behavior is appropriate?   What is confrontational about
20 that?
21   A        I think said in that way, I don't
22 think it is necessarily confrontational.
23   Q        Let's talk about Susan.  Susan,
```

Page 203

```
1  what was confrontational in your view regarding Arminda
2  and Susan is Arminda's response to Susan is that correct?
3    A        Right.
4    Q        And Susan's e-mail; is that
5  correct?
6    A        Sorry.  The question?
7    Q        Susan's e-mail to Arminda; is that
8  correct?
9    A        It is Arminda's response to the
10 e-mail.  Is that the question?
11   A        Yes.  Arminda's response to
12 Susan's e-mail?
13   A        Yes.
14   Q        You read the e-mail and you said
15 you did not see anything wrong with the e-mail?
16   A        With Susan's e-mail to Arminda.
17   Q        But Susan herself believed that
18 the e-mail had a negative tone, do you recall?
19   A        Yes.
20   Q        If Susan believed it was negative,
21 then why would Arminda not think that it was negative?
22   A        Sometimes, I don't think things
23 are negative when people say they are negative.
```

Page 204

```
1    Q        Susan believed it was negative and
2  Arminda believed it was negative, but you did not think
3  it was negative?
4    A        No, I did not.
5    Q        I will show you what has been
6  marked at Exhibit Five.  At the bottom of this exhibit
7  from Susan, to Arminda dated March 23rd and cc'd to you;
8  Susan says " I know this e-mail is a bit negative in
9  terms of its tone and possibly other things. "
10       You read this e-mail; correct?
11   A        Yes.
12   Q        You understood the content of the
13 e-mail; correct?
14   A        Yes.
15   Q        But you did not think it was
16 negative?
17   A        No.
18   Q        Did you think Arminda could
19 perceive that it was negative?
20   A        I -- I don't know.  I don't have
21 any idea what I thought.
22   Q        Did you talk to Susan when you
23 received this e-mail from her?
```

Page 205

```
1    A        No.
2    Q        You are aware that Arminda
3  responded to the e-mail on the very next day?
4    A        Yes.
5    Q        I want to show you what has been
6  marked as Exhibit 6.  When you read Arminda's e-mail on
7  the 24th of March -- did you read it on the same day?
8    A        Probably.  I don't know what day
9  I read any e-mail.
10   Q        Do you think --
11       Let me direct your attention to the last line in
12 this e-mail from Arminda.  She says  quote, unquote to
13 Susan, " I look forward to working with you to learn more
14 about how the site visits have been run in the past and
15 to consider ways to smooth out the process. "
16       And do you see that?
17   A        Yes.
18   Q        Take a minute to look at this.
19       (Pause)
20       Is there anything that you deem confrontational
21 about the language in the last paragraph?
22   A        Not in the last paragraph, no.
23   Q        Is there anything that you deem
```

Page 206

1 confrontational in Susan's letter to Arminda?
2    A        No.
3    Q        Is there anything that you deem
4 confrontational in this -- Arminda's response to --
5    A        Yes.
6    Q        Tell me specifically what that is?
7    A        " And unnecessarily so. "
8    Q        What are you referring to?
9    A        The very first line.
10    Q        Okay.  She said yes, the tone is a
11 negative one.  You deem the language " and unnecessarily
12 so " to be confrontational?
13    A        Yes.
14    Q        Why?
15    A        I think it is a judgement that she
16 makes.
17    Q        Is there anything else, language
18 wise, phrases, sentences in this particular document --
19    A        No.
20    Q        Let me finish the question.
21 -- that you deem to be, quote, unquote confrontational?
22    A        No.
23    Q        Outside of the 3 words, and

Page 207

1 unnecessarily so, how would you characterize the rest of
2 the correspondence from Arminda to Susan?
3    A        I think Arminda was telling Susan
4 what she had done and proving to Susan that she had done
5 a lot of good work.  She is mostly laying out the good
6 work that she has been.
7    Q        She is also responding as to why
8 and how things were working and how she was working?
9    A        Yes.
10    Q        Do you think Arminda's responses
11 were fair and reasonable?
12    A        I have never made a judgement
13 about that.
14    Q        After you received Arminda's
15 response on the 24th, you had not talked to Arminda and
16 Susan at all about this, did you?
17    A        I don't believe so.
18    Q        Susan did not tell you, did she,
19 that she thought that Arminda's correspondence was
20 confrontational?
21    A        Yes, she did.
22    Q        When did she tell you that?
23    A        She sent an e-mail to me that says

Page 208

1 " ouch. "
2    Q        Did she think that hers was an
3 ouch correspondence?
4    A        I believe she said what she felt
5 about hers.  I don't know -- I can't determine what else
6 she felt.
7    Q        Arminda, earlier you said that she
8 complained to you about her evaluation in August and she
9 did not mention anything about race or anything like that
10 to you; do you remember?  I show you what is now marked
11 as Exhibit 7.  Take minute to look over it, please.
12        This is, for the record, a memorandum from
13 Arminda to you dated August 4th, 2004.
14        (Pause)
15        Did you deem this particular correspondence to
16 be confrontational?
17    A        Yes.
18    Q        What about it in particular, did
19 you find to be confrontational?
20    A        " I have suffered financially and
21 reputationally. "  She assumes that I view her style as
22 aggressive and inflammatory.  And that there -- she says
23 there are stereotype characterizations.

Page 209

1    Q        That is the extent of it, what you
2 deem to be confrontational.  You said her, her style was
3 inflammatory.  That is not what she deemed.  That is what
4 is written in the evaluation; right?
5    A        Yes.
6    Q        She does say here that you have
7 stereotyped her as a woman of color.
8    A        That is her belief, yes.
9    Q        So there is a concern of
10 discrimination; is that correct?
11    A        I assume so.
12    Q        I am sorry people of color is not a term in my
13 vocabulary and I don't -- until -- I did not understand
14 until this suit came a long that that was another word
15 for race.
16    Q        There is some handwriting here?
17    A        Yes.
18    Q        And is that your hand writing?
19    A        Yes, it is.
20    Q        And I would like to ask you to
21 tell me what the hand writing is at the bottom of the
22 page, please?
23    A        " This regularly weekly meeting

Multi-Page™

1 scheduled, where is ideas to dialogue, why two months to
2 get fall catalogue in place.   Outside work/participation
3 should be discussed with me first.   What benefit is it to
4 WCA. "
5      Q          What are you referring to with
6 regard to  " regular weekly meetings scheduled? "
7      A         I had asked her -- let's see
8 here.   I had asked her to stick her head in my office
9 and give me an update on things she was doing.   She said
10 I can't do that.
11     Q          Why?
12     A         She did not say.   I was shocked
13 by the answer.   So I did not ask.
14     Q          Okay.
15     A         So I felt that if she did not feel
16 that she could do that, that -- then I would take the
17 initiative and schedule regular weekly meetings.
18     Q          You said " where is ideas to
19 dialogue? "
20     A         Part of her job was to schedule 3
21 meetings that we called " ideas to dialogue. "  They
22 were educational in nature, but they were a little bit
23 above the regular workshops and they were more conceptual

1 and not so much hands on.
2      Q          Why did you write that here?
3      A         Part of the her job was to put
4 together ideas to dialogue.
5      A         Was she not doing that?
6      A         No.
7      Q          At this particular point, when did
8 you put this handwriting on this piece of paper?
9      A         Probably that day.
10     Q          You did not say anything about
11 this ideas to dialogue in her performance evaluation?
12     A         I did not.
13     Q          Why is that?
14     A         I thought they would be done.
15     Q          But is that a criticism, where is
16 ideas to dialogue?
17     A         I am wondering whether we were
18 going to have any.
19     Q          Is that a criticism of her
20 performance?
21     A         It could be taken that way.
22     Q          If it is a criticism, why didn't
23 you tell her that on July 11th, that it was concern about

1 about her substantive performance instead of writing it
2 on August 4th?
3      A         I can't know what my intent was or
4 my ideas were at that time.   It is very possible that I
5 thought in July we could still have 3 ideas or 2 ideas to
6 dialogue that had not yet been held.
7      Q          You say why 2 months to get Fall
8 catalogue in place.   What are you referring to please?
9      A         The conference that she and Lisa
10 put on was in the 2nd week of June, I believe and I had
11 had a conversation with Arminda about the fall catalogue
12 and we had sort of agreed that until the conference was
13 over, you know, she had to concentrate on the conference.
14      But she did not have anything else to do after
15 that, except get the Fall catalogue together.
16     Q          When was the Fall catalogue dead
17 line?
18     A         Well, if you are going to have
19 classes and you want people to come to them, you have to
20 have the catalogue in their hands prior to the first
21 class.    So there was no deadline written except for
22 when we wanted people to attend these courses.
23     Q          When was the first class

1 scheduled?
2      A         Mid September.   I don't know the
3 date.
4      Q          Lisa and Arminda were working on
5 the conference.   Did you -- the Fall catalogue is
6 something that she is assigned to; is that correct to do?
7      A         Yes.
8      Q          Was there anyone else assigned to
9 work on the Fall catalogue other than Arminda?
10     A         It was Arminda's job to see to it
11 that it got done.
12     Q          That is not my question.   My
13 question is --
14     A         If Arminda assigned someone else,
15 she might have.   I don't know.
16     Q          Did you assign someone else?
17     A         No, I did not assign anyone.
18     Q          You understood that the conference
19 that took place in Prince George's County consumed a
20 great deal of time and work and energy; is that correct?
21     A         Yes.
22     Q          And resources; is that right?
23     A         In terms of what we paid Arminda

# EXHIBIT G

1

WASHINGTON, D. C.

   IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____X

ARMINDA VELLES-HALL,            :

                                : Civil Action No.

        Plaintiff      : 05-7238

vs.                                   :

CENTER FOR NONPROFIT ADVANCEMENT,:

        Defendant.            :

_____:

                              X

            Thursday, February 23, 2006

            Washington, D. C. 20005

            Session II

      The deposition of, JEFFREY KOST, witness, was called

for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R.,  a notary public in

and for the District of Columbia, commencing at 3:21

o'clock p.m.,  when were present on behalf of the

respective parties:

Page 2

```
1        A P P E A R A N C E S
2
3 For the Plaintiff":
4 DONALD TEMPLE, Esq., & DHAMIAN BLUE, Esq., 1229 15th
5 Street, Northwest, Washington, D. C. 20005, 202 628-1101
6
7 For the Defendant":
8 CHARLES H. FLEISCHER, Esq, 7700 Old Georgetown Road,
9 Suite 800, Bethesda, Maryland 20814-6100  303-986-4056,
10 fx. 301-951-0555
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 3

```
1              I N D E X
2 WITNESS      MR. TEMPLE:   MR. FLEISCHER:
3 Jeffrey Kost        4           0
4
5
6         E X H I B I T S
7            (None)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
1        P R O C E E D I N G S
2      Whereupon,
3         JEFFREY KOST,
4 was called for examination by counsel for the plaintiff,
5 and after having been first duly sworn, was examined and
6 testified as follows:
7      DIRECT EXAMINATION
8      BY MR. TEMPLE:
9 Q      Good afternoon.
10 A      Good afternoon.
11 Q      Mr. Kost, we are going to continue
12 with the series of questions from your previous
13 deposition.  We did not get too far.
14      There are a couple of things I want to know at
15 the outset.  Were you afraid of Arminda?
16 A      Afraid of her?
17 Q      Yes.
18 A      No.
19 Q      And, I understand in 2003, you had
20 a pretty good relationship with her; working relationship
21 with her?
22 A      Yes.
23 Q      You all did not  have any problems
```

Page 5

```
1 with communications; is that correct?
2 A      Correct.
3 Q      And has she ever called you
4 unprofessional?
5 A      No.
6 Q      Has she ever called you any names,
7 personally?
8 A      Not that I can recall.
9 Q      Let me um, ask you regarding your
10 evaluation.  I don't really want to talk about your
11 evaluation.  I want to talk about fund raising.
12      Do I understand, correctly that the fund raising
13 goal for WCA in 2003, was $146,000 for contributions and
14 grants?
15 A      That sounds correct.
16 Q      Other reports show that
17 contributions and grants total a range for that year was
18 $90,836.  Would that be accurate?
19 A      I don't have any information in
20 front of me.
21 Q      Were you ever told that it was
22 about a 38 percent short fall in terms of the amount that
23 was raised and the particular goal for 2003?
```

Page 14

```
 1 Carlotta?
 2      A      I think it was before that.
 3      Q      Was it after the incident with Mr.
 4 Terry?
 5      A      It was around that time.
 6      Q      Did you ever talk to her about it?
 7      A      About what?
 8      Q      About your perception that she was
 9 angry?
10      A      No.
11      Q      Why?
12      A      I don't supervise her.
13      Q      Did she ever do anything that you
14 consider to be offensive to you?
15      A      Nothing that I could not deal
16 with.
17      Q      Did she do anything that you
18 deemed offensive?  Whether you could deal with it or not
19 is another issue.
20      A      No, not really.
21      Q      Did she do anything that you
22 consider to be confrontational with you?
23      A      I think just the one time when I
```

Page 15

```
 1 was sort of -- when she came into my office and demanded
 2 an apology for something that I felt that sort of took me
 3 by surprise.
 4      Q      Is that the conference room issue?
 5      A      That was the Mr. Terry issue.
 6      Q      Did you apologize to her?
 7      A      No.  I did not.
 8      Q      Were you -- did Ms. Johnson ever
 9 talk to you about that incident?
10      A      We talked about it and she
11 counseled me; we talked about it.
12      Q      When she counseled you, where did
13 this counseling take place?
14      A      Where?
15      Q      Yes.
16      A      In her office.
17      Q      How long was this counseling?
18      A      Maybe, 20, 30 minutes.
19      Q      What did she say to you?
20      A      Um, I explained my side of the
21 story and she advised me that perhaps I should -- that I
22 did not need to act in a similar manner.
23      Q      What did she mean by a " similar
```

Page 16

```
 1 manner? "
 2      A      I assume that, that meant that I
 3 needed to take a high road.
 4      Q      What was she talking about?
 5      A      And this is -- and this is just my
 6 interpretation, but that I should just sort of either let
 7 it go or get you know, get past it.
 8      Q      Did she tell you at any point that
 9 the way you handled the situation was offensive?
10      A      No.
11      Q      At that point in time when Arminda
12 spoke to you, did you know Mr. Terry?
13      A      No.
14      Q      Did she tell you that she thought
15 that you had insulted him?
16      A      I don't think he knew I was in the
17 room.  He was on a cell phone.  So otherwise, I would
18 not have entered the room.
19      Q      Yes.
20      A      So I find it hard to believe that
21 he would have been offended.
22      Q      Let me understand something, Mr.
23 Kost.  You had that one major problem with Arminda; is
```

Page 17

```
 1 that right?  That one problem ; is that right?
 2      A      Right.  That and a minor e-mail
 3 exchange.
 4      Q      Okay.  You were -- she worked
 5 there, all of 2004, you only had that one major problem;
 6 is that right?
 7      A      Yes.
 8      Q      Did you ever say let me sit down
 9 with Arminda and we are going to talk this out?
10      A      No.  Did I ever think it or did I
11 ever?
12      Q      Did you ever think it?
13      A      Maybe I thought it.
14      Q      Why did you not do it?
15      A      I don't know.
16      Q      Did you like her?
17      A      I -- we had a professional
18 relationship.
19      Q      Did you think she was confident?
20      A      Yes.
21      Q      Did you think she was competent?
22      A      Most of the time.
23      Q      Did you have any reason to
```

Page 22

```
 1 make sure the conference room doors are closed and
 2 locked.
 3    Q        What was her response?
 4    A        It got fairly inflammatory.
 5    Q        What do you mean?  What did she
 6 say?
 7    A        That I, you know, I don't need to
 8 send these kinds e-mails.  I don't know exactly what it
 9 said, but it was, you know, and I would have sent that
10 kind of e-mail to who ever's job it was to handle the
11 conference room.
12    Q        Why did you say -- what do you
13 mean when you say inflammatory?
14    A        Well, I felt like I was being
15 attacked and what I was doing was trying to protect the
16 office suite.
17    Q        Did you know who left the door
18 open to the conference room?
19    A        No.
20    Q        How far is your office from
21 Arminda's?
22    A        Two doors away.
23    Q        Why didn't you go to her office
```

Page 23

```
 1 and leave her a note?
 2        (Pause)
 3        Strike that.
 4        Why didn't you just talk to her?
 5    A        Because she was not very
 6 accessible to talk to.
 7    Q        What do you mean?  At that time,
 8 she was not accessible?
 9    A        No.
10    Q        Had you ever tried to talk to her
11 and she said I can not talk to you?
12    A        Yes.
13    Q        How many times?
14    A        I never counted.
15    Q        You were not able to talk to her
16 because she was busy?
17    A        Did not try.
18    Q        All right.
19    A        I actually came back and I was
20 fairly angry.
21    Q        Why were you angry?
22    A        Because I came back and the doors
23 were open.
```

Page 24

```
 1    Q        You were angry before the incident
 2 and not after?
 3    A        No.  I was angry when I saw the
 4 conference room doors wide open.
 5    Q        I am saying you were angry when
 6 you saw the conference room doors wide open, but that was
 7 before you sent the e-mail?
 8    Q        Correct.
 9    Q        So why were you angry?
10    A        Because I found the conference
11 room doors wide open.
12    Q        Did your e-mail correspondence
13 reflect your anger?
14    A        I think it was fairly -- I think,
15 I don't think it expressed my anger.  I think it was
16 fairly direct.
17    Q        When is it that Arminda -- when
18 can you think of a time that you tried to talk to Arminda
19 that she could not talk to you or that she did not talk
20 to you?
21    A        I can not give you dates and
22 times.  I can tell you that there have been times when I
23 have wanted to talk to her or tried to schedule time with
```

Page 25

```
 1 her for specific things and I have -- I was told you
 2 know, I can not do this now.  We can -- I can do it you
 3 know, we can talk about this in a week or I can talk
 4 about this in 2 weeks or I am really busy now, lets talk
 5 about this in, you know.
 6    Q        When you did that, did you ever
 7 write or e-mail her and say I would like to sit down and
 8 talk to you about something.  Arminda, I would like to
 9 schedule an appointment with you?
10    A        Sometimes.  Depends on what it
11 was.
12    Q        You have sent her an e-mail to try
13 to schedule an appointment with her?
14    A        You are talking about something
15 that was a while ago, so I can not recall.
16    Q        I am not asking a date.  I am
17 asking whether you sent an e-mail asking her to schedule
18 a time when you all could talk?
19    A        I tend to work a little more
20 informally.  So my style would be more like I would drop
21 by and say I would like the talk to you about something.
22 Can we schedule a time to meet.
23    Q        Why didn't you do that on the
```

Page 26

1 conference door issue?  If you do it informally, why
2 wouldn't you have just gone by her office in that
3 context, instead of sending an --
4    A        I don't know.
5    Q        Did you complain to Betsy about
6 the e-mail?
7    A        I don't think so.
8    Q        Did you show Betsy the e-mail?
9    A        I really don't remember.
10   Q        Did you sit down with Arminda to
11 work with any project after the Terry incident?
12   A        I think we did.
13   Q        What was that regarding?
14   A        I think we tried to work on some
15 corporate sponsorship.
16   Q        How did it go?
17   A        It was okay.
18   Q        Did you have any problem with her
19 at all?
20   A        No.
21   Q        Did you ever meet with Betsy to
22 specifically complain about Arminda?
23   A        Not that I can recall.

Page 27

1    Q        Did you ever e-mail Betsy to
2 complain about Arminda?
3    A        No.
4    Q        Did you ever call her on the phone
5 to complain about Arminda?
6    A        No.
7    Q        When did you first learn about the
8 Carlotta Scott incident?
9    A        It was brought to my attention by
10 Lisa.
11   Q        Was she upset?
12   A        She was.
13   Q        What did you think when she first
14 told you what happened?
15   A        I was upset.
16   Q        Why were you upset?
17   A        Because it bothered me that that
18 happened to someone who came into our organization.  So
19 it was upsetting to me.
20   Q        What was upsetting about it?
21   A        That someone that came into our
22 organization could potentially have been treated that
23 way.

Page 28

1    Q        Did you talk to Jeremy about it?
2    A        No.  I asked Lisa, who actually
3 had the contact with Carlotta, to take her concern to
4 Jeremy.  And I asked Lisa before she left my office that
5 if she did not get satisfaction from Jeremy to come back
6 to me with it and I would pursue it.
7    Q        Who was Jeremy's supervisor at the
8 time?
9    A        Maybe it would have been Betsy
10 because I think Susan had left and I don't think
11 Stephanie was on board.  So it would have been Betsy.
12   Q        What happened after you told Lisa
13 to meet with Jeremy, do you recall?
14   A        I actually went -- I waited a
15 little while but I -- it became clear that Lisa was not
16 going to Jeremy and so I went to Jeremy myself to find
17 out his side of the story.
18   Q        Okay.
19   A        I asked -- I asked him first if
20 Lisa had come to him and he said no.
21       MR. FLEISCHER:  He said what?  I did not
22 understand you.
23       THE WITNESS:  He said no.

Page 29

1        MR. FLEISCHER:  You asked what?
2        THE WITNESS:  I asked Jeremy if Lisa had
3 come to talk to him and he said no.
4        MR. FLEISCHER:  I just did not hear you.
5    BY MR. TEMPLE:
6    Q        You got his side of the story,
7 right?
8    A        Right.  And as it turned out, Lisa
9 never went to talk to Jeremy and she also never came back
10 to me.
11   Q        Did you talk to her about that?
12   A        Yes.
13   Q        What did you tell her?
14   A        I asked her why she never went to
15 talk to Jeremy.
16   Q        What did she say?
17   A        I actually don't recall.
18   Q        Do you know if Jeremy was ever
19 disciplined as a result of that incident?
20   A        I know Betsy talked to him.
21   Q        Do you know what she told him?
22   A        I know that she tried to get his
23 side of the story.  And I think Betsy tried to get --

Page 38

1   Q        Stephanie Dodge Smith?
2   A        Gay.
3   Q        Ms. Betsy Johnson?
4   A        Gay.
5   Q        No further questions.
6        MR. FLEISCHER: No questions.   We do not
7 waive.
8     Thank you.
9        MR. TEMPLE: One last question.  I am
10 sorry.
11       BY MR. TEMPLE:
12   Q        Have you ever observed Arminda
13 berate anybody in the work place, or talk down to anybody
14 in the work place?
15   A        (Pause)
16     Not that I recall.
17   Q        Okay.
18       THE WITNESS: Are we finished?
19       MR. TEMPLE: Yes.
20       MR. FLEISCHER: I don't have any
21 questions.  And we will not waive.
22       MR. TEMPLE: Thank you, Mr. Kost.  I had
23 all of these questions for you, about six pages and you

Page 39

1 cut through them.
2        THE WITNESS: Yeah?
3        MR. TEMPLE: Yeah.
4     (The proceedings were concluded at 4:25 o'clock
5 p.m.)
6     (Signature not waived.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 40

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Sharon L. Banks, C. R., the officer  before
3 whom the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears in the
5 foregoing deposition was duly sworn by me; that the
6 testimony of said witness was taken by me in stenotype,
7 at the time and place mentioned in the caption hereof and
8 thereafter reduced to typewriting under my supervision;
9 that said deposition is a true record of the testimony
10 given by said witness; that I am neither counsel for,
11 related to, nor employed by any of the parties to the
12 action in which this deposition is taken; and, further,
13 that I am not a relative or employee of any attorney or
14 counsel employed by the parties thereto, nor financially
15 or otherwise interested in the outcome of the action.
16
17     Sharon L. Banks, C. R.
       Notary Public in and for
18     THE DISTRICT OF COLUMBIA
19 My commission expires:
20 November 30, 2006
21
22
23

# EXHIBIT H

1

WASHINGTON, D. C.

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____X

ARMINDA VELLES-HALL,            :

                                : Civil Action No.

        Plaintiff              : 05-7238

vs.                             :

CENTER FOR NONPROFIT ADVANCEMENT,:

        Defendant.             :

_____:

                                X

            Thursday, January 12, 2006

            Washington, D. C. 20005

    The deposition of, JEFFREY KOST, witness, was called

for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R., a notary public in

and for the District of Columbia, commencing at 10:00

o'clock a.m., when were present on behalf of the

respective parties:

Page 14

```
 1   Q        Uh, huh.
 2   A        So I opened the door to ask
 3 Arminda if I might be able to get into the conference
 4 room early because I think some of the people for my
 5 meeting were showing up.  And I was afraid that they
 6 were going to be -- it was going to be a disturbance in
 7 the hall way or in the reception area of the office.
 8   Q        What did she say?
 9   A        I don't recall her response, but
10 it was not -- it was neither positive nor negative.  I
11 don't remember.  I think they were shocked that I was
12 interrupting their meeting.
13   Q        Then what happened?
14   A        I turned and walked away.
15   Q        Was there a problem after that
16 with the fact that you could not get into the room early
17 in advance of the 4:00 o' clock time?
18   A        No.  I just waited until they were
19 finished.  Obviously, the answer was no.  -
20   Q        When did the problem arise?
21   A        The next day, the next morning.
22   Q        What happened?
23   A        Arminda came into my office, sat
```

Page 15

```
 1 down and said that I owed her an apology.
 2   Q        Other than what you just
 3 described, you never said anything else to Lisa or
 4 Arminda?
 5   A        No, sir.
 6   Q        When she sat down and said you
 7 owed her an apology, what was your reaction?
 8   A        I was actually a little shocked.
 9   Q        Did you guys talk?
10   A        I listened.
11   Q        What did she say?
12   A        She had a lot to say.
13   Q        Do you want to summarize it?
14   A        It was a long time ago.  But it
15 was -- she was I think very angry of the fact that I
16 interrupted the meeting.  My perception of you know I
17 thought I was just poking my head in at a time when they
18 were obviously on some kind of a break because he was on
19 a cell phone to see if I might be able to get into the
20 room.  She was very offended at that and expected an
21 apology from me.  I said I did not think I could do
22 that.
23   Q        What was your relationship with
```

Page 16

```
 1 Arminda before that?
 2   A        I think it was fine on a
 3 professional level.
 4   Q        Is that your first problem with
 5 Arminda?
 6   A        First one I can recall, yes.
 7   Q        Did you have any subsequent
 8 problems with her?
 9   A        I think there were -- it was maybe
10 another like an e-mail exchange that was not very
11 pleasant.
12   Q        What did it regard?
13   A        Conference room doors being left
14 open.
15   Q        Did -- in that particular
16 situation, you raised some concerns with her about the
17 conference door being left open?
18   A        Uh, huh.
19   Q        And someone assuming
20 responsibility for closing it, essentially; is that
21 right?
22   A        Right.
23   Q        What was her response?
```

Page 17

```
 1   A        It got a little inflammatory.
 2   Q        Okay.
 3   A        You know, I would have sent that
 4 very same e-mail to any staff person who was responsible
 5 for that room, had it been Barbara or Jeremy or anybody
 6 else.
 7   Q        Did you talk to her about that
 8 e-mail?
 9   A        No.
10   Q        Why?
11   A        She is not a very easy person to
12 talk to.
13   Q        Let me just rewind for a few
14 minutes here.
15        You have 2 communications with her and you are
16 not very happy about either of these two communications?
17   A        No.
18   Q        You are not supervising her, are
19 you?
20   A        No.
21   Q        You are supervising Lisa?
22   A        Supervising Lisa.
23   Q        And this point in time Arminda and
```

Page 22

```
 1   Q        What did you say?
 2   A        I listened to what Lisa had to
 3 say.  I asked -- it made a lot of sense and I understood
 4 what I thought had happened.  I suggested that Lisa talk
 5 to Jeremy directly.
 6   Q        Did she do that?
 7   A        She did not.
 8   Q        Okay.
 9   A        But I further, before Lisa left my
10 office, I said if you don't get satisfaction, I want you
11 to come back and I want you to tell me.
12   Q        You were not supervising Jeremy?
13   A        No.
14   Q        Why did Lisa tell you?
15   A        Because I was supervising Lisa and
16 I think she wanted me to do something about it.
17   Q        Did you speak with Betsy about it?
18   A        I did.
19   Q        Immediately?
20   A        Yes.
21   Q        When you spoke to Jeremy, that was
22 also immediately?
23   A        Yes.
```

Page 23

```
 1   Q        Tell me what happened?
 2   A        I wanted to get his side of the
 3 story.
 4   Q        What did he tell you?
 5   A        He told me that Ms. Scott was
 6 walking down the hall, that he had asked her, you
 7 what she was doing there or who she was seeing or
 8 ever.   And that she explained that she was with Li
 9 Arminda.
10   Q        Did he tell you anything about the
11 tone in which he communicated with her?
12   A        No.
13   Q        Was there anything that you recall
14 that Arminda said or did that was confrontational
15 relative to the Carlotta Scott incident?
16   A        I don't believe so.  I wish -- I
17 just -- I guess I wish that if Lisa was not going to take
18 it to Jeremy, which she obviously did not, I wish she had
19 come back and told me so that I could have taken it
20 further.
21   Q        You were aware of Carlotta's
22 response to Jeremy's interaction with her?
23   A        Carlotta's response to Jeremy?
```

Page 24

```
 1   Q        Carlotta's written response?
 2   A        Yes, I was.
 3   Q        How did you become aware of that?
 4   A        Betsy told me about it.
 5   Q        Has Betsy ever given you any kind
 6 of oral warning relative to your performance?
 7   A        No.   We have had discussions
 8 about performance and I have gone to her with concerns
 9 about my performance, concerns about meeting goals.
10   Q        What kind of discussions have you
11 had with her about your performance?
12   A        I am somebody that likes to go in
13 and check in with my supervisor on a somewhat regular
14 basis to make sure I am doing okay.  So we do that from
15 time to time.
16   Q        Have there been discussions about
17 your meeting goals?
18   A        Yes.
19   Q        Have there been discussions about
20 your not meeting goals?
21   A        Yes.
22   Q        What goals were they?
23   A        Mostly financial.
```

Page 25

```
 1   Q        When were those discussions?
 2   A        Usually, midyear, when you are a
 3 fund raiser, those kind of goals -- I mean it is pretty
 4 black and white.  Either we think we are going to make it
 5 or we will not make it.  Can we either adjust the budget
 6 or, reduce expenses, to meet the budget.
 7   Q        Those are the types of discussions
 8 you had with her?
 9   A        Yes.
10   Q        Would that have been in 2004?
11   A        Yes.
12   Q        2003?
13   A        Yes.
14   Q        Do you ever have discussions with
15 her at all about your general management style?
16   A        Sometimes.
17   Q        How about your communications
18 style?
19   A        More than once.
20   Q        You supervised Lisa Ransom Brown?
21   A        I did.
22   Q        Did you have any problems with her
23 performance?
```

# EXHIBIT I

BAIRD

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,        :

5                             : Civil Action No.

6        Plaintiff     : 05-7238

7 vs.                         :

8 CENTER FOR NONPROFIT ADVANCEMENT, :

9        Defendant.         :

10 _____:

11                          X

12              Wednesday, April 5, 2006

13              Washington, D. C. 20005

14     The deposition of, JEREMY BAIRD, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R., a notary public in

19 and for the District of Columbia, commencing at 12:05

20 o'clock p.m., when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

2

1         A P P E A R A N C E S

2

3 For the Plaintiff~:

4 DONALD TEMPLE, Esq., & DHAMIAN BLUE, Esq., 1229 15th

5 Street, Northwest, Washington, D. C. 20005, 202 628-1101

6

7 For the Defendant~:

BAIRD

21     A          Was that a problem for you?

22     A          Yes.

23     Q          Did you indicate that to her?

1      A          I don't believe so.

2      Q          What was the nature of the problem

3 that occurred as a result?

4      A          Not sure I understand the

5 question.

6      Q          What problem arose as a result of

7 her slow feedback?

8      A          It delayed me in implementing the,

9 keeping the project on schedule.

10     Q          With whom did you communicate

11 about this problem?

12     A          Betsy Johnson.

13     Q          In writing?

14     A          I believe it was a verbal meeting

15 or in person meeting.

16     Q          How many times was she slow in

17 getting feed back to you?

18     A          I don't recall.

19     Q          Do you remember the approximate

20 date when this problem arose?

21     A          No.

22     Q          Why didn't you communicate

23 directly with Arminda?

1      A          Because Betsy was her supervisor

2 and I went to her supervisor.

BAIRD

3     Q                You never said anything, at all I
4 take it, to Arminda; is that correct?

5     A                I don't recall.

6     Q                Do you know what Betsy did after
7 you communicated to her this problem?

8     A                No.

9     Q                That is number one.  What are the
10 other project specific things?

11    A                That's one that comes to mind.

12    Q                Do you recall any others?

13    A                No.

14    Q                Did you have occasions to meet
15 with Arminda during the time that both of you worked
16 there?

17    A                Yes.

18    Q                One-on-one meetings?

19    A                Yes.

20    Q                Did you have any problems talking
21 to her, communicating with her directly during those
22 meetings?

23    A                No.

1    Q                Was she intelligent during those
2 meetings?

3    A                Yes.

4    Q                Was she respectful of you?

5    A                Yes.

6    Q                Did she ever scream and yell at
7 you during any of those meetings?

8    A                No.

9    Q                Did she ever call you any names
10 during any of those meetings?

BAIRD

11    A              No.

12    Q              Did you ever have any complaints

13 to anyone that Arminda disrespected you?

14    A              No.

15    Q              Did you ever tell anybody that she

16 called you names?

17    A              No.

18    Q              You are familiar with a conference

19 that she and Lisa Ransom worked on in Prince George's

20 County sometime in 2004?

21    A              Yes.

22    Q              what do you recall about that

23 conference?

1    A              I did not attend the conference.

2    Q              Uh, huh.

3    A              And I know -- don't know much

4 about it.   I know they worked on it; it was a lot of

5 work.   But other than that, it was about bringing

6 non-profits together in Prince George's County, but I

7 don't know any specifics.

8    Q              How do you know it was a lot of

9 work?

10    A              It was talked about a lot at staff

11 meetings?

12    A              It was partnering with an outside

13 organization, maybe more than one.   It involved 2 staff

14 people.   It was -- the attendance numbers were high for

15 our events, that I recall.

16    Q              At some point, during your

17 employment at WCA, the issue arose involving a woman

18 named Carlotta Scott?

19    A              Yes.

BAIRD

19 Betsy Johnson or Stephanie Smith.

20        Q             Prior to meeting with Betsy, had
21 you had any communications with Stephanie about this
22 incident?

23        A             No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

U                                                              21

1         Q             Had you had any further
2 communications with Jeff?

3         A             Not since he told me that after it
4 happened?

5         Q             Had you had any communication with
6 Arminda?

7         A             Not that I remember.

8         Q             How was -- was there any suggested
9 resolution at the conclusion of your meeting with Betsy?

10        A             She suggested that I apologize and
11 when  Carlotta was coming to teach a work shop, that I
12 introduce myself and apologize to her.

13        Q             At that particular point in time,
14 did you know when next Carlotta would be coming to do a
15 work shop?

16        A             I had a vague idea based upon the
17 workshop schedule.

18        Q             How soon after that, would that
19 time arise?   Let me be fair.  How soon after that did
20 you expect that she would come to do a work shop with
21 WCA?

22        A             As I remember, it was in the next
23 2 months or so.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

D                                                              22

BAIRD

1     Q          Specifically, when you say in the
2 next 2 months, was it 2 months from the date of your
3 meeting with Betsy or was it within the 2 month period?

4     A          Within the 2 month period.

5     Q          Do you know how far within that 2
6 month period that next time was?

7     A          No.

8     Q          You don't know if it was a week, 3
9 weeks, 7 weeks?

10    A          No.

11    Q          How did you know it was within two
12 months?

13    A          Carlotta was scheduled in our
14 course catalogue, which had faculty members listed and
15 courses they were teaching.

16    Q          The meeting between you and Betsy,
17 on the Carlotta issue, how long did it last?

18    A          I don't remember.

19    Q          More than ten minutes?

20    A          Yes.

21    Q          More than 30 minutes?

22    A          If I had to guess it was about 30
23 minutes to 45 minutes.

0                                                    23

1     Q          Were you disciplined as a result
2 of that Carlotta Scott incident?

3     A          No.

4     Q          Were you given anything at all in
5 writing to memorialize that incident?

6     A          Yes.

7     Q          What was that?

8     A          I was given a letter very late

BAIRD

9 after that, a warning letter and that was indicated as

10 one point of concern that I refused to apologize to

11 Carlotta.

12     Q               What is the approximate date of

13 that warning letter?

14     A               It was around October 1, 2005.

15     Q               2005?

16     A               Yes.

17     Q               Okay.  Who gave you that letter?

18     A               It was given to me by Stephanie

19 Smith, my supervisor at the time and Betsy Johnson

20 together.

21     Q               How many pages?

22     A               I recall it to be a two page

23 letter.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

24

1     Q               Was there a meeting in addition to

2 the letter?

3     A               Yes.

4     Q               And the meeting would have taken

5 place, when?

6     A               The first week of October.  The

7 same day that I got the letter.  I don't recall which

8 day it was, but it was around the first week of October,

9 2005.

10     Q              Who participated in the meeting?

11     A              Stephanie Smith, Betsy Johnson and

12 myself.

13     Q              Where?

14     A              In Betsy's  office.

15     Q              Subject matter?

16     A              My performance.

17     Q              In the letter, the October letter,

BAIRD

18 it addressed a number of performance issues?

19      A          Yes.

20      Q          What were they?

21      A          Things that were of a concern to

22 Betsy and Stephanie about my performance over a period of

23 time.

U                                                           25

1      Q          Did you know about these issues

2 prior to October of 2005?

3      A          Some, yes.  Some, no.

4      Q          When did you leave WCA?

5      A          In January of 2006.

6      Q          Were you given -- told that you

7 would either be fired or you would have to resign?

8      A          No.

9      Q          You just left?  You just resigned?

10     A          I had been looking for a job

11 during the time that I received this letter and the offer

12 that I accepted came in January.

13     Q          Do you have a copy of the letter

14 that you received in October of 2005?

15     A          Yes.

16     Q          Did you receive any subsequent

17 correspondence after that related to your performance?

18     A          No.

19     Q          Were you put on any probation of

20 sorts in October of 2005?

21     A          No.

22     Q          Did you agree with the content of

23 the letter?

BAIRD

1    A          No.

2    Q          Did you write -- respond to the
3 letter in writing?

4    A          I did not.

5    Q          I would like to go to the issue of
6 Carlotta Scott.   Was that a point of contention between
7 you and Betsy at that point in time?

8    A          It was a point of contention -- it
9 was one of the many points of contention in the letter.

10   Q          To the extent that there was a --
11 did you refuse to apologize to Carlotta?

12   A          I did.  Betsy said it would be
13 nice if you introduced yourself when she is here for a
14 work shop and apologize and I said to Betsy, I don't
15 think I can do that.  Betsy replied, okay, if you happen
16 not to be here that day that would be okay too.  Based
17 upon that and that was her response during our meeting.

18   Q          In the couple months after the
19 incident?

20   A          Correct.

21   Q          Meeting?

22   A          Correct.

23   Q          Do you remember what month it

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922

1 was?

2    A          I really don't remember.

3    Q          Could it have been -- for the
4 record, Carlotta's letter was dated February 26th, 2004.
5 Does that refresh your recollection?

6    A          No.

7    Q          As to when the meeting with Betsy

BAIRD

8 happened?

9      A              I really don't  remember.

10     Q              Betsy told you that if you happen

11 not to be there, you would not have to apologize?

12     A              No.

13     Q              What did she say?

14     A              She said if you happen not to be

15 here -- after I refused to apologize, when I said I don't

16 think I can do that, meaning apologize, she said " if you

17 happen not be here that day, that would be okay too. "

18     Q              What did she mean by that?

19     A              I took it to mean that if I was

20 not there that day, that would be okay.

21     Q              And the day we are talking about

22 is the day that Carlotta is coming to do a work shop?

23     A              She was scheduled to do a work

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

☐                                                        28

1 shop.

2      Q              And so did she mean that if you

3 are not there that you would not have to extend the

4 apology?

5              MR. FLEISCHER:  Objection.  He can not

6 know what she meant by that.

7              BY MR. TEMPLE:

8      Q              Did you understand that to mean

9 that?

10     A              I don't know what she meant.

11     Q              Did you ask her what do you mean

12 by that?

13     A              I did not.

14     Q              You said that you don't think you

15 could do that.  Did she say why?  Did she ask you why?

16     A              No.

BAIRD

17    Q            What was her immediate response to
18 your statement that you don't think that you could do
19 that?

20    A            I don't recall.

21    Q            Why was it at that particular
22 point in time that you did not think you could apologize
23 to Carlotta?

1    A            I apologize for a lot of things as
2 a membership and customer service professional that I
3 have no control over.   This was something that I felt
4 was blown out of proportion based upon the facts that I
5 had and felt I did nothing wrong.

6    Q            Why did you think it was blown out
7 of proportion?

8    A            Because I had stopped people
9 plenty of times before; similar considerations.

10    Q            At that particular point in time,
11 did you have a good working relationship with Lisa
12 Ransom?

13    A            As I recall, yes.

14    Q            Did you attribute the Carlotta
15 Scott incident at all to -- and problem that you were
16 encountering, did you attribute that to Lisa in any way?

17    A            No.

18    Q            Did there come a time that you saw
19 Carlotta at all?

20    A            Not that I am aware of.

21    Q            When she came back to do her work
22 shop were you present?

23    A            As I recall the work shop was

BAIRD
Fort Washington, Maryland   20744
(301) 372-6922
                                                        30

1 cancelled.

2      Q              So Betsy did not require you to

3 apologize to Carlotta in 2004?

4      A              No.

5      Q              Did you have any further

6 communication about the Carlotta incident in 2004?

7      A              Not that I remember.

8      Q              After the meeting nothing happened

9 for the balance of the year?

10     A              Sorry.   I did not hear you.

11     Q              After the meeting between you and

12 Betsy to discuss the Carlotta incident, there is no

13 further communication about Carlotta for the balance of

14 2004?

15     A              To the best of my recollection,

16 no.

17     Q              Let me stay on this point.  2005,

18 is there any communication about the Carlotta incident

19 prior to this October, 2005 letter?

20     A              No.

21     Q              Nothing in a meeting, no

22 communication in a meeting?

23     A              No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922
                                                        31

1      Q              No communication by e-mail?

2      A              No.

3      Q              And no communication by any type

4 of hard copy writing?

5      A              No.

6      Q              In 2004, you received a

                                        BAIRD
7 performance evaluation?

  8        A              Yes.

  9        Q              In the winter of 2004?

 10        A              No.

 11        Q              When was it?

 12        A              June or July.

 13        Q              In that performance evaluation you

14 met with Ms. Johnson?

 15        A              Yes.

 16        Q              Explain to me how that performance

17 evaluation was rendered?

 18        A              My 2000 performance evaluation

19 was --

 20        Q              2004.

 21        A              I am sorry.  My 2004 performance

22 evaluation, I met with both Stephanie Smith and Betsy

23 Johnson.  Stephanie had been my supervisor since May of

  1 2004 when she joined the center.   And Betsy supervised

  2 my previous, previous to that from when Susan Sano left

  3 the center.

  4        They both met with me.   There is a standard

  5 form, went over it, then they -- as I recall, they

  6 evaluated me, you know, it's like a scale one to five and

  7 some comments at the bottom.   Then if there is a salary

  8 adjustment made, it will be noted on there as well.

  9        Q              In your 2004 performance

 10 evaluation, discussions with Betsy, in 2004 discussions

 11 with Betsy about your performance, did you all talk about

 12 Betsy's performance concerns?

 13        A              Can you repeat the question?

 14        Q              Did Betsy inquire, did she raise

 15 issues with you specifically about performance problems?

BAIRD

16      A              That's a general part of the

17 process.   Yes.

18      Q              In those discussions, did she not

19 say anything to you about your refusal to apologize to

20 Arminda?

21             MR. FLEISCHER:   Excuse me.   You said

22 did she not say.  I think that might be confusing.

23             BY MR. TEMPLE:

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland   20744
(301) 372-6922                                    33

1      Q              Okay.   Did she say anything to

2 you?   Was there any discussion about your refusal to

3 apologize to Carlotta?

4      A              No.

5      Q              In that June/July meeting with

6 Betsy about your performance, did you ever -- did you

7 talk to her at all about any problems that you were

8 having at that time with Arminda?

9      A              I don't think so.

10      Q              So let me move forward then to

11 2004, 2005, late 2004, 2005, early.   When you were

12 interviewed by Mary Ann de Barbieri about a complaint

13 that Arminda had filed?

14      A              Yes.   I don't recall the time

15 frame, but I was interviewed.

16      Q              Do you know what the basis for

17 Arminda's complaint was at that time?

18      A              I don't recall.

19      Q              Were you told, though, by Ms.

20 deBarbieri?

21      A              I believe she told me; yes.

22      Q              Where did she interview you?

23      A              In the suite at the center in a

Page 25

BAIRD
SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

U                                                                    34

1 private office.

2        Q              Just you and she?

3        A              Yes.

4        Q        .     Duration?

5        A              I am sorry?

6        Q              How long did the meeting last?

7        A              I don't recall.

8        A              Did she show you any other

9 documents during that meeting?

10       A              I don't recall.

11       Q              Do you recall the questions that

12 she asked you?

13       A              Some of them.

14       Q              What do you recall?

15       A              She asked about Carlotta Scott.

16 That's the one thing I remember.

17       Q              What did she ask you about

18 Carlotta Scott?

19       A              About the incident and my

20 recollection of what happened.

21       Q              You told her I essentially what

22 you told me today?   -

23       A              Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

D                                                                    35

1        Q              At that time, that you interviewed

2 with Ms. deBarbieri, did you have any sense that there

3 were discrimination issues in the work place at WCA?

4        A              No.

5        Q              Did you have any sense that there

BAIRD
23      A               No.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

U                                              38

1       Q               Did you at some point, learn that
2 Arminda was going to be terminated?

3       A               Yes.

4       Q               When did you learn that?

5       A               The Friday before she resigned.

6       Q               How did you learn that?

7       A               As I recall, I was told by Betsy
8 so they could deactivate some of the access that I --
9 that she had to some of our computer services systems.

10      Q               What time of day would that have
11 been?

12      A               Late after noon.

13      Q               About what time?

14      A               Sometime between 2 and 5.

15      Q               Did you know that Betsy was
16 returning from a mediation involving Arminda?

17      A               Yes.

18      Q               How did you know that?

19      A               She had mentioned --  Betsy had
20 mentioned it.

21      Q               You had a conversation with Betsy
22 after she returned from mediation?

23      A               Yes.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

D                                              39

1       Q               Who was involved in the
2 conversation?

3       A               I don't remember.

4       Q               Was it more than you and Betsy?

BAIRD

```
 5     A              I don't recall.

 6     Q              Do you recall what Betsy said to
 7 you about the mediation, if anything?

 8     A              No.  I don't.

 9     Q              Was she angry?

10     A              I don't recall.

11     Q              Do you recall what her
12 instructions to you were relative to Arminda?

13     A              To deactivate her access to our
14 on line registration system.   That was the one thing
15 that I remember.

16     Q              Did she tell you to do anything
17 other than that, that you remember?

18     A              Not that I remember.

19     Q              You said that you knew she was
20 being terminated.   Did she have any discussion with you
21 about the fact that Arminda was being terminated on that
22 Friday afternoon?

23     A              She meaning?
```

40

```
 1     Q              Betsy?

 2     A              Yes.

 3     Q              What did she say?

 4     A              I don't recall.

 5     Q              But it was some discussion about
 6 Arminda being quote, unquote, terminated?

 7     A              Yes.

 8     Q              Was Mary Ann deBarbieri a
 9 participant in that conversation?

10     A              No.

11     Q              Do you recall whether she was
12 present there in the office?

13     A              She was not there that day.
```

BAIRD

14    Q                Did you understand at that

15 particular point in time, was it your view at that time

16 that you were deactivating Arminda's access to computer

17 information because she was being terminated?

18    A                That was my understanding; yes.

19    Q                Do you also know that

20 communication in writing was being given to the security

21 at the building to exclude Arminda from entering into the

22 office?

23    A                Yes.

            SHARON L. BANKS REPORTING
                  P.O. Box 44773
            Fort Washington, Maryland   20744
                  (301) 372-6922

⌷                                                41

1    Q                How did you know that?

2    A                I don't remember.

3    Q                Did Betsy tell you that?

4    A                I don't remember who told me.

5    Q                Did you see the communication?

6    A                I did not.

7    Q                Did you talk to Arminda that

8 afternoon at all?

9    A                No.

10    Q                Do you recall telling her that

11 she would be cut off from access to the WCA communication

12 -- computer information?

13    A                No.

14    Q                Are you familiar with the WCA's

15 sick leave policies?

16    A                Generally, yes.

17    Q                How much sick leave were you

18 entitled to on an annual basis?

19    A                I really don't remember at this

20 point.

21    Q                Did you ever use your sick leave

# EXHIBIT J

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____X

4 ARMINDA VALLES-HALL,          :

5                               : Civil Action No.

6          Plaintiff     :  05-7238

7 vs.                           :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9          Defendant.           :

10 _____:

11                               X

12               Tuesday, February 28, 2006

13               Washington, D. C. 20005

14          The deposition of, SUSAN SANOW, witness, was

15 called for examination by counsel for the Plaintiff,

16 pursuant to notice, at the offices of Donald Temple,

17 Esq., 1229 15th Street, Northwest, Washington, D. C.

18 20005, before Sharon L. Banks, C.R.,  a notary public in

19 and for the District of Columbia, commencing at 2:35

20 o'clock p.m.,  when were present on behalf of the

21 respective parties:

22

23

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

1       Q              Is it a fair characterization of
2  this e-mail that it contains suggestions and criticisms
3  of her administration of the Washington Post Awards?
4       A              Yes.
5       Q              Would you turn your attention to
6  number 4 on the last page of this exhibit where the
7  e-mail states. " I know this e-mail is a bit negative,
8  but I ask these questions out of concern and commitment
9  to this program. "
10         When you sent that, did you have the
11 understanding that your e-mail could be construed as
12 negative?
13      A              No.
14      Q              Why did you write I know this
15 e-mail is a bit negative?
16      A              I consider this to be a bit
17 negative, not negative.
18      Q              So there would be elements of
19 negativity contained within the e-mail; is that fair?
20      A              Yes.
21      Q              When you received Ms.
22 Valles-Hall's response, which I believe is the next day,
23 she writes, yes, the tone is negative, but and

1 unnecessary so.    Did that statement offend you?

2      A            Um, no.

3      Q            You did not find it offensive?

4      A            I did not care.

5      Q            Did you find her statement to be
6 confrontational?

7      A            I felt that she just needed to get
8 these thoughts on paper.   Sometime people just have to
9 emote.

10     Q            Did you tell Betsy Johnson that
11 you thought that this statement was confrontational?

12     A            I told Betsy, and I can't remember
13 the order, but I felt that in addition to this e-mail, I
14 also received a phone call from Arminda berating me and I
15 felt the double whammy of phone call and e-mail was
16 uncalled for.

17     Q            When did you receive the phone
18 call?

19     A            I can't remember.   I thought -- I
20 guess I must have received -- I can't remember if I got
21 the phone call first or the e-mail first, but I know that
22 I was berated twice.

23     Q            Do you know that you got the phone

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

61

```
 1      A              Yes.

 2      Q              What were they?

 3      A              She seemed to be unhappy with my
 4 direction, did not want to follow it.

 5      Q              What makes you say that she did
 6 not want to follow your direction?

 7      A              When we told her -- I told her
 8 that it needs to be on the -- all the classes need to be
 9 on the web site by a certain date, she said " no,
10 impossible.   Can not be done. "

11      Q              Did that happen during an oral
12 conversation?

13      A              Yes.

14      Q              Did she ever inform you that she
15 did not believe that that was within her job?

16      A              Yes.

17      Q              Duties?

18      A              Yes.

19      Q              How did you respond?

20      A              I needed more information.    I
21 remember that is how I responded.

22      Q              Did she ever tell you that CNA had
23 hired a communications director --
```

62

```
1         A              Yes.

2         Q              -- or communications personnel?

3         A              Yes.

4         Q              Did she tell you that she believed

5  it to be within his job and responsibilities?

6         A              Yes.

7         Q              How did you respond to that?

8         A              In the meeting that we had at that

9  point, I still needed more information.

10        Q              What more information did you

11 need?

12        A              I needed to know what it all

13 entailed and I can tell you how -- we then had a meeting

14 with the director of Communications and the deputy

15 director for external affairs and the executive director

16 and Arminda and myself.   And I remember specifically

17 saying I agree with Arminda.   But -- for the director of

18 Communications to put the items on the web, eventually.

19 Meaning I knew that he, our director of Communications

20 was heavily involved in a major rebranding, renaming

21 program.   So he did not have the time to do it.

22        So I agreed to, for now, in January, 2005, that

23 Arminda would continue to put the information on the web
```

63

1 and we would  reconsider this later in the year when the
2 rebranding effort was launched.

3        Q              Did she ever tell you that she did
4 not have the technical expertise to do that in a timely
5 efficient manner?

6        A              Yes.

7        Q              How did you respond to that?

8        A              That with the right amount of lead
9 time we were talking about this in January.  The dead
10 line was the end of January.  I thought that a month was
11 or just under a month was sufficient to put the things
12 on.  She had put them on in the past.

13       Q              Did she ask you for help?

14       A              No.

15       Q              Did she ask you to appropriate any
16 resources to help her?

17       A              No.

18       Q              She did not ask for help from the
19 Communications Department?

20       A              Yes.

21       Q              Was Rick Rose the only person
22 working in the Communications Department that knew how to
23 get the materials on line?

64

1        A                Yes.

2        Q                Is it true that she eventually did
3 put the materials on line?

4        A                Yes.

5        Q                What other problems do you
6 perceive that you had with her in January, 2005?

7        A                Um, getting  the catalogue
8 together and out.  Uh, we had a lot of discussion on the
9 types of workshops we were giving, the titles of the work
10 shops, trying to increase registration was very
11 important.

12       Q                Did you communicate that to her
13 directly?

14       A                Yes.

15       Q                Is there any writing to that
16 affect?

17       A                I can not recall.  I don't know.

18       Q                Take a look at what is marked as
19 Exhibit 2.

20       A                Okay.

21       Q                In front of you, we have what has
22 been marked as Exhibit 3.   Is this an e-mail from you to
23 Ms. Johnson?

84

1 Arminda would be -- her key faub would be, what do you

2 call it, not deleted, but disarmed and that she would be

3 locked out of the computer for the weekend.

4          Q               So this was on Friday?

5          A.              Yes.

6          Q               Did she tell you why?

7          A               She said that Arminda became

8 fairly angry and yelled at mediation and our counsel

9 advised us to --

10                    MR. FLEISCHER:  Um --

11                    THE WITNESS:  Okay.  Sorry.

12                    MR. FLEISCHER:  Do not relate any advice

13 that you heard about from Counsel.

14                    THE WITNESS: Okay.

15                    MR. FLEISCHER:  Answer the question as

16 best you can without doing that, please.

17                    THE WITNESS:  Can you repeat the

18 question.

19                    BY MR. BLUE:

20          Q               Um, why did Ms. Johnson tell you

21 that she was restricting her building access?

22                    MR. FLEISCHER:  Can you answer the

23 question without relating advice from counsel?

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

# EXHIBIT K

**From:** len.min@comcast.net

**Sent:** Monday, August 16, 2004 9:01 AM

**To:** debarasso@aol.com

**Subject:** Formal Complaint & Request for Investigation

Dear Mary Ann:

I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy.

Thank you,

Arminda

--
Arminda Valles-Hall
armindav@wcanonprofits.org / len.min@comcast.net
202-327-5216 (w-direct) / 703-351-7966 (h)

Apx. 112



# EXHIBIT L

**The Washington Council of Agencies**

# Memo

**To:** Arminda Valles-Hall

**From:** Betsy Johnson

**CC:** Mary Ann de Barbieri

**Date:** 11/03/2004

**Re:** Absences

---

Your poor attendance record over the past two months has caused serious disruption to the work of WCA, particularly since many of your absences have been unscheduled. By your own admission, you are unable to complete your duties in a timely way when you are absent so much.

You have stated that your absences were for medical reasons. I have asked you to furnish me with a statement from your health care practitioner justifying the leave. To date you have failed to provide such a statement. In order for me to consider your prior absences as excused, I must have such a statement by close of business on Thursday, November 4. Failure to provide a statement will result in disciplinary action.

According to our payroll records, you have exhausted your sick leave and you have 7.34 days of annual leave remaining. While I have agreed that future absences may be charged against annual leave, I cannot allow you to continue missing work on such a frequent basis. Should your absences continue at the current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed. These arrangements may include hiring a permanent replacement for your position.



Complainant's Exhibit

# EXHIBIT M

1

WASHINGTON, D. C.

   IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

_____X

ARMINDA VALLES-HALL,          :

                              : Civil Action No.

          ` Plaintiff         : 05-7238

vs.                           :

CENTER FOR NONPROFIT ADVANCEMENT,:

          Defendant.          :

_____:

                              X

                 Tuesday, February 28, 2006

                 Washington, D. C. 20005

                 Session I

     The deposition of, BARBARA MENDOZA, witness, was

called for examination by counsel for the Plaintiff,

pursuant to notice, at the offices of Donald Temple,

Esq., 1229 15th Street, Northwest, Washington, D. C.

20005, before Sharon L. Banks, C.R.,  a notary public in

and for the District of Columbia, commencing at 4:21

o'clock p.m.,  when were present on behalf of the

respective parties:

MEND2

1      A.  No.

2      Q.  Relative to her access to the computer

3   system, was that continued or disallowed?

4      A.  It was discontinued on Friday.

5      Q.  And how was that achieved?

6      A.  I believe I -- we have a software -- or

7   network maintenance providers.  I called them to

8   deactivate her access to the system.

9      Q.  And why did you do that?

10     A.  I was told to.

11     Q.  And who told you?

12     A.  Betsy.

13     Q.  And so when you spoke with Betsy, she

14  told you that she, Arminda, couldn't come into

15  the building and to deactivate the system, her

16  access to the computer system?

17     A.  Yes.

18     Q.  Did she tell you anything else other

19  than that?

20     A.  Each person has a key filed for access

21  to the building and I was told to deactivate

22  that.

23     Q.  Did you ask why?

1      A.  She told me that the mediation had gone

2   badly and that she needed me to do this.

3      Q.  Did you ask her what was bad about the

4   mediation?

5      A.  That's not my --

6      Q.  You just did what you were told?

7      A.  Yes.

8      Q.  Was anyone else present when she told

9   you to do these things?

Page 10



Page 22

```
1    A         An employee earns 2.92 hours per
2  payroll period.
3    Q         During the 18 years that you have
4  been there, have you had any employees become very sick?
5    A         Yes.
6    Q         In fact one of them died; if I
7  understand correctly?
8    A         Two of them died.
9    Q         Who are they?
10   A         Phyllis Campbell Newsom and  Wanda
11 Banks.
12   Q         How did Ms. Campbell Newsom pass?
13   A         I am sorry.
14   Q         How did Ms. Campbell Newsom pass
15 away?
16   A         It was a child birth related
17 mistake.
18   Q         How about Ms. Banks?
19   A         Cancer.
20   Q         Breast cancer?
21   A         No.  Cancer of the gallbladder.
22   Q         When did she pass?
23   A         June, 7th, 19 -- 2003.
```

Page 23

```
1    Q         When Ms. Banks was sick, she was
2  required to use a lot of sick leave?
3    A         Yes.
4    Q         The same when Ms. Campbell was
5  pregnant, did she use a lot of sick leave?
6    A         She -- she used sick leave for,
7  um -- her illness was briefer.
8    Q         What was your practice relative to
9  people when they were sick and required to use most if
10 not all of their sick leave, based on your experience?
11   A         What is the practice?
12   Q         Yes.
13   A         For illness, the person is to use
14 sick leave first, then annual leave and then personal,
15 um, any accrued leave.
16   Q         What was Ms. Campbell Newsom's job
17 title?
18   A         She was director of Advocacy and
19 Community Relations.
20   Q         How long had she been there before
21 she passed?
22   A         She was there um, I am sorry
23 again, a long time.   At least 8 years.
```

Page 24

```
1    Q         In the 18 or so years that you
2  have been there, about 18 years this year?
3    A         1988, yes.
4    Q         You all ever -- do you know of any
5  instance where a person has been told they might lose
6  their job because of their illness?
7    A         No.  I was not -- the policy is
8  made clear to employees in terms of illness that you must
9  use your leave time at -- which time you need to then
10 consult with your supervisor to make special arrangements
11 of time off without leave, without pay.
12   Q         I want to make sure you understood
13 my question.
14   A         I am sorry.
15   Q         Which was have you ever -- do you
16 have any personal knowledge specifically about any
17 instance where Ms. Johnson has told an employee that
18 because they've been required to use their sick leave
19 that they may lose their job?
20   A         I am aware of instances where the
21 person is reminded that they can not go to a negative
22 leave point.
23   Q         My question is very narrow.  And
```

Page 25

```
1  I am not talking about -- I am talking about when a
2  person is told they will lose their job because they have
3  been required to exhaust their sick leave.  Have you
4  heard of that?  Do you know of an instance of that
5  nature?
6    A         No.
7    Q         Did Ms. Johnson ever consult with
8  you about Arminda's sickness or illness during the last
9  quarter of 2004?
10   A         No.
11   Q         Did you know that Arminda was
12 using sick leave during the last quarter of 2004?
13   A         Yes.
14   Q         Do you know why she was using sick
15 leave?
16   A         She had leave slips filled out and
17 it was circled as sick leave.
18   Q         Did she fill out these leave slips
19 to your knowledge, in advance of taking the leave?
20   A         For the most part.
21   Q         Do you recall the extent to which
22 she provided the appropriate medical documentation for
23 that leave?
```

# EXHIBIT N

1

1 WASHINGTON, D. C.

2    IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

3 _____ X

4 ARMINDA VALLES-HALL,      :

5                           : Civil Action No.

6        Plaintiff    : 05-7238

7 vs.                       :

8 CENTER FOR NONPROFIT ADVANCEMENT,:

9        Defendant.          :

10 _____ :

11                          X

12          Tuesday, February 28, 2006

13          Washington, D. C. 20005

14

15      The deposition of, MARY ANN deBARBIERI, witness, was

16 called for examination by counsel for the Plaintiff,

17 pursuant to notice, at the offices of Donald Temple,

18 Esq., 1229 15th Street, Northwest, Washington, D. C.

19 20005, before Sharon L. Banks, C.R.,  a notary public in

20 and for the District of Columbia, commencing at 10:30

21 o'clock a.m.,  when were present on behalf of the

22 respective parties:

23

           SHARON L. BANKS REPORTING
                P.O. Box 44773
        Fort Washington, Maryland  20744
                (301) 372-6922

48

1       Q                He was one of your host lecturers
2 for one of your courses.    He was meeting with
3 apparently Arminda and Lisa in the conference room.
4       A                Oh.   It was an incident that was
5 recounted to me by Ms. Valles-Ms. Hall.
6       Q                  Did Ms. Johnson have any
7 discussion with you about that particular incident?
8       A                No.
9       Q                Did Jeff Kost have any discussion
10 with you, about that particular incident?
11      A                Not that I recall.
12      Q                After you talked to Arminda about
13 that incident, did you not discuss the issue with Ms.
14 Johnson?
15      A                Not that I recall.
16      Q                Why not?
17      A                It was irrelevant to my
18 investigation.
19      Q                Why?
20      A                Of Ms. Valles-Hall's complaint.
21 In my opinion it was.
22      Q                Why?
23      A                It did not related to her

49

1 personnel complaint.

2      Q          You were aware that there was an
3 allegation that Jeff Kost had complaints about the manner
4 in which Ms. Hall had communicated with him?   Yes?

5      A.          Yes.

6      Q          Were you?

7      A          Yes.

8      Q          The answer is yes.

9      A          Yes.

10      Q          And you are aware that that
11 particular communication evolved around the Bill Terry
12 conference room incident?

13      A          I -- incidents, I am not
14 remembering that specific incident, but there were
15 complaints; yes.

16      Q          At some point you learn that
17 Arminda Valles-Hall filed a complaint with the D. C.
18 Human Rights?

19      A          I am sorry.

20      Q          At some point you learned that
21 Arminda filed a complaint with D. C. Human Right?

22      A          Yes.

23      Q          When did you learn about the D.C.

100

1        A                 Um, yes, office politics can be
2  negative.  Her relationship with Jeremy and Jeff has
3  tension and it is negative.

4        Q                 " Have you witnessed VH telling
5  other employees what she thinks of them? "   What does
6  she say there?

7        A                 Full staff meetings were negative.
8  Betsy did not want to lead.   A came up with ways for all
9  to participate.  Folks picked A's agenda away.

10       Q                 Under that.

11       A                 " A communication --  I don't
12 know.   Communication would lead.   She did not come to
13 all of the away with Prince George's County.  Meetings
14 were negative.

15       Q                 " If yes, have you mentioned this
16 to Betsy? "   There is nothing there.  Do you know if she
17 did not respond to that question?

18       A                 I don't recall.

19       Q                 " Did you feel it was a hostile
20 place at WCA, particularly for people of color?   What
21 did she state there?

22       A                 " She said people don't consider
23 what they say.    There is an issue with race.   People

101

1 don't like -- don't think about what they say. Dawn

2 abused people. She said I can't stand you to Karen.

3 Nothing was ever done. "

4       Q                  Who is Dawn, do you know?

5       A                  Former employee.

6       Q               There is an arrow pointing there.

7 It says, " things allowed to continue. "

8       A                  Yes.

9       Q                  Did you investigate that?

10      A                  No.

11      Q                  Was that a concern to you?

12      A                  The employee was no longer there.

13      Q                  Well, the fact that nothing was

14 ever done?

15      A                  I don't know that. I did not

16 investigate it.

17      Q                  Dawn is White and Karen is African

18 American?

19      A                  Yes.

20      Q                  Question, " How are problems with

21 performance addressed generally? " Did you read that?

22      A                  I don't know what this " not " --

23 looks like " flat. " I don't know what that means.

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922

110

1 document?

2    A            I sent it to Ms. Valles-Hall.   I

3 sent it to the executive committee along with Ms.

4 Valles-Hall's response to this document.

5    Q.            After you conducted these various

6 interviews, what did you do with the information that you

7 received?

8    A            In my interviews.

9    Q            Yes.

10    A            I sat down and wrote a report.

11    Q            Did you look at the performance

12 evaluations of Jeff Kost?

13    A            I did not.

14    Q            Did you look at the performance

15 evaluations of Jeremy Baird?

16    A            I did not.

17    Q            Did you look at the performance

18 evaluation of Barbara Mendoza?

19    A            I did not.

20    Q            And if Arminda was complaining

21 about getting 3s for certain criteria, how could you

22 ascertain whether the process was fair without looking at

23 the performance evaluations of other similarly situated

111

1 employees?

2        A                I did not feel it had any bearing
3 in her evaluation?

4        A                Suppose other people were getting
5 higher evaluations and raises or strike that.

6             Suppose they were getting similar low
7 evaluations, but getting hirer rating, would that have
8 been a factor for you?

9        A                I was investigating Ms.
10 Valles-Hall's complaint.

11       Q                What Ms. Valles-Hall's complaint
12 was about is that she was not being treated fairly and
13 equally;  isn't that correct?

14       A                She -- she was being, um, that her
15 evaluation was biased.  That is what her complaint was.

16       Q                On your investigative report, if
17 you look at Exhibit 2 and number 2:  The goal of my
18 investigation was to ascertain, number two, if she was
19 being evaluated in a manner differently than other staff
20 members.

21             How can you tell, how would you, based upon your
22 approach to this investigation, determine the extent to
23 which Arminda was treated differently than other staff

136

1 determined that -- you determined here that Barbara made

2 a complaint; is that correct?

3      A             Yes.

4      Q             And did you determine that her

5 complaint was valid?

6      A          I did not -- I was not -- I was

7 looking at whether or not the complaints had been made.

8      Q             You had to have looked at whether

9 the complaint was made -- was valid in order to determine

10 that Arminda's difficulties were a result of her approach

11 to her staff colleagues; isn't that true?

12     A          I was not validating the

13 complaint.

14     Q           How could you, if I may, how

15 could you say that Arminda's problems were related to her

16 approach to her staff colleagues if in fact the

17 complaints that you had learned about in your

18 investigation were not valid?

19     A          I was not investigating whether

20 they were valid or not.

21     Q          So you made that determination --

22 you are telling me today, that you made that

23 determination without any determination as to whether or

137

1 not the complaints of Jeff Kost, Jeremy Baird, and
2 Barbara Mendoza were valid?    Is that your testimony?
3       A                The complaints were made is my
4 testimony.
5       Q .               Your testimony is that you made no
6 determination as to their validity; is that your
7 testimony?
8       A                I -- I don't recall making any
9 assessment of their validity.    I was attempting to find
10 out if the complaints had been made.
11      Q                So if the complaints had been
12 made, your investigation, how do you get there?    How do
13 you say that Arminda has problems related to the way she
14 is dealing with other people instead of the other people
15 having problems in terms  of what Arminda is complaining
16 about?
17      A                I got there.
18      Q                Let me ask you, um, to direct your
19 attention to page 3 of Exhibit 3.    Number 6.  It says,
20 " During my evaluation, " this is Arminda telling you
21 in her response to your final investigation. " Ms.
22 Johnson told me that she wanted me to swallow
23 inflammatory remarks."

SHARON L. BANKS REPORTING
P.O. Box 44773
Fort Washington, Maryland  20744
(301) 372-6922