UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARMINDA VALLES-HALL,

    Plaintiff,

    v.

CENTER FOR NONPROFIT
ADVANCEMENT,

    Defendant.

Civil Action No. 06-806 (CKK)

**MEMORANDUM OPINION**
(March 12, 2007)

Pending before the Court is Defendants' Motion for Summary Judgment. Plaintiff's

Complaint and First Amended Complaint include claims pursuant to both 42 U.S.C. § 1981 and

the District of Columbia Human Rights Act, D.C. Code §§ 2-1401 *et seq.* ("DCHRA"), alleging

that Defendant, the Center for Nonprofit Advancement ("CNA"), discriminated against Plaintiff

on the basis of "racial, ethnic, and national origin considerations," First Am. Compl. (hereinafter

"Am. Compl.") ¶¶ 73-78; Compl. ¶¶ 31-35, and that CNA retaliated against Plaintiff because

"she was engaged in statutorily protected expression concerning the vindication of her civil

rights," Am. Compl. ¶¶ 68-72; Compl. ¶¶ 41-44. In addition to these claims, Plaintiff's

Complaint includes claims for Sexual Orientation/Preference discrimination under the DCHRA

(Count II), Constructive Discharge (Count IV), Negligent Infliction of Emotional Distress (Count

V), and Negligent Supervision (Count VI); however, Plaintiff has not opposed Defendant's

Motion for Summary Judgment as to these Counts, and the Court shall therefore dismiss them as

abandoned. Defendant has moved for summary judgment as to all Counts included in Plaintiff's

Complaint and First Amended Complaint. Upon a searching consideration of the filings

currently before the Court, the attached exhibits, the relevant case law, and the entire record

herein, the Court shall grant Defendant's Motion for Summary Judgment in its entirety.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)). The

local rules for summary judgment "assist[] the district court to maintain docket control and to

decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan,*

*Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict

compliance with the local rule is justified both by the nature of summary judgment and by the

rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties

assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts

of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)). "[A] district

court should not be obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be

a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir.

1988)).

The Court further notes that Plaintiff has already been given an extra chance to comply

with Local Civil Rule 56.1. On January 30, 2007, the Court found that Plaintiff's original

"Statement of Material Facts" failed to comply with Local Civil Rules 7(h) and 56.1, and with

this Court's May 4, 2006 Order, which advised Plaintiff that "[t]he Court strictly adheres to the

dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these

2

rules." *Valles-Hall v. Cent. for Nonprofit Advancement*, Civil Action No. 06-806, Order (D.D.C. May 4, 2006 (citing *Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002)); *Valles-Hall*, Order (D.D.C. Jan. 30, 2007). Advising Plaintiff that the purpose of Rule 56.1 is to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Jackson*, 101 F.3d at 151, the Court struck Plaintiff's Opposition in its entirety and, in the interest of justice, gave Plaintiff another opportunity to file a Statement of Material Facts in Dispute/Not in Dispute that complied fully with Local Civil Rules 7(h) and 56.1.

Despite the Court's clear admonition regarding the requirements of Local Civil Rules 7(h) and 56.1, Plaintiff's more recent Genuine Statement of Material Facts in Dispute ("Plaintiff's Statement") still fails to comply with Local Civil Rules 7(h) and 56.1. As Defendant points out in its Supplemental Reply, the numbered paragraphs in Plaintiff's Statement bear no relationship at all to the numbered paragraphs in Defendant's Statement of Material Facts Not in Dispute (hereinafter "Defendant's Statement"). As a result, it is extremely difficult for the Court to parse from Plaintiff's Statement those specific facts that Plaintiff considers in dispute. *See Gibson v. Office of the Architect of the Capitol*, Civ. No. 00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002), *aff'd* No. 05-5031, 2003 WL 21538073 (D.C. Cir. July 2, 2003). In addition, as Defendant also notes, Plaintiff fails to cite specific record support for a number of assertions included in her Statement, even though Defendant's initial Reply Memorandum highlighted this shortcoming. Def's Supp. Reply at 2-3. Indeed, Plaintiff repeatedly cites portions of her deposition transcript in support of her assertions, but fails to actually provide the Court with the particular pages to which she cites. Plaintiff did

not correct these omissions in her revised Opposition and Statement, and as a result, the Court is unable to determine whether she has simply incorrectly cited her deposition or whether she instead lacks factual support for her assertions. Nevertheless, as Plaintiff has already been given an opportunity to revise her Opposition and Statement, the Court has decided not to correct Plaintiff's errors for her by soliciting additional record evidence that Plaintiff has failed to provide. Finally, the Court notes that Plaintiff's failure to comply with Local Civil Rule 56.1 has significantly prejudiced Defendant, who has been required to file additional memoranda in response to Plaintiff's filings, and who has faced the unnecessarily difficult task of meaningfully responding to Plaintiff's improper filings.

Pursuant to Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1; 7(h). In accordance with this Rule, the Court has treated as admitted all facts alleged by Defendant in its Statement and not specifically contradicted by Plaintiff in her Statement. The Court has also considered the facts adduced by Plaintiff in her Statement, to the extent that they are supported by record evidence, and cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

A.    *The Parties*

Plaintiff, Arminda Valles-Hall, identifies herself as a heterosexual Mexican-American woman, and describes her racial identity as either Latino or Hispanic. *See* Pl.'s Stmt. ¶ 1; Compl.

¶¶ 3, 33.[1]  In March 2003, Plaintiff applied for the position of Director of Education at Defendant the Center for Nonprofit Advancement ("CNA").[2]  Def.'s Stmt. ¶ 12; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 51:8-20.  Plaintiff was interviewed by CNA's Executive Director, Betsy Johnson, who was solely responsible for the decision to offer Plaintiff the position with a starting salary of $52,000 per year.  Def.'s Stmt. ¶¶ 5, 13; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 51:8-52:15; Def.'s Ex. 2 (4/2/03 Offer Letter from Johnson to Valles-Hall).  Plaintiff accepted Ms. Johnson's offer and began working at CNA on April 21, 2003.  Def.'s Stmt. ¶ 14; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 41:7-10.[3]  Plaintiff was an at-will employee of CNA from April 21, 2003 to February 14, 2005.  Def.'s Stmt. ¶ 14; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 41:11-16.

CNA is a tax-exempt, District of Columbia nonprofit corporation headquartered in the District of Columbia.  Def.'s Stmt. ¶ 1; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 11:6-11.  CNA was founded in 1979 and serves the nonprofit community in the Washington, DC metropolitan area through education, advocacy, nonprofit community building and group purchasing.  Def.'s Stmt. ¶ 2; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 11:11-12:9.  CNA is governed by a Board of

---

[1] Plaintiff also identifies herself as "a woman of color," *see* Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 52:16-53:14.

[2] CNA was formerly known as the Washington Council of Agencies, and is referred to throughout the record by that name, and also as "WCA," the "Center," and "CNA."  For ease of reference, the Court shall refer to Defendant as CNA.

[3] As Director of Education, Plaintiff's responsibilities included assessing the educational and technical assistance needs of CNA's members; developing educational offerings to meet those needs by working with staff members and speakers; developing and implementing registration procedures and an evaluation system for educational offerings; marketing educational offerings; handling on-site logistics; and calendaring and managing the use of CNA's conference room, including overseeing the security of the conference room.  Def.'s Stmt. ¶ 16; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 53:15-54:14; 64:7-65:11; Def.'s Ex. 3 (Director of Education Job Description); Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 39:9-23; 107:21-108:3.

Directors, which is chaired by its President.  At all times relevant to this matter, Mary Ann de

Barbieri served as President of CNA.  Def.'s Stmt. ¶ 4; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at

20:109-22:11.  CNA's paid staff is headed by Ms. Johnson, who has served as CNA's Executive

Director since 1988.  Def.'s Stmt. ¶ 5; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 12:12-14:1.  CNA

has a Personnel Handbook, which each employee is required to read, and acknowledge having

read, upon being hired.  Def.'s Stmt. ¶¶ 6, 8; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 55:8-14;

Def.'s Ex. 4 (WCA Personnel Handbook); Def.'s Ex. 5 (4/28/03 Valles-Hall Handbook

Acknowledgment Form); Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 77:16-78:16).  In addition to

containing provisions relating to equal employment and non-discrimination, use of compensatory

time, sick leave, workplace behavior, and discipline, the Personnel Handbook notes that specific

types of misconduct may lead to corrective action or dismissal.  Def.'s Stmt. ¶¶ 6-7; Def.'s Ex. 4

(WCA Personnel Handbook).  These include "[c]onduct, including speech . . . that is abusive to

or disrespectful of [CNA]'s directors [or] employees . . .;" "[f]ailure to conduct yourself in a

professional and cooperative manner while carrying out your duties;" and "[n]eglect of duty."  *Id.*

Just prior to Plaintiff's resignation in February 2005, the CNA Board had 13 directors –

six African-Americans, six whites, and one Latino – and CNA had a staff of 13 people – six

African-Americans, six whites, and one Latina.  Def.'s Stmt. ¶¶ 56-57; Def.'s Ex. 26 (4/11/06

Johnson Supp. Aff.) ¶¶ 18-19.  Although Plaintiff asserts that CNA's "management staff at the

time of her hiring was predominantly white and gay," Pl.'s Stmt. ¶ 4, she does not provide record

support for this statement, or indicate whom she considers included in the term "management

staff."

B.    *Plaintiff's Performance as Director of Education Through Her June 2003
Evaluation*

CNA, acting through Johnson, evaluates employees and considers salary increases

annually, in late June or early July.  Def.'s Stmt. ¶ 9; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at

31:12-32:3.  CNA's evaluation form rates employees on 13 criteria, using a 5-point scale, where

"1" is unsatisfactory, "2" is marginal, "3" is satisfactory, "4" is above average, and "5" is

outstanding.  Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 3; Def.'s Ex. 6 (6/26/03 Valles-Hall Personnel

Review Form, introduced as Ex. 8 at 1/4/06 Valles-Hall Dep.).

Johnson normally does not do a formal evaluation for employees who have worked at

CNA for fewer than six months; however, at Plaintiff's request, Johnson agreed to evaluate

Plaintiff during CNA's June/July 2003 evaluation cycle, despite the fact that Plaintiff had been at

CNA for only two months.  Def.'s Stmt. ¶ 18; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 7.  In

Plaintiff's June 2003 evaluation, she received a "5" on the eight criteria on which she was

evaluated – "Attitude," "Initiative," "Open Mindedness," "Inter-personal Communication," "Self

Confidence," "Assertiveness," "Work Habits," and "Quality/Quantity."  Def.'s Ex. 6 (6/26/03

Valles-Hall Personnel Review Form).  Johnson did not evaluate Plaintiff on the other five criteria

listed on the evaluation form because they were inapplicable to Plaintiff.  Def.'s Stmt. ¶ 19;

Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 61:4-18.

The CNA Board of Directors approves a ceiling for awarding raises to employees

coincident with their annual performance evaluations; however, Johnson determines the amount

of individual raises.  Def.'s Stmt. ¶ 10; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 9:7-10:7.

Coincident with Plaintiff's June 2003 evaluation, Johnson raised Plaintiff's salary by $8,000

from $52,000 to $60,000 per year, making Plaintiff the third highest paid employee at CNA. Def.'s Stmt. ¶ 20; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 60:8-21; Def.'s Ex. 6 (6/26/03 Valles-Hall Personnel Review Form); Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 8.  Plaintiff admitted in her deposition that she does not know how other CNA employees were evaluated in 2003, and that she does not know whether or the extent to which they received raises.  Def.'s Stmt. ¶ 21; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 62:4-63:3.  However, Johnson avers that in June 2003, she gave a white female CNA employee who worked in a management position comparable to Plaintiff's an overall rating of "2" (marginal) and no raise, based primarily on a history of verbal abuse towards other staff.  Def.'s Stmt. ¶ 22; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 9.

   C.   *Plaintiff's Performance Between June 2003 and June 2004*

   Plaintiff asserts that "up to and including" the date of her June 2003 performance evaluation, she "had not had any adverse interaction with any of Defendant's employees."  Pl.'s Stmt. ¶ 6 (citing Pl.'s Ex. C (6/26/03 Valles-Hall Personnel Review Form)).  However, according to Plaintiff, during late 2003 and early 2004, "her close association with [CNA's female, African-American Director of Public Policy and Advocacy, Lisa Ransom] made her the subject of increased bias on the part of Johnson."  Pl.'s Stmt. ¶ 12; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 82:15-21.[4]  Plaintiff further asserts that in April 2004, she complained to Tim Kime, Vice-

---

   [4] In her Complaint, Plaintiff alleges that she and Ransom worked jointly on CNA's annual business meeting held on December 3, 2003 and on an outreach conference to be held in Prince George's County.  Compl. ¶¶ 8-10.  Plaintiff further alleges that the conference was highly successful, but that following the conference, CNA terminated Ransom because she was not a "good fit" for the organization.  *Id.* ¶¶ 11-13.  However, Plaintiff's Statement, which includes incomplete sentences and cites to pages of Plaintiff's deposition transcript not provided to the

Chairman of the CNA Board of Directors, that Ransom "was being treated in a discriminatory

way and that [Plaintiff] was in the cross-hairs of that," citing as evidence of Johnson's alleged

bias her decision to strip Plaintiff of her responsibilities regarding a CNA program known as the

Washington Post Award for Excellence in Nonprofit Management (the "Post Award"), discussed

in greater detail below.  Pl.'s Stmt. ¶ 13; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 82:22-84:22.

However, Plaintiff does not dispute CNA's assertion that "Johnson . . . did not know about

[Plaintiff's conversations with Mr. Kime] prior to this litigation."  Def.'s Reply at 8 (citing Def.'s

Ex. 23 (1/12/06 Johnson Dep.) at 22:16-21).  As such, even if Plaintiff in fact complained to Mr.

Kime during April 2004 regarding a perceived bias on the part of Johnson, it is uncontroverted

that Johnson was unaware of such complaints at the time.  Def.'s Ex. 23 (1/12/06 Johnson Dep.)

at 22:16-21).

For its part, CNA points to a number of incidents of which Johnson became aware prior

to Plaintiff's next performance evaluation in July 2004.[5]  These include:

---

Court, *see* Pl.'s Stmt. ¶¶ 7-11, does not clearly explain why Plaintiff believes her association with
Ransom made her the subject of increased bias on the part of Johnson.  *See* Pl.'s Stmt. ¶¶ 7-11.
As Plaintiff has failed to provide the pages of her deposition to which she cites, despite being
given the opportunity to remedy this shortcoming in her revised Opposition, the Court is unable
to determine whether Plaintiff has simply incorrectly cited her deposition or whether no record
support in fact exists for Plaintiff's assertions.

[5] CNA's Statement describes a number of additional incidents, on which CNA does not
assert Johnson relied in conducting Plaintiff's July 2004 evaluation.  As these incidents therefore
appear to be of no factual significance, the Court shall simply note them briefly at this point.
First, Johnson testified during her deposition that in late 2003 or early 2004, Michael Freedman,
CNA's long-time treasurer, complained to Johnson regarding Plaintiff's management of the Post
Award, a CNA program.  Def.'s Stmt. ¶ 23c; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 89:12-
90:19.  However, as Plaintiff correctly notes in her Opposition, Johnson's testimony regarding
Freedman's complaint is inadmissible hearsay, which could not be considered even if CNA
asserted that it was factually significant.  Pl.'s Opp'n 21.  Second, CNA asserts, and Plaintiff
does not dispute, that in March 2004 she submitted a budget for her educational programs

### 1.     Compensatory Time

During the fall of 2003, Plaintiff assigned herself compensatory time without approval

from Johnson, in violation of CNA's Personnel Handbook.  Def.'s Stmt. ¶ 23a; Def.'s Ex. 24

(Def.'s Ans. to Interrogs. #18(a)).  Plaintiff does not deny misusing compensatory time, but

rather asserts that her "alleged misuse of compensatory time" was "neither intentional nor a

problem prior to the initiation of this lawsuit."  Pl.'s Stmt. ¶ 38.  Plaintiff also disputes CNA's

assertion that Johnson counseled her about the matter.  *Id.* ¶ 39.

### 2.     Mendoza Complaint

In October 2003, CNA's Office Manager, Barbara Mendoza, left a message for Plaintiff

regarding the security of the CNA conference room.  Def.'s Stmt. ¶ 23b; Def.'s Ex. 28 (3/20/06

---

directly to a board member without Johnson's knowledge or consent.  Def.'s Stmt. ¶ 23d; Def.'s
Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 10.  Third, in June 2004, Jeff Kost, CNA's Deputy
Director for External Affairs, noticed that the CNA conference room was not secure and sent
Plaintiff an e-mail to that effect.  Def.'s Stmt. ¶ 23j; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at
105:15-19; Def.'s Ex. 10 (7/2/04 e-mail from Valles-Hall to Kost replying to 6/30/04 e-mail from
Kost).  Plaintiff does not dispute that she responded to Kost's e-mail with an e-mail stating "[i]n
past person-to-person communications and, most recently, in your June 30 email to Lee and me,
you have chosen to communicate in an offensive tone, displaying a lack of professional control,
courtesy and regard."  Def.'s Ex. 10 (7/2/04 e-mail from Valles-Hall to Kost).  Finally, Plaintiff
does not address CNA's assertions that prior to Plaintiff's July 2004 evaluation, Johnson became
aware that, unlike most other CNA employees, Plaintiff routinely worked with her office door
shut; that Plaintiff had little interaction with other CNA staff members; that Plaintiff refused to
keep Johnson informed of her activities unless weekly meetings were scheduled; that Plaintiff
frequently missed staff meetings; and that as a result of Plaintiff's failure to schedule her time
efficiently, she and another staff member worked all night on at least one occasion to meet a
deadline.  Def.'s Stmt. ¶ 23k; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 112:21-113:15; 181:19-
182:23; 210:5-17; Def.'s Ex. 23 (2/23/06 Johnson Dep.) at 59:3-15; Def.'s Ex. 25 (2/23/06 Kost
Dep.) at 13:4-16; 24:17-25:22; Def.'s Ex. 28 (2/28/06 Mendoza Dep.) at18:16-20:22.

Mendoza Dep.) at 52:2-53:12.[6]  CNA asserts that Plaintiff criticized Mendoza for leaving the

message, calling Mendoza "unprofessional."  Def.'s Stmt. ¶ 23b; Def.'s Ex. 28 (3/20/06

Mendoza Dep.) at 53:13-55:8.  During her deposition in this matter, Mendoza testified that

Plaintiff called her unprofessional, Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 53:13-55:8;

however, Plaintiff denies calling Mendoza unprofessional, Pl.'s Stmt. ¶ 33; Pl.'s Ex. A (1/4/06

Valles-Hall Dep.) at 122:7-13).  As a result, a factual dispute exists as to whether Plaintiff, in

fact, called Mendoza unprofessional.  Nevertheless, during her deposition Mendoza testified that

she reported the interaction to Johnson, including telling Johnson that Plaintiff had called

Mendoza unprofessional.  Def.'s Stmt. ¶ 23b; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 55:9-

56:22; 75:2-9.  Likewise, Johnson testified during her deposition that Mendoza reported to her

that Plaintiff called Mendoza unprofessional.  Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 133:6-21.

As such, while Plaintiff disputes calling Mendoza unprofessional, she cannot controvert the

evidence that Mendoza reported as much to Johnson.[7]

Plaintiff further asserts that the Mendoza incident is insignificant because "Johnson, after

---

[6] According to CNA, on a number of occasions, unauthorized persons have gained entrance to CNA's interior office space, and the management of CNA's office building has warned of thefts in other suites in the building.  Def.'s Stmt. ¶ 11; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 52:4-53:1; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 132:2-10.

[7] In her Statement, Plaintiff also asserts that "Mendoza was not penalized in her performance evaluation for any negative interaction with [Plaintiff]," and cites to "Exhibit __, filed under seal."  Plaintiff states that pursuant to an agreement between the parties to keep employee records confidential, copies of Mendoza and Kost's performance evaluations will be filed under seal.  It appears, however, that Plaintiff may never have actually filed those evaluations with the Court.  Her list of exhibits submitted in support of her Opposition includes no reference to either evaluation, nor does CNA make any reference to either exhibit in its Motion for Summary Judgment or Reply.  Moreover, the Court notes that the docket in this matter does not indicate that either evaluation was ever filed under seal, and that the Clerk's office has no record of any such filing.

discussing the alleged incident with Mendoza, said that she did not think it . . . was a problem." Pl.'s Stmt. ¶ 35 (citing Pl.'s Ex. F (1/12/06 Johnson Dep. at 136)).  Plaintiff accurately reports Johnson's deposition testimony, but fails to note that in her deposition, Johnson continued to explain that the Mendoza incident was the first involving Plaintiff to come to Johnson's attention, and that Johnson eventually came to consider the Mendoza incident problematic "[a]fter there were a series of complaints."  Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 135:19-137:6.  As such, Plaintiff's attempt to downplay the Mendoza incident does not undercut the evidence that Mendoza reported to Johnson that Plaintiff called Mendoza unprofessional.

### 3.    Workshop Funds

In January 2004, Plaintiff was responsible for collecting fees charged by CNA for a workshop, and for turning the fees over to CNA's bookkeeper for deposit.  Def.'s Stmt. ¶ 23e; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 107:21-109:9.  In February, during a routine audit of CNA's finances, Plaintiff was found to have receipts from the workshop still in her possession and to have borrowed cash from the receipts to purchase lunch.  *Id.*  As a result, CNA received a "management letter" from its auditor criticizing CNA for poor handling of funds.  *Id.*  Plaintiff does not dispute these facts, but asserts that, like her misuse of compensatory time, her "withholding of corporate funds was neither intentional nor a problem prior to the initiation of this lawsuit."  Pl.'s Stmt. ¶ 38 (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 108).  Plaintiff's attempt to downplay the incident, however, raises no factual issue as to whether Plaintiff improperly retained CNA funds and used them for personal purposes.

### 4.    Kost Conference Room Incident

In February 2004, Plaintiff had a disagreement with Kost about the use of CNA's

conference room, after which Plaintiff claimed Kost was disrespectful towards her and demanded

that he apologize. Def.'s Stmt. ¶ 23f; Def.'s Ex. 25 (1/12/06 Kost Dep.) at 12:8-15:22; Pl.'s

Stmt. ¶ 23. Plaintiff claims that "Kost testified that he never met with Johnson, nor did he

communicate via e-mail or telephone with her to specifically complaint about [Plaintiff]." Pl.'s

Stmt. ¶ 24 (citing Pl.'s Ex. G (2/23/06 Kost Dep.) at 26-27). However, Plaintiff's assertion

obscures the fact that while Kost testified that he did not speak with Johnson *specifically* to

complain about Plaintiff, he also testified that he reported the conference room incident to

Johnson and that he considered Plaintiff's behavior confrontational. Def.'s Ex. 25 (1/12/06 Kost

Dep.) at 20:10-15; Pl.'s Ex. G (2/23/06 Kost Dep.) at 14:21-16:10; Def.'s Ex. 23 (1/12/06

Johnson Dep.) at 109:18-23; 112:10-18. Johnson investigated the incident involving Plaintiff

and Kost, "but could find no evidence that [Kost] had been disrespectful," finding instead that

"[Plaintiff] had been inflexible in her position and unnecessarily confrontational." Def.'s Stmt. ¶

23f; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 126:2-7. Although Plaintiff takes issue with

"Johnson's alleged inquiry into the matter," Pl.'s Stmt. ¶ 26, neither Plaintiff's justifications of

her behavior nor her dissatisfaction with Johnson's inquiry into the incident raises a factual

question as to whether the incident actually occurred and was reported to Johnson by Kost.

### 5.     Baird Incident

In February 2004, CNA employee Jeremy Baird questioned an African-American visitor,

who was unaccompanied in CNA's office, concerning her presence at CNA. Def.'s Stmt. ¶ 23g;

Def.'s Ex. 30 (4/5/06 Baird Dep.) at 16:16-17:21; 45:17-47:20. Plaintiff does not dispute that

she did not witness the incident, but nevertheless encouraged the visitor to make a written

complaint. Def.'s Stmt. ¶ 23g; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 224:8-12. CNA does not

indicate that Johnson relied on the Baird incident in conducting Plaintiff's July 2004 evaluation and any dispute regarding the facts of the incident are therefore immaterial.  Def.'s Mot. for Summ. J. at 21-22.  However, Plaintiff maintains that, in connection with her July 2004 evaluation, Johnson told Plaintiff that Baird had complained about Plaintiff's involvement in the incident, and that Johnson has since "recanted and changed her story about Baird's negative comments, saying that Baird never complained about [Plaintiff]."    Pl.'s Stmt. ¶ 25 (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 118:21-122:6).  Indeed, Plaintiff asserts, "Baird testified that he never complained to anyone about [Plaintiff]."  Pl.'s Stmt. ¶ 25 (citing Pl.'s Ex. I (4/5/06 Baird Dep.) at 15:12-14).

While Johnson did testify at her deposition that Baird did not complain to her *electronically* about Plaintiff, Plaintiff provides no evidence that Johnson altogether denied receiving a complaint from Baird, rather than that Johnson was aware of the incident.  Pl.'s Ex. F (1/12/06 Johnson Dep.) at 108:23-109:5.  Moreover, Plaintiff's detailed notes of the meeting during which she alleges Johnson told her that Baird complained about her do not substantiate Plaintiff's claim.  *See* Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting with Johnson).  Instead, Plaintiff's notes indicate that Johnson discussed the incident with Plaintiff, telling Plaintiff that she believed Plaintiff had "offended" Baird, *see id.* at 4, that Johnson believed Plaintiff had inappropriately insinuated that Baird treated the African-American visitor poorly, and that Johnson believed Plaintiff had not made any attempt to diffuse the situation, *id.* at 6-7.  Plaintiff's assertion that Johnson told Plaintiff that Baird complained about her, and that Johnson has since "recanted and changed her story about Baird's negative comments," Pl.'s Stmt. ¶ 25, is thus unsupported by anything other than Plaintiff's own testimony to that effect.

14

6.    *Sanow Incident*

Among other things, CNA ran a program known as the Washington Post Award for Excellence in Nonprofit Management (the "Post Award"), which was created and managed by CNA employee Susan Sanow for ten years. Def.'s Stmt. ¶ 23c; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 63:12-64:11. Sanow resigned from CNA in November 2003, and upon Sanow's resignation, Johnson assigned management of the Post Award to Plaintiff. Def.'s Stmt. ¶ 23c; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 66:12-18. Sanow continued, however, to serve as a consultant on the Post Award. Def.'s Stmt. ¶ 23h; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 66:22-67:4; Pl.'s Stmt. ¶ 28. In March 2004, Sanow sent Plaintiff an e-mail in which she raised concerns regarding the late delivery of applicant materials and inconsistencies within the materials, reminded Plaintiff of upcoming critical deadlines, and offered Plaintiff help if necessary. Def.'s Stmt. ¶ 23h; Def.'s Ex. 7 (3/23/04 e-mail from Sanow to Valles-Hall). At the end of her e-mail, Sanow stated, "I know this e-mail is a bit negative, but I ask these questions out of concern and commitment to this program" Def.'s Ex. 7 (3/23/04 e-mail from Sanow to Valles-Hall). Plaintiff responded to Sanow's e-mail with her own e-mail, stating "Yes, the tone is negative and unnecessarily so." Def.'s Ex. 8 (3/24/04 e-mail from Valles-Hall to Sanow). Johnson was copied on both Sanow's initial e-mail and Plaintiff's response e-mail. Def.'s Ex. 7 (3/23/04 e-mail from Sanow to Valles-Hall) and Ex. 8 (3/24/04 e-mail from Valles-Hall to Sanow).

Plaintiff attempts to downplay this interaction by contrasting Johnson's deposition testimony that she found Plaintiff's use of the words "and unnecessarily so" to be "angry and defensive," Pl.'s Stmt. ¶ 31 (citing Pl.'s Ex. F (1/12/06 Johnson Dep.) at 205:2-207:12, with

15

Sanow's deposition testimony that she was not offended by Plaintiff's response e-mail, *Id.* ¶ 30 (citing Pl.'s Ex. J (2/28/06 Sanow Dep.) at 34:21-35:4. Whether or not Sanow was "offended" by Plaintiff's e-mail, however, does not undercut Sanow's testimony that she reported the interaction to Johnson because "in addition to this e-mail, [she] also received a phone call from [Plaintiff] berating me and [she] felt the double whammy of phone call and e-mail was uncalled for." Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16.

### 7.    *Plaintiff's Post Award Complaint*

In April 2004, Sanow's employer offered to allow Sanow to manage the Post Award without cost to CNA. Def.'s Stmt. ¶ 23i; Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 40:21-41:1. CNA asserts that Johnson accepted the offer because it amounted to a substantial gift in kind, because Sanow was very experienced in managing the Post Award, and because Johnson was not satisfied with Plaintiff's management of the Post Award to that point. Def.'s Stmt. ¶ 23i; Pl.'s Ex. F (1/12/06 Johnson Dep.) at 165:6-21. Plaintiff complained to Johnson about the decision to strip Plaintiff of responsibility for managing the Post Award, and sent Johnson a memo detailing her concerns with the manner in which the Post Award management issue was handled. Def.'s Stmt. ¶ 23i, Def.'s Ex. 9 (5/11/04 memo from Valles-Hall to Johnson re: Issues of Concern & Discussion). Johnson testified in her deposition that when she tried to explain the Post Award management decision to Plaintiff, Plaintiff accused Johnson of "intentionally being disrespectful or thoughtless . . . I had the distinct impression that she thought I had intentionally ruined her reputation." Pl.'s Ex. F (1/12/06 Johnson Dep.) at 136:19-137:6. Johnson further testified that this conversation was the first time that Plaintiff spoke to her in a disrespectful manner. *Id.* at 137:9-11. Plaintiff does not dispute CNA's account of these events, but rather argues that

CNA's assertion that Plaintiff "was incompetent in her handling of the Washington Post Award [is] . . . unsubstantiated," because Sanow testified that she continued to maintain confidence in Plaintiff's ability to manage the award. Pl.'s Opp'n at 21 (citing Sanow Dep. at 42-43).[8] Sanow testimony that she maintained confidence in Plaintiff's ability to run the Post Award, however, is entirely irrelevant to whether Johnson made a legitimate business decision regarding management of the Post Award.

    D.    *Plaintiff's July 2004 Evaluation and Subsequent Complaints*

        1.    *Plaintiff's July 2004 Evaluation*

Johnson's annual evaluation of Plaintiff took place over the course of two days, July 7 and July 8, 2004. Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review Form); Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 110:2-21. Johnson gave Plaintiff a "5" (outstanding) on five of 13 criteria ("Self Confidence;" "Job-Knowledge;" "Quality/Quantity;" "Decision Making;" and "Motivating"); a "4" (above average) on three criteria ("Initiative;" "Planning;" and "Leadership"); and a "3" (satisfactory) on five criteria ("Attitude;" "Open Mindedness;" "Inter-personal Communication;" "Assertiveness;" and "Work Habits"). Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 14; Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review Form). Johnson included a number of handwritten comments on Plaintiff's Personnel Review Form, including "responds with inflammatory remarks;" "needs work on staff;" "in conflicts in the office; reactions need work;"

---

    [8] Plaintiff cites to Sanow's deposition transcript in support of her argument that she was qualified to manage the Post Award, but fails to provide the pages to which she cites in either her original opposition or her revised Opposition. Pl.'s Ex. J (2/28/06 Sanow Dep.). CNA includes page 42 of Sanow's deposition transcript in support of its Motion for Summary Judgment, *see* Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 42; however the Court is unable to discern whether Sanow testified further in this respect and so relies on the transcript pages it has been provided.

and "you need to work harder at solving problems with colleagues and refrain from telling them

your judgement of them."  Pl.'s Stmt. ¶ 14; Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review

Form).

Coincident with Plaintiff's July 2004 evaluation, Johnson raised Plaintiff's salary from

$60,000 per year to $61,800 per year, a 3% increase.  Def.'s Stmt. ¶ 27; Def.'s Ex. 11 (7/7/04

Valles-Hall Personnel Review Form).  At that salary, Plaintiff continued to be the third highest

paid CNA employee, after Johnson and Kost.  Def.'s Stmt. ¶ 27; Def.'s Ex. 26 (4/11/06 Johnson

Supp. Aff.) ¶ 11.  Plaintiff asserts that "[b]ased upon Defendant's negative evaluation, Johnson

gave Plaintiff a 3% [sic] rather than the higher percentage paid to all other management staff."

Pl.'s Stmt. ¶ 15.  Plaintiff provides no support for her suggestion that other CNA management

received larger raises, and indeed, during her deposition, admitted that she does not know how

other CNA employees were evaluated in 2004 and whether or the extent to which they received

raises.  Def.'s Stmt. ¶ 35; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 31:19-32:13; 129:21-130:3.

### 2.    *August 6, 2004 Meeting Between Plaintiff and Johnson*

Plaintiff was unhappy with her July 2004 evaluation, "attributed the negative

characterizations about her . . . to her involvement and association with Ransom and requested a

meeting with Johnson to discuss her concerns."  Pl.'s Stmt. ¶ 17; Def.'s Ex. 1 (2/16/06 Valles-

Hall Dep.) at 254:8-256:6.  Plaintiff documented her concerns in an August 4, 2004

memorandum to Johnson, in which she "request[ed] a correction of my evaluation and a

corresponding retroactive adjustment of salary commensurate with the quality and quantity of my

work . . . ."  Def.'s Ex. 12 (8/4/04 Memo from Valles-Hall to Johnson re: July 2004 Evaluation).

Plaintiff asserted that her July 2004 evaluation was "markedly different from my first evaluation

in June 2003" and that she was "concerned that the basis of all scores rated less than 5 on my most recent evaluation were based on biased subjective impressions and on false and completely unfounded and undocumented charges discussed for the first time in my evaluation." *Id.* Plaintiff stated that she was "not being treated equitably," that she was "being evaluated differently and more critically than [her] colleagues and peers," and that she had "suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard." *Id.* Furthermore, Plaintiff stated, "I believe my style of communication is viewed unfortunately as aggressive and 'inflammatory.' These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive." *Id.*

Johnson met with Plaintiff on August 6, 2004 to discuss Plaintiff's complaint. Def.'s Stmt. ¶ 29; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 255:8-256:6; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting with Johnson). During that meeting, Johnson expressed to Plaintiff that, while she did not initially believe individual complaints to be problematic, over time she observed a pattern of Plaintiff reacting quickly and negatively in her interactions with co-workers. Def.'s Stmt. ¶ 29; Def.'s Ex. 23 (2/23/06 Johnson Dep.) at 44:2-19; Def.'s Ex. 18 (Pl's Notes of 8/6/04 meeting) at 2-3. Plaintiff asserts that during that meeting, Johnson initially told Plaintiff that 13 out of 14 CNA employees had complained about Plaintiff, but that when pressed about the quantity and substance of these complaints, Johnson revealed that only five employees had complained – Kost, Baird, Sanow, Mendoza, and Johnson herself – and described the incidents discussed above. Pl.'s Stmt. ¶¶ 20-37; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 113:15-124:16; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 4. Plaintiff's detailed notes of the August 6,

2004 meeting indicate that Johnson told Plaintiff that she had "offended" Kost, Baird, Sanow,

Mendoza, and Johnson herself.  Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 4.  In addition,

Plaintiff's notes reflect that Johnson raised the issues of Plaintiff's misuse of compensatory time,

missed staff meetings, use of CNA funds for personal purposes, and failure to keep Johnson

updated about her work.  *Id.*  at 1-2, 6.  Johnson also appears to have mentioned to Plaintiff that

5% was not a base minimum standard for raises for 2004, but rather a ceiling, *id.* at 2, and

reminded Plaintiff that Plaintiff did not know how other CNA employees were evaluated, *id.* at 8.

During the course of the August 6, 2004 meeting, Johnson told Plaintiff that "[i]f making

judgments about people and telling them is a cultural thing, then maybe we should tell the staff

it's a cultural thing and they should buck up and take it."  Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 37;

Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 262:5-22; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at

199:14-201:12; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 2, 4.  Johnson continued to tell

Plaintiff that she considered Plaintiff's behavior not to be "a cultural thing" but rather to be

"verbal abuse."  *Id.*[9]  Johnson suggested to Plaintiff that Plaintiff sit down with or e-mail those

CNA employees that Plaintiff had offended and apologize to them.  Pl.'s Stmt. ¶37; Pl.'s Ex. A

_____

[9] Defendant notes, and Plaintiff does not contest, that other than the "cultural thing" remark and an e-mail that Johnson sent Plaintiff on May 5, 2004 wishing her a happy *cinco de mayo*, "Johnson has never made any reference in the workplace, directly or indirectly, to [Plaintiff's] ancestry, race or color" or to Plaintiff's sexual orientation.  Def.'s Stmt. ¶¶ 31-32; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 297:15-300:20.  Defendant further notes, and Plaintiff does not contest, that other than these two incidents, "Johnson has never made a derogatory reference to race, color, national origin or sexual orientation to [Plaintiff], in [Plaintiff's] presence, or in the presence of any other [CNA] employee," nor has any other "employee of [CNA] ever made a derogatory reference to race, color, national origin or sexual orientation in Johnson's presence."  Def.'s Stmt. ¶¶ 33-34; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 297:15-300:20.

(1/4/06 Valles-Hall Dep.) at 125:11-126:1; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 7.   In

addition, Johnson told Plaintiff that she expected her employees to "leave their shit at home."

Pl.'s Stmt. ¶ 37; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 113:1-2; Def's Ex. 18 (Pl.'s Notes of

8/6/04 meeting) at 9.

### 3.    Plaintiff's August 2004 Complaints to OHR and de Barbieri

On August 9, 2004, Plaintiff filed a charge of discrimination with the District of

Columbia Office of Human Rights ("OHR"), alleging discrimination on the basis of race and

national origin.  Pl.'s Stmt. ¶ 42; Def.'s Stmt. 36.  However, Johnson did not learn of Plaintiff's

OHR charge until December 2004, when CNA was served with notice of the charge.  Def.'s

Stmt. ¶ 37; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 151:13-18; Def.'s Ex. 23 (1/12/06 Johnson

Dep.) at 127:2-8.

On August 16, 2004, Plaintiff sent an e-mail to Mary Ann de Barbieri, then CNA's

President, in which she stated "I am writing to formally complain about my most recent

evaluation, conducted on July 7-8, 2004.  The scores and process are unfounded and biased on

the basis of race, national origin and, possibly, retaliation.  I am very disturbed by the manner in

which I am being treated and request an investigation consistent with company policy."  Def.'s

Stmt ¶ 38; Pl.'s Stmt. ¶ 43; Def.'s Ex. 13 (8/16/04 e-mail from Valles-Hall to de Barbieri re;

Formal Complaint & Request for Investigation).  Following Plaintiff's complaint, de Barbieri

tried to schedule an interview with Plaintiff, but was unable to do so until October 19, 2004

because of Plaintiff's resistance. Def.'s Ex. 14 (de Barbieri Draft Report on Investigation of

Personnel Complaint by Plaintiff) at 1; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 147:3-13.  In

connection with her investigation, de Barbieri conducted a two-hour interview with Plaintiff,

which was held offsite at Plaintiff's request, and also interviewed Johnson and five other CNA employees, including Kost, Baird, and Mendoza.  Def.'s Stmt. ¶ 39; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 147:14-148:19; Def.'s Ex. 14 (de Barbieri Draft Report) at 2-4; Def.'s Ex. 27 (2/28/06 de Barbieri Dep.) at 65:2-66:2.

Following her investigation, de Barbieri prepared an undated draft Report summarizing her investigation.  Def.'s Stmt. ¶ 40; Def.'s Ex. 14 (de Barbieri Draft Report).  In her draft report, de Barbieri concluded that Plaintiff experienced the same evaluation process as other CNA employees and that there was no "evidence that [Plaintiff's] evaluation was racially or ethnically biased," but rather that Plaintiff's "difficulties are a result of her approach to her staff colleagues."  *Id.*  Finally, de Barbieri stated "I see no evidence that [Plaintiff's] 2004 evaluation scores were a retaliation, as they appear to be based upon a valid assessment of her performance during the past year by her supervisor."  *Id.*  In a letter to Plaintiff dated December 6, 2004, de Barbieri indicated that she had considered Plaintiff's response to de Barbieri's draft report and found that Plaintiff's response was unrelated to Plaintiff's initial August 16, 2004 complaint.  *See* Def.'s Ex. 15 (12/6/04 Letter from de Barbieri to Plaintiff).  As a result, de Barbieri decided to conclude her investigation and submit her draft report as final.  *Id.*

Plaintiff criticizes de Barbieri's investigation, focusing on de Barbieri's decision that certain issues were irrelevant to Plaintiff's complaint.  Pl.'s Stmt. ¶ 47.  Plaintiff takes issue with de Barbieri's decision not to investigate the truthfulness of the various CNA employee complaints underlying Plaintiff's July 2004 evaluation, *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 136-37), not to review the performance evaluations of "similarly situated white employees," *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 110-11), and not to investigate

an observation made by an unidentified African-American female former CNA employee that

"[t]here is an issue with race," *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 100-01.

However, as de Barbieri emphasized in her deposition, her investigation was focused on

Plaintiff's actual claim – that her July 2004 evaluation had been biased on the basis of race or

national origin or constituted retaliation – and her conclusions were limited to that complaint.

Def.'s Ex. 27 (2/28/06 de Barbieri Dep.) at 113:6-21; 126:4-20.  Moreover, de Barbieri and

Johnson each invited Plaintiff, in writing, to supplement her August 16, 2004 complaint if she

believed she had experienced other instances of discrimination.  *See* Def.'s Ex. 15 (12/6/04 Letter

from de Barbieri to Valles-Hall); Def.'s Ex. 16 (11/4/04 e-mail from Johnson to Valles-Hall re:

Note from Doctor & Request for Clarification).  Plaintiff did not take advantage of these offers.

Def.'s Stmt. ¶ 41.

Plaintiff's criticism of de Barbieri's investigation thus appears unfounded, because de

Barbieri's investigation appropriately addressed Plaintiff's August 16, 2004 complaint that her

July 2004 evaluation had been biased on the basis of race or national origin or constituted

retaliation.  In response to that complaint (as opposed to other complaints that Plaintiff now

raises but failed to assert at the time of the investigation), de Barbieri reasonably limited her

investigation to confirming that CNA employees had, in fact, complained to Johnson about

Plaintiff, and ensuring that Plaintiff received the same evaluation process (as opposed to results)

as other CNA employees.  Def.'s Ex. 14 (de Barbieri Draft Report) at 1-4.  Furthermore, de

Barbieri's conclusions actually reflect the record before the Court.  There is no dispute that

Plaintiff's co-workers complained to Johnson about Plaintiff and, because Plaintiff presents

absolutely no evidence that her evaluation process differed from that of other CNA employees,

her claim to this effect is nothing more than a bald assertion.

       E.     *Issues Arising During Late 2004 and Early 2005*

The catalogue for CNA's Fall 2004 course offerings was not completed and mailed until the end of October 2004.  Def.'s Stmt. ¶ 43; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 212:7-213:17; 216:9-23; Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 56.20-58:12.  By the time the catalogue was mailed, the dates for many courses had already passed and other courses had to be cancelled as a result of low registration.  *Id.*  Plaintiff does not dispute that the Fall 2004 catalogue was her responsibility, and does not assert that she was given responsibility for the catalogue as the result of a retaliatory animus.  Instead, Plaintiff argues that "neither Defendant nor any of its employees ever set a deadline for publication," Pl.'s Stmt. ¶ 40 (citing Def.'s Ex. F (1/12/06 Johnson Dep.) at 212).  Plaintiff further asserts that "any perceived tardiness is reasonably excused by Defendant's unilateral decision to cut [Plaintiff's] support staff in September 2004."  *Id.* (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 166.  Plaintiff's justifications and excuses fail, however, to raise a factual issue as to whether in fact the Fall 2004 catalogue (for which Plaintiff was solely responsible) was mailed so late that courses had to be skipped or cancelled.

Also in the fall of 2004, Plaintiff worked only 12 out of 29 scheduled workdays during the six-week period from September 20 to October 30, 2004.  Def.'s Stmt. ¶ 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 12.  Plaintiff does not dispute this fact, asserting that in September 2004 she "began to suffer from physical ailments caused by work-induced stress," that "[l]ater that month, she also began to see a licensed clinical social worker," and that she "was required to miss days from work to address her work related illness."  Pl.'s Stmt. ¶ 44; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 35:5-38:16.  Plaintiff also does not dispute that in October

2004, Johnson counseled Plaintiff about her poor attendance and requested that Plaintiff provide

a note from her doctor regarding her absences.  Def.'s Stmt. ¶ 45; Def.'s Ex. 1 (1/4/06 Valles-

Hall Dep.) at 192:17-194:15.  In fact, in an e-mail Plaintiff sent to Johnson, Plaintiff confirmed

that Johnson first requested a doctor's note on October 19, 2004.  Def.'s Ex. 16 (11/4/04 e-mail

from Johnson to Valles-Hall replying to 11/4/04 e-mail from Valles-Hall to Johnson).

On November 3, 2004, having not received a note from Plaintiff's doctor, Johnson wrote

Plaintiff a memorandum stating that Plaintiff's "poor attendance record over the past two months

has caused serious disruption to the work of [CNA]."  Def.'s Ex. 17 (11/3/04 Memo from

Johnson to Valles-Hall).  Johnson noted that Plaintiff had failed to provide the requested doctor's

statement, and informed Plaintiff that "to consider your prior absences as excused, I must have

such a statement by close of business on Thursday, November 4.  Failure to provide a statement

will result in disciplinary action."  *Id.*  Johnson further informed Plaintiff that:

> According to our payroll records, you have exhausted your sick leave and you
> have 7.34 days of annual leave remaining.  While I have agreed that future
> absences may be charged against annual leave, I cannot allow you to continue
> missing work on such a frequent basis.  Should your absences continue at the
> current, unacceptable rate, I will have no choice but to make other arrangements
> to assure that the work assigned to you is properly completed.  These
> arrangements may include hiring a permanent replacement for your position.

*Id.*[10]  Plaintiff provided a note from her doctor on November 4, 2004, which stated "Pt. is

undergoing treatment for medical condition & needs periodic followup & assessment."  Def.'s

---

[10]  In her deposition, Plaintiff stated that she did not believe that she had exhausted her
sick leave at the time that Johnson counseled Plaintiff about her attendance.  Def.'s Ex. 1 (1/4/06
Valles-Hall Dep.) at 193:4-12.  However, according to the CNA Personnel Handbook, employees
are granted 10 days per year of sick leave, *see* Def.'s Ex. 4 (WCA Personnel Handbook) at 8, and
Plaintiff does not contest that between September 20 and October 30, 2004 she worked only 12
of 29 scheduled workdays, Def.'s Stmt. ¶ 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 12.

Ex. 19 (10/24/04 note from Dr. Manish Upadhyay).

Plaintiff asserts that "Johnson's letter [of November 4, 2004] was uncharacteristic, particularly as the office manager [Mendoza] had never known of another instance in which an employee's job would be threatened for their use of sick leave." Pl.'s Stmt. ¶ 46 (citing Pl.'s Ex. M (2/28/06 Mendoza Dep.) at 25). However, the CNA Personnel Handbook specifically states that "[i]f an employee takes more than a week of sick leave at a time, the Executive Director may require a Doctor's note." Def.'s Ex. 4 (WCA Personnel Handbook) at 8. It therefore appears that Johnson was authorized to request a doctor's note from Plaintiff, and Plaintiff fails to identify any similarly situated CNA who was not required by Johnson to provide a doctor's note.

In January 2005, Plaintiff initially refused to follow Johnson and Sanow's instruction to post CNA's spring course offerings on the CNA website. Def.'s Stmt. ¶ 48; Pl.'s Stmt. ¶ 41; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 196:14-197:22. Plaintiff had performed this duty several times before, *id.*; nevertheless, in January 2005, Plaintiff informed Johnson and Sanow that "she was overloaded with work and could not continue to do other people's work" and that "the website responsibility fell within the job description of the newly-hired communications director," Pl.'s Stmt. ¶ 41; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 208:13-209:12; Pl.'s Ex. J (2/28/06 Sanow Dep.) at 61:3-63:18. Plaintiff correctly asserts that Sanow "agreed that website responsibility was not in [Plaintiff's] job description." Pl.'s Stmt. ¶ 41 (citing Pl.'s Ex. J (2/28/06 Sanow Dep.) at 62). However, Sanow also testified that she believed it was Plaintiff's responsibility to post the offerings in January 2005 and that Plaintiff had performed the task in the past. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 62:22-63:12. Plaintiff eventually put the course materials online. *Id.* at 64:2-4; Pl.'s Stmt. ¶ 41. Significantly, while Plaintiff maintains that

26

posting the course offerings on the website in January 2005 was not her responsibility, she does

not claim that Johnson and Sanow's insistence that Plaintiff post the offerings on the website

represented a form of retaliation.

Finally, in connection with her retaliation claims, Plaintiff vaguely asserts that CNA

altered her job duties so as to impose more arduous tasks upon her.  *See* Pl.'s Opp'n at 30-31.

However, this vague claim is entirely devoid of specification – Plaintiff does not state how her

duties were allegedly altered, when they were allegedly altered, or by whom.  The Court therefore

declines to speculate as to what additional work Plaintiff refers to or which protected activity she

believes engendered this alleged retaliation.[11]

### F.    February 2005 Mediation and Plaintiff's Resignation

Plaintiff was actively job hunting in the fall of 2004.  Def.'s Stmt. ¶ 42; Def.'s Ex. 1

(1/4/06 Valles-Hall Dep.) at 13:11-12.  On February 1, 2005, Plaintiff received and accepted an

offer from her current employer, Society of Research Administrators International ("SRAI"),

with a planned start date of March 1, 2005.  Def.'s Stmt. ¶ 49; Def.'s Ex. 1 (1/4/06 Valles-Hall

Dep.) at 14:9-21.  CNA does not indicate that it was aware that Plaintiff had accepted

employment with SRAI on February 1, 2005 or that she planned to start working for SRAI on

March 1, 2005.  Rather, CNA asserts that in "early February 2005 Johnson decided to fire

[Plaintiff] for insubordination, poor performance, and unacceptable workplace behavior," but

postponed doing so pending mediation of Plaintiff's OHR complaint in hopes that CNA and

---

[11] Moreover, the Court notes that, other than being asked to post the course offerings on the CNA website in January 2005, Plaintiff does not identify any instance in which she was given work that fell outside the auspices of her job responsibilities.  Furthermore, with respect to posting the course offerings on the website, as discussed above, Plaintiff does not dispute that she had performed this task before.

Plaintiff could reach a resolution that would include Plaintiff's voluntary resignation.  Def.'s

Stmt. ¶ 50; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 188:16-189:12; 198:5-13; Def.'s Ex. 26

(4/11/06 Johnson Supp. Aff.) ¶¶ 13-14.

On February 11, 2005, the parties participated in an unsuccessful mandatory mediation of

Plaintiff's OHR complaint.  Def.'s Stmt. ¶ 51; Pl.'s Stmt. 48; Def.'s Ex. 22 (2/11/05 Mediation

and Confidentiality Agreement).  Following the mediation, late in the afternoon of Friday,

February 11, 2005, Johnson arranged to bar Plaintiff's access to CNA's office during the

February 12-13 weekend and to bar Plaintiff's remote access to CNA's computer network.

Def.'s Stmt. ¶ 52; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff. ¶ 15); Pl.'s Stmt. ¶ 49.  These steps

were taken in preparation for firing Plaintiff.  *Id.*  During Plaintiff's deposition, she testified that

she attempted to gain access to the CNA office on Saturday, February 12, 2005 and that on

Sunday, February 13, 2005, she asked a co-worker if she could follow her into the CNA office

because Plaintiff's "key fob didn't seem to be working."  Pl.'s Ex. A (2/16/06 Valles-Hall Dep.)

at 286:8-17; 292:13-20.  Significantly, however, Plaintiff does not assert that she was – nor does

she appear to have been – aware that she had actually been locked out of the CNA office.

On Monday, February 14, 2005, Plaintiff submitted a letter resigning her employment

with CNA to Johnson, prior to being fired.  Def.'s Stmt. ¶ 53; Def.'s Ex. 1 (2/16/06 Valles-Hall

Dep.) at 293:12-294:1.  Plaintiff's resignation letter states that she is resigning her position at

CNA, effective immediately, because "the collective impact of the professional indignities I have

suffered leave me no choice but to resign."  Def.'s Ex. 21 (2/14/05 Letter from Valles-Hall to

Johnson) at 3.  Plaintiff's resignation letter states "I have been judged differently and more

harshly than my white counterparts, subjected to aggressive retaliatory action when I complained

28

about this treatment and forced to do the work of others under the threat of job loss." *Id.* at 1. In support of this assertion, Plaintiff describes what she views as discriminatory and disrespectful treatment on the part of Johnson, focusing on her July 2004 evaluation. *Id.* at 1-3.[12] Plaintiff does not, however, mention that she had been locked out of the CNA offices over the February 12-13 weekend, or indicate any awareness of that fact.

Plaintiff does mention the lockout in a separate e-mail to Johnson, also dated February 14, 2005 and time-stamped 9:55 p.m.. Def.'s Ex. 20 (2/14/05 e-mail from Valles-Hall to Johnson). Plaintiff's e-mail notes that her key fob was deactivated, a security code was placed on her phone to prevent her from retrieving messages, and "in an effort to publicly humiliate me, the building management was given a letter written by [CNA] that informed building security that I was not to be allowed to enter the building under any circumstances" along with a 4" x 6" color photograph of Plaintiff, both of which were posted at the security desk in the building's lobby. *Id.* Nevertheless, Plaintiff's e-mail specifically states "I was not informed that these measures were put into effect." *Id.* Furthermore, during her deposition, Plaintiff testified that she did not see the letter and her picture hanging at the security desk until she left the office after resigning on February 14, 2005. Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 292:1-6. It is therefore clear from the record evidence that, when she resigned her employment with CNA on February 14, 2005, Plaintiff was unaware that she had been locked out of the CNA office over the February

---

[12] Plaintiff's resignation letter also states that she was retaliated against for "reporting information regarding possible financial irregularities related to the late depositing of 403(b) contributions." Def.'s Ex. 21 (2/14/05 Letter from Valles-Hall to Johnson) at 2. Plaintiff included an allegation to this effect in Count III (Retaliation) of her Complaint. Compl. ¶ 43. However, as Plaintiff makes no mention of such allegations in her Opposition to Defendant's Motion for Summary Judgment or Statement of Facts and the record contains no evidence regarding these allegations, the Court assumes she has abandoned this claim.

12-13 weekend.

In her deposition, Plaintiff testified that she began working for SRAI as planned on March 1, 2005, at a higher salary and with better benefits than the salary and benefits she had been receiving at CNA.  Def.'s Stmt. ¶ 54; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 15:8-17:16. On April 4, 2005, Johnson hired an African-American female who appears to be heterosexual as CNA's Manager of Education, and assigned her a number of Plaintiff's former responsibilities. Def.'s Stmt. ¶ 55; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 17.  The remainder of Plaintiff's responsibilities were assigned to Sanow, who was re-hired by CNA effective January 3, 2005, and appointed Director of Programs.  *Id.*; Def.'s Stmt. ¶ 47.

### G.    *Procedural History*

On July 28, 2005, Plaintiff voluntarily withdrew her OHR charge and OHR subsequently closed the administrative proceeding with no findings.  Def.'s Mot. for Summ. J. at 2.  Plaintiff filed her six-Count Complaint in this case in the Superior Court for the District of Columbia on September 8, 2005.  *Id.*  CNA answered Plaintiff's Complaint on November 16, 2005.  Def.'s Notice of Removal Att. 3 (Def.'s Ans. to Pl.'s Compl.).  Plaintiff's Complaint did not include a demand for a jury trial, and on March 31, 2006, Plaintiff moved to amend her Complaint to add two counts under 42 U.S.C. § 1981, and also moved for a jury trial.  Def.'s Mot. for Summ. J. at 3.  By Order docketed April 27, 2006, the Superior Court granted Plaintiff's Motion for Leave to Amend Complaint, but denied her Motion for Jury Trial as untimely in light of the fact that discovery had closed.  Def.'s Mot. for Summ. J. at 3; Def.'s Notice of Removal Att. 5 (4/27/06

Superior Court Order).[13]  Also on April 27, 2006, the Superior Court granted Defendant's request

to file an Amended Answer to Plaintiff's Complaint.  Def.'s Mot. for Summ. J.

Plaintiff's First Amended Complaint was deemed filed on April 27, 2006, and included

two additional claims pursuant to 42 U.S.C. § 1981.  Based on these additional claims, CNA

removed this case from Superior Court to this Court on May 2, 2006.  Def.'s Mot. for Summ. J.

at 3; Def.'s Notice of Removal at 3.  Thereafter, CNA filed its Motion for Summary Judgment on

May 25, 2006.  On January 30, 2007, the Court struck Plaintiff's initial Opposition in its entirety,

finding that Plaintiff's original "Statement of Material Facts" failed to a comply with Local Civil

Rules 7(h) and 56.1.  *Valles-Hall v. Cent. for Nonprofit Advancement*, Civil Action No. 06-806

(D.D.C. Jan. 30, 2007).  Plaintiff filed a revised Opposition to Defendant's Motion for Summary

Judgment, and a correspondingly revised Genuine Statement of Material Facts in Dispute on

February 13, 2007.  On February 16, 2007, CNA filed a Supplemental Reply, in which it

responded to Plaintiff's Genuine Statement of Material Facts in Dispute and indicated a desire to

adopt by reference the arguments made in its initial Reply Memorandum.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

---

[13] The Court notes that, as a result of the April 27, 2006 Superior Court Order, if this case proceeded to trial, Plaintiff's claims would be resolved by bench trial.

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S. Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647 (D.C. Cir. 2003) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case."  *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution."  *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more exacting, it is not inherently preclusive.  Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute

and the moving party is entitled to a judgment as a matter of law.

### III: DISCUSSION

Plaintiff's Complaint includes six Counts: race discrimination under the DCHRA (Count I); sexual orientation discrimination under the DCHRA (Count II); retaliation under the DCHRA (Count III); constructive discharge (Count IV); negligent infliction of emotional distress (Count V); and negligent supervision (Count VI). Plaintiff's First Amended Complaint adds two claims: retaliation under 42 U.S.C. § 1981 (Count VII) and disparate treatment discrimination under 42 U.S.C. § 1981 (Count VIII). CNA moved for summary judgment on all eight of Plaintiff's claims; however, Plaintiff's Opposition addresses only her claims of race discrimination and retaliation. CNA's Reply (filed before the Court struck Plaintiff's initial opposition) highlighted Plaintiff's failure to address CNA's motion for summary judgment as to her claims for sexual orientation discrimination, constructive discharge, negligent infliction of emotional distress, and negligent supervision. Def.'s Reply at 4. As Plaintiff failed to address this shortcoming in her revised Opposition., it appears the claims she raised in Counts II, IV, V, and VI are abandoned and shall be dismissed. The Court therefore shall not address Defendant's Motion for Summary Judgment with respect to those claims, but will only address Plaintiff's claims for race discrimination and retaliation, each of which is brought pursuant to both 42 U.S.C. § 1981 and the DCHRA.

    A.    *Plaintiff's Discrimination Claims*

        1.    *Proper Standards*

Pursuant to 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens

. . . ." 42 U.S.C. § 1981(a).  As amended by the Civil Rights Act of 1991, "§ 1981's prohibition

against racial discrimination in the making and enforcement of contracts applies to all phases and

incidents of the contractual relationship, including discriminatory contract terminations."  *Rivers*

*v. Roadway Express*, 511 U.S. 298, 302, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994).  For its part,

the DCHRA makes it unlawful for an employer to "fail or refuse to hire, or to discharge, any

individual; or otherwise discriminate against any individual, with respect to his compensation,

terms, conditions, or privileges of employment . . ." based upon, *inter alia*, the individual's "race,

color [or] national origin."  D.C. Code § 2-1402.11(a).

  "The burdens of persuasion and production for claims raised under § 1981 or under the

[DCHRA] are identical to those for claims alleging discriminatory treatment in violation of Title

VII" of the Civil Rights Act of 1964."  *Mungin v. Katten Munchin & Zavis*, 116 F.3d 1549, 1553

(D.C. Cir. 1997).  To prove a violation of § 1981 or the DCHRA, Plaintiff must demonstrate by a

preponderance of the evidence that the actions taken by the employer were "more likely than not

based on the consideration of impermissible factors" such as race, ethnicity, or national origin.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207

(1981) (internal quotation marks and citation omitted).  Furthermore, "the plaintiff may prove his

claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination"

under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C.

2006); *see also Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 45 (D.D.C. 2003) (citing *Patterson v.*

*McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), *superseded*

*in part by* The Civil Rights Act of 1991); *Carter v. George Washington Univ.*, 387 F.3d 872, 878

35

(D.C. Cir. 2004) (*McDonnell Douglas* framework applies to claims brought pursuant to § 1981).

"While courts have not precisely defined what constitutes 'direct evidence,' it is clear that 'at a

minimum, direct evidence does not include stray remarks in the workplace, particularly those

made by nondecision-makers or statements made by decisionmakers unrelated to the decisional

process itself.'" *Brady*, 456 F. Supp. 2d at 6 (citing *Ayala-Gerena v. Bristol Myers-Squibb Co.*,

95 F.3d 86, 96 (1st Cir. 1996) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-52, 109 S.

Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality op.), *superseded in part by* The Civil Rights Act of

1991; *id.* at 277-78, 109 S. Ct. 1775 (O'Connor, J., concurring))).  Although they may be

probative of discrimination, "stray remarks do not satisfy a plaintiff's burden of proving

discrimination by direct evidence." *Brady*, 456 F. Supp. 2d at 6 (citing *Ayala-Gerena*, 95 F.3d at

96 (citing *Price Waterhouse*, 490 U.S. at 277-78, 109 S. Ct. 1775 (O'Connor, J., concurring))).

      Here, although Plaintiff emphasizes Johnson's "cultural thing" comment as "evidencing a

hostility towards [Plaintiff] and her cultural identity," Plaintiff does not attempt to argue that

Johnson's comment constitutes direct evidence of discrimination.  Pl.'s Opp'n at 23-24.  Nor

could Plaintiff succeed with such an argument.  When viewed in context, Johnson's "cultural

thing" comment appears to be an uninformed and insensitive statement regarding Plaintiff's

ethnicity or national origin, but not an intentionally discriminatory statement.  At most,

Johnson's "cultural thing" comment is a stray remark that, although probative of discrimination,

cannot serve as direct evidence of discrimination.  *See Price Waterhouse*, 490 U.S. at 277-78,

109 S. Ct. 1775 (O'Connor, J., concurring).

      Thus, in the absence of direct evidence, it is necessary to employ the *McDonnell Douglas*

tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000)

(citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817).[14]   It is the district court's

responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-

personnel department that reexamines an entity's business decisions."  *Fischbach v. D.C. Dep't*

*of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a

preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411

U.S. at 802, 93 S. Ct. 1817.  If she succeeds, the burden shifts to Defendant to articulate some

legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible

evidence supporting its claim.  *Id.*  Defendant's burden is only one of production, and it "need

not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450

U.S. at 254, 101 S. Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.

Ct. 2742, 125 L. Ed. 2d 407 (1993) ("[T]he determination that a defendant has met its burden of

production (and has thus rebutted any legal presumption of intentional discrimination) can

involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts

intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir.

2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L. Ed. 2d 146 (2003); *see also Burdine*,

450 U.S. at 253, 101 S. Ct. 1089.

---

[14] The *McDonnell Douglas* framework also applies to Plaintiff's claims under the
DCHRA.  *See Perkins v. District of Columbia*, 769 F. Supp. 11, 14 n.3 (D.D.C. 1991) (noting
that the "*McDonnell Douglas* approach has been adopted by courts reviewing [DCHRA] claims
of employment discrimination").  Because the same analysis applies to Plaintiff's § 1981 claims
and DCHRA claims, the Court will refer from this point on to her claim under § 1981 only.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S. Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S. Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S. Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S. Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*, 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S. Ct. 2097. "[The trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S. Ct. 2097 (quoting *Burdine*,

450 U.S. at 255 n.10, 101 S. Ct. 1089).  The Court of Appeals for the District of Columbia

Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the

combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack
> the employer's proffered explanation for its actions; and (3) any further evidence
> of discrimination that may be available to the plaintiff (such as independent
> evidence of discriminatory statements of attitudes on the part of the employer) or
> any contrary evidence that may be available to the employer (such as evidence of
> a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

        "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]."  *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full

context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-

finder] could conclude that he has suffered discrimination."  *Aka*, 156 F.3d at 1290.

        2.        *Application of the* McDonnell Douglas *Analysis*

                a.        *Plaintiff's Prima Facie Case*

        Plaintiff claims disparate treatment discrimination, and thus makes out a prima facie case

"'by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse

employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"

*Czekalski v. Peters*, No. 05-5221, Slip Op. at 6 (D.C. Cir. Feb. 2, 2007) (quoting *George v.*

*Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *see also Stella v. Mineta*, 284 F.3d 135, 145 (D.C.

Cir. 2002).  CNA does not dispute that Plaintiff has met the first element of her prima facie case.

Plaintiff variously describes herself as Mexican-American, Latina, Hispanic, and a "woman of color." Pl.'s Stmt. ¶ 1; Compl. ¶¶ 3, 33; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 52:16-53:14. All of these descriptions place Plaintiff within a protected class under the DCHRA, *see* D.C. Code § 2-1402.11(a); and, while the scope of § 1981 is limited to race discrimination, the Supreme Court has held that § 1981 reaches national origin discrimination that is based on racial or ethnic considerations associated with the national origin in question. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987).

CNA vigorously disputes, however, whether Plaintiff can show that she suffered an adverse employment action. In her Opposition, Plaintiff identifies three possible adverse employment actions (1) her termination and/or constructive termination by CNA, Pl.'s Opp'n at 9-11; (2) Johnson's alleged threat to terminate Plaintiff for her use of sick leave and Johnson's demand that Plaintiff produce a doctor's note, *id.* at 12-13, and (3) Plaintiff's July 2004 evaluation, which she describes as "negative" and claims was used to deny her the raise to which she was entitled, *id.* at 11-12. The Court shall address each possible adverse employment action in turn.

Plaintiff asserts that CNA constructively discharged her when it locked her out of the CNA offices over the weekend of February 12-13, 2005, and contends that "Defendant's termination of [Plaintiff] is among the most-egregious 'adverse employment actions' prohibited by § 1981." Pl.'s Opp'n at 9. For its part, CNA argues that the lockout cannot constitute a constructive discharge because, according to Plaintiff's own testimony, she had been searching for new employment since the Fall of 2004 and, by February 11, 2005 had already accepted employment with SRAI to begin on March 1, 2005. Def.'s Mot. for Summ. J. at 16; Def.'s Ex. 1

(1/4/06 Valles-Hall Dep.) at 13:11-12; 14:9-21.  In response, Plaintiff notes that "[n]o evidence in the record indicates that at the time of Defendant's action, that [sic] Defendant knew that Plaintiff had accepted a full-time position with a new employer."  Pl.'s Opp'n at 10.

Whether or not CNA was aware at the time of the lockout that Plaintiff had accepted new employment is of no consequence, however, because Plaintiff has proffered no evidence to show that the lockout played a role in her resignation on February 14, 2005.[15]  A resignation is actionable as a constructive discharge when "the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).  Thus, constructive discharge "can be regarded as an aggravated case of . . . hostile work environment."  *Id.* at 146, 124 S. Ct. 2342.  Moreover, in addition to demonstrating intentional discrimination, the plaintiff must establish the presence of "aggravating factors" that drove her to quit.  *Dashnaw v. Pena*, 12 F.3d 1112, 1115 (D.C. Cir. 1994), *superseded in part by* 29 U.S.C. § 633a(d).  While Plaintiff's Complaint alleges that CNA "deliberately made Plaintiff's working conditions intolerable," Compl. ¶ 47, Plaintiff fails to substantiate this allegation in either her Complaint or her Opposition to CNA's Motion for Summary Judgment.  Instead, Plaintiff focuses solely on the February 12-13 lockout.  However, Plaintiff's resignation letter contains no mention of the lockout, Def.'s Ex. 21 (2/14/05 Letter from Valles-Hall to Johnson), and her

---

[15] The Court nevertheless notes that Plaintiff's acceptance of another job at the time of her resignation suggests that she was not compelled to resign her employment at CNA as a result of the lockout.  *See Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 766 (D.C. Cir. 1997) ("A constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign.  It does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive") (internal citations and quotation omitted).

resignation e-mail specifically states "I was not informed that these measures were put into effect," Def.'s Ex. 20 (2/14/05 e-mail from Valles-Hall to Johnson).  As Plaintiff has proffered no evidence that she was aware of the lockout when she submitted her resignation letter on February 14, 2005, she cannot argue that she – or that a reasonable person in her position would have – felt compelled to resign as a result of the lockout.  Plaintiff's "constructive discharge" thus fails to constitute an adverse employment action.

Plaintiff also asserts that CNA "took adverse employment action against [Plaintiff] when Johnson threatened to terminate [Plaintiff] for her use of sick leave, and discriminatorily required her to produce evidence of illness while similarly situated white employees were not required to do the same."  Pl.'s Opp'n at 12.  As an initial matter, Plaintiff does not point specifically to any "similarly situated white employees" who "were not required to do the same," and in any event, the Court concludes that Johnson's alleged threat does not rise to the level of an adverse employment action.

Plaintiff correctly notes, citing *Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002), that actions short of an outright firing can be adverse within the context of employment discrimination.  *Id.* at 1130.  However, as *Forkkio* also explains, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Id.* at 1131 (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).  Mere threats of termination do not rise to the level of an adverse employment action because they result in no materially adverse consequences or objectively tangible harm.  *See Cromwell v. Washington Metro. Area Transit Auth.*, Civil Action

42

No. 97-2257, 2006 WL 2568009, at * 7 (D.D.C. Sept. 5, 2006) (supervisor's threat to terminate plaintiff due to alleged insufficiency of medical documentation did not constitute adverse employment action). Plaintiff does not assert that Johnson carried through with her alleged threat of termination and her mere threat, in and of itself, is not an adverse employment action.

Here, Plaintiff argues that "Johnson's conduct rose above the level of a simple threat" because, by demanding that Plaintiff furnish a doctor's note, Johnson deprived Plaintiff of "a significant employment benefit – the right, conferred upon [Plaintiff] by Defendant's employee handbook, to take sick leave up to the authorized amount." Pl.'s Opp'n at 13. Plaintiff's argument fails, however, because, as discussed above, the CNA Personnel Handbook grants employees 10 days per year of sick leave and specifically states that "[i]f an employee takes more than a week of sick leave at a time, the Executive Director may require a Doctor's note," Def.'s Ex. 4 (WCA Personnel Handbook) at 8. Plaintiff does not contest that between September 20 and October 30, 2004 she worked only 12 of 29 scheduled workdays. Def.'s Stmt. ¶ 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶ 12. As a result, Plaintiff's claim that Johnson deprived Plaintiff of a right conferred upon her by CNA's Personnel Handbook is entirely without merit.

Finally, CNA argues that Plaintiff's July 2004 evaluation does not constitute an adverse employment action because the evaluation was not negative at all (Plaintiff received an average of a "4", above average), because another CNA employee was denied a raise in 2003 for abusive behavior similar to Plaintiff's, and because an evaluation, standing alone, is not an adverse employment action. Def.'s Mot. for Summ. J. at 12-14. For her part, Plaintiff argues that her July 2004 evaluation constitutes an adverse employment action because Johnson used it "to give [Plaintiff] a 3 percent raise rather than the 5 percent raise that her job performance warranted."

43

Pl.'s Opp'n at 12.[16]

CNA is correct that a "thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions," *Brown*, 199 F.3d at 458, and that "in most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions," *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001). However, in *Russell v. Principi*, the D.C. Circuit established that where a performance evaluation is accompanied by a lower bonus, the combination may constitute an adverse employment action because the "bonus is a tangible, quantifiable award" that has "a more direct, measurable, and immediate effect." *Id.* Here, Plaintiff asserts that her July 2004 evaluation provided Plaintiff "the ammunition to deny her a maximum salary increase" – the 5% raise that Johnson was authorized by the Board to give. Pl.'s Opp'n at 12. CNA does not dispute this assertion in its Reply memorandum, and CNA's own Statement of Material Facts states that "[c]oincident with her July 2004 evaluation of [Plaintiff], Johnson raised [Plaintiff's] salary from $60,000 to $61,800 per year, a 3% increase." Def.'s Stmt. ¶ 27. As a result, to the extent that Plaintiff's July 2004 evaluation resulted in Johnson's decision to give Plaintiff only a 3% raise rather than a full 5% raise, the July 2004 evaluation meets Plaintiff's burden of demonstrating an adverse employment action.

Plaintiff is also required to meet the third element of her prima facie case, by showing that "the unfavorable action gives rise to an inference of discrimination." *Czekalski*, Slip Op. at

---

[16] Plaintiff also asserts that her July 2004 evaluation constitutes an adverse employment action because CNA cites the contents of the evaluation as legitimate non-discriminatory reasons for terminating Plaintiff. Pl.'s Opp'n at 12. However, as discussed above, CNA did not terminate Plaintiff, Plaintiff resigned her employment with CNA.

6; *George*, 407 F.3d at 412; *Stella*, 284 F.3d at 145.  Plaintiff frames her discrimination claims in terms of disparate treatment discrimination, alleging that she was treated differently than her white co-workers with respect to her July 2004 evaluation.  Traditionally, to meet the third prong of a prima facie case of disparate treatment discrimination, a plaintiff was required to demonstrate "that she was treated differently from similarly situated employees who are not part of the protected class." *Czekalski*, Slip Op. at 9.  Plaintiff cannot make such a showing because she altogether fails to identify any other CNA employee who received more favorable treatment in terms of their 2004 evaluation or raise.  In fact, Plaintiff admitted at her deposition that she does not know how other CNA employees were evaluated in 2004 and whether or the extent to which they received raises.  Def.'s Stmt. ¶ 35; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 31:19-32:13; 129:21-130:3.

The Court notes that recently in the contexts of discharges, reassignments, and failures to promote, the D.C. Circuit has emphasized that a plaintiff may also meet the third prong of a prima facie case of disparate treatment discrimination by showing, for instance, that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Czekalski*, Slip Op. at 9; *George*, 407 F.3d at 412; *Stella*, 284 F.3d 145-146.  Plaintiff, who bears the burden of establishing a prima facie case of disparate treatment discrimination, makes no argument as to how this alternative method would apply to her July 2004 evaluation and raise.  However, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Burdine*, 450 U.S. at 253, 101 S. Ct. 1089, and because the *McDonnell Douglas* model of the *prima facie* case is not "rigid, mechanized, or ritualistic," its requirements

45

can vary depending on the factual context. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). As a result, and in light of the approach taken in the D.C. Circuit's recent disparate treatment discrimination decisions, the Court shall assume, *arguendo*, that Plaintiff can establish a prima facie case, and proceed with the *McDonnell Douglas* analysis.

> b.    *CNA's Proffered Legitimate, Non-Discriminatory Reasons*

In response to Plaintiff's claim of disparate treatment discrimination, CNA asserts that it "can readily show legitimate, non-pretextual reasons for its treatment of [Plaintiff]." Def.'s Mot. for Summ. J. at 21. CNA asserts that Plaintiff's conduct failed to live up to the standards of civility set in the CNA Personnel Handbook, which warns that "[c]onduct, including speech, that . . . is abusive to or disrespectful of [CNA's] directors [or] employees" and "[n]eglect of duty" may lead to corrective action or dismissal. *See* Def.'s Ex. 4 (WCA Personnel Handbook) at 10. Specifically, CNA points to Plaintiff's frequently unpleasant interactions with her co-workers (including Mendoza, Kost, and Sanow) and with Johnson herself, misuse of compensatory time, withholding and misuse of CNA funds, lateness in mailing the Fall 2004 catalogue, and insubordination regarding posting courses on the CNA website in January 2005. Def.'s Mot. for Summ. J. at 21-22. CNA has thus succeeded in meeting its burden of production under the *McDonnell Douglas* test by offering legitimate, non-discriminatory reasons both for the scores Plaintiff received in her July 2004 evaluation, as well as for CNA's overall treatment of Plaintiff.

> c.    *Evidence of Pretext or Discrimination* Vel Non

Given these legitimate non-discriminatory reasons identified by CNA, Plaintiff now must seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288, by demonstrating that the proffered reasons are a mere pretext for discrimination, *see Paquin*, 119

F.3d at 26-27.   As always, Plaintiff retains the "ultimate burden of persuading the court that she

has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089.

However, "one way for a plaintiff to show that an adverse employment decision was made for a

discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered

for its decision was false."  *Czekalski*, Slip Op. at 10 (citations omitted).   CNA proffers a host of

legitimate, non-discriminatory reasons for its "treatment" of Plaintiff, only some which occurred

before Plaintiff's July 2004 evaluation.  The Court shall therefore first consider Plaintiff's efforts

to demonstrate pretext as to events occurring before July 2004, before turning to those additional

reasons proffered by CNA that arose after Plaintiff's July 2004 evaluation but before her

resignation in February 2005.

  CNA asserts that Plaintiff's unpleasant interactions with three co-workers (Mendoza,

Kost, and Sanow) and with Johnson herself violated the civility standard set forth in the CNA

Personnel Handbook.  Plaintiff questions CNA's account of each of these interactions,  but

ultimately fails to demonstrate pretext as to any because she cannot raise a factual issue as to

whether each co-worker reported the interaction to Johnson prior to Plaintiff's July 2004

evaluation.  First, as discussed above, Plaintiff denies calling Mendoza "unprofessional," and

asserts that Johnson did not consider the incident involving Plaintiff and Mendoza to be a

problem at the time.  Pl.'s Opp'n at 18.  However, even if a factual dispute exists as to whether

Plaintiff, in fact, called Mendoza unprofessional, the evidence is uncontroverted that Mendoza

reported as much to Johnson prior to Plaintiff's July 2004 evaluation.  Def.'s Stmt. ¶ 23b; Def.'s

Ex. 28 (3/20/06 Mendoza Dep.) at 55:9-56:22; 75:2-9; 79:11-19; Def.'s Ex. 23 (1/12/06 Johnson

Dep.) at 133:6-21.  As a result, Plaintiff fails to demonstrate pretext as to Johnson's claim that

she relied on Mendoza's complaint in connection with Plaintiff's July 2004 evaluation.

With respect to the Kost incident involving the CNA conference room, Plaintiff correctly asserts that Kost testified that he "neither met with Johnson, nor communicated via e-mail or telephone with her to *specifically* complain about [Plaintiff]." Pl.'s Opp'n at 19 (emphasis added). Nevertheless, Kost did testify that he reported the incident to Johnson and that he considered Plaintiff's behavior confrontational. Def.'s Ex. 25 (1/12/06 Kost Dep.) at 20:10-15; Pl.'s Ex. G (2/23/06 Kost Dep.) at 14:21-16:10; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 109:18-23; 112:10-18. Plaintiff thus fails to raise a factual issue as to whether the incident occurred or whether Kost reported it to Johnson. Plaintiff also attempts, but fails, to undercut CNA's reliance on the Sanow incident by contrasting Johnson's testimony that she considered Plaintiff's response e-mail to Sanow to be "angry and defensive" with Sanow's testimony that she was not offended by Plaintiff's response e-mail. Pl.'s Opp'n at 20-21. As noted above, Sanow also testified that she reported the interaction to Johnson after also receiving a critical phone call from Plaintiff. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16. Sanow's testimony that she was not offended by Plaintiff's e-mail therefore fails to raise a factual issue as to whether Sanow, in fact, complained to Johnson.[17] Finally, in response to Johnson's assertion that she found Plaintiff's response to the reassignment of the Post Award to be disrespectful, Plaintiff argues that she was, in fact, qualified to manage the Post Award. *See* Pl.'s Opp'n at 21-22. However, Plaintiff's competence in managing the award is entirely irrelevant to whether Johnson believed Plaintiff reacted to the change in management in a disrespectful manner.

---

[17] The Court notes that in conducting her investigation, de Barbieri spoke with Mendoza and Kost, who confirmed that they had made complaints to Johnson about Plaintiff. *See* Def.'s Ex. 14 (de Barbieri draft Report) at 4.

In assessing whether Plaintiff can show pretext, "[w]hether Plaintiff believes [her co-workers'] complaints were justified is irrelevant, as the issue is whether [Johnson] received the complaints and believed that plaintiff's performance was deficient." *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002) (citing *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) ("An employer is entitled to rely on his own perception of an employee's work performance.")). As a result, Plaintiff's quibbling over the details of the underlying incidents and whether or not each employee would describe their conversation with Johnson as a "complaint" cannot prove pretext as to CNA's assertion that Plaintiff was involved in a number of unpleasant interactions with her co-workers, as well as with Johnson herself, each of which Johnson was aware of prior to Plaintiff's July 2004 evaluation.[18] Plaintiff is likewise unable to rebut CNA's assertions that Plaintiff misused compensatory time and withheld and misused CNA funds. As discussed above, although Plaintiff contends that neither action was "intentional or a problem prior to the initiation of this lawsuit," Pl.'s Opp'n at 24, Plaintiff does not deny misusing compensatory time or withholding and misusing CNA funds. As a result, Plaintiff fails to demonstrate pretext as to CNA's

---

[18] Nor does Plaintiff demonstrate pretext in this respect by claiming that, during the August 6, 2004 meeting regarding Plaintiff's evaluation, Johnson initially told Plaintiff that 13 of her 14 co-workers had complained about Plaintiff, but when pressed to provide details of these complaints, admitted that only five (5) employees had actually complained – Kost, Baird, Sanow, Mendoza, and Johnson herself. Pl.'s Opp'n at 22. CNA proffers only Mendoza, Kost, Sanow and Johnson's complaints as legitimate, non-discriminatory reasons for Plaintiff's July 2004 evaluation, and Plaintiff fails to raise a factual issue as to whether any of those complaints were made. As such, it is of no significance to Defendant's Motion for Summary Judgment whether Johnson at one point in time insinuated that other complaints existed.

assertion that Johnson was aware of these issues at the time of Plaintiff's July 2004 evaluation.[19]

In response to each of CNA's proffered legitimate, non-discriminatory reasons, Plaintiff offers explanations and justifications for her behavior, or attempts to downplay the incidents at issue. However, "Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decision maker which is relevant." *Waterhouse*, 124 F. Supp. 2d at 7 (internal citation and quotation omitted). As such, Plaintiff's explanations and justifications, unsupported by factual evidence, are insufficient to demonstrate that the legitimate, non-discriminatory reasons that CNA offers for Plaintiff's July 2004 are mere pretext for a racial animus.

The Court therefore turns to considering the "ultimate question of discrimination *vel non*." *Aikens*, 460 U.S. at 714, 103 S. Ct. 1748. As always, Plaintiff retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. At this point,

---

[19] CNA's Statement of Material Facts also describes a number of other issues that arose prior to Plaintiff's July 2004 evaluation, but on which CNA does not assert Johnson relied in conducting the evaluation. These include Freedman's complaint, the Baird incident, Plaintiff's submission of a budget directly to a CNA board member, Plaintiff's e-mail to Kost, and the other miscellaneous matters. *See* Def.'s Stmt. ¶¶ 23c, 23j, and 23k. As noted above, because CNA does not proffer these incidents as legitimate, non-discriminatory reasons for Plaintiff's July 2004 evaluation, they are of no factual or legal significance. In addition, CNA identifies two issues regarding Plaintiff's performance that arose after her July 2004 evaluation, but which CNA asserts are legitimate, non-discriminatory reasons for its "treatment" of Plaintiff. These include Plaintiff's tardiness in publishing the Fall 2004 catalogue and alleged insubordination regarding posting the course offerings on the CNA website in January 2005. *See* Def.'s Mot. for Summ. J at 22. These events are of no legal consequence, however, because they clearly did not play a role in Plaintiff's July 2004 evaluation, which the Court has already determined to be the sole adverse employment action at issue.

> a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

*Carter*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

As discussed above, Plaintiff's prima facie case is extremely thin. Plaintiff establishes one adverse employment action – her July 2004 evaluation which coincided with Johnson's decision to give Plaintiff a 3% raise rather than the 5% that Johnson was authorized to give – and, while Plaintiff frames her discrimination claims in terms of disparate treatment, she completely fails to identify any similarly situated individual who was treated differently with respect to their July 2004 evaluation and raise.

In attempting to rebut CNA's proffered legitimate, non-discriminatory reasons, Plaintiff does not adduce additional evidence from which a reasonable fact-finder could infer intentional discrimination on the part of CNA. With respect to the Kost incident, Plaintiff asserts that she "unquestionably was racially offended by the incident because she had never observed Kost interact with his fellow white colleagues in a similar hostile manner," Pl.'s Opp'n at 18-20, but offers no evidence, other than her own speculation, that Kost's behavior was motivated by a racial animus. In any event, evidence of a discriminatory animus on Kost's part, alone, would not constitute evidence of discrimination on the part of CNA because Kost did not play a role in evaluating Plaintiff. *See Hall v. Giant Food*, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999); *Holbrook v. Reno*, 196 F.3d 255, 260-61 (D.C. Cir. 1999) (citing *Hall* for the proposition that "a supervisor's discriminatory remarks could not be considered evidence of discrimination because

51

the decision to dismiss the employee was made not by the supervisor, but by the company's [other personnel].").

Furthermore, Plaintiff asserts that "Johnson admits that she factored [Plaintiff's] purported single negative interaction with Kost negatively into her performance evaluation of [Plaintiff], but declined to make any reference to Kost's adverse negative and disrespectful conduct in Kost's evaluation," and that this "shows a clear different treatment of two similar employees based upon the same specific incident." Pl.'s Opp'n at 20 (citing Pl.'s Ex. F (1/12/06 Johnson Dep.) at 149, 161). This assertion is unsupported by the evidence, however, because Plaintiff's own July 2004 evaluation does not include any explicit reference to the Kost incident, or to any other incidents involving Plaintiff and her co-workers. *See* Pl.'s Ex. E (7/7/04 Valles-Hall Personnel Review Form). As such, Johnson's "factoring" of the Kost incident into Plaintiff's July 2004 evaluation – discussing it orally with Plaintiff but not specifically mentioning the incident in Plaintiff's written evaluation – actually appears to mirror Johnson's testimony that, while she did not include an explicit reference to the incident in Kost's evaluation, she was "sure" she factored the incident into Kost's evaluation. *See* Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 126:2-19.[20]

In connection with the Sanow incident, Plaintiff asserts that Johnson's conclusion that Plaintiff's response to Sanow's e-mail was "angry and defensive" demonstrates "Johnson's

---

[20] The Court further notes that Plaintiff makes no attempt to show that she and Kost are similarly situated, which would require her to "demonstrate that all of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 73 (D.D.C. 2005) (citing *Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd Phillips v. Holladay Corp.*, No. 96-7202, 1997 WL 411695 (D.C. Cir. Jun. 19, 1997)); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513-14 (D.C. Cir. 1995)), *aff'd* No. 05-7121, 2006 WL 1878891 (D.C. Cir. Jun. 27, 2006)).

application of a double-standard and stereotyping of [Plaintiff]." Pl.'s Opp'n at 20. Again, however, Plaintiff provides only her own speculation that Johnson's reaction to the incident demonstrated racial bias, and fails to rebut the record evidence demonstrating that Sanow reported the combination of Plaintiff's reply e-mail and follow-up phone call to Johnson. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16.

As Plaintiff's attempts to rebut CNA's proffered legitimate, non-discriminatory reasons fail to reveal any further evidence from which a reasonable fact-finder could infer intentional discrimination on the part of CNA, the Court next considers "'any further evidence of discrimination that may be available to the plaintiff,' as well as 'any contrary evidence that may be available to the employer.'" *Czekalski*, Slip Op. at 13 (citing *Aka*,, 156 F.3d at 1289). In her Opposition, Plaintiff maintains that Johnson's "cultural thing" comment reveals her bias against Plaintiff, "evidenc[es] a hostility towards [Plaintiff] and her cultural identity," and demonstrates that Johnson exaggerated Plaintiff's performance problems. Pl.'s Opp'n at 23-24. As discussed above, although Johnson's "cultural thing" comment is a stray remark that does not suffice as direct evidence of discrimination, it clearly ascribes negative characteristics to Plaintiff's ethnicity or national origin and thus is probative of a discriminatory animus. However, when viewed in context and in light of Johnson's explanation of her remark at her deposition, Johnson's "cultural thing" comment appears to be an uninformed and insensitive statement rather than an intentionally discriminatory statement. *See* Def.'s Ex. 18 (Pl.'s notes of 8/6/04 meeting with Johnson) at 4; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 199:14-201:16.

Plaintiff also asserts that CNA's "faux investigation conducted by Mary Ann de Barbieri, chairperson of the Board of Directors, is further evidence of . . . [CNA's] management

sanctioning of this discrimination." Pl.'s Opp'n at 26. In support of this argument, Plaintiff

points to de Barbieri's admissions during her deposition that she did not investigate the

truthfulness of the various complaints on which Johnson purportedly based Plaintiff's July 2004

evaluation, *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 136-37), and did not review the

performance evaluations of "similarly situated white employees," *id.* (citing Pl.'s Ex. N (2/28/06

de Barbieri Dep.) at 110-11).[21] However, as discussed above, Plaintiff's August 16, 2004

complaint to de Barbieri only asserted that "[t]he scores and process [for her July 2004

evaluation were] unfounded and biased on the basis of race, national origin and, possibly,

retaliation," Def.'s Ex. 13 (8/16/04 e-mail from Valles-Hall to de Barbieri), and Plaintiff did not

supplement this complaint when invited to do so by de Barbieri and Johnson. As such, the

relevant inquiry for de Barbieri's investigation was whether Plaintiff's co-workers had, in fact,

made the complaints on which Johnson based Plaintiff's July 2004 evaluation, and whether

Plaintiff experienced the same evaluation process as other CNA employees, facts that de Barbieri

confirmed in her investigation. Def.'s Ex. 14 (de Barbieri Draft Report) at 1-4.

For its part, CNA asserts that it is entitled to a "same actor inference" because Johnson,

who allegedly took discriminatory action against Plaintiff in the form of her July 2004

evaluation, also interviewed Plaintiff, hired her, and gave her substantial raises. Def.'s Mot. for

Summ. J. at 17. While CNA describes this inference as precluding a fact-finder from finding

---

[21] Plaintiff also asserts that de Barbieri did not investigate an observation allegedly made by an unidentified African-American female former CNA employee that "[t]here is an issue with race." Pl.'s Opp'n at 26 (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 100-01. However, as Plaintiff fails to identify this CNA employee or indicate the context in which the observation is allegedly made, the Court lacks any basis on which to determine whether de Barbieri's decision not to investigate the observation is indicative of a racial animus.

discrimination, Plaintiff correctly notes that the same actor inference is just that, an inference, which "cannot immunize [defendant] from liability for subsequent discrimination," *Czekalski*, Slip Op. at 15.  Nevertheless, in considering the ultimate question of discrimination *vel non*, the Court finds persuasive the fact that Johnson hired Plaintiff, gave her a perfect evaluation, and raised her salary to make her the third highest-paid CNA employee, all within the fourteen months before Plaintiff's July 2004 evaluation.  *See Waterhouse*, 124 F. Supp. 2d at 12-13 (citing "same actor inference" cases from the Second, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits).

CNA also argues that because Plaintiff describes herself as a "woman of color" the fact that she was replaced by an African-American woman – whom CNA describes as someone within Plaintiff's protected class – cuts strongly against any inference of discrimination.  Def.'s Mot. for Summ. J. at 17-18.  Plaintiff's Opposition correctly notes that, despite describing herself as a "woman of color," because she identifies herself as Latino or Hispanic, Plaintiff is not a member of the same protected class as an African-American.  Pl.'s Opp'n at 8 (citing *Dancy v. Am. Red Cross*, 972 F. Supp. 1, 3-4 (D.D.C. 1997)).  Nevertheless, as the D.C. Circuit points to "evidence of a strong record in equal opportunity employment" as an example of "contrary evidence that may be available to the employer" *Aka*, 156 F.3d at 1289, the Court notes that just prior to Plaintiff's resignation in February 2005, the CNA Board had 13 directors – six African-Americans, six whites, and one Latino – and that CNA had a staff of 13 people – six African-Americans, six whites, and one Latina.  Def.'s Stmt. ¶¶ 56-57; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) ¶¶ 18-19.

In sum, Plaintiff would seek to have this Court conclude that she was subject to disparate

treatment discrimination on the basis of her race based on (1) the fact that she received a lower,

but still positive, evaluation and a coincidentally lower raise in July 2004 than in June 2003; (2)

her unfounded assertion that she was treated differently from her white co-workers with respect

to her July 2004 evaluation; (3) her claims that Johnson and de Barbieri failed to properly

investigate the truth of the incidents underlying Plaintiff's July 2004 evaluation; and (4)

Johnson's "cultural thing" comment.  While it is clear that Plaintiff is unhappy with her

professional experience at CNA, courts "have consistently declined to serve as a super-personnel

department that reexamines an entity's business decisions."  *Holcomb v. Powell*, 433 F.3d 889,

897 (D.C. Cir. 2006) (internal citation and quotation marks omitted); *see also Forman v. Small*,

271 F.3d 285, 291 (D.C. Cir. 2001) (stating that "consistent with the courts' reluctance to became

involved in micromanagement of everyday employment decisions, the question before the court

is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not

whether he was treated fairly.").  Plaintiff has proffered a weak prima facie case, has failed to

rebut CNA's legitimate, non-discriminatory reasons for her July 2004 evaluation, and has failed

to adduce any additional evidence of a discriminatory intent on the part of CNA.  Based on the

totality of the evidence before the Court, a fact-finder could not reasonably conclude that CNA

subjected Plaintiff to disparate treatment on the basis of her race.  As such, the Court shall grant

Defendants' Motion for Summary Judgment with respect to Counts I and VIII of Plaintiff's

Amended Complaint.

  B. *Plaintiff's Retaliation Claim*s

  Plaintiff's Complaint asserts a claim of retaliation under the DCHRA, alleging that

Plaintiff complained to Johnson "about the disrespectful behavior she encountered from her co-

workers" and that Johnson "thereafter, retaliated against Plaintiff in several aspects." Compl. ¶¶ 41-44. Plaintiff's Amended Complaint, which asserts a claim of retaliation under § 1981, is more specific, alleging that Plaintiff engaged in statutorily protected activity when she raised incidents of disparate treatment to Johnson and de Barbieri and filed a grievance with the OHR, and that CNA retaliated against Plaintiff by lowering her performance evaluations, ignoring her claims of disparate treatment, increasing work demands on her, threatening to terminate her regarding her use of sick leave, and constructively discharging her. Am. Compl. ¶¶ 68-72. The Court shall only address Plaintiff's claim pursuant to § 1981 because that claim encompasses the protected activities and retaliatory actions alleged in Plaintiff's claim under the DCHRA.

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).[22] To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) a reasonable employee would have found the challenged action so materially adverse that he would have been dissuaded from making or supporting a charge of discrimination; and (3) a causal connection exists between the protected activity and the challenged retaliatory act.

―――――――――――――――

[22] It does not appear that the D.C. Circuit has ever clearly decided that claims of retaliation are actionable under § 1981. *See Carney*, 151 F.3d at 1094-95 (assuming without deciding that plaintiff could pursue retaliation claim under § 1981). However, the Court notes that the Civil Rights Act of 1991 added a subsection to § 1981 defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b); *see also Rivers*, 511 U.S. at 300, 114 S. Ct. 1510, and that "in the aftermath of the 1991 Act, a number of courts have concluded that certain retaliatory discharge claims are actionable under § 1981," *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998).

*Rochon v. Gonzalez*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). "An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212-13 (D.D.C. 2006)). However, the "alleged discriminatory treatment    . . . cannot be generic; rather, the plaintiff must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation." *Id.* (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). Thus, "to be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Hawkins*, 163 F.3d at 693.

Furthermore, the Supreme Court recently clarified in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 165 L. Ed. 2d 345, that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id.* at 2414, the anti-retaliation provision of Title VII is "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412-13. In so doing, however, the Supreme Court emphasized that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Moreover, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415. It is therefore " important to separate significant from trivial harms," *id.*, and to recognize that "the significance of any given act of retaliation will often depend upon the particular circumstances," *id.* at 2415-16.

58

Here, Plaintiff points to five separate instances in which she "lodged formal complaints of discrimination or otherwise participated in protected speech." Pl.'s Opp'n at 27. These include: (1) Plaintiff's conversations with CNA Vice-Chairman Tim Kime in April 2004, during which Plaintiff alleges she told Kime that Ransom was being treated in a discriminatory way and that Plaintiff was caught in the cross-hairs; (2) Plaintiff's August 4, 2004 letter to Johnson complaining that she believed her July 2004 evaluation and raise to be the result of disparate treatment; (3) the charge of discrimination that Plaintiff filed with the OHR on August 9, 2004; (4) Plaintiff's August 16, 2004 e-mail to de Barbieri asserting that Plaintiff's July 2004 evaluation was unfounded and biased and requesting an investigation; and (5) Plaintiff's participation in the mediation of her OHR complaint on February 11, 2005. Pl.'s Opp'n at 27-29.

Plaintiff also asserts that five separate actions taken by CNA amount to materially adverse actions under the standard announced in *Burlington*. Pl.'s Opp'n at 30. These include: (1) penalizing Plaintiff in her July 2004 evaluation "for conduct relative to internal disputes and job performance for which her white counterparts were not penalized;" (2) subjecting Plaintiff to a different standard than her white counterparts and threatening Plaintiff with termination for taking medical leave during the Fall of 2004; (3) refusing to conduct a meaningful investigation into Plaintiff's allegations of racial bias (presumably in connection with the de Barbieri investigation in the Fall of 2004); (4) at some unspecified time and in an unspecified manner, altering Plaintiff's job duties so as to impose more arduous tasks upon her; and (5) constructively discharging Plaintiff during the weekend of February 12-13, 2005 by locking her out of the CNA building and denying her remote access to CNA's computer system and voicemail. Pl.'s Opp'n at 30-31.

Plaintiff fails, however, to establish a prima facie case of retaliation, either because she cannot demonstrate a materially adverse action, or because she fails to identify the requisite causal connection between her protected activity and CNA's allegedly retaliatory actions. First, Plaintiff asserts that her April 2004 complaint to Kime that her co-worker, Ransom, was being treated in a discriminatory manner was followed closely in time by her July 2004 evaluation and 3% raise. Pl.'s Opp'n at 31-32. As the Court concluded above, the combination of Plaintiff's July 2004 evaluation and raise would constitute a materially adverse action; nevertheless, Plaintiff fails to rebut CNA's assertion that Johnson did not know of Plaintiff's complaint to Kime prior to this litigation. Def.'s Reply at 8; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 22:16-21. As such, Plaintiff fails to establish the requisite causal connection between her protected activity and the materially adverse action. *See Carney*, 151 F.3d at 1095 ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse [] action took place shortly after that activity.") (citing *Mitchell*, 759 F.2d at 86).[23]

---

[23] Plaintiff also asserts that, in addition to complaining to Kime regarding the Post Award management change, by the time of her July 2004 evaluation, Plaintiff had complained to Johnson regarding the Kost incident and Baird's offensive conduct towards the African-American volunteer. Pl.'s Opp'n at 31-32. However, Plaintiff's complaints regarding these incidents do not constitute protected activity because Plaintiff has not shown that it was objectively reasonable for her to believe that she was opposing an employment practice that was violative of either the DCHRA or § 1981. *See Welzel v. Bernstein*, 436 F. Supp. 2d 110, 120-21 (D.D.C. 2006). As discussed above, Plaintiff offers nothing other than her own speculation that either Kost or Baird's behavior was motivated by a racial animus. Moreover, even if Kost or Baird acted in a racially offensive manner, Plaintiff could not reasonably believe that stray remarks or isolated actions on the part of non-decisionmakers constituted unlawful employment discrimination. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271-272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (plaintiff's complaints not protected activity where "[n]o reasonable person could have believed that the single incident [in question] violated Title VII's standard.").

Plaintiff asserts that her next three protected activities – her August 2004 complaints to Johnson, OHR, and de Barbieri regarding her July 2004 evaluation[24] – were followed shortly by Johnson's November 2004 inquiry into Plaintiff's absences due to alleged illness and demand for a doctor's note, practices to which, Plaintiff asserts, no other CNA employee was subjected. Pl.'s Opp'n at 32. However, as discussed above, Plaintiff does not identify any other CNA employee who was treated differently with respect to medical leave, and Johnson was entirely authorized under the CNA Personnel Handbook to request that Plaintiff provide a doctor's note regarding her excessive absences. Moreover, even if Plaintiff is correct that Johnson threatened to terminate Plaintiff for her use of sick leave, that threat was not carried out, and did not produce an injury or harm. As such, it does not constitute a materially adverse action. *See Burlington*, 126 S. Ct. at 2414-15 ("[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Plaintiff also identifies as materially adverse actions CNA's alleged refusal to meaningfully investigate Plaintiff's claims of racial bias with respect to her July 2004 evaluation and CNA's alleged tasking of Plaintiff with more arduous duties. However, as discussed above, Plaintiff fails to provide any specification as to her allegedly altered job duties, or to demonstrate that de Barbieri's investigation was insufficient with regards to Plaintiff's actual complaint.

---

[24] Johnson was obviously aware of Plaintiff's August 2004 complaint to Johnson herself, and was also aware of Plaintiff's August 2004 complaint to de Barbieri because de Barbieri interviewed Johnson during the Fall of 2004 in connection with her investigation of Plaintiff's complaint. However, as noted above, Plaintiff does not contest CNA's assertion that Johnson did not learn of Plaintiff's OHR charge until December 2004, when CNA was served with notice of the charge. Def.'s Stmt. ¶ 37; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 151:13-18; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 127:2-8. As a result, Plaintiff cannot demonstrate that any actions Johnson took prior to December 2004 were in retaliation for Plaintiff's filing of her OHR complaint.

Moreover, Plaintiff makes no attempt to link either of these alleged materially adverse actions to any of Plaintiff's protected activities, and the Court declines to engage in speculation as to what causal connections Plaintiff believes exist.

Finally, Plaintiff asserts that CNA retaliated against her immediately following the February 11, 2005 mediation by locking her out of the CNA offices and denying her remote access to CNA's computer system and voicemail during the February 12-13 weekend. However, as discussed above, Plaintiff has proffered no evidence that she was aware of the lockout and, in fact, the evidence demonstrates that she did not learn that she had been purposefully locked out until after she resigned her employment with CNA on February 14, 2005. As Plaintiff appears to have been entirely unaware of the lockout, she cannot claim that she suffered an injury or harm as a result, and therefore cannot demonstrate a materially adverse action on the part of CNA.[25]

The Court therefore concludes that Plaintiff cannot establish a prima facie case of retaliation. Moreover, even if the Court were to assume, *arguendo*, that Plaintiff could make out a prima facie case of retaliation, Plaintiff could not avoid summary judgment on her retaliation claims for the same reasons that are fatal to her discrimination claims. Plaintiff fails to demonstrate that CNA's legitimate, non-retaliatory reasons for its treatment of Plaintiff are pretext, nor does she proffer additional evidence from which a reasonable fact-finder could infer a retaliatory motive on the part of CNA. In sum, as with her discrimination claims, Plaintiff cannot bear her "ultimate burden of persuading the court that she has been the victim of

---

[25] Plaintiff emphasizes that CNA employees testified that they were instructed to lock Plaintiff out of the CNA building over the February 12-13 weekend because the mediation had gone poorly. *See* Pl.'s Opp'n at 32-33. However, as Plaintiff cannot demonstrate that the February 12-13 lockout constituted a materially adverse action, her emphasis on the causal connection between the mediation and the lockout is of no legal consequence.

intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. As no reasonable trier of fact could conclude that CNA retaliated against Plaintiff for any of her complaints alleging race discrimination with respect to her assignments or evaluations, Counts III and VII of Plaintiff's Complaint and Amended Complaint cannot survive Defendants' Motion for Summary Judgment.

### IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date:   March 12, 2007

                                    _____/s/_____
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge

63